UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
CASAS, BENJAMIN & WHITE, LLC            )
                                        )
        Plaintiff,                      )
                                        )
                vs.                     )   No.
                                        )
THE POINTE GROUP, INC., a               )   JURY TRIAL DEMANDED
Massachusetts corporation d/b/a The Pointe )
Group Healthcare and Senior Living;     )
GERALD S. FREID; BARRY FREID;           )
KEY CORPORATE CAPITAL, INC.             )
        Defendants.                     )
```

## COMPLAINT

Plaintiff Casas, Benjamin & White LLC (hereinafter, "Plaintiff" or "CBW") files this Complaint and Demand for Jury Trial against The Pointe Group, Inc. d/b/a "The Pointe Group Healthcare and Senior Living" (hereinafter, "TPG"), Gerald S. Freid and Barry Freid (hereinafter, collectively, "the Freids"), and Key Corporate Capital, Inc. (hereinafter, "Key Bank"), and states as follows:

### NATURE OF ACTION

1.      This case is brought against TPG, the Freids, and Key Bank (hereinafter, collectively, "Defendants") to recover money damages in excess of one million dollars that Plaintiff suffered as a result of services that Plaintiff performed for the benefit of Defendants and for which Plaintiff was never paid. Plaintiff alleges that some or all Defendants breached a contract with CBW and breached the implied covenant of good faith and fair dealing, or were unjustly enriched by the benefits that they wrongfully derived from Plaintiff's services, and

engaged in fraudulent misrepresentation, civil conspiracy, aiding and abetting, and violations of Mass. G.L. c. 93A. Plaintiff seeks recovery of actual damages, double or treble damages, costs and attorneys' fees by virtue of Defendants' willful or knowing, unfair and/or deceptive acts.

## JURISDICTION AND VENUE

2. Jurisdiction as to all Defendants is based on 28 U.S.C. §1332, in that there is complete diversity of citizenship and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

3. Venue is proper in this district under 28 U.S.C. §1391(a).

## PARTIES

4. Plaintiff is a duly-constituted limited liability company organized under the laws of the State of Delaware with a principal place of business in Skokie, Illinois.

5. Defendant TPG is a duly-constituted Massachusetts corporation with a last and usual place of business in Chestnut Hill, Norfolk County, Massachusetts. At all material times, TPG, its shareholders and affiliates did business as The Pointe Group Healthcare and Senior Living ("Senior Living"), operating as a management company of five private nursing homes and two assisted living facilities located throughout the Boston and Cape Cod areas.

6. Defendants Gerald S. Freid and Barry Freid are residents of Needham, Norfolk County, Massachusetts. On information and belief, the Freids are brothers. At all material times, Defendant Gerald S. Freid identified himself as vice-president of TPG. Defendant Barry Freid is TPG's treasurer and, at all material times, represented that he was chief operating officer of TPG.

7. Key Bank is a duly-constituted corporation organized under the laws of the State of Ohio with headquarters in Cleveland, Ohio. At all relevant times, Key Bank operated through its agent, Steven C. Dunham, a Vice-President based in Key Bank's Albany, New York office.

## FACTUAL ALLEGATIONS

8. In or about the summer of 2003, TPG was deeply in debt and facing the prospect of foreclosure on certain facilities because it was unable to pay its debts related to these certain facilities as they came due.

9. Defendant Key Bank was among the creditors to whom TPG owed substantial sums of money.

10. At least three of the facilities owned and managed by Defendant TPG were financed by Defendant Key Bank. Specifically, these facilities (hereinafter, "Combined Operations") were: (1) Hammond Pointe Nursing Home, LLC, a business providing long-term care, Alzheimer's care, and sub-acute care; (2) Boylston Place At Chestnut Hill, LLC, a business providing assisted living services; and (3) Cranberry Pointe Nursing Home, Inc., a business providing long-term care, Alzheimer's care, and sub-acute care among other services.

11. Key Bank was the senior secured lender on loans to Defendant TPG for the Combined Operations, and in the summer of 2003 the amount of indebtedness to Key Bank exceeded the market valuation of the Combined Operations. On information and belief, Defendant Key Bank was threatening to foreclose on its loan to TPG.

12. In order to reduce its debt with Defendant Key Bank and obtain a release of the liens that Key Bank had on Defendant TPG's assets, TPG decided to sell the Combined Operations or refinance them with another lender.

13. During the summer of 2003, Plaintiff was contacted by Steven C. Dunham, an employee of Defendant Key Bank. Dunham represented that he was a Vice-President of Key Bank with general responsibilities in Key Bank's Asset Recovery program and was specifically assigned as the officer in charge of the TPG loan.

