UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CASAS, BENJAMIN & WHITE, LLC<br><br>Plaintiff,<br><br>v.<br><br>THE POINTE GROUP, INC., a Massachusetts corporation d/b/a The Pointe Group Healthcare and Senior Living; GERALD S. FREID; BARRY FREID; KEY CORPORATE CAPITAL, INC.,<br><br>Defendants. | Docket No: 1:04-CV-12333-MEL |

**DEFENDANT KEY CORPORATE CAPITAL, INC.'S APPENDIX IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

M117051.11

| **Case Name** | **Tab** |
|---|---|
| Bradston Assocs. LLC v. Rouse, 2002 Mass. Super. LEXIS 378 (2002) | A |
| Clark v. Brooks Woolen, Inc., 2000 Me. Super. LEXIS 242 (2000) | B |
| Cox v. Thorton, 1998 Mass. Super. LEXIS 425 (1998) | C |
| Defonseca v. Sandler, 2002 Mass. Super. LEXIS 250 (2002) | D |
| Eagle Pacific Ins. Co. v. Christensen Motor Yacht Corp., 959 P.2d 1052 (Wash. 1998) | E |
| Epstein, Beceker & Greene, PC v. Atlas Venture, 2003 Mass. Super. LEXIS 84 (2003) | F |
| Fleet Nat'l Bank v. Lloyd's London, 2003 Mass. Super. LEXIS 137 (2003) | G |
| Lyons v. Kelley, 1997 Mass. Super. LEXIS 499 (1997) | H |
| Miller v. Nat'l City Processing Co., Inc., 1996 Mass. Super. LEXIS 147 (1996) | I |
| Rich v. Rich, 405 S.E.2d 858 (W. Va. 1991) | J |
| Waste Stream Envtl. Inc. v. Lynn Water & Sewer, 2003 Mass. Super. LEXIS 43 (2003) | K |
| White v. Babcock, 1995 Tex. App. LEXIS 2018 (1995) | L |

1 of 100 DOCUMENTS

**Bradston Associates, LLC v. Richard J. Rouse et al.**

**02-2426 BLS**

**SUPERIOR COURT OF MASSACHUSETTS, AT SUFFOLK**

*2002 Mass. Super. LEXIS 378*

**October 8, 2002, Decided**

**DISPOSITION:** [*1] Defendants' motion to dismiss was granted.

**LexisNexis(R) Headnotes**

**JUDGES:** Allan van Gestel, Justice of the Superior Court.

**OPINIONBY:** Allan Van Gestel

**OPINION:** MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

This matter comes before the Court on a motion by the defendants to dismiss all counts of the complaint pursuant to *Mass.R.Civ.P. Rule 12(b)(6)*. As it must, the Court takes the following facts from the plaintiff's complaint.

BACKGROUND

The plaintiff, Bradston Associates LLC ("Bradston"), is a Massachusetts limited liability company based in Boston.

The defendants are the Suffolk County Sheriff (the "Sheriff"); the Superintendent of the Suffolk County Sheriff's Department (the "Superintendent"); and the Suffolk County Sheriff's Department, a political subdivision of the Commonwealth of Massachusetts (the latter individually, and all defendants collectively, "the Sheriff's Department").

On July 24, 2000, the Sheriff's Department issued a request for proposals ("RFP") to provide approximately 14,000 square feet of office space for use by administrative and technical support services for the Department. Prior to the issuance of the RFP, the Sheriff's Department had indicated to Bradston that the [*2] RFP would be drafted such that the property located at 17/19 Bradston Street in Boston ("17/19 Bradston Street"), which is located adjacent to the Sheriff's Department's facility at 20 Bradston Street, would be ideally suited to satisfy its needs.

Bradston secured the rights to acquire 17/19 Bradston Street and, on August 31, 2000, submitted to the Sheriff's Department its proposal to provide leased space in accordance with the terms and conditions of the RFP. On September 29, 2000, Bradston acquired the property at 17/19 Bradston Street for the sum of $ 1,500,000.

In late summer of 2001, the Sheriff's Department and Bradston signed a lease (the "Lease"), dated August 13, 2001, for 17/19 Bradston Street. A copy of the Lease is attached to, and thereby made a part of, the complaint.

Section 1 of the Lease recites that it is "subject to the approval of the contract between the City of Boston and [Bradston]." Although the Lease was signed by Bradston and the Sheriff's Department on August 13, 2001, the approval by the City of Boston was not executed until December 12, 2001. Further, Section 40 of the Lease states, "This Lease becomes effective only upon execution and [*3] delivery thereof by [Bradston] and [the Sheriff's Department], and upon execution of the City of Boston Standard Contract."

The lease term is for an original period of ten years "commencing upon the delivery of the Premises to Tenant with the requirements of Landlord as set forth in Section 5 below performed by Landlord ('the Commencement Day')." Included in the Lease are two five-year options, not material to the matters in issue.

DISCUSSION

On the Sheriff's Department's Rule 12 motion, the Department must admit all well-pleaded allegations of Bradston's complaint, and the Court must accept as true such inferences as may be drawn in Bradston's favor. *Blank v. Chelmsford Ob/Gyn P.C., 420 Mass. 404, 407, 649 N.E.2d 1102 (1995); Natick Auto Sales, Inc. v. Department of Procurement and General Services, 47 Mass.App.Ct. 625, 630, 715 N.E.2d 84 (1999).* Of course, conclusions of law from the facts alleged are open for review on a Rule 12 motion. Bradston's claims against the [*8] Sheriff's Department are sufficient unless they show beyond doubt that no provable set of facts would entitle Bradston to relief. *Warner-Lambert Company v. Execuquest Corporation, 427 Mass. 46, 47, 691 N.E.2d 545 (1998); Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 68, 595 N.E.2d 316 (1992).* Bradston bears a "relatively light burden," *Warner-Lambert Co., supra, 427 Mass. at 47,* and must be given the benefit of any doubt. *Kipp v. Kueker, 7 Mass.App.Ct. 206, 210, 386 N.E.2d 1282 (1979).* These are "generous principles," and the Court must apply them in the way they are intended. *Connerty v. Metropolitan District Commission, 398 Mass. 140, 143, 495 N.E.2d 840 (1986).*

The language of the Lease Agreement looms large in any decision regarding Bradston's likelihood of success on the merits of this case and on the Sheriff's Department's argument that it is in compliance therewith. The Lease is appended to--and thereby a part of--the complaint. It is central to the entire case and, as such, it must be interpreted by the Court in reaching its conclusions [*9] on each of the pending motions.

The interpretation of an unambiguous lease agreement is an issue of law for the Court. Lease language must be construed in its usual and ordinary sense. *116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376, 742 N.E.2d 76 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381, 688 N.E.2d 951 (1998).* A lease provision is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Citation Ins. Co., 426 Mass. at 381.* The mere fact that parties disagree on the proper construction of the lease language, however, does not necessarily establish ambiguity. *Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466, 645 N.E.2d 1165 (1995).*

When an element of ambiguity does appear in a lease, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. *MacDonald v. Gough, 326 Mass. 93, 96, 93 N.E.2d 260 (1950).* "The object of the court is to construe the contract as a whole, in a [*10] reasonable and practical way, consistent with its language, background and purpose." *USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116, 546 N.E.2d 888 (1989).*

Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. *City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720, 716 N.E.2d 138 (1999).*

In construing the Lease, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the transaction and the purposes to be accomplished. *Starr v. Fordham, 420 Mass. 178, 190, 648 N.E.2d 1261 (1995); Shea v. Bay State Gas Co., 383 Mass. 218, 224-25, 418 N.E.2d 597 (1981).* Significantly here, the parties are sophisticated in the matters in issue.

Further, the Sheriff's Department, being as it is a governmental department, is, and its employees are, subject to the provisions of G.L.c. 258.

Before analyzing the individual counts of the complaint, the Court pauses to consider a sentence in Section [*11] 5 of the Lease, which reads: "If there shall be a termination of this Lease pursuant to the provisions of this section, thereafter neither [Bradston] nor [the Sheriff's Department] shall have any claim against the other arising under this Lease or on account of the termination thereof." Since this Court, below, concludes that there was a termination of the Lease pursuant to the provisions of Section 5, it could stop there and dismiss the case. The parties, however, deserve to have the benefit of the Court's views on all of the various counts of the complaint.

With this general background, the Court now addresses each of the counts of the complaint.

Counts I and II

The express language of the Lease permits termination if substantial completion of the work under Schedule B and completion of the work under Schedule C is not accomplished "on or before the date which is six (6) months after the *signing* of this Lease, subject to the provisions of Section 41." (Emphasis added.) The

language chosen by the parties sets a time limit of six months "after the signing of the Lease," not six months after the Lease "becomes effective." Many leases, particularly for office space, [*12] routinely contain provisions in them calling for the landlord to conduct build-out work satisfactory to the tenant before the tenant has any obligations thereunder. Thus, the date of the execution of the City of Boston Standard Contract is not controlling. Rather, it is the August 13, 2001 Lease signing date that triggers the start of the six-month work completion period.

There are no allegations in the complaint pointing to a delay such as would extend the time for completion pursuant to Section 41 of the Lease. The reference to the basement bathrooms involved potential extra work that Bradston and the Sheriff's Department never came to agreement about.

Significantly, paragraphs 22, 23 and 26 of the complaint make it clear that substantial completion of the Schedule B work and completion of the Schedule C work did not occur until May 29, 2002, over three months after the Sheriff's Department sent the termination notice. These allegations in the complaint are binding upon Bradston, as the party who made them. *G.L.c. 231, Sec. 87.*

Thus, the unambiguous Lease language must be construed and enforced according to its plain meaning. See *Somerset Savings Bank v. Chicago Title Insurance Company, 420 Mass. 422, 427, 649 N.E.2d 1123 (1995).* [*13] "Men must turn square corners when they deal with the Government." *Rock Island, Ark. & La. R.R. v. United States, 254 U.S. 141, 143, 65 L. Ed. 188, 41 S. Ct. 55, 56 Ct. Cl. 466 (1920).* See also *Lafayette Place Associates v. Boston Redevelopment Authority, 427 Mass. 509, 524, 694 N.E.2d 820 (1998).* "It is not the role of the Court to alter the parties' contractual agreement." *Rogaris v. Albert, 431 Mass. 833, 835, 730 N.E.2d 869 (2000).* The Sheriff's Department, whatever its reasons, had an absolute right under the Lease to terminate it on February 13, 2001, on the admitted failure by Bradston to achieve the necessary completion of the Schedule B or C work. For that reason, there is no breach of contract, nor can there be a breach of the implied covenant of good faith and fair dealing.

Count III

This count asserts fraudulent misrepresentation against all defendants. It charges the Sheriff and his Department with executing and delivering a Lease that they never intended to enter into; and it charges the Superintendent with representing to Bradston that it had to demolish and replace the existing basement bathrooms, when he knew that the Sheriff's [*14] Department did not intend to occupy the property.

The short response to both of these assertions is that the Sheriff's Department did enter into the Lease and was bound by its terms and conditions. Again, Bradston's own allegations make this point in a way binding upon it. See paragraphs 11 and 12 of the complaint.

Further, *G.L.c. 258, Sec. 10(c)* clearly provides that the Massachusetts Tort Claims Act does not apply to "any claim arising out of an intentional tort . . . including . . . misrepresentation." Consequently, the Sheriff's Department, as a public employer, is immune from liability for the intentional torts of its employees. *Mohr v. Commonwealth, 421 Mass. 147, 164, 653 N.E.2d 1104 (1995).*

With regard to the Sheriff and the Superintendent individually, the allegations of the complaint do not state claims for fraud or misrepresentation. As alluded to above, it is not a misrepresentation to suggest or act in a manner indicating an intent to enter into a binding and enforceable lease, when that is exactly what occurred. Nor is it a misrepresentation to ask Bradston to do additional work in the construction phase when the [*15] Lease language itself provides that such may be the case, and extensions of time for delay, if the extra work causes it, provide relief on the timing of completion.

Counts IV and V

These two counts, charging all defendants with negligent and innocent misrepresentation, are equally unavailing.

There are no allegations that the presentment requirements of *G.L.c. 258, Sec. 4* have been complied with insofar as the Sheriff's Department is concerned. Nor can the Sheriff and the Superintendent, as public employees, be held liable for their negligent acts. *G.L.c. 258, Sec. 2.*

Further, of course, as noted above with regard to Count III, no misrepresentation, negligent or innocent, is revealed on the facts alleged in the complaint.

Count VI

This count charges the Sheriff and the Superintendent with aiding and abetting a fraud. Since no facts supporting a fraud claim are alleged, there can be no aiding or abetting thereof.

Count VII

2002 Mass. Super. LEXIS 378, *

Count VII repeats and realleges each of the paragraphs of the complaint that precede it and then states that what those facts reveal are violations of G.L.c. 93A. This Court thinks [*16] not.

First, it is doubtful that the Sheriff's Department is a "person" or that it was engaged in trade or commerce when it entered into a lease for its administrative offices. Absent the Sheriff's Department's being a person in trade or commerce, G.L.c. 93A is not applicable. See, e.g., *Bretton v. State Lottery Commission, 41 Mass.App.Ct. 736, 738-39, 673 N.E.2d 76 (1996).*

Additionally, even routine breaches of contract do not constitute c. 93A violations. *Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47 (1st Cir. 1998); Cahill v. TIG Premier Ins. Co., 20 F. Supp. 2d 141 (D.Mass. 1998).* Here there is no breach of contract at all.

With regard to the misrepresentation allegations, of course, under certain circumstances a misrepresentation can provide a basis for a c. 93A claim. "But to be actionable under that statute they must be consequential." *Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390, 415, 578 N.E.2d 789 (1991).* Here, as noted above, this Court does not even find misrepresentations, let alone misrepresentations that are consequential.

Thus, the c. 93A claim must fail as well. [*17]

Count VIII

This count seeks a declaratory judgment to the effect that the Sheriff's Department's purported termination of the Lease was improper and ineffective and that the Lease remains in full force and effect.

For all of the reasons stated above, such a declaration is not warranted.

ORDER

For the foregoing reasons, the defendants' motion to dismiss is *ALLOWED*, and judgment shall enter accordingly.

The Court declines to grant the defendants relief pursuant to *G.L.c. 231, Sec. 6F.* Although the case did not survive a motion to dismiss, it cannot be said that all of the claims were wholly insubstantial, frivolous, and not advanced in good faith.

Allan van Gestel

Justice of the Superior Court

DATED: October 8, 2002

LEXSEE 2000 ME SUPER. LEXIS 242

**ANDREW CLARK, KARIENA CLARK, Plaintiffs v. BROOKS WOOLEN, INC., MILL INVESTMENTS, INC., AMES STEVENS, JR., RUTH STEVENS, Defendants**

**CIVIL ACTION DOCKET NO. CV-99-113**

**SUPERIOR COURT OF MAINE, YORK COUNTY**

*2000 Me. Super. LEXIS 242*

**October 30, 2000, Decided**

**COUNSEL:** [*1] For Plaintiff: H. J. Friedman, Esq.

For Defendants: U. C. Remmel, II, Esq., P. D. Detroy, Esq.

**JUDGES:** G. Arthur Brennan, Justice, Superior Court.

**OPINIONBY:** G. Arthur Brennan

**OPINION:**

### DECISION AND ORDER

BACKGROUND

This matter is before the court on cross motions for summary judgment.

On September 13, 1991, Andrew Clark was seriously injured in an elevator accident at Brooks Woolen Mill ("Brooks") in Sanford, Maine. At the time of the accident, Brooks was the lessor and owner of the mill and was required to insure the mill during the terms of the lease with the lessee, International Woolen Company (IWC). Brooks failed to procure insurance that would respond to the Clarks claims. n1 On October 19, 1994, Andrew Clark and his wife Kariena Clark obtained a judgment of $ 1.61 million against Brooks and F.S. Payne, the elevator maintenance company. (Exhibits S & T). n2 The Clarks were also awarded $ 220, 376.14 in prejudgment interest and an additional $ 17,906.08 in costs, totaling $ 238,282.22. (Exhibit U). Therefore, the total judgment in favor of the Clarks, including prejudgment interest and costs was $ 1,848,282.20. (Exhibit U). On May 10, 1995, F.S. Payne reached a settlement with [*2] the Clarks for $ 1,650,000. (Exhibit V). Accordingly, the Clarks allege that they have not collected $ 198,282.20 (plus interest accrued from October, 1994) of the total judgment. n3

> n1 Ames Stevens argued that IWC, as lessee, was responsible for obtaining insurance. (File 1, Exhibit A p. 16).

> n2 Apparently due to financial difficulties, Brooks at some point stopped defending the suit and a default judgment was entered against Brooks.

> n3 Defendants dispute this figure and argue that Plaintiffs have failed to produce the complete closing documents.

On June 8, 1993 Brooks sold its mill and other related manufacturing assets to International Woolen Company ("IWC") for $ 1.75 million. Ames Stevens was the principal owner of Brooks, holding approximately 70% of its stock. The corporate directors of Brooks were Ames Stevens, his wife Ruth Stevens and Charles Cabot, an attorney at Sullivan & Worcester in Boston. Ruth Stevens also owned a corporation called Mill Investments, Inc. ("MII"). All of the Plaintiffs' [*3] claims turn on the distribution of $ 1.75 million proceeds of the plant sale to IWC. That distribution consisted of $ 1.2 million to MII, $ 50,000 to Sullivan & Worcester and $ 500,000 to Ames Textile. Ames Textile is owned by Ames Stevens and his extended family n4. No claims are asserted against Ames Textile or Sullivan & Worcester.

TAB B

acquired by MII was a transfer to an insider under *14 M.R.S.A. § 3576(2)*. It is alleged that this transfer was made while Brooks was insolvent and that subsequent to Ruth Stevens' receipt of funds from Brooks she directed MII to discharge the mortgage [*8] without having received the benefit of reasonable equivalent value. Count II concludes that the transfer of the sale proceeds received by Brooks to Ruth Stevens individually constitutes a voidable fraudulent transfer under *14 M.R.S.A. § 3576(2)*.

### COUNT III: NEGLIGENCE

Count III alleges that "Defendants owed a duty of care to Plaintiffs to act in a manner which a reasonably prudent business entity would act in the management of its affairs, assets and officers." It is alleged that Defendants breached this duty by failing to maintain insurance, failing to maintain sufficient assets, failing to account for assets and transactions and improperly distributing assets and property and commingling personal and corporate assets and seizing corporate opportunities.

### COUNT IV & V: PIERCING THE CORPORATE VEIL

Count IV alleges that Brooks Woolen was an alter ego of Ames and Ruth Stevens and therefore transfers made by Brooks Woolen should be treated as transfers by Ames and Ruth Stevens. It is alleged that the transfer of Brooks Woolen to IWC and the subsequent transfer of sale proceeds from Brooks to MII was fraudulent, lacked sufficient documentation, thinned corporate [*9] assets and resulted in an unjust and inequitable consequence in regard to Plaintiffs.

Count V alleges that MII was an alter ego of Ruth Stevens, such that transfers received by MII should be treated as transfers received by Ruth Stevens. It is further alleged that the transfer of the sale proceeds to MII was fraudulent, commingled assets, lacked sufficient documentation, thinned the corporate assets and resulted in an unjust and inequitable consequence in regard to Plaintiffs.

### COUNT VI: BREACH OF FIDUCIARY DUTIES

Count VI alleges that Defendants owed a fiduciary duty of good faith and loyalty and a duty of care to its creditors, including Plaintiffs. It is alleged that Defendants breached their fiduciary duties to Plaintiffs by failing to maintain and properly manage corporate assets; failing to provide accounting to the corporation; transferring the assets of the corporation; negligently disbursing assets of the corporation; and causing the corporation to become undercapitalized.

### COUNT VII: UNJUST ENRICHMENT

Count VII alleges that Brooks did not receive a reasonable equivalent value for the transfer of the mill to IWC as proceeds were diverted to MII without good and valid consideration. [*10] It is alleged that the transfer of funds from Brooks to MII was made under such circumstances as to make it inequitable for MII to retain the benefit of the transfer.

### DISCUSSION

The Transfer of $ 1.2 million from Brooks to MII

The purpose of the Uniform Fraudulent Transfer Act (UFTA) is to prevent the depletion of a debtor's estate to the detriment of unsecured creditors. *Fleming Companies, Inc. v. Rich, 978 F. Supp. 1281, 1294 (E.D. Mo. 1997)*. It provides unsecured creditors with a means of relief in the event the debtor engages in transactions designed to conceal assets or place them beyond the reach of the unsecured creditors seeking to satisfy their claims. Id.

For the purpose of this case, the UFTA contains two sections under which an unsecured creditor may pursue fraudulent transfer of assets, *14 M.R.S.A. § 3575* and § 3576:

*14 M.R.S.A. § 3575*

(1) Fraudulent Transfer. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer [*11] or incurred the obligation:

(A) With actual intent to hinder, delay or defraud any creditor of the debtor.
*14 M.R.S.A. § 3576*

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

For two reasons, the Clarks cannot recover under *14 M.R.S.A. § 3575.* First, the plain language of the UFTA precludes recovery against MII under the UFTA. The term "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, or disposing [*12] of or parting with an *asset or an interest in an asset ... ." 14 M.R.S.A. § 3572(12).* However, the term "asset" *does not include* "property to the extent that it is encumbered by a valid lien." *14 M.R.S.A. § 3572(2)(A).* MNB and BNE unquestionably held a valid security interest in all Brooks assets. MII was formed in April in 1991 and acquired the banks' loans and security positions in May 1991. Because MII adopted a fully secured position, the receipt of closing proceeds for the release of the security does not involve the transfer of "assets" within the contemplation of UFTA. See also *Rich v. Rich, 185 W. Va. 148, 405 S.E.2d 858, 861 (W. Va. 1991)*(finding that the portion of property that was encumbered by a lien was not an "asset" subject to fraudulent transfer under the UFTA); *Eagle Pacific Insurance Company v. Christensen Motor Yacht Corporation, 135 Wn.2d 896, 959 P.2d 1052, 1060-61 (Wash. 1998)*(stating that if a debtor transfers assets encumbered by security interests, that transfer is beyond the reach of the UFTA).

Second, under *14 M.R.S.A. § 3575* the debtor's state of mind becomes the [*13] point of inquiry. *14 M.R.S.A. § 3575(2)* identifies some factors whose presence or absence may indicate whether a transfer was made with actual intent to hinder, delay or defraud creditors. The timing of the transactions in question belie the notion that the transfer of $ 1.2 million was effected with fraudulent intent in relation to the Clarks. As noted above MII acquired the banks' loans and security positions in May 1991. Andrew Clark was injured at the mill in September 1991. The creation of MII and the acquisition of the banks' loans were therefore accomplished before Clark even became a potential creditor. The subsequent transfer of $ 1.2 million to MII in June of 1993 served to discharge the obligation that was acquired before Clark was injured.

The Clarks argue in the alternative, that if the corporate veil is pierced, Ruth Stevens qualifies as an insider of Brooks and therefore strictly liable under *14 M.R.S.A. § 3576(2).* The Clarks cite *Prairie Lakes Health Care System v. Wookey, 1998 SD 99, 583 N.W.2d 405 (S.D. 1998)* for the proposition that if the individual elements of the UFTA's transfer to insider provision are [*14] literally satisfied, a fraudulent transfer is established conclusively, regardless of the actual intent of the parties and whether or not reasonable equivalent value was given. In Wookey, a patient and his wife deeded all their real estate to their adult son. However, it was agreed that the parents would be allowed to live in the home rent-free for the rest of their lives. The court found that the property transferred was worth $ 332,560 and that the consideration included $ 148,360 on the assumption of the mortgage, $ 149,000 for payments on an antecedent debt and $ 58,000 in the form of a promissory note. Id. at 409. The plaintiff-hospital, attempting to collect substantial bills incurred by the father, sought to void the transfer as fraudulent. The Supreme Court of South Dakota remarked that Wookey exemplifies the archetypal fraudulent transfer - virtually all an insolvent debtor's property transferred to a family member thus defeating a creditor's imminent judgment while the debtor continues to reside on the property.

The reliance on Wookey and the argument that Ruth Stevens is an insider must fail for the reasons set forth above. Assuming, but not [*15] deciding that the corporate veil could be pierced, thereby reaching Ruth and Ames Stevens (who became a joint owner of the bank account after the transfer and therefore qualifies as a subsequent transferee under *14 M.R.S.A. § 3579(2)(A)* and (B)), the transfer of $ 1.2 million remains outside the scope of the UFTA because Ruth Stevens occupied the position of a valid secured lien holder, and the transfer of $ 1.2 million discharged this interest.

The $ 500,000 payment to Ames Textile

It is not disputed that in August of 1988, Ames Textile loaned Brooks $ 500,000. This loan was guaranteed by Brooks and by Ames Stevens personally and was repaid in June 1993. The Clarks obtained a judgment against Brooks in October 1994. Debtors may generally prefer one creditor over another in applying assets to discharge their obligations. 37 Am Jur. 2d. § 87. The Clarks, however, cite *Mitsubishi Caterpillar Forklift America, Inc. v. Superior Service Associates, Inc., 81 F. Supp. 2d 101, 115 (D. Me. 1999)* for the proposition that a corporation's directors owe a fiduciary duty to the corporation's creditors after the corporation becomes insolvent. In [*16] Mitsubishi, Superior Service Associates (SSA) was an authorized dealer for Mitsubishi Caterpillar Forklift America (MCFA). Defendant Burkert was the president of SSA. SSA executed and delivered to MCFA a security agreement which MCFA perfected. SSA also executed various promissory notes to MCFA. MCFA and Associates Commercial Corporation (ACC), another secured creditor of SSA entered into an Intercreditor Agreement that established the relative priorities of their security interests in all the assets of SSA. MCFA had a first priority interest in trucks and parts sold by MCFA to SSA for which they had not been paid and the proceeds of the sale of any such truck or parts. ACC had a first priority interest in the remainder of SSA's assets. Approximately three years later, SSA, ACC and Burkert

executed a Voluntary Surrender Agreement and Release pursuant to which SSA surrendered all its assets to ACC. In so doing, SSA diverted funds from the sales of MCFA's secured collateral to ACC. The debt to ACC had been personally guaranteed by Burkert.

