UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CASAS, BENJAMIN & WHITE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  04-12333-MEL |
| | ) | |
| THE POINTE GROUP, INC., a | ) | |
| Massachusetts corporation d/b/a The Pointe | ) | |
| Group Healthcare and Senior Living; | ) | |
| GERALD S. FREID; BARRY FREID; and | ) | |
| KEY CORPORATE CAPITAL, INC., | ) | |
| | ) | |
| Defendants. | | |

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
AND FOR ATTACHMENT OF REAL ESTATE**

Plaintiff Casas, Benjamin & White LLC (hereinafter, "Plaintiff" or "CBW") respectfully submits this memorandum of law in support of its motion for preliminary injunction and for attachment of real estate owned by The Pointe Group, Inc., d/b/a The Pointe Group Healthcare and Senior Living ("TPG"), Gerald Freid, and Barry Freid (hereinafter "Defendants").

**I.        INTRODUCTION**

In this action, CBW seeks to recover a fee in excess of $1,000,000 for services provided by CBW for Defendants' benefit.  Defendants retained CBW to provide certain investment banking services in connection with the sale or refinance of the Defendants' nursing home and assisted living facilities, and agreed to pay CBW a percentage of the value of any transactions consummated in connection with the sale or refinance of those facilities.   After CBW performed

all of its obligations under the parties' contract, and Defendants' facilities were in fact sold, Defendants wrongfully failed and refused to pay CBW's contracted-for fee, and instead retained sale proceeds that should have been paid to CBW.

To protect its rights and to aid in its recovery of the monies due and owing, CBW now seeks entry of a preliminary injunction restraining Defendants, and their officers, directors, agents, servants, and employees, from disbursing or transferring any part of the monies received from the sale of the facilities until further Order of the Court. CBW also requests that the Court order Defendants to provide an accounting to CBW of the distribution of proceeds at the September 30, 2004 closing on the transactions at issue. CBW is entitled to such relief because CBW is likely to prevail on the merits of its claims against Defendants, and because absent such relief, CBW will suffer irreparable harm that far outweighs any harm that Defendants may suffer by entry of the injunction.

CBW also requests that the Court issue a general writ of attachment in the amount of $1,033,000 to be recorded against real property belonging to TPG, Gerald S. Freid, and Barry Freid. CBW is entitled to such an attachment because CBW is reasonably likely to recover an amount equal to or in excess of $1,033,000, and CBW is not aware of any liability insurance that otherwise might be available to satisfy Defendants' obligation to CBW.

## II. FACTUAL BACKGROUND[1]

CBW is a duly-constituted limited liability company organized under the laws of the State of Delaware with a principal place of business in Skokie, Illinois. Defendant TPG is a duly-constituted Massachusetts corporation with a last and usual place of business in Brockton, Plymouth County, Massachusetts. At all material times, TPG, its shareholders, and affiliates owned, operated, and/or acted as the management company for certain private nursing homes

---

[1] References for all facts can be found either in CBW's Complaint, TPG's answer and counterclaim, or in the accompanying Affidavit of Matthew M. Caine.

and assisted living facilities located throughout the Boston and Cape Cod areas.  Defendants Gerald Freid and Barry Freid are residents of Needham, Norfolk County, Massachusetts.  At all material times, Gerald Freid identified himself as the Vice-President and Chief Financial Officer of TPG.  Barry Freid is TPG's Treasurer and, at all material times, represented that he was the Chief Operating Officer of TPG.

In or about the summer of 2003, TPG was facing the prospect of foreclosure on certain facilities because it was unable to pay its debts related to these certain facilities as they came due.  Specifically, these facilities (hereinafter, "Combined Operations") were:  (1) Hammond Pointe Nursing Home, LLC, a business providing long-term care, Alzheimer's care, and sub-acute care; (2) Boylston Place at Chestnut Hill, LLC, a business providing assisted living services; and (3) Cranberry Pointe Nursing Home, Inc., a business providing long-term care, Alzheimer's care, and sub-acute care among other services.  In order to reduce its debt and obtain a release of the liens that the lender had on these facilities, TPG decided to sell or refinance the Combined Operations.

