# EXHIBIT F

MAY-25-04   01:33PM   FROM-Gordon Haley LLP                    +617 261 0789            T-539   P.002/013   F-991

# GORDON HALEY LLP
COUNSELLORS AT LAW
101 FEDERAL STREET
BOSTON, MASSACHUSETTS 02110-1844

(617) 261-0100
FAX (617) 261-0789

May 24, 2004

**By Facsimile**

Andrew C. Sucoff, Esquire
Goodwin Procter, LLP
Exchange Place
Boston, Massachusetts 02109

Re:   Epoch Letter of Intent

Dear Andy:

Enclosed please find a copy of the Letter of Intent as executed by The Pointe Group. Exhibit C will be forwarded to you separately prior to noon tomorrow, May 25, 2004.

Please let me know if you require anything further.

Thank you for your courtesy in this matter.

Sincerely,

Peter J. Haley
PJH:vsh
Enclosure

P:\Clients\Southpointe Nursing Home\Corr\Sucoff ltr01 05-24-04.doc

May 22, 2004

<u>VIA FACSIMILE</u>

The Pointe Group
50 Christy Place
Brockton, MA 02301

    Re:    Hammond Pointe ("Hammond"), Boylston Place ("Boylston") and Cranberry Pointe Facilities ("Cranberry", and together with Hammond and Boylston, the "Pointe Group Real Property")

Gentlemen:

    Epoch Senior Living, Inc., a Delaware corporation ("Epoch") hereby submits to each of the owners (collectively, the "Pointe Group Real Property Owners") of the Pointe Group Real Property (as more particularly described on <u>Exhibit A</u> hereto) and to The Pointe Group, its shareholders and affiliates (the "Pointe Group," and together with the Pointe Group Real Property Owners, collectively, the "Sellers") this non-binding letter of intent ("Letter of Intent") regarding the Pointe Group Real Property and the Property (as hereinafter defined) (collectively, the Pointe Group Real Property and the Property, "the Subject Assets").

    Epoch was formed as a "partnership" of its CEO, Larry Gerber, and Bain Capital, and since joining forces, Epoch has acquired or leased long-term care and assisted living facilities for aggregate consideration of over $200 million and, together with its affiliates, secured equity capital (primarily from Bain) for acquisitions and other transactions of approximately $50 million. Currently, Epoch and its affiliates are a highly respected operator of long-term care and skilled nursing facilities in nine states with approximately $100 million in revenues.

    Epoch facilities are known for being high-end properties with excellent quality care, gracious surroundings and extraordinary dining, wellness, activities and fitness programs. Epoch is well known and highly respected by the Massachusetts Department of Health and enjoyed outstanding survey results and regulatory relationships in Massachusetts. In addition, Epoch and its principals have been approved for licensure in every instance and state where we have sought such approval. In particular, it should be noted that in recent years Epoch has applied and been readily approved for licensure in Massachusetts in connection with the acquisition of six skilled nursing and three assisted living facilities. We are prepared to work with the Pointe Group to

Error! Unknown document property name.

The Pointe Group
May 22, 2004
Page 2

expedite the process for application and approval of licensure transfer. While timeframes for governmental approvals are often unpredictable, our experience with the process and outstanding survey history in Massachusetts should assure that the requisite approvals can be obtained as rapidly as is ever possible.

Epoch has experience as the operator of several facilities that are direct (and most similar) competitors of the subject facilities. We presently operate Epoch Senior Healthcare of Brewster (formerly Brewster Manor) and Epoch Senior Healthcare of Weston, competitors of Cranberry Pointe and Hammond Pointe, respectively. We also operated Norumbega Point (competitor of Boylston Place) pursuant to a third party management contract for five years. With 642 skilled nursing beds and 592 assisted living units in Massachusetts and Rhode Island, Epoch has scale and local management resources that make us a uniquely qualified strategic buyer. We believe that along with NHP and Bain Capital our collective financial resources, local industry expertise, knowledge and reputations provides the Sellers with superior prospects of closing this transaction expeditiously on terms fully consistent with this Letter of Intent.

