UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CASAS, BENJAMIN & WHITE, LLC )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>THE POINT GROUP, INC. )<br>GERALD S. FREID, BARRY FREID; )<br>KEY CORPORATE CAPITAL, INC. )<br>    Defendants )<br>) | No. 04CV12333 MEL |

OPPOSITION OF DEFENDANTS, THE POINTE GROUP, INC., GERALD S. FREID AND
BARRY FREID, TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION AND FOR ATTACHMENT OF REAL ESTATE

To the Honorable Morris E. Lasker, Senior United States District Judge:

Defendants, The Pointe Group, Inc. ("TPG"), Gerald S. Freid ("Gerald Freid") and Barry Freid (also referred to collectively as the "Defendants"), hereby oppose Plaintiff, Casas, Benjamin & White, LLC's ("Plaintiff") Motion for Preliminary Injunction and for Attachment of Real Estate (the "Motion"). In support of their Opposition, the Defendants submit herewith the Affidavit of Stephen F. Gordon (the "Gordon Affidavit") and state as follows:

A. The Plaintiff's Motion Should be Denied Because the Plaintiff Has Failed to Show That it is Entitled to Either a Preliminary Injunction or a Real Estate Attachment.

1. Standard for Injunctive Relief or Real Estate Attachment

In order for a district court to grant preliminary injunctive relief, a plaintiff must establish the following four criteria: 1) that the plaintiff will suffer irreparable injury if the injunction is not granted; 2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; 3) that the plaintiff has exhibited a likelihood of success on the merits; and 4)

that the public interest will not be adversely affected by the granting of the injunction. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996).

For an order of attachment to be approved, the Court must find that "there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown by the defendant to be available to satisfy the judgment." See Hasbro, Inc. v. Serafino, 958 F. Supp. 19, 23 (D.Mass.1997) (emphasis added). The burden is on the Plaintiff to establish reasonable likelihood of success on the merits. Boston Trading Group, Inc. v. Carter, 561 F. Supp. 1175, 1176 (D.Mass.1983). It is also the Plaintiff's burden to establish that it will recover damages in the necessary amount. Anderson Foreign Motors Corp. v. New England Toyota Distributor, Inc., 475 F.Supp. 973, 978 (D. Mass.1979). Unless the Plaintiff meets both of these burdens, the Court cannot issue an attachment. See Boston Trading Group, Inc, 561 F. Supp. at 1176.

2.  No Reasonable Likelihood that CBW Will Succeed on the Merits.

Likelihood of success on the merits is the most crucial of the four criteria that courts examine when ruling on motions seeking injunctive relief. Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981). CBW relies primarily on the affidavit of Matthew M. Caine (the "Caine Affidavit") to support its claim that CBW is likely to succeed on the merits. The Caine Affidavit merely repeats the contentions set forth in CBW's Complaint and this Court should not award injunctive relief or attachments, as sought here, based on mere allegations set forth in a Complaint and regurgitated in a subsequent affidavit. In the Motion, CBW boldly asserts (without any legally sufficient support) that since it is likely to succeed on its breach of contract claim, it is entitled to the requested injunctive relief against TPG and real

estate attachments individually against Barry Freid and Gerald Freid. However, the Defendants' Answer and Affirmative Defenses raise several compelling defenses which negate a finding that CBW is likely to succeed on the merits.

There is serious doubt that CBW is likely to succeed on the merits because CBW itself claims that it acted as a broker for the sale of real estate even though it was not a licensed real estate broker. In its Reply to Counterclaims of Defendant the Pointe Group, Inc., CBW admits that it was not a licensed Massachusetts real estate broker at the time of the transaction. CBW also admitted prior to the closing, that it was in fact acting as a broker. As set forth in the Gordon Affidavit, in a September 1, 2004 e-mail, Matt Caine ("Caine"), a Principal of CBW, requested that Stephen F. Gordon ("Gordon"), counsel to the Defendants, provide him with a copy of the section of the Purchase and Sale Agreement relating to CBW's role as the broker of record. Caine asked Gordon the following:

> I had asked Gerry and now ask you (Gerry asked that I e-mail you) if you could please forward to me a copy of the section(s) in the Purchase & Sale Agreement that relate to the broker of record and Casas, Benjamin & White's role. Recognize that this request is not for a complete copy of the agreement, rather just those sections that relate to our involvement and the named broker of record.

In a response also dated September 1, 2004, Gordon provided Caine with the text of section 30 of the Purchase and Sale Agreement which states:

> Broker. Buyer and Sellers each hereby represents and warrants to each other that no broker or agent has been engaged in regard to this Agreement other than Casas Benjamin & White, LLC, who has been engaged by Sellers. Sellers and Broker have entered into a separate Brokerage Agreement.[1]

On September 2, 2004, Caine replied to Gordon's e-mail which, as Caine had requested, quoted section 30 of the Purchase and Sale Agreement, by stating that he appreciated Gordon's quick response to his request and that it was "most helpful." True and accurate copies of the

---

[1] Under the terms of the Purchase and Sale Agreement Cranberry Pointe Partnership and Chestnut Hill Life Care Realty, LLC were the Sellers and not TPG.

