UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CASAS, BENJAMIN & WHITE, LLC

Plaintiff,

v.

Docket No: 1:04-CV-12333-MEL

THE POINTE GROUP, INC., a
Massachusetts corporation d/b/a The Pointe
Group Healthcare and Senior Living;
GERALD S. FREID; BARRY FREID; KEY
CORPORATE CAPITAL, INC.,

Defendants.

**DEFENDANT KEY CORPORATE CAPITAL, INC.'S APPENDIX IN SUPPORT OF ITS
MOTION TO DISMISS CROSS-CLAIM OF DEFENDANTS, THE POINTE GROUP,
INC., GERALD S. FREID AND BARRY FREID**

M120700.11

| Case Name | Tab |
|---|---|
| City of Cleveland v. Sohio Oil Co., 2001 WL 1479233 (Ohio Ct. App. 8th Dist. Nov. 21, 2001). | A |
| Humana Found., Inc. v. Cantella & Co., Inc., No.2000-12393-MLW, 2002 U.S. Dist. LEXIS 10380 (D. Mass. May 6, 2002). | B |
| Lauring v. Lincoln, No. 92-00014, 1994 Mass. Super. LEXIS 344 (Mass. Super. Ct. 1994). | C |
| Mass. v. Mylan Lab., No. 03-11865-PBS, 2005 U.S. Dist. LEXIS 2158 (D. Mass. Feb. 4, 2005) | D |
| Mass. Ave. Laundries v. Cissell Mfg. Co., 1996 WL 1353058 (Mass. Super. Ct. Apr. 10, 1996). | E |
| Zabilansky v. American Bldg. Restoration Prod., Inc., No. 2001-01985, 2004 Mass. Super. LEXIS 425 (Mass. Super. Ct. Oct. 11, 2004) | F |



Not Reported in N.E.2d

2001 WL 1479233 (Ohio App. 8 Dist.)

**(Cite as: 2001 WL 1479233 (Ohio App. 8 Dist.))**

Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Eighth District,
Cuyahoga County.
CITY of CLEVELAND, Plaintiff-Appellant,
v.
SOHIO OIL COMPANY, Defendant-Appellee.
**No. 78860.**

Nov. 21, 2001.

Civil appeal from court of Common Pleas, Case No. CV-386680.

Marvin L. Karp, # 0021944, Craig S. Miller, # 0025665, George S. Crisi, # 0006325, and Joseph S. Simms, # 066584, Ulmer & Berne, Cornell P. Carter, # 0062986, Law Director, City of Cleveland, Cleveland, OH, for Plaintiff-Appellant.

Paul P. Eyre, # 0025756, Jordan B. Berns, # 0047404, and Sarah E. Thomas, # 0070119, Baker & Hostetler, LLP, Cleveland, OH, for Defendant-Appellant.

JOURNAL ENTRY AND OPINION

TERRENCE O'DONNELL, JUDGE.

*1 The City of Cleveland appeals from a decision of the common pleas court granting summary judgment to BP Exploration & Oil, Inc., f/k/a The Sohio Oil Company (hereafter BP ), in connection with the City's claim against BP for breach of contract, unjust enrichment, and conversion. On appeal, the City asserts that the court erred as a matter of law because it showed that it suffered damages from BP's conduct and because a genuine issue of material fact exists regarding the amount of damages. Upon careful review of the record and the applicable law, we reject these contentions and affirm the judgment of the trial court.

The facts of this case reveal that on December 20, 1988, BP's predecessor, The Sohio Oil Company, leased 33,380 square feet of space, including buildings and structures, from the City of Cleveland for the purpose of operating a retail automotive repair facility at Cleveland Hopkins International Airport.

The instant dispute stems from Article IX of the lease, which restricts parking on the leased premises and provides:

ARTICLE IX. PROHIBITED PARKING.
No vehicle parking in excess of overnight parking shall be provided by Lessee at the premises. Lessee shall not advertise directly or indirectly vehicle parking on the premises. In the event Lessee's customers require extended parking of 24 hours or more after repair work is finished, Lessee will move said customer's vehicle to regular public airport parking facilities. (Emphasis added.)

Pursuant to the lease, from mid 1989 to May 1999, BP operated a Procare automotive service facility offering repair, tune-ups, oil changes, detailing, and car washing for its customers.

Sometime during 1999, the City discovered that during the term of the lease, BP had been offering parking service to its customers in connection with its auto service. In particular, BP offered a valet service to its auto service customers: a BP employee would drive the customer from the airport Procare facility to the airport terminal for departure and would then drive the car to the terminal to pick up the customer upon arrival. The valet service initially came with two days of free parking, but BP

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB A

Not Reported in N.E.2d                                                          Page 2

2001 WL 1479233 (Ohio App. 8 Dist.)

**(Cite as: 2001 WL 1479233 (Ohio App. 8 Dist.))**

eventually eliminated the two days of free parking and began to charge its customers for parking at the facility.

On June 29, 1999, the City filed a complaint against BP for breach of Article IX of the lease, unjust enrichment, and conversion. The City alleged that BP received substantial parking revenue from its customers, asserting that between 1997 and 1998, BP generated $211,000 in parking fees; and further that, because the City operates the short-term and long-term parking facilities at the airport, BP deprived the City of $1,000,000 in lost parking revenue during the term of the lease.

BP moved for summary judgment on the ground that even if BP had violated the parking provision of the lease, the City could not establish that it suffered any damages from BP's alleged breach, pointing to the evidence of the availability of several non-City-owned parking facilities near the airport. BP asserted that the City's claim for unjust enrichment and conversion also failed as a matter of law.

**\*2** The City moved for partial summary judgment on the issue of liability contending that it had established the existence of damages resulting from BP's breach of the lease, but that the amount of damages remained to be decided by a jury.

The trial court denied the City's motion for partial summary judgment and further granted BP's motion for summary judgment stating: Defendant BP Exploration & Oil, Inc.
  Motion for Summary Judgment filed 4-21-00 is granted. On its claim of breach of contract plaintiff has failed to establish existence of damages to a reasonable degree of certainty. The language of the lease which requires vehicles to be moved to regular airport parking facilities is not restricted to city-owned lots. The plaintiff's claim of unjust enrichment fails because defendant did not confer a benefit on the City [sic] [FN1] and the City cannot establish a loss. The City's claim on conversion fails because the monies are not specifically identifiable.

FN1. The City claims that the trial court, in stating defendant did not confer a benefit on the City, had applied a wrong legal standard because an unjust enrichment claim requires a plaintiff to show, among other things, that the plaintiff conferred a benefit on a defendant. This sentence thus should have read the City did not confer a benefit on BP. A fair reading of the entire judgment entry, however, shows the transposing of the correct noun phrases here to be an inadvertent error.

The City now appeals from this judgment raising two assignments of error for our review. They state:
  I. THE TRIAL COURT ERRED AS A MATTER OF LAW BY DENYING THE CITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT BECAUSE THE CITY DEMONSTRATED THAT IT HAD BEEN DAMAGED WHEN BP BREACHED ITS LEASE WITH THE CITY BY CHARGING CUSTOMERS FOR PARKING AT BP'S AIRPORT PROCARE FACILITY AND/OR ALLOWING CUSTOMERS TO LEAVE THEIR CARS ON THE PREMISES FOR REASONS OTHER THAN AUTOMOTIVE REPAIRS.
  II. THE TRIAL COURT ERRED AS A MATTER OF LAW BY GRANTING BP'S MOTION FOR SUMMARY JUDGMENT.

We consider separately the three causes of action presented by the City.

I. Breach of Contract
The City asserts that Article IX of the lease prohibited BP from providing parking to its customers and further required BP to move customer vehicles upon completion of repair work. In its motion for summary judgment, the City relied upon the 15,960 invoices produced by BP, which indicate that 45% of the services performed at the BP facility included no repair work, but rather related solely to parking, detailing, and valet service; additionally,23% of the remaining invoices also contained charges for excess days of parking. The City therefore argues that the trial court should have granted its motion for partial summary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                      Page 3

2001 WL 1479233 (Ohio App. 8 Dist.)

**(Cite as: 2001 WL 1479233 (Ohio App. 8 Dist.))**

judgment because no genuine issue of material fact exists regarding BP's breach of the lease and the existence of damages, contending that the only issue to be submitted to a jury concerned the amount of damages.

The City also contends that the trial court erred in granting BP's motion for summary judgment because BP failed to present any evidence that established the absence of damages suffered by the City justifying summary judgment in BP's favor. And, the City argues, according to its analysis, BP realized $1,135,000 in unauthorized parking revenue and the City lost parking revenue in excess of $1,374,000 due to BP's failure to remove customer vehicles from its premises following completion of repair work. The City therefore claims that because a genuine issue of material fact exists regarding the amount of damages suffered by the City, the trial court erred in granting summary judgment in favor of BP.

BP, on the other hand, asserts that the trial court ruled correctly because it contends that the City failed to establish its breach of contract claim under the contractual provisions set forth in Article IX of the lease.

**\*3** Regarding the language set forth in Article IX stating, [n]o vehicle parking in excess of overnight parking shall be provided by Lessee at the premises, BP asserts that even if it had breached that provision, the City failed to present evidence to prove damages because several other parking facilities not owned by the City could have been used to park vehicles, including Park N Fly, Park Air Express, Park Place, or Thrifty. In addition, travelers had the option of utilizing public transportation, taking a taxi, or obtaining rides from relatives or friends as alternatives to parking their vehicles at the airport.

Regarding the clause in Article IX which states [i]n the event Lessee's customers require extended parking of 24 hours or more after repair work is finished, Lessee will move said customer's vehicle to regular public airport parking facilities, BP asserts that the City failed to present evidence either

that it breached this provision or that the City suffered damages. In particular, BP argues that the plain language of the provision obligates BP to move a vehicle only when the vehicle requires parking in excess of 24 hours upon completion of repairs. BP points out that it produced evidence to establish its practice of scheduling and finishing repair work within 24 hours of the customer's return. Thus, BP contends that under normal circumstances, it would not be required to move vehicles, and therefore argues that the City failed to present evidence to prove that BP violated this provision of the lease.

Furthermore, BP contends that it was only obligated to move vehicles to regular public airport parking facilities, and not City-owned parking facilities. BP asserts therefore that the City failed to present evidence to establish damages resulting from its alleged failure to move vehicles from its premises upon completion of repair work.

The issue for our consideration then concerns whether the trial court properly granted summary judgment to BP on this claim.

An appellate court will review de novo the pleadings and evidentiary material submitted to the trial court and apply the same standard to determine whether the materials submitted establish a genuine issue of material fact. *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 572 N.E.2d 198.

Pursuant to Civ.R. 56, summary judgment is proper when:
  (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made.

Furthermore, the court in *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, stated:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

2001 WL 1479233 (Ohio App. 8 Dist.)

(Cite as: 2001 WL 1479233 (Ohio App. 8 Dist.))

Page 4

**\*4** \* \* \* a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence \* \* \* which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

To successfully pursue a breach of contract claim, a plaintiff must demonstrate the existence of a contract, performance by the plaintiff, breach by the defendant, and damages or loss to the plaintiff. See *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 601, 649 N.E.2d 42, 44, where the court stated:
    \* \* \* [S]ince damages are an essential element [of a breach of contract action], if the appellants were to survive summary judgment on the issue of damages, they must have presented evidence establishing a genuine issue of material fact on that issue.
See, also, *Fiorella v. Ashland Oil, Inc.* (1993), 92 Ohio App.3d 411, 414, 635 N.E.2d 1306, 1306.

The City relies on Doner for the proposition that a party must only demonstrate the existence of damages to survive summary judgment. Doner, however, does not bifurcate the issue of damages into the existence and amount of damages for summary judgment purposes. Rather, Doner holds that a plaintiff in a breach of contract action must

present evidence to show the existence of a genuine issue of material fact on the issue of damages to defeat a motion for summary judgment.

In *Combs Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241, 466 N.E.2d 883, the court, in paragraph two of its syllabus, established a tripartite test for recovery of lost profits arising from a breach of contract:
    Lost profits may be recovered by the plaintiff in a breach of contract action: if (1) profits were within the contemplation of the parties at the time the contract was made, (2)the loss of profits is the probable result of the breach of the contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty. (Emphasis added.)
See, also, the syllabus in *AGF, Inc. v. Great Lakes Heat Treating Co.* (1990), 51 Ohio St.3d 177, 555 N.E.2d 634.

**\*5** Furthermore, in *Gahanna v. Eastgate Properties, Inc.* (1988), 36 Ohio St.3d 65, 521 N.E.2d 814, the court elaborated on the third prong of the tripartite test and clarified what must be proven with reasonable certainty in order to satisfy this prong of the test. The court stated:
    [T]he third prong is but a single hurdle. We hold that in order for a plaintiff to recover lost profits in a breach of contract action the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty. (Emphasis added.)

Thus, in order to raise a genuine issue of material fact on the issue of damages and survive summary judgment, the City must set forth specific facts to show that it can establish, with reasonable certainty, the existence and amount of lost parking revenue due to the actions of BP.

Here, the City alleges that BP breached two provisions in Article IX of the lease, embodied in the first and third sentence of the section.

    A. Contractual Provision Prohibiting Parking
Regarding the provision in Article IX prohibiting BP from providing parking to its customers in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

2001 WL 1479233 (Ohio App. 8 Dist.)

**(Cite as: 2001 WL 1479233 (Ohio App. 8 Dist.))**

excess of overnight parking, the record demonstrates that BP provided parking in excess of overnight parking and therefore demonstrates BP's breach of that provision.

After applying the Combs test to this breach, therefore, we have concluded that parking revenue from BP's auto repair customers was within the contemplation of the parties and that some potential loss of parking revenue would be the probable result of BP's breach of contract; however, in our view, the loss of parking revenue or profits is too remote and too speculative to be proven with reasonable certainty.

This is because the BP invoices relied upon by the City showed only that BP provided and charged its customers for parking. The record before us, however, contains evidence of several other parking facilities which customers could have patronized instead of parking at BP. Furthermore, it is also conceivable that, without the convenience of BP's valet parking service or its detail service in connection with parking, some potential BP customers may have utilized other means of transportation to the airport instead of patronizing any airport parking facilities. Thus, it is impossible to ascertain with reasonable certainty, in accordance with Combs, how much of BP's revenue is a corresponding loss to the City.

### B. Contractual Provision Requiring BP to Move Customer Vehicles

We turn next to the other provision in Article IX which obligated BP to move customer vehicles to regular public airport parking facilities when such vehicles required parking after completion of work.

Although the City pointed to the testimony of a BP assistant manager who stated that BP would typically start service on the cars as early as it could, no evidence in the record establishes when repairs would have been completed; therefore the evidence does not demonstrate how many vehicles should have been moved as required by this contractual clause.

Moreover, the phrase regular public airport parking

facilities means any airport parking facilities open to the public--it does not, as the City asserts, refer only to publicly-owned or City-operated airport parking facilities. In fact, in response to a BP interrogatory, the City itself listed four public airport parking facilities not owned or operated by the City. Moreover, any ambiguities regarding this phrase would be construed against the party who prepared the lease. As stated by the Ohio Supreme Court:

> **\*6** A fundamental and frequently applied general rule of construction is that if there is doubt or ambiguity in the language of a contract the document is to be construed strictly against the party who prepared it or selected its language and in favor of the party who took no part in its preparation or in the selection of its language. He who speaks should speak plainly or the other party may explain to his own advantage. *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77; 228 N.E.2d 304, 18 O.Jur.3d Section 149.

Here, the record indicates that the authorization to enter into a lease with BP was codified in Cleveland City Ordinance No. 1554-88: CCO No. 1554-88 states that the lease shall be prepared by the Director of Law and shall contain such additional provisions as she deems necessary to benefit and protect the public interest. CCO 1554-88. Therefore, any doubt regarding the meaning of the phrase regular public airport parking facilities should be construed against the City. If it had been the City's intention to benefit the public interest, it would have been incumbent upon the director of law to achieve its intent by stating, for example, City-owned airport parking facilities.

Thus, the City failed to present evidence to establish how many vehicles which had parked at the BP lot during the term of the lease should or would have been moved to the City-owned parking facility. Applying the Combs test to BP's alleged breach of this provision, therefore, we conclude that without evidence establishing certitude of the extent of BP's breach, the City's claim for lost parking revenue arising from this breach is too remote and too speculative to be proven with reasonable certainty.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Page 6

2001 WL 1479233 (Ohio App. 8 Dist.)

**(Cite as: 2001 WL 1479233 (Ohio App. 8 Dist.))**

Accordingly, the City failed to carry its burden of presenting evidence to establish a genuine issue of material fact regarding damages resulting from BP's breach. Therefore, the trial court properly granted summary judgment to BP and denied the City's motion for partial summary judgment on the issue of liability.

### II. Unjust Enrichment

The City also asserts that the trial court erred in granting BP's motion for summary judgment because a genuine issue of material fact exists regarding the benefit conferred by the City upon BP stemming from BP's unauthorized use of its property.

