# EXHIBIT A

104

| Time | # | |
|---|---|---|
| 12:30:14 | 1 | Q. Who actually prepared the text of this |
| 12:30:16 | 2 | e-mail? |
| 12:30:17 | 3 | A. Mary Anne Tyler. |
| 12:30:32 | 4 | Q. Can you tell me what this e-mail refers to? |
| 12:30:32 | 5 | What is the $869,055 Terry Nolan is being directed |
| 12:30:32 | 6 | to release? |
| 12:30:33 | 7 | A. That's the recoupment to the Commonwealth. |
| 12:30:36 | 8 | Q. And can you explain to me why Terry Nolan is |
| 12:30:39 | 9 | being instructed to release these funds to Cranberry |
| 12:30:44 | 10 | Point Nursing Home? |
| 12:30:45 | 11 | A. Yes. As I tried to explain to you, I think |
| 12:30:49 | 12 | it was a very difficult thing, you might think this |
| 30:54 | 13 | is odd, but to pay the Commonwealth the money they |
| 12:30:58 | 14 | were owed, and I think we ultimately worked out an |
| 12:31:03 | 15 | arrangement after talking to a whole bunch of people |
| 12:31:06 | 16 | over there. As you can see, it took over a month |
| 12:31:10 | 17 | from the closing. The original intention at the |
| 12:31:12 | 18 | closing was simply to either wire the funds or to |
| 12:31:18 | 19 | get funds over there from Fidelity, but they |
| 12:31:21 | 20 | wouldn't accept a wire, because for some reason it |
| 12:31:25 | 21 | would go into the general fund and not into the |
| 12:31:26 | 22 | Medicaid funds if it was wired, so ultimately we had |
| 12:31:30 | 23 | to find somebody over there that would agree to |
| 12:31:33 | 24 | accept a check at some point, and I believe the |

| | | |
|---|---|---|
| 12:31:37 | 1 | arrangement -- Frank Barker made an arrangement |
| 12:31:43 | 2 | with -- through, I guess, Landa's office that |
| 12:31:43 | 3 | somebody would accept a check if they walked it |
| 12:31:46 | 4 | over there, and it was on Cranberry's heading, so I |
| 12:31:51 | 5 | think Andy and I sent a release to Nolan telling him |
| 12:31:58 | 6 | to give the money to Cranberry, and Cranberry went |
| 12:32:02 | 7 | over and paid the bill.  They had made arrangements |
| 12:32:05 | 8 | to pay it. |
| 12:32:05 | 9 | Q.  So this e-mail is dated November 2 of 2004? |
| 12:32:09 | 10 | A.  Looks like it, yes.  It took a while to get |
| 12:32:12 | 11 | it done.  It was amazing. |
| 12:32:14 | 12 | Q.  I think you had testified earlier that the |
| 32:16 | 13 | money was going to be given at the closing to |
| 12:32:19 | 14 | Goodwin, Procter & Hoar, and Goodwin, Procter & Hoar |
| 12:32:26 | 15 | was to give the funds to the Commonwealth? |
| 12:32:28 | 16 | A.  That's right.  That was the original |
| 12:32:30 | 17 | intention. |
| 12:32:30 | 18 | Q.  And so was there a check written to Goodwin, |
| 12:32:35 | 19 | Procter & Hoar at the closing in this amount? |
| 12:32:40 | 20 | A.  I think it went -- well, actually, I don't |
| 12:32:44 | 21 | know.  I have to look at a settlement statement.  I |
| 12:33:18 | 22 | think it went to Goodwin.  Where is the memo?  I |
| 12:33:18 | 23 | don't see it in there, but I think it was supposed |
| 12:33:19 | 24 | to go to -- Goodwin was supposed to take it over, |

