# EXHIBIT "I"

Page 1

```
 1                        Volume:   I

 2                        Pages:  1-128

 3                        Exhibits:  48-69

 4           UNITED STATES DISTRICT COURT

 5             DISTRICT OF MASSACHUSETTS

 6    - - - - - - - - - - - - - - - - - - x

 7    CASAS, BENJAMIN & WHITE, LLC,

 8                        Plaintiff,

 9        v.            Case No.: 04-CV-1233-MEL

10    THE POINTE GROUP, INC., a

11    Massachusetts corporation d/b/a The Pointe

12    Group Healthcare and Senior Living, GERALD S. FREID,

13    BARRY, FREID, and KEY CORPORATE CAPITAL, INC.,

14                        Defendants.

15    - - - - - - - - - - - - - - - - - - x

16

17         DEPOSITION OF JOHN C. McCULLOUGH

18              May 19, 2005

19                 9:24 a.m.

20    Conn Kavanaugh Rosenthal Peisch & Ford, LLP

21              Ten Post Office Square

22           Boston, Massachusetts  02109

23

24    Reporter:  Carol A. Pagliaro, CSR/RPR/RMR
```

John C. McCullough

05/19/2005

Page 2

1  A P P E A R A N C E S :
2     CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP
3        By Erin K. Higgins, Esq.
4        Ten Post Office Square
5        Boston, Massachusetts  02109
6        617-482-8200
7        Counsel for the Plaintiff
8     NIXON PEABODY, LLP
9        By Courtney Worcester, Esq.
10       889 Elm Street
11       Manchester, New Hampshire  03101
12       603-628-4000
13       Counsel for the Defendant
14       Key Corporate Capital, Inc.
15     GORDON HALEY LLP
16       By Stephen F. Gordon, Esq.
17       101 Federal Street
18       Boston, Massachusetts  02110
19       617-261-0100
20       Counsel for the Witness and Defendants
21       The Pointe Groupe, Inc., Gerald S. Freid,
22       and Barry Freid
23
24

Page 4

1         E X H I B I T S
2   NO.                            PAGE
3   60  9/30/04 9:28 a.m. Draft of Closing
4       Statement                    68
5   61  9/30/04 1:18 p.m. Draft of Closing
6       Statement                    81
7   62  9/30/04 3:14 p.m. Draft of Closing
8       Statement                    85
9   63  9/30/04 e-mail from Tyler to Sucoff    88
10  64  9/30/04 Closing Memorandum         88
11  65  9/30/04 3:31 p.m. Partial Draft of
12      Closing Statement            97
13  66  Purchase Price Allocation       101
14  67  11/2/04 e-mail from McCullough to
15      Sucoff                      103
16  68  11/3/04 letter from Sucoff and
17      McCullough to Nolan          107
18  69  11/4/04 letter from Byrne to Tyler  110
19
20     *Original exhibits retained by Atty. Higgins
21
22
23
24

Page 3

1            I N D E X
2   EXAMINATION OF:                  PAGE
3   John C. McCullough
4   By Atty. Higgins              5
5   By Atty. Worcester          112
6
7         E X H I B I T S
8   NO.                           PAGE
9   48  Subpoena                 20
10  49  12/23/03 letter from Kauffman to
11      McCullough               20
12  50  6/3/2004 e-mail from Gordon to Kauffman  27
13  51  9/25/04 e-mail from Gordon to Sucoff and
14      Henken                   39
15  52  9/27/04 e-mail from McCullough to Cole   41
16  53  9/27/04 package of wiring instructions   43
17  54  9/29/04 e-mail from McCullough to Gordon  49
18  55  9/29/04 e-mail from Caine to Cole    51
19  56  9/27/04 draft of Closing Statement   56
20  57  9/30/04 8:20 a.m. Draft of Closing
21      Statement                65
22  58  9/30/04 8:37 a.m. Draft of Closing
23      Statement                67
24  59  9/29/04 e-mail from Sucoff to McCullough  61

Page 5

1         P R O C E E D I N G S
2           Stipulation
3     It is stipulated by and between counsel for the
4   respective parties that Motions to Strike and all
5   objections, except as to form, are reserved until
6   the time of trial.  It is further stipulated that
7   the witness may sign the deposition under the pains
8   and penalties of perjury, rather than before a
9   notary public.
10          JOHN C. McCULLOUGH,
11  a witness called on behalf of the Plaintiff, having
12  first been duly sworn, was deposed and testified as
13  follows:
14          DIRECT EXAMINATION
15     BY ATTY. HIGGINS:
16     Q.  Sir, could you state your full name for the
17  record?
18     A.  Yes, John McCullough, M-c-C-u-l-l-o-u-g-h.
19       ATTY. HIGGINS:  Mr. McCullough, I
20  represent the plaintiff in this, Casas, Benjamin &
21  White.  Have you ever had your deposition taken
22  before?
23     A.  I can't recall if I have.
24     Q.  I know you are a transactional lawyer,

John C. McCullough                                                     05/19/2005

Page 6

1   correct?
2       A.  Yes.
3       Q.  Have you ever sat in on deposition?
4       A.  Yes.
5       Q.  So you are generally aware of the rules, but
6   I'll just tell you a few that sometimes it's hard
7   for people who are actually giving depositions to
8   remember.  Most important is you need to let me
9   finish my question before you start answering, even
10  though, like most attorneys, you are going to think
11  you know what my question is, so the court reporter
12  can take down my question and your answer without us
13  talking over one another.
14          If you don't understand a question I'm
15  asking you, please let me know, and I'll try too
16  rephrase it.
17          If you need to take a break, let me
18  know.  We can do that as long as it's not in the
19  middle of a pending question.
20          And that's about it.
21          Are you taking any medications today
22  that would affect your ability to answer my
23  questions?
24      A.  No.

Page 7

1       Q.  I'm not going to go through a huge litany,
2   but could you just briefly tell me your educational
3   background and where you have worked in the last 20
4   year?
5       A.  I went to law school.
6       Q.  Where did you go to law school?
7       A.  BC Law.
8       Q.  When did you graduate?
9       A.  1966.
10      Q.  And where have you worked during the past
11  ten years.
12      A.  McCullough, Stievater & Polvere, 121 Main
13  Street, Charlestown.
14      Q.  And that's a firm you founded?
15      A.  Yes.
16      Q.  What year did you found the firm?
17      A.  1972.
18      Q.  And you have worked there ever since?
19      A.  Yes.
20      Q.  Can you just describe for me generally your
21  areas of practice?
22      A.  Currently the areas of practice are project
23  developments, affordable housing, extensive nursing
24  home representation, management, sales, HUD closing,

Page 8

1   finances, financing of projects, health care and
2   residential.
3       Q.  And has the concentration of your practice
4   changed in the last 5 years?
5       A.  No.
6       Q.  Are you represented at today's deposition?
7       A.  Yes.
8       Q.  Are you represented by Attorney Gordon?
9       A.  Yes.
10      Q.  When did that representation begin?
11      A.  When the suit started, I assume, or when I
12  was noticed to the deposition, I suppose.
13      Q.  When did you first become aware that Mr.
14  Gordon was going to be representing you at the
15  deposition?
16      A.  When I got notice of the deposition.
17      Q.  And that's the subpoena you were served
18  with?
19      A.  Yes.
20          (Document marked as Exhibit 48
21          for identification.)
22      Q.  I'm showing you what the court reporter has
23  marked as Exhibit 48.  Do you recognize that to be
24  the subpoena that was served on you for your

Page 9

1   deposition?
2       A.  Looks like it.
3       Q.  If you could turn to the schedule that's
4   attached.  Were you served with this deposition
5   subpoena by mail at your office?
6       A.  I think that's correct.
7       Q.  When you were served with the subpoena did
8   you undertake a review of these requests to see if
9   you had responsive documents?
10      A.  I read the subpoena, spoke with Steve, and
11  looked at the requests, the schedule, yes.
12      Q.  And you looked the at the requests around
13  the time you received the subpoena?
14      A.  Right.
15      Q.  Did you determine whether you had documents
16  that were responsive to the request?
17      A.  A number of these documents we had, yes.
18      Q.  And were these documents, at the time you
19  received the subpoena and read the schedule, were
20  the documents in your office?
21      A.  I would say these documents were both in our
22  client's office, my office, and I don't recall if
23  Steve had these documents at the time also, Steve
24  Gordon.

3 (Pages 6 to 9)

John C. McCullough

Page 10

1    Q. So let's just look at No. 1, All documents
2  relating to or reflecting disbursements made at the
3  closing on the sale of the combined operations, or
4  from the date of the closing to the date of your
5  response to this request, including any disbursement
6  of the buyer's deposit or any escrow funds. Did you
7  review your files to see if you had any documents
8  relating to that request?
9    A. Yes.
10    Q. What did you determine?
11    A. That those documents were in the closing
12  binders.
13    Q. And the documents that were in the closing
14  binders, how many binders were there?
15    A. I think there were 3. They were prepared by
16  Goodwin Procter.
17    Q. Those closing binders, just to make sure I
18  understand your response, would those closing
19  binders include documents that were created or
20  generated after the closing?
21    A. I don't believe so.
22    Q. Just let me repeat my question then. As to
23  the second part of that request which asks for
24  documents relating to disbursements made from the

Page 11

1  date of the closing to the date of your response,
2  including any disbursements of the buyer's deposit
3  or any escrowed funds, did you review files to
4  determine if you had any documents responsive to
5  that request?
6    A. There were no documents in our possession
7  after the close to buyers that related to
8  disbursements.
9    Q. You said the 3 closing binders were prepared
10  by Goodwin Procter?
11    A. Right.
12    Q. After the date of the closing did you ever
13  review those binders to see if they were complete?
14    A. I don't recall that I reviewed them to see
15  if they were complete. It was a number of weeks
16  after the closing that we received them, so...
17    Q. And do you know whether those closing
18  binders were given to Atty. Gordon so that he could
19  make them available for review in response to a
20  document request served on The Pointe Group?
21    A. I believe that's correct.
22    Q. And it's your testimony that you, aside from
23  those closing binders, you don't have any documents
24  in your possession, custody, or control that relate

Page 12

1  to post-closing disbursements from the escrow funds?
2    A. In that context, post-closing disbursements,
3  when you say relate, we have received a claim letter
4  recently for disbursements of the escrow funds; are
5  you referring to that?
6    Q. Well, that certainly would relate to
7  disbursement, any disbursements from the escrow
8  fund.
9    A. Well, there hasn't been a disbursement,
10  but... We are in the process of preparing a
11  response to that request.
12    Q. But let me just ask you about that claim
13  letter. Who was the claim received from?
14    A. Epoch.
15    Q. And I don't need to know the details, but
16  just generally in that letter Epoch is claiming some
17  entitlement to some funds that were in an escrow
18  account at some point?
19    A. That's correct.
20    Q. Do you recall the different escrow funds
21  that were set up, whether they were funds that were
22  escrowed at Mellon or Fidelity?
23    A. The Fidelity escrow was the deposit escrow;
24  the Mellon escrow is the closing escrows.

Page 13

1    Q. That may answer the question in your mind,
2  but not mine --
3    A. Sorry.
4    Q. -- not being a transactional lawyer, so I
5  think what you are saying is that the Fidelity was
6  the deposit escrow --
7    A. That's correct.
8    Q. -- and the Mellon was the -- what was the
9  word you used to describe it?
10    A. Closing escrow.
11    Q. -- closing escrow. So the Epoch letter, or
12  the claim letter that you received from Epoch, they
13  are claiming an entitlement to funds that were in
14  which escrow?
15    A. The Mellon escrow.
16    Q. And aside from that claim letter you don't
17  recall any documents having been in your possession
18  from the date of closing to today that related to
19  disbursements that were made from the Fidelity fund,
20  the deposit fund?
21    A. Nothing else.
22    Q. Through other productions in the case I've
23  also gotten, and we will go through some of those
24  today, some draft closing statements that were

John C. McCullough                                                    05/19/2005

Page 14

1   prepared in the days leading up to the September 30
2   closing and also some that were prepared, it looks
3   like, on the day of the closing.  Did you review
4   your file to see if you had any drafts of closing
5   statements in your files?
6       A.  I didn't find any drafts.
7       Q.  And before the deposition started you had
8   handed me a document that you -- a printout of an
9   e-mail that your counsel represented you found when
10  you searched your e-mail.  I just had a couple of
11  questions about your e-mail system, if you don't
12  mind.  In the days leading up to the closing I
13  presume that you received e-mails pertaining to the
14  closing; is that correct?
15      A.  I would assume that some went back and
16  forth.
17      Q.  And what is your practice with respect to
18  e-mails that you receive in terms of whether you
19  delete them, whether you store them in a folder,
20  whether you typically print them out and put them in
21  a file?
22      A.  It depends on the e-mail transaction.
23  E-mails that are just exchanging documents, or
24  something of that nature, we don't save.  I purge my

Page 15

1   e-mail every 3 months, every quarter, and this
2   particular e-mail that I delivered to you this
3   morning was I asked my associate to look in her
4   files, and she found that particular e-mail.
5       Q.  Is that Mary Cole?
6       A.  Mary Cole, yes.  She is a project manager.
7   She was the project manager on this file.
8       Q.  With respect to this particular transaction,
9   the sale of what we have been calling the combined
10  operations as it's defined in that subpoena, do you
11  recall receiving any e-mails that, rather than
12  deleting, you put into a folder or otherwise saved?
13      A.  I did not.
14      Q.  Do you recall receiving any e-mails
15  pertaining to this transaction that you printed out
16  rather than deleting?
17      A.  I don't recall that, no.
18      Q.  In preparation for coming here today, in
19  addition to searching e-mail on your computer, did
20  you also go through any correspondence files you
21  maintained to see if you had any responsive e-mail
22  messages?
23      A.  I did not have any responsive e-mail
24  messages.

Page 16

1       Q.  But did you review any files that you
2   maintained?
3       A.  I looked on my e-mails, and as I say, I had
4   purged my e-mails.
5       Q.  But aside from looking on your computer, did
6   you also look through whatever files you had
7   pertaining to the transaction to see if you had
8   produced or had any e-mail messages pertaining to
9   the transaction?
10      A.  I had no e-mails that were printed out.
11      Q.  My question is are you answering that from
12  memory or after you received the subpoena did you
13  actually look through your files to see if you had
14  any e-mails?
15      A.  I'm telling you I had no e-mails that were
16  printed out.
17      Q.  If I could ask you to look at Request No.
18  12, and this request, I'm not going to read the
19  whole request into the record, because, obviously,
20  you can you read it yourself, but in substance asks
21  for documents relating to, or evidencing, loans made
22  by Key Bank for the various facilities that we have
23  been calling the combined operations, and my
24  question is whether you reviewed your files to

Page 17

1   determine whether you had any documents responsive
2   to that request.
3       A.  I did have copies of the workout agreements
4   with Key Bank, it was my understanding that they
5   have been produced, which would include Hammond
6   Point, Boylston Place, and Cranberry Point.
7       Q.  Aside from the workout agreements did you
8   have copies of documents relating to the loans that
9   Key Bank made to those entities; for example, did
10  you have mortgages --
11      A.  We would have had copies of mortgages,
12  because we had to secure releases of those mortgages
13  from Key Bank.  When I say copies, we would have had
14  copies, probably copies, but we also had -- you
15  know, we would go online and check the titles to
16  make sure we were getting all the discharges and
17  releases from Key Bank.
18      Q.  During the course of this case we have heard
19  some testimony regarding some accounts, and, in
20  particular, Mrs. Freid testified that she had an
21  account at UBS PaineWebber that she didn't have
22  access to before the closing and that she did have
23  access to after the closing, and it was her
24  understanding, via her testimony, that Key Bank has

LegaLink Boston
(800) 822-3376

John C. McCullough                                                                    05/19/2005

Page 18

1  some sort of a lien on that account, and I'm
2  wondering if you had any documents that would be
3  responsive to this request that related to that
4  account and the discharge or release of whatever
5  lien Key had on that account.
6      A. We would have no documents related to what
7  was in the account. We did have knowledge that
8  there was a lien on assets of Mrs. Freid. It's my
9  understanding at the closing that we secured
10 releases of all liens that Key had on all
11 properties, the facilities, and I believe we also --
12 the release we obtained from the bank included a
13 release of their claim against Mrs. Freid.
14     Q. And in order to insure that all of these
15 liens were released, do you recall whether you
16 had -- your office had copies of documents that
17 demonstrated or showed what the liens were?
18     A. No, I can't recall at the instant. I know
19 that the discharge from Key Bank was comprehensive
20 as to all claims.
21     Q. When did you first begin to represent any
22 member of the Freid family?
23         ATTY. GORDON: You talking about as
24 individuals or any entity they were involved with?

