# TAB B

Stephen F. Gordon                                                   06/09/2005

```
                                                              Page 1
 1                          Volume: I
 2                          Pages:  1 - 183
 3              UNITED STATES DISTRICT COURT
 4                DISTRICT OF MASSACHUSETTS
 5                    Case No. 04-CV12333-MEL
 6
 7   CASAS, BENJAMIN & WHITE, LLC,
 8            Plaintiff,
 9       v.
10   THE POINTE GROUP, INC., a Massachusetts corporation,
11   d/b/a The Pointe Group Healthcare and Senior Living;
12   GERALD S. FREID; BARRY FREID; and KEY CORPORATE
13   CAPITAL, INC.,
14            Defendants.
15
16                      * * * * * * * * *
17          DEPOSITION OF STEPHEN F. GORDON
18              Thursday, June 9, 2005
19     Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP
20                 10 Post Office Square
21                  Boston, Massachusetts
22                      10:20 a.m.
23            Reporter:  Linda M. Grieco
24       320 Congress Street, Boston, MA  02210
```

Page 2

1  APPEARANCES:
2
3  CONN, KAVANAUGH, ROSENTHAL, PEISCH & FORD, LLP
4  (By Erin K. Higgins, Esquire)
5  10 Post Office Square
6  Boston, Massachusetts 02109
7  on behalf of the Plaintiff
8  (617) 348-8200
9
10 GORDON HALEY LLP
11 (By Stephen F. Gordon, Esquire)
12 101 Federal Street
13 Boston, Massachusetts 02110
14 on behalf of The Pointe Group,
15 Gerald Freid and Barry Freid
16 and acting Pro Se
17 (617) 261-0100
18
19 NIXON PEABODY LLP
20 (By Courtney Worcester, Esquire)
21 889 Elm Street
22 Manchester, New Hampshire 03101
23 on behalf of Key Corporate Capital
24 (603) 628-4048

Page 3

1              I N D E X
2  Deposition of:        Direct  Cross
3  STEPHEN F. GORDON
4     By Ms. Higgins       5
5     By Ms. Worcester           177
6
7
8
9
10            E X H I B I T S
11 No.                        Page
12 70  Subpoena                 6
13 71  4/4/05 Letter from Mr. Gordon to
14     Ms. Higgins              8
15 72  Answer                  21
16 73  E-mail 5/27/04          33
17 74  E-mail re Engagement Letter    35
18 75  E-mail 4/26/04 and 4/27/04     52
19 76  E-mail 5/4/04 re Solicitation Update  60
20 77  Summary of Letters of Intent from
21     CBW 5/5/04              61
22 78  E-mail to Ms. Kauffman 5/12    76
23 79  E-mail to and from Mr. Caine 5/12/04  80
24 80  E-mails 5/27 from Mr. Sucoff   81

Page 4

1  EXHIBITS, Cont'd.
2  No.                         Page
3  81  E-mail to Mr. Caine 5/28/04    81
4  82  E-mails to and from Mr. Sucoff 5/17  85
5  83  E-mail to Mr. Kauffman 5/19/04   88
6  84  E-mail to Mr. Caine 5/19         90
7  85  E-mail to Mr. Sucoff 5/19/04     91
8  86  E-mails to and from Mr. Caine 5/19
9      and 5/20                     96
10 87  E-mail 5/21                 101
11 88  E-mail                      121
12 89  E-mail to Mr. Casas and Mr. Caine  123
13 90  Two E-mails to and from Mr. Sucoff  137
14 91  E-mail                      139
15 92  E-mail                      139
16 93  E-mail to Ms. Kauffman 9/27/04  143
17 94  E-mail from Mr. Caine 9/28/04   148
18 95  E-mail from Goodwin Procter     149
19 96  E-mails between Ms. Kauffman and
20     Mr. Gordon                  150
21 97  Letter to Mr. Caine            164
22 98  Affidavit 6/4/05               168
23
24

Page 5

1            P R O C E E D I N G S
2                STIPULATION
3      It is stipulated by and between counsel
4  for the respective parties that the deposition is to
5  be read and signed by the deponent under the pains
6  and penalties of perjury within 30 days of receipt
7  of the transcript; and that the sealing and filing
8  thereof are waived; and that all objections, except
9  as to form, and motions to strike are reserved to
10 the time of trial.
11              * * * * *
12       STEPHEN F. GORDON,
13 a witness called by counsel for the Plaintiff,
14 having been satisfactorily identified by the
15 production of his driver's license, and duly sworn
16 by the Notary Public, was examined and testified as
17 follows:
18            DIRECT EXAMINATION
19            BY MS. HIGGINS
20    Q. Steve, could you state your full name for
21 the record, please?
22    A. Stephen Franklin Gordon.
23       MS. HIGGINS: Let's mark this as the
24 first exhibit.

