# TAB D

```
 1                          Volume:  I
 2                          Pages:   1 - 236
 3                          Exhibits: 32 - 38
 4
 5            UNITED STATES DISTRICT COURT
 6              DISTRICT OF MASSACHUSETTS
 7                 No. 04CV12333MEL
 8  - - - - - - - - - - - - - - - - - - - - -
 9  CASAS, BENJAMIN & WHITE, LLC.,
10                 Plaintiff,
11
12  vs.
13
14  THE POINTE GROUP, INC., GERALD S. FREID; BARRY
15  FREID; KEY CORPORATE CAPITAL, INC.,
16                 Defendants.
17  - - - - - - - - - - - - - - - - - - - - -
18         DEPOSITION OF GERALD S. FREID
19           March 9, 2005 - 10:35 a.m.
20      Conn, Kavanaugh, Rosenthal, Peisch & Ford
21              10 Post Office Square
22               Boston, Massachusetts
23
24   Reporter:  Donna J. Whitcomb, CSR/RPR/RMR
```

Page 2

APPEARANCES:

CONN, KAVANAUGH, ROSENTHAL, PEISCH & FORD
By Erin K. Higgins, Esquire
10 Post Office Square
Boston, Massachusetts 02109
(617) 482-8200
On behalf of the Plaintiff.

GORDON HALEY, LLP
By Stephen F. Gordon, Esquire
101 Federal Street
Boston, Massachusetts 02110
(617) 261-0100
On behalf of The Pointe Group, Inc.

NIXON PEABODY, LLP
By W. Scott O'Connell, Esquire
100 Summer Street
Boston, Massachusetts 02110
(617) 345-1000
On behalf of Key Corporate Capital, Inc.

Page 3

INDEX
EXAMINATION OF:                               PAGE
GERALD FREID
By Ms. Higgins                               4, 227
By Mr. O'Connell                                173

EXHIBITS
NO.                                           PAGE
32  Indemnification Letter, 9/14/03             56
    Gerald Freid to CBW
33  Letter with Attachments, 12/20/03           56
    CBW to Freid
34  E-mail, 8/31/04, Gordon to Kauffman        133
    Re: Encroachment Problem
35  E-mail, Gordon to Kauffman, 9/17/04        134
    Re: Grand Jury Subpoena Objection Letter
36  E-mail, 9/25/04, Gordon to Sucoff          135
    and Henken
37  E-mail, Caine to Freid, 9/29               151
38  E-mail, Cover Letter and                   154
    Closing Statement

*Original exhibits retained by Ms. Higgins.

Page 4

PROCEEDINGS
    GERALD S. FREID, after having been
satisfactorily identified was duly sworn by the
Notary Public that his testimony would be the truth,
the whole truth, and nothing but the truth,
testified as follows in answer to direct
interrogatories by Ms. Higgins:
    Q.  Sir, could you please state your full name
for the record including your middle name?
    A.  Gerald Steven Freid.
    Q.  Steven with a "V" or "P-H"?
    A.  "V."
    Q.  And your date of birth?
    A.  2/11/58.
    Q.  Where do you live, sir?
    A.  47 William Street, Needham, 02494.
    Q.  Who do you live there with?
    A.  My wife and two children.
    Q.  What is your wife's name?
    A.  Kim.
    Q.  Freid?
    A.  Yes.
    Q.  And your children's names?
    A.  Older one is Jared.  He goes to college so

Page 5

he's home half the year.  He's 20.  And Harry is 16.
    Q.  How long have you lived at that address?
    A.  20 years.
    Q.  Where do you work?
    A.  At The Pointe Group.
    Q.  What is your position there?
    A.  I'm the treasurer.
    Q.  How long have you been the treasurer?
    A.  About a year.
    Q.  And The Pointe Group is located at the
address that your brother gave us yesterday?
    A.  Yes.
    Q.  And just to get this out of the way, do
you have a business card?
    A.  I do.
    Q.  And does it identify you as the treasurer
at The Pointe Group?
    A.  It does.
    Q.  What position did you hold before you
became treasurer?
    A.  I didn't have a position.
    Q.  Okay, did you have a business card, did
you carry a business card?
    A.  No.

