# TAB E

Barry A. Freid                                                              03/08/2005

Page 1

```
 1                              Volume:  I

 2                              Pages:   1 - 241

 3                              Exhibits: 1 - 31

 4

 5              UNITED STATES DISTRICT COURT

 6              DISTRICT OF MASSACHUSETTS

 7                 No. 04CV12333MEL

 8   - - - - - - - - - - - - - - - - - - - - -

 9   CASAS, BENJAMIN & WHITE, LLC.,

10                 Plaintiff,

11

12   vs.

13

14   THE POINTE GROUP, INC., GERALD S. FREID; BARRY

15   FREID; KEY CORPORATE CAPITAL, INC.,

16                 Defendants.

17   - - - - - - - - - - - - - - - - - - - - -

18         DEPOSITION OF BARRY A. FREID

19           March 8, 2005 - 10:15 a.m.

20      Conn, Kavanaugh, Rosenthal, Peisch & Ford

21              10 Post Office Square

22              Boston, Massachusetts

23

24      Reporter:  Donna J. Whitcomb, CSR/RPR/RMR
```

Barry A. Freid                                                                              03/08/2005

Page 2

1  APPEARANCES:
2
3  CONN, KAVANAUGH, ROSENTHAL, PEISCH & FORD
4    By Erin K. Higgins, Esquire
5    10 Post Office Square
6    Boston, Massachusetts 02109
7    (617) 482-8200
8    On behalf of the Plaintiff.
9
10 GORDON HALEY, LLP
11   By Stephen F. Gordon, Esquire
12   101 Federal Street
13   Boston, Massachusetts 02110
14   (617) 261-0100
15   On behalf of The Pointe Group, Inc.
16
17 NIXON PEABODY, LLP
18   By W. Scott O'Connell, Esquire
19   100 Summer Street
20   Boston, Massachusetts 02110
21   (617) 345-1000
22   On behalf of Key Corporate Capital, Inc.
23
24 ALSO PRESENT: Gerald Freid

Page 4

1              E X H I B I T S
2  NO.                                          PAGE
3  14  Web Site Home Page                       117
4  15  Amendment to Limited Guaranty            118
5  16  Fourth Modification and Extension        119
6  17  E-Mails, Subject: TPG Engagement         127
7  18  Letter, Barry Freid to CBW               129
8  19  Letter, CBW to Barry Freid               139
9  20  Letter, Barry Freid to CBW               141
10 21  Letter, 6/3/04, Re: Distribution and     144
11     Application of Sale Proceeds
12 22  E-Mail, Caine to B. Freid 6/4/04         146
13     Re: CBW Follow Up
14 23  Confirmation Letter Limited Modification 150
15 24  Draft P&S 6/25/04                        152
16 25  Limited Modification to 6/3/04           167
17     Letter Agreement
18 26  E-Mail, Gordon to E. Casas               154
19 27  E-Mail 7/15/04, Re: TPG Request          154
20 28  Confirmation Letter Limited Modification 175
21 29  Epoch/TPG Closing Statement              227
22 30  Obligations Modification                 232
23 31  E-Mail, Re: Epoch/TPG                    234
24 *Original exhibits retained by Ms. Higgins.

Page 3

1               I N D E X
2  EXAMINATION OF:                             PAGE
3  BARRY FREID
4    By Ms. Higgins                            5, 237
5    By Mr. O'Connell                          188
6
7              E X H I B I T S
8  NO.                                          PAGE
9  1   Profile, The Pointe Group, Inc., 2003   25
10     Re: Cranberry Pointe, Eastpointe
11 2   Profile, The Pointe Group, Inc., 2003   29
12     Re: Hammond Pointe
13 3   Business Card, Barry Freid              32
14 4   Casas, Benjamin & White, LLC            39
15 5   Copies of Checks, 8 Pages               46
16 6   Memorandum 12/2/04, Re: Status Update   77
17 7   Management Presentation April 2004      87
18 8   Confidential Information Memorandum     87
19 9   Non-Binding Expression of Interest      96
20 10  Letter of Intent                        102
21 11  Series of E-Mails, Re: Letter of Intent 104
22 12  Confidential Presentation               104
23 13  Letter, Haley to Sucoff 5/24/04         116
24     Re: Letter of Intent

