# TAB I

Westlaw.

Slip Copy                                                                    Page 1

2005 WL 1491233 (D.Mass.)

**(Cite as: 2005 WL 1491233 (D.Mass.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
INVERNESS MEDICAL SWITZERLAND
GMBH, Unipath Diagnostics, Inc., and Church &
Dwight Co., Inc., Plaintiffs,
v.
ACON LABORATORIES, INC., Defendant.
**No. Civ.A. 03-11323-PBS, Civ.A. 02-12303-PBS.**

June 23, 2005.

MEMORANDUM AND ORDER

SARIS, J.

I. INTRODUCTION

*1 Plaintiffs Inverness Medical Switzerland
GmbH, Unipath Diagnostics, Inc., and Church &
Dwight Co., Inc. (collectively "Inverness") have
sued defendant Acon Laboratories, Inc. ("Acon") in
an action (the "Charlton litigation") for
infringement of three U.S. patents, including U.S.
Patent No. 6,485,982 ("the '982 patent"). In a
separate action (the "May-Davis litigation"),
Inverness has sued Acon for infringement of
additional patents. Acon moves to disqualify law
firm Goodwin Procter LLP ("Goodwin") as counsel
for Inverness in these actions, claiming a violation
of Massachusetts Supreme Judicial Court Rules of
Professional Conduct 3.7 and 1.10 based on
Goodwin's recent hiring of Douglas Kline and
Duncan Greenhalgh. Acon contends that
disqualification is necessary for two reasons. First,
Acon argues that there is a conflict of interest under
SJC Rule 1.10 because between January and
September 2003, while Kline and Greenhalgh were

employed by Testa Hurwitz LLP ("Testa") as patent
lawyers, Testa acted as local counsel for Acon.
Second, Acon argues that Goodwin must be
disqualified under SJC Rule 3.7 because Kline and
Greenhalgh will be necessary witnesses in the
upcoming trial on Acon's inequitable conduct
claims. The Court permitted discovery on these
issues. After hearing and review of the record,
Acon's motion to disqualify is *DENIED*.

II. BACKGROUND
A. Testa's Representation of Acon

David Doyle, Acon's lead counsel at Morrison &
Foerster, LLP in the May-Davis and Charlton
litigation, retained Testa to act as co-counsel for
Acon in the May-Davis litigation in 2002 and in the
Charlton litigation in 2003. (Doyle Decl. Supp.
Acon Reply Brief ¶ 2.) In connection with this
work, he provided extensive confidential client
information regarding Acon to a partner at Testa,
Steven Bauer. (*Id.* ¶¶ 3, 4.) Mr. Doyle's
declaration on these points does not mention Kline
or Greenhalgh.

Kline and Greenhalgh submitted declarations
discussing their involvement with Testa's
representation of Acon. Both attorneys state that
they have searched their "files and recollections
carefully" and do not believe that they received any
confidential or proprietary information relating to
Acon or to Testa's representation of Acon.
(Greenhalgh Decl. ¶¶ 3,5; Kline Decl. ¶¶ 3,4.)
While at Testa, they did no work for Acon and
billed no time to the Acon matter. (Greenhalgh
Decl. ¶ 4; Kline Decl. ¶ 4.) They say that they
knew that Testa represented Acon based on
discussions with Bauer about possible conflicts
related to the firm's representation of both Acon and
Church & Dwight (then Armkel LLC). (Greenhalgh
Decl. ¶ 4; Kline Decl. ¶ 4.) Both Kline and
Greenhalgh state that they never discussed Acon's
strategies or intellectual property rights with any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 1491233 (D.Mass.)

**(Cite as: 2005 WL 1491233 (D.Mass.))**

attorneys at Testa. (Greenhalgh Decl. ¶ 5; Kline Decl. ¶ 5.) Finally, neither attorney recalls discussion of the Acon litigation at any general firm meetings. (Greenhalgh Decl. ¶ 5; Kline Decl. ¶ 5.)

**\*2** Acon points to several time entries in Testa's bills to Acon that mention Kline and Greenhalgh:

(1) A January 2003 fifteen-minute entry by Stephen Whetstone, another Testa partner working on the Acon matter, reads "vm to S. Bauer re: Acon; email from S. Bauer re: Acon; vm to DJK re: Acon; emails re: Answer, Motion to Dismiss". (Comer Aff. Supp. Mem. re: Dep., Ex. 4 at 2.) Inverness does not dispute that DJK are Kline's initials, or that the notation refers to him.

(2) Another January 2003 fifteen-minute entry by Whetstone states "vm's to/from D. Greenhalgh re: complaint, interested parties." (*Id.*)

(3) A February 2003 Whetstone entry for two hours states in part: "reviewed proposed litigation timeline; conf. w/N.Maroney re:Saris' views; email re: same; tc's w/DJK, DSG, RSS re: same...." (*Id.* at 8.)

(4) A September 2003 fifteen-minute Whetstone entry states in part "emails to/from DJK re: SJ papers." (*Id.* at 16.)

(5) Another September 2003 fifteen-minute entry states "vm to S. Bauer; tc w/DJK re: Inverness's withdrawal request." (*Id.*)

(6) A third September 2003 entry, for thirty minutes, includes the note "conf w/DJK, DJB re: conflicts analysis...." (*Id.* at 17.)

(7) An October 2003 fifteen-minute Whetstone entry reads in part "email to/from S. Bauer, DJKline re: withdrawal ...". (*Id.* at 19.)

(8) Finally, another October 2003 Whetstone entry, for thirty minutes, states in part "vm from S. Comer re: TH & T withdrawal; vm's to/from S.Bauer, DJK, N. Maroney re: same ...". (*Id.*)

Acon conducted brief depositions of Kline and Greenhalgh in March of this year, questioning them about the invoice entries and their knowledge of Testa's work for Acon. Greenhalgh stated in his deposition that he had never spoken to Whetstone about the Acon litigation, and that he had one conversation with Bauer, in which Kline also participated, about the conflicts issues involved in Testa's representation of Acon. (Greenhalgh Dep. at 10:20-22.) He stated that he had no other conversations about the Acon litigation with anyone at Testa. (*Id.* at 11:25-12:18.) Questioned about Whetstone's January 2003 invoice entry that reads "vm's to/from D. Greenhalgh re: complaint, interested parties," Greenhalgh stated that he did not recall discussing the Inverness complaint with Whetstone or receiving a voicemail from Whetstone on this subject. (*Id.* at 9:21-10:09.)

Kline's deposition testimony is similar to Greenhalgh's. He stated that he does not recall having any conversations with Whetstone about the Acon litigation. (Kline Dep. at 16:04-12.) He has no memory of any e-mails, voice-mails, or conversations referenced in the Whetstone invoice entries. (*Id.* at 14:08-17:15 .) He also stated that he does not recall ever seeing any summary judgment papers related to the Acon matters while at Testa. ( *Id.* at 17:16- 19.) Like Greenhalgh, Kline remembers discussing conflict issues related to the Acon representation with Bauer, but he does not remember discussing Acon's litigation strategies or any other substantive aspects of the case. (*Id.* at 18:04-19:03.)

**\*3** Bauer has worked at Proskauer Rose, LLP since 2004, and Proskauer has been representing Church & Dwight against Acon in this litigation. Acon has not moved to disqualify him or to take his deposition.

B. Testa's Representation of Carter-Wallace and Church & Dwight

During the period that Kline and Greenhalgh worked at Testa, Testa acted as counsel for Carter-Wallace, and later Church & Dwight, as owner of the '982 patent and other related Charlton

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 3

2005 WL 1491233 (D.Mass.)

**(Cite as: 2005 WL 1491233 (D.Mass.))**

patents. Testa was involved in the prosecution of those patents. Edmund Pitcher, the partner at Testa in charge of this representation, is expected to testify at the bench trial in this case involving the defense of inequitable conduct.

As part of the prosecution of the '982 patent, Kline was significantly involved in an interference proceeding between Becton Dickinson and Company and Carter-Wallace. (Kline Decl. ¶ 9.) Among other duties, Kline appeared on behalf of Carter-Wallace at an arbitration between Carter-Wallace and Becton Dickinson in November 2000, and questioned Mr. Charlton as his representative during the arbitration. (Doyle Conf. Aff. Ex. G.) Kline became chair of the patent and intellectual property group at Testa in 2001. (Kline Dep. at 10:23-11:05.)

Greenhalgh stated in his March 2005 deposition that he was primarily responsible for prosecution of at least one Charlton patent after the issuance of the '982 patent in 2002, but that he was not primarily responsible for prosecution of the '982 patent. (Greenhalgh Dep. at 20:01-21:14.) In his declaration, he stated that "[a]lthough I may have worked on the prosecution of the Charlton '982 patent, to the best of my recollection my involvement was minimal...." (Greenhalgh Decl. ¶ 6.) The record on Greenhalgh's involvement in the '982 patent prosecution is somewhat confused, but under any reading, there is no evidence that Greenhalgh was involved in that prosecution before approximately July 1999. *See* Plaintiffs' Amended and Supplemental Privilege Log, Vinti Decl. of May 19, 2005, Exh. 1. The EPO revocation decision at the heart of Acon's inequitable conduct claim was issued in November 1998. Greenhalgh Dep. at 33:11-12.

In the Charlton litigation, Greenhalgh was designated by Church & Dwight to testify as a Federal Rule of Civil Procedure 30(b)(6) deponent about, among other things, plaintiffs' knowledge of the European Patent Office decision to revoke the European counterpart to the '982 patent application, as well as plaintiffs' alleged failure to disclose this revocation to the United States Patent Office

(PTO). (Doyle Aff. Ex. D; Doyle Conf. Aff. Ex. C.) Greenhalgh was deposed by Acon as a 30(b)(6) designee on April 16, 2004. (Doyle Conf. Aff. Ex. C.)

In his affidavit, Greenhalgh stated that he "had no prior personal knowledge" of the issues about which he was asked to testify as a 30(b)(6) deponent, and that he "therefore prepared to give testimony by gathering historical information." (Greenhalgh Decl. ¶ 7.) He also stated that "any information I had about Acon's allegations regarding the disclosure of a decision of the European Patent office revoking a European counterpart of the Charlton patent was not from my own personal knowledge, but was information that I had gathered as part of my investigation." (*Id* .)

*4 Kline appeared as a "may call" witness on Inverness's Third Supplemental Witness List for the November 2004 jury trial before this Court (Docket No. 307), but he did not testify at that trial. Acon did not list Kline as a witness at any time, but listed Greenhalgh within the group of "witnesses whose testimony is expected to be presented by deposition" for the November trial. (Acon Witness List, Sept. 7, 2004 (Docket No. 162).) Greenhalgh's testimony was not presented at trial, either in person or by deposition. Inverness has stated that it does not intend to call either Kline or Greenhalgh in the upcoming bench trial, while Acon contends that it intends to call both attorneys.

### III. DISCUSSION
Lawyers appearing before this Court are bound by the Massachusetts Rules of Professional Conduct. United States District Court Local Rule 83.6(4)(B).

" '[D]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary." ' *Adoption of Erica,* 686 N.E.2d 967, 970 (Mass.1997) (quoting *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721 (7th Cir.1982)). Such a measure is generally appropriate only when continued participation by the attorney "taints the legal system or the trial of the cause before it."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 1491233 (D.Mass.)

**(Cite as: 2005 WL 1491233 (D.Mass.))**

*Borman v. Borman,* 393 N.E.2d 847, 856 (Mass.1979) (citations omitted). Courts should be "alert that the Canons of Ethics are not brandished for tactical advantage." *Serody v. Serody,* 474 N.E.2d 1171, 1174 (Mass.App.Ct.1985).

A court deciding whether to disqualify counsel should attempt "to reconcile an individual's right to counsel of his choice with the obligation of maintaining the highest standards of professional conduct and the scrupulous administration of justice." *Rodriguez v. Montalvo,* 337 F.Supp.2d 212, 217 (D.Mass.2004).

