## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CASAS, BENJAMIN & WHITE, LLC,    )
    )
    Plaintiff,    )
    )    No. 04-12333-MEL
    vs.    )
    )
THE POINTE GROUP, INC., a    )
Massachusetts corporation d/b/a The Pointe    )
Group Healthcare and Senior Living;    )
GERALD S. FREID; BARRY FREID; and    )
KEY CORPORATE CAPITAL, INC.,    )
    )
    Defendants.    )

## MOTION OF PLAINTIFF, CASAS, BENJAMIN & WHITE, LLC, TO COMPEL DEPONENT STEPHEN F. GORDON TO ANSWER CERTAIN DEPOSITION QUESTIONS

The plaintiff, Casas, Benjamin & White, LLC ("CBW"), moves pursuant to Rule 37

(a)(2)(B) of the Federal Rules of Civil Procedure for an order compelling Stephen F. Gordon,

Esq. to provide responsive answers to questions that he refused to answer at his June 9, 2005

deposition. In support of this motion, CBW certifies that it has complied with Rules 7.1 and 37.1

of the Local Rules of the U.S. District Court for the District of Massachusetts, and further states

as follows.

I.    <u>Factual Background</u>

This case is brought against The Pointe Group , Inc. ("TPG"), Barry and Gerald Freid,

and Key Bank (hereinafter, collectively, "Defendants") to recover money damages in excess of

one million dollars that CBW suffered because it was never paid for services CBW performed

for the benefit of Defendants. Specifically, TPG and the Freids retained CBW to provide

investment banking services in connection with the sale or refinance of certain nursing homes

and assisted living facilities, and agreed to pay CBW a percentage of the value of any

transactions consummated in connection with the sale or refinance of those facilities. After CBW performed all of its obligations under the parties' contract, and the facilities were in fact sold to an entity known as Epoch Senior Living ("Epoch"), Defendants wrongfully failed and refused to pay the performance incentive payments that were due to CBW under the contract.

CBW alleges that TPG breached a contract with CBW and breached the implied covenant of good faith and fair dealing, that the Freids aided and abetted TPG's misconduct, and that all Defendants were unjustly enriched by the benefits that they wrongfully derived from CBW's services, and engaged in fraudulent misrepresentation, civil conspiracy, and violations of M.G.L. c. 93A. CBW seeks recovery of actual damages, double or treble damages, costs and attorneys' fees by virtue of Defendants' willful or knowing, unfair and/or deceptive acts.

Stephen F. Gordon, Esq., who has appeared on behalf of TPG, Gerald Freid, and Barry Freid in this action, also provided legal services in connection with the underlying sale to Epoch. While Mr. Gordon has taken different positions at different times as to exactly whom he represented in the underlying transaction,[1] it is undisputed that during the six months leading up to the September 30, 2004 closing, Mr. Gordon communicated on a regular basis with representatives of CBW, Key Bank, and Epoch, and with representatives of TPG and the Freid family. (See, e.g., documents attached at Tab A). In the course of these communications, Mr. Gordon obtained a copy of CBW's engagement letter, calculated the approximate amount of the performance incentive payments due to CBW, and negotiated with Key Bank over how these payments would impact on the division of sales proceeds between Key Bank and the Freids.

---

[1]    In TPG's Answer to the Complaint in this Matter, which was prepared and filed by Mr. Gordon, TPG claimed that in the underlying transaction, Attorney Gordon "acted only as legal counsel for the Key Bank Financed Facilities and not on behalf of TPG or the Freids." (Defs.' Answer & Countercls., ¶ 43). In documents obtained in discovery in this action, however, Attorney Gordon regularly held himself out as the representative of "The Pointe Group" and "the Freid Family" in his communications with Key Bank, CBW, and Epoch. (See, e.g., Gordon Dep. Exhs. 78, 79, 80, 81, 82, 83, attached hereto at Tab A).

(See Tab A, Exhs. 74, 83). Mr. Gordon also was involved in negotiations with Epoch regarding changes in the purchase price, and in communications with CBW requesting corresponding changes to the amount of the performance incentive payments. (See Tab A, Exh. 90).