14. Dunham explained that the purpose of his call was to urge Plaintiff to agree to perform restructuring activity and transaction services that would allow Defendant TPG to reduce its debt with Defendant Key Bank.

15. Between the months of July and September 2003, Plaintiff, Defendant TPG, and Dunham engaged in extensive negotiations regarding the operative terms of an Engagement Letter between Defendant TPG and Plaintiff. Defendant Key Bank was involved throughout these negotiations and approved the terms of the Engagement Letter.

16. On September 4, 2003, the Engagement Letter was executed and signed by Kelley W. White, then the managing director of CBW. A true copy of the Engagement Letter is attached as Exhibit A.

17. Contemporaneously, Plaintiff executed an Indemnification Agreement, a true copy of which is attached as Exhibit B, whereby Defendant TPG agreed to indemnify and hold harmless CBW from any losses arising in connection with the engagement.

18. On September 12, 2003, the Engagement Letter and the Indemnification Agreement were accepted, acknowledged and agreed to by Defendant TPG and signed by Defendant Gerald S. Freid, in his capacity as vice president.

19. Under the terms of the Engagement Letter, Plaintiff was to act as financial and management advisor to assist Defendant TPG in evaluating certain financial and operating restructuring initiatives ("Restructuring Services").

20. In addition, the Engagement Letter required Plaintiff to act as Defendant TPG's "exclusive capital restructuring advisor to effect the sale and/or refinance" of the Combined Operations ("Investment Banking Services").

21. As consideration for Plaintiff's Restructuring Services, Defendant TPG agreed to pay Plaintiff a retainer of $50,000 against which CBW would charge reasonably incurred fees and expenses at fixed hourly rates.

22. The Engagement Letter provided that, upon exhaustion of the $50,000 retainer, Plaintiff would have no further obligation to provide additional Restructuring Services absent mutual agreement between the parties on an additional compensation arrangement.

23. As consideration for Plaintiff's Investment Banking Services, Defendant TPG agreed that it would pay Plaintiff additional compensation pursuant to a formula entitling Plaintiff to a percentage of the value of any transactions consummated in connection with the sale and/or refinance of TPG's Combined Operations. This additional compensation was to be due and payable at the closing of each transaction between Defendant TPG or any of its affiliates and any individuals or entities identified by Plaintiff to Defendant TPG during the term of the engagement.

24. The Engagement Letter expressly provided that Plaintiff would be notified and invited to attend all closings pertaining to all such transactions, and that all definitive agreements memorializing any transaction would specifically delineate the responsibility to CBW arising as a result of the transaction.

25. As reflected in the Engagement Letter, the parties also recognized and expressly agreed that CBW would be acting as an independent contractor and not as a broker, dealer or broker-dealer.

26. In addition, the Engagement Letter obligated Defendant TPG to reimburse Plaintiff for out-of-pocket expenses incurred as a result of the services rendered under the Engagement Letter.

27. Between September and December of 2003, and in reliance on representations made by Defendants TPG and the Freids, Plaintiff performed Restructuring Services on behalf of TPG.

28. In December 2003, Defendant Gerald S. Freid represented that it was necessary to interrupt attempts at restructuring Defendant TPG's debt and Plaintiff's efforts to execute this work plan and instead, at his request, to initiate a solicitation process with the objective of selling or refinancing the Combined Operations.

29. During the same period, Steven C. Dunham, on behalf of Defendant Key Bank, also urged Plaintiff to commence the solicitation process with the objective of selling or refinancing the Combined Operations.

30. The parties agreed to proceed with the solicitation efforts and drafted a revised timeline to govern the process, a true copy of which is attached as Exhibit C. The parties also agreed that Defendant Key Bank would receive regular progress reports, as allowed and agreed to in the Engagement Letter.

31. On December 20, 2003, Plaintiff informed Defendants Gerald S. Freid and TPG that the initial retainer provided for the Restructuring Services had been exhausted.

32. On January 14, 2004, Defendant Gerald S. Freid, acting on behalf of Defendant TPG, accepted, acknowledged and agreed to a written amendment to the Engagement Letter, a true copy of which is attached as Exhibit D.

33. Pursuant to the terms of the amendment, CBW was to continue providing Restructuring Services through the end of January. It was anticipated that the cost of these services would require an additional $50,000.

34. Defendant TPG agreed to replenish the Restructuring Services Fee Retainer in the amount of $50,000 as consideration for Plaintiff continuing to provide Restructuring Services in accordance with the timeline.