In the present case, a corporate debt obligation for which Ames Stevens was personally liable was discharged. However, that is where the analogy [*17] to Mitsubishi ends. Both the Ames Textile debt and the Clarks' judgment were unsecured and therefore on equal footing. Moreover, the Clarks' claim did not ripen until September 1994, fifteen months after the debt to Ames Textile had been discharged. Brooks was therefore entitled to discharge the debt to Ames Textile.

The entry will be as follows:

Upon Motion of the Defendants herein pursuant to Rule 56 of the Maine Rules of Civil Procedure, after notice and an opportunity to be heard, there being no genuine issue of fact and it appearing the Defendants are entitled to Summary Judgment as a matter of law, Summary Judgment is hereby entered in favor of all Defendants on all claims asserted by Plaintiffs.

The clerk may incorporate this order in the docket by reference.

Dated: October 30, 2000

G. Arthur Brennan

Justice, Superior Court

LEXSEE 8 MASS L REP 715

**Arthur Cox individually and dba Cox Systems Group v. Thornton Associates, Inc.**

**97-00178**

**SUPERIOR COURT OF MASSACHUSETTS, AT MIDDLESEX**

*8 Mass. L. Rep. 715; 1998 Mass. Super. LEXIS 425*

**August 4, 1998, Decided**

**DISPOSITION:** [*1] Thornton's Motion to Dismiss the Complaint is ALLOWED as to Counts I, II and III of the complaint, and DENIED as to Count IV.

**LexisNexis(R) Headnotes**

**JUDGES:** Stephen E. Neel, Justice of the Superior Court.

**OPINIONBY:** STEPHEN E. NEEL

**OPINION:** MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS

Defendant Thornton Associates, Inc. ("Thornton") moves to dismiss the complaint for failure to state a claim upon which relief can be granted. Thornton argues that plaintiff Arthur Cox's ("Cox") causes of action, which are based on an oral contract, are barred by the Statute of Frauds. Cox contends that his reliance on that oral contract estops Thornton from asserting the Statute of Frauds as a defense. For the following reasons, Thornton's motion to dismiss is allowed in part and denied in part.

BACKGROUND

For purposes of this decision, the Court accepts the factual allegations of the complaint as true.

At all times relevant to this action, Cox was the president and owner of Cox Systems Group. Cox was an independent sales representative for various manufacturers and distributors of industrial products.

On November 1, 1989, Cox and Thornton entered into a contract under which Cox agreed to act as [*2] Thornton's New England sales representative.

In June of 1990, the president of Thornton, Charles Staples ("Staples") asked Cox to increase his efforts in selling Thornton products. Cox agreed to do so, but informed Staples that Cox's compensation as set forth in the November 1, 1989 agreement would not sufficiently compensate him for his increased efforts. Staples told Cox that he understood Cox's dilemma, and that he would discuss it further with Cox at a later date. Cox and Staples had several subsequent discussions regarding Staples' request.

As a result of these discussions, Cox and Staples entered into an oral agreement in July of 1990. Cox agreed to attain the goal of $ 500,000 in annual sales within a three year period, and Staples agreed that Thornton would compensate Cox appropriately. Staples stated that he would "make it worth [Cox's] while" for him to meet the increased sales goal.

Cox did in fact attain the goal of $ 500,000 in sales of Thornton's products by the end of the three year period. Cox and Staples had several discussions during that time regarding Cox's increased commissions; Staples consistently assured Cox that he would be paid adequately [*3] for his efforts.

On February 1, 1994, Cox and Thornton entered into a revised sales agreement. That agreement did not address any commissions owed to Cox as a result of his increased sales for the 1990 to 1993 period; the agreement concerned future performance only.

TAB C

Case 1:04-cv-12333-MEL    Document 13-3    Filed 12/10/2004    Page 12 of 60

Page 2

8 Mass. L. Rep. 715; 1998 Mass. Super. LEXIS 425, *

Thornton failed to pay Cox any increased commissions for his efforts during 1990 to 1993, and ultimately terminated the relationship on September 1, 1994.

DISCUSSION

Thornton now moves for dismissal pursuant to *Mass.R.Civ.P. 12(b)(6)* for failure to state a claim upon which relief can be granted. For purposes of *Mass.R.Civ.P. 12(b)(6)*, the court must take the factual allegations of the complaint, as well as inferences which can be drawn from those allegations in plaintiff's favor, as true. *Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429, 583 N.E.2d 228 (1991)*, and cases cited. The complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Nader v. Citron, 372 Mass. 96, 98, 360 N.E.2d 870 (1977)*, quoting *Conley v. Gibson, 355 U.S. 41, 45-46,* [*4] *2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*; see also *Charbonnier v. Amico, 367 Mass. 146, 152, 324 N.E.2d 895 (1975)*. A complaint is not subject to dismissal if it would support relief under any theory of law. *Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89, 390 N.E.2d 243 (1979)*.

Thornton argues that Cox's claims are barred by the broker's Statute of Frauds, as set forth at *G.L.c. 259, 7*. Thornton contends that Staples' oral promise to Cox to "make it worth his while" for Cox to increase his sales efforts is unenforceable for lack of a sufficient writing. *G.L.c. 259, 7* states in pertinent part:

> Any agreement to pay compensation for service as a broker or finder . . . shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized . . . The provisions of this section shall apply to a contract implied in fact or in law to pay reasonable compensation . . .

Count I--Breach of Contract

Count II--Quantum Meruit

Count III--Promissory Estoppel

The first three counts of Cox's complaint are based on breach of his oral contract with Thornton for increased commissions. The [*5] parties do not dispute that Cox was a "broker" within the meaning of the statute, or that the contract between Cox and Staples (on behalf of Thornton) was in fact oral. Rather, Cox argues that his detrimental reliance on Thornton's oral promise estops

Thornton from asserting the Statute of Frauds as a defense.

There is no Massachusetts case that addresses this particular issue, although both parties have cited several cases from other jurisdictions as support for their respective positions. The Massachusetts cases that have interpreted *G.L.c. 259, 7* have held that the statute should be interpreted broadly to cover disputes over commissions on oral contracts in all brokerage contexts. "Introduction in 1985 of the special business brokerage Statute of Frauds [*G.L.c. 259, 7*] manifested a legislative purpose to discourage claims for commission based on conversation which persons heard differently or remembered differently." *Alexander v. Berman, 29 Mass. App. Ct. 458, 462, 560 N.E.2d 1295 (1990)*. "Indeed, apart from [the] express exceptions, we do not find in the statute any basis for concluding that the Legislature intended to obviate disputes over claimed commissions for services [*6] rendered in certain commercial brokerage contexts, but not others." *Bay Colony Marketing Co. v. Fruit Salad, Inc., 41 Mass. App. Ct. 662, 667, 672 N.E.2d 987 (1996) rev. den. 424 Mass. 1101, 674 N.E.2d 1084 (1996)*.

Cox cites a number of cases in support of his theory that his detrimental reliance removes this case from the realm of the Statute of Frauds. All but two of the cases cited by Cox concern the sale of real estate; n1 where a buyer detrimentally relies on a seller's oral promise to convey real estate, courts have indeed found that reliance estops the seller from claiming the Statute of Frauds as a defense. See *Cellucci v. Sun Oil Co., 2 Mass. App. Ct. 722, 320 N.E.2d 919 (1974), aff'd 368 Mass. 811, 331 N.E.2d 813 (1975)*; see also, *Hickey v. Green, 14 Mass. App. Ct. 671, 442 N.E.2d 37 (1982)*.

    n1 One of the remaining two cases, *Gray v. Mitsui & Co. (USA), 434 F. Supp. 1071 (D. Or. 1977)*, did not concern a broker contract, but rather a contract that could not be performed within one year. The remaining case, *Everett v. Brown, 174 W. Va. 35, 321 S.E.2d 685, 689 (1984)*, is the only case cited by Cox dealing with a broker statute of frauds that supports his theory of estoppel. That case dealt with a real estate broker's commission for the sale of a home. Although the broker statute of frauds in Everett included real estate brokers, the Massachusetts statute specifically excludes them.

[*7]

8 Mass. L. Rep. 715; 1998 Mass. Super. LEXIS 425, *

Were Cox's case governed by c. 259, 1, as are the real estate cases he relies upon, his reliance on promissory estoppel to defeat the Statute of Frauds might have merit. Where, as here, the case falls under *G.L.c. 259, 7,* promissory estoppel offers no relief. Chapter 259, 7 applies not only to "any agreement to pay compensation for service as a broker or finder," but also to "a contract implied in fact or in law to pay reasonable compensation," i.e., to claims based upon promissory estoppel or quantum meruit. n2 Where the statute by its terms includes within its scope a claim of promissory estoppel asserted as an alternative claim to breach of contract, the legislature has effectively decreed that, as to brokers, estoppel claims will not render the statute inapplicable to oral commission contracts. It is noteworthy that, while plaintiffs in both *Alexander v. Berman, supra, 29 Mass. App. Ct. 458,* and *Bay Colony Marketing Co. v. Fruit Salad, Inc., supra, 41 Mass. App. Ct. 662,* apparently did not assert estoppel, each plaintiff alleged that he had performed under the alleged oral broker's agreement, and each agreement was nevertheless held to be within c. 259, 7.

---

n2 Claims of promissory estoppel and quantum meruit are both claims under "a contract implied in fact or in law," within the meaning of c. 259 7. Cf. *Loranger Construction Corp. v. E.F. Hauserman Co., 6 Mass. App. Ct. 152, 156-159, 374 N.E.2d 306* (applying earlier theory of promissory estoppel in charitable subscription cases, Massachusetts courts "purported to find

consideration by the charity for the promise"; reasonable detrimental reliance is sufficient to enforce even a promise that does not meet formal requirements necessary to constitute an offer); *Lonnqvist v. Lammi, 240 Mass. 371, 374, 134 N.E. 255* (where there is no express contract, "the law implies an obligation to pay for what has been done . . .") *Stavaridis v. Dynamic Machine Works, Inc., 1994 Mass. Super. LEXIS 738, 1994 WL 879484* (Mass.Super.), aff'd *40 Mass. App. Ct. 1110, 662 N.E.2d 1064 (1996)* (same).

[*8]

Count IV--Violation of G.L.c. 93A

Cox also brings a claim based on unfair or deceptive trade practices, in violation of G.L.c. 93A. Thornton having offered no persuasive basis for its dismissal, the motion to dismiss as to the 93A claim will be denied.

ORDER

For the foregoing reasons, Thornton's Motion to Dismiss the Complaint is ALLOWED as to Counts I, II and III of the complaint, and DENIED as to Count IV.

Stephen E. Neel

Justice of the Superior Court

Dated: August 4, 1998

LEXSEE 2002 MASS SUPER LEXIS 250

**Misha Defonseca v. Shirley Sandler et al. n1**

**n1 Palmer & Dodge LLP, John Taylor Williams, Elaine M. Rogers, Sandra Missakian, American Programs Bureau, Inc.**

**02-0362**

**SUPERIOR COURT OF MASSACHUSETTS, AT MIDDLESEX**

*15 Mass. L. Rep. 9; 2002 Mass. Super. LEXIS 250*

**June 21, 2002, Decided**
**June 25, 2002, Filed**

**DISPOSITION:** [*1] Defendant's motion to dismiss was denied.

**LexisNexis(R) Headnotes**

**JUDGES:** Raymond J. Brassard, Justice of the Superior Court.

**OPINIONBY:** Raymond J. Brassard

**OPINION:** MEMORANDUM OF DECISION AND ORDER ON DEFENDANT SHIRLEY SANDLER'S RENEWED MOTION TO DISMISS

*INTRODUCTION*

The plaintiff, Misha Defonseca, filed the present action against the defendants seeking damages for breach of contract, breach of implied covenant of good faith and fair dealing, legal malpractice, violation of Mass. Gen. L. ch. 93A, intentional interference with contractual relations, fraud, negligence, and civil conspiracy. The matter is presently before the court on the defendant, Shirley Sandler's, motion to dismiss Count XIII, Intentional Interference with Contractual Relations, and Count XIV, Civil Conspiracy, pursuant to MassR.Civ.Pro. 12(b)(6). n2 The defendant asserts that there are no grounds for intentional interference with contractual relations because the plaintiff failed to allege the contract was breached, and that a claim of civil conspiracy cannot be sustained without underlying [*2]

tortious activity. For the reasons set forth below, the defendant's motion to dismiss is *DENIED*.

n2 Defendant's original 12(b)(6) motion was dismissed without prejudice when the plaintiff's motion to amend the original complaint was granted.

*BACKGROUND*

The amended complaint sets forth the following allegations. Plaintiff, Misha Defonseca ("Defonseca"), wrote an autobiography about her childhood in Nazi Europe titled *Misha: a Memoir of the Holocaust Years* ("the Book"). Defonseca had a contract ("Publishing Agreement") with Mt. Ivy Press L.P. ("Mt. Ivy"). In the Publishing Agreement, Mt. Ivy agreed to publish and market the Book, and Defonseca agreed to cooperate with Mt. Ivy's efforts to market the book. During the course of their business relationship, Defonseca brought a cross-claim action in *Vera Lee v. Mt. Ivy Press, L.P. et al.* (the "Related Action"), against Mt. Ivy and its president Jane Daniel ("Daniel") for attempting to deprive Defonseca of her rights to the Book. Mt. Ivy and [*3] Daniel were found liable, and Defonseca was awarded a $ 7.5 million judgment on August 21, 2001 in the Middlesex Superior Court.

Shirley R. Sandler ("Sandler") is a public relations professional, and was retained by Mt. Ivy to market and promote the Book in the United States. However, at Daniel's request, Sandler acted in manner so as to create

15 Mass. L. Rep. 9; 2002 Mass. Super. LEXIS 250, *

the appearance that Defonseca was not complying with her obligation to cooperate with Mt. Ivy's marketing efforts. Among other things, Sandler scheduled engagements for times when she knew Defonseca was unavailable, gave short notice of scheduled engagements, refused to answer Defonseca's questions regarding the content and format of the interviews, and scheduled hostile and inappropriate interviews. This eventually resulted in a cross claim in the Related Action by Mt. Ivy against Defonseca for breach of the Publishing Agreement. However, after a jury trial, Defonseca was found not to have breached. Defonseca filed the present actions against the defendants on January 24, 2002.

*DISCUSSION*

When evaluating the sufficiency of a complaint pursuant to *Mass.R.Civ.P. 12(b)(6)*, the court must accept as true the well pleaded factual [*4] allegations of the complaint, as well as any inference which can be drawn therefrom in the plaintiff's favor. *Fairneny v. Savogran Co., 422 Mass. 469, 470, 664 N.E.2d 5 (1996); Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429, 583 N.E.2d 228 (1991).* "The complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nader v. Citron, 372 Mass. 96, 98, 360 N.E.2d 870 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* "[A] complaint is not subject to dismissal if it would support relief on any theory of law." *Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89, 390 N.E.2d 243 (1979).* A complaint should not be dismissed simply because it asserts a new or extreme theory of liability. *Bell v. Mazza, 394 Mass. 176, 183, 474 N.E.2d 1111 (1984); Jenkins v. Jenkins, 15 Mass. App. Ct. 934, 934, 444 N.E.2d 1301 (1983).* All inferences should be drawn in the plaintiff's favor in the complaint "so as to do substantial [*5] justice." *Ourfalian v. Aro Mfg. Co., Inc., 31 Mass. App. Ct. 294, 296, 577 N.E.2d 6 (1991).*

*A. Intentional Interference with Contractual Relations*

The Supreme Judicial Court has recognized § § Restatement (Second) of Torts 766, n3 766A n4 to be the law in the Commonwealth with respect to intentional interference with contractual obligations. *Shafir v. Steele, 431 Mass. 365, 369, 727 N.E.2d 1140 (2000).* See also *Boyle v. Boston Found., Inc., 788 F. Supp. 627, 630 (D.Mass. 1992)* (applying *Restatement (Second) of Torts (1979) § 766A* and not requiring breach of contract as an element to state a claim for intentional interference with contractual relations); *Anzalone v. Massachusetts Bay Transp. Auth., 403 Mass. 119, 123, 526 N.E.2d 246*

*(1988)* (breach of contract was not required as an element to state a claim for intentional interference with contractual relations). *Restatement (Second) of Torts (1979) § 766* is the applicable law when the defendant interferes with a third person's performance of a contract between that person and the plaintiff, and § 766A is applied when the defendant interferes with the [*6] plaintiff's performance of a contract with a third person. *Shafir, 431 Mass. at 369.* To maintain a claim for intentional interference with contractual relations under § 766A, the plaintiff must allege: [1] [the defendant] "intentionally and improperly interfered with the performance of a contract . . . between another and a third person, [2] by preventing the other from performing the contract or causing his performance to be more expensive or burdensome . . ." *Shafir, 431 Mass. at 369, quoting Restatement (Second) of Torts § 766A (1979).* See also *Boyle, 788 F. Supp. at 630* (wrongdoer may be liable for making plaintiff's performance of the contract more burdensome). Therefore, if the plaintiff's performance of the contract was made more expensive or burdensome by the defendant's intentional actions, breach of contract is not a required element of intentional interference with contractual relations under § 766A. n5 *Shafir, 431 Mass. at 369.* See also *Boyle, 788 F. Supp. at 630; Anzalone, 403 Mass. at 123.*

n3 §  766-Intentional Interference with Performance of Contract by Third Person-One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person. Restatement (Second) of Torts, v. 4, § 766 (1979) [*7]

n4 §  766A-Intentional Interference with Another's Performance of His Own Contract-One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him. *Restatement (Second) of Torts, § 766A (1979).*

n5 Sandler cites cases *Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 122, 731 N.E.2d 1075 (2000),* and *Williams v.*

Case 1:04-cv-12333-MEL     Document 13-3     Filed 12/10/2004     Page 16 of 60

Page 3

15 Mass. L. Rep. 9; 2002 Mass. Super. LEXIS 250, *

*B&K Medical Systems, 49 Mass. App. Ct. 563, 573, 732 N.E.2d 300 (2000),* and urges that breach of contract is a required element to state a claim for intentional interference with contractual relations. In both of those cases, the defendant allegedly interfered with a third party's performance of the contract between the plaintiff and the third party. *Restatement (Second) of Torts (1979) § 766,* not § 766A, is controlling for that type of intentional interference. Therefore these cases can be distinguished from the case at bar, where it is the plaintiff's performance of the contract that is made more burdensome.

[*8]

In Defonseca's amended complaint, sufficient facts are alleged to state a claim for intentional interference with contractual relations. The amended complaint alleged that Sandler knew about the Publishing Agreement between Defonseca and Mt. Ivy, and intentionally interfered with its performance when she, among other things, scheduled engagements for times when she knew Defonseca would be unavailable, gave short notice of scheduled engagements, refused to answer questions regarding the content and format of the interviews, and scheduled hostile and inappropriate interviews. Although Sandler's actions did not cause Defonseca to breach her contract with Mt. Ivy, the performance of her obligation to cooperate with Mt. Ivy's marketing efforts became more burdensome. See *Shafir 431 Mass. at 369.* Defonseca alleged that she suffered substantial monetary damages due to Sandler's intentional interference with the contract. Accordingly, this count should not be dismissed.

*B. Civil Conspiracy*

The Commonwealth recognizes two types of civil conspiracy. The first type requires proof of coercion and the second requires proof of a common plan to commit a tortious act. *Kurker v. Hill,* 44 Mass. App. Ct. 184, 188-89, 689 N.E.2d 833 (1998); [*9] *Stock v. Fife,* 13 Mass. App. Ct. 75, 82 n. 10, 430 N.E.2d 845 (1982); *Aetna Casualty Insurance Co. v. P&B Autobody,* 43 F.3d 1546, 1563-64 (1st Cir. 1994). "The element of coercion has been required only if there was no independent basis for imposing tort liability--where the wrong was in the particular combination of the defendants rather than in the tortious nature of the underlying conduct." *Kurker,*

44 Mass. App. Ct. at 188. The plaintiff must allege that as a collective the defendants had a special coercive power that they did not have individually. *Aetna,* 43 F.3d at 1564; *Kurker,* 44 Mass. App. Ct. at 188; *Neustadt v. Employers' Lia. Assur. Corp.,* 303 Mass. 321, 325, 21 N.E.2d 538 (1939). The second type of civil conspiracy is akin to joint liability for concerted actions. *Kurker,* 44 Mass. App. Ct. at 189; *Aetna,* 43 F.3d at 1564. To state a claim for this type of civil conspiracy, the plaintiff must allege "first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some [*10] tortious act in furtherance of the agreement." *Aetna,* 43 F.3d at 1564 (referring to Restatement (Second) of Tort (1977) § 876 cmt. b).

Analyzing this case under the second type of civil conspiracy, this court concludes that Defonseca alleges facts sufficient to state a claim for civil conspiracy. In the amended complaint, Defonseca alleges an agreement between Sandler and Daniel to commit a wrongful act and tortious conduct in furtherance of the agreement. Defonseca alleges that Sandler and Daniel acted in concert to interfere with her rights to the Book and to create the appearance that Defonseca breached the Publishing Agreement. At Daniel's request, the complaint alleges, Sandler intentionally scheduled engagements when she knew Defonseca was unavailable, gave short notice of scheduled engagements, refused to answer questions regarding the content and format of the interviews, and scheduled Defonseca for hostile and inappropriate interviews. Defonseca alleges that she suffered monetary damages as a result of Sandler and Daniel's conspiratorial conduct. Accordingly, this count should not be dismissed.

*ORDER*

For the reasons stated herein, it is [*11] hereby *ORDERED* that the defendant's motion to dismiss pursuant to *Mass.R.Civ.P. 12(b)(6)* be *DENIED* as to Count XIII, Intentional Interference with Contractual Relations, and Count XIV, Civil Conspiracy.

Raymond J. Brassard

Justice of the Superior Court

DATE: June 21, 2002

LEXSEE 959 P2D 1052

**EAGLE PACIFIC INSURANCE COMPANY, Respondent, v. CHRISTENSEN MOTOR YACHT CORPORATION, a Washington corporation; THE CHRISTENSEN GROUP, INC., a Washington corporation; and DAVID H. CHRISTENSEN and JANE DOE CHRISTENSEN, husband and wife, and their marital community, Defendants, and CHRISTENSEN SHIPYARDS, LIMITED, a Washington corporation, Petitioner.**

**65883-8**

**SUPREME COURT OF WASHINGTON**

*135 Wn.2d 896; 959 P.2d 1052; 1998 Wash. LEXIS 570*

**July 30, 1998, Filed**

**SUBSEQUENT HISTORY:** [**1]

As Corrected August 11, 1998.

**PRIOR HISTORY:** Appeal from Superior Court, Clark County. 94-2-02902-2. Honorable Roger A. Bennett, Judge.

**DISPOSITION:** Affirm the imposition of successor liability on CSL, and we affirm and remand on the issue of CGI's liability under the UFTA.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Petitioner: Philip G. Marshall, Lane & Marshall, Vancouver, WA, Helen T. Dziuba, Attorney At Law, Portland, OR.

For Defendants: Helen T. Dziuba, Attorney At Law, Portland, OR, Russ Weed, Mcewen Gisvold et al, Portland, OR.

For Respondents: Scott B. Henrie, Williams Kastner & Gibbs, Seattle, WA, Margaret A. Sundberg, Williams Kastner Gibbs, Seattle, WA.

**JUDGES:** Authored by James M. Dolliver. Concurring: Barbara Durham, Charles Z. Smith, Richard P. Guy, Charles W. Johnson, Barbara A. Madsen, Gerry L. Alexander, Philip A. Talmadge, Richard B. Sanders.

**OPINIONBY:** James M. Dolliver

**OPINION:** [*1053] En Banc

DOLLIVER, J.--Eagle Pacific Insurance Company (Eagle Pacific) filed an action against Christensen Motor Yacht Corporation (CMYC) to recover unpaid insurance premiums. Because CMYC was insolvent, Eagle Pacific sought to recover the debt from Christensen Group, Inc. (CGI), Christensen Shipyards, Limited (CSL), and David Christensen personally.

The Court [**2] of Appeals held CSL was liable for CMYC's debts under the successor liability doctrine. *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp., 85 Wash. App. 695, 934 P.2d 715 (1997).* The Court of Appeals remanded for further fact-finding on the separate issue of whether certain cash transfers from CMYC to CGI were fraudulent under *RCW 19.40.051(b),* part of the Uniform Fraudulent Transfer Act (UFTA). We affirm the Court of Appeals on both issues.

David H. Christensen organized CGI in 1962 to do construction and leasing. In 1985 Christensen and another person organized CMYC to build luxury yachts in Vancouver, Washington. CSL is a third corporation created by Christensen in 1993 or 1994. Christensen is the chief executive officer and sole shareholder of CMYC, CGI, and CSL. In his answer to the sixth

TAB E

Case 1:04-cv-12333-MEL    Document 13-3    Filed 12/10/2004    Page 18 of 60

Page 2

135 Wn.2d 896; 959 P.2d 1052, *;
1998 Wash. LEXIS 570, **

amended complaint, Christensen admits that he, CGI, and CSL are all insiders to CMYC.

Eagle Pacific issued two workers' compensation insurance policies to CMYC in 1990 and 1991. These policies were canceled in December 1991 because CMYC failed to pay the premiums. Eagle Pacific claims CMYC's debt arose from these policies, but materials in the record suggest the actual dollar [**3] amount owed by CMYC was not calculated by Eagle Pacific until 1993. Eagle Pacific's Sixth Amended Complaint explains the insurance policies involved retrospective premiums, with the amount owed being dependent on the number of claims made against the policies. The Sixth Amended Complaint states CMYC's debt to Eagle Pacific was $ 268,443 as of August 9, 1993. This August 9, 1993 date was established by a demand letter sent by Eagle Pacific to CMYC on July 9, 1993. The letter states the amount owing was due within 30 days (August 9, 1993).