TPG thereafter retained CBW to assist in implementing this strategy.  In September 2003, CBW and TPG, d/b/a The Pointe Group Healthcare and Senior Living, executed an Engagement Letter under the terms of which CBW was to assist TPG in evaluating certain financial and operating restructuring initiatives ("Restructuring Services") and was to act as TPG's "exclusive capital restructuring advisor to effect the sale and/or refinance" of the Combined Operations ("Investment Banking Services").  As consideration for CBW's Investment Banking Services, TPG agreed that it would pay CBW additional compensation pursuant to a formula entitling CBW to a percentage of the value of any transactions consummated in connection with the sale and/or refinance of TPG's Combined Operations.  This additional compensation was to be due and payable at the closing of each transaction between TPG or any of its affiliates and any

individuals or entities identified by CBW to TPG during the term of the engagement. The Engagement Letter expressly provided that CBW would be notified and invited to attend all closings pertaining to all such transactions, and that all definitive agreements memorializing any transaction would specifically delineate the responsibility to CBW arising as a result of the transaction.

Between September and December of 2003, CBW performed Restructuring Services on behalf of TPG. CBW was paid for these Restructuring Services by means of checks issued by TPG, and signed by Gerald Freid, Barry Freid, or Mark Tobin, the President of TPG. (See Caine Affidavit, Exhibit L.)

On January 14, 2004, Gerald Freid, acting on behalf of TPG, accepted, acknowledged and agreed to a written amendment to the Engagement Letter. Pursuant to the terms of the amendment, CBW was to continue providing Restructuring Services through the end of January. The amendment also provided that, beginning on or around January 23, 2004, CBW would commence working exclusively on the solicitation process by providing Investment Banking Services intended to culminate in the sale of the Combined Operations.

In May 2004, CBW presented twelve Letters of Interest ("LOI") from parties interested in either acquiring or refinancing the Combined Operations. Subsequently, TPG selected Epoch Senior Living ("Epoch"), one of the parties identified by CBW, as the preferred party with whom to enter into negotiations for the sale of the Combined Operations. The sale to Epoch is hereinafter referred to as the "Transaction."

On or about June 2, 2004, Barry Freid, in his capacity as Chief Operating Officer of TPG, wrote a letter to CBW in which he acknowledged that, under the terms of CBW's Engagement Letter, CBW would be entitled to a fee of $1.25 million in connection with the proposed sale price of $37 million. In the letter, Barry Freid appealed to CBW to adjust its fee downward.

On June 4, 2004, the Freids and Stephen Gordon, TPG's counsel, reassured CBW that the terms of the Engagement Letter would be honored and that CBW should continue to provide its services with the objective of finalizing the Transaction with Epoch. Shortly after this June 4th conference, TPG's counsel e-mailed CBW, acknowledging that, without the services rendered by CBW, the Transaction would not have been possible.

On July 13, 2004, a meeting was held between representatives of Epoch, TPG, Key Bank (the senior secured lender), and CBW. The meeting took place in Massachusetts and was attended by TPG's counsel and the Freids, among others. During the meeting, Epoch proposed a reduction in the purchase price. After the presentation, TPG's counsel expressly instructed CBW to leave the meeting room to allow TPG and Key Bank to resolve negotiations as to the revised purchase price. Epoch's proposal to reduce the purchase price was not agreed to and the meeting ended without the parties reaching a final agreement as to the terms of the Transaction.