We anticipate that Epoch's equity capital to close this transaction will be funded with existing cash or through drawdown of unused capacity on our Revolving Line of Credit. While we do not anticipate raising equity capital to consummate this transaction, our longstanding and successful partnership with Bain Capital remains a significant advantage. Bain Capital is one of the most active principal investment firms in the world, with investments in over 250 businesses. They currently manage in excess of $15 billion in capital, with more than $3 billion of available capital to complete new and add on investments in portfolio companies. Their portfolio presently includes such well-known companies as Domino's Pizza, Sealy Mattresses, Houghton Mifflin Publishing, Burger King and Ameritrade/Datek. Our Board of Directors (whom, with the exception of myself are all employees or partners of Bain Capital) has been apprised of and fully supports our efforts to acquire these properties.

Epoch contemplates that we will consummate this transaction with a "sale leaseback transaction" with Nationwide Health Properties ("NHP"), one of the country's leading healthcare focused REIT's. Epoch currently operates five facilities pursuant to a master lease relationship with NHP. Accordingly, we anticipate a smooth and collaborative process between parties who have worked together successfully over the years, and have an existing structure and documentation model in place. As a $2 billion REIT, NHP has the capacity to fund this transaction without any financing contingency. Given the relationships among the parties and our presence in Massachusetts we believe that collectively Epoch and NHP (collectively, "Epoch/NHP") can offer you much greater assurances of a timely and successful closing than other bidders relying on more speculative, third party financing. Epoch, directly or through one or more of its affiliates, would operate the Pointe Group Real Property as licensed nursing care facilities ("SNF") and an assisted care living facility ("ALF"), as applicable. We have

Error! Unknown document property name.

The Pointe Group
May 22, 2004
Page 3

previously provided you with a copy of the non-binding letter of intent from NHP evidencing their interest in entering into this transaction.

The purpose of this Letter of Intent is to confirm the interest of Sellers in selling the Subject Assets, including, without limitation, certain licenses, permits, personalty and other rights on the terms and conditions described below. By signing this Letter of Intent you are agreeing to cooperate with Epoch/NHP in its due diligence investigation and to negotiate exclusively with Epoch for the sale of the Subject Assets. This Letter of Intent is not intended to be, nor should it be construed as, an offer or counteroffer; the intention of the parties being that no binding contract or obligations with respect to the purchase or sale or lease of the Subject Assets shall arise until the relevant definitive transaction documents have been duly executed by Epoch and Sellers, as applicable, except that the provisions of Sections 8, 9, 11 and 15 below, shall be binding on Sellers and Epoch as of the date execution of this Letter of Intent.

1. **Property**: The property consists of: (i) all the personal property which is used in connection with the Pointe Group Real Property including all fixtures used in the operation of the SNFs, and ALF, respectively, including, without limitation, normal inventory levels of foods, supplies and the like, (collectively, the "Personal Property"), (ii) all other tangible assets used in or necessary to run the business including, without limitation, work product and the goodwill of Sellers in the businesses conducted at the Pointe Group Real Property and (iii) the licenses, permits and approvals of Sellers to use and operate the Pointe Group Real Property and the Personal Property as currently used and operated. Those items described in clauses (i) through (iii) above, collectively, the "Property"). The Property shall be conveyed to Epoch free and clear of all liens and encumbrances.

2. **Purchase Price**: The purchase price, subject to customary closing prorations and adjustments, for the Subject Assets will be an aggregate of $37,000,000.00 (the "Purchase Price"), payable in immediately available funds at Closing. The purchase price does not contemplate that any liabilities will be assumed or that cash, receivables or other items of working capital is included in the transaction.