3

September 1, 2004 and September 2, 2004 e-mail exchange between Caine and Gordon are attached to the Gordon Affidavit. It is clear beyond any doubt from the September 1, 2004 and September 2, 2004 e-mail exchanges that CBW considered itself to be acting as a broker and had no objection whatsoever to being named a broker and having that status reflected in the Purchase and Sale Agreement. That is simply because CBW was acting as a broker.

>Massachusetts General Laws Chapter 112 § 87RR provides in pertinent part:
>
>Except as otherwise provided, no person shall engage in the business of or act as a broker[2] or salesman **directly or indirectly, either temporarily or as an incident to any other transaction, or otherwise**, unless he is licensed. Except as otherwise provided no person shall recover in any suit or action in the courts of the commonwealth for compensation for services as a broker performed within the commonwealth unless he was a duly licensed broker at the time such services were performed….

M.G.L. 112 § 87RR (1978) (emphasis added).

As a general rule, an otherwise valid contract that results in a violation of a public-protection statute or regulation is unenforceable. Paul Arpin Van Lines, Inc. v. Universal Transportation Services, Inc., 988 F.2d 288, 290 (1st Cir. 1993) (citing Resolution Trust Corp. v. Home Savings. of America, 946 F.2d 93, 96 (8th Cir. 1991)); see also Restatement (Second) of Contracts 2d § 181 (1981). Here, CBW even refers to itself as the broker to the transaction and raised no objection to the provision in the Purchase and Sale Agreement labeling them as such. An unlicensed broker is simply not entitled to collect a commission on the sale of real estate. See Turnpike Motors, Inc. v. Newbury Group, Inc., 403 Mass. 291, 295 (1988) (holding unlicensed broker not entitled to collect any commission for real estate sale). As an unlicensed broker who participated in the sale of real estate, CBW is not entitled to a commission on the proceeds of the

---

[2] M.G.L. 112 § 87PP, entitled "Definitions," defines broker as "any person who for another person and for a fee, commission or other valuable consideration, does any of the following: - sells, … negotiates, or offers, attempts or agrees to negotiate the sale, … of any real estate, or lists or offers, attempts or agrees to list any real estate or … sells or offers to sell… real estate, or assists or directs in the procuring of prospects or the negotiation or completion of any agreement or transaction which results … in the sale, … of any real estate." M.G.L. 112 § 87PP (1991).

4

real estate sold and is therefore not likely to succeed on the merits and should not be awarded the injunctive relief or real estate attachments it seeks.

CBW also seeks to make TPG's corporate employees, Gerald Freid and Barry Freid, personally responsible for the alleged debts and alleged wrongdoing of TPG. While there are situations in which corporate officers may be found individually liable for corporate debts and wrongdoings, CBW has not even attempted to make any showing as to why Gerald Freid or Barry Freid should be personally liable for any amounts that may be owed to CBW. See generally Demoulas v. Demoulas Supermarkets, Inc., 424 Mass. 501 (1997) (outlining egregious circumstances where individuals may be found personally liable for corporate debts). At all times relevant to this action, Gerald and Barry Freid were acting in their capacities as employees of TPG and any documents they signed reflect that they were not acting individually. See Exhibits A, C and F to the Motion. Therefore, CBW cannot establish any likelihood of success on the merits as to its claims against Gerald Freid and Barry Freid.

Even if the alleged Engagement Letter is in fact an enforceable contract against TPG, CBW is not likely to succeed on the merits because CBW materially breached its contractual obligations in that CBW explicitly promised that its Managing Partner, Kelley W. White, would personally oversee CBW's responsibilities with respect to the engagement. In fact, Ms. White's background and experience was one of the key reasons why CBW was originally retained. Section 2 of the alleged Engagement Letter, attached as Exhibit A to the Motion, states in pertinent part that "[t]he CBW consulting team will be lead by Kelley W. White, a CBW Managing Director, who will have general oversight responsibilities with respect to the engagement…." Ms. White, however, left CBW and ceased working on the engagement very early in the project. It is well established that a material breach of contract by one party excuses

5

the other party's performance. See generally Restatement (Second) of Contracts § 241 (1981). Therefore, since CBW materially breached the terms of the Engagement Letter when Ms. White left CBW and failed to oversee the engagement as promised, TPG was excused from performing any obligations it may have had under Engagement Letter.