BP, on the other hand, urges that the City cannot recover for unjust enrichment because a contract exists governing the matters on which the City bases its claim for unjust enrichment. Further, even if the City properly asserted a cause of action for unjust enrichment, BP argues that the City failed to satisfy an essential element, viz, the requirement that a plaintiff had conferred a benefit on a defendant: BP argues that third parties, namely its customers, conferred the benefit of parking revenues, not the City of Cleveland. Accordingly, BP contends that the claim for unjust enrichment is not well taken.

A party seeking a remedy under a contract cannot also seek equitable relief for unjust enrichment, absent evidence of fraud, illegality, or bad faith, since compensation is governed by the contract. *Weiper v. W.A. Hill & Assocs.* (1995), 104 Ohio App.3d 250, 262, 661 N.E.2d 796, 804. See, also, *Hughes v. Oberholtzer* (1954), 162 Ohio St. 330, 123 N.E.2d 393 (it is generally agreed that there cannot be an express agreement and an implied contract for the same thing existing at the same time.)

**\*7** Bad faith refers to the breach of good faith that is implied in every contract. See *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 662 N.E.2d 1074. In *Metropolitan Life Ins. Co. v. Triskett Ill., Inc.* (1994), 97 Ohio App.3d 228, 646 N.E.2d 528, the court summarized the standard of good faith:

'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of [a contract's] drafting, and which therefore was not resolved explicitly by the parties. When the contract is silent, principles of good faith * * * fill the gap. (Emphasis added.)

Furthermore, to recover under a claim of unjust enrichment, a plaintiff must show that the plaintiff has conferred a benefit on a defendant; that the defendant is aware of the benefit; and that the defendant's retention of the benefit would be unjust. *Hambleton v. R.G. Barry Corp.,* 12 Ohio St.3d 179, 465 N.E.2d 1298.

Here, we recognize that a contract exists which governs the matter of parking upon which the City's unjust enrichment claim is based. Section IX of the lease specifically addressees the issue of parking on the premises BP leased from the City it prohibits parking in excess of overnight parking; forbids advertising for parking; and requires BP to move customer vehicles to regular public parking facilities when the vehicles require parking in excess of 24 hours upon completion of repairs. Thus, in order to maintain an unjust enrichment claim, the City must show either fraud, illegality, or bad faith. The City alleges that the affirmative steps taken by BP to circumvent the parking restrictions in the lease constitute bad faith, thus allowing the City to make the alternative claim of unjust enrichment. Applying the standard of bad faith provided in Metropolitan Life, however, we note that the restrictions on parking were not only contemplated but in fact expressly provided for in the lease. Therefore, we conclude that the bad faith exception is not applicable here.

In the absence of fraud, illegality, or bad faith in this case, the City cannot prevail upon its unjust enrichment claim, because the subject matter of the instant dispute, i.e., parking on the leased premises, is governed by a valid contract, in Article IX of the lease. Weiper, supra.

Moreover, even if an unjust enrichment claim could be maintained, we conclude that the City

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                    Page 7

2001 WL 1479233 (Ohio App. 8 Dist.)

**(Cite as: 2001 WL 1479233 (Ohio App. 8 Dist.))**

could not satisfy, as a matter of law, the essential element regarding conferring a benefit on a defendant by a plaintiff because the benefit of parking revenues * * * wrongfully obtained by BP, sought in the City's complaint, had been conferred on BP by its customers.

### III. Conversion

**\*8** Finally, the City asserts that the trial court erred in denying summary judgment to the City because a genuine issue of material fact exists regarding BP's conversion of the leased property for private unauthorized use. BP argues that an action for conversion will not lie in connection with real property.

It is well-established that a conversion claim can only be asserted with respect to personal property and not with respect to real property. *Wiltberger v. Davis* (1996), 110 Ohio App.3d 46, 673 N.E.2d 628; *Ohio Tel. Equipment & Sales, Inc. v. Hadler Realty Co.* (1985), 24 Ohio App.3d 91,93, 493 N.E.2d 289, 292. Accordingly, we conclude that the City cannot maintain a conversion claim stemming from BP's unauthorized use of City property for parking purposes.

On the basis of the foregoing, we affirm the judgment of the trial court.

Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

FRANK D. CELEBREZZE, JR., P.J., concurs.
COLLEEN CONWAY COONEY, J. concurs. (See

attached concurring opinion).

N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also S.Ct.Prac.R. II, Section 2(A)(1).

### CONCURRING OPINION

COLLEEN CONWAY COONEY, J., concurring:

I concur with the majority's affirmance of summary judgment and write separately to provide an additional basis which supports the trial court's action. The City alleges that BP violated the terms of the lease from its inception in 1988. The City allowed the parking to continue for a decade before it filed suit. Thus, the doctrine of laches applies in this case. Laches is an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party. It signifies delay independent of limitations in statutes. It is lodged principally in equity jurisprudence. *Connin v. Bailey* (1984), 15 Ohio St.3d 34, 35, 472 N.E.2d 328.

The City's unreasonable delay in pursuing its claim prejudiced BP because BP is unable to correct the violation or provide records to calculate how many cars parked in the lot in violation of the terms of the lease.

**\*9** Furthermore, I agree with the majority that the City is responsible for any ambiguity found in the language of the lease. The ordinance which authorized the lease with BP specified that the lease shall be prepared by the Director of Law and shall contain such additional provisions as she deems necessary to benefit and protect the public interest.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                      Page 8

2001 WL 1479233 (Ohio App. 8 Dist.)

**(Cite as: 2001 WL 1479233 (Ohio App. 8 Dist.))**

Cleveland City Ordinance No. 1554-88. Clearly, it was incumbent upon the director of law to capitalize the word Airport or say city-owned parking facilities if that was the City's intention to benefit the public interest.

2001 WL 1479233 (Ohio App. 8 Dist.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Service: **Get by LEXSEE®**
Citation: **2002 U.S. Dist. LEXIS 10380**

*2002 U.S. Dist. LEXIS 10380, \**

THE HUMANA FOUNDATION, INC. and HUMANA MILITARY HEALTHCARE SERVICES, INC., Plaintiffs, v. CANTELLA & CO., INC., Defendant.

CIVIL ACTION NO. 2000-12393-MLW

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2002 U.S. Dist. LEXIS 10380

May 6, 2002, Decided

**DISPOSITION: [\*1]** Magistrate judge recommended that Third Party Defendant J.P. Morgan's motion to dismiss Amended Third Party Complaint be allowed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Third party defendant bank filed a motion to dismiss the third party amended complaint filed against it by defendant/third party plaintiff seller based upon negligent misrepresentation and common law tort indemnity. The matter was submitted to the magistrate judge for report and recommendation.

**OVERVIEW:** The seller was named as a defendant in an action filed by plaintiff purchasers after the seller obtained certificates of deposit for the purchasers that were forgeries. The seller filed a third party action against the bank for negligent misrepresentation and common law tort indemnity because the bank had verified the authenticity of the first certificate of deposit. The magistrate judge recommended that the bank's motion to dismiss should be allowed. The limitations period governing the negligent misrepresentation claim under either Massachusetts or New York law was three years. The seller had notice that the purchaser was going to demand its money back by the purchaser's letter sent April 3, 1997, and this letter was sufficient notice to apprise the seller of the potential claim for accrual purposes. Thus, the seller's action against the bank, initiated more than three years after the April 1997 demand letter was barred by the applicable statute of limitations. The magistrate judge also recommended that the tort law indemnity claim be dismissed because such indemnity was only appropriate if the seller had been passively negligent and the bank had been actively at fault.

**OUTCOME:** The magistrate judge recommended that the bank's motion to dismiss the third party complaint filed against it by the seller for negligent misrepresentation and tort indemnity should be allowed.

**CORE TERMS:** certificate, negligent misrepresentation claim, statute of limitations, third party, notice, negligent misrepresentation, cause of action, motion to dismiss, common law tort, limitations period, appreciable harm, time-barred, accrue, recommendation, accrued, intends, verification, counterfeit, indemnity, harmed, discovery rule, misrepresentation, indemnification, indemnity claim, fails to state, suspicious circumstances, certificates of deposit, special relationship, own conduct, legal claim

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action 

TAB B

Get a Document - by Citation - 2002 US. Dist. LEXIS 10380

Case 1:04-cv-12333-MEL   Document 40-3   Filed 04/18/2005   Page 12 of 52   Page 2 of 11

*HN1* In deciding a third party defendant's motion to dismiss under Fed. R. Civ. P. 12 (b) (6), the court must accept the complaint's allegations as true, indulging all reasonable inferences in favor of the third party plaintiff. Indeed, when the sufficiency of a complaint is tested, it has long been the law that such a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. At the same time, the court is not required to credit bald assertions, subjective characterizations, optimistic predictions, or problematic suppositions. The court need not accept conclusions of law when considering a motion to dismiss. More Like This Headnote

Torts > Business & Employment Torts > Negligent Misrepresentation 
Torts > Procedure > Statutes of Limitations
*HN2* The Massachusetts statute of limitations for a negligent misrepresentation claim is three years. Mass. Gen. Laws ch. 260, § 2A. More Like This Headnote

Torts > Business & Employment Torts > Negligent Misrepresentation
Torts > Procedure > Statutes of Limitations
*HN3* Under New York law, the statute of limitations for a negligent misrepresentation claim depends on where the claim "accrues". N.Y. C.P.L.R. 202 provides that an action based on cause of action accruing outside New York cannot be commenced after the expiration of the time limited by the laws of the state where the cause of action accrued. More Like This Headnote

Civil Procedure > State & Federal Interrelationships > Choice of Law
*HN4* For purposes of N.Y. C.P.L.R. 202, a cause of action accrues in the place where the injury is sustained, which, in cases of economic injury, is usually where the plaintiff resides. More Like This Headnote

Governments > Legislation > Statutes of Limitations > Time Limitations
Civil Procedure > State & Federal Interrelationships > Choice of Law
*HN5* When borrowing an out of state limitations period pursuant to N.Y. C.P.L.R. 202, all extensions and tolls applied in the foreign state must be imported with the limitations period. More Like This Headnote

Governments > Legislation > Statutes of Limitations > Time Limitations
*HN6* Under Massachusetts law, a claim accrues for statute of limitations purposes when there occurs a necessary coalescence of discovery and appreciable harm. A cause of action does not accrue until a plaintiff knows or reasonably should know that it has sustained appreciable harm as a result of a defendant's negligence. More Like This Headnote

Torts > Procedure > Discovery
Governments > Legislation > Statutes of Limitations > Time Limitations
*HN7* The discovery rule provides that certain causes of action based on inherently unknowable wrongs do not accrue until the plaintiff learns, or reasonably should have learned, that he has been harmed by the defendant's conduct. Misrepresentation claims may be subject to the discovery rule. The discovery rule starts a limitations period running when a reasonably prudent person, in the tort claimant's position, reacting to any suspicious circumstances of which he might have been aware should have discovered that he had been harmed by the defendant. It is not necessary that a plaintiff be aware of the full extent of the harm. Uncertainty about the total extent of the damages does not delay the accrual of a cause of action. The statute of limitations does not stay in suspense until the

Get a Document - by Citation - 2002 U.S. Dist. LEXIS 10380    Page 13 of 52

Case 1:04-cv-12333-MEL    Document 40-8    Filed 04/18/2005    Page 3 of 11

full extent, gravity, or permanence and consequences of the injury are known.  More Like This Headnote

Governments > Legislation > Statutes of Limitations > Time Limitations
Torts > Procedure > Statutes of Limitations
*HN8* In all cases the statute of limitations begins to run when the injured person has notice of the claim. The "notice" required is not notice of every fact which must eventually be proved in support of the claim. Rather, "notice" is simply knowledge that an injury has occurred. What matters for statute of limitations purposes is the date when plaintiff, reacting to any suspicious circumstances of which it might have been aware, should reasonably have been put on notice that it may have been harmed.  More Like This Headnote

Torts > Multiple Defendants > Contribution & Indemnity
*HN9* Tort-based indemnification has usually been available only when the party seeking it was merely passively negligent while the would-be indemnitor was actively at fault. Where the party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injury, tort indemnification is inappropriate.  More Like This Headnote

**COUNSEL:** For THE HUMANA FOUNDATION, INC., HUMANA MILITARY HEALTHCARE SERVICES, INC., Plaintiffs: Robert E. Sullivan, Sullivan Weinstein & McQuay, P.C, Boston, MA.

For HUMANA MILITARY HEALTHCARE SERVICES, INC., Plaintiff: Scott A. Roberts, Sullivan, Weinstein & McQuay, Boston, MA.

For CANTELLA & CO., INC., Defendant: Robert T. Gill, Peabody & Arnold LLP, Timothy O. Egan, Peabody & Arnold, Robert E. Sullivan, Sullivan Weinstein & McQuay, P.C, Boston, MA.

For FLEET BANK, interested party: Ann Pauly, Griesinger, Walsh & Maffei, LLP, Boston, MA.

For CANTELLA & CO., INC., Third-Party Plaintiff: Robert T. Gill, Peabody & Arnold LLP, Timothy O. Egan, Peabody & Arnold, Robert E. Sullivan, Sullivan Weinstein & McQuay, P.C, Boston, MA.

For J.P. MORGAN CHASE &, Third-Party Defendant: John C. Englander, Greer N. Shaw, Richard A. Oetheimer, Goodwin Procter LLP, Boston, MA.

For MUTUAL MONEY INVEST, Third-Party Defendant: Philip M. Giordano, Giordano & Champa, P.A., James F. Champa, Giordano, Champa & Powers, Boston, MA.

**JUDGES:** ROBERT B. COLLINGS,  **[*2]**  United States Magistrate Judge.

**OPINIONBY:** ROBERT B. COLLINGS

**OPINION:** *REPORT AND RECOMMENDATION ON THIRD PARTY DEFENDANT J.P. MORGAN CHASE & CO.'S MOTION TO DISMISS AMENDED THIRD PARTY COMPLAINT (# 36)*

COLLINGS, U.S.M.J.

### I. Introduction

The Humana Foundation, Inc. and Humana Military Healthcare Services, Inc. (collectively,

Get a Document by Citation - 2002 U.S. Dist. LEXIS 31038

Case 1:04-cv-12883-MEL2 Document 40-5 Filed 04/18/2005 Page 14 of 52 Page 4 of 11

"Humana") filed a Complaint (# 1) seeking recovery of more than $ 4 million from Cantella & Co., Inc. ("Cantella") in connection with Humana's purchase of two allegedly forged certificates of deposit. On December 4, 2001, Cantella filed an Amended Third Party Complaint (# 29) against Deutsche Bank Argentina S.A., J.P. Morgan Chase & Co. ("Chase"), and Mutual Money Investments, Inc. d/b/a Tri-Star Financial ("Tri-Star"), asserting claims including negligence, negligent misrepresentation and contribution. Chase has moved (# 36) to dismiss all counts asserted against it in the Amended Third Party Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. With its motion to dismiss, Chase filed a Memorandum of Law (# 37). Cantella filed an opposition (# 39) and, after obtaining leave of Court, Chase filed a reply brief (# 40). **[*3]**

Chase's motion to dismiss has been referred to the undersigned for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b). The motion was argued at a hearing held on April 3, 2002. For the reasons discussed below, I shall recommend that Chase's Motion to Dismiss be allowed.

## II. The Facts

As is required when ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the Court has accepted the facts alleged in the Amended Third Party Complaint as true. See Kiely v. Raytheon Co., 105 F.3d 734, 735 (1 Cir., 1997). The Court also has accepted for purposes of this analysis facts which are admitted in Cantella's Answer to Humana's Complaint.

In late 1996, Tri-Star obtained two certificates of deposit which appear on their faces to have been issued by Deutsche Bank Argentina S.A. # 29 P8. Each of the certificates had a face value of $ 2,000,000. # 29 PP9, 10. In late 1996 and early 1997, Tri-Star reached an agreement with Cantella to transfer the certificates to Cantella so it could sell them to Humana. # 29 P12. On or about January 18, 1997, Humana expressed an interest in purchasing one of the certificates ("769 Certificate"). **[*4]** # 29 P13. Cantella sent certain documentation to Humana concerning the '769 Certificate. # 29 P13. Humana informed Cantella that it had forwarded the information to its bank, Chase, for verification of the certificate's authenticity. # 29 PP13, 14. On or about January 22, 1997, Humana informed Cantella that based on the verification process completed by Chase and information it received directly from Deutsche Bank Argentina S.A., Humana believed the '769 Certificate to be genuine. # 29 P16. On January 24, 1997, the '769 Certificate was sent to Chase for final verification. # 29 P17. Chase examined the '769 Certificate and released the funds to complete the purchase on behalf of Humana. # 29 P17.

In early February 1997, Humana instructed Cantella to purchase the second certificate. # 29 P19. Humana and Cantella relied on Chase's verification of the '769 Certificate in completing the sale of both certificates. # 29 PP30, 64, 68. Chase knew Humana and Cantella would rely on Chase's opinion in deciding whether to proceed with the sales of the certificates. # 29 P67.