106

| | | |
|---|---|---|
| 12:33:21 | 1 | then that didn't work out.  We made some calls over, |
| 12:33:24 | 2 | I guess, to Medicaid, and they wouldn't take it, so |
| 12:33:26 | 3 | I think it was deposited with Nolan, as I think back |
| 12:33:30 | 4 | on it, and it was to be released from Nolan to |
| 12:33:38 | 5 | Sucoff.  I think there is a memo in these documents |
| 12:33:40 | 6 | you have looked at this morning indicating we |
| 12:33:43 | 7 | weren't to have any say about what happens to it, it |
| 12:33:48 | 8 | was to go to Sucoff to take over when he made |
| 12:33:50 | 9 | arrangements to do it, but then apparently Medicaid |
| 12:33:53 | 10 | wanted our guys to bring it in or something. |
| 12:33:59 | 11 | Q.  So as of the time of this November 2, 2004 |
| 12:34:03 | 12 | e-mail, the money had been sitting with Fidelity |
| 12:34:05 | 13 | since the closing? |
| 12:34:06 | 14 | A.  I think that's right. |
| 12:34:09 | 15 | Q.  And it's your testimony what happened is, |
| 12:34:12 | 16 | per this e-mail, is that Fidelity then cut a check |
| 12:34:17 | 17 | to Cranberry Nursing Home for this amount; is that |
| 12:34:17 | 18 | right? |
| 12:34:20 | 19 | A.  I think they agreed that Frank Barker would |
| 12:34:23 | 20 | take it in and pay it.  That was the arrangements |
| 12:34:26 | 21 | made with Medicaid, and to my knowledge it was paid, |
| 12:34:28 | 22 | because there has been no claim against Epoch. |
| 12:35:07 | 23 | ATTY. HIGGINS:  Let mark that as the |
| 12:35:08 | 24 | next exhibit. |

| | | |
|---|---|---|
| 35:49 | 1 | (Document marked as Exhibit 68 |
| 12:35:49 | 2 | for identification.) |
| 12:35:50 | 3 | Q. Mr. McCullough, I'm handing you what has |
| 12:35:52 | 4 | been marked as Exhibit 68. This appears to be a |
| 12:35:57 | 5 | letter dated November 3, 2004, on your letterhead, |
| 12:36:02 | 6 | signed by both you and Andy Sucoff; is that right? |
| 12:36:07 | 7 | A. Yes. |
| 12:36:09 | 8 | Q. Is there any reason why, in responding to |
| 12:36:11 | 9 | your deposition subpoena, we didn't get this letter? |
| 12:36:15 | 10 | A. I don't know that you didn't get it. |
| 12:36:19 | 11 | Q. This obviously would have been a document in |
| 12:36:21 | 12 | your files, correct? |
| 36:25 | 13 | ATTY. GORDON: There were no documents |
| 12:36:26 | 14 | produce in response to the deposition subpoena. |
| 12:36:31 | 15 | ATTY. HIGGINS: I understand that, and |
| 12:36:33 | 16 | my question is why not, why didn't we get this in |
| 12:36:36 | 17 | response to the subpoena. |
| 12:36:37 | 18 | ATTY. GORDON: Because there was an |
| 12:36:38 | 19 | objection from the witness to producing documents. |
| 12:36:44 | 20 | Q. Mr. McCullough, this document that we have |
| 12:36:46 | 21 | just marked as Exhibit 68, is there a copy of this |
| 12:36:49 | 22 | document in your files? |
| 12:36:53 | 23 | A. I would think there probably is. |
| 12:36:55 | 24 | Q. Is it your practice to maintain copies of |