Page 19

1          ATTY. HIGGINS: Well, he can answer it
2  to the best of his ability. If he doesn't
3  understand it he can let me know.
4      A. I don't think I have ever represented any of
5  the Freids individually, only in connection with
6  their interests in these entities, and your question
7  is how long have I done that? I'd say 15 or 20
8  years, I suppose. I was trying to think back as to
9  the first time Bill Freid became involved in these
10 projects. It had to be in the eighties, I would
11 think, sometime.
12     Q. Do you recall which particular project it
13 was that Mr. Freid first became involved with?
14     A. He was involved as an investor in other
15 projects that we were working on. That was in the
16 late seventies and early eighties.
17     Q. And were you -- did you represent -- let me
18 ask this, During the time that you have been
19 providing legal services to entities that Mr. Freid
20 either had an investment in or some other interest
21 in -- strike that.
22         Did you represent the entities that we
23 have identified as the combined operations as the
24 time that Key Bank made the loans to these entities

Page 20

1  that we have been talking about today?
2      A. We did work for these entities at that time,
3  but the financing of these entities was not provided
4  by this office. We didn't work on the financing
5  with Key Bank.
6      Q. Do you know which law firm did?
7      A. No, I don't.
8      Q. During the last 5 years has your office
9  provided any legal services to Key Bank?
10     A. No.
11     Q. And have you provided legal services to
12 other entities, other than the entities affiliated
13 with the Freids, on transactions in which Key Bank
14 was lending money?
15     A. Yes.
16     Q. And on those other transactions do you
17 recall what contact people at Key Bank you worked
18 with?
19     A. I worked with Key Bank in Columbus Ohio.
20         (Document marked as Exhibit 49
21         for identification.)
22     Q. Mr. McCullough, I'm handing you what the
23 court reporter has marked as Exhibit 49, a December
24 23, 2003 letter from Madeline Kauffman to you, and

Page 21

1  you see this references a facility that is not one
2  of the ones we have been considering part of the
3  combined operations, the South Point property and
4  facility. My first question is, Do you remember
5  ever working with Ms. Kauffman before this, December
6  of 2003?
7      A. Yes.
8      Q. When was that?
9      A. That was on the refinancing of South Point.
10     Q. So is that what we are talking about here,
11 the re: here?
12     A. Yes.
13     Q. When did you first start working on that?
14     A. Well, it was a HUD refinance, so it would
15 have been probably 6, 7 months prior to this letter.
16     Q. Before working on the South Point refinance,
17 had you ever worked with Ms. Kauffman before?
18     A. I don't believe so.
19     Q. This letter describes a payoff that is
20 anticipated to be made to Key; do you know whether
21 that actually happened?
22     A. Yes.
23     Q. At the time of this December 23 letter did
24 you know that individuals at The Pointe Group were

6 (Pages 18 to 21)

John C. McCullough                                              05/19/2005

Page 22

1  attempting to work something out with Key with
2  respect to Key's liens on the other properties, the
3  ones we have been defining as the combined
4  operations?
5       A. Yes.
6       Q. Did you have any role in those negotiations?
7       A. With Key Bank?
8       Q. Yes.
9       A. No, other than closing on South Point.
10      Q. When did you first become involved in --
11  strike that. During this time period December of
12  2003 did you ever learn from anyone affiliated with
13  The Pointe Group that they had retained the services
14  of my client Casas, Benjamin & White?
15      A. Did I learn at sometime?
16      Q. No, around the time of this letter in
17  December of 2003 did you know that The Pointe Group
18  had retained Casas, Benjamin & White?
19      A. I'm note sure in the context of time whether
20  Casas, Benjamin was involved at this time. I don't
21  recall.
22      Q. Did you ever review any sort of an
23  engagement letter between The Pointe Group and
24  Casas, Benjamin & White?

Page 23

1       A. I did see an engagement letter, yes.
2       Q. Did you see that in the context of this
3  case, the one you are here on today, or did you see
4  it before that?
5       A. I don't recall the date of that engagement
6  letter.
7       Q. I'm showing you what was marked previously
8  as Deposition Exhibit 4, which I'll represent to you
9  is the engagement letter which has the date on the
10  first page of September 4, 2003. Did you see this
11  engagement letter on or about the date that it was
12  executed?
13      A. I would say I saw it sometime after that. I
14  have a copy of it in my file.
15      Q. Were you involved at all in any negotiations
16  regarding the terms of the engagement letter?
17      A. No.
18      Q. Do you recall, from the time that engagement
19  letter was signed September 4 of 2003, to the date
20  of the closing, did you ever have any communications
21  directly with anyone at Casas, Benjamin & White?
22      A. Which closing are you speaking of, the South
23  Point?
24      Q. I'm sorry, the September 30 closing.

Page 24

1       A. 2004?
2       Q. Correct.
3       A. Did I have any communication with Casas,
4  Benjamin & White?
5       Q. Correct.
6       A. I recall 2 telephone conferences in which
7  Casas, Benjamin & White participated, overall
8  conferences on the transaction, early in the
9  transaction.
10      Q. And you were also a participant in those
11  conference calls?
12      A. Yes.
13      Q. Other than those 2 conference calls did you
14  ever speak with anyone at Casas, Benjamin & White?
15      A. Yes.
16      Q. When was that?
17      A. I spoke with a representative of Casas,
18  Benjamin & White at a meeting at Goodwin Procter.
19      Q. Was that meeting in July of 2004?
20      A. It was a meeting at which Larry Gerber made
21  a presentation as to why he had to reduce the
22  purchase price.
23      Q. And other than that meeting and the 2
24  conference calls where you were all participants, do

Page 25

1  you recall speaking with anyone at Casas, Benjamin &
2  White?
3       A. No, I don't.
4       Q. Other than the transaction that ultimately
5  closed in September of 2004 have you ever worked
6  with anyone at Casas, Benjamin & White?
7       A. No.
8       Q. Before the first time you saw that
9  engagement letter that was marked as Exhibit 4 had
10  you ever heard of Casas, Benjamin & White?
11      A. Before I saw the engagement letter?
12      Q. Correct.
13      A. I think in the workout agreements with Key
14  Bank there was a reference to, or in some
15  correspondence I saw I saw the name of Casas,
16  Benjamin & White, but I had never heard of them
17  before that.
18      Q. Other than this particular transaction you
19  had never heard of Casas, Benjamin & White?
20      A. That's correct. Subsequent to the
21  transaction I have.
22      Q. Subsequent to the transaction have you been
23  involved in deals or transactions in which Casas,
24  Benjamin & White also was involved?

7 (Pages 22 to 25)

John C. McCullough                                                                05/19/2005

Page 26
1    A. No.
2    Q. So when you say subsequent to the
3  transaction are you talking about this litigation?
4    A. No, I read in the newspaper where they sold
5  an interest in Casas, Benjamin & White for a
6  substantial amount of money.
7    Q. Do you recall approximately when you were
8  first asked to get involved in the transaction that
9  ultimately closed on September 30 of 2004?
10   A. I think the first time I was involved was
11  when we saw a draft of a Letter of Intent, I think
12  it was, from the Epoch Group.
13   Q. From the date on which you saw that draft
14  Letter of Intent, to the date of the closing on
15  September 30 of 2004, can you tell me what entities
16  did you represent, your office represent?
17   A. The selling entities, the Cranberry Point
18  Partnership, Cranberry Point, Inc., and Hammond
19  Point Realty -- is it Realty? I can't remember the
20  exact name of the real estate entity -- and then
21  Boylston Place.
22   Q. Did you represent The Pointe Group, Inc.?
23   A. The Pointe Group wasn't a participant in the
24  actual transaction; they were basically a management

Page 27
1  group.
2    Q. Has your office rendered legal services to
3  The Pointe Group, Inc., the management?
4    A. From time to time.
5    Q. You didn't consider that entity to be your
6  firm's client with respect to this transaction?
7    A. They weren't a seller.
8    Q. So you didn't consider them to be your
9  client for purposes of this transaction?
10   A. I think that would probably be correct. We
11  didn't bill them for any work done on this project,
12  as I remember.
13   Q. And in terms of the selling entities that
14  you did represent, did you have a particular contact
15  person that if you had any questions you would
16  contact, or were there different contact people for
17  different issues?
18   A. There were a number of contact people.
19   Q. Who were those people?
20   A. Frank Barker, Barry Freid, Jerry Freid, Mark
21  Tobin, some of the other staff in their office.
22       (Document marked as Exhibit 50
23       for identification.)
24   Q. Mr. McCullough, during the time period that

Page 28
1  you were involved in the transaction leading up to
2  the September 30, 2004 closing, what was your
3  understanding as to what individuals had ownership
4  interests in the selling entities?
5    A. Those individuals that had ownership were
6  those that were set forth in the public records.
7    Q. What public records are you referring to?
8    A. Corporations Department. Let's see. There
9  would have been statements filed with the Secretary
10  of State's Office, so that would have been Mark
11  Tobin and Georgia Freid, I think. I think that's
12  probably it.
13   Q. These public documents that you were
14  referring to, have you actually seen them?
15   A. Of course partnership documents are not
16  recorded. Secretary of State filings which show the
17  officers and directors. You are talking about
18  ownership interest, who would own the shares? That
19  wouldn't be a public record, I guess. My
20  understanding was Mark and Georgia.
21   Q. And during the time period that we are
22  talking about here, let's just see, January 1 of
23  2004 through the date of the closing, were those
24  documents in your office's possession, custody, or

Page 29
1  control?
2    A. We would have had copies of partnership
3  documents, yes.
4    Q. And documents that showed which individuals
5  owned shares in the entities, those documents were
6  documents that you had?
7    A. Yes, those are also public records at Public
8  Health -- Department of Public Health I mean.
9  Sorry.
10   Q. Are those documents still in your office?
11   A. I would say we have copies of those
12  documents, yes. They were part of every HUD
13  closing, they were part of every transaction they
14  participated in, and they are on file in the
15  Department of Public Health.
16   Q. Did you look for those documents in
17  responding to the subpoena that is in front of you
18  today?
19   A. No. It's my understanding that they were
20  produced.
21       ATTY. HIGGINS: Steve, I'm going to ask
22  that those documents be produced, because they are
23  clearly responsive to the subpoena.
24   Q. I'm showing you what the Court Reporter has

8 (Pages 26 to 29)

John C. McCullough                                                                                                                05/19/2005

Page 30

1  marked as Exhibit 50.  Mr. McCullough, you see that
2  this e-mail which has a date at the top of June 3,
3  2004 and was directed to Madeline Kauffman from
4  Stephen Gordon, was cc'd to an e-mail address that
5  appears to be yours; is that your e-mail address?
6      A.  Yes, it is.
7      Q.  Do you recall receiving this e-mail from Mr.
8  Gordon that had this calculation in it with respect
9  to how CBW's commission can be, quote, revenue
10  neutral, close quotes, to Key?
11     A.  Where does it say it's revenue neutral, I'm
12  sorry?
13     Q.  If you read the first sentence of the
14  e-mail.
15     A.  Oh, I see.  Okay.  Do I recall getting this?
16     Q.  Yes.
17     A.  I don't recall getting it, but, I mean, I
18  assume I got it.
19     Q.  Do you recall in this time frame, June of
20  2004, becoming aware that CBW -- strike that.  Do
21  you recall in this time frame, June of 2004,
22  communications regarding CBW's commission?
23     A.  I don't understand the question.
24     Q.  Whether or not you recall the specific

Page 31

1  e-mail, do you recall in this time frame, June of
2  2004, there being communications between the
3  individuals involved in the transaction about the
4  amount that was due to CBW?
5      A.  No, I don't recall it.
6      Q.  At any time prior to the September 30, 2004
7  closing did you have an understanding that an amount
8  would be due to CBW for the services that it had
9  provided?
10     A.  My understanding was only what I had read in
11  the engagement letter.
12     Q.  And do you recall -- well, let's look at the
13  engagement letter.  Looking at Exhibit 4, if you
14  look at -- this actually doesn't have pages, but if
15  you look at the paragraph that begins with No. 2,
16  Fee arrangements --
17     A.  Okay.
18     Q.  -- and you see that there is, first,
19  services described as restructuring services and
20  some hourly rates; do you see that?
21     A.  Yes.
22     Q.  Then on the next page you see that there is
23  underlined investment banking services?
24     A.  Yes.

Page 32

1      Q.  And that there is set out in that paragraph
2  a formula for CBW to be compensated for those
3  services?
4      A.  I see that.
5      Q.  Did you ever do a calculation based on the
6  Epoch purchase price of the amount that was due to
7  CBW?
8      A.  No.
9      Q.  Do you recall seeing communications where
10  that calculation was made?
11     A.  I don't recall seeing calculations.
12     Q.  Did you have an understanding prior to the
13  closing that pursuant to the terms of this
14  engagement letter that you had read CBW was entitled
15  to be paid based on this formula for investment
16  banking services?
17     A.  I had no idea how, and whether or not, CBW
18  had performed.  I had no idea about that, whether
19  they would be entitled to.
20     Q.  What was the purpose of your reading the
21  engagement letter?
22     A.  It was a document that came to my office,
23  and I looked at it and put it in the file.
24     Q.  After the date of this e-mail that has been

Page 33

1  marked as Exhibit 50, this June 3 date, do you
2  recall -- let me ask this question first, do you
3  recall that at one point in time Epoch had offered
4  to pay $37 million for the combined operations?
5      A.  The initial purchase price?
6      Q.  Yes.
7      A.  I think there was an initial purchase price,
8  right.  I'm sorry.  Go ahead.
9      Q.  Were you involved at all with negotiations
10  with Epoch in terms of Epoch's reduction of that
11  purchase price?
12     A.  Well, there wasn't much negotiations.  You
13  asked me was I involved in negotiations.  As I
14  described to you we had a meeting at Goodwin Procter
15  at which they indicated that they would not pay the
16  $37 million for various reasons, and, as I recall
17  that day we left the meeting, it appeared that the
18  transaction may have ended, and we then worked with
19  other counsel to see if we could get the deal back
20  on track.
21     Q.  And that other counsel, was that the
22  attorneys at Goodwin, Procter & Hoar?
23     A.  No, it was my understanding that Mr. Gordon
24  took the lead in that matter.