Stephen F. Gordon                                                                           06/09/2005

Page 38

1  Q. At the time you first received and reviewed
2  this agreement, was it your belief that if a
3  transaction was consummated as described in the
4  agreement, that The Pointe Group would owe some
5  amount to CBW?
6  A. I can't answer that question.
7  Q. At the time you first received and reviewed
8  this agreement, did you have discussions with
9  anyone, without telling me what the substance of
10 those discussions were, as to whether or not The
11 Pointe Group had an enforceable obligation to pay
12 CBW a fee if the conditions of the engagement letter
13 were met?
14 A. I can't answer that question.
15 Q. From the time you first received and
16 reviewed the engagement letter through the date of
17 the closing on September 30, 2004, did you ever have
18 a discussion with anyone, other than those
19 individuals who you consider to be your clients, as
20 to whether or not there was an enforceable
21 obligation under this agreement to pay CBW?
22 A. I don't believe so. By "the closing," you
23 mean September 30, 2004?
24 Q. Correct.

Page 39

1  A. And by the time I left that closing?
2  Q. Correct. From the time you first received
3  and reviewed this agreement through the date of the
4  closing, did you have any discussions with John
5  McCullough as to whether or not there was an
6  enforceable obligation to pay Casas, Benjamin &
7  White under the terms of this agreement?
8  A. I can't answer that.
9  Q. Between the date that you first received and
10 reviewed this letter and the date of the closing,
11 September 30, 2004, did you have any discussions
12 with Gerald Freid as to whether or not there was an
13 enforceable obligation to pay Casas, Benjamin &
14 White under this agreement?
15 A. I can't answer that.
16 Q. Did you have any such discussions during the
17 time period I've just referenced with Barry Freid?
18 A. I can't answer that.
19 Q. Did you have any such discussions during the
20 time period I just referenced with Mark Tobin?
21 A. I can't answer that.
22 Q. Did you have any discussions, such
23 discussions during that time period I just mentioned
24 with Frank Barker?

Page 40

1  A. I can't answer that.
2  Q. Prior to your representation of the KeyBank
3  Financed Facilities, had you ever been retained in
4  connection with the sale of a business or the
5  refinancing of a business in which the selling
6  entity or the ownership entity was utilizing the
7  services of an investment banking company like
8  Casas, Benjamin & White?
9  A. I don't know. I would think so, but I don't
10 know.
11 Q. Can you remember any such instance as you
12 sit here today?
13 A. I can't. Again, I'm not a transactional
14 lawyer, but I'm sure I've been involved in sales or
15 refinancings where there were -- you said investment
16 bankers?
17 Q. Correct.
18 A. Where there were investment bankers, but I
19 guess I can't be sure, and I certainly can't name
20 any.
21 Q. Leaving aside this particular litigation, do
22 you recall any instance prior to today where you
23 took a position on behalf of a client that a
24 consultant wasn't entitled to a fee upon the sale of

Page 41

1  a business because the consultant wasn't a licensed
2  real estate broker in Massachusetts?
3  A. I don't believe so.
4  Q. If you could look, Mr. Gordon, at the
5  third -- section two of the engagement, and you'll
6  see that's titled fee arrangements. And there's a
7  first page that says restructuring services. And
8  then the next page, the next underlined paragraph
9  says investment banking services. Is that the
10 paragraph that you reviewed in connection with
11 preparing your e-mail to Madeline Kauffman that
12 we've just marked as Exhibit 74 regarding a
13 calculation of the performance incentive payments as
14 they're defined in that paragraph to CBW?
15 A. My e-mail says commission.
16 Q. Is that the paragraph that you looked at in
17 reaching the figure that you have here of 1,250
18 thousand dollars?
19 A. I believe so, yes.
20 Q. And you'd agree with me that, that paragraph
21 refers to CBW's entitlement to performance incentive
22 payments? Do you see that language?
23 A. I do see that.
24 Q. And you also see, if you look about halfway

11 (Pages 38 to 41)

Stephen F. Gordon    06/09/2005

Page 42

1  down, there's a definition of transaction value
2  where it says, "Transaction value shall mean the sum
3  of the gross sale proceeds." Then it goes on from
4  there. Do you see that?
5  A. Yes.
6  Q. Then if you go further down in that same
7  paragraph, do you see where it says, "The
8  performance incentive payments shall be due and
9  payable at the closing of each transaction"? Do you
10 see that?
11 A. I see that.
12 Q. And you had reviewed this language, at least
13 the paragraph pertaining to these fees, when you
14 wrote this e-mail to Madeline Kauffman on May 27th,
15 correct?
16 A. I'm not sure what I did on May 27th.
17 Obviously I read the percentages to come up with a
18 commission amount that's in the May 27th e-mail.
19 Q. Okay. So what you're saying is that you're
20 confident that you read part of the paragraph, but
21 you're not sure that you read all of it?
22 A. That's correct.
23 Q. Mr. Gordon, when did you first form an
24 opinion that CBW was not entitled to the full amount

Page 43

1  of the performance incentive payments as identified
2  in this paragraph?
3  A. I can't answer that.
4  Q. Did you ever discuss that opinion with
5  anyone prior to September 30, 2004?
6  A. I can't answer that.
7  Q. When did you first discuss that opinion with
8  any other person?
9  A. After September 30th. Either on or after
10 September 30th.
11 Q. With whom did you first discuss that
12 opinion?
13 A. I can't answer.
14 Q. In connection with the first discussion that
15 you had with anyone regarding that opinion, who was
16 present for that discussion?
17 A. I don't remember who was present.
18 Q. When did you first discuss that opinion with
19 anyone other than an individual whom you considered
20 to be your client?
21 A. October 1st.
22 Q. And who was that?
23 A. I believe it was Ed Casas.
24 Q. At the time you had that -- strike that.