**Page 158**

1  sorts of massive confusion going on with thousands
2  of things being shoved in front of the people's
3  faces to have them sign.
4      And people running in and out of the
5  office making conferences left and right, and I
6  basically got dizzy watching it. So there was no
7  set this group was sitting here and this group was
8  sitting here. We were waiting for the okay so I
9  could take my mother home.
10     Q. Now, your mother I'm sure had to sign some
11 documents, correct?
12     A. Yes.
13     Q. And you said you were there holding her
14 hand, correct?
15     A. Yes.
16     Q. So were you sitting with her and looking
17 at documents that she was being asked to sign?
18     A. No.
19     Q. Was someone else doing that?
20     A. Yes.
21     Q. The attorneys?
22     A. Yes.
23     Q. Do you remember your mother asking whether
24 the brokers were going to be paid?

**Page 159**

1      A. Absolutely not.
2      Q. Do you remember John McCullough saying
3  anything about when or how the brokers would be
4  paid; not in a private conference with you but --
5      A. No.
6      Q. -- in the presence of other people?
7      A. There were no discussions.
8      Q. How did you learn that CBW wasn't paid out
9  of the proceeds?
10     A. I don't know. I don't know whether I -- I
11 certainly didn't see these papers. I don't know. I
12 saw it written down somewhere that there was -- I
13 can't put my hand on it. I don't know how -- I
14 don't know how I was informed. I don't know how I
15 knew. My brother might have told me. I can't
16 recollect or -- but when I found out I was shocked.
17     Q. Now, you knew you had signed the
18 engagement letter so you knew that The Pointe Group
19 had agreed to pay this fee, correct?
20     A. That's correct.
21     Q. So when you learned that CBW wasn't going
22 to be paid out of the sale proceeds, were you also
23 concerned about a liability to CBW?
24     A. I was certainly concerned, yes.

**Page 160**

1      Q. Did you have any discussions with Matt Caine
2  that day?
3      A. No, I did not.
4      Q. You didn't call Matt Caine and say you're
5  not getting paid?
6      A. I referred him to my attorney at that
7  point because...
8      Q. Okay, so he called you?
9      A. He could have called me and if I did pick
10 up the phone, I asked him to please call Steve
11 Gordon if he has any questions.
12     Q. How about after either the day of the
13 closing or after the closing; did you ever have any
14 conversations with Steve Dunham about CBW's fee?
15     A. He vanished; the last two weeks of the
16 sale.
17         MR. GORDON: I think the question was
18 after the closing; is that correct?
19     Q. Well, the day of or any time after did you
20 have any discussions with Steve Dunham --
21     A. No.
22     Q. -- about the fact that CBW wasn't paid out
23 of the sale proceeds?
24     A. No.

**Page 161**

1      Q. Mr. Freid, are you aware that The Pointe
2  Group has brought a counterclaim against Casas,
3  Benjamin & White in this case?
4      A. No.
5      Q. Are you aware of anything that CBW did or
6  failed to do that you consider to be a breach of its
7  fiduciary duties to The Pointe Group?
8      A. I don't know the law, no.
9      Q. Okay. Well, is there anything that you
10 could think of that you thought CBW did or failed to
11 do that you thought was detrimental to The Pointe
12 Group?
13     A. No.
14     Q. And is there anything that they did or
15 failed to do that you thought indicated that they
16 were aligned with Key Bank against The Pointe Group?
17     A. I think they were aligned with themselves
18 and whatever benefited them, whatever they thought
19 the right thing to do at the time, they did.
20 Whether it went back and forth, allegiances to one
21 side to another side or even to the buyer, but
22 that's -- I believe wherever -- they were as
23 brokers, as the real estate brokers, they were
24 involved with the buyer, the seller and the bank.