Page 5

1  P R O C E E D I N G S
2       MS. HIGGINS: Since this is the first
3  deposition in the case, should we put something on
4  the record?
5       MR. GORDON: Yes.
6       MS. HIGGINS: Then let the record
7  reflect that at this deposition and at all other
8  depositions in this case counsel have agreed that
9  all objections except as to the form of the question
10 will be reserved until the time of trial as well as
11 all motions to strike. I assume that Mr. Freid
12 would like to read and sign?
13      MR. GORDON: Yes, before any notary.
14      MS. HIGGINS: We'll waive the notary
15 requirement and 30 days to read and sign but,
16 obviously, Steve, if you need more time just let me
17 know. Anything else anyone want to say?
18      MR. O'CONNELL: I agree with what
19 you've indicated.
20      BARRY A. FREID, after having been
21 satisfactorily identified was duly sworn by the
22 Notary Public and testified as follows in
23 answer to direct interrogatories by Ms. Higgins:
24      Q. Sir, could you state your full name

2 (Pages 2 to 5)

LegaLink Boston
(800) 822-3376

Page 174
1   Q.  And this July 22nd letter has a purchase
2   price, if you look on the first page, of 32,650,000,
3   correct?
4   A.  Right.
5   Q.  Now, between the time of this letter and
6   the time of the closing were there any other issues
7   that arose that affected the purchase price other
8   than this abutter issue and the service of the grand
9   jury subpoena that you recall?
10  A.  Yeah, I recall -- I recall there was a
11  lien against -- I think there were a couple of liens
12  that had to be paid.
13  Q.  Were those issues that came up between the
14  time that this July 22nd letter was signed and the
15  closing?
16  A.  I think so.
17  Q.  What were the liens?
18  A.  There was a mechanic's lien from
19  construction costs; there was -- I think that there
20  was -- there might have been liens from some of the
21  utility companies; there were -- we were having
22  problems with an Otis elevator, for example.  We had
23  a legal case going.  There were some Workmen's
24  Compensation cases that were current; there was some

Page 175
1   claims that were current.  You know, all this stuff
2   started to come up all of a sudden when you're going
3   to go to a closing and your attorney says, well,
4   what's this, what's that; so we faced them as
5   necessary.
6           (Document marked as Exhibit No. 28
7   for identification.)
8   BY MS. HIGGINS:
9   Q.  Mr. Freid, my only question about this
10  document is whether that you recall there was a
11  final set of modifications to this, to the original
12  June 3rd, 2004 letter agreement which is referenced
13  in the first paragraph of this September 27th
14  letter?
15  A.  Right.
16  Q.  Do you remember that you received this
17  September 27th letter from Steve Dunham constituting
18  this Fourth Modification to the June 3rd letter?
19  A.  Probably.
20  Q.  As the closing was approaching did you
21  review any drafts of closing statements, attachments
22  to closing statements?
23  A.  No.
24  Q.  Do you know what I mean by a closing

Page 176
1   statement?
2   A.  Yeah.
3   Q.  And you said you went to the closing at
4   Goodwin Proctor, correct?
5   A.  Yes, I did.
6   Q.  And while you were there that day I
7   presume you saw a closing statement?
8   A.  Yes, I did.
9   Q.  And was that the first time you had seen a
10  closing statement for this transaction?
11  A.  Yes.
12  Q.  So you hadn't seen any drafts in the days
13  leading up to the closing?
14  A.  Not really.  I mean, I -- I probably did.
15  I mean, there was -- there was many of them.  You
16  know, I started to just not look so close at stuff.
17  Q.  To the extent that the purchase price that
18  Epoch had agreed to went down from what we saw in
19  that July 22nd letter, the 32,000,000 plus number,
20  to the extent that number went down, were you
21  involved in discussions as to whether any new
22  purchase price was acceptable to The Pointe Group?
23  A.  To the best of my recollection we were
24  just trying to come up with as little money as