A. Alleged Conflict of Interest

Acon argues that Goodwin must be disqualified under Rule 1.10(d) of the Massachusetts Rules of Professional Conduct because Kline and Greenhalgh were employed by Testa during Testa's ten-month representation of Acon in 2003. Rule 1.10(d) provides:

(d) When a lawyer becomes associated with a firm, the firm may not undertake to or continue to represent a person in a matter that the firm knows or reasonably should know is the same or substantially related to a matter in which the newly associated lawyer (the "personally disqualified lawyer"), or a firm with which that lawyer was associated, had previously represented a client whose interests are materially adverse to that person unless:

(1) the personally disqualified lawyer has no information protected by Rule 1.6 or Rule 1.9 that is material to the matter ("material information"); or

(2) the personally disqualified lawyer (i) had neither substantial involvement nor substantial material information relating to the matter and (ii) is screened from any participation in the matter in accordance with paragraph (e) of this Rule and is apportioned no part of the fee therefrom.

*5 Mass. S.J.C. Rule 3:07, Rule 1.10. Neither party disputes that Kline and Greenhalgh are currently associated with Goodwin, that Goodwin represents Inverness in the current matter, that the interests of Inverness are materially adverse to those of Acon, that Acon was previously a client of Testa,

and that Kline and Greenhalgh were previously associated with Testa. The relevant disputed issues, then, are whether the current matter is the "same or substantially related" to the matter in which Testa represented Acon, and if it is, whether either of the two safe harbors of Rule 1.10(d) apply here. Because I find that the first safe harbor provision applies, I need not consider the other disputed points.

Comment 9 to Rule 1.10 elaborates on the 1.10(d)(1) exception, stating that a firm need not be disqualified under 1.10(d) if the personally disqualified lawyer does not possess material confidential information:

If the lawyer has no confidential information about the representation of the former client, the new firm is not disqualified and no screening procedures are required. This would ordinarily be the case if the lawyer did no work on the matter and the matter was not the subject of discussion with the lawyer generally, for example at firm or working group meetings. The lawyer must search his or her files and recollections carefully to determine whether he or she has confidential information. The fact that the lawyer does not immediately remember any details of the former client's representation does not mean that he or she does not in fact possess confidential information material to the matter.

Goodwin has the burden of establishing that neither Kline nor Greenhalgh received any confidential information about the Acon representation while at Testa. *See* Comment 7 to Rule 1.9 ("the burden of proof should rest upon the firm whose disqualification is sought"). Goodwin has met this burden. Both attorneys declared in their affidavits and depositions that they have looked through their files carefully, and that they received no such information. Significantly, there is no evidence that either Kline or Greenhalgh billed any time to the Acon matter at Testa.

Acon relies on the invoice entries to demonstrate the transfer of material confidential information to Kline or Greenhalgh. Most of the entries appear to relate to the conflicts issues and withdrawal from the representation rather than the substance of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 5

2005 WL 1491233 (D.Mass.)

**(Cite as: 2005 WL 1491233 (D.Mass.))**

litigation. Only the September 23, 2003 fifteen-minute entry noting "emails to/from DJK re: SJ papers" suggests possible discussion of material confidential information. However, summary judgment papers were not filed in the May/Davis litigation until March 2004, after Testa withdrew from representing Acon; in the Charlton litigation, summary judgment papers were filed by Inverness in early September 2003, and Acon filed its opposition on September 16, a week before the invoice entry and a month before Testa withdrew from the representation. There is no evidence that Testa was substantively involved at any point in the Charlton litigation, and Ms. Joan Griffin, then at the law firm of Cooke, Clancy and Greunthal, appeared as local counsel for Acon from the beginning. Based on these facts and the short length of time allotted to the invoice entry (fifteen minutes), it is unclear whether the e-mail involved transfer of substantive information. While there is some evidence that Kline and Greenhalgh had minimal contacts with the Acon litigation, the record contains no persuasive evidence that Kline and Greenhalgh gained material confidential information about the Acon litigation while at Testa.

**\*6** Acon suggests that because a confidential relationship was established between Testa and Acon, that relationship is imputed to every lawyer in the firm, and then imputed to every lawyer at any firm to which a lawyer from the first firm transfers. The relevant caselaw does not support this position. In *Dieter v. Regents of the University of California*, 963 F.Supp. 908 (E.D.Cal.1997), involving California law, lawyers for a party to the litigation had previously worked for a law firm that represented an adverse party, but those lawyers had never worked on the case while at the previous firm, and had worked at a different branch of the firm. *Id.* at 910. The court cast doubt upon Acon's "double imputation" approach here:

Such imputation upon imputation--imputing to the attorney knowledge of confidences in the first representation and then imputing to the attorney's new firm knowledge of these imputed confidences--could have potentially large effects on the market for attorney services and the ability of attorneys to move from firm to firm.

*Id.* at 911. *Cf. Exterior Sys., Inc. v. Noble Composites, Inc.*, 210 F.Supp.2d 1062, 1070 (N.D.Ind.2002) (holding that under Indiana's professional conduct rules, a law firm must "reject representation only where a new lawyer to the firm had represented an adverse client while at his former firm *and had acquired actual client confidences*" (emphasis in original)).

Although *Dieter* was decided under California law, the same reasoning applies here. The cases pointed to by Acon are inapposite, as they discuss imputation less attenuated than that proposed in this case. *See Bays v. Theran*, 639 N.E.2d 720, 722, 724 (Mass.1994) (affirming disqualification of law firm where lower court found that attorney at the firm had represented adverse party and received confidential information from that party while at the firm); *Kevlik v. Goldstein*, 724 F.2d 844, 845-46, 850-51 (1st Cir.1984) (affirming disqualification of defendants' law firm where attorney at the firm had privileged communications with witness relevant to plaintiffs' case while at the firm); *Rodriguez*, 337 F.Supp.2d at 217-19 (holding that confidential information imparted by a party to a paralegal is imputed to the attorney supervisors within a firm, and that the imputation remains with those attorney supervisors when they transfer to a new firm, so that they cannot personally represent a client adverse to that party); *Atasi Corp. v. Seagate Tech.*, 847 F.2d 826, 828-29 (Fed.Cir.1988) (affirming disqualification of law firm where attorney at the firm previously worked at adverse party's law firm and "was personally involved in the matter" while employed there, helping to prepare a brief and signing his name on a pleading (applying Ninth Circuit law)). [FN1]

> FN1. Acon also points to language in *Bays* and *Kevlik* stating that a court will assume that where an attorney-client relationship existed, confidences were transmitted. *See Kevlik*, 724 F.2d at 851 ("The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation."); *Bays*, 418 Mass. at 691. That point in no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 6
2005 WL 1491233 (D.Mass.)

**(Cite as: 2005 WL 1491233 (D.Mass.))**

way bolsters Acon's claim here because neither Kline nor Greenhalgh personally represented Acon.

Thus, based on the safe harbor in Rule 1.10(d)(1), Goodwin has proven that neither Kline nor Greenhalgh received confidential information while at Testa. Acon's motion to disqualify based on Testa's previous representation of Acon must be denied.

B. Lawyer-as-Witness Issue

*7 Acon further argues that Goodwin must be disqualified because Kline and Greenhalgh will be necessary witnesses in the upcoming trial, based on their involvement with the prosecution of the Charlton patents for Carter-Wallace while employed by Testa. Acon alleges a violation of Massachusetts Supreme Judicial Court Rule 3:07, Rule 3.7, which states:
(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client.
(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.
Rule 3.7(a) is inapplicable here, as neither Kline nor Greenhalgh will act as advocate for Inverness in the upcoming trial. Under Rule 3.7(b), the relevant inquiry is whether Kline or Greenhalgh are likely to be called as witnesses, and if so, whether Rule 1.7 or 1.9 would preclude advocacy by Goodwin attorneys. Nothing in Rule 1.9 appears to be relevant to Acon's 3.7(b) claim that Goodwin attorneys should not represent Inverness, and Acon does not provide convincing argument to the contrary. [FN2] Rule 1.7 states, *inter alia*:

FN2. Acon makes a brief argument under Rule 1.9(c), distinct from its Rule 3.7 argument, that in testifying at trial, Kline

or Greenhalgh may improperly use or reveal confidential information relating to Testa's former representations of Acon or Church & Dwight without the consent of those parties. (*See* Acon Reply at 13-14.) Acon has presented no evidence to support this scenario.

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client ...
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after consultation....
Mass S.J.C. Rule 3:07, Rule 1.7. Rule 1.7(a) is inapplicable to Acon's claim under Rule 3.7. Rule 1.7(b) may be applicable, however, if the testimony of Kline or Greenhalgh is likely to be in conflict with the testimony of witnesses for Inverness. This situation could create conflicting loyalties for counsel from Goodwin, between their client, Inverness, and Goodwin attorneys Kline and Greenhalgh. Comment 5 to Rule 3.7 provides: "[I]f there is likely to be substantial conflict between the testimony of the client and that of the lawyer or a member of the lawyer's firm, the representation is improper. The problem can arise whether the lawyer is called as a witness on behalf of the client or is called by the opposing party." According to the comments to Rule 1.7, a conflict is not in itself sufficient to preclude representation, however; the focus of the court must be on whether the lawyer's loyalty to the client is threatened:
A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.
*8 Comment 4 to Rule 1.7.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 7

2005 WL 1491233 (D.Mass.)

**(Cite as: 2005 WL 1491233 (D.Mass.))**

It is clear that "disqualification may rightly be sought by opposing counsel," as here, "even though he/she is not representing the aggrieved client." *Kevlik,* 724 F.2d at 848 (citation omitted). Comment 15 to Rule 1.7 advises wariness in such a case, however, noting that "where the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question," but that [s]uch an objection should be viewed with caution ... for it can be misused as a technique of harassment." *See also Serody,* 474 N.E.2d at 1174 ("[C]alling upon the testimony of opposing counsel to maneuver his withdrawal ... is a practice which, regrettably, holds high fashion.").

Rule 1.7(b) provides an exception to the disqualification requirement where the client has consented to the conflict, as Inverness has done here. However, "when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent." Comment 5 to Rule 1.7.

The Massachusetts precedent cited by both sides on the lawyer-as-witness issue is not entirely applicable here, as it involves cases where the advocate at trial, rather than a different lawyer from the advocate's firm, gives testimony at trial. The ethical dilemma posed where trial counsel actually testifies is more serious than the problem posed here, as the distinction between Rule 3.7(a) and Rule 3.7(b) indicates. However, testimony by a lawyer from the advocate's law firm may be problematic in some cases under Massachusetts law. *See Borman,* 393 N.E.2d at 855 ("Although the impact on the client, trial, and public lessens when the attorney-witness is not himself trial counsel but only a member of trial counsel's firm, there is an impact nonetheless."). Generally, Massachusetts courts focus on whether a substantial conflict between the lawyer's and client's testimony could emerge. *See id.* at 858 (Before disqualification is required, "[t]here must be a showing ... that counsel's testimony on behalf of the opponent will be prejudicial to counsel's client."); *Serody,* 474 N.E.2d at 1173 ("[Borman] sounds a

cautionary note about judicial disqualification of counsel.... The matter lies differently, however, if the testimony sought by an opponent is likely to be prejudicial to the client of the lawyer-witness.").

The question before this Court is whether Kline and/or Greenhalgh are likely to be necessary witnesses at trial, and if so, whether their testimony is likely to be in conflict with the testimony of witnesses for Inverness. If such a conflict is likely, the Court must determine whether the conflict is so substantial as to threaten Goodwin counsel's loyalty to its client, to the extent that a disinterested lawyer would conclude that Inverness should not agree to such representation.

*1. Necessity as Witnesses and Likelihood of Substantial Conflict*

**\*9** Acon suggests three possible subject areas in which the testimony of Kline will be necessary at trial, and one area in which Greenhalgh's testimony will be necessary. Acon contends that there is likely to be a substantial conflict between the two attorneys' testimony and that of witnesses for Inverness as to all of these subject areas.

First, Acon argues that Charlton's testimony at the November trial conflicts with legal positions regarding obviousness taken by Kline and other Testa lawyers during the Becton Dickinson interference. (Acon Mem. at 5.) In denying Acon's Motion to File its Third Amended Answer and Counterclaim, this Court prohibited Acon from presenting this claim at trial. (*See* Electronic Order of March 16, 2005.) Acon's Rule 3.7 argument in this regard is therefore moot.