Mr. Gordon also attended the September 30, 2004 closing on the sale to Epoch at Goodwin Proctor along with TPG's closing attorney, John McCullough. (Gordon Dep. Tr., pp. 158-59, attached hereto at Tab B). Mr. McCullough testified at his deposition that, at the outset of the closing, he told Epoch's counsel that TPG would deal with the payments due to CBW "outside of closing." (McCullough Dep. Tr., p. 71, attached hereto at Tab C). Mr. McCullough then instructed Epoch's counsel to delete the payments due to CBW from the closing statement, without CBW's knowledge or consent, and in violation of the terms of the CBW's engagement letter. (Id.) Mr. McCullough further testified that before giving Epoch's counsel this instruction, he had discussed the issue with persons "affiliated with the sellers." (Id. at pp. 71-72). When pressed to identify the person or persons who authorized him to give Epoch's counsel this instruction, however, Mr. McCullough was instructed by his attorney (coincidentally, Mr. Gordon) not to answer the question on the grounds of attorney-client privilege. (Id. at pp. 72-75).[2]

Facts obtained in discovery establish a strong inference that Mr. Gordon was the person who authorized Mr. McCullough to instruct Epoch's counsel to delete the payments due to CBW from the closing statement. Indeed, the other key principals "affiliated with the sellers" – Gerald Freid, Barry Freid, and Georgia Freid – have denied having knowledge of any such statement being communicated to Epoch's counsel. (Gerald Freid Dep. Tr., p. 159, attached hereto at Tab D (testifying that he was "shocked" to learn that CBW was not paid out of the sale

---

[2]    Mr. McCullough's refusal to answer questions regarding communications intended to be conveyed to third parties is the subject of a pending motion to compel.

proceeds); Barry Freid Dep. Tr., pp. 178-79, attached hereto at Tab E (testifying that he was "surprised" not to see CBW's fee in the closing statement); Georgia Freid Dep. Tr., p. 81, attached hereto at Tab F (testifying that she did not remember any discussion as to whether CBW would be paid outside of closing)).  Unless one of these witnesses has lied under oath, this testimony creates a strong inference that Mr. Gordon was the person who authorized Mr. McCullough to instruct Epoch's counsel to strike CBW's fee from the closing statement.

This inference is further supported by documentary evidence establishing that on the morning of October 1, 2004, less than twenty-four hours after the closing had occurred, Mr. Gordon sent CBW a three-page facsimile detailing several (unmeritorious) grounds on which CBW purportedly was "entitled to no payment." (Tab G.)  Mr. Gordon's involvement in these communications, coupled with the Freids' professed ignorance of the same, leads to the inescapable conclusion that Mr. Gordon himself was involved in the decision to deprive CBW of its justly-earned fee.

Given his extensive knowledge of and involvement in these events, CBW noticed and took the deposition of Mr. Gordon on June 9, 2005.  Mr. Gordon raised no objection to the subpoena ordering him to appear for this deposition.  At his deposition, CBW's counsel, Attorney Erin K. Higgins, asked Mr. Gordon questions exploring his participation in the decision to deprive CBW of its fee, and then to inform CBW after the closing that it was "entitled to no payment." (Tab G.)  Mr. Gordon refused to answer more than 45 separate questions during this deposition, on various grounds, some articulated, some not.[3]  As set forth in more detail below, these questions bore directly on facts relevant to CBW's claims against the defendants, and did not call for the disclosure of attorney-client privileged information.  CBW therefore requests that

---

[3]    Mr. Gordon appeared at his deposition without an attorney, and therefore was essentially instructing himself not to answer those questions. See Gordon Depo. Tr., pp. 20-21.

the Court order Mr. Gordon to appear at a further deposition to answer these questions and any questions that flow directly from his answers to these questions.

II.  Argument

  A.  The Court Should Order Mr. Gordon To Appear For A Further Deposition To Answer The Questions Posed By CBW And Any Further Questions Flowing From His Answers To Those Questions.