35. The amendment also provided that, beginning on or around January 23, 2004, Plaintiff at the directive of TPG and Dunham would commence working exclusively on the solicitation process by providing Investment Banking Services intended to culminate in the sale of the Combined Operations.

36. In reliance on the amendment to the Engagement Letter, as well as on representations made by Defendants, Plaintiff provided Restructuring Services in compliance with its contractual obligations through the end of January 2004 and also provided Investment Banking Services as part of the solicitation process.

37. As part of that process, Plaintiff gathered information regarding the Combined Operations and their worth. The total revenue generated by the Combined Operations during the twelve month period ending in September 2003 was approximately $21.7 million.

38. Revenue generated by the Cranberry Pointe Nursing Home business had dropped precipitously during the summer months of 2003 after allegations of patient abuse surfaced and received wide-spread publicity.

39. In January 2004, the Attorney General of Massachusetts filed a complaint against a Cranberry Pointe Nursing Home employee charging him with numerous counts of assault and battery and abuse of patients.

40. On January 28, 2004, the Attorney General's Office announced that it was continuing to investigate whether supervisors at Cranberry Pointe Nursing Home could also be held liable in connection with reports that abuse and neglect were ongoing problems with this business.

41. The publicity resulting from these charges and the ongoing investigation by the Attorney General's Office had an adverse effect both on Defendant TPG's revenue as well as on Plaintiff's ability to attract lenders or investors willing to refinance or acquire an interest in the Combined Operations.

42. Between January and May 2004, Plaintiff expended time, money and other resources to further the solicitation process, which included preparation of offering materials and communications with potentially interested parties.

43. All of the Defendants were regularly apprised of Plaintiff's efforts in connection with the solicitation process. In addition, Stephen F. Gordon, of the law firm Gordon Haley LLP, involved himself in the process on behalf of Defendants TPG and/or the Freids.

44. In May 2004, Plaintiff presented Defendant TPG with 12 Letters of Interest ("LOI") from parties interested in either acquiring or refinancing the Combined Operations.

45. Subsequently, Defendant TPG selected Epoch Senior Living ("Epoch"), one of the parties identified by Plaintiff, as the preferred party with whom to enter into negotiations for the sale of the Combined Operations.

46. A Purchase and Sales Agreement ("P&S Agreement") was drawn up between Defendant TPG and Epoch. On information and belief, Stephen F. Gordon was involved in the drafting and negotiation of this document on behalf of Defendants TPG and/or the Freids.

47. At that time, Plaintiff contacted Defendant Barry Freid in an attempt to obtain a copy of the draft P&S Agreement, explaining that receipt of such agreements was typical of engagements in which CBW provided Investment Banking Services. Defendant Barry Freid refused to provide a copy of the draft agreement.

48. Defendant Key Bank was apprised of Plaintiff's interest in obtaining a copy of the draft P&S Agreement and of Barry Freid's refusal to provide one. On behalf of Defendant Key Bank, Dunham urged CBW not to insist on obtaining a copy because Key Bank wanted the parties to stay focused on completing the sale and to avoid any dispute that might unsettle Defendant TPG and impact the Epoch sale. Defendant Key Bank reassured Plaintiff that it would safeguard CBW's economic interests as provided for under the Engagement Letter and amendment.

49. In reliance on Defendant Key Bank's representations, Plaintiff did not insist on reviewing the language of the P&S Agreement.

50. On information and belief, the P&S Agreement governed the sale of the Combined Operations, including the transfer of the management and employment contracts in place between Defendant TPG and personnel employed by the businesses that were being sold. The sale contemplated by the P&S Agreement is hereinafter referred to as the "Transaction."

51. Retention of the personnel working within the Combined Operations was important to Epoch because the presence of experienced staff within an industry that is hampered by a dearth of qualified personnel would increase the value of the acquired assets.

52. Towards the end of May 2004, while the P&S Agreement was still being negotiated by the parties, Epoch contacted Plaintiff to express its concerns that Defendant TPG

was attempting to retain control over certain key employees and that TPG would not allow Epoch to discuss employment opportunities with these employees.

53. Plaintiff communicated Epoch's concerns to the Defendants and Gordon knowing that, unless they were addressed, the Transaction would not be finalized.

54. On May 28, 2004, Gordon notified Plaintiff by e-mail that Epoch had placed additional non-negotiable demands on Defendant TPG. Gordon accused Plaintiff of working to further the interests of Epoch and of having acted in a way that was detrimental to Defendant TPG's interests and that Gordon found personally offensive.