After attempting, and failing, to collect the debt from CMYC, Eagle Pacific finally filed a court action. On July 29, 1994, Eagle Pacific obtained a judgment against CMYC for $ 268,443. Because CMYC was insolvent, Eagle Pacific sought to recover the debt from numerous other parties on various legal theories. Only two of those parties are involved here, and just the facts relevant to those claims will be discussed.

[*1054]    The first issue presented for review involves Eagle Pacific's attempt to collect the debt from CSL as a successor corporation to CMYC. Numerous events from 1993 and 1994 are relevant to Eagle Pacific's claim against CSL. [**4]

In 1993, CMYC was building three boats, referred to as the Lastebro, Armstrong, and L & L boats. The buyers of the Armstrong and L & L boats paid CMYC in installments as construction progressed. The Lastebro boat was financed by KHD Deutz of America Corporation (KHD Deutz). The financing agreement with KHD Deutz stated CMYC would be deemed in default of the contract if any judgment was rendered against CMYC which CMYC did not satisfy in 10 days. All three boat buyers held security interests in the boat hulls and appurtenances.

Other parties also held security interests in CMYC's assets. In September 1987, Northwest National Bank extended a line of credit to CMYC.

Under the credit agreement, the bank retained security interests in "essentially all assets of CMYC." 1 Clerk's Papers at 16. No exhibits can be found in the record clarifying what particular assets were encumbered by the bank's lien. The amounts CMYC borrowed against its credit line varied over the years, but as of December 1993, CMYC reached the credit limit and owed $ 1.2 million to Northwest National Bank.

Christensen personally guaranteed completion of the three boats to the buyers, and Christensen [**5] and CGI had also guaranteed payment of the loans made by KHD Deutz. Because of these personal guarantees, Christensen had a strong incentive to see that the boats were completed and delivered to the buyers.

Christensen admits CMYC was, or became, insolvent in 1993. The buyers' payments on the boats were not covering all costs. In July 1993, after extensive arbitration, Lloyd's of London was awarded $ 332,250 against CMYC. This amount was supplemented in September 1993, bringing the total award to $ 447,250. Eagle Pacific's demand letter, discussed above, was also sent to CMYC in July 1993.

Because of CMYC's outstanding debts to Lloyd's of London and Eagle Pacific, KHD Deutz threatened to declare CMYC in default of the financing agreement on the Lastebro boat. For December 1993 and January and February 1994, KHD Deutz suspended installment payments on the construction of the Lastebro boat. Christensen was worried the buyers of the other two boats would also suspend payments. Christensen explained the situation in an affidavit:

The only remaining way to convince KHD Deutz to resume advancing funds for completion of the Lastebro boat, and to assure that the three [**6] boat buyers would not all stop making progress payments on their boats, was to form a new corporation to complete the boats, under terms acceptable to KHD Deutz and the three buyers, and which did not have CMYC's financial burdens. 1 Clerk's Papers at 20. Christensen then created Christensen Shipyards Limited (CSL) to complete the boats. CSL, being unburdened by any of CMYC's debts, was able to obtain a line of credit from U.S. National Bank. CSL subcontracted with CMYC to finish construction of the three yachts.

135 Wn.2d 896; 959 P.2d 1052, *;
1998 Wash. LEXIS 570, **

CSL paid nothing to take over the yacht contracts, but if the contracts ultimately yielded a profit, the subcontract agreement contained a formula whereby CSL was to pay a percentage of the profits to CMYC. CSL paid $ 70,000 to CMYC for supplies inventory, and CSL agreed to pay CMYC $ 5,500 per month to lease CMYC's machinery and equipment to be used in the construction of the boats.

CMYC did not own the facilities where the yachts were constructed. Christensen states in his affidavit that CMYC was subleasing the space from CGI. After CSL took over the yacht contracts, CMYC forfeited its lease of the building to CGI, and CSL began renting the same space. [**7] In the end, CSL, with the same employees and in the same facilities, continued construction of the same three yachts. Eagle Pacific claims CMYC, for all purposes, ceased to exist. Christensen alleges CMYC continues to do business, and at the time he filed his affidavit in 1994 the [*1055] company was building a crane for the owner of a boat previously built by CMYC.

In superior court Eagle Pacific argued two theories why CSL was liable for CMYC's debts under the successor liability doctrine. First, Eagle Pacific claimed CSL was liable because it was a "mere continuation" of CMYC. 2 Verbatim Report of Proceedings at 24 (Oct. 28, 1994). As a second and alternative ground for imposing liability, Eagle Pacific claimed CMYC's transfer of assets to CSL was fraudulent. The trial court granted partial summary judgment to Eagle Pacific on this issue, and the Court of Appeals affirmed. CSL's successor liability for CMYC's debts forms the first issue we review.

The second issue presented for review involves the question of whether Eagle Pacific can look also to CGI to recover all or part of CMYC's debts. Additional facts regarding CGI's involvement with CMYC must be recited to aid [**8] in our analysis of this second issue.

When CMYC struggled financially, CGI and Christensen loaned large amounts of cash to CMYC. Christensen submitted evidence detailing CMYC's cash transfers to CMYC during 1993. Christensen's exhibit also shows CMYC making numerous cash transfers back to CGI. Christensen claims such transfers between CGI and CMYC occurred in the normal course of business and had been going on for years.

CGI's loans to CMYC in the beginning of 1993 were unsecured; but, on or about August 18, 1993, CMYC granted CGI a security interest in most, if not all, of CMYC's assets. The agreement created a security interest in CMYC's "inventory, stock in trade, equipment, fixtures, tools, parts, accessories, supplies, furnishings, bank accounts, accounts, general intangibles, and work in progress (the Collateral)." 1 Clerk's Papers at 65. The agreement specifies the security interest was subordinate to prior security interests including Northwest National Bank and KHD Deutz. An additional security interest was granted to CGI on or about November 22, 1993. CGI perfected its security interests against CMYC.

Eagle Pacific argues the cash transfers from CMYC to [**9] CGI, prior to creation of CGI's security interest in August 1993, violate RCW 19.40.051(b). Eagle Pacific claims that, prior to creation of CGI's security interest, CMYC transferred more cash to CGI than CGI transferred to CMYC. These transfers allegedly resulted in a net draw down of CMYC's assets, thereby favoring an insider creditor to the detriment of Eagle Pacific. Eagle Pacific claims CMYC transferred over $ 500,000 to CGI in the first half of 1993. The trial court agreed and held CGI liable under RCW 19.40.051(b).

The Court of Appeals found further questions of fact remained as to CGI's liability to Eagle Pacific under the *UFTA. Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp., 85 Wash. App. 695, 934 P.2d 715 (1997).* The Court of Appeals addressed other issues in its opinion, but those other issues have not been presented for review before this court.

First issue: Is CSL liable for CMYC's debt to Eagle Pacific as a successor corporation?

Normally, when a corporation sells its assets to another corporation, the purchasing corporation does not become liable for the debts of the selling corporation. *Hall v. Armstrong Cork, Inc., 103 Wash. 2d 258, 261,* [**10] *692 P.2d 787 (1984).* The rationale for this rule is a "bona fide purchaser who gives adequate consideration and who lacks notice of prior claims against the property acquires no liability for those claims." Hall, 103 Wash. 2d at 262. Four exceptions to this rule of non-liability exist. Successor liability is imposed if:

(1) the purchaser expressly or impliedly agrees to assume liability;

(2) the purchase is a de facto merger or consolidation; (3) the purchaser is a mere continuation of

135 Wn.2d 896; 959 P.2d 1052, *;
1998 Wash. LEXIS 570, **

the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability.

*Hall, 103 Wash. 2d at 261-62.* Liability may be imposed regardless of the exact form of transfer of assets between the corporations. *Stoumbos v. Kilimnik, 988 F.2d 949, 961 (9th Cir. 1993)* (applying Washington law).

[*1056] The trial court found CSL liable under the mere continuation exception to the nonliability rule. The Court of Appeals reversed the trial court on this issue. The trial court's ruling on the mere continuation theory was inconsistent with the trial court's later factual finding that Eagle
Pacific failed to prove CMYC's transfer of assets to CSL lacked sufficient consideration. [**11] None of the briefing before this court challenges the Court of Appeals' ruling with regard to the mere continuation doctrine, so we do not consider the issue.

The Court of Appeals ruled a different theory nonetheless supported imposition of successor liability on CSL. The appellate court held the findings of fact supported application of the fraudulent transfer theory--a theory which Eagle Pacific also presented to the trial court. The appellate court relied upon the trial court's finding "that CSL was created for the sole purpose of hindering CMYC's creditors." Eagle Pac., 85 Wn.
App. at 707. Even though Eagle Pacific failed to prove that the transfer of assets lacked sufficient consideration, the facts demonstrated CMYC's transfer of assets to CSL was designed to avoid the reach of creditors.

CSL's Petition for Review asserts a transfer of assets between corporations can never be fraudulent absent a showing of insufficient consideration: Eagle Pacific failed to prove CMYC's transfer of assets to
CSL lacked consideration, so the transfer cannot be fraudulent. CSL's argument oversimplifies the fraudulent transfer ground for imposing successor liability.

CSL is [**12] correct in its analysis when it states numerous cases have looked to adequacy of consideration in determining whether a transfer of assets was fraudulent. Adequate consideration for a transfer of assets between a buying and selling corporation is an important element when determining whether to impose successor liability. If the buying corporation pays sufficient consideration for the seller's assets, the selling corporation's creditors can then seek to satisfy their judgments from the sale proceeds. If the sale proceeds are equivalent in value to the transferred assets, then, assumedly, but not necessarily, no harm has been done to the creditors of the selling corporation.

In some situations, however, the selling corporation has intangible assets on which it is difficult to place a value. CSL paid nothing to CMYC

for CSL's assumption of the yacht contracts. The only benefit CMYC
received for transferring the yacht contracts was a contractual promise by
CSL to share a percentage of profits, if any, resulting from CSL's completion of the yachts. CSL argues the yacht contracts had no market value since any potential profit from completing the contracts was too speculative. [**13]

Eagle Pacific was unable to prove that these yacht contracts had a current market value; but this does not diminish the harm resulting to
Eagle Pacific when CSL took over the yacht contracts. By taking over the contracts, CSL thereby became entitled to future installment payments on the construction of the boats--payments from which Eagle Pacific could have satisfied its debts had CMYC continued the contracts. Indeed, as a result of CSL's taking over the contracts, Eagle Pacific lost the right to recover any of the future payments and potential future profits deriving from the construction of the three boats. CMYC used Eagle Pacific's insurance services without fully paying for those services; and, by CSL's taking over CMYC's operations, CSL ultimately yields the profits from CMYC's operations while cutting off Eagle Pacific's ability to recover its debts.

Eagle Pacific's inability to establish inadequate consideration does not preclude a court from finding the transfer of assets was fraudulent. None of the cases cited by CSL hold insufficient consideration is a necessary element for a finding of fraud. Rather, insufficient consideration is merely a sufficient element. [**14]

The fraudulent transfer theory is usually discussed as having at least two alternative elements. "It is generally held that if one corporation purchases the assets of another and pays a fair consideration therefor, no liability for the debts of the selling corporation exists in the absence of fraud or agreement to assume the debts." *19 Am. [*1057] Jur. 2d Corporations sec. 2704* (1986) (emphasis added); see also 15 William Meade Fletcher, Cyclopedia of the Law of Private Corporations sec. 7125
(1990 rev. perm. ed.) (hereinafter Fletcher Cyc. Corp.) ("But where a corporation receives in good faith a transfer of the assets of another corporation, and pays full consideration, the transfer is not fraudulent.")
(emphasis added). Both treatises show fraud can be present despite the payment of adequate consideration. Case law from our jurisdiction and other jurisdictions supports our reading of these treatises.

In Culinary Workers & Bartenders Union, Local 596 v. Gateway Cafe,

135 Wn.2d 896; 959 P.2d 1052, *;
1998 Wash. LEXIS 570, **

*Inc., 91 Wash. 2d 353, 588 P.2d 1334 (1979)* (Gateway), this court held Bypass

Sales, Inc., a successor corporation to Gateway, was liable for the debts and other contractual responsibilities of the predecessor [**15] Gateway corporation. Evidence showed the creation of Bypass and dissolution of

Gateway was "designed to avoid their settlement responsibilities."

*Gateway, 91 Wash. 2d at 367.* The court observed:

The dissolution eventually left Gateway without a single asset.

Bypass, a new corporation with substantially identical ownership,

operating the identical business with identical employees in an identical location to Gateway, received all Gateway's assets.

*Gateway, 91 Wash. 2d at 367.* Although the court did not specifically state under which theory of successor liability Bypass was liable, the court's language stated the transfer of assets was designed to avoid Gateway's responsibilities to the Culinary Workers and Bartenders Union. This description suggests the imposition of liability fell under the fraudulent transfer theory. The amount of consideration Bypass paid for Gateway's assets was not discussed in the decision. The important factors discussed by the court were the identity of parties behind each corporation and the bad faith reason behind the transfer of assets.

In *Long v. Home Health Servs. of Puget Sound, Inc., 43 Wash. App. 729, 719 P.2d 176,* [**16] (1986), an employee of a nursing home sued the successor corporation of the home for back wages owed by the predecessor corporation.

The Court of Appeals held the sale of assets between the two corporations was in good faith and for full consideration, thereby negating the plaintiff's fraudulent transfer argument. *Long, 43 Wash. App. at 738.* The decision explicitly relied on two different factors--adequate consideration and good faith. *Long, 43 Wash. App. at 737-38.* The court also observed that there was no common identity between the operators of the two corporations.

*Long, 43 Wash. App. at 736.* Long demonstrates consideration is not the conclusive issue under the fraudulent transfer theory--there is also an issue of whether the transfer is in good faith.

In *Stoumbos v. Kilimnik, 988 F.2d 949 (9th Cir. 1993),* a bankruptcy trustee sought to impose successor liability on a new corporation, where both the predecessor and successor corporations were run by Walter

Kilimnik. The court discussed both the mere continuation and the fraudulent transfer theories. The transfers between the debtor and the successor corporation were complicated, and it was difficult to determine [**17] whether the purchasing corporation had paid sufficient consideration for the seller's assets. The court ultimately ruled it was not necessary to decide on the adequacy of consideration:

Because we conclude that successor liability may exist based on the fraud-to-creditors theory, at this juncture we need not decide the extent and adequacy of the consideration and the bankruptcy court may not need to do so on remand.

The circumstances of this case indicate that Kilimnik may be liable as a successor under a fraud-to-creditors theory.

*Stoumbos, 988 F.2d at 962.* The court then went on to discuss how

Kilimnik's actions left the debtor corporation with substantial liabilities. The court's analysis demonstrates consideration is not a necessary element of the fraudulent transfer theory.

Cases from other jurisdictions support imposing successor liability on

CSL under the fraudulent transfer exception. In *Avery v. Safeway Cab, Transfer & Storage Co., 148 Kan. 321, 80 P.2d 1099 (1938),* the plaintiff was injured on March 17, 1935, by a taxicab [*1058] owned and operated by *Peoples Taxicab Company. Avery, 80 P.2d at 1100.* On July 20, 1935, Avery sued Peoples Taxicab for damages. [**18] On that same day, all of Peoples Taxicab's assets were transferred to Safeway Cab, Transfer & Storage Company. With one exception, the stockholders, directors and officers of both companies were identical. Id. The court held Avery could look to Safeway Cab for her damages:

Where the transfer of assets strips a debtor corporation of all its assets, and disables the corporation from earning money to pay its debts, thus leaving creditors and holders of claims no resources to which they may look for the payment of their due, the net result is in legal effect a fraud; and the courts will subject the transferee to liability for the satisfaction of claims against the corporation whose assets it has absorbed.

*Avery, 80 P.2d at 1101.*

Avery applies to the facts of this case. CMYC's principal business purpose was the construction of yachts. In the course of the construction of the three yachts, CMYC incurred debts which it could not pay. With the transfer of the three yacht contracts to CSL, and CMYC's surrender of its employees and facilities to CSL, CMYC was stripped of its main potential source for future revenues. Christensen admits the yacht

135 Wn.2d 896; 959 P.2d 1052, *;
1998 Wash. LEXIS 570, **

contracts were transferred [**19] to CSL to allow the continuation of construction on the yachts unhampered by creditors' efforts to collect unpaid bills.

Christensen's admitted reason for the transfer of assets from CMYC to
CSL fits the definition of a fraudulent transfer. Eagle Pacific's inability to prove CSL paid insufficient consideration for the transferred assets does not automatically purge the transaction of fraud. The intent behind the transfer of assets can render the transaction fraudulent, as demonstrated by two recent cases involving asbestos claims. In Oregon state, Raymond Schmoll sued Raymark Industries, Inc. (Raymark) and Raytech
Corporation (Raytech) for damages arising from Schmoll's asbestos-caused injuries. *Schmoll v. ACandS, Inc., 703 F. Supp. 868 (D. Or. 1988)*, aff'd,
*977 F.2d 499 (9th Cir. 1992).* Raymark originally stood as a single corporation with five different divisions. Two divisions, Wet Clutch &
Brake and Raybestos Industrie--Produkte G.m.b.H (RIPG), a German subsidiary, were very profitable, and had not generated asbestos liabilities. Through a series of complicated transactions involving numerous corporate shells, Wet Clutch & Brake and RIPG, the profitable divisions, [**20] ended up being owned by Raytech, and the other three liability-
ridden divisions were owned by Raymark. See *Schmoll, 703 F. Supp. at 870-71.*

Schmoll successfully argued that Raytech was liable for Raymark's manufacture and distribution of asbestos-containing products. The District
Court, following Oregon law, imposed liability under the fraudulent transfer theory. Rather than dwelling on the nature or amount of consideration involved in the complicated transactions, the court found the elaborate transfer of assets "was designed with the improper purpose of escaping asbestos-related liabilities." *Schmoll, 703 F. Supp. at 874.* The court held "Raymark Industries should not be allowed to avoid liability by transferring its profitable assets leaving no more than a corporate shell unable to satisfy its asbestos-related obligations." *Schmoll, 703 F. Supp.*
at 874.

Seven years after Schmoll was decided, Raytech filed for bankruptcy and sought a declaration from the bankruptcy court holding Raytech immune from Raymark's asbestos-related liabilities. See *Raytech Corp. v. White, 54 F.3d 187, 190 (3d Cir. 1995).* The main issue was whether Schmoll collaterally estopped Raytech [**21] from relitigating the issue of its successor liability for Raymark. The United States District Court found Schmoll did estop Raytech from relitigating the issue, and the Third Circuit Court of Appeals, after

conducting a detailed analysis of Schmoll, affirmed the District Court. *Raytech, 54 F.3d at 196.*

One challenge in Raytech was that Oregon's successor liability law was unique, and its holding did not apply in other jurisdictions. The Third
Circuit disagreed. "To impose liability on the successor corporation, the law in every jurisdiction, including Oregon, requires a finding that the corporate [*1059] transfer of assets 'is for the fraudulent purpose of escaping liability.'" *Raytech, 54 F.3d at 192* (quoting Fletcher Cyc. Corp. sec. 7122, at 232). The court subsequently clarified the meaning of "fraudulent" as used in the successor liability doctrine: "Under Fletcher's articulation of the exception, transferring corporate assets for the purpose, or with the intention, of escaping liability is, by definition, a transfer of assets with fraudulent purpose." *Raytech, 54 F.3d at 192.*

Raytech also sought to avoid collateral estoppel by arguing essential facts had changed since [**22] Schmoll was decided in 1988. Raytech argued Schmoll imposed successor liability because Raytech's acquisition of RIPG and Wet Clutch & Brake lacked consideration. Raytech argued to the Pennsylvania court that, since Schmoll was decided, it had paid over $ 63 million to Raymark for the two profitable divisions. *Raytech, 54 F.3d at 193.* The Third Circuit ruled the amount of consideration paid was not an essential factor in Schmoll's holding:

While [Schmoll] also placed some emphasis upon the facts that Raytech had passed unsecured notes and Raytech stock of questionable value to
Raymark as part of the purchase price for RIPG and Wet Clutch & Brake,
the court appears to have been equally troubled by the fact that the restructuring left Raymark's creditors without access to the potential stream of profits generated by RIPG and Wet Clutch & Brake. See *Schmoll, 703 F. Supp. at 873.* This latter concern would have been warranted regardless of the value of the consideration passed by
Raymark to Raymark.
*Raytech, 54 F.3d at 194.* The Third Circuit observed that Schmoll "doubted the bona fides of the sale of Raymark .
. . following the purchase by Raytech of Raymark's profitable [**23] assets." *Raytech, 54 F.3d at 194.* The overall context of the multi-layered corporate transactions "smacked of dubious intent." Id. Finally, the court concluded:

We also note that it was not the failure or the inadequacy of consideration proffered by Raytech for the purchase of Raymark's profitable assets that so deeply troubled the court in Schmoll;

135 Wn.2d 896; 959 P.2d 1052, *;
1998 Wash. LEXIS 570, **

instead the court viewed the transaction as rife with improper intent

. . . .

*Raytech, 54 F.3d at 195*. See also *National Carloading Corp. v. Astro Van*

*Lines, Inc., 593 F.2d 559, 563 (4th Cir. 1979)* ("Without the bona fides on the part of the grantee, the valuable consideration has no effect in rescuing the transaction from the literal terms and spirit of the

Statute.") (internal quotation marks omitted) (applying Virginia State law).

CSL is simply incorrect in its claim that adequate consideration precludes a finding of fraudulent transfer of assets. The fraudulent transfer theory has always required consideration and good faith, as mentioned in *Long v. Home Health Servs. of Puget Sound, Inc., 43 Wash. App. 729, 738, 719 P.2d 176 (1986)* and as illustrated by Avery, Schmoll, and Raytech. Numerous factors may be relevant [**24] when determining good faith.

The common ownership of the buying and selling corporations casts a suspicion on the transactions. Cf. *Dummer v. Wheeler Osgood Sales Corp., 198 Wash. 381, 391, 88 P.2d 453 (1939)* ("'Undoubtedly, it is the general rule that mere common ownership of the capital stock or interlocking directorates, or like evidences of close association, will not justify the courts in disregarding corporate identities, but where, as here, the identities are so confused and intermingled as to result in probable fraud upon third persons dealing with the corporations or either of them, whether fraud be actually intended or not, then the exception to the rule will apply, and the exception is as well established as the rule itself.[']") (quoting *Associated Oil Co. v. Seiberling Rubber Co., 172 Wash. 204, 207, 19 P.2d 940 (1933))*. A corporation's purchase of another corporation's assets is more likely to be an arm's-length transaction when there is no common identity between the corporations and individuals involved.

Good faith, or the lack thereof, ultimately rests upon the intent of the parties involved in the transaction. Transferring assets [**25] to another corporation to hinder or delay creditors is by definition a fraudulent transfer. *Raytech, 54 F.3d at 192*.

In his own words, Christensen admits the transaction [*1060] was designed to continue building the yachts without interference from creditors:

The only remaining way to convince KHD Deutz to resume advancing funds for completion of the Lastebro boat, and to assure that the three boat buyers would not all stop making progress payments on their boats, was to form a new corporation to complete the boats, under terms acceptable to KHD Deutz and the three buyers, and which did not have CMYC's financial burdens.

1 Clerk's Papers at 20 (emphasis added). In the course of conducting business and building yachts, CMYC incurred debts which Christensen sought to avoid by transferring the business to CSL. Because the assets were transferred to CSL to avoid the reach of the creditors, the transaction is fraudulent and successor liability attaches to CSL. The fact that the transaction was designed to "save the business" does not defeat imposition of successor liability. We affirm the Court of Appeals as to CSL's liability.

Second Issue: Do the facts support summary [**26] judgment for Eagle Pacific against CGI under *RCW 19.40.051(b)*?

The trial court found CMYC had transferred cash to CGI in violation of *RCW 19.40.051(b)*. The Court of Appeals reversed the trial court's partial summary judgment, finding further questions of fact existed. The Court of Appeals focused on the issue of whether the transferred assets were encumbered by valid security interests.

*RCW 19.40.051(b)* states:

A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Two critical factual issues regarding application of *RCW 19.40.051(b)* to this case are presented. The first issue regards when Eagle Pacific's claim accrued. The second issue involves whether the transferred assets are subject to the UFTA.

*RCW 19.40.051(b)* applies to transfers only if the transfers occurred before the creditor's claim arose. The UFTA gives a very broad definition of a claim:

"Claim" means a right to payment, whether or not the right is reduced to judgment, [**27] liquidated, unliquidated, fixed, contingent,

matured, unmatured, disputed, undisputed, legal, equitable, secured,

or unsecured.

*RCW 19.40.011(3)*. Before the trial court can analyze any particular transfers for possible violation of the UFTA, the court must first establish the date upon which the creditor's claim arose. We can find no documentation in the record supporting Eagle Pacific's assertion that its claim arose as of December 1991.

Eagle Pacific's various pleadings filed before the trial court only imply CMYC's debt arose as of December 1991 for failure to pay premiums on the 1991 and 1990 workers' compensation insurance policies. It may be that

135 Wn.2d 896; 959 P.2d 1052, *;
1998 Wash. LEXIS 570, **

Eagle Pacific's claim can be considered an "unmatured" right to payment as early as December 1991, thereby satisfying the definition of a claim under the UFTA. If the policies involved retrospective premiums, however, it could be argued Eagle Pacific's right to payment did not arise until Eagle
Pacific actually submitted the bill to CMYC in July 1993. This is a novel issue not addressed by the parties, unresolved in the record, and it precludes summary judgment. Questions of fact remain as to when Eagle Pacific's [**28] claim arose.

The second unresolved issue involves whether the assets transferred from CMYC to CGI are subject to the UFTA. The UFTA defines "transfer" as any means of disposing of an asset. *RCW 19.40.011(12)*. "Asset" means the property of the debtor, but does not include "property to the extent it is encumbered by a valid lien[.]" *RCW 19.40.011(2)(i)*. A "lien" is defined, in part, as "an interest in property to secure payment of a debt[.]" *RCW 19.40.011(8)*. Simply put, if a debtor transfers assets unencumbered by security interests, that transfer may be analyzed for fraud under *RCW 19.40.051(b)*; but, if the debtor transfers assets encumbered by security interests, that transfer is beyond the reach of the statute.