On July 14, 2004, TPG, through Gerald Freid, requested that CBW reduce its fee to a lump sum of $800,000 in order to facilitate the closing, thereby acknowledging that, upon closing of the Transaction, the contracted-for fee would be due and owing to CBW. On July 15, 2004, CBW sent an e-mail to Gerald Freid in which CBW offered to accept a lump sum transaction fee of $1 million, instead of the $1.25 million that had been originally calculated, along with reimbursement of out-of-pocket expenses. In an e-mail dated July 15, 2004, TPG's counsel informed CBW that the Epoch deal could not be concluded unless CBW further reduced the amount of its fee. On July 16, 2004, Key Bank notified CBW that agreement had been reached between all parties, and that the fee due CBW was unaffected by negotiations.

On September 21, 2004, Gerald Freid contacted CBW to inform it that: (1) the Massachusetts Department of Public Health was close to approving the licensure transfer; (2) TPG was under investigation for patient abuse problems at Cranberry Pointe Nursing Home; and

(3) he was unable to honor an invoice submitted by CBW for out-of-pocket expenses that had been incurred, but would make payment of the invoice and of CBW's fee at the closing.

On September 27, 2004, TPG's counsel reassured CBW that the sale of the Combined Operations to Epoch was in the final stages and that CBW would receive its fee. On September 28, 2004, CBW contacted TPG's counsel to inquire as to the date and location of the anticipated closing so that it could exercise its contractual right to attend. TPG's counsel represented that he was not in possession of this information.

On September 29, 2004, CBW contacted Gerald Freid, who requested an invoice for the final amount owed by TPG for the services provided by CBW. Gerald Freid represented that the fee would be paid at the closing, thereby again acknowledging TPG's obligation to pay CBW a fee for its Investment Banking Services, as specified under the Engagement Letter. CBW sent the requested invoice the same day to TPG and also to the personnel preparing the wire information for TPG's disbursement obligations at closing.

The invoice prepared by CBW stated that $1,033,030 was owed in conjunction with the Investment Banking Services provided by CBW in connection with the sale of the Combined Operations. This calculation of CBW's fee was based on an Aggregate Transaction Value of $31,950,000 for the sale of the Combined Operations and included an amount slightly more than $5,000 in unreimbursed expenses.

The closing occurred on or about September 30, 2004 and TPG's interests in the Combined Operations were sold to Epoch for an adjusted sales price of approximately $31,950,000. Based on this sales price, CBW was entitled, pursuant to the terms of the Engagement Letter, to a fee of $1,028,000, plus out-of-pocket expenses. TPG failed to pay CBW its fee at the time of the closing, as required by the terms of the Engagement Letter.

On or about October 1, 2004, CBW received a letter from TPG's counsel. In the letter, TPG's counsel claimed for the first time that CBW was not entitled to any payment because, among other things, TPG was not contractually bound by the terms of the Engagement Letter inasmuch as it had been entered into by "The Pointe Group Healthcare and Senior Living," an entity that TPG's counsel characterized as non-existent. TPG's counsel also claimed that CBW was not entitled to payment because CBW did not have a license to sell real estate in Massachusetts and therefore by operation of law could not collect a brokerage commission. After reciting these contrived and baseless objections to paying the fee to which CBW was contractually and equitably entitled, TPG's counsel set forth "at Gerry Freid's insistence" a so-called "settlement" proposal under which TPG allegedly would make a series of installment payments totaling $782,773 over a period of approximately one year, with no security or guarantee for these payments.

Upon receiving this malicious and false letter with its proposed unilateral and unjustified reduction in CBW's fee, CBW contacted Epoch to inform Epoch of the contractual breach. Epoch informed CBW that it had anticipated CBW's participation at the closing and had prepared a security pass to allow CBW entrance to the meeting place. Epoch also informed CBW that during the closing, questions had been raised as to the manner in which CBW's fee would be handled and that, in response, TPG's representatives began smiling and laughing.

Despite repeated demands for payment of all sums due and owing, CBW has never been paid for the services it rendered in connection with the Transaction.