3. **Contract and Closing Date**: The closing (the "Closing") of the Subject Assets will take place as soon as practicable after completion of diligence and satisfaction of the conditions to closing set forth below and in the definitive transaction documents have been satisfied. Sellers shall provide a draft of the definitive transaction documents reflecting the terms of this Letter of Intent to Epoch within 5 business days after acceptance of this Letter of Intent (the "P&S Delivery Date") and the parties hereto will negotiate with a goal of executing the definitive transaction documents within 12 business days after acceptance of this Letter of Intent (the "P&S Execution Date"). In the event that the definitive transaction documents are not

Error! Unknown document property name.

The Pointe Group
May 22, 2004
Page 4

received by Epoch by 10 am on the P&S Delivery Date, the P&S Execution Date shall be extended by one business day for each after such 5th business day until delivered.

4. **Employees**: Epoch will have the right (but not the obligation) to hire at closing all employees providing services at the ALF and SNFs run at the Pointe Group Real Property other than those individual employees whose names, positions and a brief description of their duties are listed on Exhibit C attached hereto. Epoch will not assume any employee liabilities of any type or nature for any period up to and including the Closing, provided, however, in the event Epoch shall elect to maintain existing employees, Epoch shall allow those employees to use vacation and other earned personal time, subject to a dollar-for-dollar purchase price adjustment in the amount of these liabilities assumed by Epoch.

5. **Successor Liability Escrow**: Any Medicare or Medicaid or other payments received by Epoch post Closing which are attributable solely to the period prior to Closing will belong to Sellers. Epoch will remit any such payments received by Epoch related to the period prior to Closing to Sellers within ten (10) days of receipt thereof. Sellers will be responsible for and will indemnify Epoch against any and all amounts due or claimed to be due to Medicare or Medicaid for the period prior to and including the Closing. At Closing, Sellers will establish an escrow account with Escrow Agent (defined below) in a to be agreed upon amount (to be determined at the end of the Due Diligence Period) to secure Sellers' indemnification obligations, including those with respect to such Medicare/Medicaid payments, successor liability claims and cost report settlements. Amounts remaining in escrow would be released to Seller at an agreed upon date.

6. **Termination of Existing Management Agreements at Closing**: All existing management or similar agreements with the Pointe Group or any third party will be terminated effective as of the Closing, at Sellers' sole cost and expense, unless Epoch elects, in its sole discretion, to assume such contract or agreement.

7. **Deposit**: Upon execution of the definitive transaction documents, Epoch will deliver to a mutually acceptable national title insurance company, as escrow agent (the "Escrow Agent") a sum equal to $100,000 as an earnest money deposit to be held in escrow pursuant to mutually acceptable escrow instructions. In addition, the definitive transaction documents will provide that (i) upon the expiration of the Business Due Diligence Period (as defined below), Epoch will deposit an additional $100,000 with the Escrow Agent and (ii) upon the date ten (10) business days following the expiration of the 60 Day Diligence Period (as defined below), Epoch will deposit an additional $100,000 with the Escrow Agent. The Escrow Agent will place the deposits into an interest bearing account, with interest to accrue to the benefit of Epoch. (The

Error! Unknown document property name.

MAY-25-04   01:34PM   FROM-Gordon Haley LLP                       +617 261 0789           T-539   P.007/013   F-991

The Pointe Group
May 22, 2004
Page 5

deposits together with the interest earned thereon is referred to herein as the "Deposit".) If for any reason the definitive transaction documents are terminated at the end of the Business Due Diligence Period or the 60 Day Diligence Period by Epoch, or are terminated by Epoch due to a failure of a condition precedent, then the Deposit shall be promptly returned to Epoch. If Sellers default under its obligations under the definitive transaction documents, Epoch shall be entitled to a return of the Deposit in addition to any rights and remedies available at law and in equity. If Epoch defaults in its obligations under the definitive transaction documents to which it is a party then Sellers shall be entitled to retain the Deposit as its sole and exclusive remedy. If the transaction closes, the Deposit shall be applied as a credit against the Purchase Price.