    3.    <u>CBW Will Not Suffer Irreparable Harm If The Motion For Preliminary Injunction Is Denied</u>

Federal Rule of Civil Procedure 65(a), as interpreted by the United States Court of Appeals for the First Circuit (the "First Circuit"), places the burden of demonstrating that a denial of interim injunctive relief would cause irreparable harm squarely upon the movant. See <u>Narragansett Indian Tribe v. Guilbert</u>, 934 F.2d 4, 6 (1st Cir. 1991). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." <u>Regan v. Vinick & Young</u>, 862 F.2d 896, 902 (1st Cir. 1988).

Here, CBW has failed to offer any evidence that it will suffer irreparable harm if the Motion is denied. Instead, CBW argues only that it will suffer irreparable harm if the Motion is denied because of TPG's alleged uncertain financial situation which it claims existed at the outset of its relationship with CBW, nearly a year and half ago, and the Defendant's alleged conduct in the course of its business relationship with CBW (as if an injunction should issue as some sort of pre-judgment "punishment"). CBW cites no specific harm that it would suffer if the Motion were to be denied. Any harm that CBW might potentially suffer is speculative at best and therefore the Motion must be denied. See <u>Narragansett Indian Tribe v. Guilbert</u>, 934 F.2d at 6-7 (holding preliminary injunction not warranted by a tenuous or overly speculative forecast of anticipated harm).

In support of its Motion, CBW also contends that under <u>Teradyne, Inc. v. Mostek Corp.</u>, 797 F.2d 43 (1st Cir. 1986) it is entitled to a preliminary injunction. In <u>Teradyne</u>, the First Circuit held that irreparable harm may exist where damages may not be obtainable from the defendant because the defendant could become insolvent before a final judgment can be collected or if the defendant would be unable to satisfy a judgment against it due to outstanding credit obligations. <u>See</u> <u>Teradyne</u>, 797 F.2d at 52-54. The <u>Teradyne</u> case is readily distinguishable from the case before the Court. <u>Teradyne</u> stands for the very narrow proposition that irreparable harm may exist and, thus, a preliminary injunction may be granted, where it is <u>shown</u> that damages may not be obtainable from a defendant because the defendant could become insolvent before a final judgment can be collected. In <u>Teradyne</u>, Teradyne, Inc. ("Teradyne") sought to enjoin Mostek Corp. ("Mostek") from disposing of or encumbering $4,000,000 of Mostek's assets. The First Circuit affirmed the District Court's order granting a preliminary injunction preventing Mostek from disposing of its assets based on the District Court's finding that:

> Although Mostek realized assets far exceeding Teradyne's claims when the sale of its assets occurred, the record shows that those assets were being used to pay off creditors' claims and wind down the expenses in what Mostek itself described as an "orderly liquidation process." Further, the amount Mostek received for its assets was stated to be subject to a number of unspecified offsets and debits and no assurances were given that Mostek would be able to pay a Teradyne judgment.

<u>Teradyne</u>, 797 F.2d at 53.

Here, there is no "record to show" that any of the Defendants have sold any assets[3], are paying off other creditor claims or are involved in a "liquidation process" with their assets

---

[3] Plaintiff knows that Defendant, TPG, is a management company and sold none of its assets. <u>See</u> page 6, entitled "Legal Structure" of Exhibit E to the Motion, which was drafted by Plaintiff and states that "[t]he current legal structure for the three entities contemplated in this transaction consists of two real estate entities (Cranberry Pointe Partnership and Chestnut Hill Life Care Realty, LLC) and three operating entities. The operating entities lease the properties from the real estate entities. In addition, the operating companies obtain management services from The Pointe Group, Inc. and Commonwealth Communities Management Co." <u>See</u> <u>also</u> chart of entities which follows.

subject to "unspecified offsets and debits." In short, none of the findings in <u>Teradyne</u> can be made here. In this case, CBW cannot show that it is faced with the danger that the Defendants will become insolvent before a final judgment can be collected and CBW has not provided any evidence that any of the Defendants would be unable to meet any obligations they may be found to have to CBW. There is simply no basis for any finding by this Court, much less a <u>Teradyne</u> finding.

In a recent decision of the First Circuit, a party seeking an injunction attempted to show a meaningful risk of irreparable harm by asserting that since the non-moving party was in control of the funds in question, it faced the risk that there would be nothing left of the proceeds at the end of the day. <u>See</u> <u>Charlesbank Equity Fund II v. Blinds To Go, Inc.</u>, 370 F.3d 151, 162-63 (1st Cir.2004). The <u>Charlesbank</u> Court responded to the moving party's claim that it risked the possibility of never recovering its money damages by noting that that "statement can be made by virtually every person who sues another for money damages. Its very ubiquity indicates why it cannot conceivably be enough to justify the issuance of a prejudgment injunction of this nature." <u>Id.</u> at 163. Moreover, beyond the unsupported implication made in the Motion, CBW has made no showing that the Defendants would not be able to satisfy any judgment that may be entered against them after a trial on the merits in this case. Since any irreparable harm that CBW will allegedly suffer is tenuous, overly speculative and unsupported by specific factual allegations, CBW has failed to meet its heavy burden of showing that it will be irreparably harmed and its request for injunctive relief (and real estate attachments) should be denied.