On March 20, 1997, Cantella's Boston office sent a letter to Humana stating that the certificates "may be fraudulent securities. **[*5]** " Complaint (# 1) P16; Answer of Defendant Cantella & Co., Inc. ("Answer") (# 27) P16. In that letter, Cantella stated that Cantella and its broker were "investigating the situation and considering the remedial steps to be taken in this matter." # 1 P16; # 27 P16. A copy of Cantella's March 20, 1997 letter is attached to the Complaint as Exhibit G. # 1 P16; # 27 P16. Also on March 20, 1997, Cantella's broker, National Financial Services Corporation ("National Financial"), sent a letter to Southwest Securities (the entity that had physically delivered the certificates to National Financial on behalf of Tri-Star) stating that, according to Cantella, the National Association of Securities Dealers, Inc. had "declared" the certificates "to be fraudulent." # 1 P17; # 27 P17. A copy of National Financial's March 20, 1997 letter is attached to the Complaint as Exhibit H. # 1 P17; # 27 P17.

On April 3, 1997, Humana sent a demand letter to Cantella's Boston office concerning the certificates, stating as follows:

> Humana has been informed by the Denver office of the Securities and Exchange Commission and the Boston office of the Federal Bureau of Investigation that the Time Deposits are **[*6]** counterfeit. Consequently, please consider this a demand for immediate payment for the Humana Foundation Time Deposit calculated to provide a yield of 6.52% (including all accrued interest) to the date of payment and the Humana Military Time Deposit calculated to provide a yield of 6.47% to the date of payment.

Complaint (# 1) P20; Answer (# 27) P20.

A copy of the April 3, 1997 letter is attached to the Complaint as Exhibit I. *# 1 P20; # 27 P20.* Cantella has failed to pay the amounts demanded by Humana. # 1 P20; # 27 P20.

Humana now believes the certificates are counterfeit and has brought suit against Cantella. Complaint; *see also* # 29 P21. Cantella has filed an Amended Third Party Complaint which asserts three claims against Chase: Count III for common law tort indemnity, n1 Count XII for negligence, and Count XII[sic] for negligent misrepresentation. At oral argument, Cantella's counsel stated that his client is no longer pursuing its negligence claim against Chase. Accordingly, the discussion which follows will relate only to the two claims which Cantella is pressing.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 In Cantella's opposition brief (# 39) and at oral argument, its counsel stated that despite being titled as a contribution claim, Count III was intended to assert a claim of common law tort indemnity. Count III shall be treated as a common law tort indemnity claim.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*7]**

### III. The Standard

The Rule 12(b)(6) standard is quite familiar. *HN1*⚓In deciding the third party defendant's motion to dismiss, the Court must "accept the complaint's allegations as true, indulging all reasonable inferences in favor of [the third party plaintiff]." *See Kiely,* 105 F.3d at 735. Indeed, when the sufficiency of a complaint is tested, it has long been the law that such "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)(footnote omitted). At the same time, the Court is not required to credit bald assertions, subjective characterizations, optimistic predictions, or problematic suppositions. *See United States v. AVX Corp.,* 962 F.2d 108, 115 (1 Cir., 1992) (quoting *Correa-Martinez v. Arrillaga-Belendez,* 903 F.2d 49, 52 (1 Cir., 1990) and *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1 Cir., 1989)). The Court need not accept conclusions of law when **[*8]** considering a motion to dismiss. *See New England Cleaning Services, Inc. v. American Arbitration Ass'n,* 199 F.3d 542, 545 (1 Cir., 1999).

### IV. Analysis

Chase moves to dismiss the counts asserted against it in the Amended Third Party Complaint pursuant to Fed. R. Civ. P. 12(b)(6), contending that 1) the negligent misrepresentation claim (Count XII) is time-barred and fails because Chase owed no legal duty to Cantella, and 2) the common law tort indemnity claim (Count III) fails because Cantella has not alleged facts supporting a finding of derivative or vicarious liability.

Cantella contends its negligent misrepresentation claim is not time-barred because it filed the Third Party Complaint within three years of when it was first harmed, when it "incurred legal expenses to defend against the Plaintiff's Complaint." Cantella & Co., Inc.'s Opposition to Third Party Defendant J.P. Morgan Chase & Co.'s Motion to Dismiss Or In the Alternative Cantella & Co., Inc.'s Motion for Leave to Amend the Third Party Complaint (# 39) ("Opposition") at 12. Cantella further argues that under conflicts of law principles, Massachusetts law governs and under Massachusetts law, **[*9]** the negligent misrepresentation claim states a claim.

The Court is required to engage in a conflicts of law analysis only if there is a conflict between the law of Massachusetts and New York on the relevant legal issues. *See Steinke v. Sungard Financial Sys., Inc.,* 121 F.3d 763, 775 (1 Cir., 1997) (court need not resolve choice of law issue when "the outcome is the same under the substantive law of either jurisdiction") (quoting *Lambert v. Kysar,* 983 F.2d 1110, 1114 (1 Cir., 1993)). Although the elements of negligent misrepresentation differ under Massachusetts and New York law, n2 those differences do not change the outcome of Chase's motion to dismiss if Cantella's negligent misrepresentation claim is time-barred, as Chase contends. The Court therefore first addresses the timeliness of the negligent misrepresentation claim.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 New York law provides that "'[a] claim for negligent misrepresentation can only stand where there is a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another, the information given was false, and there was reasonable reliance upon the information given.'" *H&R Project Assocs., Inc. v. City of Syracuse,* 289 A.D.2d 967, 969, 737 N.Y.S.2d 712, 715 (2001) (quoting *Hudson River Club v. Consolidated Edison Co.,* 275 A.D.2d 218, 220, 712 N.Y.S.2d 104, 106 (2000)). A "special relationship" under New York law "'requires a closer degree of trust than an ordinary business relationship.'" *Id.* (quoting *Solondz v. Barash,* 225 A.D.2d 996, 998, 639 N.Y.S.2d 561, 564 (1996)). By contrast, under Massachusetts law, the elements of negligent misrepresentation are as follows:

> "(1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." That liability is limited to "loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."

*Nycal Corp. v. KPMG Peat Marwick LLP,* 426 Mass. 491, 496, 688 N.E.2d 1368, 1371-72 (1998) (quoting Restatement (Second) of Torts § 552 (1977)).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*10]**

A. Is Cantella's negligent misrepresentation claim time-barred?

*HN2*The Massachusetts statute of limitations for a negligent misrepresentation claim is three years. Mass. Gen. L. c. 260, § 2A. *HN3*Under New York law, the statute of limitations for a negligent misrepresentation claim depends on where the claim "accrues". See N.Y. C.P.L.R. § 202 (action based on cause of action accruing outside New York cannot be commenced after the expiration of the time limited by the laws of the state where the cause of action accrued); N.Y. C.P.L.R. § 213(1) (six year general statute of limitations); *Fandy Corp. v. Lung-Fong Chen,* 262 A.D.2d 352, 353, 691 N.Y.S.2d 572, 573 (N.Y. A.D. 1999) (N.Y. C.P.L.R. § 213(1) governs claims of negligent representation). *HN4*For purposes of N.Y. C.P.L.R. § 202, a cause of action accrues in the place where the injury is sustained, which, in cases of economic injury, is usually where the plaintiff resides. See *Global Financial Corp. v. Triarc Corp.,* 93 N.Y.2d 525, 529, 715 N.E.2d 482, 485, 693 N.Y.S.2d 479, 482 (1999).

In this case, Cantella alleges that it is a citizen of Massachusetts. # 29 PP5, 69. Because Cantella's negligent **[*11]** misrepresentation claim accrued in Massachusetts for purposes of N.Y. C.P.L.R. § 202, section 202 would "borrow" the Massachusetts limitations period. Cantella's claim is therefore governed by a three year statute of limitations under either New York or Massachusetts law.

Because the application of Massachusetts and New York law both lead to a three year statute of limitations for Cantella's negligent misrepresentation claim, the Court will apply Massachusetts law to determine when the claim accrued. See *Steinke,* 121 F.3d at 775; see also *Smith Barney, Harris Upham & Co. v. Luckie,* 85 N.Y.2d 193, 207, 647 N.E.2d 1308, 1316, 623 N.Y.S.2d 800, 808 (1995) (*HN5*when borrowing an out of state limitations period pursuant to N.Y. C.P.L.R. § 202, all extensions and tolls applied in the foreign state must be imported with the limitations period). n3

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Both parties argue in their briefs for the application of Massachusetts law concerning the accrual of the negligent misrepresentation claim. See Memorandum in Support of J.P. Morgan Chase & Co.'s Motion to Dismiss Amended Third Party Complaint (# 37) at 8-9; Opposition (# 39) at 12-13. If the Court were to apply New York law, Cantella's negligent misrepresentation claim accrued in January of 1997, on the date the alleged misrepresentation was made. See *Fandy Corp.,* 262 A.D.2d at 353; 691 N.Y.S.2d at 573.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*12]**

On April 3, 1997, Cantella received a letter from Humana demanding its money back with interest. See # 1 Exhibit I; # 27 P20. Cantella filed the Third Party Complaint on October 19, 2001. Because the Third Party Complaint was filed more than three years after certain communications in March and April of 1997 in which the authenticity of the certificates was questioned, n4 the issue before the Court is when Cantella's cause of action for negligent misrepresentation accrued. The burden is on Cantella to allege facts showing that its claim is timely. See *Riley v. Presnell,* 409 Mass. 239, 243-44, 565 N.E.2d 780, 785 (1991) ("Once the

defendant pleads the statute of limitations as a defense . . . and establishes that the action was brought more than three years from the date of the injury, the burden of proving facts that take the case outside the impact of the statute falls to the plaintiff."); *see also Franklin v. Albert,* 381 Mass. 611, 619, 411 N.E.2d 458, 463 (1980); *Salin v. Shalgian,* 18 Mass. App. Ct. 467, 469, 467 N.E.2d 475, *477,* review denied, 393 Mass. 1102, 469 N.E.2d 830 (1984).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 *See* # 1, Exhibits G, H, and I; # 27 PP16, 17, 20.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - **[*13]**

*HN6* Under Massachusetts law, a claim accrues for statute of limitations purposes when there occurs a "necessary coalescence of discovery and appreciable harm". *Murphy v. Smith,* 411 Mass. 133, 136, 579 N.E.2d 165, 167 (1991) (quoting *Cantu v. St. Paul Cos.,* 401 Mass. 53, 57, 514 N.E.2d 668, 668-69 (1987)); *Lyons v. Nutt,* 436 Mass. 244, 251, 763 N.E.2d 1065, 1071 (2002); *see also In re Tomaiolo,* 205 B.R. 10, 13 (D. Mass. 1997), aff'd, 2002 U.S. Dist. LEXIS 2038, 2002 WL 226133 (D. Mass. 2002); *Rohmtech, Inc. v. Taylor,* 7 Mass. L. Rptr. 616, 1997 Mass. Super. LEXIS 58, 1997 WL 778669 at *7 (Mass. Super. 1997). A cause of action "does not accrue until a plaintiff knows or reasonably should know that it has sustained appreciable harm as a result of a defendant's negligence." *Cantu, 401 Mass. at 57, 514 N.E.2d at 668* (malpractice claim); *see also In re Tomaiolo, 205 B.R. at 13* (same).

*HN7* The discovery rule provides that "'certain causes of action based on inherently unknowable wrongs do not accrue until the plaintiff learns, or reasonably should have learned, that he has been harmed by the defendant's conduct.'" **[*14]** *Hanson Housing Auth. v. Dryvit System, Inc.,* 29 Mass. App. Ct. 440, 443, 560 N.E.2d 1290, 1293 (1990), review denied, 409 Mass. 1101, 565 N.E.2d 792 (1991) (quoting *White v. Peabody Constr. Co.,* 386 Mass. 121, 129, 434 N.E.2d 1015, 1020 (1982)). Misrepresentation claims may be subject to the discovery rule. *Hanson Housing Auth.,* 29 Mass. App. Ct. at 445, 560 N.E.2d at 1293 (citing *Friedman v. Jablonski,* 371 Mass. 482, 485, 358 N.E.2d 994, 997 (1976)). The discovery rule starts a limitations period running "'when a reasonably prudent person (in the tort claimant's position) reacting to any *suspicious circumstances* of which he might have been aware . . . should have discovered that he had been harmed by [the defendant].'" *Hanson Housing Auth.,* 29 Mass. App. Ct. at 446, 560 N.E.2d at 1294 (quoting *Malapanis v. Shirazi,* 21 Mass. App. Ct. 378, 383, 487 N.E.2d 533, 537 (1986)) (emphasis in original).

"It is not necessary that a plaintiff be aware of the full extent of the harm." *Cantu, 401 Mass. at 57, 514 N.E.2d at 668; see also Key Trust Co. v. Doherty, Wallace, Pillsbury and Murphy, P.C.,* 811 F. Supp. 733, 737 **[*15]** (D. Mass., 1993); *Massachusetts Elec. Co. v. Fletcher, Tilton & Whipple, P.C.,* 394 Mass. 265, 268, 475 N.E.2d 390, 392 (1985). "Uncertainty about the total extent of the damages does not delay the accrual of a cause of action." *Swasey v. Barron,* 46 Mass. App. Ct. 127, 132, 703 N.E.2d 1208, 1212 (1999); *see also Beaconsfield Townhouse Condominium Trust v. Zussman,* 49 Mass. App. Ct. 757, 762, 733 N.E.2d 141, 146, review denied, 432 Mass. 1109, 738 N.E.2d 750 (2000) ("The statute of limitations does not stay in suspense until the full extent, gravity, or permanence' and consequences of the injury are known") (quoting *Gore v. Daniel O'Connell's Sons, Inc.,* 17 Mass. App. Ct. 645, 649, 461 N.E.2d 256, 260 (1984)).

*HN8* "In all cases the statute of limitations begins to run when the injured person has notice of the claim. The 'notice' required is not notice of every fact which

must eventually be proved in support of the claim. . . . Rather, 'notice' is simply knowledge that an injury has occurred."

*Hanson Housing Auth.,* 29 Mass. App. Ct. at 445-46, 560 N.E.2d at 1294 (quoting **[\*16]** *White,* 386 Mass. at 130, 434 N.E.2d at 1020-21).

"What matters for statute of limitations purposes is the date when [plaintiff], 'reacting to any suspicious circumstances of which [it] might have been aware,' should reasonably have been put on notice that it may have been harmed . . . ." *Rohmtech, Inc.,* 7 Mass. L. Rptr. 616, 1997 Mass. Super. LEXIS 58, 1997 WL 778669 at *8 (quoting *Bowen v. Eli Lilly & Co.,* 408 Mass. 204, 207, 208, 557 N.E.2d 739,739, 741, 742 (1990)) (letter from EPA sufficient to put plaintiff on notice "that there was a potential ground for liability" and to start running of statute of limitations) (footnote omitted). The appreciable harm a plaintiff must sustain before a limitations period starts running can be something less than payment of money. *See, e.g., In re Tomaiolo,* 205 B.R. at 14 (plaintiff sustained appreciable harm when he signed bankruptcy filings which he knew or should have known contained false statements and "could bring about serious consequences"); *Key Trust Co.,* 811 F. Supp. at 739 ("Notice of the 'harm' occurs when the plaintiff has knowledge of its exposure to liability, not when **[\*17]** it must actually write the check."); *Hanson Housing Auth.,* 29 Mass. App. Ct. at 447, 560 N.E.2d at 1295 (cracks and other visible defects in wall surfaces "reasonably should have alerted the plaintiff to the *possible existence* of a legal claim" against the defendant) (emphasis added); *Cargill v. Gilmore,* 1 Mass. L. Rptr. 167, 1993 Mass. Super. LEXIS 296, 1993 WL 818899 at *5 (Mass. Super., 1993) (claim accrued when plaintiff "alerted to facts which pointed to the possible existence of a legal claim against the defendant").

The Court finds that at least by the time Cantella received the April 3, 1997 demand letter from Humana, Cantella knew the following: 1) the certificates sold to Humana were alleged to be counterfeit; 2) Cantella sold the certificates to Humana in reliance on Chase's representation that they were authentic; and 3) as a result of the sales, Humana was demanding money from Cantella. It is not necessary for a claim to accrue that the plaintiff discover all of the elements of its cause of action. *See Malapanis,* 21 Mass. App. Ct. at 382, 487 N.E.2d at 536-37 ("Massachusetts does not require discovery of each of the elements of the cause of action **[\*18]** . . . before the limitations clock . . . starts ticking.") The Court finds that even if, in April of 1997, Cantella did not know for sure whether it would be sued by Humana as a result of the sales, it knew facts from which a reasonable plaintiff would have concluded that it had suffered appreciable harm. Because Cantella failed to bring suit within three years of that date, as required by Mass. Gen. L. c. 260, § 2A and N.Y. C.P.L.R. § 202, its claim is time-barred. n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n5 Given the Court's ruling that Cantella's negligent misrepresentation claim is barred by the statute of limitations, it need not consider Chase's additional argument that it fails to state a claim because Chase owed no duty to Cantella.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

B. Does Count III state a claim for common law tort indemnity?

Massachusetts law does not differ materially from New York law on the elements of common law tort indemnity. *See Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth.,* 693

Get a Document - by Citation - 2002 U.S. Dist. LEXIS 10380    Page 20 of 52

Case 1:04-cv-12393-MEL   Document 10-3   Filed 04/18/2005   Page 20 of 11

F.2d 1, 3 (1 Cir., 1982); *Slocum v. Donahue,* 44 Mass. App. Ct. 937, 939, 693 N.E.2d 179, 182, **[\*19]** *review denied,* 427 Mass. 1108, 700 N.E.2d 268 (1998); *Mauro v. McCrindle,* 70 A.D.2d 77, 83, 419 N.Y.S.2d 710, 714 (1979). Accordingly, the Court will apply Massachusetts law. *See Steinke,* 121 F.3d at 775.