108

| Time | # | |
|---|---|---|
| 12:36:58 | 1 | correspondence? |
| 12:36:58 | 2 | A.  This document, yes, I would say. |
| 12:37:16 | 3 | ATTY. HIGGINS:  What was the basis for |
| 12:37:17 | 4 | the objection to producing documents responsive to |
| 12:37:21 | 5 | the subpoena?  I don't know if I should direct this |
| 12:37:22 | 6 | to Mr. McCullough or his attorney.  I think you said |
| 12:37:25 | 7 | the witness made an objection. |
| 12:37:27 | 8 | ATTY. GORDON:  Well, I, as his counsel, |
| 12:37:29 | 9 | made an objection on his behalf. |
| 12:37:32 | 10 | ATTY. HIGGINS:  Could you just state for |
| 12:37:32 | 11 | the record, because your letter does not so state, |
| 12:37:35 | 12 | what the basis of the objection is? |
| 37:38 | 13 | ATTY. GORDON:  No. |
| 12:37:39 | 14 | ATTY. HIGGINS:  No? |
| 12:37:40 | 15 | ATTY. GORDON:  No. |
| 12:37:41 | 16 | ATTY. HIGGINS:  You are refusing to |
| 12:37:41 | 17 | tell me why you objected to producing documents |
| 12:37:44 | 18 | responsive to the subpoena. |
| 12:37:45 | 19 | ATTY. GORDON:  I'm refusing to answer |
| 12:37:46 | 20 | questions at this deposition.  Mr. McCullough is the |
| 12:37:54 | 21 | deponent. |
| 12:37:59 | 22 | Q.  Mr. McCullough, you see that this -- if you |
| 12:38:01 | 23 | look at the document that is attached to this |
| 12:38:04 | 24 | November 3 letter. |

John C. McCullough                                                   05/19/2005

109

| | | |
|---|---|---|
| 38:13 | 1 | A. Yes. |
| 12:38:13 | 2 | Q. Now this check, which is in the amount of |
| 12:38:14 | 3 | $869,055, you see that, it is a Fidelity check, do |
| 12:38:20 | 4 | you see that, and it's got -- somebody has written |
| 12:38:24 | 5 | canceled across it; do you see that? |
| 12:38:26 | 6 | A. It says Fidelity National Title Insurance |
| 12:38:28 | 7 | Company? |
| 12:38:28 | 8 | Q. Yes. |
| 12:38:29 | 9 | A. Yes. |
| 12:38:29 | 10 | Q. And somebody has written canceled across it? |
| 12:38:32 | 11 | A. Yes. |
| 12:38:32 | 12 | Q. Is that your handwriting? |
| 38:32 | 13 | A. No. |
| 12:38:34 | 14 | Q. You sent this letter to Mr. Nolan, and you |
| 12:38:46 | 15 | requested that Mr. Nolan release a check in the |
| 12:38:46 | 16 | amount of $869,055 made payable to Cranberry Point |
| 12:38:46 | 17 | Nursing Home, Inc., correct? |
| 12:38:46 | 18 | A. This is a joint letter from Sucoff and |
| 12:38:48 | 19 | myself. |
| 12:38:50 | 20 | Q. Correct. |
| 12:38:51 | 21 | A. That's correct. I have no idea looking at |
| 12:38:56 | 22 | this check who it is made out to. It says -- oh, it |
| 12:38:59 | 23 | says pay to the Commonwealth of Mass. |
| 12:39:01 | 24 | Q. Correct. |

110

| Time | # | |
|---|---|---|
| 12:39:41 | 1 | (Document marked as Exhibit 69 |
| 12:39:41 | 2 | for identification.) |
| 12:39:42 | 3 | Q. Mr. McCullough, I'm handing you Exhibit 69. |
| 12:39:49 | 4 | The first page of that exhibit is a letter dated |
| 12:39:52 | 5 | November 4, 2004 to Mary Anne Tyler of your office; |
| 12:39:56 | 6 | do you see that? |
| 12:39:57 | 7 | A. Yes. |
| 12:39:57 | 8 | Q. The letter is from a woman named Jacquelyn |
| 12:40:00 | 9 | Byrne at Fidelity National Title Insurance Company |
| 12:40:03 | 10 | enclosing a check made payable to Cranberry Point |
| 12:40:06 | 11 | Nursing Home in the amount of $869,055, correct? |
| 12:40:11 | 12 | A. Yes. |
| 12:40:11 | 13 | Q. Is this also a letter a copy of which is in |
| 12:40:13 | 14 | your files? |
| 12:40:18 | 15 | A. I assume it would be, but I don't -- I mean, |
| 12:40:21 | 16 | I don't have a memory of it. |
| 12:40:30 | 17 | Q. This letter is dated November 4, 2004. Have |
| 12:40:38 | 18 | you ever had -- strike that. From that date to the |
| 12:40:55 | 19 | present have you had conversations with anyone at |
| 12:40:56 | 20 | the Commonwealth of Massachusetts about this |
| 12:40:59 | 21 | obligation, whether it's been paid, whether it's not |
| 12:41:01 | 22 | been paid? |
| 12:41:02 | 23 | A. No. |
| 12:41:19 | 24 | Q. Mr. McCullough, are you familiar with an |