9 (Pages 30 to 33)

Page 34

1    Q.  You previously mentioned that you recall 2
2  different conference calls that you participated in
3  and that folks from CBW also participated in?
4    A.  Yes.
5    Q.  Do you remember which individuals from CBW
6  participated in those calls?
7    A.  I believe the first call there were 2
8  individuals from CBW.  I think Matt Caine is a name
9  I remember, and I can't recall the second fellow.
10  I'm sure I'd recognize the name, but I can't
11  remember it.
12    Q.  Do you recall if it was Matt Ryan?
13    A.  That doesn't ring a bell.
14    Q.  Ed Casas?
15    A.  I don't think so.  It was an older fellow,
16  as I remember the tone of his voice.  I never met
17  him.
18    Q.  Do you recall whether that conference call
19  preceded, or was subsequent to, the meeting at
20  Goodwin, Procter & Hoar where Epoch announced that
21  it was going to be reducing a purchase price?
22    A.  I believe it was before.
23    Q.  And do you recall the purpose or general
24  subject matter of the conference call?

Page 35

1    A.  I think the conference call, although they
2  were on the call, they didn't really participate in
3  the call.  It was basically a discussion between
4  counsel to determine the schedules for producing
5  exhibits and due diligence on behalf of Epoch and
6  what individuals would be participating in those
7  matters.
8    Q.  Is it your recollection that at the time of
9  that first conference call it had already been
10  decided to go forward with Epoch?
11    A.  I think the letter of intent had been
12  executed.  We were working on the purchase and sale
13  agreement.
14    Q.  What about the second conference call; what
15  was the purpose of it?
16    A.  It was a similar call to see what the status
17  was of exhibits and matters of that sort.
18    Q.  Who do you recall being at the meeting at
19  Goodwin, Procter & Hoar where Larry Gerber spoke?
20    A.  Epoch was represented by Deborah Paff, and
21  Beth Anderson, and I think one other Epoch
22  participant, counsel, Andy Sucoff, David Henken for
23  Epoch.  I believe representatives from Key Bank came
24  down that day, Madeline Kauffman and another banker,

Page 36

1  Italian fellow.  I don't recall his name.  Matt
2  Caine came, this is the first time I met him, and
3  representatives from the sellers.
4    Q.  And do you remember which members of the
5  Freid family were there?
6    A.  I believe Barry, I think Gerry was there,
7  and their CFO Frank Barker, Steve Gordon, counsel.
8    Q.  Was Georgia Freid at that meeting?
9    A.  No.
10    Q.  Before you went to the meeting and Larry
11  Gerber made that presentation, what did you
12  understand was the purpose of the meeting?
13    A.  They were discussing the completion of due
14  diligence and their findings.
15    Q.  And you recall that Mr. Gerber made a
16  presentation?
17    A.  Yes, slides, pointers, quite extensive.
18    Q.  At the end of that presentation did Mr.
19  Gerber make some sort of an announcement about the
20  purchase price?
21    A.  Oh, yes.
22    Q.  What was his announcement?
23    A.  That it had to be less.  I think it was
24  33,000 or something -- 33 million, I'm sorry,

Page 37

1  somewhere around there.
2    Q.  After Mr. Gerber made his presentation and
3  announced that Epoch was willing to pay, was there
4  then a meeting among the group there representing
5  the sellers?
6    A.  We probably talked for a moment and then we
7  left.
8    Q.  Do you recall that before the group
9  representing the sellers talked that Mr. Caine was
10  asked to leave the room?
11    A.  Well, no, I don't recall that, but I
12  remember, you know, we had a conversation.
13    Q.  You don't recall whether or not Mr. Caine
14  was there?
15    A.  He wasn't part of our conversation, no.  I
16  think after the general presentation he left and the
17  folks at Key went back to Albany.
18    Q.  After Mr. Gerber's presentation did you, or
19  anyone else representing the sellers, have any
20  conversations with anyone there representing Key
21  Bank as to what was going to happen now that Epoch
22  had decided to reduce the purchase price?
23    A.  I did not have any conversation with Key
24  Bank about that matter.

10 (Pages 34 to 37)

John C. McCullough                                                        05/19/2005

Page 38

1    Q. Do you recall being there when anyone else
2 had such conversations that day?
3    A. About the matter, no, I don't. I don't
4 recall.
5    Q. It's your recollection that after Mr.
6 Gerber's presentation the Key Bank people left and
7 there was some further discussion just among the
8 folks representing the sellers?
9    A. Right.
10    Q. When you left Goodwin Procter's office that
11 day what was your understanding as to the status of
12 the transaction?
13    A. It appeared that this was going to be a bump
14 in the road.
15    Q. Was there any consensus among the group as
16 to any sort of a counter that should be presented to
17 Epoch in terms of its reduction of the purchase
18 price?
19    A. You are asking me to disclose a conversation
20 with my client?
21    Q. No, I'm not; I'm asking you whether it was
22 your understanding that there was a counteroffer
23 that was going to be conveyed from The Pointe Group
24 side to Epoch.

Page 39

1    A. We were going to think about it further to
2 see what we could do.
3    Q. Do you know whether, after that meeting,
4 there was a number conveyed to Epoch in terms of
5 another proposed number between 37 million and the
6 number that Epoch was proposing?
7    A. I don't recall. I was not involved in that.
8        (Document marked as Exhibit 51
9        for identification.)
10    Q. This September 25, 2004 e-mail appears to
11 have been copied to you?
12    A. Yes.
13    Q. And you see that in the -- that the e-mail
14 is actually directed to Madeline Kauffman, Andy
15 Sucoff, and David Henken, and in that e-mail Mr.
16 Gordon begins by saying, I did not have a chance
17 after we concluded our agreement late in the day
18 yesterday to confirm it in writing. My question is,
19 Were you a participant in whatever discussions led
20 to the agreement that is referenced in this
21 September 25 e-mail?
22    A. No.
23    Q. Do you see that the e-mail in the second
24 sentence references an abutter title issue in

Page 40

1 Chestnut Hill? Do you see that?
2    A. Yes.
3    Q. Do you have any knowledge about what that
4 abutter title issue was at the time of this e-mail?
5    A. Yes.
6    Q. What can you tell me about what the title
7 abutter issue was that was referenced in this
8 e-mail?
9    A. Apparently the buyers, Epoch, had obtained
10 a survey of the property at Chestnut Hill, Chestnut
11 Hill being Hammond Point and Boylston Place, and
12 concluded that there was an encroachment on a
13 portion of the property on neighboring property.
14    Q. The next sentence talks about the as-agreed
15 Cranberry, with a capital C, escrow of $300,000
16 being increased to $400,000; do you know -- what was
17 that -- what is the Cranberry escrow set up for?
18    A. The escrow was set up to support warranties,
19 and guaranties, and representations made in the
20 purchase and sale agreement.
21    Q. Was that escrow increased from 300,000 to
22 400,000 to account for the abutter issue?
23    A. No.
24    Q. Do you know why that escrow was increased

Page 41

1 from 300- to 400,000?
2    A. Yes.
3    Q. Why was that?
4    A. There had been a recent claim notice, or a
5 notice of investigation filed by the Atty. General's
6 Office concerning Cranberry Point Nursing Home, the
7 operation of Cranberry Point Nursing Home.
8        (Document marked as Exhibit 52
9        for identification.)
10    Q. Mr. McCullough, I think you previously
11 identified Mary Cole as the -- did you call her the
12 project manager?
13    A. Yes.
14    Q. And that was for the transaction that closed
15 on September 30; is that correct?
16    A. Yes, she was working on that project, yes.
17    Q. In your office what is the role of a project
18 manager?
19    A. Her role in this particular case was to
20 compile documentation, there was an enormous amount
21 of paper in this case, and compile documentation,
22 interact with the attorneys and paralegals at
23 Goodwin Procter to exchange documents, satisfy the
24 extensive lists of exhibits in the Purchase and Sale

11 (Pages 38 to 41)

John C. McCullough                                                    05/19/2005

<table>
<tr><td valign="top">

Page 42

1  Agreement, and to make sure that we had good records
2  of what we had delivered, and that we would do so
3  timely.
4      Q.  And is Ms. Cole an attorney?
5      A.  No.
6      Q.  What is her educational background, do you
7  know?
8      A.  I believe she is a college graduate.  She is
9  the former Administrator of the Federal Court of
10  Appeals.
11      Q.  How long has she worked for your firm?
12      A.  She has worked for our firm on and off for
13  over 30 years.  She hasn't worked there 30 years;
14  she has worked in Washington as a major litigation
15  project manager.  She was the administrator of
16  District Attorney Ralph Martin's Office, and she has
17  come back and forth on different projects with our
18  office over the years.
19      Q.  Does she still work with your office today?
20      A.  Yes.
21      Q.  Whose handwriting is on this document, do
22  you know?
23      A.  No.
24      Q.  Do you see that this -- at the top it says

</td><td valign="top">

Page 44

1  this document there is a logo and then some text
2  that says The Pointe Group Healthcare and Senior
3  Living?
4      A.  Mm-mm.
5      Q.  Is that a name that you are familiar with?
6      A.  I've seen it before, yes.
7      Q.  Do you have any understanding as to whether
8  that's a corporate entity?
9      A.  I think that's a d/b/a for the management
10  entity.
11      Q.  A d/b/a for The Pointe Group, Inc.?
12      A.  Yes, I believe so.
13      Q.  And Mary Cole is the person we talked about
14  before, the project manager on this project?
15      A.  That's correct.
16      Q.  And would it have been part of Ms. Cole's
17  responsibilities to gather wiring instruction for
18  the transaction?
19      A.  Well, it was her responsibility to, as I
20  say, assimilate all documentations.  We had meetings
21  from time to time in our office about where
22  documents were, what we needed, and who had to get
23  what, and I assume that she just followed
24  instructions to obtain information.

</td></tr>
<tr><td valign="top">

Page 43

1  her -- the very top message says this e-mail came to
2  John today, and then there is some initials, M A T?
3      A.  Yes.
4      Q.  Who is that?
5      A.  Mary Ann Tyler, my paralegal.
6      Q.  Was Ms. Tyler also working on this
7  transaction?
8      A.  Yes.
9      Q.  How long has she been with your firm?
10      A.  Since 1973.
11      Q.  And is she still there today?
12      A.  Yes.
13          (Document marked as Exhibit 53
14          for identification.)
15      Q.  Mr. McCullough, you see that this exhibit,
16  which was marked as Exhibit 53 -- and it has
17  multiple pages, but the cover page appears to be a
18  fax transmission page from Frank Barker, correct?
19      A.  Yes.
20      Q.  And do you know what Mr. Barker's role was
21  with The Pointe Group?
22      A.  It's my understanding that he is the
23  financial officer.
24      Q.  And you see that on the left-hand side of

</td><td valign="top">

Page 45

1      Q.  And followed instructions from whom?
2      A.  Probably me.  I was lead counsel on that
3  case.
4      Q.  So you see this fax, it says on it -- this
5  is in, obviously, Mr. Barker's writing -- it appears
6  to say Pointe Group wire instructions?
7      A.  I don't know that that is Mr. Barker's
8  writing.
9      Q.  You see the comments on the lower part of
10  the first page; do you understand that to refer to
11  Pointe Group wire instructions?
12      A.  Yes.
13      Q.  And these wire instructions, it looks like
14  the fax was sent on 9/27/04, a few days before the
15  closing?
16      A.  Okay.  Yes.
17      Q.  Does that agree with your memory as to when
18  the closing took place?
19      A.  The closing took place on 9/30/04.
20      Q.  And you see, if you go through this fax,
21  that there are different entities identified in some
22  wiring instructions.  The second page indicates a
23  wire instruction for an account named The Pointe
24  Group, Inc.; do you see that?

</td></tr>
</table>

12 (Pages 42 to 45)

John C. McCullough                                                                      05/19/2005

Page 46

1     A.  Yes, I see that.
2     Q.  If you go a few pages on there are wire
3   instructions for Fidelity National Title; do you see
4   that?
5     A.  Yes.
6     Q.  And it was your understanding that that was
7   the deposit escrow; is that correct?
8     A.  No, that's not correct.
9     Q.  What was your understanding as to what
10   Fidelity was to do?  What escrow responsibilities
11   did they have?
12     A.  It was my understanding they were going to
13   make all the disbursements on the closing.  All
14   monies to be paid were going to be paid through
15   Fidelity.
16     Q.  You see the next page after that there are
17   wire instructions for Casas, Benjamin & White?
18     A.  Yes.
19     Q.  And then --
20     A.  Wait a minute, I'm sorry.  The CBW?
21     Q.  Yes.
22     A.  Yes, I see that.
23     Q.  And then there are wire instructions on the
24   next page for Key Bank?

Page 47

1     A.  Okay, I see that.
2     Q.  On the last page for Mellon Trust, correct?
3     A.  Yes.
4     Q.  Just because I may have misunderstood your
5   prior testimony, what was your understanding as to
6   what escrow funds Mellon Trust would hold and
7   disburse?
8     A.  Mellon was going to hold the warranty
9   representation escrow, the $400,000, plus the 16 V
10   escrow.
11     Q.  Do you know why there were 2 different
12   entities designated to hold escrow funds?
13     A.  What do you say, Fidelity and --
14     Q.  -- Mellon.
15     A.  Well, Fidelity was the disbursement escrow
16   in closing.  They shouldn't be holding anything more
17   now.
18     Q.  I see.  And Mellon would hold escrows until
19   such point as they weren't necessary anymore; is
20   that right?
21     A.  Pursuant to the Escrow Agreement, yes.
22   There are disbursement dates in that Escrow
23   Agreement.
24     Q.  In the Mellon Escrow Agreement?

Page 48

1     A.  That's correct.  With regard to
2   disbursements it's my understanding that there was
3   only one exception to Fidelity disbursing funds, and
4   that was a payment to the Commonwealth of
5   Massachusetts for recoupment funds that was going to
6   be paid separately by Goodwin Procter.
7     Q.  Just so I understand that, meaning that the
8   payment would not go through Fidelity, but would be
9   made directly by Goodwin Procter?
10     A.  I believe that's correct, yes.  This exhibit
11   you have handed me isn't -- I don't know how it has
12   been put together, but it is made up of several
13   different -- appears to be several different either
14   e-mails or faxes.
15     Q.  Okay.
16     A.  I think the one that you indicated came from
17   Frank Barker with their wiring instructions, but
18   these other documents were not part of that initial
19   transmission.
20     Q.  Okay.  And you say that because, for
21   example, the first page, Frank Barker's facsimile
22   indicates it has two pages?
23     A.  Right, right, and I look at the page numbers
24   at the top, so just for clarification.