Page 44

1  Was that a discussion that you had with
2  Mr. Casas on the telephone or was that in writing?
3  A. Both. I had sent him a letter, and then we
4  had subsequent telephone conversations, I believe.
5  I know we had prior telephone conversations or a
6  prior telephone conversation on October 1st, which I
7  believe was non-substantive. I simply asked him to
8  wait for my letter. I then e-mailed him my letter,
9  and I believe that we had at least one telephone
10 conversation after that, although it might have been
11 with his counsel. I'm not sure.
12 Q. At the time that you wrote your letter,
13 which you sent to Mr. Casas by e-mail, did you
14 believe that you had authority from your client to
15 convey that position to Mr. Casas?
16 A. I can't answer that.
17 Q. Prior to raising with Mr. Casas the argument
18 the CBW was not entitled to the performance
19 incentive payments because it was not a licensed
20 real estate broker in Massachusetts, had you had
21 discussions about that issue with anyone else?
22 A. I can't answer that.
23 Q. Prior to raising that issue with Mr. Casas,
24 had you had discussions about that issue with

Page 45

1  anyone, other than someone who you considered to be
2  your client?
3  A. Or co-counsel.
4  Q. Are you adding to my question?
5  A. Well, if I can't add to your question, I
6  have to refuse to answer it. I can't answer it. If
7  you exclude -- if by your question you're trying to
8  exclude people to whom the privilege would apply, I
9  can answer that question.
10 Q. Okay. Well, let's do it both ways. Prior
11 to having those communications with Mr. Casas, had
12 you discussed that issue with co-counsel?
13 A. I can't answer that.
14 Q. In connection with your retention by the
15 KeyBank Financed Facilities, whom did you consider
16 your co-counsel to be?
17 A. John McCullough.
18 Q. And -- let me go back, then. Prior to
19 having those communications with Ed Casas in which
20 you took the position that CBW wasn't entitled to
21 the full amount of the performance incentive
22 payments because CBW was not a licensed real estate
23 broker in Massachusetts, had you had discussions
24 about that issue with anyone, other than

12 (Pages 42 to 45)

Page 54

1  Q. Were those communications in the form of
2  e-mails, faxes?
3  A. Maybe.
4  Q. What were the communications regarding?
5  A. They were regarding the lending relationship
6  between the KeyBank Financed Facilities and KeyBank.
7  Q. Prior to the time that Epoch was identified
8  as the party with whom negotiations were going to
9  move forward, what types of -- what type of
10 negotiation was going on with KeyBank?
11 A. We were negotiating extensions in
12 forbearance agreements.
13 Q. Who were you dealing with at KeyBank in
14 connection with those?
15 A. I believe it was always Madeline Kauffman.
16 Q. In response to this April 26, 2004 e-mail
17 from Matt Caine, you sent an e-mail back to Matt
18 Caine and others dated April 27, 2004. Do you see
19 that?
20 A. I do.
21 Q. And you begin by saying, "The Pointe Group
22 has nothing for sale," correct?
23 A. That's what it says.
24 Q. You then go on to say about halfway down,

Page 55

1  "And I think it's important for The Pointe Group,
2  which has other interests not for sale, not to give
3  the impression internally or externally that
4  everything they have is for sale." My question is,
5  what were the other interests that The Pointe Group
6  had when you wrote this e-mail that were not for
7  sale?
8  A. Management contracts with other facilities.
9  Q. Those were with which facilities?
10 A. I don't recall. I think there are three
11 such facilities. It might be four.
12 Q. Did you ever have any communications with
13 Kelly White of Casas, Benjamin & White?
14 A. I don't think so.
15 Q. Prior to the closing on September 30, 2004,
16 had you ever discussed with anyone at CBW any issues
17 pertaining to Kelly White's departure from CBW?
18 A. I have no memory of having done that.
19 Q. Did you ever discuss that prior to the
20 closing with anyone from KeyBank?
21 A. I have no memory of having done that, no.
22 Q. So with respect to either KeyBank or CBW,
23 you don't remember ever having conveyed to either of
24 those entities that your clients had concerns about

Page 56

1  the fact that Kelly White was no longer working on
2  the deal?
3  A. That's correct.
4  Q. In terms of, if you look back at Exhibit 4,
5  the engagement letter, and you see that there is a,
6  in paragraph one, background and scope of services,
7  it first refers to certain restructuring services
8  that Casas, Benjamin & White is going to provide.
9  It starts on the bottom of that first page and goes
10 on to the next page.
11 A. I see that, yes.
12 Q. Do you have any personal knowledge as to
13 whether or not CBW performed the restructuring
14 services described in the agreement?
15 A. I don't know if I've ever seen the
16 restructuring work plan, which is described as
17 exhibit A. So I'm not sure I can answer that
18 question.
19 Q. Okay. Well, my question was whether you had
20 any knowledge, personal knowledge as to whether or
21 not CBW performed the restructuring services that
22 are described in the agreement?
23 A. I don't know.
24 Q. Would it be fair to say, then, that you