Page 177
1   possible to get this -- to get the closing done.
2   Q.  Meaning The Pointe Group?
3   A.  No, meaning my family:  Meaning my mother,
4   my brother, and my two sisters and myself.  To the
5   best of my recollection we were just trying to come
6   up with as little money at the closing as possible.
7   Q.  And the day you went to the closing did
8   your family bring money to the closing?
9   A.  I believe so.
10  Q.  Do you remember how much?
11  A.  I think it was a little bit over 200,000.
12  Q.  And at any point prior to the day of the
13  actual closing were you ever told that your family
14  would have to bring more than that to the closing?
15  A.  Not that I remember.
16  Q.  When you went to the closing at Goodwin
17  Proctor it was on September 30th, correct?
18  A.  I'm pretty sure.
19  Q.  Were you expecting that CBW would be paid
20  out of the proceeds of the closing?
21  A.  When I went to the close -- when I went to
22  the closing I didn't know what to expect.
23  Q.  Do you remember in the days leading up to
24  the closing having discussions with your brother

**Page 178**

1  about whether CBW's fee would need to be paid out of
2  the sale proceeds?
3     A.  No.
4     Q.  Did you ever see an invoice submitted by
5  CBW in advance of the closing?
6     A.  No, I didn't.
7     Q.  When you went to the closing and you --
8  did you actually see -- you said you saw a closing
9  statement?
10    A.  Yes, I did.
11    Q.  Did you make any observation as to what
12 that closing statement said about CBW's fee?
13    A.  I just saw that it was outside of the
14 deal.
15    Q.  How did you know it was outside of the
16 deal?
17    A.  It stated it clearly on the statement.
18    Q.  And were you surprised to see that?
19    A.  Pleasantly.
20    Q.  Did you have any knowledge when you went
21 to the closing that morning that such an agreement
22 had been reached?
23    A.  No.
24    Q.  Do you remember there being any discussion

**Page 179**

1  at the closing, other than obviously discussions
2  that were private between you and counsel, but do
3  you remember any discussion at the closing as to how
4  CBW was going to be paid?
5     A.  No.
6     Q.  And just so my question's clear, that
7  includes conversations that you weren't a party to
8  but conversations that you overheard as well; did
9  you ever hear anyone discussing that issue?
10    A.  All I know is that it was outside of the
11 closing statement. It was to be paid outside.
12    Q.  Do you remember, you know, sometimes this
13 happens during a closing, you go down the closing
14 statement and sort of talk about each item on the
15 closing statement; did that happen at this closing?
16    A.  Just like it was said, there was three
17 initials outside of closing.
18    Q.  Okay, but my question was whether during
19 the closing did the people who were at the closing
20 go through each item and kind of check off each one
21 as to, okay, this amount is going to be paid, this
22 amount's going to be paid?
23    A.  I believe so. I believe so.
24    Q.  When you got to CBW --

**Page 180**

1     A.  I told you there was three initials there.
2  I'm not sure what they were, but to be paid outside
3  of the closing.
4     Q.  Do you remember who discussed or who said,
5  well, that's what that means, they're going to be
6  paid outside of the closing?
7     A.  John McCullough.
8     Q.  And the initials "POC," does that mean
9  anything to you?
10    A.  Yeah, something like -- yes, that's...
11    Q.  And you remember John McCullough saying
12 that they were going to be taken care of outside of
13 the closing?
14    A.  He never said "taken care of"; he didn't
15 use that word.
16    Q.  What did he say?
17    A.  He said to be handled outside of the
18 closing; that's it. He didn't...
19    Q.  And you don't remember having any
20 discussions with any of your family members, with
21 anyone other than counsel, in the days leading up to
22 the closing concerning how CBW was going to be paid?
23    A.  Well, the only conversations that I -- you
24 know, prior to it, no. Prior to it, no, I didn't

**Page 181**

1  have any conversations.
2     Q.  Do you remember we saw those -- there was
3  the letter that you sent to CBW?
4     A.  Right.
5     Q.  Asking if they could compromise their fee,
6  right?
7     A.  Right.
8     Q.  We saw a later e-mail to CBW again
9  requesting that they compromise the fee?
10    A.  Right.
11    Q.  And you remember we talked about the fact
12 that they agreed to cut $50,000 off, correct?
13    A.  Right.
14    Q.  And so between the time of that
15 correspondence and the closing itself you had no
16 communications with anyone, leaving aside counsel,
17 about how CBW was going to be paid out of this
18 transaction when there was no money?
19    A.  You're right, there was -- there was no
20 money. I --
21       MR. GORDON: The question is
22 conversations.
23    A.  No, no.
24    Q.  You had no conversations with anyone about