Second, Acon states that Kline's testimony will be relevant regarding Acon's best mode inequitable conduct claim. The best mode claim is based on Acon's contention that Charlton and his attorneys withheld material information from the PTO about the best mode for performing the two-step embodiment of Charlton's invention. Acon alleges that at the November 2000 arbitration with Becton Dickinson at which Kline represented Carter-Wallace and questioned Charlton, Charlton

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 8

2005 WL 1491233 (D.Mass.)

**(Cite as: 2005 WL 1491233 (D.Mass.))**

failed to disclose the best buffer he had developed for the two-step embodiment. Acon points to the following exchange from the arbitration, among others:

Q: [Kline] ... why don't you tell us all briefly how does the premix embodiment differ if at all from the embedded embodiment?

A: [Charlton] ... Essentially the difference is the placement of where the conjugate is. There's no difference between the buffers you're using or any other way of putting the product together.

Q: [Kline] This is going to be important. Is that clear enough? I want to be sure that we get that.

(Doyle Conf. Aff. Ex. G at 49:09-50:02.) Acon argues that this snippet and similar testimony by Charlton at the arbitration are in conflict with Inverness's current position, and lend support to Acon's best mode claim.

The problem with this argument is that Charlton, who provided the testimony, rather than Kline, who asked the questions, would appear to be the relevant witness regarding the truth of this testimony, and no evidence in the record suggests that Kline would contribute any useful information. *See Serody,* 474 N.E.2d at 1174 ("If ... the evidence sought from opposing counsel could as easily be adduced through others, or the lawyer's testimony would be merely cumulative or marginally relevant, it may be desirable to exclude the proffered evidence or to admit the evidence and let the lawyer-witness stay in the case.").

Even if Kline is a necessary witness based on his involvement in the arbitration hearing, there is no indication that his testimony will substantially conflict with the testimony of Inverness witnesses. At his deposition in March 2005, Kline was read the exchange quoted above from the November 2000 arbitration. (Kline Dep. at 27:12-28:06.) Based on privilege, he was instructed not to respond when asked whether he discussed this testimony with Charlton before the hearing. (*Id.* at 28:07-28:15.) He could not recall whether after the hearing, he had looked at the patent application to see whether a best buffer was disclosed. (*Id.* at 28:16-28:20.) When asked if he provided any information to the PTO regarding a best buffer, he stated that he was

not involved in that process. (*Id.* at 28:21-29:03.) Based on privilege, he was instructed not to respond to a question about his discussions with colleagues at Testa about a best buffer. (*Id.* at 29:04-29:12.) None of this testimony provides any support for Acon's claim of substantial conflict in this case.

**\*10** Third, Acon argues that Kline is a necessary witness regarding Acon's inventorship inequitable conduct claim. The inventorship claim is based on Acon's allegation that Charlton intentionally deceived the PTO by failing to include Dr. Henry Graham as a co-inventor on the '982 patent application. According to Acon, Kline's March 2005 deposition shows that Kline "learned by 1995 that Charlton had conceived of the '982 invention at Ortho, rather than at Carter-Wallace, indicating a potential inventorship defect." (Acon Mem. Re: Depositions at 4.) In fact, in the portion of the deposition cited by Acon to support this point, Acon counsel simply read Kline certain testimony that Charlton had given at a hearing attended by Kline (Kline Dep. at 30:25-32:12), and asked Kline about it. Kline stated that he did not recall being present during the testimony (*id.* at 32:12-14), and objected to a characterization of a portion of the testimony by Acon's counsel (*id.* at 32:15-33:01). This deposition testimony provides no support for Acon's claims.

Finally, Acon makes a more general claim that "[b]efore the '982 patent issued in 2002, Kline learned yet further details from Charlton that may include deficiencies of the '982 patent, but which he refused to disclose during the deposition based on the attorney-client privilege." (Acon Mem. Re: Dep. at 4-5.) This is pure conjecture.

Acon contends that Greenhalgh is a necessary witness regarding Acon's European patent revocation inequitable conduct claim. This claim relates to the 1998 revocation by the European Patent Office (EPO) of the European counterpart to the '982 patent, for lack of an "inventive step." Acon alleges that plaintiffs engaged in inequitable conduct by failing to disclose this revocation to the PTO. Greenhalgh's testimony as to the revocation is necessary, according to Acon, because he was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 9

2005 WL 1491233 (D.Mass.)

**(Cite as: 2005 WL 1491233 (D.Mass.))**

designated by Church & Dwight as a 30(b)(6) deponent on the subject of the revocation and because he was involved in the prosecution of several Charlton patents. Acon contends that Greenhalgh can address, among other things, "whether Edmund Pitcher was aware that the European Patent Office had revoked the patent and yet did not disclose that action to the United States PTO." (Acon Mem. at 3.)

In his affidavit, Greenhalgh stated that he had no personal knowledge of the issues that he was asked to discuss as a 30(b)(6) deponent, including plaintiffs' knowledge of the EPO revocation decision. (Greenhalgh Decl. ¶ 7.) Without personal knowledge of the relevant events, there is no reason to believe that Greenhalgh's testimony at trial would conflict with the testimony of Pitcher himself. Acon points to the following exchange from Greenhalgh's 30(b)(6) deposition in April 2004:

> Q: Did you ask Mr. Pitcher whether or not there came a point in time when he was working on the patent prosecution for Carter-Wallace or Armkel that he became aware that the European Patent Office revoked the '215 patent?
> **\*11** Mr. Vinti: Objection. Attorney-client privilege and attorney work product and instruct you not to answer.
> Q: Are you going to follow counsel's instruction not to answer that?
> A: I am.
> Q: Aside from counsel's instruction, do you possess the knowledge to answer that question?
> A: Yes.

(Doyle Conf. Aff. Ex. C, Greenhalgh April 2004 Dep. at 64:25-65:14 .) This exchange is problematic because the basis for the assertion of privilege is unclear. However, Acon did not move to compel and this answer is inadequate to demonstrate that Greenhalgh has substantial impeachment evidence.

Acon argues that Greenhalgh's "own conduct supports Acon's inequitable conduct defense." (Acon Mem. Re: Dep. at 2.) Based on Greenhalgh's March 2005 deposition, Acon states that it "now knows that Greenhalgh had personal responsibility for prosecuting the Charlton patents as early as 1999, and prosecuted those patents for three years

before issuance of the '982 patents without disclosing the highly material EPO revocation to the PTO," with "no plausible explanation for his failure to disclose." (*Id.*) In fact, Greenhalgh stated in the deposition that he did not see the EPO revocation decision when it was issued. (Greenhalgh Dep. at 28:04-29:17.) He also testified that while preparing for his 30(b)(6) deposition, he found a document transmitting the EPO revocation decision from Testa to Carter-Wallace (*id.* at 31:14-24), but that he had not been cc'd on that document and had not seen it at the time that it was written (*id.* at 34:17-22). Without knowledge of the revocation decision, Greenhalgh could not plausibly be accused of inequitable conduct regarding it. Acon has not presented evidence to refute Greenhalgh's declaration that he had no personal knowledge about the events relevant to the EPO revocation, or otherwise to support its expansive assertions about Greenhalgh's involvement in intentional deception in this regard.

Finally, Acon argues that Greenhalgh's deposition testimony substantially conflicts with that of Edmund Pitcher. In his deposition on March 16, 2005, Pitcher stated that Isabelle Blundell at Testa was charged with producing materials such as the European proceedings documents to the PTO. (Pitcher Dep. at 294:10-295:04.) Pitcher was later asked whether Greenhalgh had "any involvement in forwarding or not forwarding [the EPO revocation decision] to the U.S. PTO," and Pitcher responded, "could have." (*Id.* at 310:06-310:10.) At Greenhalgh's deposition, Greenhalgh did not recall whether Pitcher had ever told him that Ms. Blundell's role was in part to transmit foreign prosecution documents related to the Charlton patents to the PTO. (Greenhalgh Dep. at 27:19-28:03.) Based on these statements by Pitcher and Greenhalgh, Acon states: "Greenhalgh refutes Pitcher's delegation explanation for his failure to inform the PTO. Greenhalgh would not confirm that Pitcher ever instructed him or Ms. Blundell to produce all materials for the European proceedings to the PTO." (Acon Mem. Re: Dep. at 3.) This is a mischaracterization of the deposition testimony--Greenhalgh neither disputed nor affirmed Pitcher's statements on this subject. There

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 10

2005 WL 1491233 (D.Mass.)

**(Cite as: 2005 WL 1491233 (D.Mass.))**

is simply no evidence of substantial conflict on this record.

**\*12** In sum, there is insufficient evidence that Greenhalgh's testimony regarding Acon's EPO revocation claim would be in substantial conflict with that of witnesses for Inverness.

### IV. POSTSCRIPT
This is not a frivolous motion in light of the musical chairs in this litigation. Given Greenhalgh's and Kline's prior connections to patent prosecution, Acon was not unreasonable in its concerns. Nonetheless, after ample discovery, the challenges did not prove up. In light of the strong policy against disqualification of counsel in Massachusetts, Acon's motion must be denied.

### V. ORDER
Defendant's motion to disqualify Goodwin Procter, LLP as counsel for Inverness (Docket No. 429) is *DENIED*.

2005 WL 1491233 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2649162 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Further Support of Motion in Limine (No. 10) to Exclude Any Evidence or Argument Concerning Anticipation Theories of Invalidity (Oct. 05, 2004)

• 2004 WL 2649170 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Further Support of Motion in Limine (No. 9) to Exclude Evidence Concerning Acon's New Theory of "Abandonment" (Oct. 05, 2004)

• 2004 WL 2649177 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Further Support of Motion In Limine (No. 5) to Exclude Acon's Written Description Theory (Oct. 05, 2004)

• 2004 WL 2649155 (Trial Pleading) Inverness Medical Switzerland Gmbh, Unipath Diagnostics, Inc. and Church & Dwight Co., Inc.'s Answer to Defendant Acon Laboratories' Counterclaims (Sep.

29, 2004)

• 2004 WL 2649150 (Trial Motion, Memorandum and Affidavit) Defendant Acon Laboratories, Inc.'s Supplement to Its Opposition to Plaintiffs' Motion to Strike (Sep. 22, 2004)

• 2004 WL 2649148 (Trial Pleading) Acon Laboratories, Inc.'s Non-Confidential Redacted Second Amended Answer and Counterclaims for Declaratory Relief (Sep. 15, 2004)

• 2004 WL 2649144 (Trial Pleading) First Amended Complaint (Sep. 03, 2004)

• 2004 WL 2649139 (Trial Motion, Memorandum and Affidavit) Acon Laboratories, Inc.'s Reply to Inverness's Response to Acon's Revised Submission Concerning the Amount of the Injunction Bond (Aug. 26, 2004)

• 2004 WL 2649133 (Trial Motion, Memorandum and Affidavit) Defendant Acon Laboratories' Opposition to Inverness's Motion for Clarification of Order of July 22, 2004 Concerning Case 03-11323 (Aug. 2004)

• 2003 WL 23886168 (Trial Motion, Memorandum and Affidavit) Inverness's and Armkel's Sur-Reply to Acon's Motions for Summary Judgment of Invalidity of Claims 5-7, 18-19 and 22 (Dec. 22, 2003)

• 2003 WL 23886155 (Trial Motion, Memorandum and Affidavit) Acon Laboratories' Response to Inverness and Armkel's Consolidated Response to Acon's Local Rule 56.1 Statement of Material Facts in Support of Motions for Summary Adjudication of Invalidity of Claims 5, 6, 7, 18, 19 and 22 of the '982 Patent (Dec. 15, 2003)

• 2003 WL 23886136 (Trial Motion, Memorandum and Affidavit) Inverness and Armkel's Consolidated Response to Acon's Local Rule 56.1 Statements of Material Facts in Support of Motions for Summary Judgment of Invalidity of Claims 5-7, 18-19 and 22 (Dec. 05, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 1491233 (D.Mass.)