The Court should grant CBW's motion to compel Mr. Gordon to answer Attorney Higgins' deposition questions, because the questions sought information relevant to CBW's claims in this case, and not protected by the attorney-client privilege. "The privilege protects only those communications that are confidential and are made for the purpose of seeking or receiving legal advice." In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003).[4]  The privilege "must be narrowly construed because it comes with substantial costs and stands as an obstacle of sorts to the search for truth." Id. (citing United States v. Nixon, 418 U.S. 683, 709-10 (1974)).  The party who invokes the privilege bears the burden of proving that it applies and has not been waived. Id. at 22.

  1.  The Identity of Mr. Gordon's Clients Is Not Encompassed by the Attorney-Client Privilege.

At the beginning of the deposition, Attorney Higgins asked Mr. Gordon several questions regarding who he claimed to represent in this action, and which of those clients he had performed legal work for in the past.  These questions have become relevant because Mr.

---

[4]     When, as in this case, the causes of action and defenses being litigated are based on state law, state privilege law is applicable. Fed. R. Evid. 501. State and federal law are substantially similar regarding the basic aspects of the attorney-client privilege as it applies to the facts underlying this motion. See Edna Selan Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 20 (American Bar Association 4th ed. 2001).  Therefore, the instant motion cites both Massachusetts state law and federal common law.

Gordon's frequent, and often contradictory, assertions of attorney-client privilege have

continually stymied discovery.[5]

For example, Mr. Gordon testified that he had rendered legal services to Georgia Freid,

her husband's estate, and/or The Pointe Group in the past. (Gordon Depo. Tr., p. 19). He

refused to specify which one, however:

> Q. .... Can you tell me generally the type of legal service that you rendered, even
> if you're not able to identify the exact matter?
> A. Matters involving actual or potential visits to courtrooms. I don't handle
> transactions. I don't handle business transactions. I handle bankruptcies and
> matters in courtrooms.
> …
> Q. In the matter that you're referring to, can you tell me who your client is?
> A. No. You gave me a list of people, and the client is amongst those people.
> Q. When did the representation begin?
> A. I can't tell you that.

(Id. at pp. 19-20).

Mr. Gordon similarly refused to answer the following questions:

> Q. [D]uring the time period September 30, 2003 to September 30, 2004, did you
> represent Barry Freid in his individual capacity?
> A. I can't answer that.
> Q. During that same time period, did you represent Gerald Freid in his individual
> capacity?
> A. I can't answer that.

(Id. at pp. 50-51.)

Mr. Gordon's understanding of the scope of the attorney-client privilege is overbroad.

As this Court noted in Refuse & Environmental Systems, Inc. v. Industrial Services of America:

> [T]he privilege does not cloak all details of the attorney/client relationship. In
> fact, many details may be probed without in any way implicating the privilege.
> The fact that an attorney was consulted, for example, is not protected. The date,

---

[5] For example, in early April, 2005, Mr. Gordon advised CBW's counsel that he could not accept service of deposition subpoenas on behalf of the five Key Bank Financed Facilities because he no longer represented any of them. Only six days later, on April 18, 2005, Mr. Gordon contacted CBW's counsel by letter, formally objecting on behalf of all five entities to the production of any documents in response to the subpoenas served on the entities. (A true and accurate copy of Mr. Gordon's April 18, 2005 letter is attached hereto at Tab H). Mr. Gordon also represented one of the entities at its Keeper of Records deposition on April 25, 2005.

length of time and place of consultation is not protected. Questions may be asked
as to who was present at the meeting, since the presence of strangers may vitiate
the privilege.

120 F.R.D. 8, 10 (D. Mass. 1988); see also 24 Charles Alan Wright & Kenneth W. Graham, Jr.

Federal Practice & Procedure: Evidence § 5484 at 359 (1986 ed.) (factual circumstances

surrounding the attorney-client relationship, such as the identity of the client and the person

paying the attorney's fees, are not privileged absent unusual circumstances). The identity of Mr.

Gordon's past and present clients, along with the beginning and end dates of those purported

attorney-client relationships, are all discoverable. See id.