55. In that email, which he also sent to Defendants TPG and the Freids, Gordon falsely insinuated that Plaintiff was working for Epoch and that CBW's actions were detrimental to the interests of TPG. Gordon urged TPG and the Freids to instruct Plaintiff to desist from any further communications with Epoch.

56. Also on May 28, 2004, Defendant Barry Freid wrote a letter to Plaintiff referencing the information imparted to him by Gordon and instructing CBW to cease its involvement with the sale process.

57. During the same time period that Defendants TPG and the Freids, as well as Gordon, were seeking to eliminate Plaintiff's involvement in the sale, they were also interceding with Plaintiff to reduce its fee. On or about June 2, 2004, Defendant Barry Freid, in his capacity as chief operating officer of Defendant TPG, wrote a letter to Plaintiff in which he stated that, under the terms of CBW's Engagement Letter, CBW would be entitled to a fee of $1.25 million in connection with a sale price of $37 million for the Combined Operations. In the letter, Barry Freid appealed to CBW to adjust its fee downward.

58.  Defendant Key Bank was aware that Defendant TPG had contacted Plaintiff in an attempt to negotiate a reduction in the amount of the fee that was due CBW. Dunham reassured Plaintiff that Key Bank would insist on having CBW's fee structured into the closing to cover CBW's interests as a condition for providing documents that would allow the sale to move forward. On information and belief, Epoch wanted certain assurances in order to go forward with the Transaction because it realized that the purchase price would be insufficient to cover the full extent of Defendant TPG's obligations to Defendant Key Bank. Epoch, therefore, wanted written assurances that Defendant Key Bank would agree to the Transaction and release its liens on the Combined Operations upon conclusion of the Transaction.

59.  On June 3, 2004, Plaintiff wrote a letter to Defendant Barry Freid referencing his May 28, 2004 communication discussing the Transaction, with copies to Defendant Gerry S. Freid and to Gordon. Plaintiff's letter proposed a telephone conference for the following day in order to discuss the accusations levied by Gordon and to assure CBW that the fiduciary obligations of TPG and its principals would continue to be satisfied.

60.  On June 4, 2004, Plaintiff, Defendants TPG and the Freids, as well as Gordon, held the planned telephone conference. Plaintiff, on Defendant TPG's behalf, agreed to intercede with Defendant Key Bank to ensure that the bank would provide the "comfort letter" required by Epoch.

61.  During the phone conference, Defendants TPG and the Freids, as well as Gordon, reassured Plaintiff that the terms of the Engagement Letter would be honored and that CBW should continue to provide its services, under agreed rules of engagement detailed below, with the objective of finalizing the Transaction with Epoch. Gordon said that CBW had done everything asked of it.

62. Shortly after the telephone conference, Gordon e-mailed Plaintiff to apologize for having falsely accused CBW of acting improperly and to thank Plaintiff for interceding with Defendant Key Bank. Gordon acknowledged that, without the services rendered by CBW, the Transaction would not have been possible and reassured Plaintiff that CBW's continued involvement was a necessary component to concluding the Transaction.

63. As a result of the telephone conference, Plaintiff agreed with Defendants TPG and the Freids and with Gordon that: (1) CBW would be provided daily written status reports relating to diligence efforts on the Transaction; (2) bi-weekly conference calls would be held to discuss the status of the Transaction; (3) Plaintiff would involve a TPG representative in any communications had with Epoch; (4) CBW would make itself fully available to assist in due diligence support; and (5) CBW would contact Defendant Key Bank to inquire as to any flexibility in negotiations regarding the net distributable proceeds from the Transaction.

64. On July 13, 2004, a meeting was held between representatives of Epoch, TPG, Key Bank, and CBW. The meeting took place in Massachusetts and was attended by Gordon and the Freids, among others.

65. During the meeting, the parties discussed the problems related to Cranberry Pointe Nursing Home's profitability [and other findings related to the Combined Operations] and Epoch proposed a reduction in the purchase price.

66. After the presentation, Defendants TPG and Key Bank agreed to meet separately and Gordon expressly instructed Plaintiff to leave the meeting room to allow TPG and Key Bank to resolve negotiations as to the revised purchase price.

67. Epoch's proposal to reduce the purchase price was not agreed to and the meeting ended without the parties reaching a final agreement as to the terms of the Transaction.

-12-

68. On July 14, 2004, Defendant TPG, through Defendant Gerald S. Freid, requested that Plaintiff reduce its fee to a lump sum of $800,000 in order to facilitate the closing, thereby acknowledging that, upon closing of the Transaction, the contracted-for fee would be due and owing to CBW.