[*1061] As mentioned in the summation of the facts above, CGI did not hold a security interest in any of CMYC's assets prior to August 1993. CGI's security interest was created on or about August 18, 1993. In the months
(and possibly years) prior to this date, CGI made numerous loans to CMYC,
and CMYC periodically made loan repayments back to CGI.

CGI argued after the Court of Appeals that any of the cash transfers from CMYC to CGI are outside the scope of [**29] the UFTA because of the existence of other security interests in those assets. The three yacht buyers held security interests in the boats, supplies and accessories. CMYC's line of credit with Northwest National Bank included the bank's holding security interests in essentially all of CMYC's assets.

Eagle Pacific argues CGI failed to demonstrate two important facts.
First, Eagle Pacific claims CGI failed to prove on the record the cash assets transferred from CMYC to CGI were in fact encumbered by valid liens held by the bank or any other secured party for that matter. Secondly, Eagle Pacific points out the record only shows the bank's line of credit was fully extended as of December 1993-- nothing in the record shows how much CMYC owed the bank on the credit line in the first half of 1993 when the challenged transfers to CGI occurred. Eagle Pacific claims CGI's failure to establish these facts supports the trial court's grant of partial summary judgment, but we agree with the Court of Appeals and find
CGI's arguments sufficiently raise questions of fact requiring a remand.

In conclusion, we affirm the imposition of successor liability on CSL,
and we affirm and remand [**30] on the issue of CGI's liability under the UFTA.
WE CONCUR:

Barbara Durham

Charles Z. Smith

Richard P. Guy

Charles W. Johnson

Barbara A. Madsen

Gerry L. Alexander

Philip A. Talmadge

Richard B. Sanders

LEXSEE 2003 MASS. SUPER. LEXIS 84

**Epstein, Becker & Green, PC v. Atlas Venture**

**02-5445 BLS**

**SUPERIOR COURT OF MASSACHUSETTS, AT SUFFOLK**

*2003 Mass. Super. LEXIS 84*

**March 24, 2003, Decided**

**DISPOSITION:** Defendant's motion to dismiss complaint allowed.

**LexisNexis(R) Headnotes**

**JUDGES:** [*1] Allan van Gestel, Justice of the Superior Court.

**OPINIONBY:** Allan Van Gestel

**OPINION:** MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS AND FOR *G.L.C. 231, SEC. 6F* SANCTIONS

This matter comes before the Court on a motion by the defendant, Atlas Venture ("Atlas"), to dismiss the complaint pursuant to *Mass.R.Civ.P. Rule 12(b)(6)* and for sanctions pursuant to *G.L.c. 231, Sec. 6F*. The plaintiff, Epstein, Becker & Green, P.C. ("EB&G"), is a large law firm with offices in several cities, including Boston.

What is involved basically is a claim for breach of a contract drafted by EB&G. The complaint, however, contains a somewhat common array of six separate counts, as follows: Count I for breach of contract; Count II for breach of the implied covenant of good faith and fair dealing; Count III for breach of an implied contract/unjust enrichment; Count IV for promissory estoppel; Count V for violation of *G.L.c. 93A, Secs. 2, 11*; and Count VI for declaratory judgment.

Because, at heart, what is involved is a relatively simple breach of contract claim, the Court will first focus on Count I.

The facts, [*2] as they must be, are taken from the complaint.

BACKGROUND

In the spring and summer of 2001, a new office tower (the "Building") located at 111 Huntington Avenue, Boston, was being leased for initial occupancy. Two of the tenants, EB&G and Atlas, got together with a third tenant, SAS Institute, Inc. ("SAS"), and proposed a swap transaction to the landlord. It is the portion of that transaction between EB&G and Atlas that produced the contract in issue.

Originally: EB&G agreed to lease the entirety of the 27th floor and three-quarters of the 28th floor of the Building; Atlas agreed to lease the entirety of the 26th floor of the Building; and SAS agreed to lease approximately one-half of the 23rd floor of the Building.

For reasons personal to each of EB&G, Atlas and SAS, they each had a desire to reconfigure their leased premises, thereby resulting in the swap.

The essence of the swap was: Atlas would abandon its lease for the entire 26th floor and take over SAS's lease for about one-half of the 23rd floor; EB&G would abandon its lease for three-quarters of the 28th floor, take Atlas's space on the 26th floor and retain its original space on the 27th floor; and SAS would take [*3] EB&G's space on the 28th floor.

EB&G asserts that it was only interested in participating in the swap if the transaction would be economically neutral to it. For that reason, EB&G informed Atlas that the swap would only be acceptable if Atlas agreed to assume liability for any difference between the actual rent that EB&G would receive for certain space defined as the "Sublease Space" and the rent EB&G would have to pay the landlord under its lease for that space (the "rent subsidy"). The Sublease Space is an additional 6,000 square feet that EB&G

would become responsible for on the 26th floor that it did not have on the 28th floor.

While an exchange of letters between the landlord and the three parties proposing the swap occurred, and the arrangement was ultimately approved, what is in issue in this lawsuit is a document between EB&G and Atlas relating to the rent subsidy for the Sublease Space. This was accomplished by a letter agreement dated August 17, 2001 (the "Letter Agreement").

The document that formed the Letter Agreement was a letter drafted by EB&G. The Letter Agreement was accepted, without change, by Atlas on the same day, August 17, 2001. It reads in material part [*4] as follows:

This letter sets forth the understanding between EBG and Atlas with respect to 6,000 square feet of office space to be sublet by EBG on the 26th Floor . . .

1. EBG intends to sublet approximately 12,000 of its approximately 25,000 square feet of space on the 26th floor of 111 Huntington Avenue, Boston, MA. EBG will sublet such space in two 6,000 square foot blocks. The first 6,000 square foot sublease will be for a term of two to four years. All economic risks associated with this sublet space shall remain with EBG.

2. The second 6,000 square foot block of space will be sublet to a third party by EBG for a period of six years (the "Sublease Space"). Atlas and EBG agree that in the event EBG subleases this space at a per square foot rent of less than $ 61.00, Atlas will pay to EBG the difference between such rent and $ 61.00 per square foot; provided, however, that in no event will Atlas be required to pay EBG more than $ 11.00 per square foot per year ($ 66,000.00 annually) with respect to the Sublease Space pursuant to this Section 2 . . .

3 . . . Atlas will also pay to the appropriate broker(s) when due, all brokerage commissions associated with renting the Sublease [*5] Space; provided that such brokerage commissions shall not exceed $ 36,000 in the aggregate.

4. In no event shall Atlas have any obligation to make payment to EBG pursuant to the terms of this Letter in the event that EBG occupies the Sublease Space.

For reasons wholly unrelated to Atlas, EB&G, based on information received from its architects and designers, learned that it would be considerably more difficult to build an internal staircase and complete construction if the main entrance to its offices was maintained on the 27th floor and the 28th floor was flipped to the 26th floor. There would be no such difficulties if, instead of a "flip," the original plans

remained unchanged, but with the 26th and 27th floors being built as the 27th and 28th floors were originally drawn.

As a result, on the 26th floor, where EB&G was going to sublease two 6,000-square-foot spaces, they both, including particularly the one referred to in the Letter Agreement as the Sublease Space, now would be on the 27th floor, not part of the former Atlas space on the 26th floor. The rent, other financial terms, and the physical features of the spaces to be sublet would remain identical on the 27th floor to [*6] what they were going to be on the 26th floor.

For a number of reasons, again having nothing to do with Atlas, until July 1, 2002, EB&G was not able to sublease a 6,000-square-foot space on the 27th floor that would have been the Sublease Space on the 26th floor, and was not able to get as rent therefor the $ 50.00 per square foot that had been projected.

When EB&G demanded from Atlas additional rent for the space EB&G had sublet, Atlas refused to pay on the grounds that the sublet space was located on the 27th floor, and was not the Sublease Space on the 26th floor as defined in the Letter Agreement.

DISCUSSION

A Rule 12(b)(6) motion admits all well-pleaded allegations of the complaint, and the Court must accept as true such inferences as may be drawn in the plaintiff's favor. *Blank v. Chelmsford Ob/Gyn P.C., 420 Mass. 404, 407, 649 N.E.2d 1102 (1995)*; *General Motors Acceptance Corp. v. Abington Cas. Ins. Co., 413 Mass. 583, 584, 602 N.E.2d 1085 (1992)*; *Natick Auto Sales, Inc. v. Department of Procurement and General Services, 47 Mass.App.Ct. 625, 630, 715 N.E.2d 84 (1999)*. Of course, conclusions of law from the facts alleged [*7] are open for review on a *Rule 12(b)(6)* motion. The complaint here, however, is sufficient unless it shows beyond doubt that no provable set of facts would entitle the plaintiff to relief. *Warner-Lambert Company v. Execuquest Corporation, 427 Mass. 46, 47, 691 N.E.2d 545 (1998)*; *Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 68, 595 N.E.2d 316 (1992)*; *Moll Industries, Inc. v. Oral-B Laboratories, Inc., Suffolk Superior Court, 2001 Mass. Super. LEXIS 407*, Civil Action No. 01-1301 BLS, 13 Mass. L. Rptr. 569, aff'd. pursuant to Rule 1:28, *57 Mass. App. Ct. 1113; 784 N.E.2d 1151 (2003)*. The plaintiff bears a "relatively light burden," *Warner-Lambert Co., supra, 427 Mass. at 47*, and must be given the benefit of any doubts. *Kipp v. Kueker, 7 Mass.App.Ct. 206, 210, 386 N.E.2d 1282 (1979)*. These are "generous principles," and the Court will apply them in the way they are intended. *Connerty v.*

*Metropolitan District Commission, 398 Mass. 140, 143, 495 N.E.2d 840 (1986).*

The August 17, 2001, Letter Agreement looms large in any decision regarding the merits of this case. The Letter Agreement [*8] is appended to--and thereby made a part of--the complaint. It is central to the entire dispute and, as such, it must be interpreted by the Court in reaching its conclusions on the pending motion.

The interpretation of an unambiguous agreement is an issue of law for the Court. *Lumbermans Mut. Cas. Co. v. Zoltek Corp., 419 Mass. 704, 707, 647 N.E.2d 395 (1995).* Contract language must be construed in its usual and ordinary sense. *116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376, 742 N.E.2d 76 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381, 688 N.E.2d 951 (1998).* A contract provision is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Citation Ins. Co., supra, 426 Mass. at 381.* The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. *Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466, 645 N.E.2d 1165 (1995).*

When an element of ambiguity does appear in a contract, [*9] the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. *MacDonald v. Gough, 326 Mass. 93, 96, 93 N.E.2d 260 (1950).* "The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose." *USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116, 546 N.E.2d 888 (1989).* The Court must act in a way to give effect to the agreement as a rational business instrument in order to carry out the intent of the parties. *Starr v. Fordham, 420 Mass. 178, 192, 648 N.E.2d 1261 (1990).* Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. *Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119, 718 N.E.2d 383 (1999).*

Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. *City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720, 716 N.E.2d 138 (1999).* [*10]

In construing the Letter Agreement, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the transaction and the purposes to be accomplished. *Starr v. Fordham, 420 Mass. 178, 190,*

*648 N.E.2d 1261 (1995); Shea v. Bay State Gas Co., 383 Mass. 218, 224-25, 418 N.E.2d 597 (1981).*

Significantly here, the plaintiff--a major national law firm--is extremely sophisticated in the matters in issue. Where a sophisticated and knowledgeable party chooses to embody its relationship in a simple written instrument crafted by it, it is entitled to and should be held to the contractual language it chose. The Court should be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instrument that are specifically anticipated and addressed within the agreement overwhelm or change the contract itself. What the Court must not do is to attempt to re-write the parties' contract to conform to the Court's sense of equity or preference for a different outcome. *Rogaris v. Albert, 431 Mass. 833, 835, 730 N.E.2d 869 (2000).* [*11] "Courts cannot . . . [for example,] use commercial context to override express provisions of a contract." *Plymouth Rubber Co., Inc. v. Insurance Company of North America, Inc., 18 Mass.App.Ct. 364, 369, 465 N.E.2d 1234 (1984).*

The only space that Atlas had to contribute to the swap was its lease-hold rights to the entire 26th floor. It had no other tenancy interests in the Building. Consequently, for all that appears, Atlas could have made a simple swap with SAS alone. SAS would thereby get the additional space it desired, and Atlas would become responsible for the lesser space it desired. These two parties could, if necessary, have worked out a rent subsidy just like that between Atlas and EB&G in the Letter Agreement.

EB&G, despite its protests to the contrary, however, had its own reason for wanting to be involved in the swap. Its space on the 28th floor was not the entire floor. EB&G did not need the whole floor at the time, but prudently was planning for future expansion. Standing in the way of that expansion on the 28th floor was the other tenant, which had the first option on the space. Thus, by moving from the 28th floor to the 26th floor, EB&G would be [*12] in control of the entire floor and could sublet parts thereof until it needed expansion space.

In this context, the Court examines the language chosen by EB&G, the drafter of the Letter Agreement. The Court can fairly assume that EB&G, a firm comprised of competent and sophisticated lawyers having their own interests at stake, exercised care in preparing the Letter. It wrote, "EBG intends to sublet approximately 12,000 of its approximately 25,000 square feet of space on the 26th floor of 111 Huntington Avenue, Boston, MA." Letter Agreement, Section 1. The obligation of Atlas with regard to the rent subsidy, in the plainest of words, relates to "the second 6,000 square foot block of space [that] will be sublet to a third party

by EBG for a period of six years (the 'Sublease Space')." Letter Agreement, Section 2. By this sentence the words "Sublease Space" became a defined term and was no longer just any space that EB&G, at its option, chose to sublease on any of its two floors in the Building. Equally clear are the words of EB&G in Section 4: "In no event shall Atlas have any obligation to make payment to EBG pursuant to the terms of [the] Letter [Agreement] in the event that [*13] EBG occupies the Sublease Space." EBG occupied the entire 26th floor, which included the defined Sublease Space. "The language of the [Letter Agreement] involved is explicit . . . There is nothing ambiguous in this language and the Court cannot subvert its plain meaning." *Freelander v. G.&K. Realty Corp., 357 Mass. 512, 515-16, 258 N.E.2d 786 (1970).*

The swap having occurred, "changed circumstances, unforseen at the time the Swap was entered into, required that the literal language of one portion of the August 17th letter be deviated from in order to effectuate the parties' intent." These are EB&G's chosen words at p. 9 of its opposition to the motion to dismiss. But this Court has no authority to deviate from the literal language included in a contract on the request of just one party thereto because some circumstance has changed since the contract's making.

In *Freelander,* the S.J.C. affirmed the trial court and stated, "We do not believe that the 'equitable construction of the documents' urged by the plaintiffs is applicable here." *Id. at 516.* This Court both agrees with the *Freelander* decision and, in any event, is bound by it. There [*14] is no breach by Atlas of the contract drafted by EB&G and, therefore, Count I must be dismissed.

In the absence of a breach of contract, there can be no breach of any implied covenant of good faith and fair dealing. *Dunkin' Donuts, Inc. v. Panagakos, 5 F. Supp. 2d 57, 64 (D.Mass. 1998).* See, also, *Owen v. Kessler, 56 Mass.App.Ct. 466, 471-72, 778 N.E.2d 953 (2002).* Count II cannot stand either.

Count III raises two issues: an implied contract and unjust enrichment. Neither applies in this case.

There can be no valid claim for an implied contract when, in fact, there is an actual written contract. See, e.g., *James B. Rendle Co. v. Conley & Daggett, Inc., 313 Mass. 712, 713-14, 48 N.E.2d 676 (1943); Popponesset Beach Association v. Marchillo, 39 Mass.App.Ct. 586, 592, 658 N.E.2d 983 (1996).*

Nor is this a case involving unjust enrichment. There is nothing in the complaint showing that Atlas received a benefit conferred by EB&G without offering compensation therefor; nor is there any basis to concluded that Atlas obtained from EB&G a benefit, not intended as a gift and not legally justifiable, for which

Atlas must [*15] make restitution or recompense. EB&G received the leasehold rights to the 26th floor from Atlas. Atlas received the rights of SAS to the 23rd floor. That Atlas's rental obligations were enhanced, however significantly, comes out of the relationship between Atlas and the landlord. EB&G was not the landlord to Atlas, and EB&G gave nothing to Atlas by way of reduced rent.

Count III does not state a claim upon which relief may be granted.

Count IV seeks relief for promissory estoppel. But here there are no allegations that EB&G relied upon any particular promise by Atlas aside, of course, from that in the Letter Agreement itself. An "action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration." *Rhode Island Hospital Trust National Bank v. Varadian, 419 Mass. 841, 850, 647 N.E.2d 1174 (1995).* There is no allegation that Section 4 of the Letter Agreement related to other than the 26th floor or that Atlas was in breach in insisting thereon. Nothing permits even an inference that Atlas said or did anything that would enable EB&G to reasonably rely upon that [*16] compels payment of a rent subsidy for any floor at 111 Huntington Avenue other than the 26th. See, e.g., *Hall v. Horizon House Microwave, Inc., 24 Mass.App.Ct. 84, 93-94, 506 N.E.2d 178 (1987).*

Count V is the G.L.c. 93A count that so frequently provides the caboose to the long train of events following the engine of what is truly at stake, a claimed breach of contract. Here, however, the engine never pulled out of the station--there is no breach of contract--and, thus, there is nothing to which the caboose can be attached. As this Court said in *Bradston Assocs., LLC v. Rouse, 2002 Mass. Super. LEXIS 378,* Suffolk Civil Action No. 02-2426 BLS, "Even routine breaches of contract do not constitute c. 93A violations. *Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47 (1st Cir. 1998); Cahill v. TIG Premier Ins. Co., 20 F. Supp. 2d 141 (D.Mass. 1998).* Here there is no breach of contract at all." There is no basis for a c. 93A claim.

The final count, Count VI, seeks declaratory relief essentially declaring that the rent subsidy is due from Atlas to EB&G. For the reasons stated above, the Court declines to enter such a declaration. The Court should, however, enter [*17] a declaration consistent with its rulings herein. "When an action for declaratory relief is properly brought and relief is denied on the merits, the action should not be dismissed . . . The rights of the parties should be declared." *Attorney General v. Kenco Optics, Inc., 369 Mass. 412, 418, 340 N.E.2d 868 (1976).*

Consequently, a judgment shall enter on Count VI declaring that Atlas is not in breach of the Letter Agreement, and EB&G is not entitled to any recovery from Atlas.

Atlas also seeks a separate and distinct finding, pursuant to *G.L.c. 231, Sec. 6F*, that all or substantially all of the claims made by EB&G were wholly insubstantial, frivolous, and not advanced in good faith, and award reasonable counsel fees and other costs and expenses incurred herein to Atlas. On the record before it, this Court is not prepared to make an explicit judicial finding that the plaintiff's claims were not advanced in good faith. See *Bartlett v. Greyhound Real Estate Finance Co., 41 Mass.App.Ct. 282, 292, 669 N.E.2d 792 (1996)*.

ORDER

For the foregoing reasons, the motion of the defendant, Atlas Venture, to dismiss the complaint of [*18] the plaintiff, Epstein, Becker & Green, P.C., pursuant to *Mass.R.Civ.P. Rule 12(b)(6)* is ALLOWED as to all counts.

Further, on Count VI a declaratory judgment shall enter in favor of the defendant, Atlas Venture, as follows:

1. Because Epstein, Becker & Green, P.C. has not sublet the "Sublease Space," being that space on the 26th floor at 111 Huntington Avenue, Boston, but rather occupies the Sublease Space itself, Atlas Venture is not obligated to pay the Rent Subsidy pursuant to Sections 2 and 4 of the Letter Agreement of August 17, 2001;

2. Atlas Venture has neither breached nor repudiated its obligations under the Letter Agreement of August 17, 2001; and

3. Epstein, Becker & Green, P.C. is entitled to recover nothing from Atlas Venture.

Allan van Gestel

Justice of the Superior Court

DATED: March 24, 2003

LEXSEE 16 MASS L REP 212

**Fleet National Bank v. Certain Underwriters at Lloyd's, London n1**

**n1 Liberty Mutual Insurance (UK) Limited; American International
Specialty Lines Insurance Company; Federal Insurance Company; Exclusive
Risk Indemnity, Inc.; Travelers Casualty & Surety Company of America;
Gulf Insurance Company; St. Paul Fire & Marine Insurance Company; and
United States Fidelity & Guaranty Company.**

**02-2673 BLS**

**SUPERIOR COURT OF MASSACHUSETTS, AT SUFFOLK**

*16 Mass. L. Rep. 212; 2003 Mass. Super. LEXIS 137*

**May 14, 2003, Decided**

**DISPOSITION:** [*1] Motion denied.

**LexisNexis(R) Headnotes**

**JUDGES:** Allan van Gestel, Justice of the Superior
Court.

**OPINIONBY:** Allan Van Gestel

**OPINION:** *MEMORANDUM AND ORDER ON
MOTION TO DISMISS THE THIRD CAUSE OF
ACTION IN THE SECOND AMENDED COMPLAINT*

This matter comes before the Court on a motion by
the defendants to dismiss the third cause of action in the
second amended complaint. This cause of action is
predicated on alleged violations of *G.L.c. 93A, Secs. 2
and 11.* The principal issue involved at this time is
whether the acts complained of in the second amended
complaint on which the third cause of action is grounded
occurred primarily and substantially in Massachusetts.

For these purposes the portion of *G.L.c. 93A, Sec. 11*
that is pertinent reads:

No action shall be brought or maintained under this
section unless the actions and transactions constituting
the alleged unfair method of competition or the unfair or
deceptive act or practice occurred primarily and
substantially within the commonwealth. For the purposes
of this paragraph, the burden of proof shall be upon the
person claiming that such transactions and actions did

not occur primarily and substantially [*2] within the
commonwealth.

The statute places the burden of proof in this case
upon the defendants.

Further, a Rule 12(b)(6) motion--which is what the
present motion is--admits all well-pleaded allegations of
the complaint, and the Court must accept as true such
inferences as may be drawn in the plaintiff's favor. *Blank
v. Chelmsford Ob/Gyn P.C., 420 Mass. 404, 407, 649
N.E.2d 1102 (1995)*; *Natick Auto Sales, Inc. v.
Department of Procurement and General Services, 47
Mass.App.Ct. 625, 630, 715 N.E.2d 84 (1999)*. Of course,
conclusions of law from the facts alleged are open for
review on a Rule 12(b)(6) motion. The G.L.c. 93A claim
in the second amended complaint here, however, is
sufficient unless the defendants show beyond doubt that
no provable set of facts would entitle the plaintiff to
relief. *Warner-Lambert Company v. Execuquest
Corporation, 427 Mass. 46, 47, 691 N.E.2d 545 (1998)*;
*Harvard Law School Coalition for Civil Rights v.
President & Fellows of Harvard College, 413 Mass. 66,
68, 595 N.E.2d 316 (1992)*. The plaintiff bears a
"relatively light burden," *Warner-Lambert Co., supra,
427 Mass. at 47,* [*3] and must be given the benefit of
any doubts. *Kipp v. Kueker, 7 Mass.App.Ct. 206, 210,
386 N.E.2d 1282 (1979)*. These are "generous
principles," and the Court must apply them in the way
they are intended. *Connerty v. Metropolitan District
Commission, 398 Mass. 140, 143, 495 N.E.2d 840
(1986)*.

TAB G

16 Mass. L. Rep. 212; 2003 Mass. Super. LEXIS 137, *

On January 16, 2003, the Supreme Judicial Court addressed the issue and set forth guidance on how a Court ought to approach the determination of when, under *G.L.c. 93A, Sec. 11*, a matter occurs primarily and substantially in Massachusetts. *Kuwaiti Danish Computer Co. v. Digital Equipment Corporation, 438 Mass. 459, 470-75, 781 N.E.2d 787 (2003)* (hereafter "*Kuwaiti Danish*"):

We have misgivings about the utility of a formula for analyzing all cases under *Sec. 11*. Whether the "actions and transactions [constituting the *Sec. 11* claim] occurred primarily and substantially within the commonwealth" is not a determination that can be reduced to a precise formula. Significant factors that can be identified for one case may be nonexistent in another. Any determination necessarily will be fact intensive and unique to each case. [*4] Cases in the nature of contract will be different from cases sounding in tort.

*Id. at 472-73.*

We conclude that the analysis required under *Sec. 11* should not be based on a test identified by any particular factor or factors because of a tendency to shift the focus of inquiry away from the purpose and scope of c. 93A. *Section 11* suggests an approach in which a judge should, after making findings of fact, and after considering those findings in the context of the entire *Sec. 11* claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the commonwealth.

*Id. at 473.*

ORDER

The Court finds itself between the mandate of the S.J.C. to decide the "primarily and substantially" issue "after making findings of fact" and the very liberal requirements for notice pleadings at the motion to dismiss stage. It can do nothing but *DENY*, without prejudice, the defendants' motion to dismiss the third cause of action in the second amended complaint. [*5]

Allan van Gestel

Justice of the Superior Court

DATED: May 14, 2003

LEXSEE 6 MASS L REP 709

**Leonard Anthony Lyons v. Paul M. Kelley et al.**

**96-5011**

**SUPERIOR COURT OF MASSACHUSETTS, AT MIDDLESEX**

*6 Mass. L. Rep. 709; 1997 Mass. Super. LEXIS 499*

**March 5, 1997, Decided**
**March 13, 1997, Filed**

**DISPOSITION:** [*1] Defendants' Motion for Summary Judgment be, and the same hereby is, Allowed.

**LexisNexis(R) Headnotes**

**JUDGES:** Hiller B. Zobel, Associate Justice, Superior Court.

**OPINIONBY:** HILLER B. ZOBEL

**OPINION:** MEMORANDUM

Plaintiff here seeks compensation for services rendered Defendants' investment funds. He says he undertook to locate investors for Defendants' Zero Stage Capital Assurance Fund ("ZSCAF"), and that they in turn agreed to pay him 2.5% of the profits earned by the funds for which he solicited, plus 2% of "capital raised, paid by the investor." Defendants also paid him a $ 2,000 monthly advance, travel expenses, and certain office support.