### III.  ARGUMENT

#### A.  CBW is Entitled to Entry of A Preliminary Injunction

CBW is entitled to a preliminary injunction because it can show: 1) that it will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which

granting injunctive relief would inflict on Defendants; (3) that it has a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction. See Shipley Co., L.L.C. v. Kozlowski, 926 F. Supp. 28, 29-30 (D. Mass. 1996) (citing Jackson v. Fair, 846 F.2d 811, 814-15 (1st Cir. 1988)); see also Planned Parenthood League of Massachusetts v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981).  The purpose of a preliminary injunction is to protect the rights of the parties and preserve the status quo between the parties pending a full hearing on the merits of the controversy.  Itek Corp. v. First Nat. Bank of Boston, 566 F. Supp. 1210 (D. Mass. 1983).  Pursuant to Mass. R. Civ. P. 65(d), an injunction is binding not only upon the parties to an action, but also on "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed. R. Civ. P. 65(d) (2004); see also G. & C. Merriam Co. v. Webster Dictionary Co., 639 F.2d 29, 35 (1st Cir. 1980) (Rule 65(d) codifies the common-law rule that a non-party may be held in contempt for violation of the terms of an injunction where that non-party is legally associated with the defendant or is an aider and abettor of the defendant).

1. CBW Will Suffer Irreparable Injury If The Requested Injunction Is Not Granted.

The circumstances of the present case establish that CBW will suffer irreparable injury if the requested injunctive relief is not granted.  This Court may enter a preliminary injunction "to protect a plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." See Wright & Miller, *Federal Practice & Procedure* § 2947 at 123 (2004).  While injunctive relief typically is granted only in situations where a legal remedy will not suffice, a plaintiff can make a showing of irreparable harm even where the only relief sought is money damages if circumstances suggest that the plaintiff

otherwise will have no meaningful ability to collect on a judgment.  See Unisys Corp. v. Dataware Products, Inc., 848 F.2d 311 (1st Cir. 1988) (in dispute between creditor and corporate successor to Chapter 7 debtor, injunctive relief was necessary to assure the presence of an adequate legal remedy); Teradyne, Inc. v. Mostek Corp., 797 F.2d 43 (1st Cir. 1986) (supplier entitled to injunction where buyer was winding down its assets and had given no assurances as to its ability to pay any judgment); Micro Networks Corp. v. HIG Hightec, Inc., 188 F. Supp. 2d 18, 22 (D. Mass. 2002) (citing Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245 (2nd Cir. 1999) (irreparable harm exists where, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.")); Seide v. Crest Color, Inc., 835 F. Supp. 732 (D.C.N.Y. 1993) (entering injunction where employer had a past history of avoiding payment of money judgments).

Courts also have exercised their discretion to grant injunctive relief, even in cases involving purely monetary damages, where the party seeking the injunction asserts an equitable interest in the assets which are the subject of the requested injunctive relief.  See Fairview Machine & Tool Co. v. Oakbrook International, Inc., 77 F. Supp. 2d 199, 204 (D. Mass. 1999) (injunction is appropriate where there is a sufficient nexus between a cognizable claim in equity and the assets of the defendant that are the target of the preliminary injunction); Micro Networks, 188 F. Supp. 2d 18, 22 (D. Mass. 2002)(noting that the First Circuit has recognized the propriety of a preliminary injunction where the relevant funds or assets in which the party has an equitable interest are in danger of depletion or dissipation); United States ex rel. Rahman v. Oncology Associates, P.C., 198 F.3d 489, 492 (4th Cir. 1999) (same).

Under this authority, the Court should find that CBW has met its burden of demonstrating irreparable injury.  First, given TPG's precarious financial status at the outset of its relationship with CBW, its conduct in repeatedly assuring CBW that its fee would be paid only to reverse that

position at the time of the closing, its post-closing efforts to recharacterize its contract with CBW as a "real estate broker's" contract "with a non-existent entity," and its post-closing offer to "settle" with CBW by making a reduced payment over a period of years, this Court should find that an injunction is necessary to preserve the status quo and provide a meaningful damages remedy.  Second, CBW has brought equitable claims against TPG and the Freids, and there is a clear nexus between those claims and the assets that are the target of the injunction motion.  In fact, CBW claims that the very funds which are the subject of its attachment motion are funds that belong to CBW, and should have been paid directly to CBW at the time of the September 30, 2004 closing.  In light of these facts, the Court should find that this case is within the dictates of <u>Teradyne</u> and <u>Fairview Machine</u>, and should further find that CBW has made the required showing of irreparable harm.