8. **Due Diligence**: Epoch intends on conducting the diligence described on Exhibit B attached hereto (the "Diligence Plan"). Sellers will provide Epoch/NHP with the information concerning the Subject Assets and the business conducted at each property (in accordance with applicable law) as described on the Diligence Plan within the time periods provided for in the Diligence Plan. Epoch/NHP will have a period (the "Business Diligence Period") ending 20 Business days after the business day after the last of the following occurs (i) delivery of the priority diligence materials listed in the Diligence Plan attached hereto; (ii) the Sellers have delivered a draft of the definitive transaction documents which reflect the terms of this Letter of Intent and other customary, arms length, market terms for nursing home and assisted living facility transactions; (iii) delivery of satisfactory written evidence that the Sellers, guarantors and all other appropriate interested parties have entered into an agreement with the current mortgage lender (the "Lender") regarding any potential deficiency or other required payments resulting from the sale of the Subject Assets hereunder and (iv) delivery of satisfactory written evidence that the Lender has consented to the transaction described herein and is willing to discharge its lien in connection with a closing of the transaction as contemplated herein, to perform its due diligence review of the Subject Assets as Epoch/NHP deems appropriate. The definitive transaction documents will provide that Epoch/NHP will have an additional period ending 60 calendar days after the P&S Delivery Date, to complete the diligence listed on the 60 Day Items list within the Diligence Plan (the "60 Day Diligence Period"). If the definitive transaction documents are not executed by 5 pm on the 12th business day after acceptance of this Letter of Intent, the Business Diligence Period and the 60 Day Diligence Period shall each be extended by one business day for each business day after such date until executed and in addition the Business Diligence Period and the 60 Day Diligence Period, as the case may be shall be extended by one business day for each day that a required delivery, access or other time frame contained in the Diligence Plan is not met by Sellers. Epoch/NHP may, within the time frames outlined in the Diligence Plan, interview any persons involved in the management and operation of the Subject Assets, including, reimbursement accountants, third party managers and other consultants. Sellers hereby authorize Epoch/NHP to conduct the due diligence in accordance with the Diligence Plan and will cooperate with Epoch/NHP in its due diligence review, including, but not limited to, allowing Epoch and its agents access to the Subject Assets. To

Error! Unknown document property name.

MAY-25-04   01:34PM   FROM-Gordon Haley LLP              +617 261 0789         T-539  P.008/013  F-991

The Pointe Group
May 22, 2004
Page 6

assist in determining whether the Business Diligence Period has commenced, Sellers shall provide a written certification to Epoch that they have provided all of the priority diligence materials listed in the Diligence Plan and Epoch shall, within 10 business days of receipt of such notice, acknowledge that such priority diligence materials listed in the Diligence Plan have been provided or if not so provided, a list of the materials which have not been provided.

If the draft definitive documents delivered by Sellers under clause (ii) of the first paragraph of this Section 8 are, in the reasonable determination of Epoch, sufficiently outside the range of customary, arms length market terms for nursing home and assisted living facility transactions such that Epoch believes that good faith negotiations are unlikely to lead to timely execution of the definitive transaction documents Epoch will terminate this Letter of Intent by written notice to Sellers within 5 business days after receipt of such draft definitive documents, in which case this Letter of Intent will automatically terminate. If at, or prior to the end of the Business Diligence Period or 60 Day Diligence Period, as the case may be, Epoch/NHP notifies Sellers in writing that Epoch/NHP is not satisfied (in its sole and absolute discretion) with all aspects of the due diligence investigations, Epoch/NHP may terminate this Letter of Intent and if the definitive transaction documents have been executed, the definitive transaction documents, in which case this Letter of Intent and the transaction documentation which is not intended to survive termination of the agreement will automatically terminate and the Deposit will be promptly returned to Epoch.