  B. <u>CBW Has Already Received an "Accounting."</u>

CBW claims that it is entitled to an immediate accounting of the proceeds from the transaction. CBW further alleges that it has repeatedly requested copies of the closing papers but

has never received them. That is not true.  Whether or not CBW is or was entitled to the closing statement, it received it within minutes after it was available.  As detailed in the Gordon Affidavit, on October 1, 2004, the day after the closing, CBW requested a copy of the closing statement in a telephone call to Gordon. Gordon received the closing statement at 12:21PM. Only twenty minutes later, Gordon sent Edward R. Casas ("Casas"), Managing Director of CBW and Caine, by e-mail, a copy of the closing statement containing an accounting of the disbursements of proceeds from the September 30, 2004 transaction. This is the very same information that CBW now seeks and claims it has been denied.  Copies of the October 1, 2004 e-mail from Gordon to Casas and Caine and the closing statement are attached to the Gordon Affidavit.  Since CBW was previously provided, and is now provided again, with the information it seeks via an "accounting," its request for an accounting is moot and should be denied (without, of course, limiting in any way CBW's discovery rights).

    C.    <u>CBW is Not Entitled to a General Writ of Attachment</u>

CBW seeks issuance of "a general writ of attachment in the amount of $1,033,000.00 against the real property of Defendants The Pointe Group, Inc., Gerald Freid, and Barry Freid." As CBW correctly notes in the Motion, its request for issuance of a general writ of attachment is governed by the requirements set forth in rule 4.1 of the Massachusetts Rules of Civil Procedure. For an order of attachment to be approved, the Court must find that there is a reasonable likelihood that the plaintiff will recover judgment in an amount equal to or greater than the amount of the attachment over and above any liability insurance available to satisfy the judgment. See <u>Hasbro</u>, 958 F. Supp at 23.  The burden is on CBW to establish that it is reasonably likely to succeed on the merits.  <u>Boston Trading Group, Inc.</u> 561 F. Supp. at 1176.  It is also CBW's burden to establish that it will recover damages in the amount it seeks in its

Complaint.  Anderson Foreign Motors Corp., 475 F. Supp. at 978.  Unless CBW meets both of these burdens, the Court cannot issue the requested attachments.  See Boston Trading Group, Inc, 561 F. Supp. at 1176.  As stated above, CBW cannot establish that there is a "reasonable likelihood" that it will recover a judgment.  Furthermore, CBW seeks the issuance of a writ of attachment against the real property of TPG.  TPG owns no real estate and has never owned any real estate.  CBW is well aware that TPG has never owned any real estate, yet CBW still seeks the issuance of an attachment against TPG here which would result in the recording of what amounts to an ineffective and useless attachment.

CBW also seeks the issuance of a writ of attachment in the amount of $1,033,000.00 against the real property of Gerald Freid and Barry Freid.  As stated in more detail above, since Barry Freid and Gerald Freid were at all times relevant to this matter acting only in their official capacities as employees of TPG and not individually, there is no question that there is a significantly lesser likelihood that CBW will recover any judgment against Barry or Gerald Freid let alone a judgment in the amount of $1,033,000.00.  And again, there is no showing that Barry and Gerald Freid would not be able to pay any judgment against them.  As a result, CBW's request for an issuance of a writ of attachment should be denied as it would serve no purpose other than to publicly embarrass the Freids and is in effect a court-authorized defamation of credit.

WHEREFORE, the Court should deny the Plaintiff's Motion for Preliminary Injunction and For Attachment of Real Estate and Plaintiff's demand for an immediate accounting and grant

such further relief as is just.

                                        THE POINTE GROUP, INC.,
                                        GERALD S. FREID AND BARRY FREID

                                        By their attorneys,

                                        /s/ Todd B. Gordon
                                        Stephen F. Gordon (BBO No. 203600)
                                        Todd B. Gordon (BBO No. 652482)
                                        Gordon Haley LLP
                                        101 Federal Street
                                        Boston, Massachusetts 02110
                                        Tel:   (617) 261-0100
                                        Fax:   (617) 261-0789
                                        email:  sgordon@gordonhaley.com
                                                      tgordon@gordonhaley.com

Dated: January 4, 2005

P:\Clients\Pointe Group \CBW Plead\Opp to mot for injunct and attach.doc