*HN9* Tort-based indemnification "has usually been available only when the party seeking it was merely passively negligent while the would-be indemnitor was actively at fault." *See, e.g., Araujo,* 693 F.2d at 3 ("Where the party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injury, tort indemnification is inappropriate"); *see also Mauro,* 70 A.D.2d at 83, 419 N.Y.S.2d at 714. Here, Humana alleges that Cantella was negligent, made negligent misrepresentations, breached a contract and breached warranties by its own conduct (selling counterfeit certificates), not that it is vicariously liable or derivatively liable for some other party's conduct. *See #* 1 PP25-70. If Cantella ultimately is found liable to Humana, it will be for its own conduct, not the conduct of another party. If Cantella is found not to be liable to Humana, it will have no liability **[\*20]** for which Chase could indemnify it. In either scenario, its indemnity claim fails to state a claim.

Accordingly, Count III fails to state a claim and the Court recommends that Chase's motion to dismiss be allowed with respect to it.

## V. Recommendation

For the reasons stated, I RECOMMEND that the Third Party Defendant J.P. Morgan Chase & Co.'s Motion to Dismiss Amended Third Party Complaint (# 36) be ALLOWED.

## VI. Review by the District Judge

The parties are hereby advised that pursuant to Rule 72, Fed. R. Civ. P., any party who objects to these proposed findings and recommendations must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services,* 848 F.2d 271 **[\*21]** (1 Cir., 1988); *United States v. Valencia-Copete,* 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega,* 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn,* 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985).

ROBERT B. COLLINGS

United States Magistrate Judge

May 6, 2002

Service: **Get by LEXSEE®**
Citation: **2002 U.S. Dist. LEXIS 10380**
View: Full
Date/Time: Monday, April 18, 2005 - 12:01 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: **Get by LEXSEE®**
Citation: **1994 Mass. Super. LEXIS 334**

*1994 Mass. Super. LEXIS 334, \**

Raymond J. Lauring et al. v. Timothy Lincoln et al.

92-00014

SUPERIOR COURT OF MASSACHUSETTS, AT WORCESTER

1994 Mass. Super. LEXIS 334

April 26, 1994, Decided

**DISPOSITION: [\*1]** Defendant Samtron's motion for summary judgment with respect to Counts IV, VIII and XII are ALLOWED.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff landlord filed an action against defendants, tenants and a computer maker, to recover for fire damage to rental property. The computer maker filed a third party action, bringing an indemnity and contribution claim against third party defendant, a computer monitor maker. The monitor maker filed a motion for summary judgment.

**OVERVIEW:** The fire allegedly started from a faulty computer monitor. The court found that the monitor maker did not manufacture, distribute, sell, design, assemble, test, inspect, handle, or market any of the computer equipment involved in the fire. In granting summary judgment in the monitor maker's favor, the court held that the computer maker did not dispute the monitor maker's claims with affidavits or otherwise, but contended that it required more time for discovery. The court held that such a contention suggested that speculation would thwart an otherwise meritorious motion for summary judgment and was not persuasive.

**OUTCOME:** The court granted summary judgment in favor of the monitor maker.

**CORE TERMS:** computer equipment, summary judgment, indemnification, monitor, moving party, third-party, disputed, triable issue, defeat, common law, manufacture, contributor, distribute, assemble, inspect, handle, entitled to judgment, essential element, negligent act, matter of law, demonstrating, aforementioned, manufactured, deposition, indemnitor, indemnity, entity, manuals, label

### LexisNexis(R) Headnotes  ◆ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard 🖼
*HN1* Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and, further, that the moving party is entitled to judgment as a matter of law.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🖼
*HN2* A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting

TAB  C

affirmative evidence that negates an essential element of the opponent's case or by demonstrating that proof of that element is unlikely to be forthcoming at trial. If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat the motion. The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. More Like This Headnote

Contracts Law > Breach > Causes of Action 🔍
HN3⬦ With respect to a contract-based right of indemnification, the claim will succeed only if there was a binding contract between the indemnitor and indemnitee in which such right is expressed or from which it can be fairly implied. More Like This Headnote

Torts > Multiple Defendants > Contribution & Indemnity 🔍
HN4⬦ Where an indemnification claim is founded upon the common law, indemnification has been available traditionally only to a defendant whose liability was vicarious or formal. Thus, indemnification has been permitted where the person seeking indemnification did not join in the negligent act of another, but was exposed to liability because of that negligent act. More Like This Headnote

Torts > Multiple Defendants > Contribution & Indemnity 🔍
HN5⬦ With respect to a contribution claim, the right to contribution is derivative of joint liability, requiring the contributor also to be liable. Evidence of the contributor's liability is, therefore, an irreducible minimum. More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof 🔍
HN6⬦ A party may not rest on its pleadings and mere assertions of disputed facts to defeat a timely motion for summary judgment. More Like This Headnote

**JUDGES:** Toomey.

**OPINIONBY:** TOOMEY

**OPINION:** Memorandum of Decision and Order for Defendant Samtron Displays, Inc.'s Motion for Summary Judgment

This action arose from a fire damaging real property owned by the plaintiffs, Raymond J. Lauring and Claire E. Lauring (the "Laurings") allegedly caused by Apple computer equipment (the "Computer Equipment") owned by defendants, Timothy Lincoln and Laura Lincoln (the "Lincolns"), who purchased the computer equipment from Apple Computer, Inc. ("Apple"). Apple, in turn, has brought a third-party claim for indemnity and contribution against the alleged manufacturers of the computer equipment. Samtron Displays, Inc. ("Samtron"), a third-party defendant, has moved for summary judgment on all counts against it (Count IV, Count VIII, Count XII) urging that it did not manufacture, distribute, sell, design, assemble, test, inspect, handle or market any of the computer equipment. For the reasons outlined below, the defendant's motion for summary judgment is ALLOWED.

BACKGROUND

The undisputed material facts are as follows:

On August 25, 1989 a fire damaged **[*2]** a three-story apartment building, 16 Samoset Road, owned by the plaintiffs, Raymond J. Lauring and Claire E. Lauring (the "Laurings").

Complaint, 4. The Laurings allege that certain Apple computer equipment owned by their tenants caused the fire. Complaint, 5 and 6; Deposition of Timothy Lincoln, p. 8, 13, 56; Deposition of Laura Lincoln, p. 28.

Apple contends that Samtron was involved in the "manufacturing, distribution, sale, design, assembly, testing, inspection, handling or marketing" of part of the computer equipment, specifically a Monitor II computer monitor, ("Monitor II") which allegedly caused the fire. Apple Third Party Complaint, 28. Apple, however, also has suggested that corporate entities other than Samtron manufactured the Monitor II. Apple Answers to Plaintiff's First Set of Interrogatories, 7 and 11(a-c). ("Monitor II was manufactured by Samsung Electronic Devices Co. Ltd., and/or Samsung Pacific International, Inc.")

In support of its motion for summary judgment, Samtron has submitted an affidavit from K.S. Han, Samtron's Vice-President for OEM Sales, in which he contends that Samtron did not develop, manufacture, distribute, sell, design, assemble, test, **[*3]** inspect, handle, market, or label any part of the computer equipment. Affidavit of K.S. Han, 45. The affidavit also includes Han's statement that Samtron did not produce the instructions, owner's manuals or directions for the computer equipment. Affidavit of K.S. Han, 45.

According to documents offered in connection with the instant motion, Samtron did not exist in February 1986 when the Lincolns purchased their Apple Computer System, as it was formed almost two years after the Lincolns purchased the computer equipment. Samtron Answer to Apple's First Set of Interrogatories, 1. Furthermore, Samtron did not agree to assume the debts or liabilities of any other corporation or entity involved with Apple. *Id.*

The plaintiffs have not disputed any of the aforementioned facts with affidavits.

DISCUSSION

*HN1* Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422, 456 N.E.2d 1123 (1983); *Community Nat'l Bank v. Dawes,* 369 Mass. 550, 553, 340 N.E.2d 877 (1976); Mass.R.Civ.P. 56(c). The moving party bears **[*4]** the burden of affirmatively demonstrating the absence of a triable issue, "and [further] that the moving party is entitled to judgment as a matter of law." *Pederson v. Time, Inc.,* 404 Mass. 14, 16-17, 532 N.E.2d 1211 (1989). *HN2* A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent's case or "by demonstrating that proof of that element is unlikely to be forthcoming at trial." *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 809, 575 N.E.2d 1107 (1991); accord, *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716, 575 N.E.2d 734 (1991). "If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion." *Pederson, supra,* 404 Mass. at 17. "The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment." *LaLonde v. Eissner,* 405 Mass. 207, 209, 539 N.E.2d 538 (1989).

At **[*5]** bar, Apple has brought third-party claims against Samtron for indemnity, by reason of contract and common law, and for contribution. Both claims require, as an essential element, that the indemnitor or contributor was, through actions or in contract, liable for the loss.

*HN3* With respect to a contract-based right of indemnification, the claim will succeed only if there was a binding contract between the indemnitor and indemnitee in which such right is

expressed or from which it can be fairly implied. *Kelly v. Dimeo, Inc.,* 31 Mass. App. Ct. 626, 628, 581 N.E.2d 1316, rev. denied, 412 Mass. 1102, 588 N.E.2d 691 (1991); *H.P. Hood & Sons, Inc. v. Ford Motor Co.,* 370 Mass. 69, 77, 345 N.E.2d 683 (1976); see e.g. *Hartford Acc. and Indem. Co. v. Millis Roofing and Sheet Metal, Inc.,* 11 Mass. App. Ct. 998, 999, 418 N.E.2d 645 (1981); *Methuen Const. Co., Inc. v. J&A Builders, Inc.,* 4 Mass. App. Ct. 397, 402, 349 N.E.2d 357 (1976); *Baystate Gas Co.* 9 Mass. App. Ct. 744, 747, 404 N.E.2d 683 (1980). And **HN4** where the indemnification claim is founded upon the common law, "indemnification has been available traditionally only to a defendant whose liability was vicarious or formal." *Rathbun* **[*6]** *v. Western Mass. Elec. Co. v. Commonwealth,* 395 Mass. 361, 479 N.E.2d 1383 (1985). See *Economy Engineering Co. v. Commonwealth,* 413 Mass. 791, 794, 604 N.E.2d 694 (1992). Thus, "indemnification has been permitted . . . where the person seeking indemnification did not join in the negligent act of another, *but was exposed to liability because of that negligent act.*" *Rathbun,* 395 Mass. at 364. (Emphasis supplied.)

**HN5** With respect to the contribution claim, the right to contribution is derivative of joint liability, requiring the contributor also to be liable. *Dighton v. Federal Pacific Elec. Co.,* 399 Mass. 687, 506 N.E.2d 509, cert. denied, 108 S. Ct. 345, 484 U.S. 953, 98 L. Ed. 2d 371 (1987); see *Quintin v. Magnant,* 285 Mass. 450, 451-52, 189 N.E. 209 (1934) (right of contribution in common law). Evidence of the contributor's liability is, therefore, an irreducible minimum.

In this case, Samtron has established, through its affidavits and other submissions, that it is not liable, by its acts or through contract, under either an indemnification or a contribution theory of recovery. Samtron did not "develop, manufacture, distribute, sell, design, assemble, test, inspect, **[*7]** handle, market, or label" any of the computer equipment, instructions, owner's manuals or directions involved in the fire. Affidavit of K.S. Han, 45. Samtron also did not agree to assume the debts or liabilities of any other corporation or entity involved with Apple. Affidavit of K.S. Han, 45.

Apple, on the other hand, has not disputed the aforementioned with affidavits or otherwise. Rather, it contends that it requires more time for discovery. Such a contention suggests that speculation may thwart an otherwise meritorious motion for summary judgment. That suggestion is not persuasive. And, because **HN6** a party may not "rest on [its] pleadings and mere assertions of disputed facts" to defeat a timely motion for summary judgment, *LaLonde v. Eissner,* 405 Mass. at 209, Apple's reliance thereon, at bar, will not support its opposition to the instant motion.

In light of the above, third-party defendant Samtron's motion for summary judgment is ALLOWED.

ORDER

Accordingly, the defendant Samtron's motion for summary judgment with respect to Counts IV, VIII and XII are ALLOWED. **[*8]**

Service: **Get by LEXSEE®**
Citation: **1994 Mass. Super. LEXIS 334**
View: Full
Date/Time: Monday, April 18, 2005 - 12:10 PM EDT

* Signal Legend:
 - Warning: Negative treatment is indicated
 - Questioned: Validity questioned by citing refs
 - Caution: Possible negative treatment

Get a Document - by Citation - 1994 Mass. Super. LEXIS 334   Page 5 of 52

Case 1:04-cv-12606-MEL   Document 40-3   Filed 04/18/2005   Page 26 of 52

◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Service: **Get by LEXSEE®**
Citation: **2005 U.S. Dist. LEXIS 2158**

*357 F. Supp. 2d 314; 2005 U.S. Dist. LEXIS 2158, \**

THE COMMONWEALTH OF MASSACHUSETTS, Plaintiff, v. MYLAN LABORATORIES, et al., Defendants.

CIVIL ACTION NO. 03-11865-PBS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

357 F. Supp. 2d 314; 2005 U.S. Dist. LEXIS 2158

February 4, 2005, Decided

**DISPOSITION:** Motion to dismiss was granted in part and denied in part.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff commonwealth, with respect to the allegations of inflated Wholesale Acquisition Costs (WAC) for drugs, asserted causes of action for fraud, unjust enrichment, and violations of state law against defendant pharmaceutical manufacturers. Under the Best Prices Statute, 42 U.S.C.S. § 1396r-8, the commonwealth asserted that the sellers breached their federal rebate agreements. The manufacturers moved to dismiss.

**OVERVIEW:** The commonwealth sued the manufacturers for their alleged role in causing the commonwealth to overpay pharmacies and other providers for generic prescription drugs under the commonwealth's Medicaid program by fraudulently inflating the WAC of covered drugs. The commonwealth also alleged that the manufacturers reported false prices to the federal Secretary of Health and Human Services under the best prices rebate program, depriving the commonwealth of amounts it would have received from the manufacturers. The court held that the term WAC was understood in the trade to mean a true price, and the manufacturers were misrepresenting their true prices to the government. The government reports, together with this opportunity to perform reverse-calculations, raised the issue of when the commonwealth became or should have become aware of the alleged WAC inflation, but finding out the true price of a drug was no easy matter because drug pricing terms were protean. The reasonableness of any reliance is best left to a summary judgment record. However, as there was no implied right of action under the Best Prices Statute, that claim was dismissed.

**OUTCOME:** The manufacturers' motion to dismiss asserting an implied right of action under the best prices statute was allowed. The court denied the remainder of the motion.