John C. McCullough                                          05/19/2005

111

| | | |
|---|---|---|
| :41:21 | 1 | entity called Freid and Tobin Venture Partners? |
| 12:41:25 | 2 | A. No. |
| 12:41:26 | 3 | Q. To the best of your knowledge did any monies |
| 12:41:32 | 4 | from any of the escrow funds that were established |
| 12:41:35 | 5 | at the closing go back to any member of the Freid |
| 12:41:38 | 6 | family? |
| 12:41:39 | 7 | A. Which escrows are you talking about? |
| 12:41:41 | 8 | Q. Any of the escrows that were established at |
| 12:41:44 | 9 | the closing. |
| 12:41:44 | 10 | A. The Mellon escrows? |
| 12:41:46 | 11 | Q. Or the Fidelity escrows. |
| 12:41:55 | 12 | A. No, no monies, to my knowledge, went back to |
| :41:58 | 13 | the sellers, or the Freids. |
| 12:42:03 | 14 | Q. And it's your understanding that the check |
| 12:42:06 | 15 | that is made payable to Cranberry Point, the intent |
| 12:42:09 | 16 | of that check was it was going to be deposited into |
| 12:42:14 | 17 | that -- into a bank account, Cranberry Point bank |
| 12:42:17 | 18 | account, and then a check was going to be written |
| 12:42:19 | 19 | out to the Commonwealth of Massachusetts and then |
| 12:42:21 | 20 | delivered to them? |
| 12:42:23 | 21 | A. I don't know if this check ultimately was |
| 12:42:25 | 22 | endorsed over to the Commonwealth. Frank Barker had |
| 12:42:29 | 23 | made arrangements with the Medicaid Division to |
| 12:42:32 | 24 | obtain this check, and satisfactory arrangements, |

John C. McCullough                                                    05/19/2005

112

| | | |
|---|---|---|
| 12:42:36 | 1 | that were satisfactory to Sucoff, and Goodwin |
| 12:42:39 | 2 | Procter, and Epoch in that regard, and they |
| 12:42:42 | 3 | obviously had had communications with the Medicaid |
| 12:42:45 | 4 | office also to determine the correct pathway to pay |
| 12:42:48 | 5 | this bill, and it's my understanding it was paid, |
| 12:42:51 | 6 | otherwise Epoch would be screaming about it now, |
| 12:42:54 | 7 | because they would have had their checks reduced. |
| 12:42:59 | 8 | Q.  Do you have any understanding as to whether |
| 12:43:25 | 9 | the current -- as to the current status of the |
| 12:43:28 | 10 | ownership of the shares in The Pointe Group, Inc. |
| 12:43:36 | 11 | A.  The Pointe Group Inc.; not off the top of my |
| 12:43:39 | 12 | head I don't, no. |
| 43:41 | 13 | Q.  How about any of the healthcare -- remaining |
| 12:43:44 | 14 | healthcare entities that the Freid family is |
| 12:43:46 | 15 | involved with; do you know whether the shares, in |
| 12:43:49 | 16 | either the companies that own those entities, or the |
| 12:43:51 | 17 | operating companies, whether those shares are still |
| 12:43:55 | 18 | held by Georgia Freid and Mark Tobin? |
| 12:43:59 | 19 | A.  I believe that's the case. |
| 12:44:33 | 20 |         ATTY. HIGGINS:  I don't think I have any |
| 12:44:34 | 21 | other questions. |
| 12:44:34 | 22 |                CROSS EXAMINATION |
| 12:44:41 | 23 | BY ATTY. WORCESTER: |
| 12:44:41 | 24 | Q.  Mr. McCullough, my name is Courtney |