Page 49

1     Q.  Well, you'd agree with me, though, that all
2   of the documents that have been grouped together as
3   part of this exhibit appear to be wiring
4   instructions?
5     A.  They are all wiring instructions, and I
6   assume that we would have compiled them to get them
7   to Terry Nolan at Fidelity.
8          (Document marked as Exhibit 54
9          for identification.)
10     Q.  Mr. McCullough, I just have a few questions
11   about this printed out e-mail.  You see at the
12   bottom there is an e-mail from Andy Sucoff to Steve
13   Gordon on September 29 at 8:08 a.m. where he is
14   talking about a -- what appears to be a successor
15   liability escrow in the amount of $162,000; do you
16   see that?
17     A.  Yes.
18     Q.  And he says that that is separaate from the
19   $400,000 escrow?
20     A.  Yes.
21     Q.  And what was that escrow, the 162,000; what
22   was that intended to address.
23     A.  That's the 16 V escrow I was referring to
24   that had to do with the anticipated recoupment

13 (Pages 46 to 49)

John C. McCullough                                                                05/19/2005

Page 50

1  against one of the facilities, or any of the
2  facilities, with regard to claims by the
3  Commonwealth after the sale, and the successor
4  liability issue from the Commonwealth's perspective
5  in a nutshell is that they can claim it from a
6  purchaser facility if it's owed by a seller.
7  Q. Was that number, 162,000, something that was
8  negotiated based on expected claims?
9  A. That's right.
10  Q. And if you look at the top, going to the
11  top, it looks like Mr. Gordon perhaps responded to
12  this, and then there is a separate response at the
13  top from you, also dated September 29. You say,
14  Andy, Steve, the TPG folks have advised me that the
15  credit balances at Cranberry have been paid down to
16  approximately 36,000; is that right?
17  A. Mm-mm.
18  Q. And was it your understanding that the
19  escrow amount could be reduced to reflect that?
20  A. We were trying to get it reduced; they
21  wouldn't agree to go along with it. They didn't --
22  they claimed that their accountants, I think there
23  was Feeley & Driscoll, didn't agree with Landa. L&A
24  is Landa & Altscher.

Page 51

1  Q. And whose accountants were they?
2  A. They were the accountants for the seller's
3  facilities.
4  Q. Where are they located?
5  A. They are in Canton.
6  Q. Could you just say that name again.
7  A. Landa, L-a-n-d-a, & Altscher,
8  A-l-t-s-c-h-e-r.
9  Q. And then at the end you say the Hammond
10  calculation remains the same. Is that the abutter
11  issue? What was the Hammond calculation?
12  A. No.
13  Q. What was the Hammond calculation?
14  A. I think the Hammond calculation would be the
15  anticipated recoupments on Hammond.
16  Q. I see.
17       (Document marked Exhibit 55
18       for identification.)
19  Q. Mr. McCullough, I hand you what the Court
20  Reporter has marked as Exhibit 55, and this is the
21  e-mail that you provided this morning before the
22  deposition started, and I believe you had told me
23  that this e-mail was an e-mail that Mary Cole
24  located on her computer; is that correct?

Page 52

1  A. Yes.
2  Q. Do you recall, other than sitting here
3  today, seeing this e-mail and the attached invoice
4  from CBW in connection with preparations for the
5  closing?
6  A. I probably did see it. We were rounding up
7  all invoices and wiring instructions to be submitted
8  to Fidelity.
9  Q. And from the time that you were first asked
10  to provide -- your firm was first asked to provide
11  services in connection with this transaction,
12  through the date that this invoice was sent on
13  September 29, did anyone affiliated with The Pointe
14  Groupe ever tell you that they were dissatisfied
15  with any services that CBW provided?
16  A. I never had any conversations with anybody
17  from The Pointe Group about CBW.
18  Q. It would be fair to say, then, that you
19  never heard any complaints about CBW's performance
20  from anyone affiliated with The Pointe Group or the
21  selling entities?
22  A. I had no conversations with anybody about
23  CBW.
24  Q. And did you, between the time you first

Page 53

1  became involved in the transaction, through the date
2  of the closing, ever hear from anyone that The
3  Pointe Group or the selling entities were
4  dissatisfied with CBW's services?
5  A. I saw a letter dated October 1 from Atty.
6  Gordon to CBW.
7  Q. The closing was on September 30, the day
8  before?
9  A. Yes.
10  Q. And my question was, From the time you first
11  became involved, through the date of the closing,
12  did you ever hear from anyone that there was any
13  dissatisfaction with the services CBW had provided?
14  A. I never heard any comments about CBW,
15  positive or negative.
16  Q. Prior to the transaction that closed on
17  September 30, had you been involved in any sale
18  transactions where the selling entities had used a
19  company to find potential buyers, and solicit offers
20  from potential buyers, and help clients evaluate
21  potential offers?
22  A. I'm sure I have.
23  Q. And do you remember the names of any of
24  those entities that you remember being involved in

14 (Pages 50 to 53)

John C. McCullough                                                                                    05/19/2005

Page 54

1  transactions in which you were involved?
2      A. No.
3      Q. You don't remember any, like, Massachusetts
4  companies that provided those services that you --
5      A. Well, there have been many closings that I
6  have worked at where brokers have been involved in
7  some capacity.
8      Q. Can you tell me the names of any entities
9  that you recall being involved? Obviously I'm
10  talking about commercial transactions.
11      A. Atrium Nursing Home I'm sure.
12      Q. Is that an actual nursing home, or is that
13  a --
14      A. It's a nursing home.
15      Q. I'm sorry.
16      A. It's a nursing home.
17      Q. Okay, but was there some sort of entity
18  involved in that transaction?
19      A. Oh, the entity that provided the service? I
20  can't recall who got paid in that deal. There were
21  several transactions where brokers got paid, but I
22  can't recall the names of the brokers.
23      Q. In those transactions where you recall folks
24  getting paid for those kinds of services, in each of

Page 55

1  those transactions were those entities paid out of
2  the closing proceeds?
3      A. Not all the time, no.
4      Q. Tell me what you remember about the
5  different circumstances.
6      A. Well, I've been in a number of cases where
7  brokers were paid at the closing or paid over time
8  after the closing.
9      Q. How many different times do you think that
10  occurred that a broker was paid over time after a
11  closing?
12      A. I have no idea.
13      Q. Do you know what the engagement letter in
14  this case required?
15      A. I don't recall what it required.
16      Q. Why don't we look at that Exhibit 4. If you
17  would look at the sections we were looking at
18  before, the section entitled Investment Banking
19  Services. If you look at the last sentence of that
20  particular section which begins, The performance
21  incentive payments shall be due and payable at the
22  closing of each transaction. Do you see that?
23      A. Yes.
24      Q. And as the lawyer for the selling entities

Page 56

1  was it important to you to know what was in the
2  engagement letter that had been signed?
3      A. Was it important for me to know? I mean, I
4  read it.
5      Q. So is it fair to say that you were aware
6  that per the terms of the engagement letter the
7  payment due to CBW was due and payable at the
8  closing?
9      A. All I can say is that this is what the
10  document says. I can't comment on it in any other
11  way.
12      Q. And you had read it before the closing?
13      A. I did see this document.
14          (Recess taken.)
15          (Document marked Exhibit 56
16          for identification.)
17      Q. I'm going to hand you what been marked as
18  Exhibit 56. Mr. McCullough, I have handed you what
19  appears to be a draft of the closing statement for
20  the September 30, 2004 transaction; would you agree
21  with that?
22      A. It looks like it, other than the notations
23  on it. I don't know what those are.
24      Q. If you look at the bottom there is what

Page 57

1  appears to be a document number in the left-hand
2  corner?
3      A. Yes.
4      Q. Looking at that document number, do you know
5  whether that document was created in your office?
6      A. No, it was not.
7      Q. Do you have a recollection as to who
8  prepared the first draft of the closing statement
9  for the transaction?
10      A. This looks like a document from Goodwin
11  Procter.
12      Q. You just referenced the fact that on the
13  first page of this document there are some
14  handwritten notations; do you see those?
15      A. Yes.
16      Q. Is that your handwriting?
17      A. No.
18      Q. Do you know whose handwriting it is?
19      A. I have no idea.
20      Q. If I could just turn your attention to what
21  on this document appears as Page 10, I'm sorry, 9 of
22  11, and you see at the top it's identified as
23  Schedule 7, Closing Costs and Disbursements?
24      A. Yes.

15 (Pages 54 to 57)

John C. McCullough                                                                          05/19/2005

Page 58

1    Q. And there are 2 different columns of closing
2  costs and disbursements, one for the buyer and one
3  for the seller?
4    A. Yes.
5    Q. You see Item No. 4, Broker commissions, and
6  then it says Payable to, and there is a blank, and
7  there is an amount that had been typed in brackets
8  of a million dollars, and somebody has etched that
9  out and written in handwriting $960,546.46; is that
10 your handwriting?
11   A. No.
12   Q. Do you know whose handwriting it is?
13   A. No idea.
14   Q. In terms of the days leading up to this
15 transaction, in your office which person had the
16 responsibility of reviewing drafts of the closing
17 statement?
18   A. I would.
19   Q. Did Mary Cole also play some part in
20 reviewing drafts of the closing statement?
21   A. She would have probably got a copy of an
22 e-mail, I suppose, or I would given her a copy of
23 documents to make sure we had documents in every
24 category.

Page 59

1    Q. Do you remember, independent of whose
2  handwriting is on this page that we just looked at,
3  there being a determination in the days leading up
4  to the closing that the amount due to CBW, rather
5  than this initial rounded amount that appears of a
6  million dollars, was $960,546?
7    A. I don't recall that. I'd have to look at
8  the bill from Casas, Benjamin. It doesn't refresh
9  my memory as to whether that was the number.
10   Q. Well, looking at the amount that's on the
11 invoice, which is more than 960,000, do you recall
12 conversations with anyone as to whether the amount
13 should be less than the amount that is reflected on
14 the invoice?
15   A. No, I don't recall conversations.
16   Q. I'll hand you what was previously marked as
17 Deposition Exhibit 29, and you will see that appears
18 to be another e-mail with another draft of a closing
19 statement, this one on the day before the closing,
20 September 29?
21   A. Yes.
22   Q. And do you recall that the day before the
23 closing there were a number of draft settlement
24 statements, or closing statements, that were

Page 60

1  exchanged between the parties?
2    A. There probably were, yes.
3    Q. Do you recall that the day before the
4  closing you were working fairly late in the evening
5  on getting the closing statement finalized?
6    A. Oh, yes. Well, all other matters too. This
7  was just one of the issues. Closing statement and
8  other matters were going on.
9    Q. And this is the day before the closing?
10   A. Well, right up to closing, yes, and through
11 the closing.
12   Q. You see that this e-mail was sent to you, as
13 well as to, I think, Mary Cole in your office?
14   A. Mary Cole, Mary Anne Tyler, yes.
15   Q. If you look at the next page of the exhibit,
16 if you look at the bottom amount, there is a number
17 reflected there, Amount due from sellers of funds --
18 due to sellers, sorry?
19   A. Yes. It says to seller, but it's a negative
20 number.
21   Q. Do you recall, the day before the closing,
22 receiving or reviewing a draft settlement statement
23 that had an amount due from the seller in excess of
24 a million dollars?

Page 61

1    A. Yes.
2      (Document marked as Exhibit 59
3       for identification.)
4    Q. I'm going to hand you what the Court
5  Reporter has marked as Exhibit 59.
6      ATTY. GORDON: 59?
7      ATTY. HIGGINS: Yes.
8      ATTY. GORDON: Are you going to use 57
9  and 58?
10     ATTY. HIGGINS: Oh, I'm sorry. These
11 were marked out of order. They will be exhibits.
12   Q. Mr. McCullough, this e-mail that has been
13 marked as Exhibit 59, the originating e-mail is one
14 from Andy Sucoff to various individuals, also on
15 Wednesday September 29 at 8:31 p.m., and this
16 printout also reflects your response to that e-mail
17 which went from you to Mr. Sucoff; is that correct?
18   A. Yes.
19   Q. And in that e-mail you say, Andy, thanks for
20 the revised closing statement. I have forwarded it
21 to my client, and they have made provisions for the
22 amount due from sellers. See you tomorrow. You see
23 that?
24   A. Yes.

16 (Pages 58 to 61)

John C. McCullough                                                      05/19/2005

Page 62

1    Q. And at the time you sent this e-mail to Mr.
2  Sucoff, were you intending to communicate to Mr.
3  Sucoff that your clients would be bringing in excess
4  of a million dollars to the closing the following
5  day?
6    A. I was intending to communicate that we were
7  going to proceed with the closing. Were they going
8  to be bring a million dollars; I don't know.
9    Q. Well, this e-mail to Mr. Sucoff says that
10 provisions have been made, correct?
11   A. That's what it says.
12   Q. Did you know whether provisions had been
13 made when you sent the e-mail?
14   A. I probably had some communication with my
15 clients. I'm sure I sent them the closing
16 statement. What time is this? Is there a time on
17 this; 8:31. There is no time on my e-mail; why is
18 that?
19   Q. You see your e-mail has a date of 9/29,
20 correct?
21   A. Yes, I do see that.
22   Q. When you sent this e-mail to Mr. Sucoff,
23 what was your understanding as to the amounts that
24 would be due from the sellers to have the

Page 63

1  transaction close?
2    A. Well, it would be the last amount that
3  appeared on the last settlement statement.
4    Q. The number that was in excess of a million
5  dollars?
6    A. Looks like that would be the number, yes.
7    Q. I'm going to go back to the correct order.
8  I'm handing you what has been marked as -- strike
9  that. Let me hand you first what was previously
10 marked at Mr. Freid's deposition as No. 31, and you
11 see at the top of that e-mail -- well, the second
12 e-mail down, there is an e-mail -- there is an
13 e-mail, it's actually the third e-mail down, from
14 Madeline Kauffman to Steve Gordon the same day,
15 September 29 at 10:27 p.m., where Ms. Kauffman says
16 that John McCullough called her around 10:00 p.m.
17 to confirm that he, meaning you, and Andy had
18 finalized. Do you remember having a conversation
19 with Ms. Kauffman on the night of September 29 and
20 indicating to her that the closing statement had
21 been finalized?
22   A. I had a conversation with her that night. I
23 believe I -- she had called me, and I indicated to
24 her that from a document perspective we appeared

Page 64

1  ready to go over there and see if we could close the
2  sale. I think that was the substance of the
3  conversation. I was waiting for -- I think I had
4  received earlier that day discharges from Key Bank
5  to get to Terry Nolan.
6    Q. Do you remember within that conversation
7  with Ms. Kauffman any discussion as to whether the
8  numbers had been finalized and whether there was
9  enough money to close the transaction?
10   A. I don't recall if we talked about money. I
11 told her we were going to go over and I probably
12 asked her if she was coming down.
13   Q. If you look at the second e-mail from the
14 top, there is an e-mail from Steven Gordon to Ms.
15 Kauffman in response to hers, and his is pretty
16 short. It says, And is there enough money, and Ms.
17 Kauffman responds at 10:46 p.m. on September 29, I
18 understand from John McCullough that everything is
19 set for tomorrow. Do you see that?
20   A. I see that, yes.
21   Q. And in the e-mail that we just looked at you
22 indicated to Mr. Sucoff, Exhibit 59, on the same day
23 that the clients had made provisions to bring the
24 amount that was due from the sellers, correct?