Page 57

1  don't have any personal knowledge as to the quality
2  of the services -- of those restructuring services
3  as they were provided by CBW?
4  A. Yes.
5  Q. You see that the agreement then goes on to
6  talk on page 2 about certain investment banking
7  services that CBW will provide.
8  A. Yes, I see that.
9  Q. Based on documents that you received during
10 the relevant time period, would you agree with me
11 that CBW -- strike that for one second.
12     You see that in the first full paragraph
13 on the top of page 2 where it talks about the
14 investment banking services, it says, "The
15 investment banking services that CBW will provide
16 include the following: CBW will use all reasonable
17 efforts to accomplish on behalf of PGHS, which CBW
18 is using to refer to Pointe Group Health Care and
19 Senior Living, and its stockholders, the
20 consummation of a transaction or series of
21 transactions involving the Cranberry Pointe and
22 Chestnut Hill facilities." Did you ever advise CBW
23 that the stockholders of either The Pointe Group,
24 Inc. or The Pointe Group Health Care and Senior

Stephen F. Gordon                                                                                                   06/09/2005

Page 58

1  Living did not have an ownership interest in any of
2  the facilities that were being marketed by CBW?
3    A. Yes.
4    Q. When did that happen?
5    A. At least on April 27, 2004 in Exhibit 65.
6    Q. Did you have any specific discussions with
7  anyone at CBW as to who the stockholders of The
8  Pointe Group, Inc. were during that time period of
9  September 30, 2003 to 2004?
10   A. I don't think so.
11   Q. Did you have any discussions with anyone at
12 CBW as to who had ownership interest in the selling
13 entities?
14   A. I don't think so.
15   Q. If you see at the bottom there, sub
16 paragraph C, well the initial -- the introductory
17 phrases at the top, "In pursuit of the transaction,
18 CBW shall provide the following." Then in sub
19 paragraph C it says, "Identifying and contacting and
20 introducing potential purchasers for all or part of
21 the business as well as capital sources to provide
22 debt financing, including those which have contacted
23 you." Do you see that language in the agreement?
24   A. I do.

Page 59

1    Q. Would you agree with me that CBW, in pursuit
2  of the transaction, identified and sent initial
3  information about the facilities to 88 different
4  parties, including 12 lenders?
5    A. I don't know.
6    Q. Would you agree with me that CBW thereafter
7  distributed the confidential information memoranda
8  to 31 parties, including five lenders?
9    A. I don't know that.
10   Q. Do you recall reviewing the confidential
11 information memorandum that CBW sent out?
12   A. I don't have a memory of having done so. I
13 may have, but I don't have a memory of having done
14 so.
15   Q. Would you agree with me that some of the
16 interested lenders refused to move forward with the
17 process after Gerry Freid and Barry Freid refused to
18 provide personal financial statements?
19   A. I have no knowledge of that.
20   Q. Would you agree with me that by March 19th
21 of 2004, CBW had received indications of interest
22 from 12 parties, including four lenders?
23   A. I don't know the exact number, but I
24 remember that there was interest.

Page 60

1    Q. Do you remember that Epoch's indication of
2  interest was at the highest range?
3    A. Yes.
4    Q. And you'd agree with me that Epoch was
5  introduced to the selling entities by CBW?
6    A. I don't know that.
7    Q. Do you have any information to suggest
8  otherwise?
9    A. I do not.
10   Q. Would you agree with me that Barry Freid and
11 Gerald Freid were the individuals who made the
12 decision as to which parties to invite for
13 management presentations?
14   A. I don't know.
15   Q. Were you present at the management
16 presentations?
17   A. I don't think so. I don't know what a
18 management presentation is.
19   Q. Were you present at meetings where
20 interested buyers or lenders toured the facilities
21 and met with management of the different facilities?
22   A. No.
23     (Exhibit 76 marked for identification.)
24     (Document exhibited to witness.)