**(Cite as: 2005 WL 1491233 (D.Mass.))**

• 2003 WL 23886146 (Trial Motion, Memorandum and Affidavit) Inverness's and Armkel's Consolidated Opposition to Acon's Motions for Summary Judgment of Invalidity of Claims 5-7, 18-19 and 22 (Dec. 05, 2003)

• 2003 WL 23886129 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Acon Laboratories' Motion for Summary Adjudication of Invalidity of Claims 5, 6, 7, 18, 19 and 22 of the '982 Patent (Nov. 14, 2003)

• 2003 WL 23886117 (Trial Motion, Memorandum and Affidavit) Inverness's Opposition to Acon's Motion to Postpone Ruling on Plaintiffs' Motion for Preliminary Injunction Pending Briefing on Summary Judgment of Invalidity of Claim 22 (Nov. 07, 2003)

• 2003 WL 23886106 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Acon Laboratories' Motion for Summary Adjudication of Invalidity of Claim 22 of the '982 Patent (Nov. 04, 2003)

• 2003 WL 23886081 (Trial Motion, Memorandum and Affidavit) Reply of Acon Laboratories, Inc. in Support of Motion to Consolidate Case No. 02-12303 Pbs With Case No. 03-11323 Pbs (Oct. 17, 2003)

• 2003 WL 23886095 (Trial Motion, Memorandum and Affidavit) Acon Laboratories' Reply in Support of Its Motion to Strike the Declaration of John Bridgen (Oct. 17, 2003)

• 2003 WL 23886066 (Trial Motion, Memorandum and Affidavit) Inverness's Reply Memorandum in Support of Motion for Preliminary Injunction and Summary Judgment of Infringement (Oct. 03, 2003)

• 2003 WL 23886074 (Trial Motion, Memorandum and Affidavit) Inverness Medical Switzerland Gmbh and Unipath Diagnostics, Inc.'s Opposition to Acon Laboratories' Motion to Strike the Declaration of John Bridgen (Oct. 03, 2003)

• 2003 WL 23886054 (Trial Pleading) Inverness Medical Switzerland Gmbh and Unipath Diagnostics, Inc.'s Answer to Defendant Acon Laboratories' Counterclaims (Sep. 26, 2003)

• 2003 WL 23885988 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Acon Laboratories' Motion to Strike the Declaration of John Bridgen (Sep. 16, 2003)

• 2003 WL 23886000 (Trial Motion, Memorandum and Affidavit) Acon Laboratories, Inc.'s Memorandum in Support of Motion to Consolidate Case No. 02-12303 PBS With Case No. 03-11323 PBS (Sep. 16, 2003)

• 2003 WL 23886011 (Trial Pleading) Acon Laboratories, Inc.'s First Amended Answer and Counterclaims for Declaratory Relief (Sep. 16, 2003)

• 2003 WL 23886021 (Trial Motion, Memorandum and Affidavit) Defendant and Counter-Plaintiff Acon Laboratories' Response to Plaintiffs' Local Rule 56.1 Statement (Sep. 16, 2003)

• 2003 WL 23886038 (Trial Motion, Memorandum and Affidavit) Defendant and Counter-Plaintiff Acon Laboratories' Opposition to Plaintiffs' Motion for Preliminary Injunction and Summary Judgment (Sep. 16, 2003)

• 2003 WL 23885977 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction and Summary Judgment of Infringement (Sep. 02, 2003)

• 2003 WL 23885960 (Trial Pleading) Acon Laboratories' Answer and Counterclaims for Declaratory Relief (Aug. 29, 2003)

• 2003 WL 23886182 (Trial Motion, Memorandum and Affidavit) Acon Laboratories' Response to Sur-Reply to Acon's Motions for Summary Judgment of Invalidity of Claims 5, 6, 7, 18, 19 and 22 of the '982 Patent (2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.E.2d

1997 WL 1417476 (Mass.Super.)

**(Cite as: 1997 WL 1417476 (Mass.Super.))**

Page 1

**H**
Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
Jerilyn HOGAN, & another, [FN1]

FN1. Kenneth Hogan.

v.

METROPOLITAN PROPERTY AND
CASUALTY INSURANCE COMPANY, &
another. [FN2]

FN2. Laurie Marshall.

**No. 962337B.**

Dec. 10, 1997.

MEMORANDUM OF DECISION ON ORDER
ON DEFENDANT'S MOTION FOR A
PROTECTIVE ORDER

TRAVERS.

INTRODUCTION

*1 The Defendant, Metropolitan Property and
Casualty Insurance Company (MPC) filed a motion
for protective order on July 2, 1997. This motion
led to the filing of two additional discovery motions
[FN3] by Plaintiffs, Jerilyn Hogan and Kenneth
Hogan (the Hogans).

FN3. The Hogans filed a Motion to Strike,
for Sanctions and for Contempt, which this
Court addressed in a Memorandum of
Decision dated October 31, 1997. In
addition, the Hogans filed a Motion to
Quash, for a Protective Order and for
Sanctions which this Court will address in
a separate Memorandum of Decision.

By way of its motion, MPC seeks a protective
order to prevent (1) its keeper of records from
delivering by hand duplicative discovery requests,
(2) the production of documents protected by
attorney-client and work product privileges, (3) the
production of irrelevant or burdensome documents,
and (4) the production of any discovery to the
Hogans' attorney, Terance Perry or the firm of
Brendan J. Perry and Associates, P.C. The Hogans
oppose MPC's motion for a protective order.

For the following reasons, a protective order is
issued in accordance with the provisions set forth
below.

DISCUSSION

The procedural history of this case is set forth in
this Court's Memorandum of Decision dated
October 31, 1997, and is fully incorporated herein
by reference. This Court has broad discretion to
issue or deny a protective order. *Wansong v.
Wansong,* 395 Mass. 154, 156 (1985), citing,
*Matter of Roche,* 381 Mass. 624, 637 (1980). "In
determining whether a protective order should
issue, a judge must assess the competing interests of
preventing "annoyance, embarrassment, oppression,
or undue burden or expense [Mass.R.Civ.P. 26(c) ],
and considerations of an efficient and just resolution
of the action." *Wansong,* 395 Mass. at 156, citing
*Roche,* 381 Mass. at 637. A protective order may
issue when the motion is grounded by reasons
which would otherwise be permitted as objections
to the requested discovery. *Caron v. General
Motors Corp.,* 37 Mass.App.Ct. 744, 747 (1994)
(noting the federal courts' interpretations of
analogous federal rules) (citations omitted).

MPC seeks an order protecting them from serving
duplicative, irrelevant, burdensome and privileged
documents upon the Hogans. In addition, MPC
requests that it be protected from serving discovery
upon counsel for the Hogans, as counsel for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                    Page 2

1997 WL 1417476 (Mass.Super.)

**(Cite as: 1997 WL 1417476 (Mass.Super.))**

Hogans should be disqualified. MPC's request for a protective order is examined in light of the above standards.

1. Duplicative Requests, Privileged Documents and Irrelevant or Burdensome Requests

"The conduct and scope of discovery is within the sound discretion of the judge." *Solimene v. B. Grauel & Co., KG,* 399 Mass. 790, 799 (1987) (citations omitted). A party may object to the production of discovery which is privileged or irrelevant. See *G.S. Enter., Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 270-71 (1991); Mass.R.Civ.P. 26(b)(1). "Generally, discovery is permissible of any non-privileged material which is relevant to the pending action and reasonably calculated to lead to the discovery of admissible evidence. Mass.R.Civ.P. 26(b)(1)." *Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co.,* 414 Mass. 609, 615-16 (1993).

i. Duplicative Document Requests

*2 The Hogans served upon MPC's keeper of the records a subpoena requiring the production of documents at deposition. The requested documents were identical to the request served upon MPC. MPC has since delivered the requested documents not covered by objections. In the interests of efficiency and financial management, MPC need not again provide the same documents.

ii. Attorney-Client and Work-Product Privileges

MPC has objected to the production of certain documents, as the requested discovery falls under the work-product privilege or the attorney-client privilege. In its memorandum in support of its motion for a protective order, MPC details the privileges claimed and the reasons for the exercise of such privileges.

The Hogans failed to offer support for their opposition to the protective order with any justification for the requested documents. See *Ward v. Peabody,* 380 Mass. 805, 817 (1980). Rather, the Hogans sought to have MPC's objections stricken.

For the reasons set forth in this Court's Memorandum of Decision dated October 31, 1997, the objections were permitted to stand. Because MPC has demonstrated the appropriateness of its objections, MPC is protected from disclosing the privileged documents. [FN4]

> FN4. However, MPC is cautioned that while a party can avoid disclosing privileged information sought under Mass.R.Civ.P. 26(b)(1), that party may not later use the undisclosed documents at trial. *G.S. Enterp., Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 270-71 (1991).

iii. Irrelevant Documents

Discovery is relevant when it "encompass[es] any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case ... [D]iscovery itself is designed to help define and clarify the issues." *Cronin v. Strayer,* 392 Mass. 525, 534 (1984), quoting, *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978), citing, *Hickman v. Taylor,* 329 U.S. 495, 501 (1947). While MPC has demonstrated that the requested documents are irrelevant, the Hogans have failed to substantiate how these documents may lead to other issues in the case. See *Cronin,* 392 Mass. at 534.

2. Disqualification of the Hogans' Attorney

MPC, in its Motion for a Protective Order, sought disqualification of Attorney Terance Perry (Attorney Perry) alleging that he is a necessary witness to be called at trial. In order to resolve MPC's request that Attorney Perry be disqualified, this Court ordered on October 21, 1997, that counsel for each party submit an affidavit and memorandum detailing factual and legal support for or against disqualification of Attorney Perry. From the supplemental documents, additional information was provided regarding Attorney Perry's role as a potential witness in the trial in this matter.

Attorney Perry was employed by the Hogans to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                         Page 3

1997 WL 1417476 (Mass.Super.)

**(Cite as: 1997 WL 1417476 (Mass.Super.))**

represent them in a personal injury matter originating when Ms. Hogan was involved in an automobile accident. Attorney Perry represented the Hogans in that matter. The suit resulted in a settlement with the defendant driver's insurance company for the full value of the driver's policy. Attorney Perry contacted MPC, the Hogans' insurer, and obtained permission to settle the claim with the driver's insurance company. At that time, Attorney Perry reserved the Hogans' rights to pursue an underinsured claim against the MPC policy.

*3 Attorney Perry communicated with MPC and the Defendant Laurie Marshall (Marshall), an MPC claims adjuster, regarding settlement of the underinsurance claim. The claim went unsettled. As a result of the inability to settle the underinsurance claim, the Hogans filed the present action. It is alleged in the Complaint in this action that MPC and Laurie Marshall breached their contractual obligations and acted in violation of G.L.c. 176D and c. 93A in failing to properly and promptly resolve the underinsurance claim.

Marshall states, by way of affidavit, that as the adjuster handling the underinsurance claim she made numerous requests for medical records to Attorney Perry. Marshall communicated only with Attorney Perry as counsel for the Hogans, and not with the Hogans directly. Marshall states that she relied upon Attorney Perry's statements that he would supply the relevant medical records, but never received any records from Attorney Perry. [FN5] Marshall requested the records as part of the evaluation and investigation of the claim.

> FN5. Attorney Perry's affidavit is barren of factual allegations surrounding the initiation of this litigation. Attorney Perry states "[n]ext following the initiation of Plaintiffs' representation regarding the accident I unsuccessfully attempted to resolve Plaintiffs' claim to underinsured benefits and, thereafter, this litigation resulted." This single statement regarding the unsuccessful attempt at resolving the underinsured claim does not provide much insight into the reasons, if any, why

Attorney Perry should not be considered a pertinent witness in this case.

Based upon the above facts, MPC argues that Attorney Perry is a material witness to both the prosecution and defense of the allegations set forth in the Complaint. MPC argues that because the Complaint is founded upon communications (or lack thereof) between Attorney Perry, MPC and Marshall, Attorney Perry cannot present a case without himself taking the stand. Attorney Perry contends that the applicable rules of ethics are not violated by virtue of his ongoing representation of the Hogans; and further, if he were disqualified as counsel for the Hogans, the Hogans would suffer hardship because they would be unable to continue with their counsel of choice in whom they have trust and confidence. If Attorney Perry is obligated to withdraw from his representation of the Hogans, it will be because Supreme Judicial Court (S.J.C.) Rule 3:07, Canon 5, DR 5-102 requires such action. DR 5-102 states:

(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or *it is obvious* that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B), (1) through (4).