    2.    The Identity of The Client Who is Paying Mr. Gordon in This Case is Not
           Encompassed by the Attorney-Client Privilege.

Mr. Gordon similarly sought to cloak in secrecy the identity of the client who is paying

for his services in the instant matter.

    Q. Now, you also represented Georgia Freid at her deposition, correct?
    A. Yes.
    Q. Whom did you bill for the time that you spent defending that deposition?
    A. I can't tell you that.
    Q. And you represented Mr. McCullough at his deposition?
    A. Yes.
    Q. Who did you bill for the time you spent defending that deposition?
    A. I can't tell you that.
    Q. You represented Frank Barker in his capacity as keeper of the records at
    Chestnut Hill Lifecare?
    A. Yes.
    Q. Who did you bill for the time representing that deposition?
    A. I can't tell you.
    Q. Who do you intend to bill for the time you're spending at deposition here
    today?
    A. I can't tell you.

(Gordon Depo. Tr., pp. 29-30).

Information regarding payment of fees and billing arrangements are discoverable so long

as it does not reveal the nature of the services performed by the attorney. Colonial Gas Co. v.

<u>Aetna Cas. & Sur. Co.</u>, 144 F.R.D. 600, 607 (D. Mass. 1992). The answers to Attorney Higgins'
questions do not call for the disclosure of any confidential attorney-client communications and
are tantamount to simply asking who Mr. Gordon represents in this case. This information is not
protected by the privilege and is discoverable. <u>See</u> <u>id.</u>

3. The Factual Circumstances Surrounding a Client's Grant of Authority to His
Attorney to Make a Communication to a Third Party are Not Encompassed by the
<u>Attorney-Client Privilege.</u>

The fact that Mr. Gordon appears most eager to shield from disclosure is the identity of
the individual who made the decision to deprive CBW of its duly-earned fee, which was payable
to CBW at the time of the September 30, 2004 closing. Attorney Higgins first attempted to ask
Mr. Gordon who had authorized him to convey to CBW the positions that he ultimately
communicated to CBW immediately after the September 30, 2004 closing:

Q. .... From the time you first received and reviewed this agreement[6] through the
date of the closing, did you have any discussions with John McCullough as to
whether or not there was an enforceable obligation to pay Casas, Benjamin &
White under the terms of this agreement?
A. I can't answer that.
Q. Between the date that you first received and reviewed this letter and the date
of the closing, September 30, 2004, did you have any discussions with Gerald
Freid as to whether or not there was an enforceable obligation to pay Casas,
Benjamin & White under this agreement?
A. I can't answer that.
Q. Did you have any such discussions during the time period I've just referenced
with Barry Freid?
A. I can't answer that.
Q. Did you have any such discussions during the time period I just referenced
with Mark Tobin?
A. I can't answer that.
Q. Did you have any discussions, such discussions during that time period I just
mentioned with Frank Barker?
A. I can't answer that.

(Gordon Depo. Tr., pp. 39-40).

---

[6] "This agreement" refers to the initial Engagement Letter between CBW and TPG. (Attached hereto at Tab H.)

8

Later, when confronted with those provisions of the Engagement Letter that dealt with the performance incentive payments due to CBW, Mr. Gordon refused to answer the following questions:

> Q. Mr. Gordon, when did you first form an opinion that CBW was not entitled to the full amount of the performance incentive payments as identified in this paragraph?
> A. I can't answer that.
> Q. Did you ever discuss that opinion with anyone prior to September 30, 2004?
> A. I can't answer that.
> Q. When did you first discuss that opinion with any other person?
> A. After September 30th. Either on or after September 30th.
> Q. With whom did you first discuss that opinion?
> A. I can't answer.

(Id. at pp. 42-43.)