69. On July 15, 2004, Plaintiff discussed Defendant TPG's request for a fee reduction with Defendant Key Bank and received assurances that Plaintiff's fee would come straight off the top of the sale's proceeds at closing and that Key Bank was committed to protecting Plaintiff's interests by refusing to release its security interests in TPG's property unless Plaintiff's fee was wired.

70. In reliance on these assurances, Plaintiff sent an e-mail to Defendant Gerald S. Freid in which CBW offered to accept a lump sum transaction fee of $1 million, instead of the $1.25 million that had been originally calculated, along with reimbursement of out-of-pocket expenses, including travel-related expenses associated with CBW's participation in the July 13, 2004 meeting.

71. In an e-mail dated July 15, 2004, Gordon informed Plaintiff that the Epoch deal could not be concluded unless CBW further reduced the amount of its fee. Gordon also noted that he was personally offended by Plaintiff's attempt to recover travel expenses because he felt that Plaintiff's presence at the July 13 meeting was unnecessary, that Defendant TPG felt likewise, and that, nevertheless, he had personally acted to ensure that Plaintiff was invited to attend at its own expense.

72. The next day, Dunham notified CBW that agreement had been reached between all parties and told Plaintiff that the fee due CBW was unaffected by negotiations.

73. On or about August 20, 2004, Plaintiff contacted Defendant Key Bank and was informed that the P&S Agreement for the sale of the Combined Operations was complete, except for the exhibit schedules, and pending approval of the transfer to Epoch by the State regulatory agency.

74. Upon learning this information, Plaintiff requested that it be provided a copy of the final P&S Agreement, but Defendant Key Bank refused to supply one while continuing to assure CBW that its fee would be paid out of the sale's proceeds. Plaintiff then contacted Gerald S. Freid to follow-up on the request for a copy of the P&S Agreement, but Freid denied any awareness that the P&S Agreement had been completed.

75. On September 1, 2004, Gordon sent Plaintiff an e-mail purporting to recite that portion of the P&S Agreement referencing CBW's role as an agent in securing the Transaction and Defendant TPG's obligation to hold Epoch harmless for any claims on the part of CBW and acknowledging Defendant TPG's obligation to pay CBW's fee.

76. Contrary to the agreement of the parties set forth in the Engagement Letter, the P&S Agreement misrepresented the nature of Plaintiff's engagement by referring to it as the Broker for Defendant TPG and misrepresented the nature of the contractual relation between the parties by referring to the Engagement Letter as a Brokerage Agreement.

77. On September 2, 2004, Plaintiff communicated with Defendant Key Bank to discuss (i) Gordon's September 1, 2004 e-mail and (ii) the fact that Plaintiff had not seen the P&S Agreement that was now purportedly complete. Having again been directed by Defendant Key Bank to avoid upsetting Defendants TPG and the Freids by requesting the P&S Agreement, CBW sought assurances that its fee would be covered at the closing. CBW and Defendant Key Bank discussed how CBW would receive its payment and how Key Bank would protect payment

of CBW's fee by controlling the logistics of the closing to ensure that payment for Plaintiff's services would occur.

78. On information and belief, the transfer of ownership interests in the Combined Operations could not be finalized absent approval by the Massachusetts Department of Public Health ("DPH") of a licensure transfer from Defendant TPG to Epoch.

79. On September 14, 2004, the DPH held a public hearing at Cape Cod, Massachusetts on the proposed transfer.

80. On September 21, 2004, Defendant Gerald S. Freid contacted Plaintiff to inform it that: (1) the DPH was close to approving the licensure transfer; (2) that TPG was under investigation for the patient abuse problems at Cranberry Pointe Nursing Home; and (3) he was unable to honor an invoice submitted by Plaintiff for out-of-pocket expenses that had been incurred, but that he would make payment of the invoice and of CBW's fee at the closing.

81. On September 24, 2004, Plaintiff spoke with Defendant Key Bank and was informed that Epoch had issued an ultimatum regarding the price it was willing to pay for the transfer of ownership interests in the Combined Operations due to an unresolved easement problem and further problems at Cranberry Pointe Nursing Home.

82. During this communication, Defendant Key Bank also informed Plaintiff that Defendant TPG had allegedly asked it to absorb the adjustment between what Epoch was willing to pay and Defendant TPG's asking price, and had threatened to file bankruptcy papers if Defendant Key Bank refused to absorb the difference. Defendant Key Bank requested that CBW agree to reduce the fee to which it was entitled in order to help the Transaction close.