Unfortunately, no investor placed any money with ZSCAF.

Later, the parties concluded an agreement regarding referral fees due Plaintiff for investments by the Worcester County Retirement System in Defendants' *non*-ZSCAF funds. They established Plaintiff's fee at 3% and outlined a payment schedule, including set-offs which Plaintiff owed Defendants.

Plaintiff, although acknowledging the absence of investment in ZSCAF, claims that an oral agreement with Defendants entitles him to fees for contacting investors who invested in the *non*-ZSCAF funds.

Defendants understandably [*2] point to Statute of Frauds, *G.L.c. 259, 7.* Plaintiff argues, however, that 7 is inapplicable here because it applies only to the sale or purchase of a business; and, second, because Plaintiff was not acting as a "finder." On both grounds, Plaintiff's arguments are unpersuasive, see *Bay Colony Marketing Co. v. Fruit Salad, Inc., 41 Mass. App. Ct. 662, 664-66, 672 N.E.2d 987 (1996).*

The statute seems plain:

> Any agreement to pay compensation for service as a broker or finder or for service rendered in negotiating a loan or in negotiating the purchase, sale or exchange of a business, its good will, inventory, fixtures, or an interest therein . . . shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged . . . *G.L.c. 259, 7.*

Although Plaintiff would apply this language only to those engaged in negotiating the sales or purchases of businesses, in fact it covers any "broker or finder," *or* those negotiating the sales or purchases of businesses. *Bay Colony Marketing Co. v. Fruit Salad, Inc., supra, 41 Mass. App. Ct. at 665-66.* The word "or" between the two phrases suggests that the legislature considered each category disjunctively: "broker or finder," [*3] as opposed to those negotiating sales or purchases of businesses, *id. at 665.*

Plaintiff contends however, that he is neither a broker nor a finder for purposes of the statute. Applying the words in their plain sense, *id. at 665 n.4,* Plaintiff comes easily within the definition. His main function here,

6 Mass. L. Rep. 709; 1997 Mass. Super. LEXIS 499, *

despite any lack of label, was to contact investors, introduce them to Defendants' investment plan, and to receive a share of the profits from any resultant investment.

A "finder" is "an intermediary who contracts to find, introduce and bring together parties to a business opportunity, leaving ultimate negotiations and consummation of business transaction to the principals," *Black's Law Dictionary* 631 (6th ed. 1990); see also, Annot., Validity, Construction, and Enforcement of Business Opportunities or "Finder's Fee" Contract, *24 A.L.R.3d 1160, 1164 (1969)*.

Nothing in the present record suggests that Plaintiff was anything but a finder. Absent a written agreement his claim is barred by *G.L.c. 259, 7*. Defendants, therefore, are entitled to judgment as a matter of law.

Plaintiff also suggests that he has not received the remuneration required by the later [*4] agreement. He admits, however, receiving the first $ 15,000 payment from Defendants in August 1995, as well as another, for $ 15,975, in August 1996. The only payments left to be made are those outlined in the agreement; none is due until August 1997 and August 1998.

Plaintiff also disputes the set-offs, although the agreement he accepted plainly states them. Because he alleges no facts impeaching the agreement's validity, he cannot question its conditions, see *John Hancock Mutual Life Insurance Co. v. Schwarzer, 354 Mass. 327, 329, 237 N.E.2d 50 (1968); see also Ferris v. Marriott Family Restaurants, Inc., 878 F. Supp. 273, 275 (D.Mass. 1994)*.

ORDER

Accordingly, it is *Ordered*, that Defendants' Motion for Summary Judgment be, and the same hereby is, *Allowed*.

Hiller B. Zobel

Associate Justice,

Superior Court

Dated: March 10, 1997

LEXSEE 1996 MASS SUPER LEXIS 147

**Douglas Miller v. National City Processing Company, Inc. et al. n1**

**n1 National City Corporation, B. & L. Consultants, Inc. and James A. Lloyd.**

**96-01066**

**SUPERIOR COURT OF MASSACHUSETTS, AT NORFOLK**

*1996 Mass. Super. LEXIS 147*

**December 11, 1996, Decided**

**DISPOSITION:** [*1] Motion to dismiss of National Processing Company, Inc., National City Corporation, B. & L. Consultants, Inc. and James A. Lloyd ALLOWED on Count VII and DENIED on Counts I, II (subject to above discussion in decision), III, IV, V, VI and VIII; and defendants' motion to strike prayer for punitive damages ALLOWED.

**LexisNexis(R) Headnotes**

**JUDGES:** Judith A. Cowin, Justice of the Superior Court.

**OPINIONBY:** JUDITH A. COWIN

**OPINION:** MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS AND DEFENDANTS' MOTION TO STRIKE CLAIM FOR PUNITIVE DAMAGES

INTRODUCTION

On May 21, 1996, the plaintiff, Douglas Miller, brought suit against the defendants, National City Processing Company, Inc., National City Corporation, B. & L. Consultants, Inc. and James A. Lloyd, for fraud/misrepresentation, breach of contract, promissory estoppel, tortious interference with contractual relations, tortious interference with advantageous and prospective advantageous relations, unjust enrichment, negligence/recklessness and quantum meruit. On October 15, 1996, this matter came before the Court for hearing on defendants' motion to dismiss and defendants' motion to strike the claim for punitive damages. For the reasons stated below, the defendants' [*2] motion to dismiss is DENIED in part and ALLOWED in part. The defendants' motion to strike the claim for punitive damages is ALLOWED.

BACKGROUND

For the purposes of this motion, I accept as true the following facts alleged in the complaint. In 1994, the plaintiff was working in New Jersey at C.T.I. Logistics, a company that was involved in the high-volume cash business known as freight bill processing. n2 According to the complaint, C.T.I. Logistics was acquired by National City Processing Company, National City Corporation and B & L Consultants (corporate defendants). Representatives of the corporate defendants approached the plaintiff and urged him to become controller of the new consolidated operation of C.T.I. Logistics and B & L Consultants (another freight bill processing business that had been acquired by National City Processing Company and National City Corporation in 1992). He was told that he was needed because the corporate defendants were concerned about the accuracy of the financial reporting and operations.

n2 In the freight bill processing business, customers who do a large amount of shipping around the country, such as manufacturers of automobiles, computers, electronics, appliances and parts, hire an intermediary--a freight bill processing company--to handle the process of paying the various carriers which transport their goods. These customers deposit large sums of money in advance with the freight processing companies, said money to be held for payment of

TAB I

invoices submitted to the freight processing company by freight carriers.

[*3]

The plaintiff was hired by the corporate defendants with the specific representation that he would oversee the accounting operations of the business in Norwood, Massachusetts. He was informed that he would report to the corporate parent in Louisville, Kentucky, rather than to the local operation in order to preserve his independence. The plaintiff accepted the job and uprooted his family, in reliance on the representation that he would have the independence to perform his duties adequately. He understood this independence to be particularly important in an environment where there was concern about the accuracy and integrity of accounting and financial operations.

Shortly after he began working at the Norwood facility, the plaintiff became concerned about the financial operations and accountability for expenditures and customers' funds. Even though the Norwood facility was responsible for processing millions of dollars in payments and for tracking customers' funds each month, the plaintiff discovered that there was no accountant on the staff. Accordingly, the plaintiff recommended, and the corporate defendants acquiesced in, the hiring of an individual with an accounting background.

As [*4] the plaintiff familiarized himself with the Norwood operations, he discovered irregularities and/or questionable practices in the financial operation of the business. For instance, the records showed that nine employees in Norwood had received bonuses totaling more than one million dollars ($ 1,000,000.00) in 1993 and 1994. However, there was no evidence that any income taxes or other withholding had been taken out of their paychecks. The plaintiff reported the matter to the main office in Louisville with a warning that the corporate defendants could be subject to penalties or other liabilities if it could not be established that taxes and other withholding had been deducted or otherwise explained. While the Louisville office expressed only mild interest in the issue, the defendant, James A. Lloyd, who was responsible for the business operation at the Norwood office, assumed a hostile and aggressive stance on the matter. Lloyd made it clear that he considered himself off-limits from any inquiry by the plaintiff.

The plaintiff discovered several other circumstances which made him question the financial operations of the business. However, despite being informed about the improper [*5] accounting methods, the corporate defendants resisted proper methods and instead continued old, haphazard practices. Moreover, the corporate defendants discouraged further inquiry into the questionable activity of the Norwood operation, specifically regarding matters involving Lloyd.

Less than a year after the plaintiff was recruited by the corporate defendants, he was told that his position was eliminated and that he was discharged. The plaintiff was informed that the corporate defendants no longer needed a controller at the Norwood center and he was told to leave that same day. When the corporate defendants thus discharged the plaintiff without notice, they offered him compensation of twenty thousand dollars ($ 20,000.00) contingent upon his promise not to bring a lawsuit. The plaintiff refused the offer.

The corporate defendants also discharged the individual whom the plaintiff had hired who had an accounting background. This other person had also been troubled by the various financial practices at the Norwood office.

After the plaintiff had been discharged, he made an effort to look at his personnel file which was in the custody of the corporate defendants. The plaintiff [*6] claims he was praised as an employee while he worked at C.T.I. Logistics in New Jersey and that his personnel file was supposed to contain those C.T.I. Logistics records. However, the plaintiff's personnel records from C.T.I. Logistics were not in the plaintiff's personnel file. These records were either misplaced, lost or destroyed by the corporate defendants. The only evaluation of the plaintiff in his file was completed by Lloyd who, unbeknownst to the plaintiff, evaluated him upon discharge. The plaintiff claims that although he was told that Lloyd would not be his superior, Lloyd's cursory and derogatory evaluation is the only one which remains in his personnel file.

DISCUSSION

When evaluating the sufficiency of a complaint pursuant to *Mass.R.Civ.P. 12(b)(6)*, the court must accept as true the well pleaded factual allegations of the complaint, as well as any inference which can be drawn therefrom in the plaintiff's favor. *Eyal v. Helen Broadcasting Corp, 411 Mass. 426, 429, 583 N.E.2d 228 (1991)*. "[The] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle [*7] him to relief." *Nader v. Citron, 372 Mass. 96, 98, 360 N.E.2d 870 (1977)*, quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*; See also *Charbonnier v. Amico, 367 Mass. 146, 152, 324 N.E.2d 895 (1975)*; *Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89, 390 N.E.2d 243 (1979)*.

"[A] complaint is not subject to dismissal if it would support relief on any theory of law." *Whitinsville Plaza, Inc., 378 Mass. at 89.* Further, a complaint should not be dismissed simply because it asserts a new or extreme theory of liability. *New England Insulation Co. v. General Dynamics Corp., 26 Mass. App. Ct. 28, 522 N.E.2d 997 (1988); Jenkins v. Jenkins, 15 Mass. App. Ct. 934, 444 N.E.2d 1301 (1983); Bell v. Mazza, 394 Mass. 176, 474 N.E.2d 1111 (1985).* All inferences should be drawn in the plaintiff's favor, so as to do substantial justice. *Ourfalian v. Aro Mfg. Co., Inc., 31 Mass. App. Ct. 294, 296, 577 N.E.2d 6 (1991).*

I. Count I: Fraud/Misrepresentation

A. Punitive Damages

As a preliminary matter, I must determine whether Massachusetts or New Jersey law applies to the plaintiff's claim for fraudulent misrepresentation. The corporate defendants argue that Massachusetts law controls; punitive damages are not allowed in Massachusetts unless expressly authorized by [*8] statute; no such authorization exists as to fraud or misrepresentation; thus, they move to strike the prayer for punitive damages. The choice of law rules in Massachusetts apply the law of the state with the "most significant relationship" with the suit. *Sargent v. Tenaska, Inc., 914 F. Supp. 722, 726 (D.Mass. 1996).* In an employment case, the place where the injury occurred (i.e., the place where the employee was terminated) and the place where the employment relationship was centered are clearly the most important factors in deciding which state's law to apply. *Dunfey v. Roger Williams University, 824 F. Supp. 18, 21 (D.Mass. 1993).* Given the fact that the plaintiff is claiming a false representation of intention, it would appear that the last event necessary to cause liability could not have occurred until after plaintiff relocated to Massachusetts to work at the Norwood facility. Although the alleged misrepresentations were made to the plaintiff in New Jersey, Massachusetts has all the other significant contacts with this matter. The plaintiff was hired by the corporate defendants to work at their place of business in Massachusetts; the employment relationship was centered [*9] in Massachusetts; the plaintiff was a resident of Massachusetts during his employment with the corporate defendants; and the alleged injuries occurred in Massachusetts. For these reasons, I conclude that Massachusetts has the "most significant relationship" with this case and Massachusetts law will therefore apply. Accordingly, the corporate defendants' motion to strike the prayer for punitive damages is allowed.

B. False Representations

In support of the motion to dismiss Count I, the corporate defendants argue that the complaint fails to describe the allegations of fraud/misrepresentation with particularity. In all averments of fraud, the circumstances constituting fraud must be stated with particularity. *Mass.R.Civ.P. 9(b).* A pleading states the circumstances constituting fraud with requisite particularity where the allegations indicate the statements made, the period in which they were made, their falsity, the defendant's knowledge of their falsity, and the plaintiff's detrimental reliance upon the statements. *Schinkel v. Maxi-Holding, Inc., 30 Mass. App. Ct. 41, 48, 565 N.E.2d 1219 (1991).*

In the complaint, the plaintiff alleges that several misrepresentations were made to him by [*10] the corporate defendants in their efforts to recruit him to work as controller for the Norwood operation. n3 The complaint also states that the corporate defendants made these representations with knowledge of their falsity or with reckless disregard for whether the representations were true. In reliance on these representations, the complaint alleges that the plaintiff accepted the corporate defendants' offer, left his job in New Jersey and moved his family to Massachusetts. As a result of the misrepresentations made by the corporate defendants, the plaintiff claims that he suffered and continues to suffer damages and harm, including but not limited to, the loss of income. Inferring that the use of the word "representations" means promises, the plaintiff has sufficiently alleged that the corporate defendant made promises without intending to keep them. The above allegations, among others, satisfy the requirement of rule 9(b). I have no doubt that the corporate defendants were adequately warned by the complaint of the acts which the plaintiff claims were fraudulent to enable them to prepare their defense. *Lazzaro v. Holladay, 15 Mass. App. Ct. 108, 110, 443 N.E.2d 1347 (1983),* citing *Friedman v.* [*11] *Jablonski, 371 Mass. 482, 488-89, 358 N.E.2d 994 (1976).* "Notice is still the principal purpose of any pleading, even one containing averments of fraud, mistake, duress and undue influence. Thus although a bare statement that defendant's 'fraudulent conduct harmed' plaintiff . . ., standing alone, is insufficient, rule 9(b) must be read with the rule 8(a) mandate that the pleading contain a short and plain statement of the claim. Rule 9(b) does not require the claimant to set out in detail all of the facts upon which he bases his claim, nor does it require him to plead detailed evidentiary matter." n4 *Id.* at 110-11, quoting Smith & Zobel, Rules Practice 9.2 (1974). Accordingly, I rule that the corporate defendants' motion to dismiss Count I is denied.

n3 In the plaintiff's complaint, he alleges that the corporate defendants made the following false representations:

1) The plaintiff would be the controller of the Norwood operation, with its accompanying responsibilities and authority to: a) track financial expenditures; b) assure the integrity and accuracy of the system; and c) ensure sound accounting and financial practices;

2) as controller of the premises in Norwood, the plaintiff would take steps to upgrade and improve its financial integrity and accuracy;

3) the plaintiff would be an independent controller reporting to the Louisville office rather than to Lloyd in Norwood in order to preserve his independence;

4) as controller, the plaintiff's superior would not be Lloyd but would be individuals in the Louisville office. In addition, Lloyd would not dictate or control the financial accounting of the operation; and

5) the improvement of the financial accounting of the Norwood operation was the priority and goal of the corporate defendants. [*12]

n4 In fact, the complaint in the present case does set out in detail the facts upon which plaintiff bases his claim.

## II. Count II: Breach of Contract

In support of their motion to dismiss the plaintiff's breach of contract claim, the corporate defendants argue that the plaintiff was an at-will employee, he did not have an express or implied contract for employment at the Norwood operation for a definite duration and the corporate defendants' rights to terminate the employment relationship were not otherwise limited. Accordingly, the corporate defendants assert that as an at-will employee the plaintiff was terminable at any time, for any reason or for no reason.

An express or implied contract which does not specify a definite employment period creates employment at-will. *Jackson v. Action for Boston Community Development, Inc., 403 Mass. 8, 9, 525 N.E.2d 411 (1988).* As a general rule, employment at-will can be terminated at any time by either party for almost any reason. n5 *Id.*

The Supreme Judicial Court has recognized exceptions to the general rule, however, when employment is terminated under [*13] certain bad faith circumstances n6 or contrary to a clearly established public policy. See *King v. Driscoll, 418 Mass. 576, 638 N.E.2d 488 (1994).*

n5 Whether an employment contract contains a definite period of employment "depends upon all the attendant conditions surrounding the agreement, as well as upon its terms, when the latter are not specific and clear." *Kravetz v. Merchants Distributors, Inc., 387 Mass. 457, 460, 440 N.E.2d 1278 (1982).* Viewing all facts alleged in the light most favorable to the plaintiff, I conclude that the plaintiff was an at-will employee. The complaint provides no allegation of a written employment contract or a claim that anyone ever stated that the plaintiff would be employed for a certain period of time.

n6 See *Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251 (1977).*

The complaint contains no allegation that the plaintiff's termination was contrary to a clearly established public policy. n7 Nor does the complaint allege that he was discharged in bad faith, as bad faith has been defined by case [*14] law. n8 The bad faith exception is not established by the mere absence of good cause to discharge an at-will employee. *Mello v. Stop & Shop Cos., 402 Mass. 555, 524 N.E.2d 105 (1988).* Moreover, an arbitrary firing, even for mistaken reasons, does not trigger the bad faith exception. *Tenedios v. Wm. Filene's Sons Co., 20 Mass. App. Ct. 252, 479 N.E.2d 723 (1985).* Bad faith in the termination of an employment contract can be found if the employer benefits from the termination at the expense of the employee by denying the employee just compensation for past services. *Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251 (1977).* In order to enforce a claim for bad faith termination the employee must prove that the employer intended to benefit financially at the employee's expense. *Siles v. Travenol Laboratories. Inc, 13 Mass. App. Ct. 354, 433 N.E.2d 103 (1982).*

n7 The Supreme Judicial Court has recognized an exception to the general rule when employment is terminated contrary to a clearly established public policy. "Although the term 'public policy' is amorphous, . . . the public policy exception to the at-will employment rule has been made available to employees discharged for performing important public deeds . . . While the importance of a public deed is not determined on

the sole basis of whether the law absolutely requires its performance, . . . such a mandate would bespeak a legislative determination of the importance of the act to the public." *Mistishen v. Falcone Piano Co., 36 Mass. App. Ct. 243, 245, 630 N.E.2d 294 (1994)*(citations omitted).

Redress is available under the public policy exception for at-will employees "who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469, 472, 589 N.E.2d 1241 (1992)*, quoting *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 404 Mass. 145, 149-50, 533 N.E.2d 1368 (1989)*. Moreover, redress has also been available to an at-will employee who was discharged in retaliation for his cooperation with a law enforcement investigation concerning his employer. *Wright, 412 Mass. at 473,* citing *Flesner v. Technical Communications Corp., 410 Mass. 805, 811, 575 N.E.2d 1107 (1991).* [*15]

n8 The plaintiff claims that he was discharged because he uncovered and expressed concern about the business' financial practices and dealings. Specific examples of the improprieties asserted by the plaintiff include: (1) the absence of an accountant on staff to manage the tens of millions of dollars of client funds and payments to carriers; (2) the lack of evidence that any income taxes or other withholdings was taken out of the checks of nine employees who had received bonuses totaling more than one million dollars ($ 1,000,000.00) in 1993 and 1994; (3) the failure to issue "1099s" to certain consultants and contractors who had been paid for work in 1993 and 1994; (4) evidence of specific activity which violated the written ethical rules of the corporate defendants; (5) the status change of two workers from "employees" to "consultants;" (6) the Norwood operation's haphazard approach to accounting for customers' funds; and (7) the inadequacy of the computer system. I classify these issues as "the internal administration, policy, functioning, and other matters of an organization [which] cannot be the basis for a public policy exception to the general rule that at-will employees are terminable at any time with or without cause." *King, 418 Mass. at 583.* Internal policy decisions are a matter of judgment for

those entrusted with decision making within the institution rather than the courts. *Smith-Pfeffer, 404 Mass. at 151.* Therefore, the plaintiff has failed to articulate a claim to support the public policy exception.

[*16]

When the plaintiff was discharged, he was offered compensation of twenty thousand dollars ($ 20,000.00) conditioned on his signing an agreement promising not to bring a lawsuit. When the plaintiff refused to release the corporate defendants from a lawsuit, they did not give him the compensation. The complaint alleges that the corporate defendants determined that, based on the plaintiff's work, he deserved twenty thousand dollars ($ 20,000.00) in addition to the compensation he was paid. However, the corporate defendants never paid the plaintiff.

The complaint does not state a cause of action for unlawful termination. It does not allege facts that would establish either that the termination was contrary to a clearly established public policy or that the employer intended to benefit financially by denying the plaintiff just compensation for past services. The plaintiff never claims that the firing was motivated by the defendants' desire not to pay him his earnings. Rather, the complaint alleges that the firing was due to the plaintiff's attempts to alter the financial and record-keeping practices and his concern about Lloyd's financial dealings within the companies. Nevertheless,    [*17]    the complaint sufficiently alleges that there was a contractual agreement by the corporate defendants to pay the plaintiff twenty thousand dollars ($ 20,000.00) to sustain a claim for breach of that contract. The alleged agreement is a separate, subsequent contractual provision on which the plaintiff may seek to recover.

The plaintiff characterizes his attempt to recover the twenty thousand dollars ($ 20,000.00) sum as a claim for unjust enrichment (see Count VI). For purposes of a motion to dismiss, it is not meaningful whether the claim is characterized as one for breach of contract or for unjust enrichment. The claim survives. n9

n9 It is possible to infer that this twenty thousand dollars ($ 20,000.00) was merely a settlement offer. However, that inference is not the only inference that can be drawn and is certainly not a basis for dismissing what is properly alleged as a breach of contract.

III. Count III: Promissory Estoppel

The corporate defendants also move to dismiss the plaintiff's claim [*18] for promissory estoppel. Although the theory of promissory estoppel is recognized in Massachusetts, the Supreme Judicial Court eschews use of the doctrine by name. *Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 761, 384 N.E.2d 176 (1978); Rooney v. Paul D. Osborne Desk Co, Inc., 38 Mass. App. Ct. 82, 83, 645 N.E.2d 50 (1995)* (noting that the Supreme Judicial Court avoids using the phrase "promissory estoppel"). Promissory estoppel "consists simply of a promise that becomes enforceable because of the promisee's reasonable and detrimental reliance." *Rooney, 38 Mass. App. Ct. at 83.*

The plaintiff alleges that he was hired by the corporate defendants with the specific representation that he would oversee the accounting operations of a business in Norwood, Massachusetts and that he would report back to the corporate parent, rather than to the local operation, to preserve his independence. In reliance on these representations, the plaintiff relocated to Massachusetts and attempted to perform the tasks he was hired to perform. However, after expressing concern about the self-dealing of Lloyd and other issues, the plaintiff was prevented from doing the job he was hired to do. Eventually, the plaintiff [*19] was discharged.

After examining the complaint and taking the factual assertions therein as true, I find that dismissal of the plaintiff's promissory estoppel claim is improper. The plaintiff alleges that he reasonably relied to his detriment on the corporate defendants' promise. n10

> n10 If there are questions of materiality as to the conditions of his employment, they are to be construed in the plaintiff's favor at this stage. See *Ourfalian v. Aro Mfg. Co., Inc., 31 Mass. App. Ct. 294, 296, 577 N.E.2d 6 (1991).*

IV) Counts IV and V: Tortious Interference With Contractual Relations and Tortious Interference with Advantageous and Prospective Advantageous Relations

The plaintiff alleges that Lloyd tortiously interfered with the plaintiff's contractual and/or advantageous relations with the corporate defendants. To sustain a cause of action for tortious interference with contractual relations, the plaintiff must establish that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party [*20] to break the contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. n11 *Wright v.*

*Shriners Hospital for Crippled Children, 412 Mass. 469, 476, 589 N.E.2d 1241 (1992).*

> n11 The torts of interference with advantageous relationships and interference with contractual relations are interchangeable with respect to the conduct by a defendant which is actionable, except that for the latter there must be a contract. *United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 815 n.6, 551 N.E.2d 20 (1990).*

In the context of employment disputes, an at-will employee such as the plaintiff may assert a tortious interference with contractual relations claim against a supervisor. n12 The at-will employee need not establish the existence of an actual employment contract, but instead may demonstrate a business relationship with his employer or a sufficient expectation of continued employment. See *King v. Driscoll, 418 Mass. 576, 581, 638 N.E.2d 488 (1994)* [*21] (trial judge ruled that certain directors were liable for interfering with employee's at-will relationship with company); *Owen v. Williams, 322 Mass. 356, 361-62, 77 N.E.2d 318 (1948)* (employee need only show existing or probable future business relationship with employer to sustain unlawful interference claim); *Clement v. Rev-Lyn Contracting Co., 40 Mass. App. Ct. 322, 324, 663 N.E.2d 1235 (1996)* (at-will employee must show that supervisor interfered with employee's business relationship with employer). By virtue of his employment with the corporate defendants, the plaintiff has established that he had a business relationship with the corporate defendants and, therefore, may assert a tortious interference claim against Lloyd.