        2.        <u>The Irreparable Harm That CBW Will Suffer In The Absence Of The Requested Injunction Outweighs Any Possible Harm To Defendants.</u>

Moreover, the balance of harms favors issuance of the requested injunction, given the risk that CBW will never recover its fee if Defendants are free to spend the proceeds resulting from the September 30, 2004 closing.  Defendants cannot possibly argue that they will suffer any substantial harm if the injunction is entered, as the requested injunction would not prohibit the defendants or their agents from doing business in the normal course, but merely from dissipating monies that belong to CBW.

        3.        <u>CBW Is Likely To Succeed On The Merits Of Its Claims</u>

Finally, CBW can show that it is likely to succeed on the merits of its claims in this case. CBW's complaint contains claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, civil conspiracy, aiding and abetting, fraudulent transfer, and for violations of Chapter 93A, as well as the equitable claims of unjust

enrichment and detrimental reliance. The facts set forth in Mr. Caine's affidavit and its exhibits establish CBW's right to recover on its breach of contract claim, and CBW therefore will not address its ability to make such a showing as to each of the other claims contained in its complaint.

While Defendants likely will dispute CBW's chances of prevailing on its contract claim on the same spurious grounds set forth in Attorney Gordon's October 1, 2004 letter – i.e., that CBW's Engagement Letter is directed to an allegedly non-existent entity, and that CBW is prohibited from recovering its fee because CBW does not hold a real estate broker's license – Defendants' position is meritless. As established in the exhibits attached to Mr. Caine's affidavit, TPG at all times acted in accord with CBW's understanding that it had contracted to provide services to TPG, whether operating under a trade name or otherwise, and any relevant TPG shareholders or affiliates. Further, defendants can point to no Massachusetts authority for the proposition that an investment advisor like CBW needs a Massachusetts real estate broker's license to provide investment services in connection with the sale or refinancing of a commercial entity.

Moreover, even if Defendants' arguments on the breach of contract claim had merit, CBW has made several equitable claims for recovery of its fee to which Defendants' argument are entirely inapplicable. Thus, even if Defendants were correct in arguing that they have no obligation to abide by their contractual obligations, CBW still would be entitled to the requested injunction.

### B.  CBW Also is Entitled to an Immediate Accounting

CBW also is entitled to an accounting of the proceeds from the transaction. A court may order a defendant to file an accounting, in connection with the issuance of a preliminary injunction, to ensure that the preliminary injunction will have the necessary effect and to assist

the Court and the parties in monitoring the defendant's compliance with the injunction. <u>Colonial Mortgage Bankers Corp. v. Rua</u>, 228 B.R. 516, 518 (1st Cir. 1999) ("In order to determine the extent of the self-dealing transactions made by [the defendant] and the value of the assets of the debtor corporation as of the date of the filing, an accounting is required."); <u>Unisys Corp. v. Dataware Products, Inc.</u>, 848 F.2d 311, 314 (1st Cir. 1988) (accounting was necessary in order to "assure the presence of an adequate legal remedy.").

In this case, CBW repeatedly has requested copies of the closing papers and an accounting of the disbursements of proceeds from the September 30, 2004 transaction, but it has never received such an accounting. Thus, CBW does not know how much of its fee is in the hands of Defendants, and what portion of its fee might be in the hands of each defendant or in the possession of an agent of any particular defendant. This Court should order Defendants to file such an accounting immediately to ensure that no further part of CBW's fee is disbursed, and to assist the parties and the Court in monitoring Defendants' compliance with the injunction.