9.     **Exclusivity**: In consideration of Epoch/NHP's commitment to expend significant time, effort and expense to evaluate the Subject Assets, Sellers agree that from the date of Seller's execution of this Letter of Intent until the expiration of the 60 Day Diligence Period (unless sooner notified by Epoch in writing of its intent not to proceed with the transaction or as otherwise agreed in writing or if the definitive documents are executed) none of Sellers nor their representatives, directors, officers, stockholders, partners, members, agents or affiliates will, except for the proposed sale of the Subject Assets as contemplated herein, (i) offer the Subject Assets (or any interest therein) for sale, lease or refinancing to any other party, (ii) negotiate, solicit or entertain any offers to purchase, lease or refinance the Subject Assets or (iii) disclose to any party the existence or contents of all or any portion (whether orally or in writing) of this Letter of Intent provided however, Seller may disclose the Letter of Intent and review the details of this Letter with its attorneys and other business and financial advisors, as well as the Lender. In the event NHP determines not to acquire the Pointe Group Real Property, the restrictions set forth in this Section 9 shall continue for an additional ten (10) business days beyond the date they would otherwise expire after receipt of notice by each of the parties of any such determination, and the parties hereto shall discuss alternatives. In the event an agreement acceptable to both parties is not reached within such time period, this Agreement shall terminate, except Section 14, which shall survive such termination.

Error! Unknown document property name.

The Pointe Group
May 22, 2004
Page 7

10. **Special Conditions**: Each of Epoch's and Sellers' obligations to purchase and sell, respectively, are also conditioned upon the following:

    10.1    **Licensure**: Receipt of all necessary and required permits, approvals, and licenses from any local, state and/or federal authority having jurisdiction over the Subject Assets or the use thereof. The definitive transaction documents will provide that the parties will cooperate to file the suitability/transfer of license request with the Massachusetts Department of Public Health within 25 business days after the expiration of the Business Diligence Period.

    10.2    **Other Consents and Estoppel Certificates**: Receipt of all necessary governmental, regulatory and third party consents and estoppel certificates as shall be set forth in the definitive transaction documents.

    10.3    **NHP Closing**: Closing of the sale of the Pointe Group Real Property to NHP or another financing source selected by Epoch; provided, however, that this condition shall expire on the tenth (10th) business day following the expiration of the 60 Day Diligence Period.

    10.4    **Other Terms and Conditions**: Execution of mutually satisfactory definitive transaction documents which shall incorporate the terms and conditions hereof together with other terms and conditions not stated herein.

    10.5    **Material Adverse Change**: No material adverse change in the Subject Assets or business conducted thereon, including without limitation, any active union organizing activity or campaign.

11. **Expenses**: Regardless of whether or not the transactions contemplated hereby close, each of the parties hereto shall bear its own costs and expenses in connection with this Letter of Intent and the transactions contemplated hereby.

12. **Assignment:** This Letter of Intent may not be assigned by either party hereto, except Epoch may assign this Letter of Intent to one or more of its direct or indirect affiliates, provided, however that any such assignment shall not release Epoch from its obligations hereunder and provided further that Epoch shall be entitled to assign its rights in connection with the definitive documents to NHP or other financing sources.

Error! Unknown document property name.

The Pointe Group
May 22, 2004
Page 8

13. **Conduct of Business:** Prior to the Closing, the Sellers will conduct their business only in the ordinary course, consistent with past practices, and will use their best efforts to maintain the value of their assets as a going concern. The Sellers will not, without the prior written consent of Epoch, (a) enter into, modify or perform any transactions with affiliates, other than on an arm's length basis in the normal and ordinary course of business, provided that they do not survive the closing or impact the Subject Assets, (b) increase any compensation or benefit arrangement for any property employees other than ordinary course increases for hourly employees and salaried employees in connection with their regular annual review conducted at least 1 year after the last salary increase and in no event shall any such increase be more than a 3% increase, (c) enter into or renew contracts which would survive transfer of the Subject Assets and are not terminable, without penalty on less than thirty days' notice, (d) relocate or transfer employees to other facilities operated by the Sellers, the Pointe Group or any of their affiliates, (e) amend licensure to increase or decrease beds or change use, or (f) modify the physical improvements other than ordinary course, capital expenditures which do not alter the physical layout of the facilities.