**CORE TERMS:** manufacturer, beneficiary, rebate, third-party, wholesaler, pharmacy, pricing, unjust enrichment, providers, enrichment, motion to dismiss, market share, reimbursement, right of action, pharmaceutical, scienter, discounts, duty, cause of action, net price, termination, dispensing, customers, federal government, reasonably relied, false information, intent to create, matter of law, misrepresentation, anti-kickback

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Healthcare Law > Insurance > Medicaid 🔍
Healthcare Law > Insurance > Reimbursement Rates 🔍

TAB  D

*HN1* Under the Medicaid Best Prices Statute, 42 U.S.C.S. § 1396r-8,, a drug manufacturer must enter into a Rebate Agreement with the Secretary of Health and Human Services in order for federal matching funds to be made available for that manufacturer's covered outpatient drugs. 42 U.S.C.S. § 1396r-8(a)(1). The Rebate Agreement provides that the secretary enters the agreement on behalf of the Department of Health and Human Services and all states and the District of Columbia (except to the extent they have in force an Individual State Agreement). Upon entering a Rebate Agreement with the Secretary, the manufacturer must pay a quarterly rebate directly to each participating state based on all of the manufacturer's drugs purchased by that state pursuant to its Medicaid plan during that quarter. More Like This Headnote

Healthcare Law > Insurance > Medicaid
Healthcare Law > Insurance > Reimbursement Rates
*HN2* For single source or innovator multiple source drugs, the rebate due on each unit paid for under the state plan is the difference between the average manufacturer price (AMP) and the manufacturer's best price, defined as the lowest price available from the manufacturer to any private purchaser or governmental entity (with certain exclusions) within the United States, or 15.1 percent of AMP, whichever is greater. 42 U.S.C.S. § 1396r-8(c)(1), (2). For multiple source non-innovator drugs, the rebate is 11 percent of AMP. 42 U.S.C.S. § 1396r-8(c)(3). Each state must agree to cover all of the manufacturer's covered outpatient drugs unless the state complies with one of several statutory provisions allowing it to exclude or restrict coverage. 42 U.S.C.S. §§ 1396a(a)(54), 1396r-8(d). Any rebate amounts received by the state must be offset against the state's Medicaid expenditures that quarter for purposes of calculating the matching federal financial participation. 42 U.S.C.S. § 1396r-8(b)(1)(B). More Like This Headnote

Healthcare Law > Insurance > Medicaid
Healthcare Law > Insurance > Reimbursement Rates
*HN3* "The term average manufacturer price" means, with respect to a covered outpatient drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts. 42 U.S.C.S. § 1396r-8(k)(1). More Like This Headnote

Healthcare Law > Insurance > Medicaid
Healthcare Law > Insurance > Reimbursement Rates
*HN4* States may enter directly into Rebate Agreements with drug manufacturers as authorized by the Secretary of Health and Human Services. 42 U.S.C.S. § 1396r-8 (a)(1). The Secretary has approved supplemental drug Rebate Agreements in at least twenty states. States may also control their Medicaid drug costs and coverage by establishing prior authorization programs, 42 U.S.C.S. § 1396r-8(d)(1)(A), or by creating drug formularies, 42 U.S.C.S. § 1396r-8 (d)(1)(B)(iv). Though not part of the rebate statute, states are also permitted to set payment rates with respect to covered drugs. 42 U.S.C.S. § 1396(a)(30). More Like This Headnote

Healthcare Law > Insurance > Medicaid
Healthcare Law > Insurance > Reimbursement Rates
*HN5* Drug manufacturers are required under the rebate statute and agreement to calculate and report their average manufacturer prices and best prices to the Secretary of Health and Human Services on a quarterly basis. 42 U.S.C.S. § 1396r-8(b)(3)(A)(i). Any information provided by a manufacturer or wholesaler under the rebate statute is confidential and shall not be disclosed by the Secretary or a state

agency except as the Secretary determines to be necessary to carry out this section. 42 U.S.C.S. § 1396r-8(b)(3)(D). States are required to report their total Medicaid drug utilization to each manufacturer and the Secretary sixty days after the end of the rebate quarter. 42 U.S.C.S. § 1396r-8(b)(2)(A). Using the manufacturer pricing data, the Centers for Medicare & Medicaid Services computes the unit rebate amount to which the Medicaid utilization information may be applied by states in invoicing the manufacturer for the rebate payment due. More Like This Headnote

Healthcare Law > Insurance > Medicaid
Healthcare Law > Insurance > Reimbursement Rates
*HN6* The Secretary of Health and Human Services may survey wholesalers and manufacturers to verify reported average manufacturer prices (AMP) and best prices, 42 U.S.C.S. § 1396r-8(b)(3)(B), and may audit manufacturer calculations of AMP and best price. The Secretary may impose civil money penalties on manufacturers that either fail to timely report their pricing information or submit false information to the secretary. 42 U.S.C.S. § 1396r-8(b)(3)(C). Section 1396r-8 (b)(3)(C)(ii) also provides that any civil money penalties imposed under this subsection are in addition to other penalties as may be prescribed by law. The Secretary may terminate the Rebate Agreement for either violations of the Rebate Agreement or for other good cause shown. 42 U.S.C.S. § 1396r-8(b)(4)(B) (i). More Like This Headnote

Healthcare Law > Insurance > Medicaid
Healthcare Law > Insurance > Reimbursement Rates
*HN7* See 42 U.S.C.S. § 1396r-8(b)(4)(B)(i).

Healthcare Law > Insurance > Medicaid
Healthcare Law > Insurance > Reimbursement Rates
*HN8* If there is a termination of the Rebate Agreement, the Secretary of Health and Human Services must notify the states, 42 U.S.C.S. § 1396r-8(b)(4)(B)(iv), and the statute requires the Secretary to delay reinstatement of any terminated contract for one calendar quarter absent good cause. 42 U.S.C.S. § 1396r-8(b)(4)(C). More Like This Headnote

Healthcare Law > Insurance > Medicare
Healthcare Law > Insurance > Reimbursement Rates
*HN9* Rebate Agreements are effective only for one year, and shall be automatically renewed for a period of not less than one year unless terminated under subparagraph (B). 42 U.S.C.S. § 1396r-8(b)(4)(A). More Like This Headnote

Healthcare Law > Insurance > Medicare
Healthcare Law > Insurance > Reimbursement Rates
*HN10* While the Rebate Agreement does not address remedies for breach of contract, it specifies that it shall be construed under federal common law, and states that nothing in it shall be construed as a waiver of any legal right of the Secretary of Health and Human Services or the manufacturer under state or federal law. Specifically, it provides that: The Rebate Agreement shall be construed in accordance with federal common law and ambiguities shall be interpreted in the manner which best effectuates the statutory scheme. More Like This Headnote

Healthcare Law > Insurance > Reimbursement Rates
*HN11* Massachusetts reimburses "providers," meaning doctors who directly administer

drugs and pharmacies, based on formulae set out in Massachusetts regulations, which were developed in accordance with federal requirements. Reimbursement for non-innovator "multiple-source drugs," is the lowest of (a) the Federal Upper Limit payment for the drug, if one is available, plus a dispensing fee; (b) the Massachusetts Upper Limit for the drug, if any, plus a dispensing fee; (c) the Estimated Acquisition Cost of the drug, plus a dispensing fee; or (d) the pharmacy's usual and customary charge for the drug. Mass. Regs. Code tit. 114.3, § 31.04.   More Like This Headnote

Healthcare Law > Insurance > Reimbursement Rates
HN12 ⬇ See Mass. Regs. Code tit. 114.3, § 31.02.

Healthcare Law > Insurance > Reimbursement Rates
HN13 ⬇ See 42 C.F.R. § 447.332(b).

Torts > Business & Employment Torts > Deceit & Fraud
HN14 ⬇ The elements of intentional misrepresentation are well established: in order to recover, a plaintiff must allege and prove that the defendant has made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff has relied upon the representation as true and acted upon it to his or her damage. In Massachusetts, a party who discloses partial information that may be misleading has a duty to reveal all the material facts he or she knows to avoid deceiving the other party.   More Like This Headnote

Torts > Business & Employment Torts > Deceit & Fraud
HN15 ⬇ Although there may be no duty imposed upon one party to a transaction to speak for the information of the other if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading as active misrepresentation, and half-truths may be as actionable as whole lies.   More Like This Headnote

Torts > Business & Employment Torts > Deceit & Fraud
HN16 ⬇ Regarding reliance, it is well established under Massachusetts law that failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation. Only reliance on "preposterous or palpably false" representations vitiates a misrepresentation claim. However, a person who is confronted with inconsistent or contradictory representations may not reasonably rely on one side of the controversy without attempting to resolve the inconsistency or contradiction.   More Like This Headnote

Torts > Business & Employment Torts > Deceit & Fraud
HN17 ⬇ Under Massachusetts law failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation.   More Like This Headnote

Contracts Law > Types of Contracts > Implied-in-Law Contracts
HN18 ⬇ A person who has been unjustly enriched at the expense of another is required to make restitution to the other. A person obtains restitution when he is restored to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its equivalent in money. Unjust enrichment does not require any contractual or fiduciary relationship between the parties. Unjust enrichment does not require that a defendant receive direct payments from a

plaintiff. Under the doctrine of unjust enrichment, a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at the plaintiff's expense would be unconscionable.  More Like This Headnote

Contracts Law > Types of Contracts > Implied-in-Law Contracts 🗒
HN19⬇ To satisfy the elements of unjust enrichment, a plaintiff must show: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) an absence of justification and (5) the absence of a remedy provided by law. Liability in unjust enrichment involves a showing that wealth is in one persons's hands when it should be in another's.  More Like This Headnote

Contracts Law > Types of Contracts > Implied-in-Law Contracts 🗒
HN20⬇ Unjust enrichment is an equitable remedy, and it is a basic doctrine of equity jurisprudence that courts of equity should not act when the moving party has an adequate remedy at law. However, a remedy at law cannot be considered adequate so as to prevent equitable relief, unless it covers the entire case made by the bill in equity. A suit in equity will lie where the remedy at law is not clear or as adequate and complete as that which equity can afford.  More Like This Headnote

Governments > Legislation > Interpretation 🗒
HN21⬇ Like substantive federal law itself, private causes of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative.  More Like This Headnote

Governments > Legislation > Interpretation 🗒
HN22⬇ The express provision of one method of enforcing a substantive rule suggests that Congress has intended to preclude others. Sometimes the suggestion is so strong that it precludes a finding of Congressional intent to create a private right of action, even though other aspects of the statute (such as language making the would be plaintiff a member of the class for whose benefit the statute was enacted) suggest the contrary.  More Like This Headnote

Governments > Legislation > Interpretation 🗒
Healthcare Law > Insurance > Medicaid 🗒
Healthcare Law > Insurance > Reimbursement Rates 🗒
HN23⬇ Because 42 U.S.C.S. § 1396r-8, unambiguously gives the Secretary of Health and Human Services the power to terminate the Rebate Agreement, renew it and impose federal penalties for false or untimely filings, the states do not have a remedy under the statute.  More Like This Headnote

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement 🗒
HN24⬇ A court applying federal common law may look to the Restatement of Contracts for guidance regarding when a third-party beneficiary may sue.  More Like This Headnote

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement 🗒
HN25⬇ Only intended beneficiaries, not incidental beneficiaries, can enforce a contract. The crux in third-party beneficiary analysis is the intent of the parties. The law requires "special clarity" to support a finding that the contracting parties intended to confer a benefit on a third party. The intended party need not be specifically or individually identified in the contract, but must fall within a class clearly intended

by the parties to benefit from the contract.  More Like This Headnote

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement 📄
Governments > Legislation > Interpretation 📄
HN26⬇ Although whether the plaintiff has a private right of action under a statute is
conceptually distinct from whether the plaintiff may sue as a third-party
beneficiary of the contract mandated by the statute, the same considerations
largely determine both issues.  More Like This Headnote

Contracts Law > Contract Interpretation > Interpretation Generally 📄
Governments > Legislation > Interpretation 📄
Public Contracts Law > Contract Interpretation > Interpretation Generally 📄
HN27⬇ When the United States enters into contract relations, its rights and duties therein
are governed generally by the law applicable to contracts between private
individuals, and when Congress uses statutory language with a settled meaning at
common law, Congress presumably knows and adopts the cluster of ideas that
were attached to each borrowed word in the body of learning from which it is
taken and the meaning its use will convey to the judicial mind unless otherwise
instructed. In such case, absence of contrary direction may be taken as
satisfaction with widely accepted definitions, not as a departure from
them.  More Like This Headnote

Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement 📄
Public Contracts Law > Dispute Resolution
HN28⬇ A beneficiary to a federal contract has the right to enforce an agreement imposing
duties on a person contracting with the government so long as this is consistent
with the statutory scheme, and not an end-run on it.  More Like This Headnote

Antitrust & Trade Law > Exemptions & Immunities > Filed Rate Doctrine 📄
HN29⬇ The Filed Rate doctrine, which limits attacks outside the regulatory process on
rates filed with federal regulatory agencies, forbids a regulated entity to charge
rates for its services other than those properly filed with the appropriate federal
regulatory authority. The considerations underlying the doctrine are preservation
of the agency's primary jurisdiction over reasonableness of rates and the need to
ensure that regulated companies charge only those rates of which the agency has
been made cognizant.  More Like This Headnote

**COUNSEL: [*1]** For Ethex Corporation, Defendant: Justin S. Antonipillai, Arnold & Porter,
Washington, DC; Scott A. Birnbaum, Birnbaum & Godkin, LLP, Boston, MA; Drew A. Harker,
Robert S. Litt, Arnold & Porter, Washington, DC.

For Mylan Laboratories, Inc., Defendant: Jonathan D Cohen, Michael R. Costa, Evan
Georgopoulos, Gary R. Greenberg, A. John Pappalardo, Louis J. Scerra, Jr., Greenberg
Traurig, LLP, Boston, MA.

For Dey, Inc., Defendant: Jenny K. Cooper, Martin F. Murphy, Bingham McCutchen LLP,
Boston, MA; Christopher C. Palermo, Philip D. Robben, Kelley Drye & Warren LLP, New York,
NY.

For Par Pharmaceuticals, Inc., Defendant: Richard M. Cooper, Paul K Dueffert, Williams &
Connolly LLP, Washington, DC; Stephen R. Delinsky, Andrew R. McConville, Anthony M.
Moccia, Eckert Seamans Cherin & Mellott, LLC, Boston, MA.

For Roxane laboratories, Inc., Defendant: Paul J. Coval, Darrell A.H. Miller, Douglas L. Rogers, Vorys, Sater, Seymour and Pease, LLP, Columbus, OH; John W. Steinmetz, Robinson & Cole, Boston, MA.

For Purepac Pharmaceutical, Co., Defendant: John R. Fleder, Alan M. Kirschenbaum, Hyman, Phelps & McNamara, P.C., Washington, DC.

For The Commonwealth of Massachusetts, **[*2]** Plaintiff: Richard C. Heidlage, Attorney General's Office, Commonwealth of Massachusetts, Boston, MA; Nicholas J Messuri, Attorney General's Office, Boston, MA. Robert P Patten, Attorney General's Office, Boston, MA.

For Teva Pharmaceuticals USA, Inc., Defendant: James W. Matthews, Robert J. Muldoon, Jr., Pamela A. Zorn, Sherin and Lodgen LLP, Boston, MA; T. Reed Stephens, Sonnenschein Nath & Rosenthal LLP, Washington, DC.

For Warrick Pharmaceuticals Corporation, Defendant: Kirsten V. Mayer, John T. Montgomery, Brien T. O'Connor, John R. Therien, Ropes & Gray LLP, Boston, MA.

For Purepac Pharmaceutical, Co., Schein Pharmaceutical, Inc., Watson Pharmaceuticals, Inc., Defendants: Robert M. Thomas, Jr., Thomas & Associates, Boston, MA.

For Purepac Pharmaceutical, Co., Watson Pharmaceuticals, Inc., Defendants: Mary Kate Whalen, Hyman, Phelps & McNamara, P.C., Washington, DC.

**JUDGES:** PATTI B. SARIS, United States District Judge.

**OPINIONBY:** PATTI B. SARIS

**OPINION: MEMORANDUM AND ORDER**

Saris, U.S.D.J.

## I. INTRODUCTION

The Commonwealth of Massachusetts brings this case against thirteen Defendant pharmaceutical manufacturers for their alleged role in causing Massachusetts **[*3]** to overpay pharmacies and other providers for generic prescription drugs under the Commonwealth's Medicaid Program by fraudulently inflating the "Wholesale Acquisition Cost" ("WAC") of covered drugs. n1 Massachusetts also alleges that Defendants reported false prices to the federal Secretary of Health and Human Services ("HHS") under the Best Prices rebate program, depriving Massachusetts of amounts it would have received from the Defendants. With respect to the allegations of inflated WACs, Massachusetts asserts causes of action for fraud (Count I), unjust enrichment (Count II), violations of the Massachusetts Medicaid False Claims Act, Mass. Gen. L. Ann. ch. 118E, §§ 40 and 41 (Count III), and violation of the Massachusetts False Claims Act, Mass. Gen. L. Ann. ch. 12, § 5A et seq. (Count IV). With respect to the claim involving Best Prices, Massachusetts asserts Defendants breached their federal Rebate Agreements with HHS (Count V), breached the implied covenant of good faith and fair dealing (Count VI), and violated the Rebate Statute, 42 U.S.C. § 1396r-8 (Count VII). n2 Defendants have moved to dismiss all counts of the Complaint.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Massachusetts names the following Defendants: Mylan Laboratories, Inc.; Barr Laboratories, Inc.; Duramed Pharmaceuticals, Inc.; Ivax Corporation; Warrick

Pharmaceuticals Corporation; Watson Pharmaceuticals, Inc.; Schein Pharmaceutical, Inc.; Teva Pharmaceuticals USA, Inc.; Par Pharmaceutical, Inc.; Dey, Inc.; Ethex Corporation; Purepac Pharmaceutical Co.; and Roxane Laboratories, Inc. **[*4]**

n2 The parties submitted to the Court a "model rebate agreement" issued by HHS, and do not discuss any differences relevant to this decision between the model and the actual agreements. The Court's discussion, therefore, is based on this model, termed the "Rebate Agreement."