Page 65

1    A. It was my understanding we were going to go
2  forward with the closing.
3    Q. And it was further your understanding, as
4  you communicated to Mr. Sucoff, that your clients
5  had made provisions for the amount that was due?
6    A. That's what the e-mail says, yes.
7       (Document marked as Exhibit 57
8       for identification.)
9    Q. I'm handing you what has been marked as
10 Exhibit 57. This exhibit 57, again just looking at
11 the bottom, left-hand corner, there is a different
12 indicator. It says TPG Closing Statement,
13 parenthesis, 9, close parenthesis; do you see that?
14   A. Yes.
15   Q. Do you recognize that to be something that
16 appears on documents generated by your office?
17   A. No, I think the closing statement entirely
18 was generated by Goodwin Procter.
19   Q. And you see in the right-hand corner of this
20 Exhibit 57 there is a date and a time, 9/30/2004,
21 8:20 a.m.; do you see that in the right-hand corner?
22   A. Yes.
23   Q. And that was the date of the closing,
24 correct, September 30?

17 (Pages 62 to 65)

John C. McCullough                                                      05/19/2005

---

Page 66

1     A.  That's the day that we met at Goodwin
2  Procter, yes.
3     Q.  And at 8:20 a.m. on that date closing
4  statement which appears to be version 9 reflected
5  net funds due to seller a negative number of
6  1,093,310, correct?
7     A.  Yes.
8     Q.  Do you remember -- you went to Goodwin
9  Proctor's office that day, correct, September 30?
10    A.  Yes.
11    Q.  Do you remember what time you got there?
12    A.  Probably around 9:00.  I don't know if I had
13  this before I went, but maybe not, but if I didn't,
14  they had a copy there.
15    Q.  And if you look at what appears on this one
16  as Page 10 of 11, and again this is Schedule 7,
17  Closing Costs and Disbursements, and you see that
18  under Item 4, listed as a cost to the seller is an
19  amount due to CBW of $960,546.46; do you see that?
20    A.  I do.
21    Q.  When you went to the closing on September 30
22  around 9:00, or whenever you arrived, was it your
23  understanding that your clients would be bringing
24  the amount that is reflected on this closing

---

Page 67

1  statement generated the morning of the closing, in
2  excess of a million dollars, to close the
3  transaction?
4     A.  It was my understanding that from a
5  financial perspective arrangements had been made to
6  proceed with the closing --
7     Q.  And as of --
8     A.  -- the best we could.
9     Q.  -- as of 8:20 a.m. on 9:30 that proceeding
10  with the transaction would require the seller to
11  bring in excess of a million dollars?
12    A.  I don't know if I knew they were going to
13  bring a million dollars.  I have no recollection
14  that I knew they were going to bring a million
15  dollars.
16    Q.  But it was your understanding that they had
17  made provisions to come up with sufficient funds to
18  close the transaction; is that right?
19    A.  Either come up with sufficient funds or made
20  alternate arrangements.  This is not the settlement
21  statement that was executed, I believe.
22    Q.  We are going to get to those.
23       (Document marked as Exhibit 58
24        for identification.)

---

Page 68

1     Q.  I'm going to hand you what is marked as
2  Exhibit 58.  Mr. McCullough, looking at the document
3  that has been marked as Exhibit 58, would you agree
4  with me that this document indicates in the lower
5  right-hand corner a date of 9/30/2004, 8:37 a.m.?
6     A.  I see that, yes.
7     Q.  And again this document still has a number
8  due from the seller of in excess of a million
9  dollars?
10    A.  It seems to be the same number as Exhibit
11  57, yes.
12    Q.  And again on page 11 of 12 we still show an
13  amount payable to Casas, Benjamin & White of in
14  excess of $960,000?
15    A.  That's what it shows.
16    Q.  I'm handing you what has been marked as
17  Exhibit 60.
18       (Document marked as Exhibit 60
19        for identification.)
20    Q.  Mr. McCullough, would you agree with me that
21  this is yet another version of the closing
22  statement, this one with a date of 9/30/2004, 9:28
23  a.m.?
24    A.  That's what it says.  I have, however, no

---

Page 69

1  memory that I actually saw these, if that is what
2  you are asking me, because these do not appear to be
3  e-mails.  These were probably being generated over
4  at Goodwin Procter.  I don't know -- and it says
5  1XLS, I don't know what that means, but I have no
6  idea if these were the ones we were working with
7  over there.
8     Q.  My question was whether you agree with me
9  that this document has a date of 9/30/2004 and time
10  of 9:28 a.m.?
11    A.  That's what it says, yes.
12    Q.  Do you know if you were at Goodwin Procter
13  at this time?
14    A.  Yes, we probably were.  I think we were
15  there by 9:00, quarter of 9:00, 9:00.
16    Q.  If I could just ask you to look at the
17  Schedule 7.  It's Page 10 of 11.  You see, again
18  this is Schedule 7, looking at item 4 do you see
19  that somebody has crossed out the number $960,546;
20  do you see that?
21    A.  Yes.
22    Q.  Looking at this whole page, is any
23  handwriting on this page yours?
24    A.  No.

---

18 (Pages 66 to 69)

John C. McCullough                                                    05/19/2005

Page 70

1    Q. Do you know whose handwriting it is?
2    A. No.
3    Q. Did you instruct -- strike that. Was your
4  understanding that Goodwin Procter was in charge of
5  generating these different generations of the
6  closing statements?
7    A. They were doing that, yes.
8    Q. And Goodwin Procter, the attorneys there,
9  they were representing the buyer, correct?
10   A. Yes.
11   Q. Did you tell any of the attorneys at Goodwin
12 Procter, or any of the paralegals, to strike out
13 that number?
14   A. I believe I told Andy Sucoff that we would
15 deal with the broker commission outside of closing.
16   Q. You see that someone has written here next
17 to Casas, Benjamin & White, LLC, parenthesis, POC,
18 close parenthesis? Do you see that?
19   A. Yes.
20   Q. Do you have an understanding as to what POC
21 means?
22   A. It means outside of closing.
23   Q. So pay it outside of closing?
24   A. I think that's what it means, yes, pay

Page 71

1  outside of closing. It's a typical standard
2  reference.
3    Q. What was Andy Sucoff's response to that?
4    A. He didn't have any response. I just said we
5  are going to deal with it outside of closing, and he
6  adjusted the -- he would make the adjustment he
7  said. We were going over many other issues at the
8  same time.
9    Q. And before you told Mr. Sucoff that -- well,
10 let me ask this question, When you told Mr. Sucoff
11 that we would deal with the broker commission out of
12 the closing, who were you referring to?
13   A. The sellers.
14     (Court Reporter changes paper.)
15   Q. Before you told Mr. Sucoff that the sellers
16 would deal with the broker commission outside of the
17 closing, did you have any conversations with anyone
18 at Casas, Benjamin & White as to whether that was
19 acceptable to Casas, Benjamin & White?
20   A. I did not.
21   Q. Did anyone tell you that they had had such a
22 conversation with anyone at Casas, Benjamin & White?
23   A. I don't recall if anybody told me that.
24   Q. Prior to telling Mr. Sucoff that the sellers

Page 72

1  would deal with the broker commission outside of the
2  closing, had you, without revealing the substance of
3  any communications, had you spoken with anyone
4  affiliated with the sellers about that issue?
5     ATTY. GORDON: Just yes or no.
6    A. Yes.
7    Q. And, again, without revealing the substance
8  of any such communications, before telling Mr.
9  Sucoff that the sellers would deal with the broker
10 commission outside of the closing, had you discussed
11 that issue with Barry Freid?
12     ATTY. GORDON: I'm going to instruct the
13 witness not to answer that question.
14     ATTY. HIGGINS: It's a yes-or-no
15 question.
16     ATTY. GORDON: I understand that. I'm
17 going to instruct him not to answer the question.
18     ATTY. HIGGINS: And on what, just to
19 make sure for the record?
20     ATTY. GORDON: On the grounds of
21 privilege.
22   Q. All right, I'm going to ask a similar
23 question. Prior to telling Mr. Sucoff that the
24 sellers would deal with the broker's commission

Page 73

1  outside of the closing, again without revealing the
2  substance of any communications, had you discussed
3  that issue with Gerald Freid?
4     ATTY. GORDON: I'm going to instruct the
5  witness not to answer the question on the grounds
6  of privilege.
7     ATTY. HIGGINS: I'll object to that
8  instruction.
9    Q. Mr. McCullough, prior to telling Mr. Sucoff
10 that you would deal with the broker commission
11 outside of the closing, had you discussed that issue
12 with Mark Tobin?
13     ATTY. GORDON: I'm going to instruct the
14 witness not to answer that question on the grounds
15 of privilege.
16   Q. Had you discussed the issue -- let me start
17 again. Prior to telling Mr. Sucoff that the sellers
18 would deal with the broker commission outside of the
19 closing, had you discussed that issue with Mr.
20 Gordon?
21     ATTY. GORDON: I'm going to instruct the
22 witness not to answer that question on the grounds
23 of privilege.
24   Q. Mr. McCullough, had you discussed that

19 (Pages 70 to 73)

John C. McCullough                                                                                05/19/2005

Page 74

1   issue, the issue that I have just been talking
2   about? Had you discussed that issue, again without
3   telling me the substance of such communications,
4   with Georgia Freid?
5          ATTY. GORDON: I'm going to instruct the
6   witness not to answer the question on the grounds of
7   privilege.
8      Q. Let me just try it a slightly different way.
9   Mr. McCullough, prior to telling Mr. Sucoff that the
10  sellers would deal with the broker commission
11  outside of the closing, had anyone affiliated with
12  The Pointe Group authorized you to make that
13  communication to Mr. Sucoff?
14         ATTY. GORDON: I'm going to instruct the
15  witness not to answer that question on the grounds
16  of privilege.
17         ATTY. HIGGINS: Even though my question
18  regards a communication that was to be made to a
19  third party?
20         ATTY. GORDON: My instruction stands.
21         ATTY. WORCESTER: Could you read back
22  Erin's last question.
23         (Question read.)
24         ATTY. HIGGINS: Let's go off the record

Page 75

1   for a second.
2          (Discussion off the record.)
3          ATTY. HIGGINS: I just want the record
4   to reflect that while we were off the record counsel
5   discussed whether to suspend Mr. McCullough's
6   deposition now for the purpose of obtaining the
7   judge's ruling on whether Mr. McCullough should be
8   required to answer questions, the questions that I
9   just posed to Mr. McCullough, whether we would
10  suspend his deposition at the end of today, then
11  seek the judge's ruling on whether he should be
12  required to answer those questions, which might
13  entail Mr. McCullough coming back for a subsequent
14  deposition to answer questions as the judge directs,
15  and I just want to make it clear for the record that
16  I'm reserving my right to do that.
17         ATTY. GORDON: And we have agreed to do
18  that.
19      Q. Getting back to the closing itself, do you
20  recall who was present at Goodwin's offices that day
21  from The Pointe Group side of things?
22      A. Yes, there were a number of people, Mark
23  Tobin, Jerry Freid, Barry Freid, Steve Gordon, Frank
24  Barker, Mary Anne Tyler, Mary Cole, myself, and

Page 76

1   that's all on our side, I think.
2      Q. And do you remember --
3      A. And Georgia Freid.
4      Q. Do you remember how long you were at
5   Goodwin's offices that day? Was it a full day, less
6   than a full day?
7      A. We were there until 5:30, quarter of 6:00,
8   and maybe later, actually.
9      Q. Among the people you just identified as
10  being there on The Pointe Group side, did all those
11  people remain there for the day or did some people
12  leave?
13     A. I think at a point in time in the afternoon
14  we tried to get as many documents that Georgia had
15  to sign out of the way. She is a relatively elderly
16  woman, and we wanted to accommodate her, and I think
17  we accomplished that, so she left at some time. I
18  think Jerry, perhaps, took her at some point in the
19  middle to late afternoon.
20     Q. And did he return, do you know?
21     A. I don't believe he did. I think he drove
22  her home or wherever she was staying.
23     Q. How about Mr. Gordon? Do you remember if
24  Mr. Gordon was there that day?

Page 77

1      A. Oh, yes, he was there. I listed him
2   earlier.
3      Q. Do you remember whether he was at the
4   closing the entire day?
5      A. He was there until late in the afternoon
6   around, my guess is, I remember around 5:00 or so.
7      Q. Other than the folks affiliated with The
8   Pointe Group, who else was at the closing that day?
9      A. A number of representatives from Epoch, all
10  of whom I don't remember. I don't know if we had a
11  sign-in sheet or not, but of course there was a
12  cadre of attorneys from Goodwin Procter, including
13  Andy Sucoff, David Henken, Lori Woodward, and
14  several other department attorneys that came in and
15  out of the closing.
16     Q. And you may have listed this before, who
17  else from your office was there?
18     A. Mary Cole, Mary Anne Tyler.
19     Q. Were they there the entire day as well?
20     A. Oh, yes.
21     Q. And do you recall that during the day that
22  you were there different versions of the closing
23  statement were prepared?
24     A. Yes.

20 (Pages 74 to 77)

John C. McCullough                                                                                05/19/2005

Page 78

1    Q. And were those all word-processed at
2  Goodwin's offices?
3    A. I believe that's correct.
4    Q. Was anyone else present from Key Bank?
5    A. No.
6    Q. Did anyone participate in the closing by
7  conference call as opposed to being there in person?
8    A. No. Let me -- to my knowledge, no. I don't
9  know if anybody called the Epoch Group. I have no
10  idea.
11    Q. Were the folks affiliated with The Pointe
12  Group in one room and the folks with Epoch in the
13  other room; is that how it was working?
14    A. Yes. When we originally walked in we all
15  went into the main conference room where they asked
16  us to go into a smaller conference room, and then
17  periodically during the day we were in several
18  different offices at Goodwin, the main conference
19  room, side room, several side rooms.
20    Q. During the day of the closing did you have
21  any communication with anyone from Key Bank?
22    A. No. During the closing, no.
23    Q. Do you know whether anyone from Key Bank
24  called in to see if the closing had actually

Page 79

1  occurred?
2    A. During the closing I have no idea.
3    Q. At the time you told Mr. Sucoff that the
4  broker's fee would be taken care of outside of the
5  closing, did you have any concern that the terms of
6  the engagement letter were being breached?
7        ATTY. GORDON: I'm going to instruct the
8  witness not to answer that question.
9        ATTY. HIGGINS: On what grounds?
10        ATTY. GORDON: Privilege.
11        ATTY. HIGGINS: I'm asking about his
12  concerns.
13        ATTY. GORDON: He can only have a
14  concern as a lawyer. Are you asking him if he has a
15  concern other than as a lawyer?
16        ATTY. HIGGINS: No.
17        ATTY. GORDON: Then my objection stands.
18        ATTY. HIGGINS: Okay. We might have
19  more than a few questions to take up with the judge.
20    Q. We previously looked at and marked as
21  exhibits documents that came into your office from
22  CBW, including an invoice from CBW and wiring
23  instructions from CBW. When you told Andy Sucoff
24  that the broker's fee would be paid outside of the

Page 80

1  closing you knew that that was not CBW's
2  understanding, correct?
3    A. That is not the conversation I have
4  testified to. I said that we would deal with it
5  outside of closing; I didn't say we would pay it
6  outside of closing. That's not my testimony.
7    Q. When you told Andy Sucoff that the sellers
8  would deal with CBW's fee outside of the closing,
9  you knew that CBW expected to be wired funds on the
10  day of the closing, correct?
11    A. We had an invoice. I would say that I was
12  aware that they had sent an invoice expecting to get
13  paid, yes.
14    Q. You were aware they had sent wire
15  instructions, correct?
16    A. Oh, yes.
17    Q. On the day of the closing did you have
18  conversations with anyone in which any
19  dissatisfaction was expressed with the quality of
20  CBW's services?
21        ATTY. GORDON: On the day of the
22  closing?
23        ATTY. HIGGINS: (Nod.)
24        ATTY. GORDON: On the day of the

Page 81

1  closing.
2    A. On the day of the closing. I think it's
3  difficult to answer that question without getting
4  into conversations with clients.
5    Q. Well, it's only a yes-or-no question.
6    A. Then I would say yes.
7    Q. Did you understand that CBW had brought
8  Epoch to the transaction?
9    A. I'm not sure that I understood that. I
10  assumed they had some role, but I'm not for sure
11  that they brought Epoch.
12    Q. You don't know one way or the other?
13    A. No.
14    Q. Other than that conversation that you have
15  testified to having with Mr. Sucoff on the day of
16  the closing about the fee that was reflected on the
17  closing statement, did you have conversations with
18  anyone on the day of the closing, other than your
19  clients, about CBW's fee?
20    A. No.
21        (Document marked as Exhibit 61
22        for identification.)
23    Q. I'm going to hand you what was marked as
24  Exhibit 61. Mr. McCullough, before we get to that

21 (Pages 78 to 81)

John C. McCullough                                                           05/19/2005

Page 82

1  exhibit, at the time that you spoke to Mr. Sucoff,
2  and you made a point earlier of clarifying your
3  testimony, it's your memory that you said to Mr.
4  Sucoff that the sellers would deal with CBW's fee
5  outside of the closing; is that right?
6       A. Yes.
7       Q. Did you have an understanding at the time
8  you had that conversation with Mr. Sucoff as to
9  whether CBW was going to be paid?
10          ATTY. GORDON: I'm going to instruct the
11  witness not to answer the question on the grounds of
12  privilege.
13          ATTY. HIGGINS: It's a yes-or-no
14  question; you are not going to let him answer that
15  question?
16          ATTY. GORDON: No, I'm not.
17      Q. Mr. McCullough, if you could look at Exhibit
18  61, and you see that that has a date of 9/30/2004,
19  and it's dated -- the time is 1:18 p.m. in the
20  lower, right-hand corner?
21      A. Mm-mm. Yes. Sorry.
22      Q. You see that Schedule 7, if you look again
23  at page -- now it's page 9 of 10?
24      A. Yes, I see it.