Page 61

1     (Exhibit 77 marked for identification.)
2     (Document exhibited to witness.)
3    Q. Mr. Gordon, Exhibit 76 you'll see, would you
4  agree with me that this page appears to be a
5  printout from your computer system?
6    A. Yes.
7    Q. And you see at the bottom, the bottom half
8  consists of a message from Matt Ryan on May 4, 2004
9  to Barry Freid, Gerry Freid and others, including
10 you, that says, "Barry and Gerry, attached please
11 find the TPG solicitation update, which includes a
12 summary of all letters of intent that we received on
13 Friday, April 30, 2004." Do you see that?
14   A. I do.
15   Q. If you look at Exhibit 77, which is this
16 larger document, do you recall receiving -- well,
17 let me ask you this question first. You recall
18 receiving this e-mail, is that right, the one marked
19 as Exhibit 76?
20   A. I don't have a specific memory of it, but
21 I'm sure I received it, and I responded to it,
22 apparently.
23   Q. Do you recall receiving from CBW a document
24 that summarized the letters of intent that had been

16 (Pages 58 to 61)

Stephen F. Gordon                                                                                          06/09/2005

Page 118

1   A. I think so, yes.
2   Q. Do you remember that the purpose of the call
3   was to address concerns that CBW was not being
4   helpful in the process?
5   A. Yes.
6   Q. Who do you remember being on the call, other
7   than Ed Casas and Matt Caine?
8   A. I don't remember who else was on that call.
9   Q. Were you in your office at the time of the
10  call?
11  A. I don't know.
12  Q. Do you remember as a result of the call that
13  you gained some level of comfort that CBW was in
14  fact working towards the transaction happening?
15  A. No, I did not.
16  Q. You did not?
17  A. No.
18  Q. What do you remember you saying during that
19  call?
20  A. I don't have a memory of what I said during
21  the call. I don't have any memory of what I said
22  during the call.
23  Q. Do you have a memory of anything that Matt
24  Caine said during the call?

Page 119

1   A. No. The only memory I have is I believe a
2   private call after that between Ed Casas and myself.
3   Q. Getting back to the first call. I believe
4   you said you had no memory of anything that Matt
5   Caine said during the call?
6   A. I don't.
7   Q. Do you have any memory of anything Ed Casas
8   said during that call?
9   A. No.
10  Q. Do you remember the general subject matters
11  discussed during that call?
12  A. Yes. The subject matter was how CBW could
13  be isolated from the transaction but still gain
14  knowledge of its progress.
15  Q. Who was proposing that CBW be isolated from
16  the transaction?
17  A. Well, it was obviously the seller's side,
18  not the CBW side.
19  Q. Was that you?
20  A. I don't remember.
21  Q. Do you remember any facts that were
22  discussed during the call as to the basis for the
23  seller's desire to have CBW isolated from the
24  transaction?

Page 120

1   A. I remember the call as being
2   non-confrontational. So I don't think that -- it
3   was more in the sense of how can this work or how
4   shall this work going forward. And some sort of
5   program was agreed upon where there would be regular
6   telephone calls between CBW and the sellers.
7   Q. And you said there was then a subsequent
8   call just between you and Ed Casas?
9   A. I believe just between Ed Casas and myself.
10  His was the only voice that I heard, and the call
11  was to me alone.
12  Q. Your recollection is that Ed Casas called
13  you back after the first call had ended?
14  A. I believe so, yes.
15  Q. What did Mr. Casas say during that
16  conversation?
17  A. Mr. Casas told me that my e-mail of the
18  previous week was devastating to the career of a
19  young man, Matt Caine. And he asked me if I would
20  please send something that would eliminate that
21  problem for Matt Caine.
22  Q. What did you say in response to that?
23  A. I said I would do so.
24  Q. Getting back to the first call --

Page 121

1       MS. HIGGINS: Let's mark that as the
2   next exhibit.
3       (Exhibit 88 marked for identification.)
4       (Document exhibited to witness.)
5   Q. Is this the e-mail that you sent after your
6   subsequent telephone conversation with Ed Casas?
7   A. Yes.
8   Q. Is there anything that you said in this
9   e-mail that is untrue?
10  A. So long as what Matt Caine said that he had
11  said and done with respect to both KeyBank and Epoch
12  was true, then what I said here was true.
13  Q. I'm showing you what was marked as Exhibit
14  22 at Barry Freid's deposition.
15      (Document exhibited to witness.)
16  Q. You see that this is an e-mail from Matt
17  Caine dated June 4, 2004, 5:43 p.m. So this would
18  follow e-mail that we just discussed as Exhibit 8 --
19  excuse me, Exhibit 88. And this was an e-mail that
20  Matt Caine sent to you on June 4th at 5:43 p.m., to
21  you and to others; do you see that?
22  A. I do.
23  Q. Mr. Caine says in here, "We appreciate
24  everyone taking the time to join the call and

31 (Pages 118 to 121)

Page 122

1  providing valuable input." He then goes on to say,
2  "The positive comments from Steve, Barry and Frank
3  regarding CBW's performance and contributions to
4  date were appreciated." Do you see that?
5     A. Yes.
6     Q. So the comments that Barry and Frank made
7  must have been made during the first call, correct?
8     A. Correct.
9     Q. Do you remember what comments Barry and
10 Frank made regarding CBW's performance?
11    A. I don't.
12    Q. You see in point five -- well, let me say
13 this. He then goes on to say, "Going forward, TPG
14 and CBW have agreed to the following rules of
15 engagement to complete this transaction." Then he
16 identifies five points. Reading those five points,
17 are there any of those points that you disagree with
18 in terms of what was agreed on during that call?
19    A. I don't remember what was agreed on during
20 the call. I have no reason to believe that any of
21 these were not as discussed in the call.
22    Q. You see point five, it says, "Ed Casas will
23 contact KeyBank to inquire as to any flexibility in
24 negotiations regarding the net distributable