(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation *until it is apparent that his testimony is or may be prejudicial to his client.*

(Emphasis added.) DR 5-101(B)(1) through (4) state:

A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:

*4 (1) If the testimony will relate solely to an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                  Page 4

1997 WL 1417476 (Mass.Super.)

**(Cite as: 1997 WL 1417476 (Mass.Super.))**

uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

DR 5-102 was designed to be a self-executing rule and "will itself have a regulatory effect." *Serody v. Serody,* 19 Mass.App.Ct. 411, 413 (1985), citing, *Borman v. Borman,* 378 Mass. 775, 788 (1979). The Canons of Ethics are not tactical weapons at the hands of opposing counsel. See, *Serody,* 19 Mass.App.Ct. at 414. "When needless disqualification occurs as a result of [abuse of the code of ethics], the very rules intended to prevent public disrespect for the legal profession foster a more dangerous disrespect for the legal process." *Borman,* 378 Mass. at 787. To prevent the abuses which lead to a degradation of the legal profession, the Supreme Judicial Court concludes, the Code of Ethics is "self-executing" in that attorneys are expected "to know and comply with its provisions." *Id.*

Whether an attorney should be disqualified is a complex question, not to be decided without thoughtful consideration by the trial judge. See *Serody,* 19 Mass.App.Ct. at 412-13. Although an attorney "is competent to testify either for or against his client," *Kendall v. Atkins,* 374 Mass. 320, 323 (1978), an attorney acting as both counsel and a witness at trial is disapproved by the legal profession. See *Black v. Black,* 376 Mass. 929 (1978) (Rescript). "In any event, judges should not permit this practice absent exceptional circumstances. Attorneys finding themselves in the position of trial counsel and witness should obtain substitute counsel well in advance of trial." *Id.*

Where a dispute exists over whether counsel should testify as a witness, the trial judge should, rather than use his discretion, "defer to the best

judgment of counsel and his client." *Borman,* 378 Mass. at 790, citing, *J.D. Pflaumer, Inc. v. Dep't of Justice,* 465 F.Supp. 746, 747 (E.D.Pa.1979). See also *Serody,* 19 Mass.App.Ct. at 413; *Filippone v. Mayor of Newton,* 392 Mass. 622, 630 (1984). The Court may disregard counsel's best judgment and require disqualification "[o]nly when a present intention to forgo the testimony of counsel appears obviously contrary to the client's interests ..." *Borman,* 378 Mass. at 791. To require counsel to disqualify himself, the party seeking disqualification must first show that the attorney-witness's testimony is "prejudicial to the client." *Borman,* 378 Mass. at 792. See also *Kendall,* 374 Mass. at 324. In the present case, MPC seeks the removal of Attorney Perry as counsel for the Hogans. While every motion to disqualify opposing counsel is looked upon with suspicion, [FN6] in this case there is sufficient evidence to warrant an in-depth examination into the merits of the motion. MPC states that all communications regarding the underinsurance claim were between MPC, Marshall and Attorney Perry. MPC alleges that the reason for the delay in processing and evaluating of the underinsurance claim is because Attorney Perry made certain representations but failed to follow through with them. Attorney Perry, according to MPC, has first-hand knowledge about the events and circumstances surrounding the delay in the investigation by MPC, and thus is a pertinent witness as to whether MPC and Marshall acted in the manner alleged in the Complaint.

> FN6. The parties have been playing their own version of hard-ball since the inception of this case. Despite this, this Court will not consider the unprofessional antics of both counsel when examining the motion for a protective order and the motion to disqualify, as such behavior was sufficiently addressed in the Memorandum dated October 31, 1997.

**\*5** Without elaborating on the events surrounding the underinsurance claim, Attorney Perry states in his affidavit that "I do not contemplate calling myself as a witness at the time of trial of the instant action." Attorney Perry further states: "I believe, as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                    Page 5

1997 WL 1417476 (Mass.Super.)

**(Cite as: 1997 WL 1417476 (Mass.Super.))**

a member of the Massachusetts Bar, that my representation of the Plaintiffs, as their chosen counsel, comports with Supreme Judicial Court Rule 3:07." From the affidavit it is clear that Attorney Perry's best judgment is that his ongoing representation of the Hogans is not violative of S.J.C. Rule 3:07. This Court must accept Attorney Perry's best judgment unless exceptional circumstances exist warranting the exercise of judicial discretion.

"When a lawyer, exercising his best judgment, determines that his employment will not bring him into conflict with the code, disqualification may occur only if the trial court determines that his continued participation as counsel taints the legal system or the trial of the cause before it." *Borman,* 378 Mass. at 788. If the testimony that counsel is to provide is contrary to his client's interests, counsel must withdraw. See *Serody,* 19 Mass.App.Ct. at 413 . The gravity of ethical dilemmas arise when it is the credibility of counsel as a witness which determines the outcome of the case. See *id.,* quoting *Black,* 376 Mass. at 929. "The need for disqualification is greatest where the lawyer is most intimately involved in the events at issue." *Id.* When counsel's best judgment appears questionable, "[s]izing up the potential for prejudice in a particular case and the degree of that prejudice involves exercise of discretion by the trial judge." *Serody,* 19 Mass.App.Ct. at 415.

However, disqualification of counsel is not proper in every case where counsel's testimony is necessary. See *Byrnes v. Jamitkowski,* 29 Mass.App.Ct. 107, 109 (1990). "We must look to whether the attorney is likely to 'withhold crucial testimony from his client because he prefers to continue as counsel,' *Borman,* 378 Mass. at 790, to determine if the 'continued participation as counsel taints the legal system or the trial of the cause before it.' *Id.* at 788." *Byrnes,* 29 Mass.App.Ct. at 109-10.

The standard as realized from the above case law requires this Court to examine Attorney Perry's role in the surrounding events leading up to the present litigation. This Court does not easily brush aside

Attorney Perry's best judgment. Despite Attorney Perry's best judgment, this Court finds that the legal system or trial in this matter may be tainted, and the outcome of trial depends on Attorney Perry's credibility. "The ultimate concern about the testifying advocate is, in Professor Wigmore's view, that the public might think that the lawyer is distorting the truth for his client." *Borman,* 378 Mass. at 786, citing, 6 J. Wigmore, Evidence § 1911 (Chadbourn rev.1976). An attorney as a witness may impact the client, also, because his interest in the case makes him susceptible to impeachment on the stand. *Id.,* citing, A.B.A.Code of Professional Responsibility, EC 5-9 (1978) (footnote omitted).

**\*6** MPC intends to call Attorney Perry as a witness to support its defense that any delay in the evaluation and investigation of the underinsurance claim is due to the actions of Attorney Perry. There does not appear to be any other means of presenting such evidence. [FN7] Thus, Attorney Perry is indeed a potential key witness at trial in this case, whose testimony will be both competent and relevant to MPC and Marshall.

> FN7. Cf. *Rizzo v. Sears Roebuck and Co.,* 127 F.R.D. 423, 426 (D.Mass.1989) (because opposing counsel had documents which supported the same contentions to which counsel would testify at trial, disqualification of counsel was not necessary, and a protective order preventing the deposition of counsel was allowed).

Attorney Perry does not have Constitutional protections which will allow him to avoid testifying at trial. [FN8] If he is called to testify, Attorney Perry as a witness will jeopardize the Hogans' strategies and trial tactics. This is the result even if the Court assumes that Attorney Perry never made any representations that he would provide medical reports as alleged by Marshall and MPC. As the only individual communicating with MPC on behalf of the Hogans, Attorney Perry surely would need to testify to refute the allegations of MPC and Marshall. In addition, there is no other way to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Page 6

1997 WL 1417476 (Mass.Super.)

**(Cite as: 1997 WL 1417476 (Mass.Super.))**

substantiate that Attorney Perry made numerous requests to MPC and Marshall that the claim be settled without Attorney Perry's testimony. Thus, it is apparent that a trial in this case will turn on the testimony of Attorney Perry, and whether he made representations to MPC, and if so, whether they were performed.

> FN8. Attorney Perry has brought a motion for a protective order to avoid being deposed and subject to further discovery in this matter. That motion is decided in light of the Court's outcome in this motion, in a separate Memorandum of Decision.

The Court's evaluation of the disqualification does not end with an analysis of Attorney Perry's potential testimony. Against the above considerations in favor of disqualification, the Court must measure the impact on the client, which oftentimes is harsher. See *Borman*, 378 Mass. at 787 . The Supreme Judicial Court has found that disqualification has the effect of depriving the client of his choice of counsel, and "temporarily (if not permanently) disabl [ing] the litigant in his effort to prosecute a claim or mount a defense." *Id.* Indeed, where disqualification will place a substantial hardship upon the client, DR 5-101(B)(4) suggests that the attorney be permitted to retain his status as counsel. See S.J.C. Rule 3:07, DR 5-101(B)(4).

The Hogans and Attorney Perry point to DR 5-101(B)(4) to support their argument that Attorney Perry should not be disqualified. They argue that disqualification of Attorney Perry will cause the Hogans to lose their first chosen counsel in whom they have trust and confidence. In addition, the Hogans contend that the complex nature of this case, and its extensive history, make Attorney Perry the only qualified attorney to represent them. Lastly, the Hogans claim that they will experience "financial, emotional and strategic hardship" if Attorney Perry is disqualified.

While it is true that the Hogans will lose their first choice of counsel, the legal profession is not so barren of qualified attorneys that Attorney Perry cannot recommend with confidence another attorney who can perform competently and equally sufficient to Attorney Perry's own abilities. In addition, if the Hogans have trust and confidence in Attorney Perry, they will accept with trust and confidence an attorney recommended to take his place.

**\*7** Furthermore, this case is a claim for violations of G.L.c. 93A and c. 176D, and breach of contract. The issues presented are not so complicated and difficult for a competent successor counsel practicing in this field of law to understand and comprehend. It is not altogether certain that successor counsel "would have to grapple" to gain an understanding of the issues involved in this case. This Court finds that the effect of the disqualification of Attorney Perry will not be so deleterious to the Hogans so as to warrant implication of DR 5-101(B)(4).

3. Disqualifying the Firm

DR 5-102 requires not only the attorney to withdraw, but also the law firm with which he is associated. See *Borman,* 378 Mass. 775, 785 (1979) . "Although the impact on the client, trial and public lessens when the attorney-witness is not himself trial counsel but only a member of trial counsel's firm, there is an impact nonetheless." *Id.,* at 787 (citations omitted).

In light of the necessity to remove Attorney Perry as counsel for the Hogans in the present case, and given the above case law, neither Attorney Perry nor any member of his firm may be permitted to represent the Hogans.

ORDER

For the foregoing reasons, it is hereby ORDERED that the Defendant, Metropolitan Property and Casualty Insurance Company's Motion for a Protective Order is ALLOWED.

Pursuant to this Memorandum of Decision, it is hereby ORDERBD as follows:
  1. The subpoena served upon the Keeper of the Records for Metropolitan Property and Casualty

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

1997 WL 1417476 (Mass.Super.)

**(Cite as: 1997 WL 1417476 (Mass.Super.))**

Page 7

Insurance Company, dated May 20, 1997, is quashed; and

2. The Keeper of the Records is protected from furnishing a response to the requested documents inasmuch as the requested documents duplicate the request served upon Metropolitan Property and Casualty Insurance.

It is further ORDERED that Metropolitan Property and Casualty Insurance Company is protected from serving upon the Plaintiffs any discovery which is protected by the attorney-client privilege or work-product privilege, unless the Plaintiffs demonstrate a substantial need for such discovery pursuant to Mass.R.Civ.P. 26.

It is further ORDERED that Metropolitan Property and Casualty Insurance Company is protected from serving upon the Plaintiffs any discovery which is duplicative, irrelevant or unduly burdensome.

It is further ORDERED that:

1. Terance Perry, Esq., and the firm of Brendan J. Perry & Associates, P.C. is disqualified from representing the Plaintiffs, Jerilyn Hogan and Kenneth Hogan; and

2. Metropolitan Property and Casualty Insurance Company is protected from serving a response to any discovery upon the Plaintiffs' attorney, Terance Perry, Esq., or the firm of Brendan J. Perry & Associates, P.C.