Likewise, when questioned about the October 1, 2004 letter that he wrote to CBW claiming that CBW was not entitled to the performance incentive payments because it was not a licensed real estate broker in Massachusetts, Mr. Gordon proved obstinate once more:

> Q. At the time that you wrote your letter, which you sent to Mr. Casas by e-mail, did you believe that you had authority from your client to convey that position to Mr. Casas?
> A. I can't answer that.
> Q. Prior to raising with Mr. Casas the argument the CBW was not entitled to the performance incentive payments because it was not a licensed real estate broker in Massachusetts, had you had discussions about that issue with anyone else?
> A. I can't answer that.
> Q. Prior to raising that issue with Mr. Casas, had you had discussions about that issue with anyone, other than someone who you considered to be your client?
> A. Or co-counsel.
> Q. Are you adding to my question?
> A. Well, if I can't add to your question, I have to refuse to answer it. I can't answer it. If you exclude -- if by your question you're trying to exclude people to whom the privilege would apply, I can answer that question.

(Id. at pp. 44-45).

Mr. Gordon took the same position with respect to TPG's negotiations with its

mortgagee, Key Bank, regarding its share of any proceeds from the Epoch sale.

> Q. In terms of the position of your clients that you were conveying to Madeline Kauffman, who was conveying that information to you to be conveyed to Madeline Kauffman?[7]
> A. I can't answer that.

(Id. at p. 148.)

Towards the end of the deposition, Attorney Higgins inquired about Mr. Gordon's

activities at the September 30, 2004 closing at Goodwin Proctor:

> Q. Did you have discussions while you were at Goodwin, Procter & Hoar with anyone as to whether CBW's fee was going to be paid that day?
> A. I can't answer that.
> Q. You're not going to answer the question of whether you had such discussions with anyone?
> A. I can't answer that.
> Q. When you left Goodwin, Procter & Hoar after you were in the closing room with Georgia Freid, at the time you left Goodwin, Procter & Hoar, did you have an understanding as to whether CBW's fee was going to be paid that day?
> A. I can't answer that.

(Id. at p. 160.)

Again, Mr. Gordon took the same position regarding the decision-making process leading

to his October 1, 2004 letter to CBW asserting that it was "entitled to no payment." (Tab G).

> Q. When did you start working on this letter?
> A. I can't tell you that.
> ....
> Q. Did Gerry Freid specifically authorize you to convey to CBW the number of $782,773 that's in your letter?
> A. I can't tell you that.
> Q. Well, you say in the first paragraph of your letter that you will conclude with a settlement proposal at Gerry Freid's insistence, correct?
> A. That's what the letter says.
> Q. Did Gerry Freid tell you something that he intended for you to convey to CBW?

---

[7]     Madeline Kauffman was counsel for Key Bank in the underlying transaction. The "information" referred to in this exchange relates to repayment terms concerning TPG's debt to Key Bank. (Gordon Depo. Tr., pp. 147-48).

A. I can't answer that.

(Gordon Depo. Tr., p. 165).

Q. The statement that you make at the bottom of the first page carrying over to the second that, "CBW is not qualified to act as a real estate broker in Massachusetts, which is a necessary prerequisite for earning and collecting a brokerage commission," is that statement based on any legal research that you did?

A. I can't answer that.

Q. When did you first conduct any legal research regarding the issue of whether CBW was entitled to collect its fee based on its status as a licensed real estate broker?

A. I can't answer.

(Id. at pp. 167-68).

Finally, Attorney Higgins inquired about one of the central issues in this case: who authorized Mr. McCullough to tell Epoch's counsel to delete the performance incentive payments due to CBW from the closing statement?

Q. You were at Mr. McCullough's deposition, correct?

A. Yes.

Q. And I believe you were present when Mr. McCullough testified that he communicated to Andy Sucoff that CBW's fee would be taken care of outside of the closing; do you remember that testimony?

A. I don't know if you're exactly characterizing it, but I do remember his testimony.

Q. To the best of your knowledge, when Mr. McCullough made that statement or substantially similar statement to Mr. Sucoff, was Mr. McCullough, did Mr. McCullough have authority from one of the clients that you considered to be part of your client group to communicate that statement to Andy Sucoff?

A. I can't answer that.

(Id. at pp. 170-71).