> n12 The plaintiff would not be able to assert a tortious interference claim against the corporate defendants because an employer, as a matter of law, cannot interfere with its own employment relationship. *Gram v. Liberty Mut. Ins Co., 384 Mass. 659, 663 n.3, 429 N.E.2d 21 (1981).*

The Supreme Judicial Court recognizes a privilege [*22] against liability for corporate officials in the context of tortious interference claims. *Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 429 N.E.2d 21 (1981).* This privilege is based on the notion that corporate officials should have the freedom to act for corporate purposes without the fear of personal liability. The corporate official loses the privilege when he acts solely "for a spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Boothby v. Texon, Inc., 414 Mass.*

1996 Mass. Super. LEXIS 147, *

*468, 487, 608 N.E.2d 1028 (1993)*, quoting *Sereni v. Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 432-33, 509 N.E.2d 1203 (1987)*.

In support of the motion to dismiss, it is argued that the plaintiff failed to allege any facts that would warrant a finding that Lloyd's actions deprived him of the corporate official privilege. However, I find sufficient allegations in the complaint to preclude dismissal of these claims. The plaintiff claims that Lloyd interfered with the plaintiff's relationship with the corporate defendants to advance his own interests and not for any legitimate business purpose. Specifically, the plaintiff asserts that, as controller, he was uncovering significant evidence of financial self-dealing on the part [*23] of Lloyd, which threatened Lloyd's personal income, as well as the income of his relatives. n13 As a result, Lloyd took an aggressive and hostile stance towards the plaintiff's inquiries into these matters and refused to cooperate with the plaintiff, the controller designated by the corporate defendants to oversee the financial operations. Based on the allegations in the complaint, I find that the plaintiff adequately states a claim against Lloyd for tortious interference.

> n13 The questionable financial practices and dealing that the plaintiff discovered, which specifically involve Lloyd, that are alleged in the complaint include: (1) the issue of whether Lloyd paid income taxes on his bonuses himself, since it was not deducted from his paychecks; (2) the failure to issue "1099s" to a consultant who was a relative of Lloyd who had been paid for work in 1993 and 1994; (3) the rental of a building by the corporate defendants from a realty trust which Lloyd allegedly controlled which arrangement allegedly violated the corporate defendants' written ethics rules; (4) the corporate defendants' billing for certain improvements and other expenses associated with the construction of an adjacent building that was owned and being built by the realty trust controlled by Lloyd; and (5) the change of two workers, who were relatives of Lloyd, from the status of "employees" to "consultants"--whose combined annual salaries had been fifty-seven thousand dollars ($ 57,000.00) and whose earnings then totalled more than one hundred and five thousand dollars ($ 105,000.00).

[*24]

V. Count VI and VIII: Unjust Enrichment and Quantum Meruit

The plaintiff next seeks to recover against the corporate defendants for claims of unjust enrichment and quantum meruit. n14 The corporate defendants seek to dismiss the claims of unjust enrichment and quantum meruit because they argue that the plaintiff fails to allege that any part of the plaintiff's salary was withheld. The complaint sufficiently alleges claims for unjust enrichment and quantum meruit. n15 Specifically, the plaintiff claims that he provided considerable services and benefits for the corporate defendants. In addition, the plaintiff states that based on his work, the corporate defendants determined that the plaintiff deserved twenty thousand dollars ($ 20,000.00) in addition to the compensation he already received. n16 However, the corporate defendants allegedly failed to pay the plaintiff this money. Given these allegations, the corporate defendants' motion to dismiss these claims is inappropriate.

> n14 The elements that a plaintiff must allege for a claim of quantum meruit include: (1) the plaintiff conferred a measurable benefit upon the defendant; (2) the defendant accepted the services with the expectation of compensating the plaintiff; and (3) the plaintiff demonstrates that he provided the services with the reasonable expectation of receiving compensation from the defendant. *Bolen v. Paragon Plastics, Inc.*, 747 F. Supp. 103, 106-07 (D.Mass. 1990). [*25]

> n15 The distinction between quantum meruit and unjust enrichment is at best vague and, on this record, may be meaningless. The plaintiff, of course, may only obtain one recovery.

> n16 As stated earlier, the corporate defendants argue that the twenty thousand dollars ($ 20,000.00) was offered as severance pay and was conditioned on the plaintiff's willingness to sign an agreement promising not to bring a lawsuit. Therefore, the corporate defendants assert that this payment was unrelated to the value of the services the plaintiff rendered. A determination of the purpose of the twenty thousand dollars ($ 20,000.00) offered is premature at this stage.

VI. Count VII: Negligence/Recklessness

The plaintiff alleges that the corporate defendants recklessly or negligently lost or destroyed the part of his personnel file that contained positive information and supplemented the file with a derogatory evaluation by Lloyd.

1996 Mass. Super. LEXIS 147, *

Employers in Massachusetts have a statutory duty to preserve personnel records so employees can have access to their files. *G.L.c. 149, 52C*. n17 This is a penal statute as [*26] it imposes a penalty, cf. *Johnson v. United States Steel Corporation, 348 Mass. 168, 169, 202 N.E.2d 816 (1969),* and it does not expressly create a private right of action. "Massachusetts courts have consistently denied the existence of a private, statutory remedy for violation of a penal statute unless the private remedy 'appears by express terms or by clear implication to have been the legislative intent.' " *Massachusetts Candy & Tobacco Distribs. v. Golden Distrib., 852 F. Supp. 63, 69* (D.Mass. (1994), quoting *Johnson, 348 Mass. at 169-70.* A private remedy is not created expressly or by clear implication by *G.L.c. 149, 52C.* Accordingly, the corporate defendants' motion to dismiss this count is appropriate.

n17 General laws c. 149, 52C states, in pertinent part: "Whoever violates the provisions of this section shall be punished by a fine of not less than five hundred nor more than twenty-five hundred dollars. This section shall be enforced by the Department of Labor and Industries."

ORDER

For the foregoing reasons, it [*27] is hereby ORDERED that the motion to dismiss of National Processing Company, Inc., National City Corporation, B. & L. Consultants, Inc. and James A. Lloyd is ALLOWED on Count VII and DENIED on Counts I, II (subject to above discussion in the decision), III, IV, V, VI and VIII; and the defendants' motion to strike the prayer for punitive damages is ALLOWED.

Judith A. Cowin

Justice of the Superior Court

DATED: December 11, 1996

LEXSEE 405 SE2D 858

**VALLIE RICH, Plaintiff Below, Appellant v. DONALD K. RICH and TAMMY J. RICH, Husband and Wife, Defendants Below, Appellees**

No. 19675

Supreme Court of Appeals of West Virginia

*185 W. Va. 148; 405 S.E.2d 858; 1991 W. Va. LEXIS 85*

January 15, 1991, Submitted

May 24, 1991, Filed

**PRIOR HISTORY:** [***1] Appeal from the Circuit Court of Randolph County; Honorable Jack R. Nuzum, Judge; Civil Action No. 88-C-277.

**DISPOSITION:**

REVERSED AND REMANDED WITH DIRECTIONS.

**LexisNexis(R) Headnotes**

**COUNSEL:**

Mark D. Nigh, Esq., Philippi, West Virginia, Attorney for the Appellant.

Kathryn M. Schuppener, Esq., Elkins, West Virginia, Attorney for the Appellees.

**JUDGES:**

Justice Workman delivered the opinion of the Court.

**OPINIONBY:**

WORKMAN

**OPINION:**

[**859] [*149] Vallie Rich appeals from a decision of the Circuit Court of Randolph County dismissing the civil action which she filed against her former husband, Donald K. Rich, and his wife, Tammy J. Rich, in which Vallie Rich sought to set aside her former husband's transfer of certain real estate to his second wife. In the complaint, Vallie Rich alleged that Donald Rich effected the transfer of property with the intent to defraud her. Due to a child support arrearage, Vallie Rich was a creditor of Donald Rich at the time of the property transfer. Having reviewed the record in this case in conjunction with pertinent principles of law, we reverse the circuit court's order on the grounds that Mr. Rich's transfer of property to his second wife was made under circumstances which strongly suggest fraud both at common law and pursuant to the Uniform Fraudulent Transfers Act ("Act"), *W. Va. Code § § 40-1A-1* to -12 (Supp. 1990). Accordingly, [***3] Vallie Rich's complaint was improperly dismissed.

The record in this case discloses that Vallie and Donald Rich were divorced on January 2, 1985. Vallie had two children by a former husband and a third child by virtue of an extramarital liaison with Mr. Rich prior to their marriage. All three children were adopted by Mr. Rich during his marriage to Vallie Rich, and pursuant to the final order of divorce, all three of the children were placed in her custody. For some unspecified reason, a child support order was not entered until more than four months after the final order of divorce was entered. The child support order required Mr. Rich to pay $ 150 per month for each of the three children.

On May 13, 1985, the same day child support was initially ordered to be paid, Mr. Rich initiated proceedings to revoke his adoption of the two children born of Vallie Rich's first marriage. The circuit court granted Mr. Rich's revocation petition and Vallie Rich appealed that decision to this Court. We reversed the lower court's ruling based on Mr. Rich's failure to

*W. Va. Code § 40-1A-4(a).*

The Act identifies the following list of expressly noninclusive factors to aid "in determining actual intent under subdivision (1), subsection (a):"

(1) The transfer or obligation was to an insider;
[**861] [*151] (2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer or obligation was disclosed or concealed;
(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred;
(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*W. Va. Code* [***9] *§ 40-1A-4(b).*

Before we analyze whether the transaction was fraudulent under the Act, we must first determine that the Act applies to the parties at issue in this dispute. We find no provision in the Act which would preclude its applicability to transfers of property between relatives, such as the husband-to-wife transfer involved in this case. In fact, the Act clearly contemplates such transfers by including the term "relative" and by designating relatives of an individual debtor as "insiders" within its definitional provisions. See *W. Va. Code § 40-1A-1(k),* - 1(g)(1)(i). Accordingly, we hereby find that an interspousal transfer of property is clearly subject to the Act.

In determining whether the subject transfer was fraudulent under the Act, it is also necessary to examine whether the property which was transferred is exempt from the Act's provisions. The term "transfer," by definition involves "an asset or an interest in an asset." *W. Va. Code § 40-1A-1(1).* Accordingly, the Act would not apply if the conveyed property were determined not to qualify as an "asset." The Act defines an "asset" as:

(b) property of a debtor, but the term does not include:

(1) Property to the extent [***10] it is encumbered by a valid lien;
(2) Property to the extent it is generally exempt under nonbankruptcy law; or
(3) An interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.

*W. Va. Code § 40-1A-1(b).*

By exempting property encumbered by a valid lien from qualifying as an asset, the Act codifies what the circuit court was attempting to do in calculating sua sponte whether there was any equity in the subject property. Accordingly, that portion of the property encumbered by the $ 18,700 lien is clearly not an asset subject to fraudulent transfer. See *W. Va. Code § 40-1A-1(b)(1).* Similarly, another $ 5,000 of the property's value is not an asset due to the homestead exemption. See *W. Va. Code § 40-1A-1(b)(2).* Therefore, it is our opinion that any equity in the property above the combined amount of the outstanding mortgage lien and the $ 5,000 homestead exemption could be viewed as an "asset" under the Act. The circuit court's hastiness in resolving this case without taking any evidence regarding the property's equity precludes us from declaring at this point whether in fact [***11] there is any equity in the property which would permit a portion of the property to qualify as an "asset." This issue must be resolved on remand.

Assuming, arguendo, that the property or a portion of the property constitutes an "asset," the next determination to be made is whether Mr. Rich's transfer of property to his second wife was made "with actual intent to hinder, delay or defraud any creditor" or "without receiving a reasonable equivalent value in exchange for the transfer." *W. Va. Code § 40-1A-4(a)(1),(2).* An [**862] [*152] examination of the factors delineated by the Act for guidance in resolving the "actual intent" issue suggests that Mr. Rich's transfer was made with intent to defraud his ex-wife in her judgment creditor status. The factors which we find evident in this case include the following:
(1) The transfer was to an insider;
(2) The debtor retained possession and control of the property following the transfer;
(3) Before the transfer was made, the debtor had been sued;
(4) The transfer was of substantially all the debtor's assets;
(5) The transfer was effected without the debtor receiving a reasonably equivalent value in exchange for the transfer;
(6) The debtor was insolvent [***12] or became insolvent shortly after the transfer was made; and

185 W. Va. 148, *; 405 S.E.2d 858, **;
1991 W. Va. LEXIS 85, ***

(7) The transfer occurred shortly before or after a substantial debt was incurred.

See *W. Va. Code § 40-1A-4(b)*.

The fact that seven of the eleven factors supplied by the Act to determine "actual intent" appear to have been present in Mr. Rich's case strongly suggests that the transfer at issue was indeed a conveyance effectuated with intent to defraud his creditors. Vallie Rich qualifies as a creditor under the Act since a creditor is defined as "a person who has a claim" and a claim is further defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *W. Va. Code § 40-1A-1(d)*,(c). This broad definition of a creditor clearly includes Vallie Rich who had obtained a court order finding Donald Rich to be in arrears for child support payments at the time of the transfer.

As a creditor of Mr. Rich, the Act entitles Vallie Rich to protection from fraudulent transfers. In concluding that the transfer at issue appears fraudulent within the meaning of the Act, we rely on those [***13] seven previously enumerated factors which tend to demonstrate "actual intent." The transfer was certainly suspect since it was to an "insider," a relative in this case, and furthermore because Mr. Rich continued to have both possession and control of the property following the transfer. The real property at issue included the former marital home of Vallie Rich and Donald Rich. Following his divorce from Vallie Rich and upon his remarriage, Mr. Rich continued to reside in this home. Likewise, his residence remained unchanged after he conveyed the property to his second wife.

The "facts" surrounding the $ 6,000 consideration allegedly paid by Tammy Rich for the property are arguably suspicious. Mr. Rich's explanation concerning payment of the alleged consideration, as taken from interrogatories in aid of execution, was that his new wife's parents wrote out a check to Tammy Rich for $ 6,000. She then signed the check over to Mr. Rich, who immediately gave the check back to his wife's parents to repay them for certain furnishings which they had purchased for the home occupied by Mr. Rich and their daughter. n3 No copy of this check was ever produced during the underlying proceedings. [***14] The proffered explanation regarding the consideration paid by Tammy Rich for the transferred property and appellees' failure to corroborate their factual account by producing a copy of the alleged check suggests that the transfer was effected without Mr. Rich receiving a reasonably equivalent value in exchange for the transfer while he knew or had reason to believe that "he . . .

would incur, debts beyond his . . . ability to pay as they became due." *W. Va. Code § 40-1A-4(a)(2)(ii)*.

n3 Mr. Rich testified at his interrogatories in aid of execution that when Vallie Rich left the marital residence, she took the refrigerator, washer, dryer, all the furniture, silverware, rugs, beds, linens, tools, guns, vehicles, and even the kitchen sink. The money "borrowed" from Mr. Rich's new wife's parents allegedly went to pay for comparable replacement items.

[**863] [*153] Historically,

where property is alleged to have been purchased by a wife, or a conveyance of property is made to her during coverture, the burden is upon her to prove distinctly [***15] that she paid for it with means not derived from her husband. Evidence, that she made the purchase, or that the property was conveyed to her, amounts to nothing, unless it is accompanied by clear and full proof that she paid for it with her own separate estate; and in the absence of such proof the presumption is that her husband furnished the means to pay for it and it will be subject to his debts.

Syl. Pt. 1, *McMasters v. Edgar, 22 W. Va. 673 (1883)*. The second wife of Mr. Rich clearly did not meet her burden of establishing that she paid for the property transferred to her out of her own estate. Similarly lacking was evidence demonstrating that the "consideration" allegedly paid was a reasonable amount for the subject property. The limited evidence elicited certainly suggests that the alleged consideration transaction was merely a pretense. Assuming for the moment that a check did pass between the parties for the property, the explanation offered by Mr. Rich at his interrogatories in aid of execution makes it clear that the money was in fact repayment for a preexisting debt--the household furnishings--and not for the purchase of the marital home and accompanying [***16] parcels of real estate.

What particularly troubles us about this case is Mr. Rich's obvious attempt to shelter an asset in such close proximity to the entry of a child support arrearage order and during the pendency of an appeal before this Court, the outcome of which could and did significantly affect the amount of the previously ordered arrearage. Only two weeks after the initial arrearage order was entered, Mr. Rich transferred what appears to be his only substantial asset--his home and real estate--to his new wife. The explanation offered by Mr. Rich for the transfer was that he was attempting to protect his new wife's interests in the event he should die. n4 Regardless of whatever

altruistic intentions Mr. Rich may have had to protect his new wife, he did not have the right to shelter his only substantial asset from child support enforcement.

n4 At the time of his interrogatories in aid of execution which took place on September 22, 1988, Mr. Rich was 41 and Tammy Rich was 28.

We find Mr. Rich's argument that he [***17] notified the Child Advocate's Office to determine whether they would attempt to foreclose on his real estate to recover child support arrearages prior to the transfer as totally irrelevant. Even if the Child Advocate's Office advised Mr. Rich that they would not force a sale of his property, this does not mean that Vallie Rich, as the custodial parent of the children to whom the obligation of support was owed, could not choose to force such a sale, assuming the existence of equity in the property and her establishment of priority as a lienholder entitled to that equity. Oral argument of this case revealed that although Mr. Rich was gainfully employed at the time these appeal proceedings were initiated and Vallie Rich was at that time receiving both child support and a percentage toward the arrearage, Donald Rich has since been laid off and Vallie Rich is currently not receiving any money for child support or arrearages. n5

n5 As of August 9, 1988, the oldest of the three children turned 18. From that date forward, Mr. Rich was only required to pay child support for two children, excepting of course any arrearage which had previously accrued.

[***18]

We also find unconvincing Mr. Rich's argument that he did not foresee an increase in the amount of ordered arrearage as a result of Vallie Rich's ultimately successful appeal to this Court on the adoption revocation ruling. The Act, in no uncertain terms, explains that a transfer effected without a reasonably equivalent value in exchange is fraudulent when the debtor "believed or reasonably should have believed that he (or she) would incur, debts beyond his (or her) ability to pay as they became due." *W. Va. Code § 40-1A-4(a)(2)(ii)* (emphasis supplied). Since an increase in arrearage was certainly a foreseeable outcome of the appeal, we conclude that it was reasonable for Mr. [**864] [*154] Rich to believe that he might incur debts he was unable to pay as they became due at the time of the transfer.

Notwithstanding the likelihood of the second arrearage order, there was already an arrearage order in effect two weeks prior to the date when Mr. Rich transferred the property. The timing of this transfer simply cannot be disregarded. The fact that it occurred two weeks after the first arrearage order was entered, while an appeal on a related matter was pending before this Court and shortly before [***19] a second arrearage order was entered cannot be overlooked. As the Act makes clear, the proximity of a transfer to the incurrence of a substantial debt is a factor indicative of "actual intent." An interspousal transfer of property in close proximity to the incurrence of a substantial child support obligation may constitute evidence of fraudulent intent under the Act and may result in the transfer being set aside pursuant thereto.

The final factor which suggests fraudulent intent is the debtor's insolvency. The historical presumption that a transfer between a husband and wife is subject to close scrutiny for fraudulent intent always required as a prerequisite that the debtor first be shown to be insolvent. The Act eliminates this step by establishing a presumption of insolvency for "[a] debtor who is generally not paying his (or her) debts as they become due . . . ." *W. Va. Code § 40-1A-2(b)*. Since an arrearage order had already been entered at the time of the transfer, the Act's presumption of insolvency would apply to Mr. Rich.

While our review of the factors provided by the Act on the issue of "actual intent" as they relate to this case suggests that the transfer of Mr. Rich's home [***20] and real estate was intended to defraud a creditor within the meaning of the Uniform Fraudulent Transfers Act, this is a determination that must be made by the trial court upon a taking of evidence on these issues. Upon remand, the circuit court must determine initially whether the subject property qualifies as an "asset" within the meaning of the Act. If the property can be properly characterized as an "asset," the circuit court must proceed to determine whether the transfer was effected without the exchange of consideration reasonably equivalent to the value of the transferred property at a time when Mr. Rich was not paying child support as it became due and when Mr. Rich had reason to believe that he might incur additional debts which he would not be able to timely pay. Under the Act, either "actual intent" to defraud or the absence of reasonably equivalent consideration will suffice to establish the requisite fraudulent intent necessary to set aside the transfer as fraudulent. Accordingly, the decision of the Circuit Court of Randolph County is hereby reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded with directions.

LEXSEE 15 MASS L REP 723

**Waste Stream Environmental, Inc. v. Lynn Water and Sewer Commission**

**0-0518-D**

**SUPERIOR COURT OF MASSACHUSETTS, AT ESSEX**

*15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43*

**January 3, 2003, Decided**

**DISPOSITION:** [*1] Plaintiff's motion for partial summary judgment was granted, in part, and denied, in part.

**LexisNexis(R) Headnotes**

**JUDGES:** Howard Whitehead, Justice of the Superior Court.

**OPINIONBY:** Howard Whitehead

**OPINION:** *MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

Introduction

The parties to this suit are signatories to a ten-year output contract to haul and dispose of wastewater sludge. The plaintiff, Waste Stream Environmental, Inc. ("Waste Stream"), filed suit against the defendant, Lynn Water and Sewer Commission ("Commission"), for a declaratory judgment interpreting the contract and for monetary relief on a variety of claims grounded in its view of the contract terms. Waste Stream has moved for partial summary judgment on the claim for a declaratory judgment, as well as the claims of breach for contract, quantum meruit, and unjust enrichment. For the following reasons, the motion is allowed in part and denied in part.

BACKGROUND

The Lynn Water and Sewer Commission ("Commission") is a quasi-public authority created in 1982 n1 to manage the wastewater from Lynn, Swampscott, Saugus and Nahant. The Lynn treatment facility receives raw sludge which is pre-screened for sizeable [*2] objects (old tires, etc.). The raw material is then processed, and chemicals and water are added. The facility produces three types of sludge: primary, secondary and "cake." Primary sludge is thicker and heavier, and is preferred for use in dewatering due to its higher solids content. Secondary sludge has a lower content of solids, and is thinner and lighter. "Cake," or mud-like material, results from dewatering, whereby a filtering process squeezes the sludge through an accordion-type press in order to partially separate the solids from the liquid. Cake can be incinerated; cake with lower water content optimizes the operation of incinerators. All types of sludge are hauled off-site for disposal.

n1 Chapter 381, Acts and Resolves of Massachusetts, 1982.

Pursuant to *G.L.c. 30B, § 5*, the Commission issued a "Legal Notice" or announcement of an upcoming bid in the summer of 1996. n2 The corresponding bid solicitation package n3 was made available in August of that year. The package called [*3] for the removal and disposal of sludge and other non-hazardous waste from the treatment facility. The bid solicitation package consisted of several documents, including a ten-page document entitled "Information to Bidders" ("ITB"), a six-page document entitled "Specifications" ("Specifications"), and a copy of the three-page contract (the "Contract") to be signed by the successful bidder.

n2 Among other things, the Legal Notice informed bidders of when and where they could obtain the project Specifications.

15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43, *

n3 The Court refers to the package given to bidders generally as the "bid solicitation package." However, the project documents refer to this group of materials in several ways, including "Procurement Documents," "Specifications," and "Contract Documents."

The ITB contains primarily general bid preparation information concerning how and when to bid, what items must be part of the bid submission, what opportunities exist to visit the facility and to seek further information, and how the winner will be [*4] selected. The ITB further indicates when the Specifications may be picked up. It also states that "all information listed in the Information to Bidders and Specifications will be used as criteria to determine the most responsible and responsive bidder," and that "responsive bidders must supply all of the information requested." Some technical sludge information is contained in the ITB. Much of it also is repeated in the Specifications.

The ITB additionally includes several on-going business operations items that appear exclusively in the ITB. Those items include annual contract price increases, performance bonding requirements and their annual adjustments, required levels of insurance, and a jurisdictional selection and jury-waiver clause. The ITB is also the only source of the qualifier:

The LWSC makes no guarantees of sludge quantities (minimums or maximums), and Sludge Characteristics or quality any time during the life of this contract.

The Specifications provide extensive technical details, some of which are repeated in the ITB. They include a site description, estimated sludge volumes and solid-to-liquid percentages, day-to-day on-site operational requirements, loading procedures, [*5] transportation routes, ultimate disposal site requirements, permitting, and measurement and payment procedures. The Specifications state that all sludge over the estimated daily volume will be incinerated on site. In addition, the Commission issued two addenda during the bidding process, which became part of the bid solicitation package. n4 The addenda stated that they "shall be taken into consideration and be included in the bidder's bid."

n4 The addenda are titled "CONTRACT DOCUMENTS ADDENDUM No. 1 and No. 2." They state that, at issuance, they modify the "Procurement documents" and take precedence over any earlier contradictory information. Addendum No. 1 states that the average solid liquid concentration of the waste water is 4.5%.

Addendum No. 2 confirms that contractors must provide disposal services for all plant residuals. The parties both agree that the addenda are part of the contract.

The three-page Contact was given to bidders at the beginning of the process; they were required to submit a signed [*6] copy with their bid. The contract document, in its First and Second clause, incorporates by reference the "SPECIFICATIONS" and the "BID." n5 The parties agree that there is no list that identifies exactly what documents constitute the SPECIFICATIONS, while the ITB lists all of the items required for the BID.

n5 The contract states: FIRST: The (Contractor) agrees to furnish to the Commission the following: AS PER SPECIFICATIONS AND BID. The (Contractor) further agrees that (he) (it) will strictly comply with the specifications. [sic] requirements and (his) (its) bid prepared therefor and annexes hereto and made part thereof. SECOND: The Commission agrees to pay to the (Contractor) as follows: AS PER SPECIFICATIONS AND BID.

The actual *Bid Sheet* provides a space to record pricing, and lists three award criteria. First, the contract goes to the bidder "meeting all the specifications and conditions within this bid document." Second, only one bidder will be accepted, who will provide disposal for all plant residuals. [*7] Finally, the winning bidder will have the lowest price based on the yearly estimates given. However, the sheet also states that the estimates are for comparison with competing bids and may not represent the actual quantities to be handled during the ten years.

The bid solicitation package indicates that, at the time that the package was prepared, cakes contained an average of 23% solids, with a range of 17 to 47%, and primary and secondary sludge averaged 4.5% n6 solids, with a range of 2 to 6%. The package also provides sludge volume estimates, anticipated to be 9,000 to 18,000 gallons per day. n7 Both the ITB and Specifications indicate that any materials over the estimates will be incinerated on site. n8 However, harkening back to its previous contract for hauling, the Commission reserve the right to 1) substitute primary sludge at any time, and 2) increase sludge volume by up to 25% in order to perform maintenance, either planned or unplanned.