### C.    **CBW is Entitled to Issuance of a General Writ of Attachment**

Finally, CBW is entitled to issuance of a general writ of attachment. Rule 64 of the Federal Rules of Civil Procedure looks to "the law of the state in which the district court is held," with respect to "all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action…" Fed. R. Civ. P. 64 (2004). Rule 64 adds that "[t]he remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether by state procedure the remedy is ancillary to an action or must be obtained by an independent action." <u>Id</u>. Thus, CBW's request for issuance of a writ of attachment is governed by Rule 4.1 of the Massachusetts Rules of Civil Procedure and M.G.L. c. 223. <u>See</u> <u>Rodriguez v. Montalvo</u>, 337 F. Supp. 2d 212, 215 (D. Mass. 2004) (Rule 64 grants discretion to

federal district courts to allow for pretrial attachment of a defendant's property as permitted by state law).

Pursuant to Rule 4.1(c):

[n]o property may be attached unless such attachment for a specified amount is approved by order of the court...the order of approval may be entered only after notice to the defendant and hearing and upon a finding by the court that there is a reasonable likelihood that the plaintiff will recover judgment in an amount equal to or greater than the amount of the attachment exclusive of any liability insurance of the defendant.

Mass. R. Civ. P. 4.1(c) (2004). "A general attachment reaches all lands within the jurisdiction of the registry standing in the name of the defendant." Trager v. Hiebert Contracting Co., 339 F.2d 530, 532 n. 3 (1st Cir. 1964) (citing M.G.L. c. 223, § 62)[2].

As discussed above, CBW is reasonably likely to recover an amount equal to or in excess of $1,033,000. Further, as set forth in Mr. Caine's affidavit, CBW is unaware of any liability insurance that might otherwise be available to satisfy Defendants' obligation to CBW. Thus, CBW is entitled to issuance of a general writ of attachment in the amount of $1,033,000 against the real property of Defendants The Pointe Group, Inc., Gerald Freid, and Barry Freid.[3]

---

[2] M.G.L. c. 223, § 62 reads as follows: "In attaching land, or a right or interest therein, the officer need not enter upon the land or be within view of it. In attaching leasehold estates, the officer shall state in his return in general terms the leasehold property attached. Every writ on which such an attachment of land, or a right or interest therein, is made shall contain or have endorsed upon it the name and last known residence of each defendant."

[3] TPG has alleged in its counterclaim that its principal place of business is in Brockton, Plymouth County, Massachusetts. CBW believes that both Gerald Freid and Barry Freid reside in Needham, Norfolk County, Massachusetts. If the Court grants CBW's motion and orders the issuance of a general writ of attachment, CBW expects that it would record the attachment in both the Plymouth County and Norfolk County registries.

## IV. **CONCLUSION**

For the reasons set forth in this memorandum, plaintiff Casas, Benjamin & White, LLC respectfully submits that the Court should grant its motion for preliminary injunction and for issuance of a general writ of attachment, and enter an Order in the form of the proposed order attached to plaintiff's motion.

                                          CASAS, BENJAMIN & WHITE, LLC

                                          By its attorneys,

                                          /s/ Erin K. Higgins_____
                                          Thomas E. Peisch / BBO #393260
                                          Erin K. Higgins / BBO #559510
                                          Michael R. Bernardo / BBO #648310
                                          CONN KAVANAUGH ROSENTHAL PEISCH
                                           & FORD, LLP
                                          Ten Post Office Square
                                          Boston, MA  02109
                                          (617) 482-8200

                                          /s/ Richard P. Steinken (ekh)_____
                                          Richard P. Steinken, admitted *pro hac vice*
                                          Jeff J. Marwil, admitted *pro hac vice*
                                          David W. Austin, admitted *pro hac vice*
                                          JENNER & BLOCK, LLP
                                          One IBM Plaza
                                          Chicago, IL  60611-7603

Dated: December 21, 2004
       Boston, Massachusetts

215304.1