14. **Non-binding:** The terms expressed in this Letter of Intent are not to be construed as a commitment from Epoch and they are not legally binding on either party except for the provisions of Sections 8, 9, 11 and 15 and the obligation of each party to negotiate in good faith. This Letter of Intent is intended to reflect the current intention of the parties to negotiate in good faith toward the execution of a definitive transaction documents.

15. **Confidentiality:** The parties acknowledge and agree that Epoch is a party to and remains bound by that certain Confidentiality Agreement accepted by Epoch on March 31, 2004 (the "Confidentiality Agreement"). Notwithstanding the terms of the Confidentiality Agreement, Sellers hereby agree that Epoch shall be entitled to discuss the terms of this transaction with the Lender who Sellers represent is KeyBank or an affiliate thereof and Sellers hereby authorize and agree that the Lender may so discuss this transaction and the existence but not the specific terms of the Sellers' workout/settlement with Epoch.

16. **Governing Law:** The terms and conditions of this Letter of Intent shall be governed, construed and interpreted by the laws of the Commonwealth of Massachusetts, without giving effect to its conflicts of law principals. This Letter of Intent may be executed in one or more counterparts and may be executed by facsimile.

17. *Brokers/Finders: Epoch and Sellers represent and warrant to the other that it has not dealt with any broker or finder in connection with the sale or lease of the Pointe Group Real Property or sale of the Property and no fee or payment is due any broker or finder, except to Casas Benjamin & White, LLC ("Casas"); any fee or payment due Casas shall be paid by Sellers.*

Error! Unknown document property name.

The Pointe Group
May 22, 2004
Page 9

    If the foregoing is in accordance with your understanding, please sign this Letter of Intent in the space indicated below.

Very truly yours,

EPOCH SENIOR LIVING, INC.

By: /s/ Laurence Gerber
Laurence Gerber,
Chairman and Chief Executive Officer

Accepted and agreed to:

The Pointe Group

By:_____
   Name:
   Title:

Real Property Owners

By:_____
   Name:
   Title:

**Error! Unknown document property name.**

The Pointe Group
May 22, 2004
Page 9


If the foregoing is in accordance with your understanding, please sign this Letter of Intent in the space indicated below.

Very truly yours,

EPOCH SENIOR LIVING, INC.

By:_____
Laurence Gerber,
Chairman and Chief Executive Officer


Accepted and agreed to:

The Pointe Group

By: _[signature]_
Name: Barry Freio
Title: C.O.O.

Real Property Owners

By: _[signature]_
Name: MARK W. TOBIN
Title: PRESIDENT




Error! Unknown document property name.

TOTAL P.01

The Pointe Group
May 22, 2004
Page 10

## EXHIBIT A

Pointe Group Facilities

Hammond Pointe Nursing Home (135 Beds)
615 Heath Street
Chestnut Hill, MA 02467
Owners:

Boylston Place Assisted Living (45 Units)
615 Heath Street
Chestnut Hill, MA 02467
Owners:

Cranberry Pointe Nursing Home (135 Beds)
111 Headwaters Drive
Harwich, MA 02465
Owners:

Error! Unknown document property name.

MAY-25-04   01:35PM   FROM-Gordon Haley LLP              +617 261 0789        T-539   P.013/013   F-991

The Pointe Group
May 22, 2004
Page 11

## EXHIBIT B

Diligence Plan Attached

Error! Unknown document property name.