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

After hearing and review of the briefs, the motion to dismiss Count VII is **ALLOWED** because the Court finds that there is no implied cause of action for the states under the Best Prices Statute. Otherwise, the motion to dismiss is **DENIED.**

## II. BACKGROUND

The following facts are drawn from the Complaint n3 and accepted as true for purposes of this motion to dismiss. Defendants dispute many of the facts. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 The Complaint alleges patterns of pricing fraud involving average wholesale price substantially similar to those at issue in complaints filed in a separate multi-district litigation before this Court. See, e.g., In re Pharm. Indus. Average Wholesale Price Litig., 263 F. Supp. 2d 172 (D. Mass. May 13, 2003) (Saris, J.) ("Pharm. I"); In re Pharm. Indus. Average Wholesale Price Litig., 309 F. Supp. 2d 165 (D. Mass. Jan. 9, 2004) (Saris, J.) ("Pharm. II"); In re Pharm. Indus. Average Wholesale Price Litig., 307 F. Supp. 2d 190 (D. Mass. Jan. 9, 2004) (Saris, J.) ("Pharm. III"); In re Pharm. Indus. Average Wholesale Price Litig., 307 F. Supp. 2d 196 (D. Mass. Feb. 24, 2004) (Saris, J.) ("Pharm. IV"); In re Pharm. Indus. Average Wholesale Price Litig., 321 F. Supp. 2d 187 (D. Mass. June 10, 2004) (Saris, J.) ("Pharm. V"); In re Pharm. Indus. Average Wholesale Price Litig., 339 F. Supp. 2d 165 (D. Mass. Sept. 30, 2004) (Saris, J.) ("Pharm. VI"). Summaries of the factual background are found in Pharm. I, 263 F. Supp. 2d at 178-80 (describing alleged Average Wholesale Price ("AWP") scheme), and Pharm. V, 307 F. Supp. 2d at 196-97 (describing alleged Best Prices scheme). **[*5]**

n4 Many of the background facts about the statute and regulatory program are cloned from the Brief of Amicus Curiae United States, In Re Pharm. Indus. Average Wholesale Price Litigation, 263 F. Supp.2d 172 (D. Mass. 2003), related litigation.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## A. The Federal Medicaid Program

The Medicaid program, established by Title XIX of the Social Security Act, is a uniquely cooperative federal-state program that provides medical assistance to certain low income individuals. See 42 U.S.C. §§ 1396 -- 1396v.

Congress passed the Medicaid Best Prices Statute, 42 U.S.C. § 1396r-8, as part of the Omnibus Budget Reconciliation Act of 1990. [HN1] Under that statute, a drug manufacturer must enter into a Rebate Agreement with the Secretary in order for federal matching funds to be made available for that manufacturer's covered outpatient drugs. 42 U.S.C. § 1396r-8 (a)(1). The Rebate Agreement provides that the Secretary enters the agreement "on behalf of the Department of Health and Human Services and all States **[*6]** and the District of Columbia (except to the extent they have in force an Individual State Agreement)." (Rebate Agreement at Preamble.) Upon entering a Rebate Agreement with the Secretary, the manufacturer must pay a quarterly rebate directly to each participating state based on all of the manufacturer's drugs purchased by that state pursuant to its Medicaid plan during that quarter.

[HN2] For single source or innovator multiple source drugs, the rebate due on each unit paid for under the state plan is the difference between the average manufacturer price ("AMP") n5 and the manufacturer's best price, defined as the lowest price available from the manufacturer to any private purchaser or governmental entity (with certain exclusions) within the United States, or 15.1% of AMP, whichever is greater. 42 U.S.C. § 1396r-8(c)(1), (2). For multiple source non-innovator drugs, the rebate is 11% of AMP. 42 U.S.C. § 1396r-8 (c)(3). Each state must agree to cover all of the manufacturer's covered outpatient drugs unless the state complies with one of several statutory provisions allowing it to exclude or restrict coverage. 42 U.S.C. §§ 1396a(a)(54), **[*7]** 1396r-8 (d). Any rebate amounts received by the state must be offset against the state's Medicaid expenditures that quarter for purposes of calculating the matching federal financial participation. 42 U.S.C. § 1396r-8 (b)(1)(B).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n5 [HN3] "The term average manufacturer price' means, with respect to a covered outpatient drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts." 42 U.S.C. § 1396r-8(k)(1).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[HN4] States may enter directly into Rebate Agreements with drug manufacturers as authorized by the Secretary. 42 U.S.C. § 1396r-8(a)(1). To date, the Secretary has approved supplemental drug Rebate Agreements in at least twenty states. States may also control their Medicaid drug costs and coverage by establishing prior authorization programs, **[*8]** 42 U.S.C. § 1396r-8(d)(1)(A), or by creating drug formularies, 42 U.S.C. § 1396r-8(d)(1)(B) (iv). Though not part of the rebate statute, states are also permitted to set payment rates with respect to covered drugs. See 42 U.S.C. § 1396a(a)(30); 42 C.F.R. 447.331-447.333.

[HN5] Drug manufacturers are required under the rebate statute and agreement to calculate and report their AMPs and best prices to the Secretary on a quarterly basis. 42 U.S.C. § 1396r-8(b)(3)(A)(i); Rebate Agreement at § II (e). Any information provided by a manufacturer or wholesaler under the rebate statute is confidential and "shall not be disclosed by the Secretary . . . or a State agency . . . except as the Secretary determines to be necessary to carry out this section." 42 U.S.C. § 1396r-8(b)(3)(D); Rebate Agreement at § VII. States are required to report their total Medicaid drug utilization to each manufacturer and the Secretary sixty days after the end of the rebate quarter. n6 42 U.S.C. § 1396r-8(b) (2)(A). Using the manufacturer pricing **[*9]** data, the Centers for Medicare & Medicaid Services ("CMS") computes the unit rebate amount ("URA") "to which the Medicaid utilization information may be applied by States in invoicing the Manufacturer for the rebate payment

due." Rebate Agreement at § I (dd).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 The Rebate Agreement provides a dispute resolution mechanism in the event there is a disagreement between a state and a manufacturer regarding the state's Medicaid utilization information. Rebate Agreement at § V.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

*HN6*The Secretary may survey wholesalers and manufacturers to verify reported AMPs and best prices, 42 U.S.C. § 1396r-8(b)(3)(B), and may audit manufacturer calculations of AMP and best price, Rebate Agreement at § III (c). The Secretary may impose civil money penalties on manufacturers that either fail to timely report their pricing information or submit false information to the Secretary. 42 U.S.C. § 1396r-8(b)(3)(C); Rebate Agreement at §§ III, IV. Section 1396r-8(b)(3)(C)(ii) **[*10]** also provides that any civil money penalties imposed under this subsection are "in addition to other penalties as may be prescribed by law." The Secretary may terminate the Rebate Agreement for either violations of the Rebate Agreement or for other good cause shown. 42 U.S.C. § 1396r-8(b)(4)(B)(i). *HN7*The statute further provides:

> Such termination shall not be effective earlier than 60 days after the date of notice of such termination. The Secretary shall provide, upon request, a manufacturer with a hearing concerning such a termination, but such hearing shall not delay the effective date of the termination.

Id. *HN8*If there is a termination, the Secretary must notify the states, § 1396r-8(b)(4)(B)(iv), and the Statute requires the Secretary to delay reinstatement of any terminated contract for one calendar quarter absent good cause. 42 U.S.C. § 1396r-8(b)(4)(C).

*HN9*Rebate Agreements are effective only for one year, and "shall be automatically renewed for a period of not less than one year unless terminated under subparagraph (B)." 42 U.S.C. § 1396r-8(b)(4)(A).

*HN10*While the Rebate **[*11]** Agreement does not address remedies for breach of contract, it specifies that it shall be construed under federal common law, and states that nothing in it shall be construed as a waiver of any legal right of the Secretary or the manufacturer under state or federal law. Specifically, it provides that: "The Rebate Agreement shall be construed in accordance with federal common law and ambiguities shall be interpreted in the manner which best effectuates the statutory scheme." Id. at IX (e).

## B. The Massachusetts Medicaid Program

The Massachusetts Medicaid program provides health benefits, including prescription drugs, to low-income residents. The Massachusetts Medicaid program spends approximately $ 1.2 billion annually on pharmaceutical products.

*HN11*Massachusetts reimburses "providers," meaning doctors who directly administer drugs and pharmacies, based on formulae set out in Massachusetts regulations, which were developed in accordance with federal requirements. Reimbursement for non-innovator "multiple-source drugs," which are the generic drugs primarily involved here, is the lowest of

(a) the Federal Upper Limit payment ("FUL") for the drug, if one is available, plus **[*12]** a dispensing fee; (b) the Massachusetts Upper Limit ("MUL") for the drug, if any, plus a dispensing fee; (c) the Estimated Acquisition Cost ("EAC") of the drug, plus a dispensing fee; or (d) the pharmacy's usual and customary charge for the drug. Mass. Regs. Code tit. 114.3, § 31.04. n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n7 Reimbursement for single-source pharmaceutical products, which are typically brand-name drugs or drugs specifically requested by a doctor, is limited to the lower of (a) the EAC of the drug plus a dispensing fee, or (b) the pharmacy's usual and customary charge. (Compl. P 28; Mass. Regs. Code tit. 114.3, § 31.04.)


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

*HN12* Massachusetts regulations define the EAC as "an estimate of the price generally and currently paid by eligible pharmacy providers for the most frequently purchased package size of a drug." Mass. Regs. Code tit. 114.3, § 31.02. See also Mass. Regs. Code tit. 130, § 406.402. Prior to August 3, 2002, EAC was defined to be the drug's WAC plus 10%. Mass. Regs. Code tit. 114.3, § 31.02. Effective August 3, 2002, EAC **[*13]** is defined as WAC plus 5%. Id.

*HN13* The FULs are established by CMS and are defined as "a reasonable dispensing fee established by the agency plus an amount established by the [CMS] that is equal to 150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacists." 42 C.F.R. § 447.332 (b).

Defendants supply pricing information in the form of WACs and AWPs to third party publishers, such as First Data Bank, which publish lists organized by drug. The published WACs do not reflect actual average prices paid by wholesalers or providers for drugs. Instead, the WACS reported by defendants are materially inflated, leading Massachusetts to pay excessive amounts to pharmacy providers. The difference between the reported prices and the actual average price is called the "spread" by Massachusetts. The complaint asserts: "The purpose of each defendant in creating the spread was to provide incentives or kickbacks for customers who buy and distribute its products, to increase the profits for such customers at the expense of the state Medicaid programs, and to increase its own profits by increasing its **[*14]** market share for particular drugs and classes of drugs." Throughout the period at issue, Defendants affirmatively endeavored to conceal the actual prices they charged to customers by using undisclosed discounts, rebates, and other inducements that had the effect of lowering the actual prices charged to pharmacies.

As an alternative theory, Massachusetts alleges that the AMPs reported by the manufacturers who participated in the Best Prices rebate program were materially understated, depriving Massachusetts of funds to which it was entitled. The AMPs are materially lower than the reported WACs and AWPs. Massachusetts points out that it cannot be true that both the WACs and the AMPs were accurate reports of true prices to wholesalers, although it is possible that one of the sets was accurate.

### III. DISCUSSION

### A. Common Law Fraud (Count I)

Defendants have moved to dismiss the common law fraud count, claiming that (1) Defendants never asserted that WAC was a net price; (2) Massachusetts knew or should

have known that WAC was not a net price; and (3) in certain cases the injury is not traceable to Defendants' conduct because Massachusetts reimbursed at rates above **[*15]** the applicable FULs.

*HN14*⚓"The elements of [intentional] misrepresentation are well established: in order to recover, plaintiff must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his [or her] damage.'" Damon v. Sun Co., Inc., 87 F.3d 1467, 1471-72 (1st Cir. 1996) (quoting Barrett Assocs., Inc. v. Aronson, 346 Mass. 150, 190 N.E.2d 867, 868 (Mass. 1963)). "In Massachusetts . . . a party who discloses partial information that may be misleading has a duty to reveal all the material facts he [or she] knows to avoid deceiving the other party." Id. at 1478 (quoting Nei v. Burley, 388 Mass. 307, 446 N.E.2d 674, 676 (Mass. 1983)).

      *HN15*⚓Although there may be "no duty imposed upon one party to a transaction to speak for the information of the other . . . if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all material facts bearing upon the point that lie within **[*16]** his knowledge. Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies."

Kannavos v. Annino, 356 Mass. 42, 247 N.E.2d 708, 711-12 (Mass. 1969) (quoting Fowler V. Harper et al., The Law of Torts, § 7.14 (date unavailable)).

*HN16*⚓Regarding reliance,

      it is well established under Massachusetts law that failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation.' . . . Only reliance on "preposterous or palpably false" representations vitiates a misrepresentation claim.'

Damon, 87 F.3d at 1480 (citations omitted). However, "a person who is confronted with inconsistent or contradictory representations may not reasonably rely on one side of the controversy without attempting to resolve the inconsistency or contradiction." Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp.2d 236, 242-43 (D. Mass. 1999) (holding that as a matter of law plaintiff could not have reasonably relied on defendants' statements that smoking was not harmful) (citing Trifiro v. N.Y. Life Ins. Co., 845 F.2d 30, 33 (1st Cir. 1988)). **[*17]**

The Complaint alleges that Defendants provide WACs through pricing publication services, and that "defendant manufacturers intend the WAC to be understood by the state Medicaid agencies as the average price paid by a wholesaler to a manufacturer for a given product." (P 30.) The Complaint alleges that the manufacturers knew that the states were relying on the WACs to determine the estimated acquisition cost of the drugs, knew that the states had no other sources of information, and affirmatively concealed the actual prices charged. (PP 28,

32-33.)

Defendants strenuously argue that they never affirmatively represented WAC to be a net price, and that nothing in the pricing information published by First DataBank has ever stated that WAC is a net price. Massachusetts has submitted documentation (at the request of the Court) to support its allegation that WAC was represented by the publishers that allegedly act on behalf of manufacturers to reflect actual prices paid by wholesalers -- that is, true wholesale prices net of discounts, and that WAC was commonly understood in the industry to reflect actual prices paid by wholesalers, at least until the 2001 and 2002 reports of the Office **[*18]** of the Inspector General. For example, in the 1994-1995 First DataBank Blue Book, the source for most states' pricing information, the term Wholesale Net Price or Wholesale Acquisition Cost (WAC) is defined as price to wholesaler or distributor. In the Spring 1994 copy of the publication "Health Care Financing Review," published by HHS, a table of definitions defines WAC as the "wholesaler's net payment made to purchase a drug product from the manufacturer, net of purchasing allowances and discounts." E. Kathleen Adams, Ph.D et al., State Medicaid Pharmacy Payments and Their Relation to Estimated Costs, 15 Health Care Fin. R. 25, 26 (Spring 1994). Massachusetts also submitted a portion of the 1996 version of Medi-Span's Master Drug Database Documentation Manual, which states:

> The WAC is the estimated cost to the wholesaler by the drug manufacturer. . . .
> Actual values can vary from these estimated values as wholesalers experience discounts through volume purchases or special deals causing variance from their standard costs.

When all reasonable inferences are drawn in favor of the non-moving party during the relevant period, the term WAC was understood in the trade **[*19]** to mean a true price, and Defendants were misrepresenting their true prices to the government.

Defendants next argue that Massachusetts knew *or* should have known that WAC was not a net price, and so Massachusetts could not have reasonably relied on it as a true price. Defendants point out that Massachusetts could have used the URA data from the Best Prices program to calculate the AMP of a drug, generally by dividing the URA by .11, thus learning that WACs exceeded reported AMPs. Defendants point to several national and state reports discussing whether WAC is an appropriate basis for reimbursement, and to a 2002 report from the Massachusetts Division of Health Care Finance and Policy ("DHCFP") discussing WAC inflation, as evidence that Massachusetts was on notice that WAC was not an accurate price. Defendants also note that Massachusetts still reimburses based on WAC. The Complaint alleges:

> At all times relevant to this action, neither DMA [the Massachusetts Division of Medical Assistance] nor knew the actual prices each of the defendants charged its customers for its products. Rather, DMA obtained pricing information from FDB [First Data Bank], and DMA and DHCFP reasonably **[*20]** relied on this information in determining the Medicaid reimbursement levels for the products of each of the defendant manufacturers.

(P 34.) The ability to make a mathematical calculation based on URAs does not necessarily demonstrate as a matter of law that Massachusetts could not have reasonably relied on the reported WACs, for **HN17**"under Massachusetts law . . . failure to investigate the veracity of

statements does not, as a matter of law, bar recovery for misrepresentation.'" Damon, 87 F.3d at 1480. The government reports, together with this opportunity to perform reverse-calculations, raise the issue of when Massachusetts became or should have become aware of the alleged WAC inflation, but finding out the true price of a drug is no easy matter because drug pricing terms are protean. The First Circuit pointed out that Massachusetts attempted to obtain accurate pricing data following the 2002 report, but pharmacies refused to provide any data, leaving Massachusetts to attempt to tinker with the WAC-based system. Long Term Care Pharm. Alliance v. Ferguson, 362 F.3d 50, 52, 59 (1st Cir. 2004). The reasonableness of any reliance is best left to **[*21]** a summary judgment record.