Page 83

1       Q. You see that now there is no figure next to
2  the amount due Casas, Benjamin & White?
3       A. Correct.
4       Q. That's in accord with what you told Mr.
5  Sucoff to do?
6       A. Yes.
7       Q. If you look at the first page, the net funds
8  due seller number has changed pretty
9  dramatically, hasn't it?
10      A. It has changed, yes.
11      Q. And as a result of the deletion of CBW's
12  fee from the sellers side of the closing statement,
13  your client now, instead of having to bring over a
14  million dollars to the transaction, according to
15  this settlement sheet they need to bring 176,000 and
16  change to get the transaction closed?
17      A. Well, there is other modifications also on
18  the statement that bring it down to that number.
19      Q. Would you agree with me that the primary
20  adjustment was the deletion of CBW's fee?
21      A. The primary adjustment actually as to the
22  largest dollar amount, yes.
23          (Cell phone rings.)
24          (Recess taken.)

Page 84

1          (Last question and answer read.)
2       Q. At the time you had the conversation with
3  Mr. Sucoff that you testified to before instructing
4  him that that could be deleted from the seller's
5  side of the closing statement, did you believe that
6  you were authorized by your clients to make that
7  communication to Mr. Sucoff?
8          ATTY. GORDON: I'm going to object and
9  instruct the witness not to answer on the grounds of
10  privilege.
11      Q. Mr. McCullough, I'm just going to ask you
12  this question with respect to all the questions that
13  Mr. Gordon has instructed you not to answer. Are
14  you accepting Mr. Gordon's instruction not to answer
15  those questions?
16      A. Yes.
17      Q. Just looking again at Exhibit 61, which is
18  still in front of you, you see there is still some
19  handwriting on the first page of that exhibit?
20      A. Yes.
21      Q. Is any of that handwriting yours?
22      A. No.
23      Q. During the day of the closing were you
24  looking at various drafts of closing statements?

Page 85

1       A. Periodically they would come back in with a
2  closing statement.
3       Q. And you would get a copy of that?
4       A. Yes.
5       Q. Do you recall, as the day went on, making
6  notes on those closing statements?
7       A. No.
8       Q. Did you retain copies of the different
9  versions of the closing statements you received on
10  the day of the closing?
11      A. I don't think so. They were working
12  statements, and the only statement we retained was a
13  copy of the signed statement at the end of the day.
14      Q. It wouldn't be your practice to keep the
15  drafts in a separate file, or anything like that?
16      A. Not that day, no.
17          (Document marked as Exhibit 62
18          for identification.)
19      Q. I'm handing you what has been marked as
20  Exhibit 62. Mr. McCullough, you see that this
21  Exhibit 62 has a date on it in the lower right-hand
22  corner of the first page, 9/30/2004, 3:14 p.m.; do
23  you see that?
24      A. Yes.

22 (Pages 82 to 85)

John C. McCullough                                                                05/19/2005

Page 86

1    Q.  Is any of the handwriting that appears on
2  the first page of this exhibit yours?
3    A.  No.  I testified I have not made any notes
4  on any of these statements.
5    Q.  If you could just look at Page 10 of 11 on
6  this one.  Is that true with respect to that
7  handwriting as well, that that is not your
8  handwriting?
9    A.  I made no notes on any of these statements.
10    Q.  I'm handing you what is marked as Exhibit
11  63, Mr. McCullough.  Looking at that exhibit it
12  appears to be a printout of an e-mail from Mary Anne
13  Tyler to Andy Sucoff on September 30, 2004, and then
14  it says from you enclosed is the start of a closing
15  memorandum.  We will complete it as the day goes on.
16  Could you explain to me what was happening here?
17  Was someone working at your office while you were at
18  Goodwin Procter's office?
19    A.  No, this would have gone before.  It's
20  curious there is no time on this.  Our e-mails that
21  we would save have time frames on it, but I don't
22  see any time of day on it.  This would have been
23  early in the day.  We were working on a closing
24  memorandum, and we continued to work on it during

Page 87

1  the closing.
2    Q.  Now, how did you work on it during the
3  closing if you were at Goodwin's offices?
4    A.  We worked on it at Goodwin's offices.  They
5  put it on their computer system.
6    Q.  I see.  Was that a document that you
7  initially generated and then it was worked on at
8  Goodwin's office?
9    A.  I think the agreement was Andy would do the
10  settlement statement and I would work on a closing
11  memo.
12    Q.  And that was something you started before
13  going over to Goodwin, and then you continued to
14  work on it at Goodwin's offices?
15    A.  Yes.  Through the day a number of items got
16  added to it, and numbers attached to it, and some
17  obligation of the parties after closing, continuing
18  obligations.
19    Q.  Were you working on a laptop or was the
20  document actually on Goodwin's system?
21    A.  It was on Goodwin's system.
22    Q.  And the closing memo, as you were working on
23  it during the day, what was your understanding as to
24  who that would be distributed to once it was

Page 88

1  finished?
2    A.  Parties to the transaction.
3    Q.  Would that include Key Bank?
4    A.  I don't think Key was part of that closing
5  memo.
6    Q.  So you don't -- as you were drafting, was it
7  your intention it would go to Key, as well as to the
8  sellers and the buyer?
9    A.  I don't think so.  It's in the closing
10  binder.  It describes who would participate in what.
11  Is that it?
12    Q.  This is the closing memo.
13    A.  Yes.
14       (Document marked as Exhibit 64
15        for identification.)
16    Q.  I'm handing you what is marked as Exhibit
17  64.  Mr McCullough, is Exhibit 64 the closing
18  memorandum that was prepared by your office?
19    A.  No.
20    Q.  Do you recognize Exhibit 64?
21    A.  Yes.
22    Q.  And what does it appear to you to be?
23    A.  It's a closing memo that was prepared
24  jointly by Goodwin Procter and ourselves.

Page 89

1    Q.  And it consists of -- there is a 2-page
2  document at the front, and then there is a closing
3  statement attached to it which has 2 different
4  signature pages, one signed by Mark Tobin, and an
5  agent of Fidelity, and then one signed by the
6  buyer's nominee?
7    A.  That's what it looks like.
8    Q.  And then there is schedules to the closing
9  statements attached?
10    A.  Yes.
11    Q.  This exhibit that has been marked as 64, in
12  your mind does that constitute the closing
13  memorandum?
14    A.  Yes, I would say it does.
15    Q.  And is your office system that this
16  generally would be in front of the closing binder?
17    A.  It's in their binder, yes.
18    Q.  And the first 2 pages of the closing
19  memorandum, those detail certain things that were
20  intended to take place after the closing?
21    A.  Yes.  These are operational issues that,
22  during the transfer of a health care facility, sort
23  of is an ongoing dynamic for these issues.
24    Q.  And can you give me a general idea as to

23 (Pages 86 to 89)

John C. McCullough                                                              05/19/2005

Page 90

1  when all of these 7, I think there are 7 issues,
2  were completed.
3      A. Let's see. I think No. 1 was completed
4  within the next couple of pay periods, I believe.
5  There was -- I believe there was -- by DPH regs
6  there was an ultimate transfer of forms on the P&A
7  monies, No. 2. That was probably within 30 days, I
8  believe. Vacation issues are still outstanding on
9  No. 3. I do not know if the Medicaid user fee has
10 been finalized.
11     Q. How about Item 5?
12     A. Medicaid short year adjustment, I do not
13 know that either. Sometimes that depends on
14 subsequent Medicaid audits. It's supposed to be
15 paid over 10 months, so whether that has been
16 completed, I don't know.
17     Q. How about Item 6?
18     A. I believe that was completed, because it was
19 an adjustment of private pay. I assume both parties
20 got together and worked out their numbers on that,
21 and then 7 would be subsequent bills, probably
22 within the next 30 to 60 days after closing.
23     Q. Have you continued to represent the sellers
24 with respect to these issues, these post closing

Page 91

1  issues?
2      A. In some issues we are involved, not all of
3  them.
4      Q. Do you know whether the sellers are
5  represented by other counsel with respect to some of
6  these 7 issues?
7      A. I don't believe anyone else is working with
8  them on that, to my knowledge.
9      Q. Looking at the closing statement that is
10 signed here, if I could just ask you to turn to
11 Schedule 7. Here it's pages 9 and 10 of 11. I just
12 wanted to run through this with you starting with
13 Item 1, the title insurance premium. It was
14 payable to Fidelity National. Now that was the
15 escrow agent, correct?
16     A. That's correct.
17     Q. So the ultimate recipient of that --
18     A. When you say escrow agent, that was the
19 escrow agent for disbursements of the closing, yes.
20     Q. So the ultimate recipient of that money
21 would have been someone other than Fidelity,
22 correct?
23     A. The 34,000?
24     Q. Yes.

Page 92

1      A. No, that was the title insurance premium
2  payable to Fidelity National. That was their
3  payment for the title premium.
4      Q. Do you know whether that amount was actually
5  paid to Fidelity?
6      A. I assume it was. I assume that they paid
7  themselves out of the money it received.
8      Q. Just in general, the numbers on this
9  Schedule 7, these would not have changed, correct,
10 these were numbers that were finalized at the
11 closing?
12     A. I believe that's correct. I think that
13 Terry Nolan signed this somewhere.
14     Q. I think we looked at that. You said that
15 his signature appeared next to Mark Tobin's.
16     A. I believe that's right, yes. It's not
17 legible, but I think it's his.
18     Q. Going down the schedule you see there is
19 transfer and recording taxes, recording fees. If we
20 skip to Item 5, that's, we have talked about this
21 already, the escrow for successor liability?
22     A. Yes.
23     Q. That was payable to Mellon Trust, correct?
24     A. That's correct.

Page 93

1      Q. Do you know whether the monies that were
2  deposited with Mellon, or wired to Mellon, whether
3  those are still in that escrow fund or whether those
4  have been disbursed?
5      A. To my knowledge there has been no
6  disbursement of the escrow funds from Mellon.
7      Q. As I said before, I'm not a transactional
8  lawyer, if there were disbursements from the Mellon
9  escrow, would you, as the closing attorney, know
10 about those?
11     A. Yes.
12     Q. Item 6, General escrow also payable to
13 Mellon, this is the 400,000 escrow we talked about
14 earlier, correct?
15     A. That's correct.
16     Q. This $400,000 escrow, that was intended to
17 address both any issues arising out of the DPH
18 investigation -- correct?
19     A. That's correct.
20     Q. What else was that intended to address?
21     A. It was intended to be a security in a way
22 for warranties, and representations, and covenants
23 in the transaction.
24     Q. Do you know whether there has been any

24 (Pages 90 to 93)

John C. McCullough                                                05/19/2005

Page 94

1  disbursement from that escrow?
2      A. There have been no disbursements from the
3  Mellon escrows, 5 or 6.
4      Q. And where this closing occurred in September
5  of '04, you know, in your experience as a
6  transactional lawyer, is that unusual that those
7  escrows still haven't been disbursed?
8      A. No, very common. The escrow is sometimes a
9  period of 2 or 3 years.
10     Q. Do you know whether the DPH investigation is
11 still ongoing?
12         ATTY. GORDON: I'm going to instruct the
13 witness not to answer that question on the grounds
14 of privilege.
15     Q. If you could just turn the page to Item
16 number 7. I think we talked about this escrow as,
17 well, the payment to settle Medicaid, and I think
18 your testimony was that this was an amount that was
19 actually delivered to Goodwin Procter.
20     A. I believe that's right.
21     Q. Now, what was this intended -- this $869,055
22 payment, what was that for, do you know?
23     A. It was a prior recoupment claim of the
24 Commonwealth of Massachusetts, outstanding balance

Page 95

1  to the Commonwealth of Mass.
2      Q. Do you know, was that a claim that was
3  actually in litigation?
4      A. No, the number had been determined. It was
5  very problematic to pay the Commonwealth. We wanted
6  to deliver a check; they wouldn't take a check. We
7  had to go through a process, so the check was
8  delivered to Goodwin Procter so they would know it
9  would be paid.
10     Q. And that was for sums that the Commonwealth
11 said were due for what?
12     A. Prior years, prior years Medicaid payments.
13     Q. And was that sum of $869,055 paid to the
14 Commonwealth?
15     A. It's my understanding it was.
16     Q. Item 8 is the Key Bank payoff. Item 9, what
17 does this refer to, neighbor legal fee?
18     A. This was the title encroachment that I had
19 referenced earlier in testimony. Epoch had agreed
20 to take on the effort to  resolve it with the
21 neighbor for -- that money is to be paid to the
22 title company. I do not know if that has been paid.
23 I have no idea. That's not part of the Mellon
24 payment.