Page 123

1  proceeds of this transaction. Ed will communicate
2  his findings back to Steve Gordon." Do you see
3  that?
4     A. Yes.
5     Q. Do you recall that Mr. Casas did in fact do
6  that?
7     A. I believe he did.
8        MS. HIGGINS: Mark that as the next
9  exhibit.
10       (Exhibit 89 marked for identification.)
11       (Document exhibited to witness.)
12    Q. Mr. Gordon, this Exhibit 89, this is a copy
13 of an e-mail that you sent the same day, 5:14 p.m.
14 to Ed Casas and Matt Caine that says, "Ed, thanks
15 for putting in a good word with Steve Dunham." So
16 does this reflect that in fact Ed did call
17 Mr. Dunham and relay that back to you?
18    A. I think perhaps he did.
19    Q. Then says, "Madeline and I have now reached
20 an agreement, which will be signed on Monday." Do
21 you see that?
22    A. Yes.
23    Q. Between the time -- between the time period
24 you were first retained in connection with the

Page 124

1  KeyBank Financed Facilities and the closing, did
2  anyone from CBW, Matt Caine, Matt Ryan, Ed Casas,
3  ever tell you that KeyBank had assured CBW that CBW
4  would get paid?
5     A. No.
6     Q. Did you ever have any discussions with
7  anyone at KeyBank about that issue, about whether
8  assurances had been given to CBW that it would be
9  paid?
10    A. No.
11    Q. Have you had any discussions from the date
12 this lawsuit was filed to the present with
13 Mr. O'Connell or anyone else representing KeyBank as
14 to whether in fact KeyBank made -- gave such
15 assurances?
16    A. Yes.
17    Q. Can you tell me what the response was --
18 strike that.
19       Can you tell me what KeyBank's attorneys
20 have told you about that issue?
21    A. They say it never happened.
22    Q. Did you attend a meeting at Goodwin, Procter
23 & Hoar in the middle of July of 2004 at which Epoch
24 made a presentation regarding its due diligence?

Page 125

1     A. Yes.
2     Q. Is your memory generally consistent with the
3  testimony we've already heard, that Epoch had a
4  Power Point presentation that they gave and that,
5  that Power Point presentation concluded with Epoch
6  announcing that it was reducing the purchase price?
7     A. Yes.
8     Q. And following the Epoch Power Point
9  presentation, do you recall that there were
10 subsequent meetings at Goodwin, Procter & Hoar's
11 office where Epoch was not present?
12    A. Immediately following?
13    Q. Yes.
14    A. Yes.
15    Q. Okay. Do you recall that a representative
16 of CBW was at the meeting?
17    A. Yes.
18    Q. That was Matt Caine?
19    A. I believe so, yes.
20    Q. That was the first time you had met
21 Mr. Caine?
22    A. Yes.
23    Q. Did Mr. Caine -- do you remember Mr. Caine
24 having, making any comments either in the larger

32 (Pages 122 to 125)

Stephen F. Gordon                                                                                           06/09/2005

### Page 154

1  closing, had your belief changed at all as to
2  whether CBW was going to be paid?
3     A. No, it had not. So I may have misanswered
4  your question. My understanding was nothing
5  specific to CBW, but with respect to the listed
6  items of CBW, Medicaid recoupment, we had eliminated
7  Stanley Wallerstein. Beaver Builders had been paid
8  previous to the closing, not out of the proceeds.
9  My understanding was that the sellers were walking
10 away with nothing. But certainly that they weren't
11 contributing anything.
12    Q. So going back to Exhibit 96. When you asked
13 Madeline Kauffman, you said is there enough money,
14 was that question whether there was enough money to
15 pay Key what it had agreed to take and these other
16 obligations?
17    A. Absolutely. I wasn't for some reason copied
18 on the closing statement. If you see, on the second
19 page of Exhibit 96, when I finally got back to my
20 computer, I left the office maybe at 4:30 to go out.
21 When I got back to the office -- to my home that
22 evening, I turned on the computer and I saw these
23 earlier messages. I said, "Perhaps I missed it, but
24 I saw no draft settlement statement today. When did

### Page 155

1  you send it? Can you please resend?" Of course
2  everybody but Madeline and me were maybe asleep by
3  then. But Madeline did not forward it to me,
4  either.
5     Q. Even if you didn't see the settlement
6  statements that were being circulated that day, had
7  you seen any prior drafts of settlement statements?
8     A. No.
9     Q. When you arrived at Goodwin, Procter & Hoar
10 had folks started signing documents yet or --
11    A. No.
12    Q. Do you remember whether the Freids were
13 already there when you arrived?
14    A. They were.
15    Q. And John McCullough was there as well?
16    A. Yes.
17    Q. Do you remember during -- on the day of the
18 closing, whether anyone from KeyBank was at the
19 closing?
20    A. I don't recall anybody from KeyBank being
21 there.
22    Q. Did you expect to see someone from KeyBank
23 at the closing?
24    A. I don't know whether I had any expectation.