1997 WL 1417476 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.E.2d

Page 1

19 Mass.L.Rptr. 252, 2005 WL 1132635 (Mass.Super.)

**(Cite as: 2005 WL 1132635 (Mass.Super.))**

Superior Court of Massachusetts.
WINTER GARDENS CONDOMINIUM TRUST,
by and through its Trustees
v.
WINTER GARDENS DEVELOPMENT CORP. et
al. [FN1], [FN2]

FN1. Winter Gardens Limited Partnership,
Winter Gardens Realty Trust, Weston
Construction, Inc., MCO Associates, Mark
C. O'Hagan, A .J.P. Contractors, Armand
Porrazzo, Hanigan Engineering, John Does
1 through 5.

FN2. Third-party defendants are Richard
Gray and Glen Ehwa.

No. 023017F.

April 14, 2005.

*MEMORANDUM OF DECISION AND ORDER
ON THE DEFENDANTS' MOTION TO
DISQUALIFY THE
PLAINTIFF'S COUNSEL AND LAW FIRM*

BONNIE H. MacLEOD, Justice.

**\*1** The defendants, Winter Gardens Development
Corporation, Winter Gardens Limited Partnership,
Winter Gardens Realty Trust, Weston Construction,
Inc., MCO Associates, and Mark C. O'Hagan
(collectively "Winter Gardens defendants"), have
moved to disqualify attorney Mark O'Connor and
the law firm of Rich May, P.C., as counsel for the
plaintiff, the Winter Garden Condominium Trust
("Condominium Trust"), in the instant litigation,
pursuant to Rules 3.7 and 1.10 of the Massachusetts
Rules of Professional Conduct. For the following
reasons, the defendant's motion is *Allowed.*

*BACKGROUND*
The essential facts relevant to this motion are not in

dispute. In July of 2002, the plaintiff filed suit on
behalf of the unit owners of the Winter Gardens
Condominium Complex ("Complex"), claiming that
the shared septic system for the Complex had failed,
and that the Winter Gardens defendants were
responsible for the failure. The plaintiffs discovered
the failure of the Complex's septic system in April
of 2002. The plaintiff is represented by attorney
Mark C. O'Connor, a lawyer from the firm Rich
May, P.C. O'Connor has been a unit owner in the
Complex since November of 2001, and has served
as a trustee of the Winter Gardens Board of
Trustees since January of 2003. In June of 2002, the
plaintiff made demand pursuant to G.L.c. 93A,
against the defendants, alleging that the defendants
were responsible for the failure of the system. The
Winter Gardens defendants denied the plaintiff's
allegations, and asserted that the failure of the septic
system was caused in whole, or in part, by the
misuse of garbage grinders or disposals by unit
owners of the Complex. The defendants argued that
the use of grinders or disposals is prohibited by the
Condominium's bylaws and by the Town of Weston.
The plaintiff disagreed, and the instant litigation
ensued.

In the course of the proceedings, the plaintiff,
through attorney O'Connor, stated that no unit
owners in the Complex had ever installed disposals
or grinders in their units. In fact, attorney O'Connor
argued, as a basis for the plaintiff's summary
judgment motion filed in this court in December of
2002, that it was undisputed that none of the unit
owners in the Complex had ever installed disposals
or grinders in their units. However, in the course of
discovery, the defendants became aware that
attorney O'Connor had in fact installed, and then
removed, a disposal in his own unit around March
and April of 2002. This fact was discovered after an
inspection of attorney O'Connor's unit, and during
his deposition in February of 2004.

The defendants contend that attorney O'Connor

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

19 Mass.L.Rptr. 252, 2005 WL 1132635 (Mass.Super.)

**(Cite as: 2005 WL 1132635 (Mass.Super.))**

Page 2

knowingly failed to disclose material information relevant to the case, and to their defense, and they seek to disqualify him and his law firm, Rich May, P.C., from acting as the plaintiff's counsel in the instant litigation. The plaintiff opposes the motion, arguing that the defendants have not made a sufficient showing to warrant the disqualification of attorney O'Connor or the law firm.

*DISCUSSION*
*I. Disqualification of the plaintiff's counsel*
**\*2** The Winter Gardens defendants seek to disqualify attorney Mark O'Connor as counsel for the plaintiff on the grounds that attorney O'Connor is a necessary witness to the trial, whose testimony will be prejudicial to the plaintiff. A motion to disqualify counsel must be considered in light of the principle that the court should not lightly interrupt the relationship between attorney and client. *Adoption of Erica,* 426 Mass. 55, 58 (1997); *G.D. Mathews & Sons Corp. v. MSN Corp.,* 54 Mass.App.Ct. 18, 20-21 (2002). That right, however, has its limitations in cases such as the one at issue here, where the party's chosen counsel is also an advocate who is expected to testify in the litigation. It is a situation that is governed by Rule 3.7 of the Massachusetts Rules of Professional Conduct which provides in relevant part, that:

[A] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client.

In ruling on such a motion, the court must strike a balance between a client's right to counsel of his or her choice and the attorney's responsibilities to maintain professional standards and avoid the appearance of impropriety. *Bays v. Theran,* 418 Mass. 685, 686 (1994); *Wellman v. Willis,* 400 Mass. 494, 503 (1987).

Attorney O'Connor is a necessary witness at trial because he appears to be one of the few, if not the only, unit owner in the Complex who installed a disposal system--a fact that the defendants argue is central to the case, and whose relevance and weight

is highly contested by the plaintiffs. In an effort to escape a disqualification, the plaintiff argues that it is immaterial that a disposal was installed in O'Connor's unit because the septic system had to be designed to permit the safe use of garbage disposals, and it is thus, not a valid defense that a disposal was installed, or may have caused the failure of the system. In support, the plaintiff argues that it will present its expert's opinion at trial that a single disposal, installed in one unit, could not have caused the failure of the Winter Gardens Septic System, rendering any testimony that attorney O'Connor can offer irrelevant.

This line of reasoning, however, only highlights the ways in which plaintiff's counsel will be a necessary witness on highly contested issues. The defendants have taken the position that O'Connor's misuse of the septic system, by virtue of his installation of a disposal in his unit, not only serves as their defense against the plaintiff's claims, but may give rise to later claims for indemnity or contribution against him for any judgment entered in the action, and may implicate the breach of his fiduciary duties as a trustee. In proving their defense at trial, the defendants, for example, may necessarily call upon attorney O'Connor to controvert and refute relevant facts regarding the date of the installation of the disposal, the extent of its use, and the conditions that led to its removal in establishing a defense. In doing so, attorney O'Connor would be testifying of his own personal knowledge on facts that a jury may take as proof on key issues contested in the litigation. This is exactly the situation that Rule 3.7 contemplates, and which its drafters addressed in the Comments to the Rule where they cautioned of the prejudice to the attorney client relationship stemming from an attorney's combination of the roles of advocate and witness in the same litigation. See Mass.R.Prof.C. 3.7, Comments 1 and 2. This caution is directly applicable in this situation.

**\*3** Attorney O'Connor could only act as counsel for the plaintiff under Rule 3.7 if one of the three exceptions applies. Exceptions one and two are not relevant here. As to the third, the plaintiff has not established the issue of substantial hardship, or the lack of other reasonable choices of counsel.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

eot<br />

Not Reported in N.E.2d

Page 3

19 Mass.L.Rptr. 252, 2005 WL 1132635 (Mass.Super.)

**(Cite as: 2005 WL 1132635 (Mass.Super.))**

Therefore, the defendant has established a fundamental basis for the disqualification of attorney O'Connor from acting as plaintiff's counsel in the instant litigation. [FN3]

> FN3. The plaintiff cannot avail itself of its other argument, that attorney O'Connor is not a necessary witness because the *plaintiff* will not be calling him as a witness at trial, to argue Mass.R.Prof.C. 3.7 , therefore, does not bar the representation. The rule has no limiting language regarding *which side* in the litigation deems the advocate as "necessary" or intends to call him as a witness for purposes of analyzing whether the disqualification is warranted.

*II. Disqualification of the plaintiff's counsel's firm Rich May, P.C.*

The plaintiff argues that, even assuming that attorney O'Connor is deemed a "necessary witness," and disqualified, Rule 3.7(b) still permits plaintiff's counsel's firm, Rich May, P.C., to serve as trial counsel. I disagree. The prohibition of Rule 3.7, where applicable, applies not only to the attorney who is to be a witness but to other attorneys in his law firm. Mass.R.Prof.C. 3.7, Comment 5; See e.g. *Byington v. City of Boston,* 37 Mass.App.Ct. 907, 908 (1994) (discussing former Rule 3.7 and Cannon of Ethics DR 5-101(b)). Rule 3.7(b) provides that a lawyer may act as an advocate in a trial in which another attorney in the lawyer's firm is likely to be called as a witness *unless* lawyers is precluded from the representation by Rule 1.7 or Rule 1.9 of the rules of Professional Conduct. [FN4] See also. Mass.R.Prof.C. 1.10(a) (imputed disqualification of all lawyers associated in a firm from representing a client when any one of them alone would be prohibited from representing the client by virtue of Mass.R.Prof.C. 1.7, 1.8, or 1.9 ).

> FN4. Rule 1.9, governing an attorney's conflict of interest arising from its representation of a former client, is not applicable here.

Only Rule 1.7 is applicable to the instant case, providing, in relevant part, that,

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests unless, (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation.

The defendants argue, and I agree, that attorney O'Connor's representation of the plaintiff in this litigation conflicts with his own interests stemming from his dual role as a trustee of the plaintiff and as a unit owner of the Complex. This dual role has a high likelihood of conflicting with the responsibilities that inure to duties of loyalty to the plaintiff as counsel in this matter. Specifically, the defendants argue that O'Connor's alleged misuse of the septic system by installing a disposal is the heart of their defense, and point to the fact that this may implicate attorney O'Connor's fiduciary duties in his role as a Trustee. One need look no further than the language of the Declaration of Trust ("Declaration") to support this argument. In Section 3.11 the Declaration provides that Trustees are only subject to personal liability for errors arising from their "own personal and willful malfeasance and defaults." This language creates the situation where attorney O'Connor may be personally liable, and may act to shield himself from personal liability in his capacity as a trustee for his possible misfeasance with regard to the septic system, which may cause him to act counter to his duty of loyalty to the plaintiff.

*\*4* Although the rules of professional responsibility are largely self-executing, and courts rightly expect lawyers to know and comply with their provisions, *Borman v. Borman,* 378 Mass. 775, 788 (1979), the evidence here indicates that this Court should not defer to attorney O'Connor's own professional judgment. The defendants argue that one need look no further than the motion to dismiss the counterclaims that attorney O'Connor filed in this matter for an example of the manifestation of this conflict in this litigation. In the motion, attorney O'Connor stated that it was "undisputed evidence

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                      Page 4

19 Mass.L.Rptr. 252, 2005 WL 1132635 (Mass.Super.)

**(Cite as: 2005 WL 1132635 (Mass.Super.))**

that none of them [unit owners of the Complex] installed garbage disposals prior to the failure of the septic system," and that both the defendant's contribution and indemnity counterclaims must therefore be dismissed because "they are dependent upon the presence and use of garbage disposals ... [which] were not installed and used prior to the failure of the septic system." At a later deposition, attorney O'Connor admitted the untruth of this, stating that he had in fact installed such a disposal.

Thus, attorney O'Connor's act of withholding discoverable information, in an attempt to shield his own liability on the contribution and indemnity claims, is a situation that implicates a conflict of interest and therefore falls squarely within the purview of Rule 1.7(b). See e.g. *Maddocks v. Ricker, Casson,* 403 Mass. 592, 597 (1988) (holding that a lawyer could not adequately represent the interests of his clients, the plaintiffs, and himself in a case where the lawyer was subject to a claim for contribution even if there had been valid consent). Despite the plaintiff's arguments, they have not made an adequate showing that the exceptions of Rule 1.7(b) apply, and, that attorney O'Connor can represent them with no adverse effect. For these reasons, and because nothing in the plaintiff's opposition motion suggests that the plaintiff consented to the conflict after consultation in a manner in accordance with the exceptions articulated in Mass.R.Prof.C. 1.7(b)(2), the bar of Rule 1.7 applies to attorney O'Connor. This clearly warrants disqualification of attorney O'Connor's law firm, Rich May, P.C., from acting as trial counsel in the instant litigation, under Mass. R. Prof Conduct 1.10 and 3.7(b).