Q. I just have a few more questions. Mr. Gordon, at any point on the day of the closing or on any of the days leading up to the closing, had Gerald Freid ever authorized you to convey any instructions to Mr. McCullough with respect to CBW's fee being taken care of outside of the closing?

A. I can't answer that.

Q. At any point on the day of the closing or any of the days leading up to the closing, had Barry Freid authorized you to convey any instructions to Mr. McCullough that CBW's fee would be dealt with outside of the closing?

A. I can't answer that.

Q. Would you give the same answer to that same question with respect to Georgia Freid having authorized you to give those instructions?

A. I would.

Q. Would you answer the same way with respect to Mark Tobin authorizing you to convey instructions to Mr. McCullough?

A. Yes.

Q. And would you answer that question the same way if I was asking about Frank Barker having authorized you to convey those instructions to Mr. McCullough?

A. Yes.

Q. At any point on the day of the closing or on any of the days leading up to the closing, did Gerald Freid authorize you to convey to Andy Sucoff that CBW's fee would be dealt with outside of the closing?

A. I can't answer that.

Q. Is your answer the same with respect to Barry Freid having provided you with that authorization?

A. Yes.

Q. Georgia Freid?

A. Yes.

Q. Mark Tobin?

A. Yes.

Q. Frank Barker?

A. Yes.

MS. HIGGINS: I think that's all the questions that I have.

(Id. at pp. 175-76).

All the questions set forth above bore directly on facts relevant to CBW's claims against the defendants, namely, the decision-making process leading to defendants' deprivation of CBW's contracted-for fee. None of them are protected by the attorney-client privilege because none call for the disclosure of the contents of any confidential attorney-client communications made for the purpose of seeking or receiving legal advice. See In re Keeper of Records, 348 F.3d at 22.

"Communications between an attorney and his client are not privileged, though made privately, if it is understood that the information communicated is to be conveyed to others." Peters v. Wallach, 366 Mass. 622, 627 (1975). In Peters, the plaintiffs had brought suit to enforce a prior settlement agreement. The defendants appealed from the trial court's decision to permit the defendants' attorney from the underlying action to testify that the defendants had granted him authority to accept the plaintiffs' settlement offer. The Supreme Judicial Court affirmed the decree enforcing the settlement agreement, holding that the testimony was not protected by the privilege. "The client's grant of authority to settle must be communicated to the other party to the settlement and is thus not confidential." Id.

Here, Mr. McCullough testified that he was authorized by someone affiliated with the sellers' side of the transaction to convey to Epoch's counsel that CBW's fee would be dealt with outside of the closing, and that the fee should be deleted from the closing statement as a sellers' expense. Like the client's grant of authority to settle in Peters, the Defendants' grant of authority to delete CBW's fee from the closing statement (or lack thereof) must necessarily be communicated to the other party in order to form a valid, binding agreement. The communications were intended to be conveyed to a third party, they were not intended to be kept confidential, and therefore they were not protected by the privilege.

As a further basis for this motion to compel, CBW notes that the attorney-client privilege does not extend to the factual circumstances surrounding a communication between a client and an attorney. Refuse & Envtl. Sys., Inc., 120 F.R.D. at 11, 12; see also Wright & Graham, supra, at § 5484 at 359. In Refuse & Environmental Systems, Inc., the plaintiffs alleged that the defendants, three months prior to the filing of the federal action, improperly had filed a state court action against the plaintiffs for an anti-competitive purpose. In discovery in the

13

federal case, the plaintiffs sought to discover the identity of the individual who had authorized the initial state court action. In words equally applicable here, the court summarized the course of discovery as follows:

> [T]he defendants have played something of a penny-penny-who's-got-the-penny game with the plaintiffs. Each individual defendant claims that one of the others was responsible for the decision to file the state lawsuit and denies any knowledge of its basis. How the defendants' lawsuit ever got filed in state court is shrouded in mystery.

Id. at 9.

To clear up the mystery, the plaintiffs noticed the deposition of the defendants' attorney and asked questions "exploring... the decision-making process leading to filing of the state court lawsuit...." Id. The court held that the identity of the individual who had authorized the filing of the state court lawsuit was not protected by the privilege.