Case 1:04-cv-12333-MEL     Document 13-3     Filed 12/10/2004     Page 48 of 60

Page 3

15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43, *

n6 Addendum No. 1 is the only source stating the sludge average of 4.5%, superceding any earlier contrary information. Though not stated in the addendum itself, this number was calculated by an employee who researched the daily readings for the previous three years, and averaged the data to produce this annual rate that was consistent for the three years prior to bid.

This number was calculated in advance of the question being asked, due to an employee's expectation that bidders would need this information in addition to the range estimates in order to properly prepare a bid. The employee was experienced in the industry. [*8]

n7 No volume estimates were provided for cake, as the Commission did not anticipate having cake hauled away. The Commission made a business decision that having 9,000 to 18,000 gallons of secondary sludge removed would optimize their operations.

n8 Primary sludge with more solids makes better cake. Better cake optimizes the incinerator burning operation. Removal of secondary sludge by contract hauling would free the Commission to focus on the dewatering and incinerating processes, for which they were best equipped in 1996.

Prior to contracting with Waste Stream, the Commission had only contracted to remove cake, not liquid. The previous hauler was having difficulty disposing of the cake. The Commission decided to optimize its operations, and solicited bids for a long-term contract focused on the removal of secondary sludge. It anticipated cost savings from a long-term agreement and from focusing on doing what it did best, which was to make and burn cake. The Commission inferably excused its previous hauler from the parties' contract.

In the waste disposal industry, the percentage of solids [*9] remaining in the liquid is a factor to be considered for disposal. Sludge disposal facilities in New England are limited, with some restricting the type and pricing of sludge accepted, according to the percentage of solids it contains. In addition, those facilities most often accept sludge by weight, not volume. n9 The contract at bar required pricing by volume, not weight, which is atypical in the industry. n10

n9 Because the solids generally weigh more than the liquids, pricing by weight inherently accounts for varying solids content.

n10 This approach appears inherently to side-step the issue of varying solids content, because the more solids there are in the sludge, the greater the disposal cost at the final facility.

Waste Stream Environmental, Inc. ("Waste Stream") is a New York corporation qualified to do business in Massachusetts. Waste Stream submitted a complete bid package and was selected n11 as the "most responsible and responsive bidder" per *G.L.c. 30B, § 6.* The parties [*10] entered into a contract in January 1997. Waste Stream's bid cover letter acknowledges handling of the bid security, bid bond, and Addendum No. 1. It also states Waste Stream's intent that the bid respond to all aspects of the specifications. n12

n11 Waste Stream was actually the only bidder, though at least eight companies were represented at the August 1996 pre-bid meeting.

n12 The letter states: "Further, please be advised that it is WSE's intention to respond completely and without reservation to all aspects of the City's specification. Any aspects of WSE's bid which do not conform to the City's specification shall be considered an oversight and may be disregarded [sic] by the City." The parties consider this letter part of the bid and the contract.

The parties contracted for the removal of all plant residuals, be they cake or liquid sludge, or both. The ten-year agreement called for the removal of cake at $ 74.46 per ton, and removal of liquids at $ 0.079 per gallon. However, the Commission anticipated [*11] the bulk of the contract work to be for the removal of secondary sludge, as described earlier, not cake or primary sludge. At the time of the contract, the Commission was operating two incinerators which burned cake on-site, thereby reducing to the anticipated 9,000 to 18,000 gallon-per-day level the daily volume of sludge which was to be hauled. n13 There was no change in the volume of raw sludge received from the towns during the time of this controversy, and none was anticipated.

n13 Each truckload capacity is 9,000 gallons, though not every load carries that full quantity. The estimated volume range represents 1 to 2 truckloads per day. Volumes are measured per

Case 1:04-cv-12333-MEL    Document 13-3    Filed 12/10/2004    Page 49 of 60

Page 4

15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43, *

truck and then totaled into a daily volume. The solids content is tested by truckload; the results from every three trucks are rolled into one composite percentage. The composite numbers are then averaged daily. The measuring is done primarily by the facility operator, U.S. Filter, who is not a party to this suit.

In early 1998, Waste Stream began [*12] pursuing the Commission to re-negotiate the contract because of increased levels of solids in the secondary sludge. Then, in the summer of 1998, approximately eighteen months after the contract was entered into, one of the two incinerators in Lynn exploded, making it inoperable. Shortly thereafter, the Commission made a decision to shut down the second incinerator for safety reasons, n14 and to send all of its sludge off-site for disposal. All on-site dewatering and burning ceased. n15 All sludge, both primary and secondary, was then passed directly to Waste Stream for disposal. The record indicates that the volumes began escalating in August 1998, ultimately reaching a range of 80,000 to 97,000 gallons per day. The solids content continued to vary, averaging 5 to 6% in 1997 to 2000. n16

> n14 The parties agree that neither shutdown was for maintenance, thus the 25% maintenance clause was not invoked.

> n15 No dewatered cakes were produced because no incinerator was available to burn them.

> n16 The precise variation in solids is difficult to discern from the evidence, but both parties acknowledge that the average was greater than 4.5%.

[*13]

The parties disagreed on what solids content and volume requirements are set by the contract. In addition, concerns were raised regarding timely bill payment, actual vs. billed sludge volumes, and the proper value of the annual bond. n17 At one point, Waste Stream expressed an intent to cease hauling due to these problems, but later changed its position when the Commission noted the likelihood of very significant DEP permit violation fines being levied if Waste Stream ceased removal. Waste Stream has continued to perform under the contract, but under protest. The parties signed an "agreement to negotiate" on April 9, 1999, but no resolution was ever reached. n18 During this same time period, the Commission filed for and collected insurance monies covering the incinerator damages and the

continued cost of sludge removal. It also conducted a feasibility study on how best to manage sludge disposal in the future. n19

> n17 The ITB indicates that the bond must be in the amount of 100% of the total first-year bid amount. The ITB also set the first-year bond at $ 600,000. The ITB alone states that the bonding level must be adjusted annually, based on the previous year's contract dollar volume. The volume in 1999 was $ 2,500,000, thus setting the bond for 2000 at over four times the size of the first year. Addendum No. 1 references and confirms this ITB-based requirement. [*14]

> n18 It is unclear how much effort, if any, was put into resolving these differences.

> n19 Research indicated that when the sludge has a content of 6% or higher, the Commission is actually saving money compared to the open market, due to the fact that the contract is by volume, not weight. If disposal was by weight, sludge over 6% would cost the Commission more than the Waste Stream contract rate. Given these high volume conditions, the annual savings to the Commission would be roughly $ 500,000.

Waste Stream ultimately chose to file suit in March 2000. Due to changes implemented at the Lynn facility, the daily volume and solids content has dropped to levels below the range stated in the contract. The dispute in this case thus focuses on the mid-term elevated sludge volume and solids content levels.

DISCUSSION

1. Standard of Review

"Summary judgment is a device to make possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts or if only a question of law is involved." *Cassesso v. Comm'n of Corr.*, 390 Mass. 419, 422, 456 N.E.2d 1123 (1983) [*15] (citations omitted). A party seeking to recover upon a claim or to obtain a declaratory judgment may move for summary judgment in its favor upon all or any part thereof. *Mass.R.Civ.P. 56(c)*. Courts grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law *Id.; Community Nat'l Bank v. Dawes*, 369 Mass. 550, 553, 340 N.E.2d

Case 1:04-cv-12333-MEL    Document 13-3    Filed 12/10/2004    Page 50 of 60

Page 5

15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43, *

*877 (1976)*. The facts are viewed in the light most favorable to the non-moving party. *O'Sullivan v. Shaw, 431 Mass. 201, 202, 726 N.E.2d 951 (2000)*. Summary judgment is to be granted only if "the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716, 575 N.E.2d 734 (1991)*.

*Rule 56(e)* requires the court to consider only those facts that would be admissible as evidence, based on personal knowledge. *Madsen v. Erwin, 395 Mass. 715, 719, 481 N.E.2d 1160 (1985)* (distinguished on other grounds). "Hearsay in an affidavit is unacceptable to defeat summary judgment." *Id. at 721*. "Conclusory statements, [*16] general denials, and factual allegations not based on personal knowledge are insufficient to avoid summary judgment" *Id. Polaroid Corp. v. Rollins Envtl. Services, 416 Mass. 684, 696, 624 N.E.2d 959 (1993)*.

The central dispute in this case involves the parties' different interpretations of the contract into which they entered. Those differing interpretations raise questions of law for the court, not genuine and material issues of fact for a jury. n20

> n20 This Court is aware of numerous deposition and affidavit statements regarding which documents are part of the contract. Any of those which are conclusory are not considered as evidence here, as they would not raise genuine issues of material fact.

2. Contract Interpretation and Construction

As noted, "Construing the language of a[] contract is a question of law for the reviewing court." *Affiliated FM Ins. Co. v. Const. Reins. Corp., 416 Mass. 839, 842, 626 N.E.2d 878 (1994)*. When interpreting a contract, the court [*17] must give full effect to all terms, to be "taken in their plain and ordinary sense . . ." *Rogaris v. Albert, 431 Mass. 833, 835, 730 N.E.2d 869 (2000)*. "When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms." *Affiliated FM, 416 Mass. at 842* (quoting *Keating v. Stadium Mgmt. Corp., 24 Mass.App.Ct. 246, 249, 508 N.E.2d 121 (1987)*). Language must be construed to "give reasonable meaning whenever possible" to the parties' intentions. *Shea v. Bay State Gas Co., 383 Mass. 218, 224-25, 418 N.E.2d 597 (1981)*. All words should be given effect if

possible; none should be considered superfluous "if any other construction is rationally possible." *Computer Sys. of Am., Inc. v. W. Reserve Life Assurance Co. of Ohio, 19 Mass.App.Ct. 430, 437, 475 N.E.2d 745 (1985)*. While doubtful language is to be construed against the drafter, the intention of the parties is of higher priority. *Affiliated FM, 416 Mass. at 881*. [*18] After contract, "where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." *Restatement (Second) of Contracts § 202(4), at 86 (1981)*.

A. Contract Documents

The first legal question here is whether or not the Contract includes the Information to Bidders document. Waste Stream maintains that the ITB is not part of the Contract because it is not explicitly incorporated by reference. It essentially argues that the contract term SPECIFICATION refers only to the six-page Specification document; thus, the ITB is excluded from the contract and not binding on the parties. In contrast, the Commission maintains that all of the bidding documents are incorporated generally through the BID. Further, the Commission argues that because both parties relied on several specific elements of the ITB during the past six years, Waste Stream is prohibited from now denying incorporation of the ITB.

Contract bidding situations represent a variation [*19] on contract formation. Simply put, invitations to bid are "by necessary implication" fully incorporated into any bid submission. *Daddario v. Town of Milford, 296 Mass. 92, 95, 5 N.E.2d 23 (1936)*. In a bidding situation, the invitation to bid is an offer to the bidder to submit a bid. Response to the bid is an acceptance of that offer, creating at least an implied contract whereby the bidder agrees to comply with all of the offeror's terms and conditions, and the offeror in turn agrees to "fairly and honestly consider" the bid. *Firth Constr. Co., Inc. v. U.S., 36 Fed.Cl. 268, 271 (1996)* (examining bid responsiveness to an invitation due to missing terms and possible incorporation by reference). n21 The "bid package [] obligates the bidder to perform in accordance with the material terms of the [invitation]." *Id. at 273-74* (based on the consistent position of the federal General Accounting Office and the *Restatement (Second) of Contracts § 59*).

> n21 See also *Global Network Tech, Inc. v. Reg'l Airport Auth. of Louisville and Jefferson*

15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43, *

*County, 122 F.3d 661 (8th Cir. 1997)* (generally interpreting the invitation as part of the contract).

[*20]

The bid also becomes an offer to contract, and must be sufficient to form a "valid and binding contract" upon acceptance. *Firth, 36 Fed.Cl. at 274*. As such, bid responsiveness to the invitation is necessary to ensure fairness to the other bidders, so that everyone can be assured that all submissions will be judged equally relative to their commitment to the same set of "specifications and conditions in the invitation." *Id. at 274* (espousing the position of the Federal Court of Claims). n22 The final acceptance of the bid is necessarily undertaken on the same terms as the bid submission, since acceptance of materially varied terms would actually be a rejection (under common law). *Moss v. Old Colony Trust Co., 246 Mass. 139, 148, 140 N.E. 803 (1923).*

N22 Bid responsiveness to the invitation is also important to avoid ambiguity when courts are asked to "conduct autopsies on poorly written agreements." *Firth, 36 Fed.Cl. at 274* (citation omitted).

[*21]

The ITB in this case is an invitation to bid, one part of the bid solicitation package. As per *Firth*, the entire solicitation package was an offer from the Commission to bid. In response to that offer, Waste Stream formulated a bid proposal. Submission of that bid was an acceptance of the offer to bid, which created an implied contract that the Commission would fairly consider the bid. At the same time, the submission of the bid proposal also created an offer from Waste Stream to contract for the waste disposal job. The Commission's acceptance of the offer came with the selection of Waste Stream as the lowest "most responsible and responsive bidder," and ultimately the signing of the final contract.

The parties agree that Waste Stream's bid was "responsible and responsive." To be responsive, the bid had to encompass and comply with all of the requirements of both the ITB and the Specifications. Waste Stream's bid cover letter further demonstrates an intent to be responsive; it states that Waste Stream intended to respond to all terms, and if it did not, its failure to do so was to be deemed only an oversight. On submission, the bid therefore is deemed to have included the ITB [*22] terms, and became an offer to do the job based on those terms. The Commission's acceptance of the bid created a valid and binding contract, a contract which included the ITB terms. n23 Stated succinctly, the

ITB is subsumed within the bid; the bid is operationally incorporated into the Contract. n24

n23 In addition, the *Bid Sheet* completed by Waste Stream states that the bidder must meet all specifications and conditions.

n24 Because the ITB is incorporated by operation of law into the contract via the bid, neither the possible ambiguity of the term Specification nor the lack of express incorporation into the contract are material to the resolution of this case.

Though the Court need not look further, the parties' conduct or course of performance also reflects the inclusion of the ITB into the Contract. In particular, Waste Stream accepted annual pricing increases, provided adjusted bonds annually (albeit protesting the increased size), maintained the proper levels of insurance, and relied on the jury-waiver [*23] clause within the context of this case. All four of those elements are referenced only in the ITB. Of the four elements, the jury waiver-actions are the most notable. Waste Stream, the party arguing here for the limited contract definition excluding the ITB, came to this Court in July 2000 and successfully sought a denial of the Commission's jury trial request, relying directly on the terms of the ITB. n25 Waste Stream's position in 2000 was the antithesis of its position today. n26 If the contracting process left any doubt regarding the binding nature of the ITB, the parties' performance certainly erased any possible question.

n25 In its motion, Waste Stream represented the ITB to be part of the "Contract Specification" which was "incorporated into the Contract."

n26 "[A] contracting party's objective intention dictates and a party is bound by its outward manifestations to the other party." *Polaroid, 416 Mass. at 696-97.*

**B. Output Contracts**

When the court construes contract language, [*24] it does so as a question of law, particularly when considering the legal operation of the agreement rather than its language. *Seaco Ins. Co. v. Barbosa, 435 Mass 772, 779, 761 N.E.2d 946 (2002); Restatement (Second) of Contracts § 200,* Reporter's Notes at 82. The contract at bar is one for sludge disposal services, and thus falls under the common law, as opposed to the *Uniform*

Case 1:04-cv-12333-MEL    Document 13-3    Filed 12/10/2004    Page 52 of 60

Page 7

15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43, *

Commercial Code (UCC). *Mattoon v. City of Pittsfield, 56 Mass.App.Ct. 124, 141, 775 N.E.2d 770 (2002)* (determining that municipal water delivery and sale is a service, not a sale of goods). n27 However, few Massachusetts output/requirements contracts cases are known to this Court, particularly ones decided under the common law. n28 For reasons which will be discussed in more detail later, the ones which are known are not helpful where an overage in output is alleged. In some situations, it is appropriate to analogize to the UCC, when deciding a common-law case. n29 *Magliozzi v. P&T Container Serv. Co., 34 Mass.App.Ct. 591, 593, 614 N.E.2d 690 (1993); Dazien's Inc. v. Hodgman Rubber, 7 Mass.App.Ct. 901, 901, 387 N.E.2d 1173 (1979);* [*25] *Burlington Motor Carriers, Inc. v. APL Ltd., 1999 U.S. Dist. LEXIS 20819,* No. CIV. A. 99-157 MMS, 1999 WL 1427683, at *6 (D.Del. 1999) (applying UCC to a breach of a common-law output contract for freight transportation services). The Court analogizes to the UCC in this case.

n27 Because "goods" are defined as all things movable under the UCC, a question could be raised regarding the applicability of the common law or the UCC in this case. *G.L.c. 106, § 2-102.* In assessing whether a contract is for goods or services, the critical question is whether the predominant factor is delivery of service, or whether it is essentially a sale of goods with incidental services. The record presents no indication of an interest in sludge as a product, only in the service of disposal. The contract here is thus deemed to be one for services. See also *Cumberland Farms, Inc. v. Drehmann Paving & Flooring Co., 25 Mass.App.Ct. 530, 534, 520 N.E.2d 1321 (1988)* (distinguished on other grounds) (discussing the goods versus services assessment).

n28 This Court identified six opinions of the Supreme Judicial Court and Appeals Court which interpret requirements contracts, three of which were issued prior to the Massachusetts enactment of the UCC in 1958. *G.L.c. 106, § 1-101.* See *Mishara Constr. Co., Inc. v. Transit--Mixed Concrete, Inc., 365 Mass. 122, 310 N.E.2d 363 (1974); Neofotistos v. Harvard Brewing Co., 341 Mass. 684, 171 N.E.2d 865 (1961); Royal Paper Box Co. v. E.R. Apt Shoe Co., 290 Mass. 207, 195 N.E. 96 (1935); Brodsky v. Morrill Co., 237 Mass. 86, 129 N.E. 359 (1921); Burgess Sulphite Fibre Co. v. Broomfield, 180 Mass. 283, 62 N.E. 367 (1902); Associated Credit Serv., Inc. v. City of Worcester, 33 Mass.App.Ct. 92, 596 N.E.2d 388 (1992).*

One relevant Superior Court case was found. While the Court there did assess a requirements service contract, it is distinguishable from the case at bar on four grounds. *Falcucci Constr. Co, Inc. v. Boston Water and Sewer Comm., 1998 Mass. Super. LEXIS 541,* Civ. No. 974909, 1998 WL 1181178 (Middlesex Super. Sept. 18, 1998) (Sosman, J.) (9 Mass. L. Rptr. 151). The suit was for recovery on quantities below stated estimates; the contract had qualifiers similar to the case at bar. First, the contract was for emergency repair services, where the exact number of events is difficult to predict. Second, the contractor had prior experience and knew that the actual number of yearly events was much lower. Third, the contract addressed increased quantities, but not decreases, implying a purposeful intent to leave diminished quantities open-ended. And fourth, the case law usually allows for diminished performance, with no price adjustments, in similar unit-price contracts (discussed *infra*). [*26]

n29 Common-law cases are governed by analogous UCC principles when the UCC evolved from considerations comparable to those in the common law. *Brewer v. Poole Constr. Co., 2001 Mass. Super. LEXIS 151,* No. Civ. A. 98-0924B, 2001 WL 792783, at *4 (Super.Ct. May 3, 2001) (Welch, J.) (13 Mass. L. Rptr. 97). UCC-based, output/requirement contract law developed from the common law in the early twentieth century. Lord, *supra* § 7:12, at 196-200.

Procurement contracts have either definite, indefinite or output/requirements-based quantity terms. *Coyle's Pest Control, Inc., H.U.D.B.C.A., 1997 HUD BCA LEXIS 3,* No. 96-A-121-C10, 1997 WL 8496, at *6 (Jan. 6, 1997) (quoting *Mason v. U.S., 222 Ct. Cl. 436, 615 F.2d 1343 (Ct.Cl. 1980))*. n30 Output or requirements contracts are those with fixed unit-pricing but no definitive quantity terms. *Neofotistos v. Harvard Brewing Co., 341 Mass. 684, 171 N.E.2d 865 (1961); Burgess Sulphite Fibre Co. v. Broomfield, 180 Mass. 283, 287-88, 62 N.E. 367 (1902).* The quantity term is set by the indefinite output or requirements of one [*27] party, such as all the bread one facility can produce or all the gas needed for a year. The controlling quantity terms are thus measured by the output of the producing party ("producer") or the requirements of the consuming party ("consumer"). *Neofotistos, 341 Mass. at 686.* Such contracts need not be titled or described as output or requirements contracts in order to be

15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43, *

considered as such under the law. See generally *Brodsky v. Morrill Co., 237 Mass. 86, 129 N.E. 359 (1921); Associated Credit Services, Inc. v. City of Worcester, 33 Mass.App.Ct. 92, 93, 596 N.E.2d 388 (1992).*

n30 Requirements/output contracts are often compared to indefinite quantity contracts, which have no exclusivity but must have guaranteed minimum purchases. *Schweiger Constr. Co. v. U.S., 49 Fed.Cl. 188, 194 (2001); Coyle, 1997 HUD BCA LEXIS 3, 1997 WL 8496* at *6.

Contracts lacking a quantity term are valid under both the common law and the UCC because the party setting the volume [*28] agrees to deal exclusively with the other contracting party. *Neofotistos, 341 Mass. at 686;* see generally *Brodsky, 237 Mass. at 86,* and *Burgess, 180 Mass. at 283.* This exclusivity establishes mutual consideration, which would normally be lacking if one party were free to contract with no obligation. *Burgess, 180 Mass. at 284.* In addition, the volume setter agrees to establish quantities in good faith, and to employ standards of fair dealing such that the quantities will be reasonably foreseeable, as per *G.L.c. 106, § 2-306.* n31 *Mishara Constr. Co., Inc. v. Transit--Mixed Concrete Corp., 365 Mass. 122, 124-25, 310 N.E.2d 363 (1974).*

n31 The Code states: (1) A term which measures the quantity of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded. *G.L.c. 106, § 2-306.*

[*29]

In determining reasonable quantity or volume limits, UCC Comment 3 states:

If an estimate of output or requirement is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or demanded. Any minimum or maximum set by the agreement show a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur.

*G.L.c. 106, § 2-306* at 176. "Reasonable foreseeability" and the obligation of "good faith" are "somewhat

redundant," in that one defines the other. *Atlantic Track & Turnout Co. v. Perini Corp., 989 F.2d 541, 544 (1st Cir. 1993)* (relying on *Empire Gas Corp. v. Am. Bakeries Co., 840 F.2d 1333 (7th Cir. 1988)* (distinguished on other grounds)). The non-controlling party must be able to "reasonably assume" that the output-controlling party will operate its business in "good faith and do nothing to interfere with normal production." *Neofotistos, 341 Mass. at 689.* When quantities vary greatly from those reasonably foreseeable, they become unreasonably disproportionate, and [*30] thus represent bad faith. *Atlantic Track, 989 F.2d at 544;* see *infra,* n.38 (discussing bad faith).

Contract estimates play a critical role in allocating risk in output contracts. The risk of reasonable change in the output is assigned to the consumer, while the producer carries the risk of being restrained to "less urgent changes in circumstances." *Atlantic Track, 989 F.2d at 545.* Contract risk allocation is now common in "hard-to-determine" situations such as construction projects. *A&A Mechanical, Inc. v. Thermal Equip. Sales, Inc., 998 S.W.2d 505, 513 (1999).* Allowing for mid-term contract adjustments "in light of the actual conditions encountered obviates both expensively detailed pre-contract estimates and high, 'worst case' bids." *Id.* The producer appropriately bears the cost of additional labor, while yet benefiting from potential future consumer efficiencies. *Id.*

Contract estimates are used when bidders need guidance and specific information is not available. *Womack v. U.S., 182 Ct. Cl. 399, 389 F.2d 793, 801 (1968).* Estimates must be based on the most relevant and reliable information available. [*31] *Id.* Bidders must be able to rely on the estimates, or else their "inclusion in the invitation would be surplusage at best or deception at worst." *Id.* Government contract bidders in particular may rely on estimates as "honest and informed conclusions," since the "government is not free to carelessly guess at its needs." *Crown Laundry and Dry Cleaners v. U.S., 29 Fed.Cl. 506, 519-20 (1993).* n32 Ultimately, estimates enable the successful bidder to "begin making preparation to satisfy the contract." *Empire Gas, 840 F.2d at 1340.*

n32 Comparatively, the government can be sued for negligent estimating in output contracts, an easier burden for the plaintiff compared to indefinite contracts which carry a lower standard for the estimator, one that makes it more difficult for the plaintiff to prove. *Schweiger, 49 Fed.Cl. at 197.* Thus, government agencies that are parties to output/requirements contracts are held

15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43, *

to a comparatively higher standard to credibly provide estimates.

[*32]

Good faith changes in actual output cannot be based on mere "second thoughts about the terms of the contract." *Id.* Producers may not "arbitrarily and unilaterally change certain conditions prevailing at the time of the contract so as to take advantage of market conditions at the [consumer's] expense." *Orange and Rockland Util., Inc. v. Amerada Hess Corp.*, 59 A.D.2d 110, 397 N.Y.S.2d 814, 818 (Appellate Division, 1977). In situations where estimates of waste are supplemented by qualifications of no minimums, it cannot be assumed that one "is not required to deliver any waste." *Empire Sanitary Landfill, Inc. v. Comm. of Penn. Dept. of Envtl. Resources*, 546 Pa. 315, 339, 684 A.2d 1047 (1996). Ergo, one also cannot assume that a qualifier of no maximums equates to a mandate to dispose of an endless volume of waste. At the same time, one cannot assume that contracts terminate as soon as quantities vary unreasonably. *Philadelphia Corp. v. Niagara Mohawk Power Corp.*, 207 A.D.2d 176, 621 N.Y.S.2d 237, 239 (1995).