Finally, Defendants argue that for those instances in which Massachusetts reimbursed above the FUL, Massachusetts cannot prove that the WACs affected the reimbursement. Massachusetts argues that these instances are isolated administrative errors. n8 Massachusetts argues that if the error consisted solely of a failure to take into account FULs, but a true WAC would have been lower than whatever basis was used, then the correct FUL would limit damages but would not absolve Defendants of liability. This is a complicated factual issue the resolution of which will have to await the more detailed record available at summary judgment.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n8 Massachusetts filed an amended exhibit list claiming to correct certain of these errors.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -


## B. Unjust Enrichment (Count II)

Massachusetts brings the unjust enrichment claim to recover Defendants' "increased sales and market share" that were "a result of the Commonwealth's excessive payments to its Medicaid pharmacy providers." (Compl. at P 60.) **[*22]** Defendants move to dismiss Massachusetts's unjust enrichment count, arguing that Massachusetts has an adequate remedy at law against providers, that there is no direct benefit to the Defendants, that there is no proof that the spread led to increased market share, and that it is impossible to have an increased market share in the multiple-source arena.

*HN18* "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." Nat'l Shawmut Bank of Boston v. Fidelity Mut. Life Ins. Co., 318 Mass. 142, 61 N.E.2d 18, 20 (Mass. 1945) (quoting Restatement (First) of Restitution § 1 (1951)). "A person obtains restitution when he is restored to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its equivalent in money." Restatement § 1 comment (a). Unjust enrichment "does not require any contractual or fiduciary relationship between the parties." Greenwald v. Chase Manhattan Mortgage Corp., 241 F.3d 76, 78 n.1 (1st Cir. 2001). Unjust enrichment does not require that a defendant receive direct payments from a plaintiff. Id. at 81. "Under the doctrine of **[*23]** unjust enrichment, a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable." See In re Lupron(R) Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148, 182 (D. Mass. 2003) (Stearns, J.) (citing other cases).

*HN19* To satisfy the elements of unjust enrichment, a plaintiff must show: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) an absence of justification and (5) the absence of a remedy provided by

law. Id. Liability in unjust enrichment involves a showing that wealth is "in one persons's hands when it should be in another's." Id. (citing Guyana Tel. & Tel. Co. v. Melbourne Int'l, 329 F.3d 1241, 1245 n.3 (11th Cir. 2003)).

HN20 Unjust enrichment is an equitable remedy, and "it is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law." Mort v. United States, 86 F.3d 890, 892 (9th Cir. 1996) (quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381, 119 L. Ed. 2d 157, 112 S. Ct. 2031 (1992)). However, "[a] remedy at law [*24] cannot be considered adequate so as to prevent equitable relief, unless it covers the entire case made by the bill in equity." Hillsborough Tp., Somerset County, N.J. v. Cromwell, 326 U.S. 620, 629, 90 L. Ed. 358, 66 S. Ct. 445 (1946) (citation omitted). "[A] suit in equity will lie where the remedy at law is not clear or as adequate and complete as that which equity can afford." G.E. Co. v. Callahan, 294 F.2d 60, 64 (1st Cir. 1961).

Courts have been flexible regarding when in the trial they require the plaintiff to choose its avenue of recovery. See In re Lupron(R), 295 F. Supp. 2d at 182 n.39 (dismissing unjust enrichment claim where plaintiffs had adequate RICO remedy, but noting that it was open to plaintiffs to elect to proceed under unjust enrichment theory); Sentinel Prods. Corp. v. Mobile Chem. Co., 2001 WL 92272, at *22 n.15 (D. Mass. Jan. 17, 2001) (allowing plaintiff to choose avenue of recovery at the trial stage).

Defendants argue that Massachusetts has an adequate remedy at law to recover overpayments. Plaintiff responds that any remedies at law against providers would leave Defendants in possession of the fruits of their alleged [*25] fraud in the form of profits from increased sales and market share. The Restatement of Restitution sets forth some circumstances in which a plaintiff has been permitted to recover the enrichment of another in excess of his impoverishment under the doctrine of unjust enrichment. See Restatement of Restitution, § 1 at comment e. n9 However, Plaintiff cites no caselaw directly supporting its broad claim to Defendants' profits and their market share.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 Comment e provides, in part:

> In other situations, a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust. In such cases, the defendant may be under a duty to give to the plaintiff the amount by which he has been enriched.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Defendants argue that under the Commonwealth's reimbursement procedures, it is impossible for manufacturers of non-innovator multiple source drugs to increase sales or market shares by inflating [*26] their WACs because all competing, generally equivalent drugs are reimbursed at the same rate. Plaintiff disagrees, stating that the reimbursement rates for generically equivalent drugs vary based on the manufacturer's reported prices. The Court need not resolve these issues at this stage of the proceeding, since Massachusetts may have to elect only one theory of recovery eventually, and will not force Plaintiff to choose its remedy at this stage of the litigation.

## C. Massachusetts Statutes

Defendants also seek to dismiss the claims under the Massachusetts False Claims Act, Mass. Gen. L. Ann. ch. 12, § 5B (West 2004) and the Massachusetts Medicaid False Claims Act, Mass. Gen. L. Ann. ch. 118E, §§ 40 and 41 (2004) (Counts III and IV). Because the grounds are essentially the same as those argued in support of dismissing the fraud claim, the Court denies the motion.

In their reply brief, Defendants argue that the anti-kickback provision, Mass. Gen. Laws Ann. ch. 118E, § 41, is preempted. According to Defendants, the lack of a scienter requirement means that certain behavior legal under the federal statute would be illegal under the Massachusetts statute, leading to inevitable **[*27]** conflict. In support, Defendants cite State v. Harden, 873 So. 2d 352, 355 (Fla. Dist. Ct. App. 2004) (holding Florida anti-kickback statute, which punished negligent conduct, preempted by federal anti-kickback statute, which requires "knowing and willful" conduct, both because of difference in scienter and because of lack of safe harbor provisions in Florida statute).

Plaintiff points out that while the Massachusetts statute does not contain an explicit "knowing and willful" requirement, the First Circuit has held that the requirement that an amount be paid "to induce" another, found in the analogous federal statute, "imposes a second and stronger scienter requirement [than the knowing and willful requirement]." United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 33 (1st Cir. 1989). The case is evolving on the scienter requirement. Commonwealth v. Kobrin, No. 9873CR438A-N, slip op. at 4 (Mass. Sup. Ct. June 29, 2001) (noting that "language similar to that in G.L. c. 118E, § 41, in the federal Medicaid and Medicare Anti-Kickback statutes has been held to contain an intent element" and holding statute not unconstitutional **[*28]** for lack of a specific statement of scienter). But see Boman v. Southeast Med. Servs. Group, 1998 Mass. Super. LEXIS 328, 1998 WL 1182063, at *10 (Mass. Sup. Ct. Jan. 7, 1998) ("The primary difference between the federal anti-kickback statute and the state provisions is that the Massachusetts statutes do not require the action or practice to be knowing and willful.").

In light of the fact that this argument was raised late in the briefing, and the interpretation of the law is evolving, the Court will defer ruling.

## D. Implied Cause of Action under 42 U.S.C. § 1396r-8 (Count VII)

Massachusetts claims a right to a private cause of action under 42 U.S.C. § 1396r-8, and argues that Defendants' reporting of false information was in violation of this statute. The Supreme Court set forth the standards for implying a cause of action in Alexander v. Sandoval, 532 U.S. 275, 149 L. Ed. 2d 517, 121 S. Ct. 1511 (2001). It held:

> *HN21*☞Like substantive federal law itself, private causes of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create **[*29]** not just a private right but also a private remedy. Statutory intent on this latter point is determinative.

Id. at 286-87 (citations omitted). The Court addressed a similar argument in Pharm. VI, 339 F. Supp. 2d at 177, rejecting the County of Suffolk's claims that it possessed a right of action

because "while Suffolk arguably falls within a class of entities for whose benefit the Best Prices Statute was enacted, as a governmental entity obliged to pay for prescription drugs, Suffolk does not point to any provisions demonstrating a Congressional intent to create a remedy." Id.

Massachusetts differs from Suffolk in that it is clearly within the class of entities for whose benefit the Best Prices Statute was enacted. However, it too fails to point to any provisions demonstrating a Congressional intent to create a private remedy for the state which would allow the state to obtain penalties for the provision of false information or to require the Secretary to terminate the Rebate Agreement. As the Supreme Court stated in Sandoval,

> HN22✦the express provision of one method of enforcing a substantive rule suggests that Congress intended [*30] to preclude others. Sometimes the suggestion is so strong that it precludes a finding of Congressional intent to create a private right of action, even though other aspects of the statute (such as language making the would be plaintiff a member of the class for whose benefit the statute was enacted) suggest the contrary.

532 U.S. at 290. Here, HN23✦ because the statute unambiguously gives the Secretary the power to terminate the Rebate Agreement, renew it and impose federal penalties for false or untimely filings, I conclude that the states do not have a remedy under the statute. This is not the end of the analysis, however, because the statute also requires the Secretary to enter into the Rebate Agreement on behalf of the state and is silent on the scope of the available contractual remedies. This will be discussed in the next section.

Accordingly, the Court dismisses Count VII.

## F. Third-Party Beneficiary of the Rebate Agreements (Count V)

Massachusetts brings a claim as a third-party beneficiary of the Best Prices Rebate Agreements, which are signed by the manufacturers and the Secretary of Health and Human Services. HN24✦A court applying federal common [*31] law may look to the Restatement of Contracts for guidance regarding when a third-party beneficiary may sue. Almond v. Capital Props., Inc., 212 F.3d 20, 24 (1st Cir. 2000); Davis v. United Airlines, Inc., 575 F. Supp. 677, 679-680 (E.D.N.Y. 1983). The Restatement (Second) of Contracts § 302 provides:

> Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to perform in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the benefit of the promised performance. An incidental beneficiary is a beneficiary who is not an intended beneficiary.

HN25✦"Only intended beneficiaries, not incidental beneficiaries, can enforce a contract."

Harvard Law Sch. Coalition for Civil Rights v. President & Fellows of Harvard Coll., 413 Mass. 66, 595 N.E.2d 316, 319 (Mass. 1992) (applying Massachusetts law). The crux in third-party beneficiary analysis is the intent of the **[*32]** parties. In re Pharm. Indus. Average Wholesale Price Litig., 339 F. Supp. 2d 165, 178 (D. Mass. 2004) (quoting McCarthy v. Azure, 22 F.3d 351, 356 (1st Cir. 1994). The law requires "special clarity" to support a finding that the contracting parties intended to confer a benefit on a third party. Id. The intended party need not be specifically or individually identified in the contract, but must fall within a class clearly intended by the parties to benefit from the contract. McCarthy, 22 F.3d at 362.

The Court addressed a similar claim in Pharm. VI, 339 F. Supp. 2d at 177-79, and found that Suffolk was not a third-party beneficiary because "there is no clear indication' that counties (as opposed to states) were in the class of intended beneficiaries from the vantage point of either the pharmaceutical manufacturers or the federal government or in the text of the [Rebate Agreements]." Id. at 179.

By contrast, the Rebate Agreement begins with the statement: "The Secretary, on behalf of the Department of Health and Human Services and all States and the District of Columbia." (emphasis added). **[*33]** It goes on to provide that participating manufacturers must pay rebates directly to the states based on the states' payments for the manufacturers' drugs. As noted in Pharm. VI, the primary benefit of the Rebate Agreements inures to the states, which also bear some responsibilities. 339 F. Supp. 2d at 178. These indications show a clear intent on the part of the signatories to confer a special benefit on a discrete class that includes Massachusetts. Id.

Defendants' primary argument is that where the court has already found that there is no implied right of action under the statute establishing a government contract, a plaintiff may not seek third-party beneficiary status, as this would be an end-run around the holding that there was no Congressional intent to confer a private cause of action. The key case on point is



Not Reported in N.E.2d

1996 WL 1353058 (Mass.Super.)

**(Cite as: 1996 WL 1353058 (Mass.Super.))**

Page 1

Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
**MASS. AVE. LAUNDRIES** dba Fresh Touch,
v.
**CISSELL** MANUFACTURING **CO**. et al. [FN1]

FN1. M & R Machinery, Inc. and United
Technologies Corp.

**No. 91881A.**

April 10, 1996.

MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT, UNITED TECHNOLOGIES
CORPORATION'S, MOTION FOR SUMMARY
JUDGMENT AND FOR SEPARATE AND FINAL
JUDGMENT
BASED ON ITS GOOD FAITH SETTLEMENT
WITH THE PLAINTIFF

McEVOY.

**\*1** Defendant, United Technologies Corporation
(UTC), has entered into a settlement agreement with
the plaintiff, Mass. Ave. Laundries (Mass.Ave.),
pursuant to G.L.c. 231B, and is now seeking
summary judgment as to all claims in this lawsuit.
All parties assent to the allowance of the settlement
and the grant of summary judgment, with the
exception of defendant, Cissell Manufacturing Co.
(Cissell). Cissell has cross-claimed against UTC for
contribution and indemnity, and therefore, opposes
the dismissal of UTC from this lawsuit. This court
heard arguments on the motion on February 26,
1996, and for the reasons set forth below, the
defendant, UTC's motion for summary judgment
and for separate and final judgment is *ALLOWED.*

BACKGROUND

Mass. Ave. brought this product liability action to
recover for damages sustained at a February 9, 1988
fire at the site of its laundry, allegedly caused by a
defective steam iron. The defendant, Cissell, is the
designer, manufacturer, and distributor, of the
commercial hand-operated steam iron which
allegedly caused the fire. As part of the product
liability claim the plaintiff alleges that the failure of
the iron was due to an improper design, improper
manufacture, and/or the improper servicing of the
iron and/or its component parts. UTC is the
designer, manufacturer, and distributor of a
thermostat, the component part of the iron which is
alleged to have malfunctioned. Defendant, M & M
Machinery, provided service to said iron.

The complaint enumerates causes of action for
negligent design and manufacture, negligent failure
to warn, breach of express and implied warranties,
and violation of G.L.c. 93A. The claim for
negligent failure to warn stems from the inadequate
warnings provided to the consumer regarding the
thermostat. The thermostat had a finite life and
would malfunction which necessitates that the
thermostat be replaced every three to four years. At
the time of the fire, the thermostat in the Mass. Ave.
Laundry iron was approximately seven years old
and had yet to be replaced.

Mass. Ave. and UTC entered into a release in
settlement of claims on September 14, 1995. UTC
asked all parties to execute a stipulation of
voluntary dismissal pursuant to Mass.R.Civ.P. 41(a)
, but Cissell refused, due to the existence of its cross
claim.

DISCUSSION

This court grants summary judgment where there
are no genuine issues of material fact and where the
summary judgment record entitles the moving party
to judgment as a matter of law. *Cassesso v.
Commissioner of Correction,* 390 Mass. 419, 422

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB E

Not Reported in N.E.2d

1996 WL 1353058 (Mass.Super.)

**(Cite as: 1996 WL 1353058 (Mass.Super.))**

(1983); *Community Nat'l Bank v. Dawes,* 369 Mass. 550, 553 (1976); Mass.R .Civ.P. 56(c), 365 Mass. 824 (1974). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. *Pederson v. Time, Inc.,* 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial demonstrates the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party's case or by showing that the nonmoving party is unlikely to submit proof of that element at trial. *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 809 (1991); *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991). "The nonmoving party cannot defeat the motion for summary judgment by resting on its pleadings and mere assertions of disputed facts ..." *LaLonde v. Eissner,* 405 Mass. 207, 209 (1989). Establishing the absence of a triable issue requires the nonmoving party to respond by alleging specific facts demonstrating the existence of a genuine issue of material fact. *Pederson v. Time, Inc., supra* at 17.

**\*2** UTC contends that it is entitled to summary judgment because the settlement with Mass. Ave. was executed in good faith, and a good faith settlement extinguishes any claims for contribution. G.L.c. 231B, § 4. UTC also alleges that there is no basis for Cissell to claim a right to indemnification. UTC is seeking the entry of separate and final judgment on these grounds.

G.L.c. 231B, § 4 states, in relevant part, that:
   When a release or covenant not to sue or not to enforce judgment is given in good faith to one or two or more persons liable in tort for the same injury: ... (b) It shall discharge the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

G.L.c. 231B, § 4. "Our courts have stated that the statute was intended to encourage settlements." *Noyes v. Raymond,* 28 Mass.App.Ct. 186, 189 (1990) (citations omitted). "The goal of encouraging settlements may be achieved only to the extent that motions for discharge based upon

settlements are routinely allowed, with extended hearings on the question of good faith the exception. If it were otherwise, a party seeking to avoid trial by settling a claim could rarely achieve that objective ..." *Noyes, supra* at 189-90.