Page 96

1      Q. So this $15,000 was agreed as an amount that
2  Epoch would receive to try and deal with this
3  situation?
4      A. Right. That's correct.
5      Q. And then what about Item 10, Reimburse
6  tenant. Is the tenant Sovereign Bank, or is
7  Sovereign Bank where this accounts is?
8      A. Reimburse Sovereign Bank?
9      Q. No, it just says reimburse tenant. What was
10 this amount for? This was an amount that Epoch was
11 going to pay?
12     A. I don't know. I don't remember reading
13 that. I don't have a memory of that. I can't
14 remember what that was. It doesn't appear on other
15 exhibits.
16     Q. You don't have a memory of what that refers
17 to?
18     A. I don't actually. I really don't. Oh, let
19 me make a comment about that. This looks like an
20 Epoch issue and not a sale issue. What was
21 happening at the same time as the closing was their
22 financing with the National REIT, which is one of
23 the reasons we were in another room. They were also
24 closing with them at the same time for their

Page 97

1  financing. This looks like an issue related to
2  Epoch, not us. It has got Epoch's wiring
3  instructions.
4      Q. And it appears on the buyers side of the
5  closing statement?
6      A. Yes, it's on the buyer's said, and it's
7  clearly not anything to do with us.
8          (Document marked as Exhibit 65
9          for identification.)
10     Q. May I hand you what was marked as Exhibit
11 65. My question about this document is simply
12 whether your handwriting appears anywhere on this
13 document.
14     A. No.
15         ATTY. HIGGINS: I don't have any more
16 questions about that then.
17     Q. At any time from the day of the closing to
18 the present have you ever had any communications
19 with anyone at Key Bank about the transaction?
20     A. Yes.
21     Q. And when was that?
22     A. The evening of the closing.
23     Q. And whom did you speak with?
24     A. I spoke with Madeline Kauffman. I called

25 (Pages 94 to 97)

John C. McCullough                                                    05/19/2005

Page 98

1  her house that night.
2     Q. And you called her as opposed to her calling
3  you?
4     A. Mm-mm.
5     Q. You have to answer verbally.
6     A. Oh, I'm sorry. Yes, I know that.
7     Q. And you called her at her house, correct?
8     A. Yes.
9     Q. Was that after you had left Goodwin, Procter
10 & Hoar?
11    A. Yes.
12    Q. And were you back in your office at the
13 time?
14    A. Yes, I called her from my office. I told
15 her that we had closed, and I believe I told her
16 that monies had been wired, as far as I knew, to
17 Key.
18    Q. Did Ms. Kauffman ask you any questions as to
19 what had occurred at the closing?
20    A. No.
21    Q. Is all you recall of that conversation that
22 you told her that the transaction had closed and
23 that monies had been wired to Key?
24    A. Yes, that's right.

Page 99

1     Q. Did you tell Ms. Kauffman during that call
2  how much the sellers had had to pay to get the
3  transaction closed?
4     A. I only told her that we had closed.
5     Q. Did you, that evening send -- did you finish
6  the closing memorandum that evening?
7     A. We finished it at the closing.
8     Q. Did you actually get a copy of the closing
9  memorandum to take with you at the end of that day?
10    A. I think I took a copy of the settlement
11 statement, closing memo.
12    Q. Did you ever send a copy of the settlement
13 statement to Key Bank?
14    A. Not that I recall.
15    Q. After that conversation with Madeline
16 Kauffman and your deposition today, between those 2
17 times, have you talked to anyone from Key?
18    A. Yes.
19    Q. And -- strike that. Who did you talk to?
20    A. Madeline Kauffman.
21    Q. Was that the next day?
22    A. Yes.
23    Q. Was it in the morning, the afternoon, the
24 evening, of the next day?

Page 100

1     A. I guess maybe middle morning the next day.
2     Q. Did you call her, did she call you?
3     A. She called me.
4     Q. Can you tell me what was said during that
5  call?
6     A. She asked me what happened with CBW.
7     Q. What did you tell her?
8     A. I told her she should call Steve Gordon.
9     Q. And why did you tell her that?
10    A. Because Steve was dealing with it.
11    Q. And when Ms. Kauffman asked you what
12 happened with CBW, did she ask you specifically
13 whether CBW had been paid?
14    A. I think she said she had a call from CBW.
15    Q. Was Ms. Kauffman upset or angry?
16    A. No, she was her usual conversational tone.
17    Q. Did Ms. Kauffman say anything during that
18 call about whether she believed CBW should have been
19 paid at the closing?
20    A. No.
21    Q. At the time you had that conversation with
22 Ms. Kauffman, do you know whether Key Bank had
23 already done whatever it needed to do to release its
24 liens?

Page 101

1     A. Did I have lien releases that we obtained,
2  is that what you are asking me?
3     Q. Yes.
4     A. I testified earlier that we had obtained
5  lien releases from Key or made arrangements to have
6  them sent to Terry Noland at Fidelity to hold for
7  the closing.
8     Q. Was it your understanding that Mr. Noland at
9  Fidelity was to hold those releases in escrow until
10 he was authorized by Key Bank to release them?
11    A. I think that's correct. They had to receive
12 the funds.
13       (Document marked as Exhibit 66
14       for identification.)
15    Q. The document I have just handed you, have
16 you ever seen it before?
17    A. Well, it looks like an allocation of the
18 purchase price allocated to the various facilities.
19 Whether that's the one ultimately that was agreed
20 on, I don't know. I don't see any other indication
21 of that.
22    Q. Did you play a part in either drafting, or
23 revising, or working on, in any way, the Purchase
24 and Sale Agreement for the transaction?

26 (Pages 98 to 101)

John C. McCullough                                                                                    05/19/2005

Page 102

1    A. Working on the Purchase and Sale Agreement,
2    yes, yes.
3        Q. Do you recall that the Purchase and Sale
4    Agreement had attached to it an exhibit that was an
5    allocation of the purchase price?
6        A. I think there was ultimately an allocation
7    agreed on.
8        Q. Do you remember whether that was agreed on
9    before or after the closing?
10       A. I think there was language in the Purchase
11   and Sale Agreement that talks about an allocation
12   within 30 days of closing.
13       Q. Did you personally participate in any way in
14   coming up with the allocation that is reflected
15   here?
16       A. No, I believe the accountants on both buyers
17   and sellers worked on the allocation.
18       Q. And I think you testified earlier to the
19   accountants for the selling entities, and I'm
20   forgetting the name of the firm.
21       A. Landa & Altscher.
22       Q. Landa & Altscher. Did they remain the
23   accountants throughout and after the closing?
24       A. To my knowledge, yes.

Page 103

1        Q. After the conversation that you had with
2    Madeline Kauffman the morning following the closing,
3    from that time until today, have you had any other
4    conversations with either Ms. Kauffman, or Mr.
5    Dunham, or anyone affiliated with Key Bank?
6        A. No.
7        Q. And after Ms. Kauffman called you did you
8    have any conversations with anyone at CBW?
9        A. No.
10       Q. From the day of the closing to your sitting
11   here today, have you had any conversations with any
12   of the attorneys at Goodwin Procter about CBW's fee
13   and whether or not it had been paid?
14       A. No.
15           (Document marked as Exhibit 67 for
16           identification.)
17       Q. Have you had a chance to look at Exhibit 67?
18       A. Yes.
19       Q. Now this e-mail, it say at the top it's from
20   Mary Anne Tyler, but then your signature block
21   appears underneath. Is that something you would
22   typically do, have Mary Anne Tyler send e-mails for
23   you?
24       A. Sometimes, yes.

Page 104

1        Q. Who actually prepared the text of this
2    e-mail?
3        A. Mary Anne Tyler.
4        Q. Can you tell me what this e-mail refers to?
5    What is the $869,055 Terry Nolan is being directed
6    to release?
7        A. That's the recoupment to the Commonwealth.
8        Q. And can you explain to me why Terry Nolan is
9    being instructed to release these funds to Cranberry
10   Point Nursing Home?
11       A. Yes. As I tried to explain to you, I think
12   it was a very difficult thing, you might think this
13   is odd, but to pay the Commonwealth the money they
14   were owed, and I think we ultimately worked out an
15   arrangement after talking to a whole bunch of people
16   over there. As you can see, it took over a month
17   from the closing. The original intention at the
18   closing was simply to either wire the funds or to
19   get funds over there from Fidelity, but they
20   wouldn't accept a wire, because for some reason it
21   would go into the general fund and not into the
22   Medicaid funds if it was wired, so ultimately we had
23   to find somebody over there that would agree to
24   accept a check at some point, and I believe the

Page 105

1    arrangement -- Frank Barker made an arrangement
2    with -- through, I guess, Landa's office that
3    somebody would accept a check if they walked it
4    over there, and it was on Cranberry's heading, so I
5    think Andy and I sent a release to Nolan telling him
6    to give the money to Cranberry, and Cranberry went
7    over and paid the bill. They had made arrangements
8    to pay it.
9        Q. So this e-mail is dated November 2 of 2004?
10       A. Looks like it, yes. It took a while to get
11   it done. It was amazing.
12       Q. I think you had testified earlier that the
13   money was going to be given at the closing to
14   Goodwin, Procter & Hoar, and Goodwin, Procter & Hoar
15   was to give the funds to the Commonwealth?
16       A. That's right. That was the original
17   intention.
18       Q. And so was there a check written to Goodwin,
19   Procter & Hoar at the closing in this amount?
20       A. I think it went -- well, actually, I don't
21   know. I have to look at a settlement statement. I
22   think it went to Goodwin. Where is the memo? I
23   don't see it in there, but I think it was supposed
24   to go to -- Goodwin was supposed to take it over,

27 (Pages 102 to 105)

John C. McCullough                                                    05/19/2005

---

Page 106

1  then that didn't work out.  We made some calls over,
2  I guess, to Medicaid, and they wouldn't take it, so
3  I think it was deposited with Nolan, as I think back
4  on it, and it was to be released from Nolan to
5  Sucoff.  I think there is a memo in these documents
6  you have looked at this morning indicating we
7  weren't to have any say about what happens to it, it
8  was to go to Sucoff to take over when he made
9  arrangements to do it, but then apparently Medicaid
10 wanted our guys to bring it in or something.
11     Q.  So as of the time of this November 2, 2004
12 e-mail, the money had been sitting with Fidelity
13 since the closing?
14     A.  I think that's right.
15     Q.  And it's your testimony what happened is,
16 per this e-mail, is that Fidelity then cut a check
17 to Cranberry Nursing Home for this amount; is that
18 right?
19     A.  I think they agreed that Frank Barker would
20 take it in and pay it.  That was the arrangements
21 made with Medicaid, and to my knowledge it was paid,
22 because there has been no claim against Epoch.
23        ATTY. HIGGINS:  Let mark that as the
24 next exhibit.

---

Page 107

1        (Document marked as Exhibit 68
2        for identification.)
3     Q.  Mr. McCullough, I'm handing you what has
4  been marked as Exhibit 68.  This appears to be a
5  letter dated November 3, 2004, on your letterhead,
6  signed by both you and Andy Sucoff; is that right?
7     A.  Yes.
8     Q.  Is there any reason why, in responding to
9  your deposition subpoena, we didn't get this letter?
10    A.  I don't know that you didn't get it.
11    Q.  This obviously would have been a document in
12 your files, correct?
13        ATTY. GORDON:  There were no documents
14 produce in response to the deposition subpoena.
15        ATTY. HIGGINS:  I understand that, and
16 my question is why not, why didn't we get this in
17 response to the subpoena.
18        ATTY. GORDON:  Because there was an
19 objection from the witness to producing documents.
20    Q.  Mr. McCullough, this document that we have
21 just marked as Exhibit 68, is there a copy of this
22 document in your files?
23    A.  I would think there probably is.
24    Q.  Is it your practice to maintain copies of

---

Page 108

1  correspondence?
2     A.  This document, yes, I would say.
3        ATTY. HIGGINS:  What was the basis for
4  the objection to producing documents responsive to
5  the subpoena?  I don't know if I should direct this
6  to Mr. McCullough or his attorney.  I think you said
7  the witness made an objection.
8        ATTY. GORDON:  Well, I, as his counsel,
9  made an objection on his behalf.
10        ATTY. HIGGINS:  Could you just state for
11 the record, because your letter does not so state,
12 what the basis of the objection is?
13        ATTY. GORDON:  No.
14        ATTY. HIGGINS:  No?
15        ATTY. GORDON:  No.
16        ATTY. HIGGINS:  You are refusing to
17 tell me why you objected to producing documents
18 responsive the subpoena.
19        ATTY. GORDON:  I'm refusing to answer
20 questions at this deposition.  Mr. McCullough is the
21 deponent.
22    Q.  Mr. McCullough, you see that this -- if you
23 look at the document that is attached to this
24 November 3 letter.

---

Page 109

1     A.  Yes.
2     Q.  Now this check, which is in the amount of
3  $869,055, you see that, it is a Fidelity check, do
4  you see that, and it's got -- somebody has written
5  canceled across it; do you see that?
6     A.  It says Fidelity National Title Insurance
7  Company?
8     Q.  Yes.
9     A.  Yes.
10    Q.  And somebody has written canceled across it?
11    A.  Yes.
12    Q.  Is that your handwriting?
13    A.  No.
14    Q.  You sent this letter to Mr. Nolan, and you
15 requested that Mr. Nolan release a check in the
16 amount of $869,055 made payable to Cranberry Point
17 Nursing Home, Inc., correct?
18    A.  This is a joint letter from Sucoff and
19 myself.
20    Q.  Correct.
21    A.  That's correct.  I have no idea looking at
22 this check who it is made out to.  It says -- oh, it
23 says pay to the Commonwealth of Mass.
24    Q.  Correct.