### Page 156

1     Q. Had you had any discussions with Madeline
2  Kauffman or Steve Dunham -- well, you wouldn't have
3  had discussions with Steve, but with Madeline
4  Kauffman as to whether she was going to be there?
5     A. I may have asked her whether she was coming.
6     Q. Do you remember what her response was?
7     A. I don't.
8     Q. When you arrived at the closing, did you
9  then review settlement statements?
10    A. No.
11    Q. What did you do during the closing?
12    A. When I arrived -- I don't want -- again, I
13 don't want to split hairs, but it depends on what
14 you mean by closing. If closing is signing of
15 documents, I did not participate in that. When I
16 arrived at Goodwin Procter on September 30th, there
17 was a large conference room about the size of this
18 conference room filled with papers on this. Again,
19 I'm not a transactional lawyer, but they have those
20 accordion-type things with papers stretching from
21 one end of a gigantic conference table to the other.
22 My clients were not in that room. The sellers were
23 in another conference room diagonally across the
24 hall, and I went into that room. And shortly

### Page 157

1  thereafter, John McCullough and I left that room to
2  have conversations with Andy Sucoff on the escrows,
3  which was the only open issue that I was working on.
4  I was working on KeyBank, the encroachment and the
5  escrows or the requests for additional escrow
6  arising from the Attorney General's investigation.
7  And John McCullough and I spoke with Andy Sucoff. I
8  believe we went back into the room with the clients.
9  We then left and concluded an agreement on the
10 escrows with Andy Sucoff. And at that point, I
11 think it might have been another half an hour or 45
12 minutes after we concluded the agreement, obviously
13 somebody has to then put pen to paper. I don't
14 remember actually reviewing the escrow documents.
15 John McCullough and his two people did that. And
16 then everybody moved into the closing room. By this
17 time, it was well after one o'clock in the afternoon
18 is my memory. And I brought Georgia Freid into the
19 closing room. This was very emotional for her,
20 because her late husband had built Chestnut Hill.
21 It was intended to be the crown jewel. It was very
22 difficult for her. I actually quite literally held
23 her hand for a few minutes in the closing room. And
24 I asked her if everything was okay. She was fine,

40 (Pages 154 to 157)

Stephen F. Gordon                                                                                                                  06/09/2005

Page 158

1  and her sons were there. And Mark Tobin, whom I
2  think she has a nice relationship, was there. I
3  left.
4      Q. So you didn't stay while she actually signed
5  the documents?
6      A. I did not.
7      Q. Now, in connection with the discussions with
8  Andy Sucoff on the escrows, did you review the
9  settlement sheet to make sure they accurately
10 reflected what you had agreed on in terms of the
11 escrows?
12     A. No.
13     Q. So even if you weren't given a copy of a
14 settlement statement, it's your testimony that
15 through the day you were at Goodwin, Procter & Hoar
16 you never reviewed any draft settlement statements?
17     A. I never saw a settlement statement. I
18 didn't even know one had been prepared, other than a
19 draft that was sent that no one shared with me. But
20 if it was all set, it was all set. The closing
21 wasn't my responsibility.
22     Q. In terms of the discussion on the escrows
23 with Andy Sucoff, now those would have been -- there
24 were two escrows that were established, correct?

Page 159

1      A. I believe so.
2      Q. And the discussions were what the amount of
3  those escrows would be?
4      A. I'm not sure why there were two escrows.
5  One seemed to be for a purpose that the
6  transactional lawyers well understood, and there was
7  no issue with that. The other one seemed to be the
8  one that they were focusing on with respect to how
9  that would pay for any unanticipated additions
10 arising for the buyer out of the Attorney General's
11 investigation. That's the escrow that was the focus
12 of the discussion among Andy Sucoff, John McCullough
13 and myself the day of the closing.
14     Q. Do you recall whether as a result of those
15 discussions, the amount of the escrow went up or
16 went down or stayed the same?
17     A. I don't know whether the amount went up. I
18 know that the time that it would -- that the money
19 would remain in escrow was lengthened. The amount
20 may have gone up, too, maybe by one hundred thousand
21 dollars. I'm not sure.
22     Q. At any point during the time that you were
23 at Goodwin, Procter & Hoar, did you become aware
24 that CBW's fee was not going to be paid out of the

Page 160

1  sale proceeds?
2      A. I don't remember learning that at the time.
3      Q. During the discussions that you had with
4  Andy Sucoff about the escrow amounts, did the
5  subject of CBW's fee come up at all?
6      A. I don't believe so.
7      Q. Did you have discussions while you were at
8  Goodwin, Procter & Hoar with anyone as to whether
9  CBW's fee was going to be paid that day?
10     A. I can't answer that.
11     Q. You're not going to answer the question of
12 whether you had such discussions with anyone?
13     A. I can't answer that.
14     Q. When you left Goodwin, Procter & Hoar after
15 you were in the closing room with Georgia Freid, at
16 the time you left Goodwin, Procter & Hoar, did you
17 have an understanding as to whether CBW's fee was
18 going to be paid that day?
19     A. I can't answer that.
20     Q. While you were at Goodwin, Procter & Hoar,
21 did you have any communications with anyone at CBW?
22     A. No.
23     Q. Did you have communications while you were
24 at Goodwin, Procter & Hoar with anyone at KeyBank?