*ORDER*
The defendant has established a fundamental basis for the disqualification of attorney O'Connor, and the law firm of Rich May, P.C., from representing the plaintiff in the instant litigation. For this, and the foregoing reasons, the defendants' motion to disqualify attorney O'Connor, and the firm Rich May, P.C., from representing the plaintiff in this suit is *ALLOWED.*

19 Mass.L.Rptr. 252, 2005 WL 1132635

(Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.E.2d                                                                                          Page 1

15 Mass.L.Rptr. 734, 2003 WL 836087 (Mass.Super.)

**(Cite as: 2003 WL 836087 (Mass.Super.))**

C

Superior Court of Massachusetts.
VERIZON YELLOW PAGES CO., Formerly
known as Bell Atlantic Yellow Pages Co.,
Plaintiff,
v.
SIMS & SIMS, P.C. and Sims & Sims, LLP,
Defendants.
**No. 02-00961.**

Feb. 24, 2003.

*MEMORANDUM OF DECISION AND ORDER
ON PLAINTIFF'S MOTION TO DISQUALIFY
JOHN N.
CANNAVO, ESQ. AND WILLIAM H. SIMS,
ESQ. AS COUNSEL OF RECORD FOR SIMS &
SIMS,
LLP* [FN1]

> FN1. Based on representations in oral
> arguments, this motion is now limited to
> considering the disqualification of John N.
> Cannavo only, and not of William H. Sims.

PETER W. AGNES, JR., Justice.

*1 The Plaintiff, Verizon Yellow Pages
("Verizon") has filed a motion to disqualify
attorneys John N. Cannavo and William H. Sims as
counsel for Sims & Sims, LLP. This motion arises
from Verizon's suit for assessment of indebtedness
against Sims & Sims, LLP, which originally arose
from an advertising debt created by Sims & Sims,
PC. This motion raises the question of whether an
attorney-partner in a limited liability partnership
("LLP") may or may not represent the LLP in a *pro
se* capacity and also testify as a key witness at trial.
*Compare Gorovitz v. Planning Bd. of Nantucket,*
394 Mass. 246 (1985)(an attorney who is a general
partner in an LP and a named party in litigation
involving the LP may represent the LP on a pro se
basis even though the attorney may expect to testify

as a witness).

*BACKGROUND*
The essential facts relevant to this motion are not in
dispute. Defendant Sims & Sims, PC is a
Massachusetts professional corporation engaged in
the practice of law in Brockton, MA. Attorney
Alvin J. Sims is the firm's sole shareholder, and is
counsel of record for the PC in this suit. At one
time, William H. Sims was an employee of the PC.
Neither attorney A. Sims nor the PC is involved in
this motion.

Defendant Sims & Sims, LLP is a Massachusetts
limited liability partnership engaged in the practice
of law, also located in Brockton, MA. The LLP's
sole shareholders and partners are John N. Cannavo
and William H. Sims, who are also counsel of
record for the LLP in this suit. Documentation
submitted with the complaint includes a copy of a
fax from W. Sims indicating the LLP "has agreed to
the repayment of the [PC's] Bell Atlantic Adv. Bill,"
and a copy of a payment check from the LLP and
signed by W. Sims. The LLP's answers to
interrogatories, No. 12, indicate that all advertising
negotiations between Verizon and the LLP was
conducted by Cannavo.

Verizon and the PC entered into a contract for
yellow pages advertising. The PC then experienced
financial difficulties, did not pay its bills, and
ceased operations. Verizon obtained judgment from
the Court against the PC in August, 2000 for
$34,488.44. Verison alleges the PC was reorganized
as the LLP, and that the LLP agreed to and began
paying off some of the outstanding debt from the
PC judgment. The LLP, through attorneys Cannavo
and W. Sims, filed counterclaims, and assert that
the LLP has no business relationship with the PC,
and has no duty to pay the debt.

Verizon's motion seeks an order from the court
disqualifying    attorney   Cannavo.    [FN2]    In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

15 Mass.L.Rptr. 734, 2003 WL 836087 (Mass.Super.)

**(Cite as: 2003 WL 836087 (Mass.Super.))**

particular, Verizon maintains it has no problem with the firm (LLP) representing itself via another member, but seeks attorney Cannavo's disqualified due to the significant role he is expected to play as a witness.

> FN2. The original motion sought an order disqualifying both of the attorneys for the defendant, but during oral argument in the case plaintiff clarified that it sought relief only against attorney Cannavo. However, attorney Sims may wish to reassess his position because "[t]he prohibition, where applicable, applies not only to the attorney who is to be a witness but to other attorneys in his law firm. *See Byington v. City of Boston,* 37 Mass.App.Ct. 907, 908 (1994); Rule 3.7 Comment 5, Rules of the Supreme Judicial Court, S.J.C. Rule 3:07.

## DISCUSSION

*1. Liability of a Limited Liability Partnership.* Massachusetts has a range of different statutory schemes under which groups of people may organize themselves to conduct business. Among the forms of business organizations are general partnerships, limited partnerships, and limited liability partnerships, as defined in G.L. c. 108A, c. 109, and c. 108A, §§ 45-49. General partnerships exist when two or more people function as co-owners of a business for profit. G.L. c. 108A, § 6. Both partners are liable "jointly and severally for everything chargeable to the partnership...." G.L. c. 108A, § 15. "Thus, to reach the assets of a business being conducted as a general partnership ... it is necessary to sue all the partners"; and that means that all partners must be named in any suit. *Fusco v. Rocky Mountain I Inv. Ltd. Partnership & others,* 42 Mass.App.Ct. 441, 447 (1997), *rev. den.* 425 Mass. 1105 (1997).

**\*2** Limited partnerships are different, in that they have both general and limited partners. G.L. c. 109, § 1. The general partners are liable for partnership debts, but the limited partners are not. In contrast to members of a general partnership, both the limited and general members of limited partnerships do not hold assets as "tenants in partnership." *Fusco, supra,*

42 Mass.App.Ct. at 448. When suing a limited partnership, one must name the limited partnership and serve the statutory agent of record. *Id.* Neither the general nor limited partners must be named individually, though general partners may be named due to their exposure to personal liability. [FN3] *Fusco, supra,* 42 Mass.App.Ct. at n. 9, n. 15 and n. 16.

> FN3. There is some uncertainty about the necessity of naming general partners of an LP as parties to suits. The varied opinions are discussed and resolved in *Fusco, supra,* 42 Mass.App.Ct. at n. 9.

Limited liability partnerships present yet another statutory variety of organization. LLP's have only limited partners. No partner is "personally liable directly or indirectly, including, without limitation, by way of indemnification, contribution, assessment or otherwise, for debts, obligations and liabilities of or chargeable to such partnership, whether in tort, contract or otherwise arising while the partnership is a registered limited liability partnership." G.L. c. 108A, § 15(b)(2). *See Dow v. Donovan,* 150 F.Supp.2d 249, 268 (D.Mass.2001). The relationship between the LLP and its members is even more attenuated than it is in the LP. In a suit for business debt, recovery is limited to the extent of the LLP assets, and thus only the LLP itself need be named as a litigant. The partners are not personally liable, and no partner holds any assets in tenancy.

In the case at bar, John N. Cannavo is a partner in a limited liability partnership. As such, he was not and did not need to be named as a party litigant even if it is established that the LLP assumed the obligations of the former PC. Suit has been brought against Sims & Sims, LLP directly, not against Cannavo. As a limited liability partner, Cannavo is not personally liable for partnership debts. Should the plaintiff be successful in its suit, Verizon may only collect up to the limit of the partnership's assets, and will never be able to reach the personal assets of Cannavo or W. Sims. Contrary to the status of a general partner in either a general partnership or a limited partnership, who are liable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                              Page 3

15 Mass.L.Rptr. 734, 2003 WL 836087 (Mass.Super.)

**(Cite as: 2003 WL 836087 (Mass.Super.))**

for partnership debt, the status of Cannavo and W. Sims is different. They are limited partners with limited liability. As such, Cannavo and W. Sims are individuals, legally separate and distinct from Sims & Sims, LLP.

*2. The Right of Pro Se Representation.* General Law c. 221, § 48 establishes each individual's right to represent themselves in a legal suit *pro se,* that is, without the use of an attorney. A party to a suit does not lose that right simply because he or she is an attorney. *Gorovitz, supra,* 394 Mass. at 248- 49; *Borman v. Borman,* 378 Mass. 775, 788-89 (1979). However, there are risks in having an attorney proceed pro se. *See, e.g., Kay v. Ehler,* 499 U.S. 432 (1991)(holding that neither a civilian nor an attorney, when acting pro se, is entitled to an award of attorneys fees that might otherwise be appropriate). [FN4]

> FN4. The Court stated that "[e]ven a skilled lawyer who represents himself is at a disadvantage in contested litigation. Ethical considerations may make it inappropriate for him to appear as a witness. He is deprived of the judgment of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom. The adage that 'a lawyer who represents himself has a fool for a client' is the product of years of experience by seasoned litigators." *Kay v. Ehler, supra,* 499 U.S. at 437-38.

*3 The *Gorovitz* case is the leading Massachusetts case in this area. *Gorovitz, supra,* 394 Mass. 246 (1985). There the court established a rule that an attorney who was a general partner in a limited partnership and a named litigant could function as the partnership's *pro se* attorney, representing the limited partnership, and could also testify as a key witness. The Court relied on the fact that Gorovitz

was a party litigant, and that as a general partner, he possessed the "rights and powers of a partner in a partnership without limited partners." *Id.* at 249 (citations omitted). His rights in the suit were indistinguishable from those of the partnership or his other partners.

In the case at bar, attorney Cannavo is neither a general partner in a limited partnership nor a named litigant. He does not possess the rights and powers of a full general partner. His identity is separate and distinct from the LLP. Consequently, he cannot assume the role an attorney for the LLP on a *pro se* basis. His interests are distinct from the LLP's. [FN5] The LLP alone is liable for any judgment won by Verizon, while he is not. [FN6]

> FN5. The same can be said for W. Sims.

> FN6. There is authority suggesting that " *pro se* litigant[s] may not represent any other party, no matter what their relationship. Restatement (Third) Law Governing Lawyers, Vol. 1 at 41 (1998) (citing cases holding that a father could act *pro se* for himself, but not for his infant son; litigant may not represent another party; husband may not represent wife; and *pro se* lawyer may not represent other parties and be a witness). *See Laubinger v. Department of Revenue,* 41 mass. App.Ct. 598, 610 n. 15 (1996)(leaving open the question whether a non-attorney parent could represent his child as pro se counsel.)

*3. Applicability of Rule 3.7 of the Rules of Professional Conduct ("Lawyer as Witness").* Implicit in G.L. c. 221, § 48 is every litigant's "right to counsel of his choice." *Borman, supra,* 378 Mass. at 787. Sims & Sims, LLP has a right to counsel of its choice in this litigation. To date, the LLP has chosen to have both attorneys Cannavo and W. Sims as its counsel. However, the right of self-representation has no application to circumstances in which an attorney is not a party. Unlike the situation in *Gorovitz,* this is not a case in which the advocate who is expected to testify in this action is also a litigant. The situation in the present

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                    Page 4

15 Mass.L.Rptr. 734, 2003 WL 836087 (Mass.Super.)

**(Cite as: 2003 WL 836087 (Mass.Super.))**

case brings into play 3.7 of the Rules of Professional Conduct of the Supreme Judicial Court, S.J.C. Rule 3:07, which provides as follows:
"Lawyer as Witness.
(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client." [FN7]

> FN7. Rules of the Supreme Judicial Court, Rule 3:07. Rule 3.7 goes on to state: (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing os by Rule 1.7 or Rule 1.9. The Court does not consider the application of this clause, as the issue is not currently before the Court.