> [A] communication, to be protected, must be of "*facts* by a client to his attorney for the purpose of securing legal services." ... It is the contents of the communications themselves which are protected, not the surrounding circumstances or the facts of consultation itself."

Id. at p. 11. Thus, the court held, the plaintiffs would be permitted to inquire "as to which, if any, of [the attorney's] clients purported to authorize the filing of the lawsuit." Id. at 12.

In this case, defendants and their counsel are engaged in a similar effort to obscure the facts surrounding the defendants' decision to close on the sale to Epoch, even if it meant depriving CBW of its duly-earned fee. This Court should find that CBW is entitled to know who participated in making that decision, and when that decision was made. The questions set forth above did not require the disclosure of facts communicated to Mr. Gordon in confidence for the purpose of seeking legal advice. Instead, CBW's counsel was asking about communications made to Mr. Gordon that were intended to be conveyed to a third party, the identity of the person(s) engaging in those communications, and the dates on which those conversations took

place. Under the authorities discussed above, the answers to those questions are not protected by

the attorney-client privilege. This Court, therefore, should order Mr. Gordon to appear for a

further deposition and provide answers to those questions.

    4.    <u>Mr. Gordon's Refusal to Answer Certain Other Questions Violated Fed. R. Civ.</u>
<u>Proc. 30(d)(1).</u>

Mr. Gordon objected to certain other deposition questions on the grounds that he was not

a competent witness:

> Q. If the fact finder in this case or the court ultimately determines that CBW is
> entitled to the full amount of the performance incentive payments specified in that
> paragraph of the engagement letter, which entity or individual do you believe is
> liable for those payments?
> A. I'm here as a fact witness.
> Q. So you're not going to answer that question?
> A. I'm not going to give you legal advice, Erin.
> Q. I'm not asking you for legal advice.
> A. Yes, you are.
> Q. I'm not asking you if your opinion is right or wrong. I'm asking you what your
> belief is.
> A. My opinion is, I'm here as a fact witness. Not an opinion witness.
> Q. So you're not answering that question?
> A. I'm here as a fact witness.

(Gordon Depo. Tr., p. 46.)

He similarly objected to questions regarding his interpretation of the enforceability of

terms of the Engagement Letter (Tab H):

> Q. Let's go back, then. Looking at the language of paragraph six.
> A. Yes.
> Q. Was it your understanding at the time this was signed that this paragraph
> required the borrowers as defined in the agreement to pay or cause to be paid the
> following and immediately available funds and in the following order, first to
> Casas, Benjamin & White up to one million 250 thousand of the fee for
> investment banking services due and owing to CBW upon the closing of the sale
> transaction?
> A. I think you're asking me for a legal opinion. I don't -- how else would I have
> an understanding of what this is? I'm not going to give you a legal opinion.
> Q. Well, maybe my question was unclear. But I'm not asking you for an opinion
> as to how to accurately read this. My question is what was your understanding at
> the time that this was signed? Was your understanding at the time that this

agreement required the borrowers to make the payment to CBW as specified in
the agreement?

A. My understanding at any time is as a lawyer. So it is a legal opinion. Whether
it was what was my legal opinion then versus what my legal opinion is now, it's
still a legal opinion, and I can't answer that.

Q. I disagree that you can't answer that. But if you're refusing to answer, I'm not
going to ask it again.

(Id. at pp. 110-11).

Federal Rule of Civil Procedure 30(d)(1) provides that: "A person may instruct a

deponent not to answer only when necessary to preserve a privilege, to enforce a limitation

directed by this court, or to present a motion under Rule 30(d)(4) [for a protective order based on

a bad faith, unreasonable examination of the deponent]." Mr. Gordon acted as both the deponent

and counsel for the deponent, so his refusal to answer a question is tantamount to instructing

himself not to answer. (See Gordon Depo. Tr., pp. 20-21). His objection to the competency of

his own testimony did not constitute proper grounds for his refusal to answer these questions

under Rule 30(d)(1). See Boyd v. Univ. of Md. Med. Sys., 173 F.R.D. 143, 147-48 (D. Md.