Courts often treat unreasonably disproportionate increases in output differently from decreases. *Empire Gas*, 840 F.2d at 1337. [*33]    When considering increases, courts routinely look to the unreasonable disproportion clause in the UCC, discussed above. *G.L.c. 106, § 2-306*. "A *sudden expansion* of the plant by which requirements are to be measured would not be included within the scope of the contract as made but normal expansion undertaken in good faith would be within the scope of [2-306]." *G.L.c. 106, § 2-306*, UCC Comment 2, at 175-76 (emphasis added). Even with this illustration, the term "unreasonably disproportionate" has feigned clear or precise definition. *Orange*, 397 N.Y.S.2d at 819. Only one court has articulated a list of factors n33 to consider, focusing on the unreasonableness "in view of the expectations of the parties." *Id.*

n33 The *Orange* Court suggests that the following factors be considered: (1) the amount by which the requirements exceed the contract estimate; (2) whether the seller had any reasonable basis on which to forecast or anticipate the requested increase; (3) the amount, if any, by which the market price of the goods in question exceeded the contract price; and (5) the reason for the increase in requirements. *Orange*, 397 N.Y.S.2d at 819. The Court found an overage of 100% to be unreasonable. *Id. at 821.*

[*34]

Most courts focus heavily on the specific quantity estimate (usually a specific number) contained in the contract, comparing it to the actual resulting overage. n34 These numbers harken to the UCC position of the estimate as a center around which a certain reasonable percentage of variation may occur. *G.L.c 106, § 2-306* Comment 3. Relevant cases include: *State, Dep't of Fisheries v. J-Z Sales Corp.*, 25 Wn. App. 671, 678, 610 P.2d 390 (1980) (citing other case law and finding the following amounts to be unreasonably disproportionate: 20% over stated estimate, "double the estimate," "three times the estimated amount of salmon eggs," and 66% over the estimates for salmon carcasses); *A&A Mechanical*, 998 S.W.2d at 512 (finding a 29% overage to be unreasonable, and citing cases that found 15% and 20% overages to also be unreasonable). When presented with a range of performance, the outer limits of the range become the unreasonableness boundaries. *McLouth Steel Corp. v. Jewell Coal and Coke Co.*, 570 F.2d 594, 605 (1978) (starting from the contract language with a range of 9,000 to 20,000/22,000 tons per month).

n34 The Massachusetts cases identified earlier all deal with quantity reductions, not increases.

[*35]

Decreased output situations receive different treatment under the law. *Empire Gas*, 840 F.2d at 1337-42 (providing a detailed discussion of the various legal treatments of output decrease situations); *Canusa Corp. v. A&R Lobosco, Inc.*, 986 F. Supp. 723, 728-30 (E.D.N.Y. 1997). Courts treat decreases differently based both on early common-law premises n35 and an apparent conflict within the UCC. n36 *Empire Gas*, 840 F.2d at 1337-38. Courts also appear to be more concerned with exploitation in increased demands situations, particularly in a rising market, n37 than with volume decreases. *Id. at 1338*. Ultimately, courts make their decision on the good faith of the volume-setting party when volumes are reduced from estimates, usually even allowing for business discontinuance if done in good faith. n38 *Atlantic Track*, 989 F.2d at 544; *Royal Paper Box Co. v. E.R. Apt Shoe Co.*, 290 Mass. 207, 210, 195 N.E. 96 (1935).

n35 Common law held that "the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the

Case 1:04-cv-12333-MEL     Document 13-3     Filed 12/10/2004     Page 55 of 60

Page 10

15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43, *

business." *Empire Gas, 840 F.2d at 1337-38* (citations omitted). [*36]

> n36 UCC § 2-306 Comment 2 indicates that good faith variations are acceptable even to the extreme of discontinuance. In contrast, Comment 3 discusses estimates as a center of variation, relative to quantities that may be demanded. Courts interpret this tension to justify using estimates for increases and good faith for decreases. *Empire Gas, 840 F.2d at 1338.*

> n37 A *bad faith* situation would exist if a market price rises above the contract price, and a consumer/buyer "demands more goods than it truly needs [from the producer/seller] in order to resell them for the better market price." *Atlantic Track, 989 F.2d at 544.*

> n38 Massachusetts added a requirement of good faith to its version of the UCC, defined as "honesty in fact in the conduct or transaction concerned," falling short of actual fraud. *G.L.c. 106, § § 1-201(19) and 1-203.* This addition reinforces the Commonwealth's public policy commitment to reliance on good faith in contracting.

All six Massachusetts output cases cited earlier considered [*37] volume decrease situations, and held, either expressly or by implication, that decreases are valid if they are grounded on good faith. See *supra* n.29. In concert with Massachusetts case law and the First Circuit in *Atlantic Track*, this Court concludes that "the unreasonably disproportionate language of *§ 2-306* does not apply to an output contract where the seller[/producer] tenders less than the estimate, and that the sole test in this context is good faith." *Canusa, 986 F. Supp. at 729* (citing *Atlantic Track*).

Turning to the case at bar, the agreement signed by Waste Stream and the Commission is a valid ten-year output contract for sludge disposal services, evidenced by the contract language and the performance of the parties. Though the parties never refer to it as one for output, the contract includes the defining elements: a fixed unit price of $ 0.79 per gallon for sludge; an indefinite quantity of 9,000-18,000 gallons per day; an indefinite quantity of 2-6% solids content; and, an agreement that the Commission would deal exclusively with Waste Stream for all of its sludge disposal needs, as evidenced most expressly on the Bid Sheet. n39 The parties [*38] established mutual consideration when the Commission agreed to only deal with Waste Stream, and

Waste Stream agreed to service all of the Commission's needs.

> n39 These facts are different from those in the heavily criticized holding in *Crown Laundry*, where the facts supported neither a requirements nor an indefinite contract, yet the Court still implied a requirements contract. *Crown Laundry, 29 Fed.Cl. at 518.* In the alternative, the Court would have been forced to find the contract invalid. *Id. at 517.* Here, the facts clearly meet all of the elements of an output/requirements contract.

By entering into such a contract, the parties allocated risks between them for ten years. Sludge disposal is not a business that can be run on exact numbers; a traditional definite quantity contract would not work in this situation. Waste Stream assumed the risk of reasonable variation around the estimates. It agreed to bear whatever fluctuations in costs accompanied such variations. Conversely, [*39] in setting the estimates, the Commission agreed to endeavor to maintain its output volumes in the vicinity of its estimates. It agreed to bear the costs of any variance outside of the estimates.

The Commission also implicitly committed to set its production levels in good faith. The summary judgment record indisputably indicates that the volume and content ranges presented in the bid solicitation package were set based on reasonable business planning and judgment. The Commission sought to optimize the efficiency of its operation. It determined that its prior method of contracting was not efficient, that burning cake from primary sludge would optimize the worth of the incinerators, and that contracting to haul away secondary sludge would complement the burning and further an effective business plan. Accordingly, the Commission used care in setting the volume estimate at 9,000-18,000 gallons or 1-2 trucks per day, along with a sludge solids content in the 2-6% range.

During the contracting process, Waste Stream clearly intended, as evidenced in writing, to dispose of all refuse, and comply with all of the Commission's specifications. It appropriately assumed reliance on the estimates, [*40] which were put forth in a clear and consistent manner throughout the process. As described in the case law, if Waste Stream were not meant to rely on the estimates, the numbers would be "surplusage at best or deception at worst." *Womack, 389 F.2d at 801.* On the other hand, if Waste Stream took the contract qualifiers to heart and bid based on a truly unlimited range, the price likely would have been significantly higher. It is apparent from the evidence that estimates are

Case 1:04-cv-12333-MEL    Document 13-3    Filed 12/10/2004    Page 56 of 60

Page 11

15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43, *

needed in the waste industry in order to develop a reasonable and competitive bid. Notable is that fact that no other company submitted a bid.

Though the Commission now argues that the contract should be interpreted as being completely ended, its position is not consistent with what appears to have been its initial intent. As discussed, it set the estimates based on a reasonable business plan. Per its statutory mandate, it needed a resource that could dispose of any and all sludge it produced. It clearly anticipated and estimated the volumes accurately, even though this was the Commission's first time contracting in this manner. Several clauses were added based on its prior experience, providing [*41] it with an operational cushion. n40

> n40 Specifically, the qualifiers to substitute primary sludge or cake, and the bid request for all three types of sludge harkened to the prior contract.

The record indicates that there were no material changes in the volume of raw sludge received from the towns during the contract. Any fluctuation had to come from processing changes within the facility, all within the control of the Commission. The contract volume estimates were accurate for the first eighteen months of the contract. The Commission's ultimate decision to shut down the second incinerator for safety reasons was certainly made in good faith. It was the unpredictable and unforeseeable incinerator explosion that has created an issue.

As a result of the explosion, the sludge volume eventually expanded by 400%. This number far exceeds the variation seen in any other case. Even so, Waste Stream continued hauling. It could not take the chance that it would be in breach if it ceased doing so. However, it rightfully [*42] protested and gave proper notice to the Commission. On the other hand, the Commission was innocent in the events that led to the shut-down of the incinerators. Unfortunately, it was incorrect in its assessment of how to interpret the contract. Without question, the volume increase represents an unreasonably disproportionate change by any standard. Code Comment 2 literally applies here, indicating that "sudden expansion" of requirements is outside the scope of any contract. *G.L.c. 106, § 2-306*. While public and private organizations must be mindful of their purses, fundamental elements of contract law cannot be ignored. n41

> n41 Evidence of sludge solids content variation is unclear in the record, though the parties agree that the average exceeded 4.5%. This Court makes no determination on liability based on variation of the solids content at this time.

The UCC and the cases make clear that estimates are meant to be center points around which reasonable variation may occur. Typical [*43] contract adjustments are given when variation exceeds the 15 to 20% range. n42 When applied to the center estimated number, the percentage factor generates a range of variation, for example from 80% to 120% of the center number using a 20% factor. In this case, the contract was one step ahead, setting a range for volume and both a center-point and a range for solids content. The range of 9,000 to 18,000 gallons reflects a variation factor of 33% around an average center point of 13,500. The range of 2-6% solids content represents variation factors 56% below and 33% above the given center point of 4.5%. These actual factors are generous compared to those interpolated by the case law. But, more importantly, these ranges and factors represent the understanding of the parties concerning the makeup of the waste to be hauled.

> n42 There are examples of far greater variation as well, while the federal contracts all employ a 15% factor.

Massachusetts case law, federal case law and the UCC speak in unison in providing [*44] that reductions in quantity are acceptable if the decision to reduce is made in good faith, even to the point of discontinuing business. The facts of this case suggest that until relatively recently, there were very few days, if any, on which actual production went below the stated estimates. Though Waste Stream orally argued reduction relief during the hearing on the instant motion, this Court sees no reason to go against the weight of the law based on the facts of this case. The output reductions are not eligible for relief. However, any days that saw output increases above 18,000 gallons per day and/or solids content above 6% per day are eligible for relief under the contract.

C. Equitable Adjustment (Calculating Relief)

Contract-based relief from unreasonably disproportionate output is called equitable adjustment. *G.L.c. 7, § 42I*; *District of Columbia v. Org. for Envtl. Growth, Inc., 700 A.2d 185, 203 (1997)*. Equitable adjustment is a process of "keeping the contractor whole or maintaining the contractor's profit or loss position as it

Case 1:04-cv-12333-MEL    Document 13-3    Filed 12/10/2004    Page 57 of 60

Page 13

15 Mass. L. Rep. 723; 2003 Mass. Super. LEXIS 43, *

n44 Parties may recover for quantum meruit when the contract has been terminated (i.e., there is no longer a contract), even if it is against the Commonwealth. *Sullivan v. Commonwealth, 397 Mass. 789, 796, 494 N.E.2d 374 (1986)*; *Peabody N.E., Inc. v. Town of Marshfield, 426 Mass. 436, 442, 689 N.E.2d 774 (1998)* (granting claim against town for quantum meruit because late performance had precluded recovery under the contract).

Though this Court denies the claim for quantum meruit, it is not based on the two cases cited by the Commission. One refers to the state not being a person in trade under G.L.c. 93A. *All Seasons Services, Inc. v. Comm. of Health and Hosp. of Boston, 416 Mass. 269, 272, 620 N.E.2d 778 (1993)*. The other refers to recovering under statutory requirements before legal suit. *United States Leasing Corp. v. City of Chicopee, 402 Mass. 228, 231-32, 521 N.E.2d 741 (1988)*. While both cases are still good law, neither applies to this case.

[*50]

Plaintiffs are only "entitled to one recovery for [] services [rendered]." *Marshall v. Stratus Pharms., Inc., 51 Mass.App.Ct. 667, 670 n.6, 749 N.E.2d 698 (2001)* (citing *Szalla, 421 Mass. at 454*). "If the plaintiff is entitled to recover on a contract, he cannot recover in quantum meruit." *Id.* The same conduct cannot justify double recovery. *Szalla, 421 Mass. at 454*.

Because Waste Stream may now recover by way of equitable adjustment and because it does not seek recovery based on any subsequent or different conduct beyond the excess production of sludge, there can be no recovery in quantum meruit. Waste Stream's summary judgment motion must be denied as to the quantum meruit and unjust enrichment claims.

ORDER

For the reasons stated herein, the Plaintiff's Motion for Partial Summary Judgment is allowed in part and denied in part, as follows. Summary judgment is *ALLOWED* on Count I for Declaratory Judgment, and a declaration shall enter in accordance with Part D of this memorandum. Summary judgment is *ALLOWED* on Count II for Breach of Contract, now treated as a claim for relief under the contract. Summary judgment [*51] is *DENIED* on Counts IV and VII for Quantum Meruit and Unjust Enrichment, respectively.

Howard Whitehead

Justice of the Superior Court

Dated: January 3, 2003

LEXSEE 1995 TEX APP LEXIS 2018

**DONALD M. WHITE AND KATHLEEN WHITE, Individually and d/b/a PINE FOREST ASSOCIATES, Appellants v. MELVIN D. BABCOCK, BABCOCK MANAGEMENT CORPORATION AND TRANSAMERICA RENTAL FINANCE CORPORATION, Appellees**

No. 14-94-00468-CV

**COURT OF APPEALS OF TEXAS, FOURTEENTH DISTRICT, HOUSTON**

*1995 Tex. App. LEXIS 2018*

**August 24, 1995, Rendered
August 24, 1995, Filed**

**PRIOR HISTORY:** [*1] On Appeal from the 151st District Court. Harris County, Texas. Trial Court Cause No. 88-58626.

**DISPOSITION:** Affirmed

**LexisNexis(R) Headnotes**

**JUDGES:** Panel consists of Justices Yates, Fowler and Draughn. *

* The Honorable Joe L. Draughn sitting by assignment.

**OPINIONBY:** JOE L. DRAUGHN

**OPINION:** OPINION

This is an appeal from a summary judgment in a case involving an alleged fraudulent transfer of assets. In two points of error, appellants contend that the trial court erred in granting summary judgment for appellees because there were material issues of fact concerning whether the underlying transaction violated the Bulk Transfers Act or Uniform Fraudulent Transfer Act. We affirm the judgment of the trial court.

The following facts are undisputed. Appellants sued Gates Rental, Inc. d/b/a Love TV Rental ("Gates"), a company controlled by appellees, Melvin Babcock and Babcock Management, Inc. ("Babcock") for breach of contract. On November 23, 1987, appellants were scheduled to have a summary judgment hearing on their suit against Gates. Gates moved to delay this hearing because it alleged that it did not have adequate time to complete discovery. The trial court delayed the hearing on the motion for summary judgment [*2] until December 21, 1987. On that day, the trial court entered a judgment against Gates for $ 58,130.40, together with prejudgment and post-judgment interest, court costs, and attorney's fees. When appellants went to collect from Gates in May 1988, they discovered that Mar-Jean Management, Inc. ("Mar-Jean") had purchased all the assets of Gates on December 1, 1987. Appellee, Transamerica Rental Finance Corporation ("Transamerica"), had financed Mar-Jean's purchase of Gates's assets. On June 28, 1988, appellants filed a turnover suit against Gates. Appellants failed to recover on the turnover suit because Gates had no remaining assets after the sale to Mar-Jean on December 1, 1987.

The following facts concerning Gates's sale of its assets to Mar-Jean are also undisputed. Gates sold the assets to Mar-Jean on December 1, 1987. On December 2, 1987, Mar-Jean executed a promissory note and loan agreement with Transamerica whereby Transamerica loaned Mar-Jean the principal amount of $ 425,000. Transamerica disbursed these loan proceeds by a joint check to Gates and BankSouth and the proceeds were actually received by BankSouth. On December 3, 1987, Transamerica filed a UCC statement with [*3] the Texas Secretary of State perfecting its security interest in Gates's assets. Additionally, prior to November 23, 1987, BankSouth held a lien on Gates' property because of an unpaid loan. The loan had been designated a "problem loan" and BankSouth could foreclose at any time.

TAB  L

BankSouth released this lien because of the payment received from Transamerica. BankSouth's release of Gates' loan is dated November 30, 1987.

On November 10, 1988, appellants filed suit against Mar-Jean, Transamerica, Babcock, and Gates for violations of the Bulk Transfers Act and the Uniform Fraudulent Transfer Act claiming the sale of assets on December 1, 1987, was done to prevent payment to appellants. Appellants allege that Gates intentionally delayed the hearing and then sold the assets to deny appellants their right to recover. Appellees respond that the sale was not done with an improper motive, but solely to pay off the overdue loan to BankSouth. Appellants contend that the fraudulent nature of the transfer is shown by the fact that the loan was released prior to the sale and the assets were transferred prior to the security interest being perfected. BankSouth's release of the loan is dated November [*4] 30, 1987, while Gates did not sell the assets to Mar-Jean until December 1, 1987. Additionally, Transamerica disbursed the proceeds to Gates and BankSouth on December 2, 1987, prior to Transamerica filing a UCC statement perfecting security interest in Gates's assets on December 3, 1987. Appellants contend this transfer violated the Bulk Transfers Act and the Uniform Fraudulent Transfer Act because Gates was not under any obligation when the funds were paid since the BankSouth lien was already released and the Transamerica lien not yet perfected.

Appellees respond that the entire sale transaction was designed to pay off a loan to BankSouth and therefore was not fraudulent. Prior to the sale of the assets, BankSouth had designated Gates' loan as a "problem loan" and had the right to foreclose. Mar-Jean alleges it agreed to purchase the assets to assist Gates in paying off the loan to BankSouth. Mar-Jean raised the capital to finance the purchase of Gates's assets by granting Transamerica a security interest in the assets. Transamerica paid Mar-Jean's loan proceeds in a check payable to Gates and BankSouth. BankSouth received the entire amount of the loan proceeds. Appellees [*5] contend that this was a transfer in settlement of a lien and was not the subject of the Uniform Fraudulent Transfer Act or the Bulk Transfers Act.

The trial court granted summary judgment for Gates, Babcock, and Transamerica. Appellants went to trial against Mar-Jean and appellants recovered $ 180,000. In this appeal, appellants contend the trial court erred in granting summary judgment on their claims against Babcock and Transamerica. The summary judgment against Gates is final and appellants have not appealed that ruling.

In his two points of error, appellant contends the trial court erred in granting summary judgment for appellants because there were genuine issues of material fact concerning whether appellees violated the Bulk Transfers Act, n1 or the Uniform Fraudulent Transfer Act, n2 whether appellees engaged in a conspiracy to defraud appellants and whether Babcock was liable as Gates' alter-ego. n3 The standard to be followed in reviewing a summary judgment is well established. The movant for summary judgment must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 [*6] *S.W.2d* 549-49 *(Tex. 1985)*. Evidence favorable to the non-movant will be taken as true and every reasonable inference must be indulged in favor of the non-movant. Id. When a summary judgment does not specify the grounds upon which the trial court granted it, the reviewing court will affirm the judgment if any one of the theories advanced in the motion is meritorious. *State Farm Fire & Casualty Co. v. S.S.*, 858 *S.W.2d* 374, 380 *(Tex. 1993)*.

n1 *Tex. Bus. & Com. Code Ann. 6.101*, et seq., (Vernon 1968) (repealed by Acts 1993, 73rd Leg., ch. 570, 16, eff. Sept. 1, 1993).

n2 *Tex. Bus. & Com. Code Ann. 24.001*, et. seq., (Vernon 1987).

n3 Appellants address separate points of error to the Babcock defendants and Transamerica. However, because our disposition for all appellees turns on the same issue, we discuss both appellees' points of error together.

While many potential fact questions remain concerning appellees' motives for the sale of the assets to Mar-Jean, we find that those motives are not determinative [*7] of the issues on this appeal. Put simply, the sale of the assets served to pay off a valid and outstanding lien to BankSouth, and therefore cannot be a fraudulent transfer as a matter of law. A transfer in settlement or realization of a lien or other security interest is not subject to the Bulk Transfers Act. Tex. Bus. & Com. Code Ann. 6.103(3) (Vernon 1968). The summary evidence shows as a matter of law that the transfer of Gates' assets to Mar-Jean was done to settle the lien owed to BankSouth. BankSouth received the entire proceeds of the loan to Mar-Jean and released the loan. Although there was a one-day window in which Gates may have claimed the proceeds of Transamerica's loan because BankSouth released the loan prior to the new security interest being perfected, this does not raise a fact issue as to whether this sale was made in realization of a lien or other security interest. Whatever opportunity Gates may have

had to claim the loan proceeds for himself is not dispositive. The proceeds were received solely by BankSouth and were used solely to satisfy the lien. Gates did not receive any of the funds. . See e.g., *Hixson v. Pride of Texas Distributing Co., Inc., 683 S.W.2d 173,* [*8] *178* (Tex. App.--Fort Worth 1985, no writ); *River City Products, Inc. v. A.E.J. Inc., 774 S.W.2d 452, 453 (Ky. App. 1989); Peerless Packing Co., Inc. v. Malone & Hyde, Inc., 180 W. Va. 267, 376 S.E.2d 161, 165 (W.Va. 1988); Ouachita Electric Cooperative Corp. v. Evans-St. Clair, 12 Ark. App. 171, 672 S.W.2d 660, 663 (Ark. App. 1984); Techsonic Industries, Inc. v. Barney's Bassin' Shop, 621 S.W.2d 332, 333-34 (Mo. App. 1981); American Metal Finishers, Inc. v. Palleschi, 391 N.Y.S. 170, 172 (1977).* Because the funds were used solely to pay BankSouth, the trial court correctly determined that appellants did not have a valid cause of action for a violation of the Bulk Transfers Act.

The Uniform Fraudulent Transfer Act does not cover property to the extent it is encumbered by a valid lien. *Tex. Bus. & Com. Code Ann. 24.002 (2) (A).* The assets appellants claim were fraudulently transferred were encumbered by BankSouth's valid lien. Even if appellants were to have received Gates' assets, the assets still would have been encumbered by the BankSouth lien; therefore, Gates had no "assets" to fraudulently transfer. See e.g., *Baker & Sons Equipment Co. v. GSO Equipment Leasing, Inc., 662 N.E.2d 1113, 1118-19 (Ohio App. 1993);* [*9] *Kellstrom Bros. Painting v. The Carriage Works, Inc., 117 Ore. App. 276, 844 P.2d 221, 222 (Or. App. 1992).* Furthermore, there was no fraud in this transfer because the sale was done to pay off Gates' legitimate creditor. No cash proceeds were available to Gates and he did not defraud his creditors by absconding with the funds. The funds were received solely by BankSouth. A debtor does not commit fraud by choosing to pay one creditor ahead of another. A sale by a debtor for the purpose of applying the proceeds of the sale to payment of its debts is not fraudulent as to the creditors not sharing in the proceeds of such sale. *Rogers v. Driscoll, 59 Tex. Civ. App. 415, 125 S.W. 599, 601 (Tex. Civ. App.--San Antonio 1910, writ ref.).* Because appellants did not have a valid cause of action for a violation of the Uniform Fraudulent Transfer Act, the trial court correctly granted summary judgment for appellees on the Uniform Fraudulent Transfer claims.

The trial court also properly granted summary judgment on appellants' claims that appellees engaged in a conspiracy because appellees did not commit a fraudulent transfer. The essential elements of a civil conspiracy are: (1) two or more persons; (2) an object to

be accomplished; [*10] (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Massey v. Armco Steel Company, 652 S.W.2d 932, 934 (Tex. 1983).* The summary judgment evidence in this case, even when viewed in the light most favorable to appellants, does not show any unlawful, overt acts. The sale of the assets to Mar-Jean to pay the loan to BankSouth was legal. Because there were no improper or illegal acts in paying the valid loan due to BankSouth, appellees did not engage in a conspiracy.

Finally, appellants may not recover under their alter-ego theory against appellee, Babcock. Appellants allege that because Babcock controlled Gates, Babcock should be liable for any damages Gates caused. Without reaching whether Gates is Babcock's alter-ego, we hold that appellant may not recover under this claim because the trial court granted summary judgment that Gates committed no wrong doing and the suit against Gates was severed from this appeal and the judgment is final. If the underlying corporation cannot be liable, the corporation's alleged alter-ego cannot be liable under an alter-ego theory because the alter-ego doctrine [*11] creates liability based on the wrong doing of the corporation. *Kern v. Gleason, 840 S.W.2d 730, 736 (Tex. App.--Amarillo 1992, no writ); Equinox Enterprises, Inc. v. Associated Media, Inc., 730 S.W.2d 872, 877 (Tex. App.--Dallas 1987, no writ).* Because the judgment against Gates is final and clears it of any wrongdoing, appellants do not have a valid cause of action against Babcock under an alter-ego theory.

Because appellees presented the trial court with valid grounds upon which to properly grant summary judgment on all of appellants' causes of actions, the trial court properly granted summary judgment for appellants.

We affirm the judgment of the trial court.

/s/ Joe L. Draughn

Justice

Judgment rendered and Opinion filed August 24, 1995.

Panel consists of Justices Yates, Fowler and Draughn. *

      * The Honorable Joe L. Draughn sitting by assignment.