In its opposition, Cissell has not alleged that the settlement was not executed in good faith, and "the burden of coming forward with some showing of lack of good faith ought to rest, we think, with those opposing the discharge." *Noyes v. Raymond,* 28 Mass.App. at 191. The settlement was for $25,000 and the amount of the settlement cannot be the basis of a determination of a lack of good faith. *Id.* at 190. Since the reasonableness of the settlement has not been challenged, the evidence before this court supports a finding that the settlement was fair and reasonable. *Id.* at 191. A tort claimant has the power to grant a release from liability to one of several joint tortfeasors, and if that release is given in good faith and before judgment, it will preclude a claim for contribution against the released tortfeasor. *Grace v.. Buckley,* 13 Mass.App.Ct. 1081, 1081 (1982). Any claim against UTC by Cissell for contribution would fail because a release of liability was granted to UTC by the plaintiff. G.L.c. 231B § 4(b); *Noyes v. Raymond,* 28 Mass.App.Ct. at 191.

Three different sets of circumstances give rise to a right to indemnification: an express agreement; a contractual right implied from the nature of the parties' relationship; and a tort based right, when there is great disparity in the fault of the parties. *Araujo v. Woods Hole, Martha's Vineyard, etc.,* 693 F.2d 1, 2 (1982), citing Prosser, Law of Torts § 51 ( 4th ed.1971); *Decker v. Black & Decker Manufacturing Co.; Lenox Machine Co.,* 389 Mass. 35, 37-42 (1983). Cissell claims that there are genuine issues of material fact remaining as to whether UTC's thermostat was defective, which would deem UTC the culpable party, and give rise to a tort based claim for indemnification. Cissell also claims that genuine issue of fact remain regarding whether Cissell sold the iron with any of the component parts which were part of the iron at the time of the fire.

**\*3** There was no express contractual agreement to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1996 WL 1353058 (Mass.Super.)

**(Cite as: 1996 WL 1353058 (Mass.Super.))**

indemnification executed by Cissell and UTC. A
right to indemnification may not be implied merely
from the fact that Cissell is subjected to tort liability
for an injury that it believes UTC played a part in
causing. *Araujo v. Woods Hole, Martha's Vineyard,
etc.,* 693 F.2d at 2. To imply such an agreement
requires unique special factors demonstrating that
the parties intended that the would-be indemnitor
bear the ultimate responsibility for the plaintiff's
safety, or when there is a generally recognized
special relationship between the parties. *Id.* at 2-3.
Neither situation exists here.

The only remaining theory of indemnification is
tort based and it requires that Cissell be only
passively negligent and UTC be actively at fault
because indemnity is permitted only if one does not
join in the negligent act, but, is exposed to
derivative or vicarious liability for the wrongful act
of another. *Decker v. Black & Decker
Manufacturing Co.; Lenox Machine Co.,* 389 Mass.
at 40; *Stewart v. Roy Brothers, Inc.,* 358 Mass. 446,
459 (1970). See also *Toman by Toman v.
Underwriters Lab, Inc.,* 707 F.2d 620, 621 (1983);
*Araujo v. Woods Hole, Martha's Vineyard, etc.,* 693
F.2d 1, 3 (1982). Where the party seeking
indemnification was itself guilty of acts or
omissions proximately causing the plaintiff's injury,
tort indemnification is inappropriate. *Araujo v.
Woods Hole, Martha's Vineyard, etc.,* 693 F.2d at 3.

The plaintiff's expert is expected to testify that
Cissell knew from its supplier and its independent
testing that the thermostat had a finite life and
would malfunction. With this knowledge, Cissell
failed to warn the consumer, and failed to provide
an alternative safety mechanism which would have
prevented the fire. This alleged negligence is
separate and independent from any negligent acts
that may be attributed to UTC. "A supplier of a
component part containing no latent defect has no
duty to warn the subsequent assembler or its
customers of any danger that may arise after the
components are assembled." *Mitchell v. Sky
Climber Inc.,* 396 Mass. 629, 631 (1986). There is
nothing in the summary judgment record which
alleges that the thermostat was defective; the theory
is that the thermostat malfunctioned, which it was

known to do after a period of time. The nature of
Cissell's culpability is not derivative of any acts of
UTC. Cissell's negligence, if any, stems from its
own acts and/or omissions and therefore, Cissell is
not entitled to indemnification from UTC.

ORDER

It is therefore *ORDERED* that the defendant,
UTC's, motion for summary judgment and for
separate and final judgment be *ALLOWED.*

1996 WL 1353058 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Service: Get by LEXSEE®
Citation: 2004 Mass. Super. LEXIS 425

18 Mass. L. Rep. 386; 2004 Mass. Super. LEXIS 425, *

John Zabilansky et al. n1 v. American Building Restoration Products, Inc. et al. n2

n1 Barbara Zabilansky.
n2 Boston Restoration Supply and BCB Painting, Inc.

2001-01985

SUPERIOR COURT OF MASSACHUSETTS, AT MIDDLESEX

18 Mass. L. Rep. 386; 2004 Mass. Super. LEXIS 425

October 11, 2004, Decided

**SUBSEQUENT HISTORY:** Later proceeding at Zabilansky v. Am. Bldg. Restoration Prods., 2004 Mass. Super. LEXIS 423 (Mass. Super. Ct., Oct. 13, 2004)
Costs and fees proceeding at Zabilansky v. Am. Bldg. Restoration Prods., Inc., 2004 Mass. Super. LEXIS 601 (Mass. Super. Ct., Dec. 27, 2004)

**DISPOSITION:** Judgment entered for ABRP on Counts II and III of BCB Painting's cross claim; judgment entered for BRS on Counts V and VI of the cross claim.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant company filed cross-claims for indemnification against defendants, a manufacturer and a distributor, in plaintiff owners' action for damages caused by the company's application of a paint sealant in their home.

**OVERVIEW:** The owners alleged that they had sustained personal injuries, property damage, and other financial loss from exposure to an interior grade wood sealant. A jury found that the manufacturer and the distributor did not breach the implied warranty of merchantability, and that the manufacturer and the company were not negligent. The jury found that the distributor breached an express warranty and awarded the owners damages, except on their loss of consortium claim. The court held that the contract between the distributor and the company did not contain express indemnity language. The company was not entitled to indemnity from the manufacturer because it was absolved of all liability by the jury. Therefore, there was nothing that gave rise to a right of indemnity. Because the company's alleged liability was not merely vicarious or derivative and it did not defend solely and exclusively the wrongful acts of the manufacturer or the distributor, it was not entitled to indemnification.

**OUTCOME:** Judgment was entered for the manufacturer and the distributor.

**CORE TERMS:** indemnification, cross claim, sealant, entitled to indemnity, manufacturer, indemnity, indemnitee, loss of consortium, recommending, derivative, interior, defective product, unjustly enriched, indemnify, compelled, absolved, seller, implied warranty of merchantability, defendants breached, implied warranties, express warranty, manufactured, distributed, marketing, unfair

**LexisNexis(R) Headnotes ✦** Hide Headnotes

TAB F

Contracts Law > Contract Conditions & Provisions > Indemnity
*HN1* Under Massachusetts law, a contract-based right to indemnification exists if there is a binding contract between an indemnitor and an indemnitee in which such right is expressed or from which it fairly can be implied. More Like This Headnote

Contracts Law > Contract Conditions & Provisions > Indemnity
*HN2* Absent an express indemnity provision, a court may recognize an implied right to indemnity only when there are unique special factors surrounding the contractual relationship that indicate an intention by one party to indemnify another. The terms of the express contract must therefore contemplate indemnification. More Like This Headnote

Contracts Law > Contract Conditions & Provisions > Indemnity
*HN3* A sales agreement alone is not a sufficient basis on which to imply a contractual obligation between a seller and a purchaser to indemnify for injuries caused by use of a product. More Like This Headnote

Torts > Multiple Defendants > Contribution & Indemnity
Torts > Damages > Costs & Attorney Fees
*HN4* A party who is without fault, but compelled by operation of law to defend himself against the wrongful act of another, may recover from the wrongdoer the entire amount of his loss, including reasonable attorneys fees. However, indemnity is permitted only when the would-be indemnitee is blameless, did not contribute to the plaintiff's injury, defends solely and exclusively the act of such other party, and is compelled to defend no misfeasance of his own. More Like This Headnote

Torts > Multiple Defendants > Contribution & Indemnity
Torts > Products Liability
*HN5* One such as a seller or distributor who has acted merely as a conduit for a product and has not altered it or otherwise acted in a manner that contributed to a third party's injuries may normally sue a manufacturer of a defective product for indemnification. More Like This Headnote

Torts > Multiple Defendants > Contribution & Indemnity
*HN6* Indemnity is based on the concept of restitution: that one party is unjustly enriched at the expense of another when the other discharges liability that should be the first party's responsibility to pay. More Like This Headnote

Torts > Multiple Defendants > Contribution & Indemnity
Torts > Products Liability
Contracts Law > Types of Contracts > Implied-in-Law Contracts
*HN7* Where a manufacturer is absolved of liability for injuries caused by an allegedly defective product, a retailer is not entitled to indemnity because it did not discharge a liability that the manufacturer had the responsibility to pay, and the manufacturer was not unjustly enriched. More Like This Headnote

**JUDGES: [*1]** Wendie I. Gershengorn, Justice of the Superior Court.

**OPINIONBY:** Wendie I. Gershengorn

**OPINION:** FINDINGS OF FACT, RULINGS OF LAW, AND ORDER OF DECISION ON BCB PAINTING'S CROSS CLAIM FOR INDEMNIFICATION

FINDINGS OF FACT

Plaintiffs John and Barbara Zabilansky filed suit against the defendants alleging that they sustained personal injuries, property damage, and other financial loss from exposure to X-100 interior grade wood sealant manufactured by ABRP, distributed by BRS, and sprayed in their home by BCB Painting. Count I of the complaint alleged that the defendants breached the implied warranty of merchantability and Count II alleged that defendants breached an express warranty that X-100 was safe for interior use. Count III alleged that ABRP was negligent in the manufacture, marketing and distribution of X-100; that BRS was negligent in marketing, distributing and recommending X-100; and that BCB Painting was negligent in recommending X-100 for use in the Zabilansky home and in applying the sealant. Count IV of the complaint alleged that the defendants committed unfair and deceptive practices in violation of Chapter 93A. Count V alleged that ABRP negligently or intentionally misrepresented the **[*2]** contents and usage of X-100. Finally, Count VI alleged loss of consortium by Barbara Zabilansky.

BCB Painting filed a cross claim against ABRP and BRS for contribution and indemnification. Count II of the cross claim asserted that if BCB were found liable to the plaintiffs, it was entitled to indemnification from ABRP because its liability was merely derivative of ABRP's negligence, and Count III asserted that BCB was entitled to indemnification from ABRP because its liability was due solely to ABRP's breaches of express and implied warranties. Count V of the cross claim asserted that if BCB were found liable to the plaintiffs, it was entitled to indemnification from BRS because its liability was merely derivative of BRS's negligence, and Count VI asserted that BCB was entitled to indemnification from BRS because its liability was due solely to BRS's breaches of express and implied warranties.

At the close of the evidence at trial, this Court (Gershengorn, J.) directed a verdict for BCB Painting on Count I of the complaint alleging breach of implied warranty; directed a verdict for ABRP on Count II of the complaint alleging breach of express warranty and Count V alleging misrepresentation; **[*3]** and directed a verdict for all defendants on Barbara Zabilansky's claims other than the claim for loss of consortium.

In special questions returned on June 25, 2004, the jury found that ABRP and BRS did not breach the implied warranty of merchantability and that ABRP and BCB Painting were not negligent. The jury further found that BRS was 25% negligent, but that John Zabilansky was 75% negligent. The jury found that BRS breached an express warranty and awarded John Zabilansky $ 8,145.53 in damages. Finally, the jury found that Barbara Zabilansky did not suffer a loss of consortium.

DISCUSSION

BCB contends that it is entitled to indemnification from ABRP and BRS because it was forced to defend itself against claims that the X-100 manufactured by ABRP and distributed by BRS was a defective product. *HN1*Under Massachusetts law, a contract-based right to indemnification exists if there is a binding contract between indemnitor and indemnitee in which such right is expressed or from which it fairly can be implied. H.P. Hood & Sons, Inc. v. Ford Motor Co., 370 Mass. 69, 76-77, 345 N.E.2d 683 (1976); Kelly v. Dimeo, Inc., 31 Mass.App.Ct. 626, 628, 581 N.E.2d 1316 (1991), rev. den., 412 Mass. 1102, 588 N.E.2d 691 (1992). **[*4]** Here, the contract between BCB and BRS stated merely that BRS would sell, and BCB would purchase, ABRP products, including the X-100 sealant. The contract contained no express indemnity language.

*HN2*Absent an express indemnity provision, the court may recognize an implied right to indemnity only when there are unique special factors surrounding the contractual relationship which indicate an intention by one party to indemnify another. Fall River Housing Auth. v.

H.V. Collins Co., 414 Mass. 10, 14, 604 N.E.2d 1310 (1992); Decker v. Black & Decker Manuf. Co., 389 Masss. 35, 38-39, 449 N.E.2d 641 (1983). The terms of the express contract must therefore contemplate indemnification. Larkin v. Ralph O. Porter, Inc., 405 Mass. 179, 184, 539 N.E.2d 529 (1989). See, e.g., Monadnock Display Fireworks, Inc. v. Andover, 388 Mass. 153, 157-58, 445 N.E.2d 1053 (1983). HN3⊼A sales agreement alone is not a sufficient basis on which to imply a contractual obligation between seller and purchaser to indemnify for injuries caused by use of the product. See Decker v. Black & Decker Manuf. Co., 389 Mass. at 38-39; Araujo v. Woods Hole, Martha's Vineyard, Nantucket SS Auth., 693 F.2d 1, 3 (1st Cir. 1982). There [*5] is nothing in the contract here or the relationship between BCB and BRS that gives rise to an implied right of indemnity.

Nonetheless, BCB contends that it is entitled to indemnity based in tort. HN4⊼A party who is without fault but compelled by operation of law to defend himself against the wrongful act of another may recover from the wrongdoer the entire amount of his loss, including reasonable attorneys fees. Santos v. Chrysler Corp., 430 Mass. 198, 217, 715 N.E.2d 47 (1999); Elias v. Unisys Corp., 410 Mass. 479, 482, 573 N.E.2d 946 (1991); Decker v. Black & Decker Manuf. Co., 389 Mass. at 40. However, indemnity is permitted only when the would-be indemnitee is blameless, did not contribute to the plaintiff's injury, "defends solely and exclusively the act of such other party, and is compelled to defend no misfeasance of his own." Decker v. Black & Decker Manuf. Co., 389 Mass. at 40. See also Elias v. Unisys Corp., 410 Mass. at 482-83. Tort-based indemnification is therefore limited to situations where the indemnitee is only vicariously or technically liable and did not commit acts or omissions which proximately caused the plaintiff's injury. Decker v. Black & Decker Manuf. Co., 389 Mass. at 40. [*6]

Accordingly, HN5⊼one such as a seller or distributor who has acted merely as a conduit for a product and has not altered it or otherwise acted in a manner that contributed to a third party's injuries may normally sue the manufacturer of a defective product for indemnification. Wolfe v. Ford Motor Co., 386 Mass. 95, 101, 434 N.E.2d 1008 (1982). Cf. Mitchell v. The Stop & Shop Co., Inc., 41 Mass. App. Ct. 521, 523, 672 N.E.2d 544 (1996). In this case, however, BCB defended not only against claims that the X-100 sealant was defective but also against claims that it was independently negligent in recommending X-100 for interior use and in applying the sealant to the Zabilansky home. Because BCB's alleged liability was not merely vicarious or derivative, it did not defend solely and exclusively the wrongful acts of ABRP or BRS, and it is not entitled to indemnification.

Finally, BCB is not entitled to indemnity from ABRP because ABRP was absolved of all liability by the jury. HN6⊼Indemnity is based on the concept of restitution: that one party is unjustly enriched at the expense of another when the other discharges liability that should be the first party's responsibility to pay. Oates v. Diamond Shamrock Corp., 23 Mass.App.Ct. 446, 448, 503 N.E.2d 58, [*7] rev. den., 399 Mass. 1104, 506 N.E.2d 146 (1987). HN7⊼Where a manufacturer is absolved of liability for injuries caused by an allegedly defective product, the retailer is not entitled to indemnity because it did not discharge a liability which the manufacturer had the responsibility to pay, and the manufacturer was not unjustly enriched. Id. at 448-49. Accordingly, BCB is not entitled to indemnity from ABRP. This Court is sympathetic to the argument that because BCB made a significant contribution to the defense of ABRP's product, through expert testimony and otherwise, it is unfair to require BCB to bear its own costs. However, this Court declines BCB's invitation to declare a change in the existing law.

ORDER

For the foregoing reasons, it is hereby ORDERED that judgment enter for ABRP on Counts II and III of BCB Painting's cross claim. It is further ORDERED that judgment enter for BRS on Counts V and VI of the cross claim.

Get a Document by Citation - 18 Mass. L. Rep. 386

Case 1:04-cv-12000-MEL   Document 40-3   Filed 04/18/2005   Page 52 of 52

Page 5 of 5

Wendie I. Gershengorn

Justice of the Superior Court

DATED: October 11, 2004

Service: **Get by LEXSEE®**
Citation: **2004 Mass. Super. LEXIS 425**
View: Full
Date/Time: Monday, April 18, 2005 - 12:04 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.