---

28 (Pages 106 to 109)

John C. McCullough                                                    05/19/2005

Page 110

1      (Document marked as Exhibit 69
2      for identification.)
3      Q.  Mr. McCullough, I'm handing you Exhibit 69.
4   The first page of that exhibit is a letter dated
5   November 4, 2004 to Mary Anne Tyler of your office;
6   do you see that?
7      A.  Yes.
8      Q.  The letter is from a woman named Jacquelyn
9   Byrne at Fidelity National Title Insurance Company
10  enclosing a check made payable to Cranberry Point
11  Nursing Home in the amount of $869,055, correct?
12     A.  Yes.
13     Q.  Is this also a letter a copy of which is in
14  your files?
15     A.  I assume it would be, but I don't -- I mean,
16  I don't have a memory of it.
17     Q.  This letter is dated November 4, 2004.  Have
18  you ever had -- strike that.  From that date to the
19  present have you had conversations with anyone at
20  the Commonwealth of Massachusetts about this
21  obligation, whether it's been paid, whether it's not
22  been paid?
23     A.  No.
24     Q.  Mr. McCullough, are you familiar with an

Page 111

1   entity called Freid and Tobin Venture Partners?
2      A.  No.
3      Q.  To the best of your knowledge did any monies
4   from any of the escrow funds that were established
5   at the closing go back to any member of the Freid
6   family?
7      A.  Which escrows are you talking about?
8      Q.  Any of the escrows that were established at
9   the closing.
10     A.  The Mellon escrows?
11     Q.  Or the Fidelity escrows.
12     A.  No, no monies, to my knowledge, went back to
13  the sellers, or the Freids.
14     Q.  And it's your understanding that the check
15  that is made payable to Cranberry Point, the intent
16  of that check was it was going to be deposited into
17  that -- into a bank account, Cranberry Point bank
18  account, and then a check was going to be written
19  out to the Commonwealth of Massachusetts and then
20  delivered to them?
21     A.  I don't know if this check ultimately was
22  endorsed over to the Commonwealth.  Frank Barker had
23  made arrangements with the Medicaid Division to
24  obtain this check, and satisfactory arrangements,

Page 112

1   that were satisfactory to Sucoff, and Goodwin
2   Procter, and Epoch in that regard, who they
3   obviously had had communications with the Medicaid
4   office also to determine the correct pathway to pay
5   this bill, and it's my understanding it was paid,
6   otherwise Epoch would be screaming about it now,
7   because they would have had their checks reduced.
8      Q.  Do you have any understanding as to whether
9   the current -- as to the current status of the
10  ownership of the shares in The Pointe Group, Inc.
11     A.  The Pointe Group Inc.; not off the top of my
12  head I don't, no.
13     Q.  How about any of the healthcare -- remaining
14  healthcare entities that the Freid family is
15  involved with; do you know whether the shares, in
16  either the companies that own those entities, or the
17  operating companies, whether those shares are still
18  held by Georgia Freid and Mark Tobin?
19     A.  I believe that's the case.
20     ATTY. HIGGINS:  I don't think I have any
21  other questions.
22     CROSS EXAMINATION
23  BY ATTY. WORCESTER:
24     Q.  Mr. McCullough, my name is Courtney

Page 113

1   Worcester, and I represent Key Corporate Capital in
2   this matter.  For simplicity sake I'm just going to
3   refer to that entity as Key, if that's okay with
4   you.
5      A.  Mm-mm.
6      Q.  Other than Madeline Kauffman did you have
7   interactions with anyone else from Key related to
8   the sale of the combined operations?
9      A.  I don't know what you mean by interactions.
10     Q.  Conversations.
11     A.  I had conversations with Steve Dunham.  I
12  met him a number of times.
13     Q.  When did you first meet Mr. Dunham?
14     A.  I probably met him at the Goodwin Procter
15  meeting.  I think it was sometime in July 2004.
16     Q.  That was the first time you had met Mr.
17  Dunham?
18     A.  I believe that's correct.
19     Q.  Had you had conversation with him prior to
20  that?
21     A.  He may have been on a telephone conversation
22  conference call at one time when the transaction was
23  starting.
24     Q.  Would that have been one of the conference

29 (Pages 110 to 113)

Page 114

1 calls that you testified to earlier? I believe you
2 testified to a due diligence call that had taken
3 place.
4     A. There were a couple of due diligence calls,
5 and I believe there was a conference call that Steve
6 Dunham was involved in at one time.
7     Q. Do you recall anything about the conference
8 call where Mr. Dunham was a participant?
9     A. Do I recall anything about it; what he said?
10     Q. What he said.
11     A. Not really.
12     Q. And how about the July 2004 meeting at
13 Goodwin and Procter; do you remember anything that
14 Mr. Dunham said then?
15     A. No, I don't. My conversations with him were
16 just social conversations, just introductory
17 conversations.
18     Q. After the July 24 meeting at Goodwin
19 Procter, did you have any other conversations with
20 Mr. Dunham?
21     A. Not that I recall. I think my primary
22 contact with Key was Madeline Kauffman.
23     Q. Other than Mr. Dunham and Ms. Kauffman did
24 you have any interactions with anyone else from Key

Page 115

1 related to the sale of the combined operations?
2     A. Not that I can recall.
3     Q. Did either Jerry or Barry Freid ever relay
4 to you conversations that they had had with Mr.
5 Dunham related to the sale of the combined
6 operations?
7     A. Are you asking me for conversation with my
8 client?
9     Q. I'm just asking if they had ever mentioned
10 to you that they had spoken to him about the sale in
11 a conversation you weren't present for.
12         ATTY. GORDON: You can answer whether
13 or not that took place.
14     A. I don't recall.
15     Q. Do you have an understanding of what the
16 outstanding mortgages were on the combined
17 operations owed to Key?
18     A. Prior to the closing you mean, unadjusted?
19     Q. Unadjusted.
20     A. Unadjusted mortgages. No. It was in excess
21 of the sale price, is my understanding.
22     Q. We have seen a bunch of closing statements
23 that show that Key received somewhere around $29
24 million from the closing.

Page 116

1     A. That's what my understanding is.
2     Q. Is it your understanding that Key was owed
3 in excess of the 29 million that they received from
4 the closing?
5     A. If they agreed to reduction, were they owed
6 it, is that the question?
7     Q. I wasn't actually trying to be that tricky.
8 Prior to any reduction, do you have an understanding
9 of how much Key was owed?
10     A. I don't know exactly the number, but it's my
11 understanding it was in excess of the 29 million.
12     Q. Do you have a sense of how much in excess it
13 was; was it 40 million, was it 30 million, just to
14 try to get a ball bark?
15     A. I really don't. It depends on how you
16 calculate interest. I don't know. I'm sure it's
17 accessible in the records.
18     Q. Were you a part of any of the conversations
19 as to how the $29 million number and change was
20 reached that was going to be paid to Key out of the
21 closing proceeds?
22     A. No.
23     Q. Do you know who was a party to those
24 conversations?

Page 117

1     A. I think Mr. Gordon was working with the
2 bank.
3     Q. Were you aware of any attempts or thoughts
4 by Key to foreclose on the combined operations?
5     A. Was I aware of any thoughts by Key; no.
6     Q. Or were you aware there was a concern that
7 Key may foreclose on the combined operations?
8         ATTY. GORDON: Concern by his clients?
9         ATTY. WORCESTER: Or did Key speak to
10 him. I'm not looking for a conversation from his
11 clients; I'm just curious if he had knowledge.
12     A. It was certainly impressed on me, I think,
13 by Madeline Kaufmann that Key wanted to close --
14     Q. And based on that --
15     A. -- in several conversations, yes.
16     Q. How did Ms. Kauffman impress that upon you?
17     A. She said that the bank wanted their money.
18     Q. What did you take from that?
19     A. Well, that we should do the best we can to
20 get this matter to closing and succeed in getting
21 the bank some money.
22     Q. Was it your understanding that if the
23 closing didn't occur that the bank may take action?
24     A. I don't know what the bank would have done.

30 (Pages 114 to 117)

John C. McCullough                                                        05/19/2005

Page 118

1  I know there were several loan extension agreements
2  that were very expensive that my clients entered
3  into with the bank; whether that would have happened
4  again, I have no idea whether they would have taken
5  any action, I don't know, but they certainly wanted
6  to see the closing on 9/30 succeed, and, in fact, if
7  you look at the documents you will see I think there
8  was an extension until 9/15, and we had persuaded
9  the bank to hang in there until the end of the month
10  to close.
11      Q.  Do you recall why the transaction didn't
12  close on 9/15, it took until 9/30?
13      A.  It was a very complex transaction, a lot of
14  documentation, a lot of due diligence, a lot of
15  investigation.  It was very -- it was 3 facilities,
16  so it was quite cumbersome and a lot of paper.
17      Q.  In looking at the closing -- the drafts of
18  the various closing statements that you have seen
19  today, I have not seen anywhere the number, the
20  amount that was going to be paid to Key, changed
21  from the $29,425,000, and feel free to go back
22  through the 5 or 6 that we have looked at today.  Do
23  you have a memory of that number changing from the
24  first draft of the closing statement to the actual

Page 119

1  closing that took place on 9/30?
2      A.  From the first draft of the closing
3  statements?  I don't have a memory of that.  I know
4  there was a change along the way, yes.
5      Q.  From 9/27, which I believe is the first
6  closing statement that we have looked at today, the
7  first draft, to 9/30, are you aware of any change in
8  the amount of money that Key was to obtain from the
9  closing proceeds?
10      A.  I'm not aware of it, no.
11      Q.  Were you aware of any discussions with Key
12  to reduce that number?
13      A.  I did not have conversations with Key to
14  reduce any numbers.
15      Q.  Are you aware of any conversations that took
16  place between anyone else and Key?
17      A.  Not in my presence, no.
18      Q.  I believe you testified to this earlier,
19  but I just want to make sure.  On the day before
20  the closing on September 29, 2004, to the extent
21  that the sellers needed to bring money to the
22  closing, that was information that would have been
23  conveyed to them prior to the closing on September
24  30?

Page 120

1      A.  Did I give them a copy of the settlement
2  statement; is that what you are asking?
3      Q.  No.
4      A.  Okay.  Sorry.
5      Q.  That's okay.  It wasn't a clear question.
6  Exhibit 58, which we have looked at earlier, was an
7  e-mail from you to Andy Sucoff stating that you had
8  forwarded to your client a revised closing statement
9  and they have made provisions for the amount due
10  from sellers.
11          ATTY. GORDON:  I think that's actually
12  Exhibit 59.
13          ATTY. WORCESTER:  Oh, is it 59?
14          ATTY. GORDON:  I have 58 as one of the
15  closing statement drafts.
16          THE WITNESS:  It is, yes.
17      A.  Yes?  The question is?
18      Q.  So the sellers were aware, at least the
19  night before the closing, that there was a
20  deficiency from the closing proceeds?
21          ATTY. GORDON:  Is that a question?
22          ATTY. WORCESTER:  Yes.
23          ATTY. GORDON:  I object to the form of
24  the question, and that's not the way the witness

Page 121

1  testified, and if you are asking him to testify as
2  to his clients' knowledge, I'm going to have to
3  instruct him not to so testify on the grounds of
4  privilege.
5      Q.  Let me ask the question again, because I'm
6  rather confident it's not calling for privileged
7  information.  You forwarded, the night before the
8  closing, the revised closing statement to your
9  clients, correct?
10          ATTY. GORDON:  Is that a question?
11      Q.  Yes.
12      A.  I did send the closing statement to the
13  office.  I don't know if all the participants and
14  the seller saw it, but I did send it over there, if
15  that's your question.
16      Q.  Is it your testimony that it's possible that
17  your clients came to the closing on 9/30 unaware
18  that they would receive no money from the closing
19  proceeds?
20      A.  (No response.)
21      Q.  Honestly, I'm not trying to ask a
22  complicated question.
23          ATTY. GORDON:  It's a very -- I don't
24  understand the question.

31 (Pages 118 to 121)

Page 122

1       THE WITNESS: I don't understand it as
2   well.
3       ATTY. GORDON: If it's his testimony his
4   clients were unaware. Can you ask him a direct
5   question.
6       ATTY. WORCESTER: I'm honestly trying
7   to.
8   Q. Let's see. You forwarded to your client the
9   closing statement the night before the closing,
10  correct?
11      ATTY. GORDON: No, he said he -- he just
12  testified that he sent it to the office.
13      ATTY. WORCESTER: This e-mail says, I
14  forwarded to my client.
15      ATTY. GORDON: Exhibit 59 is dated
16  September 29 at 8:31 p.m.
17      ATTY. WORCESTER: Yes.
18  A. So I probably sent it over quarter of nine,
19  you know. They may not have seen it, or somebody
20  saw it over there, I suppose, but I don't know if
21  all of them saw it.
22  Q. If you were unaware if they saw it, what is
23  the basis for your statement to Mr. Sucoff that they
24  have made provisions for the amount due from the

Page 123

1   sellers?
2   A. I probably had a conversation -- well --
3       ATTY. GORDON: Can you answer that
4   question without divulging communications with
5   clients?
6       THE WITNESS: I can't. I can't.
7       ATTY. GORDON: Then I have to object to
8   the question on the grounds of privilege and
9   instruct the witness not to answer it.
10      ATTY. WORCESTER: I just want to make
11  sure I understand the objection. You are objecting
12  on the basis of privilege, even though Mr. Sucoff is
13  being told in this e-mail that provisions have been
14  made?
15      ATTY. GORDON: I'm objecting on the
16  ground of privilege, because the question requires
17  an answer that invades the privilege.
18      ATTY. WORCESTER: So your objection is
19  that even as to facts Mr. McCullough cannot testify
20  if they were communicated between himself and his
21  clients?
22      ATTY. GORDON: My objection is that
23  an answer to the question would require an invasion
24  of the attorney-client privilege, and on that basis

Page 124

1   I have instructed the witness not to answer it.
2   Q. You are going to follow your attorney's
3   instructions?
4   A. Yes.
5   Q. Mr. McCullough, are you aware of any comfort
6   letters that were provided by Key to Epoch regarding
7   the closing?
8   A. A comfort letter? How do you describe a
9   comfort letter? I don't know what you mean.
10  Q. I would probably defer to what you believe
11  it is, as you have much more experience in the area
12  of transactional work, but I was considering it to
13  be a letter stating to Epoch that Key would release
14  the mortgages, or any liens, that it held on the
15  combined operations if certain conditions were
16  met.
17  A. I think that I recall a request for that
18  from the Epoch Group, and did Key do that; I think
19  if they were asked to do it they probably did it. I
20  don't recall it offhand, but I don't know if it's
21  part of the closing binders.
22  Q. To the extent it was done, you were not
23  involved in the process?
24  A. Well, you are asking me if I have a memory

Page 125

1   of it. Was I involved in asking them to get us a
2   letter; I don't recall it. Actually, I don't
3   recall.
4   Q. Did you inform CBW that they were not going
5   to be paid out of the closing proceeds after the
6   closing?
7   A. I did not talk to CBW.
8   Q. Other than the conversations that you had
9   with Ms. Kaufmann the night of the closing, are you
10  aware of any other communications with Key Bank that
11  day?
12  A. Between myself and Key Bank?
13  Q. Yes.
14  A. I did not talk to Key Bank any other time
15  that day.
16  Q. To your knowledge was Key Bank provided with
17  any of the draft closing statements that were
18  generated at Goodwin Procter that day?
19  A. No.
20      ATTY. WORCESTER: That's all I have.
21      ATTY. HIGGINS: I have no further
22  questions, except to reserve my rights to, as we
23  have already put on the record, to reask those
24  questions that Mr. McCullough has not answered on

32 (Pages 122 to 125)

John C. McCullough                                                    05/19/2005

1    instructions of counsel if the court should so
2    order, and for that purpose I'm suspending today's
3    deposition.
4           (Whereupon, the record was closed at
5           1:02 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1           C E R T I F I C A T E
2    I, JOHN C. McCULLOUGH, do hereby certify that I have
3    read the foregoing transcript of my testimony, and
4    further certify that said transcript is a true and
5    accurate record of said testimony (with the
6    exception of the following corrections listed
7    below):
8    Page    Line          Correction/Reason
9    _____   _____   _____
10   _____   _____   _____
11   _____   _____   _____
12   _____   _____   _____
13   _____   _____   _____
14   _____   _____   _____
15   _____   _____   _____
16   _____   _____   _____
17
18
19        Signed under the pains and penalties of perjury
20   this _____ day of _____, 2005.
21
22           _____
23           JOHN C. McCULLOUGH
24

1    Commonwealth of Massachusetts
2    Suffolk, ss.
3         I, Carol A. Pagliaro, Registered Professional
4    Reporter and Notary Public in and for the
5    Commonwealth of Massachusetts, do hereby certify
6    that JOHN C. McCULLOUGH, the witness whose
7    deposition is hereinbefore set forth, was duly sworn
8    by me and that such deposition is a true record of
9    the testimony given by the witness to the best of my
10   skill and ability.
11        I further certify that I am neither related to,
12   nor employed by, any of the parties in or counsel to
13   this action, nor am I financially interested in the
14   outcome of this action.
15        In witness whereof, I have hereunto set my hand
16   and seal this 6th day of June, 2005.
17
18
19        _____
20        Carol A. Pagliaro, RMR
21        Notary Public
22        CSR No. 123293
23   My commission expires
24   April 28, 2011

33 (Pages 126 to 128)