Page 161

1      A. No.
2      Q. What did you do after you left Goodwin,
3  Procter & Hoar?
4      A. I went back to my office for a pre-scheduled
5  meeting, which I believe was either at 2:00 or 2:30.
6      Q. Was that meeting unrelated to --
7      A. Totally.
8      Q. -- the transaction? While you -- do you
9  remember how late you were at the office that night?
10     A. I don't.
11     Q. While you were at the office, either before
12 or after this other meeting, did you have any
13 discussions with anyone from CBW about the
14 transaction or CBW's fee?
15     A. No.
16     Q. Did you have discussions about the
17 transaction with anyone from KeyBank that afternoon?
18     A. No.
19     Q. How about after you left the office that
20 day, did you have conversations with anyone from CBW
21 or KeyBank from home or the car?
22     A. I don't believe so.
23     Q. How about the next morning? I know you
24 testified earlier you remember that you had a

Stephen F. Gordon                                                                    06/09/2005

Page 166

1  you the invoice from CBW. When did you first see
2  that invoice?
3      A. I don't recall.
4      Q. Do you recall that it was in connection with
5  writing this letter?
6      A. I don't remember. I believe so, but I don't
7  remember.
8      Q. In the third paragraph of your letter you
9  say, "To my knowledge, no analytical work at all,
10 let alone acceptable in all respects, has been
11 performed." Do you see that?
12     A. Yes.
13     Q. Is the basis of that statement that you
14 never reviewed any of CBW's work product?
15     A. No.
16     Q. What is the basis of your statement that no
17 analytical work at all has been performed?
18     A. I can't answer that.
19     Q. You go on to say, "I know of no
20 restructuring services rendered nor any meaningful
21 work done on refinancing or raising the capital."
22 Do you see that?
23     A. Yes.
24     Q. Your knowledge that no restructuring

Page 167

1  services were rendered nor any meaningful work done
2  on refinancing or raising new capital, is that based
3  on your independent review of any documents?
4      A. I'm sure -- well, I'm not sure. No, I'm not
5  sure if it's based on any review of documents.
6      Q. Did you ever review all of the work product
7  that CBW did and sent to your clients?
8      A. No.
9      Q. In the fourth paragraph of the letter,
10 second sentence says, "In any event, none of the
11 desired objectives of my client to either
12 restructure debt, refinance or raise new capital
13 were even explored." Isn't that inconsistent with
14 the summary of the letters of intent that we looked
15 at that CBW solicited and received?
16     A. I don't think so.
17     Q. The statement that you make at the bottom of
18 the first page carrying over to the second that,
19 "CBW is not qualified to act as a real estate broker
20 in Massachusetts, which is a necessary prerequisite
21 for earning and collecting a brokerage commission,"
22 is that statement based on any legal research that
23 you did?
24     A. I can't answer that.

Page 168

1      Q. When did you first conduct any legal
2  research regarding the issue of whether CBW was
3  entitled to collect its fee based on its status as a
4  licensed real estate broker?
5      A. I can't answer.
6          (Exhibit 98 marked for identification.)
7          (Document exhibited to witness.)
8      Q. In this -- Mr. Gordon, this obviously is an
9  affidavit of yours that was signed on January 4,
10 2005.
11     A. Yes.
12     Q. Even though obviously what appears here is
13 the new form of electronic signature, this is an
14 affidavit that you signed?
15     A. Absolutely.
16     Q. Looking at paragraph seven of the affidavit,
17 it refers to an attachment, which I believe is what
18 you previously testified to, the e-mail that you
19 sent to Mr. Casas on October 1st at 12:41 p.m.?
20     A. Correct.
21     Q. And beneath that is an e-mail from Andy
22 Sucoff at 12:19 p.m.?
23     A. Correct.
24     Q. In your e-mail to Mr. Casas, you say, "Ed, I

Page 169

1  am forwarding to you the just received closing
2  statement. As you can see the, quote, seller, close
3  quote, was required to pay over two hundred thousand
4  dollars at closing." Do you see that?
5      A. Yes.
6      Q. Have you ever reviewed -- strike that.
7          At the time you had sent this e-mail to
8  Mr. Casas, had you ever reviewed any other draft or
9  version of a closing statement that showed the
10 sellers bringing in excess of a million dollars to
11 the closing?
12     A. No.
13     Q. You then say, the fourth sentence, "I hear
14 that my clients are not the only ones who have
15 threatened." Do you see that?
16     A. Yes.
17     Q. What did you mean when you refer to your
18 clients being threatened?
19     A. I believe that Mr. Casas called them and
20 threatened them.
21     Q. When do you think that happened or what was
22 your understanding?
23     A. I think that happened on the morning of
24 October 1st.

43 (Pages 166 to 169)