Attorney Cannavo is a necessary witness at trial, likely the most important one for the LLP. Thus, Cannavo cannot act as counsel for the LLP under Rule 3.7 unless one of three exceptions apply. Exceptions one and two are not relevant; only the third is considered. Argument from the LLP, both written and oral, has not raised nor argued the issue of substantial hardship. The Court agrees that the LLP has other reasonable choices in securing representation, none of which would work a substantial hardship on the firm.

Comment [1] to Rule 3.7 of the Massachusetts Rules of Professional Conduct states that "[c]ombining the roles of advocate and witness can prejudice the opposing party and can involve a conflict of interest between the lawyer and the client." Rules of the Supreme Judicial Court, Rule 3:07, Rules of Professional Conduct, Rule 3.7, Comment 1. This comment is directly applicable in this situation. [FN8] It bars Attorney John N. Cannavo from representing Sims & Sims, LLP in the current litigation because it is expected that he will be a necessary witness in the case.

> FN8. The observations by Justice Keeton of the United States District Court for the District of Massachusetts about the perils associated with attorneys who become involved in the representation of law firms organized as LLPs bear close reading. *See Dow v. Donovan*, 150 F.Supp.2d 249, 268-74 (D.Mass.2001). He raises the question of possible conflict of interest between the attorney and the partnership, once partnership liability is established. Questions of internal fiduciary duty could arise in this situation because the partnership is the defendant. *Id.* at 268. In contrast, it would not have arisen in the *Gorovitz* or *Borman* cases because the causes of actions were not against the partnership for any outstanding debt.

### CONCLUSION

*4 Courts should be mindful that motions to disqualify may be used as delaying tactics to gain an advantage in litigation. This is not such a case. *See Gorovitz supra*, 394 Mass. at 250 n. 7; *Masiello v. Perini Corp.*, 394 Mass. 842, 850 (1985); *G.D. Matthews & Sons, v. MSN Corp.*, 54 Mass.App.Ct. 18, 23 (2002). The plaintiff has established a fundamental basis for the disqualification of defendant's counsel. For the foregoing reasons, Verizon's motion to disqualify John N. Cannavo as counsel representing Sims & Sims, LLP in this suit is *ALLOWED*.

15 Mass.L.Rptr. 734, 2003 WL 836087 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

765 N.E.2d 828 (Table)                                                                      Page 1

54 Mass.App.Ct. 1111, 765 N.E.2d 828 (Table), 2002 WL 530558 (Mass.App.Ct.)
**Unpublished Disposition**

**(Cite as: 54 Mass.App.Ct. 1111, 765 N.E.2d 828, 2002 WL 530558 (Mass.App.Ct.))**

H

**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED
OPINION.

Appeals Court of Massachusetts.
COMMONWEALTH,
v.
David TEW.
**No. 00-P-1459.**

April 9, 2002.

*MEMORANDUM AND ORDER PURSUANT TO
RULE 1:28*
***1** After a jury trial in Plymouth Superior Court,
the defendant was found guilty on November 12,
1999, of forcible rape of a child under the age of
sixteen years; multiple charges of indecent assault
and battery upon a child under the age of fourteen
years; and delivering an alcoholic beverage to a
person under the age of twenty-one years (which
conviction was placed on file). The defendant filed
a notice of appeal, here arguing as error the trial
judge's denial of his motions for a required finding
of not guilty as to the charge of forcible rape, and to
set aside the verdict on the same charge. The
defendant also argues error in the admission of a
stipulation in lieu of testimony of his trial counsel,
and claims that the court's participation in the
securing of the stipulation and the defendant's
assent thereto deprived him of a fair trial.

1) The defendant, at the close of the case for the
Commonwealth, and at the close of all the evidence,
filed motions for a required finding of not guilty on
the charge of forcible rape of a child under sixteen
years. A motion to set aside the verdict for the rape
charge was also filed based upon the same grounds,

namely that there was insufficient evidence to prove
that penetration of the victim had occurred. We
conclude that the statements by the victim, the
defendant's step-daughter, that the defendant licked
her in her "vagina area" for a "minute or two,"
licking "[j]ust on top of it [the genital opening],
almost near the opening," are sufficient to prove the
elements of the offense. See *Commonwealth v.
Baldwin,* 24 Mass.App.Ct. 200, 204-205 (1987);
*Commonwealth v. Edward,* 34 Mass.App.Ct. 521,
523 (1993); *Commonwealth v. Moniz,* 43
Mass.App.Ct. 913, 914 (1997).

2) The defendant's second argument concerns the
admission in evidence of a stipulation in lieu of
testimony of trial counsel, Mr. Stephen Jones. On
March 21, 1997, before the charges giving rise to
the indictment against the defendant were filed, the
victim was brought to see Jones, who later was
retained as the defendant's trial counsel. After
speaking with Jones, the victim signed an affidavit
recanting allegations she had previously made to
friends and a school counselor that the defendant
had touched her breasts, buttocks and vagina. In the
affidavit she stated that "[n]othing I said about my
father was true.... He never touched me or did any
of the things I said he did." The victim also stated in
the affidavit that "I understand that I'm signing this
document and that I can get in a lot of trouble if I
am lying now." Finally, she attested that "I am
doing this because I want to and not because of any
pressure from my family or my father's family." The
victim's mother and the victim were present at
Jones's office when the affidavit was prepared and
signed. The affidavit was notarized by Robert W.
Harnais, who testified at trial.

According to defense counsel, four days before
trial the "alleged victim in the case indicate[d]
definitively for the first time that there was some
pressure brought to bear on her [to recant her
allegations] which then [made] my observations" of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

765 N.E.2d 828 (Table)                                                          Page 2

54 Mass.App.Ct. 1111, 765 N.E.2d 828 (Table), 2002 WL 530558 (Mass.App.Ct.)
**Unpublished Disposition**

**(Cite as: 54 Mass.App.Ct. 1111, 765 N.E.2d 828, 2002 WL 530558 (Mass.App.Ct.))**

the meeting concerning the affidavit much more relevant. (Tr. 1:8.) On the morning of trial both counsel brought their concerns about the potential need for this evidence to the attention of the judge. A proposed stipulation was thereafter prepared by counsel, which set forth defense counsel's recollections of the meeting at which the affidavit was executed. The proposed stipulation included defense counsel's statements that he had "asked [the victim] if anyone was pressuring her to change her story" and "[s]he said no one was." The proposed stipulation also provided that "[h]e told her that she could get in [a lot] of trouble if she signed the document and it wasn't true." The proposed stipulation further provided that she had said that she had read the whole affidavit, and was signing as her "free act and deed." According to the proposed stipulation, "her demeanor was appropriate under the circumstances."

***2 The trial judge engaged in a lengthy colloquy with the defendant about his understanding of the difference between proceeding with the proposed stipulation and having his counsel testify as a witness with new counsel being appointed to defend him at trial. The judge found that the proposed stipulation related to an uncontested issue, namely, Jones's description of what occurred and what he observed at the meeting on March 21, 1997. The judge also found that the defendant was very intelligent and understood the benefits and disadvantages of having defense counsel testify as a witness (as opposed to using a written stipulation). [FN1] The judge further found that the defendant strongly desired to have Jones continue to represent him and that the disqualification of Jones would work a substantial hardship.

> FN1. At the close of the Commonwealth's case, there was still only a proposed stipulation. The prosecutor requested that three facts be added to the stipulation: that 1) the victim was not represented by counsel at the meeting; 2) Mae Tew, the victim's mother, was present as a parent; and 3) Jones was representing the defendant at the time of the signing of the

affidavit. The defendant's counsel agreed to the first two additions, but was uncertain whether he was representing the defendant at the time of the affidavit. The judge took a recess while the final additions to the affidavit were made by the attorneys. After the attorneys had completed the stipulation, the judge again questioned the defendant about his understanding of the situation. The defendant indicated he understood the stipulation, and was satisfied that it was an effective way of presenting the information to the jury.

Rule 3.7 of the Massachusetts Rules of Professional Conduct provides that a "lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where: (1) the testimony relates to an uncontested issue; ... or (3) disqualification of the lawyer would work substantial hardship on the client." Mass.R.Prof.C. 3.7(a), 426 Mass. 1396 (1998). The trial judge found that both the first and third exceptions were met in this case, and we agree.

The defendant contends on appeal that the issue was not "uncontested," as the victim testified at trial that she signed the affidavit under pressure from her mother and her aunt. Although her veracity at the time of signing was contested, what is relevant for the purposes of Rule 3.7 is that the content of attorney Jones's stipulation, that is, what he remembered was said and done and what he observed at the meeting, was, in fact, uncontested. Furthermore, the issue in dispute, whether the victim was telling the truth, was not, as the judge stated, an appropriate line of inquiry to explore with counsel should he have been asked to testify. (Tr. 3:86.) Additionally, both counsel questioned the victim on this issue extensively.

The cases relied on by the defendant are readily distinguishable. In *Commonwealth v. Rondeau*, 378 Mass. 408 (1979), the defendant was claiming an alibi defense, and his attorney was the only available alibi witness who "could not be impeached by evidence of a criminal record." *Id.* at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

765 N.E.2d 828 (Table)                                                    Page 3

54 Mass.App.Ct. 1111, 765 N.E.2d 828 (Table), 2002 WL 530558 (Mass.App.Ct.)
**Unpublished Disposition**

**(Cite as: 54 Mass.App.Ct. 1111, 765 N.E.2d 828, 2002 WL 530558 (Mass.App.Ct.))**

413. Moreover, in *Rondeau,* the attorney's proposed testimony, which the judge found not credible, did not relate to an uncontested issue. This differs markedly from the situation in the present case where the stipulated testimony did relate to uncontested matters, and there were other witnesses, including the victim's mother and the notary, to testify in the attorney's place. *Commonwealth v. Patterson,* 432 Mass. 767, 777 (2000) (defense counsel only witness present to contradict police officer's contested account of defendant's questioning), is distinguishable for the same reasons.

The Supreme Judicial Court has acknowledged that "application of the rule [to withdraw and testify] may have harsher consequences for the client than the continued service of the attorney. Most obviously, the rule may deny a litigant of the right to counsel of his choice." *Borman v. Borman,* 378 Mass. 775, 787 (1979). In the instant case, requiring the defendant's attorney to withdraw on the eve of trial would have had particularly harsh consequences for the defendant, especially where the defendant had indicated during the colloquy with the judge that he was satisfied with his counsel's performance, and it would constitute a "substantial hardship" for his counsel to be removed.

***3 For the above reasons, we conclude that the admission of the stipulation was not prejudicial to the defendant, and did not violate Rule 3.7, as the stipulation concerned uncontested matters and would have worked a substantial hardship on the defendant to remove counsel on the eve of trial. Additionally, the judge did not improperly act as an advocate, as the defendant contends on appeal, when he participated in the resolution of the problem that led to the drafting of the stipulation by the parties.

Finally, the defendant's contention that he was forced to make his decision after the close of the Commonwealth's case, and thus had no choice, is without merit. The stipulation necessarily would have been admitted in evidence after the Commonwealth's case had been presented because it was part of the defendant's evidence. Moreover,

the fact that the affidavit was still "proposed" when the first colloquy took place is not of concern. The only issue left unresolved, whether counsel represented defendant at the time of the affidavit signing, was not material to the substance of the stipulation, which went to counsel's recollection of the drafting and signing of the affidavit and the victim's demeanor during that time period.

Although we find that the defendant's arguments on appeal concerning the stipulation and judicial conduct fail for the above reasons, we also note that the judge's careful and considerate colloquies with the defendant concerning the retention of his counsel and the use of the stipulation satisfied the decisional law on waiver of the right to a conflict-free attorney. See *Commonwealth v. Davis,* 376 Mass. 777, 785-786 (1978); *Commonwealth v. Goldman,* 395 Mass. 495, 507-508, cert. denied, 474 U.S. 906 (1985); *Commonwealth v. Martinez,* 425 Mass. 382, 392-393 (1997); *Commonwealth v. Desfonds,* 32 Mass.App.Ct. 311, 314 (1992).
    *Judgments affirmed.*

54 Mass.App.Ct. 1111, 765 N.E.2d 828 (Table), 2002 WL 530558 (Mass.App.Ct.) Unpublished Disposition

**Briefs and Other Related Documents (Back to top)**

• 2000-P-1459 (Docket)
                                        (Sep. 12, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.