1997) (holding that counsel improperly instructed his client not to answer deposition questions

on basis that the answers to these otherwise relevant questions would not ultimately be

admissible at trial). The proper procedure would have been to raise an objection to the

competency of the witness, but answer the question and then reserve the objection for trial. See

8A Charles Alan Wright et al., Federal Practice & Procedure: Civil § 2113 at 95 (1994 ed.).

B.    The Court Should Order Mr. Gordon or TPG to Pay the Costs and Fees
Associated with Mr. Gordon's Further Deposition

CBW further submits that the Court should order Mr. Gordon or TPG to pay any

reporter's fee and the original transcript fee associated with any further deposition of Mr.

Gordon, because Mr. Gordon, as TPG's counsel, instructed himself not to answer the deposition

questions which are the subject of this motion. CBW further requests that the Court award CBW

the reasonable attorneys' fees and costs it incurred in preparing and filing this motion, upon

submission of an affidavit from CBW's counsel detailing those costs.

WHEREFORE, plaintiff Casas, Benjamin & White, LLC, respectfully requests that the

Court grant its motion to compel Stephen F. Gordon, Esq. to appear for a further deposition, at

Mr. Gordon or The Pointe Group, Inc.'s expense, to answer questions he refused to answer at his

June 9, 2005 deposition.  CBW further requests that the Court award CBW the reasonable

attorneys' fees and costs incurred by it in the preparation and filing of this motion.  A proposed

Order follows.

> Respectfully submitted,
> CASAS, BENJAMIN & WHITE, LLC
> By its attorneys,
>
> /s/ Erin K. Higgins
> Thomas E. Peisch (BBO# 393260)
> Erin K. Higgins (BBO# 559510)
> Michael R. Bernardo (BBO# 648310)
> CONN KAVANAUGH ROSENTHAL
>   PEISCH & FORD, LLP
> Ten Post Office Square
> Boston, MA  02109
> (617) 482-8200

Dated: August ___, 2005
      Boston, Massachusetts

## LOCAL RULE 7.1 & 37.1 CERTIFICATION

The undersigned counsel hereby certifies that she conferred with Attorney Todd B.
Gordon, Esq. by telephone on August 10, 2005 in a good faith effort to resolve or narrow the
issues raised in this motion.

> /s/ Erin K. Higgins
> Erin K. Higgins

Dated: August ___, 2005

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CASAS, BENJAMIN & WHITE, LLC, | ) | |
| | ) | No.  04-12333-MEL |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE POINTE GROUP, INC., a | ) | |
| Massachusetts corporation d/b/a The Pointe | ) | |
| Group Healthcare and Senior Living; | ) | |
| GERALD S. FREID; BARRY FREID; and | ) | |
| KEY CORPORATE CAPITAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter having come on for hearing on a motion by the plaintiff, Casas, Benjamin & White, LLC ("CBW"), to compel Stephen F. Gordon, Esq. to appear for a further deposition to answer questions that he refused to answer at his June 9, 2005 deposition, it is hereby Ordered:

A.      Stephen F. Gordon, Esq. shall appear for a further deposition with Attorney Erin K. Higgins within thirty (30) days of this Order, at a time and place to be agreed upon by counsel.

B.      Stephen F. Gordon, Esq. shall provide responsive answers to the questions that are the subject of CBW's motion, and any follow-up questions flowing directly from Mr. Gordon's answers to those questions.

C.      Mr. Gordon or defendant The Pointe Group, Inc. shall pay the costs of the further deposition of Mr. Gordon, but any copies CBW wishes to order of the further deposition shall be CBW's responsibility; and

D.      Mr. Gordon or defendant The Pointe Group, Inc., shall pay CBW's reasonable attorneys' fees and expenses associated with this motion, as detailed in an affidavit to be submitted by CBW's counsel and as approved by the Court upon review of the affidavit.

So Ordered.

Dated: August ___, 2005

_____
Lasker, D.J.

233145.1