# TAB B

```
 1                              Volume: I

 2                              Pages:  1 - 183

 3          UNITED STATES DISTRICT COURT

 4             DISTRICT OF MASSACHUSETTS

 5                  Case No. 04-CV12333-MEL

 6

 7   CASAS, BENJAMIN & WHITE, LLC,

 8             Plaintiff,

 9       v.

10   THE POINTE GROUP, INC., a Massachusetts corporation,

11   d/b/a The Pointe Group Healthcare and Senior Living;

12   GERALD S. FREID; BARRY FREID; and KEY CORPORATE

13   CAPITAL, INC.,

14             Defendants.

15

16                  * * * * * * * * *

17          DEPOSITION OF STEPHEN F. GORDON

18             Thursday, June 9, 2005

19      Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP

20                 10 Post Office Square

21               Boston, Massachusetts

22                   10:20 a.m.

23          Reporter:  Linda M. Grieco

24      320 Congress Street, Boston, MA 02210
```

Stephen F. Gordon

06/09/2005

Page 2

1  APPEARANCES:
2
3  CONN, KAVANAUGH, ROSENTHAL, PEISCH & FORD, LLP
4  (By Erin K. Higgins, Esquire)
5  10 Post Office Square
6  Boston, Massachusetts 02109
7  on behalf of the Plaintiff
8  (617) 348-8200
9
10  GORDON HALEY LLP
11  (By Stephen F. Gordon, Esquire)
12  101 Federal Street
13  Boston, Massachusetts 02110
14  on behalf of The Pointe Group,
15  Gerald Freid and Barry Freid
16  and acting Pro Se
17  (617) 261-0100
18
19  NIXON PEABODY LLP
20  (By Courtney Worcester, Esquire)
21  889 Elm Street
22  Manchester, New Hampshire 03101
23  on behalf of Key Corporate Capital
24  (603) 628-4048

Page 3

1                I N D E X
2  Deposition of:          Direct  Cross
3  STEPHEN F. GORDON
4     By Ms. Higgins        5
5     By Ms. Worcester              177
6
7
8
9
10             E X H I B I T S
11  No.                        Page
12  70  Subpoena                 6
13  71  4/4/05 Letter from Mr. Gordon to
14      Ms. Higgins             8
15  72  Answer                  21
16  73  E-mail 5/27/04              33
17  74  E-mail re Engagement Letter    35
18  75  E-mail 4/26/04 and 4/27/04    52
19  76  E-mail 5/4/04 re Solicitation Update  60
20  77  Summary of Letters of Intent from
21      CBW 5/5/04              61
22  78  E-mail to Ms. Kauffman 5/12    76
23  79  E-mail to and from Mr. Caine 5/12/04  80
24  80  E-mails 5/27 from Mr. Sucoff    81

Page 4

1  EXHIBITS, Cont'd.
2  No.                        Page
3  81  E-mail to Mr. Caine 5/28/04      81
4  82  E-mails to and from Mr. Sucoff 5/17   85
5  83  E-mail to Mr. Kauffman 5/19/04    88
6  84  E-mail to Mr. Caine 5/19        90
7  85  E-mail to Mr. Sucoff 5/19/04      91
8  86  E-mails to and from Mr. Caine 5/19
9      and 5/20                96
10  87  E-mail 5/21                101
11  88  E-mail                    121
12  89  E-mail to Mr. Casas and Mr. Caine    123
13  90  Two E-mails to and from Mr. Sucoff    137
14  91  E-mail                    139
15  92  E-mail                    139
16  93  E-mail to Ms. Kauffman 9/27/04    143
17  94  E-mail from Mr. Caine 9/28/04      148
18  95  E-mail from Goodwin Procter      149
19  96  E-mails between Ms. Kauffman and
20      Mr. Gordon              150
21  97  Letter to Mr. Caine          164
22  98  Affidavit 6/4/05            168
23
24

Page 5

1            P R O C E E D I N G S
2                STIPULATION
3      It is stipulated by and between counsel
4  for the respective parties that the deposition is to
5  be read and signed by the deponent under the pains
6  and penalties of perjury within 30 days of receipt
7  of the transcript; and that the sealing and filing
8  thereof are waived; and that all objections, except
9  as to form, and motions to strike are reserved to
10  the time of trial.
11                * * * * *
12            STEPHEN F. GORDON,
13  a witness called by counsel for the Plaintiff,
14  having been satisfactorily identified by the
15  production of his driver's license, and duly sworn
16  by the Notary Public, was examined and testified as
17  follows:
18            DIRECT EXAMINATION
19            BY MS. HIGGINS
20      Q.  Steve, could you state your full name for
21  the record, please?
22      A.  Stephen Franklin Gordon.
23      MS. HIGGINS:  Let's mark this as the
24  first exhibit.

LegaLink Boston
(800) 822-3376

Stephen F. Gordon

06/09/2005

Page 6

1    (Exhibit 70 marked for identification.)
2    Q. Mr. Gordon, I'm sure you've taken, attended,
3  defended many depositions in your career. So I'm
4  not going through all the rules applicable to a
5  witness in a deposition setting. But I'll just
6  remind you of those that I think it's difficult for
7  lawyers who are witnesses to remember, which is to
8  please let me finish my question before you start
9  answering so that the court reporter can take down
10  my questions and your answers clearly. Obviously
11  you know that if you need a break or something like
12  that, to let me know. If you don't understand one
13  of my questions, you can tell me so, and I'll try to
14  rephrase it in a way that's more comprehensible.
15  The first exhibit I'm handing you marked as Exhibit
16  70 is the subpoena that was served on you for your
17  deposition today.
18    (Document exhibited to witness.)
19    Q. Do you recall receiving the subpoena at your
20  office?
21    A. I do.
22    Q. You notice that the subpoena asks you to
23  appear for your deposition and to bring with you
24  documents as identified on attached schedule A?

Page 7

1    A. Well, it requests the production of
2  documents actually at a different time.
3    Q. Okay. Did you make such a production?
4    A. No.
5    Q. When you received the subpoena, did you
6  conduct any search of your documents to see if you
7  had documents responsive to the request?
8    A. I did not conduct an additional search.
9    Q. Did you review the request to -- strike
10  that.
11    When you say you didn't conduct an
12  additional search, you're referring to the fact that
13  prior to your receipt of the subpoena, the entity
14  and individuals that you represent made a document
15  production?
16    A. Correct.
17    Q. And when you received the subpoena, did you
18  review the request to insure that the documents that
19  had been produced encompassed all of these requests
20  attached to your subpoena?
21    A. No.
22    Q. Is there any reason why you didn't do that?
23    A. I made objection to the production.
24    Q. Okay. When you say that you made objection

Page 8

1  to the production, are you referring to the April
2  4th letter that you sent to me?
3    A. I don't recall the date.
4    MS. HIGGINS: Let's mark as the next
5  exhibit.
6    (Exhibit 71 marked for identification.)
7    (Document exhibited to witness.)
8    Q. Mr. Gordon, is the April 4, 2005 letter from
9  you to me the letter that you referred to as stating
10  your objection to the subpoena?
11    A. I don't know if this is the first time. I
12  can't tell. What you've handed me as Exhibit 71 has
13  a date of April 4th on the first page and March 24th
14  on the second page. So I don't know. I don't know
15  whether March 24th is simply an error or whether
16  there was a prior letter on March 24th.
17    Q. Okay. You see in the second paragraph of
18  the document that's been marked as Exhibit 71, the
19  first sentence you say "with respect to John
20  McCullough and me." That's you, correct?
21    A. That is me.
22    Q. "We have in connection with your document
23  request to The Pointe Group produced all of the
24  non-privileged documents in our respective

Page 9

1  possessions." Do you see that?
2    A. I do.
3    Q. Then you go on to say, "Consequently,
4  although there are no further documents to produce,
5  for the sake of clarity I want to express my and
6  John's objection to the production of documents
7  pursuant to your subpoena." Do you see that?
8    A. I do.
9    Q. When you say that there were no additional
10  documents to produce, you're referring to the fact
11  that this subpoena had requested a production of
12  documents, and that your position as stated in this
13  letter was that there were no additional documents
14  responsive to the subpoena, other than those that
15  had already been produced?
16    A. That's my understanding, yes.
17    Q. But when you made this statement, you hadn't
18  reviewed the subpoena to whether it asked for
19  additional documents; is that right?
20    A. I looked at this subpoena. I can't tell you
21  when I did, but I looked at the subpoena.
22    Q. Before you said you didn't look at the
23  schedule to the subpoena. But now you're saying
24  that you did?

3 (Pages 6 to 9)

Stephen F. Gordon                                                                06/09/2005

Page 10

1    A. I believe I've looked at this schedule many
2    times.
3    Q. You then went on to say, "I want to express
4    my and John's objections to the production of
5    documents pursuant to your subpoenas." Now I'm
6    referring just to the subpoena that was served on
7    you. What was the basis of your objection to the
8    production of documents?
9    A. I did so in my capacity as counsel.
10   Q. As counsel for whom?
11   A. As counsel for three of the defendants in
12   this case.
13   Q. So you objected to the production of
14   documents pursuant to a subpoena that was served on
15   you in your capacity as counsel for The Pointe
16   Group, Gerald Freid and Barry Freid?
17   A. And because I didn't want to look through
18   the exact same documents and do a duplicate
19   production of the exact same documents.
20   Q. Did you do what you thought was necessary to
21   insure that any production that you would make
22   pursuant to the subpoena that was served on you
23   would be duplicative of any production made by The
24   Pointe Group?

Page 11

1    A. I don't understand the question.
2    Q. Okay. When you wrote me this April 4th
3    letter, were you confident that any documents you
4    had in your possession, custody or control that were
5    responsive to the subpoena that was served on you
6    would have been duplicative of documents produced by
7    The Pointe Group, Barry Freid or Gerald Freid?
8    A. I was comfortable, yes.
9    Q. At any time prior to coming here today, did
10   you search through any e-mails that still appear on
11   your computer to see whether you had any e-mails
12   responsive to the subpoena that was served on you?
13   A. I'm not sure how to answer that question. I
14   searched my e-mails in connection with The Pointe
15   Group response and produced all that were not
16   privileged. I don't have two sets of e-mails.
17   Q. Mr. Gordon, did you review any documents in
18   preparation for the deposition?
19   A. I did not. You mean specifically in
20   preparation for my deposition?
21   Q. Yes.
22   A. No.
23   Q. Have you reviewed transcripts of the
24   depositions that were taken of Gerald Freid, Barry

Page 12

1    Freid and Georgia Freid?
2    A. I may have glanced at a few things. I did
3    not read those transcripts. I was present at all
4    those depositions.
5    Q. While you were present at any of those three
6    depositions, was there any testimony that was given
7    by any of those witnesses that was inconsistent with
8    your recollection of events?
9    A. I don't remember. There was a lot of
10   testimony.
11   Q. Do you remember, as you sat there attending
12   each of those depositions, having an opinion or a
13   belief as you sat there that something you had just
14   heard was inaccurate or incorrect?
15   A. I'm sure there were, because when people
16   testify honestly, they testify somewhat differently.
17   One of the hallmarks that trial lawyers learn of a
18   made up story is when it's exactly the same. Law
19   enforcement people have the same view of stories
20   that are exactly the same. But I can't identify
21   anything sitting here.
22   Q. Did you consult with counsel or obtain any
23   legal advice in advance of coming to your deposition
24   today?

Page 13

1    A. Well, I thought about it.
2    Q. You thought about doing so?
3    A. No, I thought about the deposition.
4    Q. So just your own thought process?
5    A. Correct.
6    Q. But you didn't obtain any legal advice,
7    other than from yourself?
8    A. That is correct.
9    Q. What is your --
10   A. I may have had some discussions with Todd
11   Gordon in my office.
12   Q. What is your -- can you just tell me where
13   you went to college, where you went to law school?
14   A. Went to the University of Massachusetts in
15   Amherst. And I went to the Washington College of
16   Law at American University in Washington, D.C.
17   Q. What year did you graduate from law school?
18   A. 1971.
19   Q. Were you admitted to the bar that same year?
20   A. Yes.
21   Q. Was that in Massachusetts?
22   A. Actually first in Maine in August of 1971.
23   Then in November in Massachusetts.
24   Q. Today are you admitted in both Maine and

4 (Pages 10 to 13)

Stephen F. Gordon

06/09/2005

Page 14

1  Massachusetts?
2      A. I am.
3      Q. Any other jurisdictions?
4      A. I'm a member of the bar in a number of
5  federal courts.
6      Q. How long have -- the firm that you work for
7  or the firm that you are a part of right now is
8  Gordon Haley; is that correct?
9      A. Yes.
10     Q. And at one time it was known at Gordon &
11 Wise; is that correct?
12     A. That is correct.
13     Q. When was that firm formed?
14     A. 1987.
15     Q. From 1987 to the present, have you practiced
16 continuously either at Gordon & Wise or Gordon
17 Haley?
18     A. It's the same firm with a name change. So
19 the answer is from 1987 I've been with the firm I'm
20 currently with. Until 2001 it was called Gordon &
21 Wise. Since 2001 it's been called Gordon Haley LLP.
22     Q. And I believe I saw on some internet site
23 that you're certified in bankruptcy law; is that
24 right?

Page 15

1      A. That is correct, business bankruptcy law.
2      Q. What is the entity through which you have
3  that certification?
4      A. The American Board of Certification.
5      Q. And you said your certification is in
6  business bankruptcy?
7      A. Yes.
8      Q. As opposed to consumer bankruptcy?
9      A. Exactly.
10     Q. When did you get that certification?
11     A. I believe it was 1992.
12     Q. Other than business bankruptcies, do you
13 have any other areas in which your practice
14 specializes?
15     A. Civil litigation.
16     Q. Have you ever been deposed before?
17     A. I have.
18     Q. How many different times?
19     A. I don't recall. Half a dozen. Could even
20 be a dozen.
21     Q. Did any of those cases in which you were
22 deposed, did any of those cases arise out of the
23 non-payment of a broker's fee or any type of
24 consultant's fee?

Page 16

1      A. I don't think so.
2      Q. Have you ever been named as a defendant in
3  any lawsuit?
4      A. Yes.
5      Q. How many times?
6      A. Maybe three or four.
7      Q. Did any of those cases arise out of any
8  legal advice that you rendered in connection with
9  the sale or refinance of a property?
10     A. I don't think so.
11     Q. Were all those cases in Massachusetts?
12     A. I believe so, yes.
13     Q. When did that happen most recently, that you
14 were named as a defendant in a lawsuit?
15     A. This week.
16     Q. Where is that case -- where was that case
17 filed?
18     A. Middlesex Superior Court.
19     Q. Who are the plaintiffs?
20     A. Plaintiff is Kathy Nathan.
21     Q. Is that a former client of yours?
22     A. No.
23     Q. When did you first meet William Freid?
24     A. In 1976.

Page 17

1      Q. Was that a business context or social
2  context?
3      A. Social.
4      Q. How did you meet him?
5      A. My wife and I had applied for membership in
6  a country club, and he and another person came to
7  interview us at our home.
8      Q. Did you subsequently become members of that
9  country club?
10     A. We did.
11     Q. And William and Georgia Freid also were
12 members?
13     A. Yes.
14     Q. Were their children also members of the
15 country club?
16     A. 30 years ago their children were quite
17 young. So I'm certain that they were.
18     Q. So they were at the country club simply
19 because their parents were there?
20     A. Correct.
21     Q. At any time between 1976 when you first met
22 Mr. Freid and the time that Mr. Freid passed away,
23 did you ever render any legal services to William
24 Freid or Georgia Freid or any of their children?

5 (Pages 14 to 17)

Page 18

1   A. Yes.
2   Q. Can you tell me approximately when that was?
3   A. Maybe 1998. Maybe 1999. No, wait a minute
4   Either 2000 or 2001 I think is probably more
5   correct.
6   Q. What type of legal services did you render?
7   A. Mr. Freid and another man were secured
8   creditors in a bankruptcy case.
9   Q. Who was the other individual?
10  A. Richard Tuch, T-U-C-H.
11  Q. Did that bankruptcy matter -- did their
12  status as creditors in the bankruptcy matter, did
13  that have anything to do with Mr. Freid's
14  involvement in any of the nursing home facilities
15  that have been the subject of this case?
16  A. No.
17  Q. How about, other than that representation,
18  did you render any other legal services to Mr. and
19  Mrs. Freid prior to his passing away?
20  A. I believe -- I'm not sure whether my
21  engagement with respect to KeyBank preceded or
22  followed his death.
23  Q. In any event, that's the only other matter
24  that you remember providing legal services to them

Page 19

1   in connection with?
2   A. Yes.
3   Q. How about -- obviously we're going to get to
4   your representation with respect to KeyBank. But
5   other than the representation of the KeyBank
6   Financed Entities is how I think they were described
7   in The Pointe Group's answer, at any time up to the
8   present, have you rendered legal services to either
9   Mrs. Freid or the estate or The Pointe Group?
10  A. Yes.
11  Q. What was that in connection with?
12  A. I can't tell you.
13  Q. Okay. Can you tell me generally the type of
14  legal service that you rendered, even if you're not
15  able to identify the exact matter?
16  A. Matters involving actual or potential visits
17  to courtrooms. I don't handle transactions. I
18  don't handle business transactions. I handle
19  bankruptcies and matters in courtrooms.
20  Q. Is there some reason that you can't tell me
21  what type of matter you were rendering apparently
22  litigation services to them in connection with? Is
23  it some sort of a criminal proceeding?
24  A. I think they're entitled to the

Page 20

1   confidentiality of their counsel; and, therefore, I
2   don't think I'm entitled to tell you what it is that
3   I'm representing them on or have represented them
4   on, unless it's a matter of public record. Like,
5   for example, my representation of the late Mr. Freid
6   in the bankruptcy case.
7   Q. In the matter that you're referring to, can
8   you tell me who your client is?
9   A. No. You gave me a list of people, and the
10  client is amongst those people.
11  Q. When did the representation begin?
12  A. I can't tell you that.
13  Q. Is it fair to say -- obviously there's not
14  an attorney who's instructing you not to answer. So
15  I'm not going to go through the facade of pretending
16  that there is. But is it fair to say that you're
17  refusing to answer those questions?
18  A. Yes. Although, I must say, I don't think
19  I'm permitted to answer those questions.
20  Q. Well, as I said, it's a little awkward
21  because you don't have anyone instructing you not to
22  answer. So I'm assuming you're instructing yourself
23  not to answer on the grounds of some privilege?
24  A. Well, I don't know -- you're right, it is a

Page 21

1   little awkward with respect to instruction and
2   non-instruction. But as a lawyer, I'm obligated to
3   keep my clients' confidences. So I'm not permitted
4   to answer the question.
5       (Exhibit 72 marked for identification.)
6       (Document exhibited to witness.)
7   Q. Mr. Gordon, I've handed you what's been
8   marked as Exhibit 72, the answer in this case. I
9   have if you need it, I don't think you will for the
10  questions I'm going to ask you, but I do have a copy
11  of the complaint as well. If I could just direct
12  your attention to paragraph ten of the answer. Just
13  so we're on the same page in terms of my questions,
14  you see that in this answer, there's terminology
15  KeyBank Financed Facilities, and that those are
16  identified as Hammond Pointe Nursing Home, LLC,
17  Cranberry Pointe Nursing Home, Inc., Boylston Place
18  at Chestnut Hill, LLC, and the remaining entities
19  that owned the real estate, which would be Cranberry
20  Pointe -- I'm sorry, Cranberry Pointe Partnership
21  and Chestnut Hill Realty, LLC. Do you see that,
22  that terminology is used, the KeyBank Financed
23  Facilities are defined as those entities?
24  A. I do see that.

6 (Pages 18 to 21)

Stephen F. Gordon                                                                              06/09/2005

Page 22

1    Q. Now, if I could ask you to turn to paragraph
2  43 of the answer. You see in that paragraph of the
3  answer, the defendants are denying that you involved
4  yourself in the process on behalf of TPG or the
5  Freids; do you see that?
6    A. The process being the solicitation process?
7    Q. Yes.
8    A. I see that.
9    Q. Just a general question. Well, let me ask
10  you this, do you agree with that statement, that you
11  did not involve yourself in the solicitation process
12  on behalf of TPG or the Freids?
13    A. I don't know what solicitation process is
14  being referred to here. Maybe I should take a look
15  at the complaint.
16    Q. Okay.
17       (Document exhibited to witness.)
18    A. I guess I have to go earlier than -- I don't
19  know what solicitation process is being referred to
20  here.
21    Q. Okay. Go as early as you need to.
22    A. If solicitation process means the process of
23  soliciting offers to purchase or prospective
24  refinancing for the Key Financed Entities, I did not

Page 23

1  involve myself in that process. And I think that,
2  that statement is correct in paragraph 43 of the
3  answer.
4    Q. Then it goes on to say, further answering,
5  "Defendants state that Gordon," you, "acted only as
6  legal counsel for the KeyBank Financed Facilities
7  and not on behalf of TPG or the Freids." Do you see
8  that?
9    A. Yes.
10    Q. Do you agree with that statement?
11    A. Well, again, let me take a look and see --
12  with respect to the solicitation process, I don't
13  think TPG or the Freids were involved. None of them
14  had anything to sell or refinance. So in connection
15  with the sale or refinance of the KeyBank Financed
16  Facilities, the services would not have been
17  rendered to TPG or the Freids.
18    Q. Okay. Of the KeyBank Financed Facilities as
19  they were defined in paragraph ten, did you
20  represent all of those facilities in connection with
21  the process that we just talked about, the
22  solicitation of refinancing opportunities and offers
23  to buy the premises?
24    A. No.

Page 24

1    Q. Let me ask this question. From the time
2  period, September 30, 2003 to September 30, 2004,
3  the date of the closing, did you render legal
4  services to the KeyBank Financed Facilities?
5    A. Yes.
6    Q. What types of legal services did you render?
7    A. I can't tell you that. Well, I can tell you
8  that they were with respect to KeyBank, but I cannot
9  tell you what type they were.
10    Q. Okay. You can't tell me generally what kind
11  of legal services you rendered?
12    A. No.
13    Q. Which of those entities -- to which of those
14  entities did you render legal services?
15    A. All of the KeyBank Financed Facilities.
16    Q. And during that same time period,
17  September 30, 2003 to September 30, 2004, did you
18  render any legal services to The Pointe Group, Inc.
19  in connection with the sale of Epoch of the KeyBank
20  Financed Facilities?
21    A. Point Group, Inc. did not sell anything to
22  Epoch.
23       MS. HIGGINS: Can you have my question
24  read back?

Page 25

1       (Question read back.)
2    Q. Can you answer that question?
3    A. I did.
4    Q. All right. Is it fair to say -- this is
5  going to be a long day, Steve, if we have to go
6  through this. That was a yes or no question.
7    A. Then I didn't understand the question, I'm
8  sorry.
9       MS. HIGGINS: Let's read the question
10  back again.
11       (Question reread.)
12    A. I don't understand the question. The Pointe
13  Group did not sell anything to Epoch. I don't
14  understand the question.
15    Q. Okay. So when you were performing legal
16  services during that time period in connection with
17  the sale to Epoch of the KeyBank Financed
18  Facilities, is it true that the only legal services
19  you were rendering were to the KeyBank Financed
20  Facilities?
21    A. I don't know that, that's true. I really
22  don't understand what you're trying to get to. So I
23  don't know what you're trying to accomplish, and I
24  don't know what you're trying to get to. So I don't

7 (Pages 22 to 25)

Stephen F. Gordon

06/09/2005

Page 26

1  understand the question.
2      Q.  Well, let me ask it this way, then.  In
3  connection with the sale to Epoch of the KeyBank
4  Financed Facilities, who did you consider your
5  clients to be?
6      A.  I considered my clients to be the selling
7  entities, the entities that had obligations to
8  perform ultimately under a purchase and sale
9  agreement.
10      Q.  So you considered your clients to be the
11  KeyBank Financed Facilities as they've been defined
12  in the answer?
13      A.  I believe so.  I mean, that's the best of my
14  belief.
15      Q.  Did you have an engagement letter or
16  retainer letter with the KeyBank Financed
17  Facilities?
18      A.  I don't know.
19      Q.  If you had a retainer letter or engagement
20  letter, would it have been your practice to keep a
21  copy of that?
22      A.  Absolutely.
23      Q.  During your representation of the KeyBank
24  Financed Facilities, to whom -- to which entity or

Page 27

1  individual did you send your bills for legal
2  services?
3      A.  At some point I sent them to South Pointe
4  Nursing, which was a KeyBank Financed Facility, but
5  not one of the ones that are defined in paragraph 43
6  of the answer.  And at some point I believe I sent
7  the bills to The Pointe Group.
8      Q.  It would be fair to say that you retained
9  copies of your bills in your files?
10      A.  I hope so.
11      Q.  Did you continue to represent the KeyBank
12  Financed Facilities after the closing on September
13  30th?
14      A.  I don't believe so.
15      Q.  Do you know whether subsequent to the
16  September 30, 2004 closing KeyBank loaned any
17  additional money to any of those facilities?
18      A.  I don't know.
19      Q.  Do you know whether after September 30, 2004
20  KeyBank loaned any new monies to any entity with
21  which any of the Freid family is affiliated?
22      A.  I don't know.
23      Q.  During the period September 30, 2003 to
24  September 30, 2004, did any other attorneys at your

Page 28

1  firm provide legal services to the KeyBank Financed
2  Facilities?
3      A.  Yes.
4      Q.  Which attorneys?
5      A.  Peter Haley.
6      Q.  And Mr. Haley's a partner of yours?
7      A.  Yes.  I'm not sure if any associates were
8  involved.
9      Q.  Now, in this litigation, you represent The
10  Pointe Group, Inc.; is that correct?
11      A.  Yes.
12      Q.  When did that representation begin?
13      A.  I can't pinpoint it.
14      Q.  Do you have a retainer letter with The
15  Pointe Group, Inc.?
16      A.  I don't think so, but I may.
17      Q.  Prior to your representation of The Pointe
18  Group, Inc. in this action, have you ever rendered
19  any legal services to The Pointe Group, Inc.?
20      A.  I may have.
21      Q.  What matters were those legal services in
22  connection with?
23      A.  I don't recall whether The Pointe Group was
24  a party to the Chestnut Hill abutter encroachment

Page 29

1  litigation.  And I don't know if The Pointe Group is
2  specifically involved in the attorney general's
3  investigation of Cranberry Pointe.  But those would
4  be the only matters in connection with this
5  transaction.
6      Q.  When did you first become aware of the
7  Chestnut Hill abutter litigation?
8      A.  When Andy Sucoff from Goodwin Procter called
9  me not too much prior to the closing.  Maybe three
10  weeks, maybe four weeks.
11      Q.  Now, in this litigation you also represent
12  Gerald Freid and Barry Freid; is that correct?
13      A.  Yes.
14      Q.  And prior to representing those two
15  individuals in this action, did you ever represent
16  them prior to that?
17      A.  I don't believe so.  Let me -- one or both
18  of them may have been participants in the loans that
19  I represented their late father in.
20      Q.  Are you referring to the bankruptcy
21  proceeding?
22      A.  Yes.
23      Q.  Now, you also represented Georgia Freid at
24  her deposition, correct?

8 (Pages 26 to 29)

Stephen F. Gordon                                                                              06/09/2005

Page 30

1    A. Yes.
2    Q. Whom did you bill for the time that you
3    spent defending that deposition?
4    A. I can't tell you that.
5    Q. And you represented Mr. McCullough at his
6    deposition?
7    A. Yes.
8    Q. Who did you bill for the time you spent
9    defending that deposition?
10    A. I can't tell you that.
11    Q. You represented Frank Barker in his capacity
12    as keeper of the records at Chestnut Hill Lifecare?
13    A. Yes.
14    Q. Who did you bill for the time representing
15    that deposition?
16    A. I can't tell you.
17    Q. Who do you intend to bill for the time
18    you're spending at deposition here today?
19    A. I can't tell you.
20    Q. Prior to your representation of the KeyBank
21    Financed Facilities, have you ever -- did you ever
22    work on a deal in which Casas, Benjamin & White was
23    involved in any way?
24    A. Not to my memory.

Page 31

1    Q. So when you first were brought in to
2    represent the KeyBank Financed Facilities, was that
3    the first time you had ever heard of Casas, Benjamin
4    & White?
5    A. No.
6    Q. How would you have heard of Casas, Benjamin
7    & White prior to that?
8    A. It wasn't prior to that. It was well
9    subsequent to that.
10    Q. When you first learned that Casas, Benjamin
11    & White had some role in connection with the
12    transaction, the sale to Epoch of the KeyBank
13    Financed Facilities, was that the first time you had
14    ever heard of Casas, Benjamin & White?
15    A. I believe so, yes. May have been just prior
16    to the time when they were engaged. Although I
17    didn't see a copy of their engagement letter. So I
18    don't know when I first heard of Casas, Benjamin &
19    White. But I do not believe, in answer to your
20    question, that I had ever heard of Casas, Benjamin &
21    White in any way outside of this particular matter.
22    Q. Okay. How about before your involvement in
23    this particular matter, had you ever been involved
24    in a deal on which KeyBank was either the lender or

Page 32

1    was providing financing?
2    A. Yes.
3    Q. Do you remember which offices you had worked
4    with?
5    A. I didn't work with offices. It was a
6    litigation matter.
7    Q. What type of a litigation matter was that?
8    Were you representing KeyBank or were you --
9    A. No, I wasn't representing KeyBank. It was I
10    guess what you would call lender liability suit.
11    For some reason, I'm never around when the money is
12    being lent.
13    Q. In that, for lack of a better term, the
14    lender liability suit, do you remember whether
15    either Steve Dunham or Madeline Kauffman were
16    involved in that at all?
17    A. I'm quite certain they were not.
18    Q. Mr. Gordon, I'm handing you what was
19    previously marked as Exhibit 4.
20        (Document exhibited to witness.)
21    Q. Mr. Gordon, do you recognize this document
22    as being a copy of the engagement letter between
23    Casas, Benjamin & White and an entity that's
24    described here as The Pointe Group Health Care and

Page 33

1    Senior Living?
2    A. Yes.
3    Q. Do you recall when you first saw this?
4    A. I don't recall exactly. I believe it was
5    sometime in the spring. I think perhaps late spring
6    of 2004.
7    Q. Do you recall how it came to be in your
8    possession?
9    A. I don't.
10    Q. Do you recall reading it when you first saw
11    it?
12    A. I don't recall reading it when I first saw
13    it, but I may very well have.
14    Q. Okay.
15        MS. HIGGINS: Let's mark this.
16        (Exhibit 73 marked for identification.)
17        (Document exhibited to witness.)
18    Q. Mr. Gordon, the court reporter has just
19    handed you what's been marked as Exhibit 73. Do you
20    recognize this to be an e-mail printed from the
21    system at your office?
22    A. I do.
23    Q. Is this an e-mail -- strike that.
24        The e-mail that's on the bottom half is

9 (Pages 30 to 33)

Stephen F. Gordon                                                                    06/09/2005

Page 34

1  an e-mail from you to Matt Caine on May 27, 2004
2  indicating that you had left a voice mail for Matt
3  asking him to send you an executed copy of your
4  firm's, CBW's commission agreement with The Pointe
5  Group; do you see that?
6      A.  Yes.
7      Q.  Then it looks like you're forwarding this
8  e-mail to Madeline Kauffman, correct?
9      A.  Yes.
10     Q.  Is that roughly consistent with your memory
11 that you first saw a copy of the engagement letter
12 in the spring of 2004?
13     A.  Yes, based on the assumption that in
14 response to this e-mail, Matt Caine did fax or
15 e-mail a copy of the commission agreement.
16     Q.  Having reviewed Exhibit 73, do you now
17 recall why you asked Mr. Caine to send you a copy of
18 the commission agreement?
19     A.  Yes, the second sentence of the e-mail
20 actually so states.
21     Q.  Okay.  Why did you ask for this agreement?
22     A.  So that I could include the commission
23 payable in the agreement with KeyBank.
24         MS. HIGGINS:  Mark that as the next

Page 35

1  exhibit.
2         (Exhibit 74 marked for identification.)
3         (Document exhibited to witness.)
4      Q.  Mr. Gordon, Exhibit 74 is also a printout of
5  an e-mail from your computer system?
6      A.  Yes.
7      Q.  You see at the bottom there is a printed out
8  e-mail from Matt Ryan at Casas, Benjamin & White to
9  you with a CC to Matt Caine, which says that he is
10 attaching a copy of the -- attaching the executed
11 engagement letter between The Pointe Group and CBW?
12     A.  Yes.
13     Q.  And that you then sent an e-mail to Madeline
14 Kauffman attaching that agreement?
15     A.  That's the top e-mail, yes.
16     Q.  And in that e-mail you also make a
17 calculation as to the amount that would be due to
18 CBW on a 37 million dollar sale?
19     A.  Yes, there's a calculation of a commission.
20     Q.  That's a calculation that you did?
21     A.  I believe so.
22     Q.  Getting back to Exhibit 4, which is the
23 engagement letter.
24     A.  Yes.

Page 36

1      Q.  You see that this is directed to the board
2  of directors, The Pointe Group Health Care and
3  Senior Living; do you see that?
4      A.  Yes.
5      Q.  When you saw this engagement letter, had you
6  ever seen an entity or seen that name, The Pointe
7  Group Health Care and Senior Living?
8      A.  I'm not sure I focused on that at all.
9      Q.  Regardless of whether you focused on it or
10 not, at the time period that you asked for this
11 engagement letter, May of 2004, had you at that time
12 ever seen The Pointe Group Health Care and Senior
13 Living referred to on any documents, anything like
14 that?
15     A.  Well, The Pointe Group has a letterhead or
16 had a letterhead, I don't know if they still do, in
17 which I guess they describe the business that
18 they're in as health care and senior living, just
19 like I think my letterhead says counselors at law.
20 So I'm sure I had seen that letterhead.
21     Q.  Did you at any time after you got this --
22 you received a copy of this engagement letter, from
23 that point forward to the closing, did you ever
24 discuss with CBW that this entity, The Pointe Group

Page 37

1  Health Care and Senior Living, or at least as that's
2  identified here, was not a legal entity?
3      A.  No.
4      Q.  When you first received this letter, would
5  you agree with me that based on the e-mail that you
6  sent to Madeline Kauffman, you at least read parts
7  of the letter when you received it, correct?
8      A.  Yes.
9      Q.  When you first received and reviewed this
10 letter, at that time did you form any opinion that
11 this agreement was unenforceable in terms of any
12 amount that was payable to CBW, because the
13 agreement identified the other party to the
14 agreement as The Pointe Group Health Care and Senior
15 Living?
16     A.  I can't answer that question.
17     Q.  At the time you first received and reviewed
18 this agreement, did you form any opinion that the
19 contract was unenforceable in terms of any payments
20 due to CBW because the contract had been made with
21 an entity that was not an entity that had an
22 ownership interest in any of the KeyBank Financed
23 Facilities?
24     A.  I can't answer that question.

10 (Pages 34 to 37)

Stephen F. Gordon                                                        06/09/2005

Page 38

1    Q. At the time you first received and reviewed
2  this agreement, was it your belief that if a
3  transaction was consummated as described in the
4  agreement, that The Pointe Group would owe some
5  amount to CBW?
6    A. I can't answer that question.
7    Q. At the time you first received and reviewed
8  this agreement, did you have discussions with
9  anyone, without telling me what the substance of
10 those discussions were, as to whether or not The
11 Pointe Group had an enforceable obligation to pay
12 CBW a fee if the conditions of the engagement letter
13 were met?
14   A. I can't answer that question.
15   Q. From the time you first received and
16 reviewed the engagement letter through the date of
17 the closing on September 30, 2004, did you ever have
18 a discussion with anyone, other than those
19 individuals who you consider to be your clients, as
20 to whether or not there was an enforceable
21 obligation under this agreement to pay CBW?
22   A. I don't believe so. By "the closing," you
23 mean September 30, 2004?
24   Q. Correct.

Page 39

1    A. And by the time I left that closing?
2    Q. Correct. From the time you first received
3  and reviewed this agreement through the date of the
4  closing, did you have any discussions with John
5  McCullough as to whether or not there was an
6  enforceable obligation to pay Casas, Benjamin &
7  White under the terms of this agreement?
8    A. I can't answer that.
9    Q. Between the date that you first received and
10 reviewed this letter and the date of the closing,
11 September 30, 2004, did you have any discussions
12 with Gerald Freid as to whether or not there was an
13 enforceable obligation to pay Casas, Benjamin &
14 White under this agreement?
15   A. I can't answer that.
16   Q. Did you have any such discussions during the
17 time period I've just referenced with Barry Freid?
18   A. I can't answer that.
19   Q. Did you have any such discussions during the
20 time period I just referenced with Mark Tobin?
21   A. I can't answer that.
22   Q. Did you have any discussions, such
23 discussions during that time period I just mentioned
24 with Frank Barker?

Page 40

1    A. I can't answer that.
2    Q. Prior to your representation of the KeyBank
3  Financed Facilities, had you ever been retained in
4  connection with the sale of a business or the
5  refinancing of a business in which the selling
6  entity or the ownership entity was utilizing the
7  services of an investment banking company like
8  Casas, Benjamin & White?
9    A. I don't know. I would think so, but I don't
10 know.
11   Q. Can you remember any such instance as you
12 sit here today?
13   A. I can't. Again, I'm not a transactional
14 lawyer, but I'm sure I've been involved in sales or
15 refinancings where there were -- you said investment
16 bankers?
17   Q. Correct.
18   A. Where there were investment bankers, but I
19 guess I can't be sure, and I certainly can't name
20 any.
21   Q. Leaving aside this particular litigation, do
22 you recall any instance prior to today where you
23 took a position on behalf of a client that a
24 consultant wasn't entitled to a fee upon the sale of

Page 41

1  a business because the consultant wasn't a licensed
2  real estate broker in Massachusetts?
3    A. I don't believe so.
4    Q. If you could look, Mr. Gordon, at the
5  third -- section two of the engagement, and you'll
6  see that's titled fee arrangements. And there's a
7  first page that says restructuring services. And
8  then the next page, the next underlined paragraph
9  says investment banking services. Is that the
10 paragraph that you reviewed in connection with
11 preparing your e-mail to Madeline Kauffman that
12 we've just marked as Exhibit 74 regarding a
13 calculation of the performance incentive payments as
14 they're defined in that paragraph to CBW?
15   A. My e-mail says commission.
16   Q. Is that the paragraph that you looked at in
17 reaching the figure that you have here of 1,250
18 thousand dollars?
19   A. I believe so, yes.
20   Q. And you'd agree with me that, that paragraph
21 refers to CBW's entitlement to performance incentive
22 payments? Do you see that language?
23   A. I do see that.
24   Q. And you also see, if you look about halfway

11 (Pages 38 to 41)

Stephen F. Gordon                                                    06/09/2005

Page 42

1  down, there's a definition of transaction value
2  where it says, "Transaction value shall mean the sum
3  of the gross sale proceeds." Then it goes on from
4  there. Do you see that?
5      A. Yes.
6      Q. Then if you go further down in that same
7  paragraph, do you see where it says, "The
8  performance incentive payments shall be due and
9  payable at the closing of each transaction"? Do you
10 see that?
11     A. I see that.
12     Q. And you had reviewed this language, at least
13 the paragraph pertaining to these fees, when you
14 wrote this e-mail to Madeline Kauffman on May 27th,
15 correct?
16     A. I'm not sure what I did on May 27th.
17 Obviously I read the percentages to come up with a
18 commission amount that's in the May 27th e-mail.
19     Q. Okay. So what you're saying is that you're
20 confident that you read part of the paragraph, but
21 you're not sure that you read all of it?
22     A. That's correct.
23     Q. Mr. Gordon, when did you first form an
24 opinion that CBW was not entitled to the full amount

Page 43

1  of the performance incentive payments as identified
2  in this paragraph?
3      A. I can't answer that.
4      Q. Did you ever discuss that opinion with
5  anyone prior to September 30, 2004?
6      A. I can't answer that.
7      Q. When did you first discuss that opinion with
8  any other person?
9      A. After September 30th. Either on or after
10 September 30th.
11     Q. With whom did you first discuss that
12 opinion?
13     A. I can't answer.
14     Q. In connection with the first discussion that
15 you had with anyone regarding that opinion, who was
16 present for that discussion?
17     A. I don't remember who was present.
18     Q. When did you first discuss that opinion with
19 anyone other than an individual whom you considered
20 to be your client?
21     A. October 1st.
22     Q. And who was that?
23     A. I believe it was Ed Casas.
24     Q. At the time you had that -- strike that.

Page 44

1          Was that a discussion that you had with
2  Mr. Casas on the telephone or was that in writing?
3      A. Both. I had sent him a letter, and then we
4  had subsequent telephone conversations, I believe.
5  I know we had prior telephone conversations or a
6  prior telephone conversation on October 1st, which I
7  believe was non-substantive. I simply asked him to
8  wait for my letter. I then e-mailed him my letter,
9  and I believe that we had at least one telephone
10 conversation after that, although it might have been
11 with his counsel. I'm not sure.
12     Q. At the time that you wrote your letter,
13 which you sent to Mr. Casas by e-mail, did you
14 believe that you had authority from your client to
15 convey that position to Mr. Casas?
16     A. I can't answer that.
17     Q. Prior to raising with Mr. Casas the argument
18 the CBW was not entitled to the performance
19 incentive payments because it was not a licensed
20 real estate broker in Massachusetts, had you had
21 discussions about that issue with anyone else?
22     A. I can't answer that.
23     Q. Prior to raising that issue with Mr. Casas,
24 had you had discussions about that issue with

Page 45

1  anyone, other than someone who you considered to be
2  your client?
3      A. Or co-counsel.
4      Q. Are you adding to my question?
5      A. Well, if I can't add to your question, I
6  have to refuse to answer it. If
7  you exclude -- if by your question you're trying to
8  exclude people to whom the privilege would apply, I
9  can answer that question.
10     Q. Okay. Well, let's do it both ways. Prior
11 to having those communications with Mr. Casas, had
12 you discussed that issue with co-counsel?
13     A. I can't answer that.
14     Q. In connection with your retention by the
15 KeyBank Financed Facilities, whom did you consider
16 your co-counsel to be?
17     A. John McCullough.
18     Q. And -- let me go back, then. Prior to
19 having those communications with Ed Casas in which
20 you took the position that CBW wasn't entitled to
21 the full amount of the performance incentive
22 payments because CBW was not a licensed real estate
23 broker in Massachusetts, had you had discussions
24 about that issue with anyone, other than

12 (Pages 42 to 45)

Stephen F. Gordon                                                                      06/09/2005

Page 46

1  Mr. McCullough or individuals whom you considered to
2  be your clients?
3      A. I don't believe so.
4      Q. Before those communications with Mr. Casas,
5  just to be clear, had you ever raised with CBW --
6  had you ever had any discussions with CBW as to
7  whether or not CBW had a license to sell real estate
8  in Massachusetts?
9      A. I don't believe so.
10     Q. Prior to those communications with
11 Mr. Casas, were you ever present on any occasions
12 where that issue was discussed by anyone else in
13 your presence?
14     A. I don't think so.
15     Q. Did you ever hear CBW represent that it had
16 such a license?
17     A. Not to my recollection.
18     Q. If the fact finder in this case or the court
19 ultimately determines that CBW is entitled to the
20 full amount of the performance incentive payments
21 specified in that paragraph of the engagement
22 letter, which entity or individual do you believe is
23 liable for those payments?
24     A. I'm here as a fact witness.

Page 47

1      Q. So you're not going to answer that question?
2      A. I'm not going to give you legal advice,
3  Erin.
4      Q. I'm not asking you for legal advice.
5      A. Yes, you are.
6      Q. I'm not asking you if your opinion is right
7  or wrong. I'm asking you what your belief is.
8      A. My opinion is, I'm here as a fact witness.
9  Not an opinion witness.
10     Q. So you're not answering that question?
11     A. I'm here as a fact witness.
12     Q. Prior to today, have you ever discussed that
13 issue, the issue of who would be liable for the
14 payments, if the payments are in fact due? Have you
15 ever discussed that issue with anyone, other than
16 those individuals whom you consider to be your
17 clients?
18     A. Yes.
19     Q. Who was that?
20     A. Scott O'Connell.
21     Q. What were the discussions? Relate to me the
22 discussions that you had on that issue with
23 Mr. O'Connell.
24     A. I told him that I thought that KeyBank would

Page 48

1  be liable for any payment to CBW.
2      Q. What was Mr. O'Connell's response?
3      A. He disagreed.
4      Q. Did Mr. O'Connell offer any further
5  statement as to who he thought was liable for the
6  payments?
7      A. I don't recall. I don't recall him agreeing
8  that there was liability. He certainly disagreed
9  that his client was liable.
10     Q. Other than Mr. O'Connell, have you ever had
11 a discussion with anyone whom you don't consider to
12 be your client on the issue of if the payments are
13 due, who's liable to make the payments?
14     A. Yes.
15     Q. Who was that?
16     A. Tom Peisch, yourself and Mike Bernard.
17     Q. Anyone other than those individuals?
18     A. Outside of privileged communications?
19     Q. Well, communications you consider to be
20 privileged.
21     A. Judge Laska.
22     Q. Anyone else?
23     A. I can't think of anyone else.
24     Q. Who are the individuals to whom you believe

Page 49

1  the privilege runs in connection with your having
2  provided legal services to the KeyBank -- let me ask
3  the question this way.
4          Who are the individuals to whom you
5  believe the privilege runs in connection with
6  communications that were made during the time period
7  September 30, 2003 to October 1, 2004?
8      A. Anyone employed by or involved in an
9  ownership or management capacity with any of the
10 KeyBank Financed Facilities, The Pointe Group, Gerry
11 Freid, Barry Freid.
12     Q. So let me try to break that down a little
13 bit. Anyone employed by any of the KeyBank Financed
14 Facilities; is that correct?
15     A. Anyone employed, other than a -- yes, I
16 believe anyone employed by them.
17     Q. So anyone employed by any of the KeyBank
18 Financed Facilities. Then you also said, I believe,
19 I don't want to misstate your testimony, The Pointe
20 Group, Inc.?
21     A. Yes.
22     Q. What is the basis for your taking the
23 position that there's a privilege that runs -- let
24 me ask this other question first. Is it your

13 (Pages 46 to 49)

Stephen F. Gordon                                                                    06/09/2005

Page 50

1  position that communications you had with employees
2  of The Pointe Group, Inc. during the time period
3  September 30, 2003 to September 30 -- October 1,
4  2004, that all those communications are privileged?
5      A. Well, not all those communications would be
6  privileged. Those communications involving
7  attorney/client relationships and communications are
8  privileged.
9      Q. With employees of The Pointe Group, Inc.?
10     A. Yes.
11     Q. And I believe you also said Barry Freid; is
12  that correct?
13     A. Yes.
14     Q. And is it your position that you have a
15  privilege with Barry Freid because Barry Freid was
16  in some way associated with one of those entities?
17     A. You're asking for my legal opinion again.
18  I'm here as a fact witness. Not to give you my --
19  not to give you testimony with respect to law.
20     Q. Well, during the time period September 30,
21  2003 to September 30, 2004, did you represent Barry
22  Freid in his individual capacity?
23     A. I can't answer that.
24     Q. During that same time period, did you

Page 51

1  represent Gerald Freid in his individual capacity?
2      A. I can't answer that.
3      Q. Let me just try a further question to make
4  sure we don't misunderstand each other. During that
5  time period I specified, did you represent Barry
6  Freid in his individual capacity in connection with
7  the sale to Epoch of the KeyBank Financed
8  Facilities?
9      A. I don't believe so.
10     Q. Same question, during the time period
11  September 30, 2003 to September 30, 2004, did you
12  represent Gerald Freid in his individual capacity in
13  connection with the sale to Epoch of the KeyBank
14  Financed Facilities?
15     A. I don't believe so. But, again, entities
16  speak only through human beings. Among the human
17  beings that spoke on behalf of the entities and
18  obviously communicated with counsel were Barry and
19  Gerry Freid.
20     Q. But my question was directed to the
21  representation of them in their individual
22  capacities, not as officers and employees.
23     A. And I answered that, that I did not believe
24  so.

Page 52

1      Q. During that same time period, September 30,
2  2003 to September 30, 2004, I believe it was your
3  earlier testimony that you did not represent The
4  Pointe Group, Inc. in connection with the sale to
5  Epoch of the KeyBank Financed Facilities, correct?
6      A. I can't -- I don't know how to answer that
7  question.
8      Q. Did you not know who your clients were?
9      A. Do you not know who the sellers were?
10     Q. Well, I just want to --
11     A. My understanding is -- again, I'm not a
12  transactional lawyer, but my understanding is that
13  The Pointe Group is not a party to the transaction.
14     Q. Yet you're claiming a privilege applies to
15  communications that you had with employees of The
16  Pointe Group, Inc.?
17     A. Yes.
18         MS. HIGGINS: Let's mark this as the
19  next exhibit.
20         (Exhibit 75 marked for identification.)
21         (Document exhibited to witness.)
22     Q. Mr. Gordon, you see that the top -- starting
23  with the bottom e-mail that there's an e-mail from
24  Matt Caine to various individuals, including you, on

Page 53

1  April 26th of 2004. Do you see that?
2      A. At the top?
3      Q. At the bottom, sorry.
4      A. Yes, I see that.
5      Q. And Mr. Caine is forwarding to the various
6  recipients of the e-mail a proposed form e-mail that
7  CBW intends to send out to all interested parties.
8  Do you see that?
9      A. Yes, I do.
10     Q. Do you recall if -- I'll just state for the
11  record that in terms of what we've reviewed, this
12  seems to be the first communication on which you
13  were copied in connection with this transaction. My
14  question for you is whether, you know, do you
15  remember having an involvement in the sale to Epoch,
16  what ultimately resulted in the sale to Epoch prior
17  to late April of 2004?
18     A. I was certainly involved with respect to
19  KeyBank prior to that time. So, I don't know if
20  that answers your question.
21     Q. Okay. When you were -- when you say you
22  were involved with KeyBank prior to late April of
23  2004, were you having communications with KeyBank?
24     A. I think so.

14 (Pages 50 to 53)

Stephen F. Gordon                                                    06/09/2005

Page 54

1    Q. Were those communications in the form of
2  e-mails, faxes?
3    A. Maybe.
4    Q. What were the communications regarding?
5    A. They were regarding the lending relationship
6  between the KeyBank Financed Facilities and KeyBank
7    Q. Prior to the time that Epoch was identified
8  as the party with whom negotiations were going to
9  move forward, what types of -- what type of
10  negotiation was going on with KeyBank?
11    A. We were negotiating extensions in
12  forbearance agreements.
13    Q. Who were you dealing with at KeyBank in
14  connection with those?
15    A. I believe it was always Madeline Kauffman.
16    Q. In response to this April 26, 2004 e-mail
17  from Matt Caine, you sent an e-mail back to Matt
18  Caine and others dated April 27, 2004. Do you see
19  that?
20    A. I do.
21    Q. And you begin by saying, "The Pointe Group
22  has nothing for sale," correct?
23    A. That's what it says.
24    Q. You then go on to say about halfway down,

Page 55

1  "And I think it's important for The Pointe Group,
2  which has other interests not for sale, to not give
3  the impression internally or externally that
4  everything they have is for sale." My question is,
5  what were the other interests that The Pointe Group
6  had when you wrote this e-mail that were not for
7  sale?
8    A. Management contracts with other facilities.
9    Q. Those were with which facilities?
10    A. I don't recall. I think there are three
11  such facilities. It might be four.
12    Q. Did you ever have any communications with
13  Kelly White of Casas, Benjamin & White?
14    A. I don't think so.
15    Q. Prior to the closing on September 30, 2004,
16  had you ever discussed with anyone at CBW any issues
17  pertaining to Kelly White's departure from CBW?
18    A. I have no memory of having done that.
19    Q. Did you ever discuss that prior to the
20  closing with anyone from KeyBank?
21    A. I have no memory of having done that, no.
22    Q. So with respect to either KeyBank or CBW,
23  you don't remember ever having conveyed to either of
24  those entities that your clients had concerns about

Page 56

1  the fact that Kelly White was no longer working on
2  the deal?
3    A. That's correct.
4    Q. In terms of, if you look back at Exhibit 4,
5  the engagement letter, and you see that there is a,
6  in paragraph one, background and scope of services,
7  it first refers to certain restructuring services
8  that Casas, Benjamin & White is going to provide.
9  It starts on the bottom of that first page and goes
10  on to the next page.
11    A. I see that, yes.
12    Q. Do you have any personal knowledge as to
13  whether or not CBW performed the restructuring
14  services described in the agreement?
15    A. I don't know if I've ever seen the
16  restructuring work plan, which is described as
17  exhibit A. So I'm not sure I can answer that
18  question.
19    Q. Okay. Well, my question was whether you had
20  any knowledge, personal knowledge as to whether or
21  not CBW performed the restructuring services that
22  are described in the agreement?
23    A. I don't know.
24    Q. Would it be fair to say, then, that you

Page 57

1  don't have any personal knowledge as to the quality
2  of the services -- of those restructuring services
3  as they were provided by CBW?
4    A. Yes.
5    Q. You see that the agreement then goes on to
6  talk on page 2 about certain investment banking
7  services that CBW will provide.
8    A. Yes, I see that.
9    Q. Based on documents that you received during
10  the relevant time period, would you agree with me
11  that CBW -- strike that for one second.
12        You see that in the first full paragraph
13  on the top of page 2 where it talks about the
14  investment banking services, it says, "The
15  investment banking services that CBW will provide
16  include the following: CBW will use all reasonable
17  efforts to accomplish on behalf of PGHS, which CBW
18  is using to refer to Pointe Group Health Care and
19  Senior Living, and its stockholders, the
20  consummation of a transaction or series of
21  transactions involving the Cranberry Pointe and
22  Chestnut Hill facilities." Did you ever advise CBW
23  that the stockholders of either The Pointe Group,
24  Inc. or The Pointe Group Health Care and Senior

15 (Pages 54 to 57)

Stephen F. Gordon                                                                                      06/09/2005

Page 58

1   Living did not have an ownership interest in any of
2   the facilities that were being marketed by CBW?
3       A. Yes.
4       Q. When did that happen?
5       A. At least on April 27, 2004 in Exhibit 65.
6       Q. Did you have any specific discussions with
7   anyone at CBW as to who the stockholders of The
8   Pointe Group, Inc. were during that time period of
9   September 30, 2003 to 2004?
10      A. I don't think so.
11      Q. Did you have any discussions with anyone at
12  CBW as to who had ownership interest in the selling
13  entities?
14      A. I don't think so.
15      Q. If you see at the bottom there, sub
16  paragraph C, well the initial -- the introductory
17  phrases at the top, "In pursuit of the transaction,
18  CBW shall provide the following." Then in sub
19  paragraph C it says, "Identifying and contacting and
20  introducing potential purchasers for all or part of
21  the business as well as capital sources to provide
22  debt financing, including those which have contacted
23  you." Do you see that language in the agreement?
24      A. I do.

Page 59

1       Q. Would you agree with me that CBW, in pursuit
2   of the transaction, identified and sent initial
3   information about the facilities to 88 different
4   parties, including 12 lenders?
5       A. I don't know.
6       Q. Would you agree with me that CBW thereafter
7   distributed the confidential information memoranda
8   to 31 parties, including five lenders?
9       A. I don't know that.
10      Q. Do you recall reviewing the confidential
11  information memorandum that CBW sent out?
12      A. I don't have a memory of having done so. I
13  may have, but I don't have a memory of having done
14  so.
15      Q. Would you agree with me that some of the
16  interested lenders refused to move forward with the
17  process after Gerry Freid and Barry Freid refused to
18  provide personal financial statements?
19      A. I have no knowledge of that.
20      Q. Would you agree with me that by March 19th
21  of 2004, CBW had received indications of interest
22  from 12 parties, including four lenders?
23      A. I don't know the exact number, but I
24  remember that there was interest.

Page 60

1       Q. Do you remember that Epoch's indication of
2   interest was at the highest range?
3       A. Yes.
4       Q. And you'd agree with me that Epoch was
5   introduced to the selling entities by CBW?
6       A. I don't know that.
7       Q. Do you have any information to suggest
8   otherwise?
9       A. I do not.
10      Q. Would you agree with me that Barry Freid and
11  Gerald Freid were the individuals who made the
12  decision as to which parties to invite for
13  management presentations?
14      A. I don't know.
15      Q. Were you present at the management
16  presentations?
17      A. I don't think so. I don't know what a
18  management presentation is.
19      Q. Were you present at meetings where
20  interested buyers or lenders toured the facilities
21  and met with management of the different facilities?
22      A. No.
23          (Exhibit 76 marked for identification.)
24          (Document exhibited to witness.)

Page 61

1           (Exhibit 77 marked for identification.)
2           (Document exhibited to witness.)
3       Q. Mr. Gordon, Exhibit 76 you'll see, would you
4   agree with me that this page appears to be a
5   printout from your computer system?
6       A. Yes.
7       Q. And you see at the bottom, the bottom half
8   consists of a message from Matt Ryan on May 4, 2004
9   to Barry Freid, Gerry Freid and others, including
10  you, that says, "Barry and Gerry, attached please
11  find the TPG solicitation update, which includes a
12  summary of all letters of intent that we received on
13  Friday, April 30, 2004." Do you see that?
14      A. I do.
15      Q. If you look at Exhibit 77, which is this
16  larger document, do you recall receiving -- well,
17  let me ask you this question first. You recall
18  receiving this e-mail, is that right, the one marked
19  as Exhibit 76?
20      A. I don't have a specific memory of it, but
21  I'm sure I received it, and I responded to it,
22  apparently.
23      Q. Do you recall receiving from CBW a document
24  that summarized the letters of intent that had been

16 (Pages 58 to 61)

Stephen F. Gordon                                                                06/09/2005

Page 62

1  received?
2     A. Yes.
3     Q. Do you recognize Exhibit 77 to be that
4  document?
5     A. Well, I haven't gone through it page by
6  page, but I believe it is.
7     Q. And you say in response to Mr. Ryan's
8  message, "Matt, I will have Georgia, Barry and Gerry
9  Freid and Frank Barker on the 11 o'clock with me."
10 Do you see that?
11    A. Yes.
12    Q. Do you recall that conference call actually
13 took place?
14    A. I believe it did.
15    Q. Do you remember where you were when the call
16 took place?
17    A. I was in my office.
18    Q. Do you recall if the individuals you've
19 identified, Georgia, Barry, Gerry Freid and Frank
20 Barker, were also in your office?
21    A. They were not.
22    Q. Do you recall whether there were other
23 individuals on that call, other than Georgia, Barry
24 and Gerry Freid and Frank Barker?

Page 63

1     A. And the CBW people?
2     Q. Right, and you.
3     A. I don't recall.
4     Q. You see that in Mr. Ryan's e-mail message,
5  the second paragraph, he talks about the call, and
6  he says, "We would like to have a call on Wednesday
7  at 11 a.m. eastern standard time with all TPG
8  shareholders to discuss the letters and the time."
9  Do you see that?
10    A. Yes.
11    Q. Did you ever say to Mr. Ryan, "Well, the TPG
12 shareholders have nothing to do with this"?
13    A. I don't recall saying that.
14    Q. If you look at the document marked as
15 Exhibit 77, which has a title page that says
16 confidential presentation, May 5, 2004, and then I
17 don't -- there are page numbers. Page four starts
18 the solicitation update. And page six has a summary
19 of the letters of intent that had been received.
20    A. Yes.
21    Q. Looking at that schedule, is that consistent
22 with your memory that there were a number of offers
23 to buy both facilities?
24    A. Yes.

Page 64

1     Q. Is this schedule also consistent with your
2  memory that there were some offers to buy only the
3  Chestnut Hill facility?
4     A. I don't have a specific memory of that, but
5  I have no reason to doubt this.
6     Q. And you recall -- looking at this schedule,
7  is that consistent with your memory that CBW had
8  located some refinancing options?
9     A. I have no memory of CBW locating refinancing
10 options.
11    Q. Do you remember anyone else locating
12 refinancing options for the properties during the
13 period September 30, 2003 to September 30, 2004?
14    A. Yes.
15    Q. Who located those opportunities?
16    A. They were through HUD.
17    Q. Okay. When you say they were through HUD,
18 do you mean that somebody went through some sort of
19 a process with HUD to try and identify sources of
20 refinancing?
21    A. Well, I'm certainly no expert in this field.
22 But it's my understanding that private lenders, and
23 there's one in particular called Charles River or
24 Charles River Mortgage, which is very active in

Page 65

1  this. Private lenders loan to health care
2  facilities, and the loans are guaranteed by the
3  United States of America. So they're obviously
4  attractive loans. And it's my understanding that
5  there was HUD financing available for these
6  facilities.
7     Q. Did you have any communications with anyone
8  at HUD about that?
9     A. No.
10    Q. Did you have any communications with any
11 potential lenders?
12    A. No.
13    Q. During the period September 30, 2003 to
14 September 30, 2004, did you review any paperwork
15 that indicated there were lenders who were
16 interested in lending money to these facilities with
17 the guarantee from HUD?
18    A. I can't recall.
19    Q. Do you recall any discussion of where
20 those -- where -- strike that.
21       During this May 5, 2004 conference call,
22 do you remember there being any discussions while
23 CBW was on the phone of where things stood with
24 these HUD opportunities?

17 (Pages 62 to 65)

Stephen F. Gordon                                                    06/09/2005

Page 66

1     A. I don't remember.
2     Q. Looking at this summary, the solicitation
3  update summary, you'd agree with me that by far the
4  highest offer to buy the properties was from Epoch
5  Senior Living?
6     A. I don't know what you mean by "by far." The
7  highest range is Epoch Senior Living, but they start
8  at 27 million dollars and Care Ventures ends at 27
9  million dollars. So I don't know what you mean by
10  "by far."
11     Q. Actually I'm sorry, I wasn't clear in my
12  question. You see that on the far right there's a
13  chart that indicates the ranges that were provided
14  in the initial indications of interest?
15     A. Yes.
16     Q. And then to the left of that, there's a
17  column that provides the numbers as they actually
18  came in, in the letters of intent; do you see that?
19     A. Okay, I do see that.
20     Q. When I was talking about Epoch's number
21  being the highest, I was referring to the numbers
22  that were actually in the letters of intent.
23     A. My only quarrel is "by far," because that's
24  somewhat suggestive. There's no question that Epoch

Page 67

1  is the highest.
2     Q. During that part of the conference call
3  where CBW was on the line, do you remember what
4  CBW -- let me ask you this, do you remember who from
5  CBW was on the conference call?
6     A. The problem is for me that everyone's name
7  is Matt.
8     Q. Okay.
9     A. So I'm not sure who was on the conference
10  call. And at that particular point in time, I had
11  never met anyone from CBW, to my knowledge. So, I
12  believe it was more than one person. But both of
13  them may have been named Matt. So it might have
14  been Matt Caine and Matt Ryan. I'm not sure.
15     Q. Do you recall what the folks from CBW said
16  as part of this conference call?
17     A. I don't have a specific recollection of what
18  was said.
19     Q. Do you recall that they went through this
20  summary and talked about the various letters of
21  intent that had been received?
22     A. That is my memory, yes.
23     Q. During the part of the call where CBW was
24  participating, do you remember there being

Page 68

1  discussion of moving forward with Epoch based on the
2  fact that the amount that was in their letter of
3  intent was clearly higher than anyone else's?
4     A. I don't know whether that was during the
5  call or sometime thereafter.
6     Q. Do you recall whether during that part of
7  the call where CBW was on the line, there being a
8  discussion with moving forward with any other
9  option, other than Epoch?
10     A. Yes.
11     Q. What other option?
12     A. Again, I think that the option was the HUD
13  refinance. And another option was to -- I think
14  there was some concern that Epoch's number was,
15  believe it or not, too high. And therefore
16  unsustainable.
17     Q. Who expressed that concern?
18     A. I think it was Barry Freid during the call.
19     Q. Do you remember whether anyone other than
20  Barry voiced that concern?
21     A. I don't remember.
22     Q. What do you recall the discussion being
23  after -- strike that.
24        At some point in time during the call,

Page 69

1  did the CBW folks leave the call and was there
2  further discussion among other -- the remaining
3  people who had started on the call?
4     A. My memory is that the call terminated. And
5  then -- and then the same client group, my client
6  group that was present in the call had a
7  conversation with me.
8     Q. In terms of the various offers that were
9  summarized in this solicitation update during that
10  conference, did anyone express concerns about moving
11  forward with Epoch?
12     A. I can't answer that.
13     Q. Now, you were present at Barry Freid's,
14  Gerald Freid's and Georgia Freid's depositions,
15  correct?
16     A. Correct.
17     Q. Would you agree with me all three of them
18  testified at length about the conversations that
19  were had with you about who to move forward with?
20     A. I don't know what "at length" means. I
21  don't know whether those conversations that they
22  testified to were with CBW present or persons other
23  than the client group present. I am constrained to
24  protect, since there is no waiver, the maximum

18 (Pages 66 to 69)

Stephen F. Gordon                                                                 06/09/2005

Page 70

1   attorney/client privilege. And I can't testify to
2   my recollection of conversations with the client.
3       Q. Have you reviewed those transcripts to make
4   a determination as to whether or not there has been
5   a waiver?
6       A. I don't believe there has been a waiver.
7       Q. At some point in time following the
8   conference call with CBW where these various offers
9   were discussed, did you contact Matt Caine and
10  advise him that The Pointe Group wanted to move
11  forward with Epoch?
12      A. I don't recall doing that. I may very well
13  have.
14      Q. Did you, from the time of that conference
15  call to the time that the letter of intent, the
16  final letter of intent was signed with Epoch, did
17  you ever express to Matt Caine that your clients
18  desired to move forward with anyone other than
19  Epoch?
20      A. I don't think so.
21      Q. Did you --
22      A. Actually, that's not true. I think at some
23  point I made a request to see if all of these people
24  would separate their offers for Chestnut Hill and

Page 71

1   Cranberry Pointe. I believe I made that request.
2       Q. To CBW?
3       A. I don't know whether I made that request or
4   I knew that request had been made. I'm not sure
5   that, that's specifically an answer to your
6   question, but I think it's certainly germane.
7       Q. Do you recall whether that -- whether you
8   ever saw that breakdown in numbers?
9       A. I don't think I ever saw that breakdown.
10      Q. Between the time of the conference call and
11  the time that the letter of intent with Epoch was
12  signed, did you ever advise anyone at CBW that your
13  clients had concerns about moving forward with Epoch
14  because the price was too high?
15      A. Did I?
16      Q. Yes.
17      A. I may have. I don't remember. I don't
18  remember doing that, but I may have.
19      Q. As of the time that the decision was made to
20  go forward with Epoch -- strike that.
21          You're not sure whether or not it was
22  you who communicated the decision to move forward
23  with Epoch; is that right?
24      A. That's correct.

Page 72

1       Q. Do you recall who made the decision to move
2   forward with Epoch?
3       A. I can't answer that question.
4       Q. At the time the decision was made to move
5   forward with Epoch, did you in your own mind have
6   any concerns about the quality of CBW's services as
7   of that date?
8       A. Did I?
9       Q. Correct.
10      A. I can't answer that question.
11      Q. Between the time that you first were
12  retained by the KeyBank Financed Entities and the
13  time that the decision was made to move forward with
14  Epoch, had you communicated to CBW any concerns or
15  complaints about their performance through that
16  date?
17      A. I don't think so.
18      Q. Now, in that time frame, the spring of 2004,
19  if someone had asked you what your own opinion was
20  as to the fair market value of these three
21  facilities, would you have had the knowledge or
22  expertise to make that kind of determination?
23      A. No.
24      Q. Do you have any knowledge, as you sit here

Page 73

1   today, whether or not in the spring of 2004 a
2   lender, whether guaranteed by HUD or not, would have
3   been willing to lend money to the KeyBank Financed
4   Facilities on terms that would have been sufficient
5   to satisfy the obligations to KeyBank?
6       A. I don't know.
7       Q. You couldn't say one way or the other?
8       A. I don't know.
9       Q. After the decision was made to move forward
10  with Epoch, would it be fair to say that on behalf
11  of the KeyBank Financed Facilities, that you oversaw
12  the negotiations regarding the final letter of
13  intent with Epoch?
14      A. No, I don't think that would be fair to say.
15      Q. Okay. Do you know who was communicating
16  with Epoch in terms of the letter of intent?
17      A. I think it was both John McCullough and
18  myself or it may have been John McCullough through
19  me, and it may have been me through John McCullough
20  from time to time.
21      Q. Do you know whether it was you or John
22  McCullough -- at that time were you dealing with
23  Epoch directly, Larry Gerber, or were you dealing
24  with Epoch through counsel?

19 (Pages 70 to 73)

Stephen F. Gordon                                                                                                06/09/2005

Page 74

1    A. Only through counsel.
2    Q. Mr. Gordon, I'm handing you what was
3  previously marked as Exhibit 13.
4         (Document exhibited to witness.)
5    A. I see that.
6    Q. You see that the cover page is a letter on
7  your letterhead signed by Peter Haley dated May 24,
8  2004 and directed to Andy Sucoff?
9    A. Yes.
10   Q. It says, "Enclosed please find a copy of the
11 letter of intent as executed by The Pointe Group."
12 Do you see that?
13   A. Yes.
14   Q. If you look at the letter of intent itself,
15 do you recall who prepared the first draft of this?
16   A. I don't.
17   Q. Do you know whether it was your law office
18 versus Epoch's counsel?
19   A. I think it was unlikely to be my office.
20   Q. The letter of intent is directed to an
21 entity, The Pointe Group; do you see that?
22   A. Yes.
23   Q. 50 Christie Place, Brockton, Mass. Did you
24 ever advise anyone at the offices of Epoch's counsel

Page 76

1  facilities to sell as part of the transaction?
2    A. This is a non-binding document. As I said,
3  it's -- the only obligation anyone has under this
4  document is to negotiate in good faith towards a
5  real deal. This is not a deal. I'm not denigrating
6  the need for letters of intent just because I'm not
7  a transactional lawyer. But as a trial lawyer, I
8  know that I couldn't enforce a letter of intent.
9    Q. At the time this letter of intent was
10 signed, you had no knowledge that an abutter to the
11 Chestnut Hill facility had a claim that there was an
12 encroachment on its property; is that right?
13   A. That's correct.
14        (Exhibit 78 marked for identification.)
15        (Document exhibited to witness.)
16   Q. Mr. Gordon, looking at this document that's
17 just been marked as Exhibit 78, this is a printout
18 from your computer system of an e-mail that you sent
19 to Madeline Kauffman on May 12th, correct?
20   A. Yes.
21   Q. At the time that you sent this e-mail to
22 Ms. Kauffman as indicated in the first sentence of
23 the e-mail, the purchase price or the contemplated
24 purchase price was 37 million, correct?

Page 75

1  that The Pointe Group had nothing to sell and no
2  involvement in this transaction?
3    A. I don't think I had to point that out to
4  them.
5    Q. Whether you needed to or not, you never did?
6    A. Epoch has very good lawyers. It would have
7  been, I think, offensive for me to -- for me to talk
8  that way to them.
9    Q. Well, wasn't it important to you that the
10 letter of intent be with the appropriate parties?
11   A. The letter of intent was not important to me
12 at all. Letters of intent are only an agreement to
13 try and reach an agreement.
14   Q. If you look at the last page, there's
15 actually not a page number on it. But at the top in
16 the right-hand corner it says page 11 of 13 of a
17 fax, and it's the signature page of the document.
18   A. Yes.
19   Q. You see that it's signed by Barry Freid on
20 behalf of The Pointe Group?
21   A. Correct.
22   Q. And it wasn't important to you that Barry
23 Freid was signing this document on behalf of The
24 Pointe Group, even though The Pointe Group had no

Page 77

1    A. Yes.
2    Q. When you wrote this e-mail, if you look at
3  the second full paragraph, there's certain indented
4  items that you were indicating to Ms. Kauffman the
5  Freid family would be willing to accept in
6  settlement from the sales proceeds in addition to
7  the sum of 2,568,000 dollars. The first item you
8  identified was cancellation of the shareholder loan
9  and fees still due; do you see that?
10   A. Yes.
11   Q. What does that refer to, the shareholder
12 loan?
13   A. Exactly what it says.
14   Q. Who is the loan -- was the loan in favor of
15 KeyBank?
16   A. I believe so, yes.
17   Q. Who were the obligors?
18   A. I don't recall who the obligors were.
19   Q. You obviously knew at the time.
20   A. I'm not sure.
21   Q. The next item says payment of Chestnut Hill
22 construction debt guaranteed by members of the Freid
23 family; do you see that?
24   A. Yes.

20 (Pages 74 to 77)

Stephen F. Gordon                                                                06/09/2005

Page 78

1    Q.  Was it your suggestion that this would be a
2  debt that would be paid at the time of the closing?
3    A.  I've included it in this e-mail.
4    Q.  Okay.  Not something that would be paid by
5  KeyBank outside of the closing, but something that
6  would be paid out of the sale proceeds?
7    A.  I don't think that was even considered.
8    Q.  Then there's a reference to Stanley
9  Wallerstein incentive fee, 150 thousand dollars; do
10  you see that?
11    A.  Yes.
12    Q.  What does that refer to?
13    A.  Mr. Wallerstein was prior counsel, and he
14  had negotiated a fee agreement, which had a premium
15  or incentive fee of 150 thousand dollars in it.
16    Q.  Was that ever paid, to your knowledge?
17    A.  No.
18    Q.  What about the Chestnut Hill construction
19  debt that was guaranteed by members of the Freid
20  family, was that ever paid?
21    A.  I think that was paid before the closing.
22  That was zeroed out before the closing.  I think
23  items one and two were the subject of regular
24  monthly payments.  And in the months that it took to

Page 79

1  get to a closing, they were reduced in the ordinary
2  course, I believe.
3    Q.  Do you remember who the obligor was on the
4  Chestnut Hill construction debt?
5    A.  I do.
6    Q.  Who was it?
7    A.  Lenny Rudofsky, R-U-D-O-F-S-K-Y.
8    Q.  Who paid him?
9    A.  I don't know.
10    Q.  What's the basis of your understanding that,
11  that was zeroed out before the closing?
12    A.  He told me.
13    Q.  Is he a builder?
14    A.  He's deceased.
15    Q.  What was he before he was deceased?
16    A.  He had a construction company.  The
17  construction company that constructed the Chestnut
18  Hill facility.
19    Q.  What's the name of the company?  Is it still
20  around?
21    A.  It is not.  I believe it was Beaver
22  Builders.
23    Q.  Then the fourth item says release of the UBS
24  Paine Webber account.  What is the UBS Paine Webber

Page 80

1  account?  Whose account is that?
2    A.  I believe it was Georgia Freid's account.
3    Q.  You go on to say in addition, the broker's
4  commission.  By that did you mean the payments that
5  were due to CBW?
6    A.  Yes.
7    Q.  And the Cranberry Pointe Medicare Medicaid
8  recoupment will have to come out of the sale
9  proceeds, correct?
10    A.  Right.
11    Q.  So when you wrote this e-mail to
12  Ms. Kauffman, it was your understanding that CBW's
13  fee had to come out of the sale proceeds?
14    A.  Yes.
15       (Exhibit 79 marked for identification.)
16       (Document exhibited to witness.)
17    Q.  Mr. Gordon, in this -- this is another
18  e-mail that was printed out from your system,
19  correct?
20    A.  Correct.
21    Q.  You see the bottom e-mail is from Matt Caine
22  to you and some other individuals on May 12, 2004.
23  And your e-mail back on May 12th of 2004 at 7:12
24  p.m. says, "Matt, we were working full time to reach

Page 81

1  at least an agreement in principle with KeyBank."
2  Then skipping over a sentence.  "I am not able to
3  involve you in the details of our discussions with
4  the bank, as I'm sure you can well understand."  Do
5  you see that?
6    A.  Yes.
7    Q.  When you wrote this e-mail, what was the
8  reasoning that you were trying to communicate to
9  Mr. Caine as to why Mr. Caine couldn't be involved
10  in details of your discussions with the bank?
11    A.  There was nothing that he could add.  It
12  would just frankly be a waste of time.
13    Q.  So it wasn't -- you weren't trying to
14  communicate to Mr. Caine that you thought there was
15  any sort of a privilege that attached to those
16  communications with the bank?
17    A.  No.
18       (Exhibits 80 and 81 marked for
19  identification.)
20       (Documents exhibited to witness.)
21    Q.  Mr. Gordon, you see the document that was
22  marked as Exhibit 80 is a printout, again e-mails
23  that were printed out from your computer system; is
24  that right?

21 (Pages 78 to 81)

Stephen F. Gordon                                                                                      06/09/2005

Page 82

1    A.  Yes.
2    Q.  The top message is response to a message you
3  received from Andy Sucoff about employees that were
4  going with the facilities versus those that were
5  not?
6    A.  Yes.
7    Q.  Do you recall whether prior to this --
8  receiving this e-mail from Andy Sucoff, this May
9  27th e-mail, you were involved in any discussions
10  with Epoch as to what personnel were going with the
11  facilities?
12    A.  I don't believe I was involved in that.
13    Q.  Looking at the next exhibit, Exhibit 81,
14  which is your e-mail to Matt Caine on May 28th of
15  2004, you say, "Mr. Caine, as a result of a
16  telephone conversation you had with Larry Gerber, he
17  has placed additional, non-negotiable demands upon
18  The Pointe Group."  Do you see that?
19    A.  Yes.
20    Q.  What were those non-negotiable demands?
21    A.  Keeping two is non-negotiable.
22    Q.  Keeping two what?
23    A.  Keeping two people.  That's what Mr. Sucoff
24  said that Mr. Gerber had said.  Well, he forwarded

Page 83

1  to me a message that Mr. Gerber had sent to the
2  broker, which was CBW.
3    Q.  So that was what you were referring to?
4    A.  Yes.
5    Q.  Do you know whether ultimately those
6  positions ended up being filled by people who were
7  from the old operation of the facility versus new
8  people?  Do you know how that issue ultimately was
9  resolved?
10    A.  I believe it was resolved in Epoch's favor.
11    Q.  You go on to say, "Once again your
12  involvement has proved harmful to The Pointe Group."
13  What did you mean first by saying "once again"?
14    A.  There must have been a previous instance
15  where the broker stuck his nose into something and
16  didn't turn out well.  I don't know what I was
17  referring to there.
18    Q.  You don't have a recollection?
19    A.  I don't have a recollection.
20    Q.  You go on to say, "Your involvement has
21  proved harmful to The Pointe Group."  You don't have
22  a recollection of what was harmful to The Pointe
23  Group?
24    A.  In this particular --

Page 84

1    Q.  Where you're saying "once again."
2    A.  I don't know whether I'm saying this is yet
3  another instance or to repeat myself, which I can be
4  guilty of.  Maybe there was a prior telephone
5  conversation in which I'm just saying once again in
6  the sense of I'm telling you this again.  I don't
7  know which it was.
8    Q.  When you wrote this e-mail, what did you
9  understand that Mr. Caine had done?
10    A.  Mr. Caine had communicated with the buyer
11  and had agreed with the buyer, Epoch, that Epoch was
12  right and the seller was wrong.
13    Q.  What's the basis of your statement that
14  Mr. Caine agreed with Mr. Gerber?
15    A.  That's my memory.
16    Q.  How did you learn that or from whom did you
17  learn that?
18    A.  It may have been in a telephone conversation
19  with Andy Sucoff.  This was -- this had become on
20  the Friday before Memorial Day a deal breaker.  And
21  I spent a great deal of time on the telephone,
22  because Andy Sucoff reached out to me, we had a nice
23  relationship, to solve this small problem.  I
24  suggested that it was a small problem and it ought

Page 85

1  to be resolved in the seller's favor.  And my memory
2  is that did not work.
3    Q.  The e-mail simply relates what was said to
4  Matt Caine, correct?  If you look at the e-mail from
5  Andy Sucoff to you, correct, it says, "I spoke to
6  Matt Caine.  I gave him my position."  It doesn't
7  say anything about whether or not Matt Caine agreed
8  with that position or not, correct?
9    A.  I don't know.  It says with respect to the
10  marketing function, Maureen Lewis, they acknowledge
11  that she spends most of her time at Hammond.  I
12  don't know whether that came from Matt Caine.  The
13  e-mail doesn't tell the whole story, because there
14  were multiple telephone calls that day as well.
15    Q.  And you have a specific recollection of
16  hearing from someone that Matt Caine had agreed with
17  Larry Gerber?
18    A.  Yes.
19    Q.  And you're certain about that?
20    A.  No, I'm not certain about that.
21      (Exhibit 82 marked for identification.)
22      (Document exhibited to witness.)
23    Q.  Mr. Gordon, this document that was marked as
24  Exhibit 82, you see at the bottom of the document

22 (Pages 82 to 85)

Stephen F. Gordon

06/09/2005

Page 86

1    you're asking Andy Sucoff how much involvement does
2    your client wish the broker, CBW, to have in the
3    process; do you see that?
4        A. Yes.
5        Q. Then there's a response from Andy Sucoff
6    saying, "The brokers have been our only contact to
7    date. I'm inclined to keep them in the loop, unless
8    they're not being helpful," correct?
9        A. Yes.
10       Q. Then at the top you say, "No problem, and I
11   will simultaneously submit documents to you and the
12   broker." Do you see that?
13       A. Yes.
14       Q. So when you sent this e-mail back to Andy
15   Sucoff, it was your understanding that Epoch wanted
16   CBW to continue to be in the loop, correct?
17       A. Yes.
18       Q. And you said no problem, correct?
19       A. Well, there's an unless they are not being
20   helpful in there, too.
21       Q. But as of the date you sent this e-mail, May
22   17th, did you have any reason to believe that CBW
23   was not being helpful?
24       A. Apparently not.

Page 87

1        Q. You then say, "We will simultaneously submit
2    documents to you and the broker." Do you see that?
3        A. Yes.
4        Q. Did you do that?
5        A. I don't know.
6        Q. Isn't it true that CBW asked you for a copy
7    of the purchase and sale agreement, and that you
8    refused to give it to them?
9        A. I don't think that's true. It's possible,
10   but I don't think so.
11       Q. Do you remember Matt Caine asking you for a
12   copy of the purchase and sale agreement?
13       A. I remember him asking me for either a copy
14   of the purchase and sale agreement or the section of
15   the purchase and sale agreement that referred to the
16   broker. And my memory is that I responded by
17   sending him the portion of the purchase and sale
18   agreement that referred to the broker.
19       Q. Do you have any memory of refusing to send
20   him the entire document?
21       A. I don't. It's possible, but I don't have
22   any memory of having done that. But it is possible.
23       Q. If you did do that, what reason would you
24   possibly have for not giving him the purchase and

Page 88

1    sale agreement?
2        A. I can't speculate. I don't even know that I
3    did. My best memory is that I did not refuse to
4    give the broker a copy of the purchase and sale
5    agreement, but it is possible that I did.
6            MS. HIGGINS: Kind of at a sticking
7    point since I have more exhibits to mark, and
8    there's no stickers. So I'm going to go look for
9    exhibit stickers.
10           (Discussion off the record.)
11           MS. HIGGINS: Let's mark this as the
12   next exhibit.
13           (Exhibit 83 marked for identification.)
14           (Document exhibited to witness.)
15       Q. Mr. Gordon, this again is a printout of an
16   e-mail from your computer system?
17       A. Yes, it is.
18       Q. It's a e-mail from you to Madeline Kauffman,
19   May 19, 2004, correct?
20       A. Correct.
21       Q. In this e-mail you're confirming a proposal
22   that Madeline Kauffman made to you?
23       A. I believe, yes.
24       Q. Regarding the disbursement of proceeds from,

Page 89

1    as it says here, the Chestnut Hill Cranberry Pointe
2    sale proceeds?
3        A. Correct.
4        Q. This reflects a broker's commission of a
5    million dollars, correct?
6        A. Yes.
7        Q. That was, to your understanding, was an
8    amount payable to CBW, correct?
9        A. Yes, based on a 37 million dollar sale.
10       Q. Correct.
11       A. No, actually not at that point, because I
12   guess I had not seen the Exhibit 4.
13       Q. The engagement letter?
14       A. So this was a plug number that everyone was
15   working with for some reason.
16       Q. In the second paragraph after the
17   itemization, it says, "The balance of the sale
18   proceeds will be split 50/50 between the bank and
19   the Freid family." Do you see that?
20       A. Yes.
21       Q. Then it says, "The attorney's fees will be
22   forgiven." What does that refer to?
23       A. The bank documents provide for the borrower
24   to pay all attorney's fees, and the bank was not

23 (Pages 86 to 89)

Stephen F. Gordon                                                          06/09/2005

Page 90

1  going to charge those attorney's fees back to the
2  borrower.
3      Q. I see. Do you know whether after this date
4  of May 19th, did the bank ever require the payment
5  of its attorney's fees?
6      A. I don't recall.
7      Q. Had you had any discussions with Madeline
8  Kauffman up to this point as to when you say in this
9  e-mail the balance of the sale proceeds will be
10 split 50/50 between the bank and the Freid family,
11 as to which members of the Freid family would get
12 any excess sale proceeds?
13     A. No.
14         (Exhibit 84 marked for identification.)
15         (Document exhibited to witness.)
16     Q. This again, Mr. Gordon, is a printout of an
17 e-mail from your computer system from you to Matt
18 Caine on May 19th at 10:32 p.m.; is that right?
19     A. Yes, it is.
20     Q. If you look at the exhibit that we just
21 looked at, 83, that e-mail -- this e-mail, Exhibit
22 84, was sent later in the same day; is that right?
23     A. Yes.
24     Q. When you tell Mr. Caine all the members of

Page 91

1  the Freid family and KeyBank have reached an
2  agreement in principle on the distribution of the 37
3  million Epoch sale proceeds, are you referring to
4  the breakdown that is reflected in Exhibit 83?
5      A. I believe so, yes.
6      Q. I should have asked you this before. Do you
7  remember Ms. Kauffman -- in your e-mail saying to
8  Ms. Kauffman, "Have I got it right?" Do you
9  remember whether Ms. Kauffman disagreed with
10 anything you had in your e-mail?
11     A. I don't have any memory of her disagreeing.
12         (Exhibit 85 marked for identification.)
13         (Document exhibited to witness.)
14     Q. Mr. Gordon, this is a printout of an e-mail
15 from your system dated Wednesday, May 19, 2004, from
16 you to Andy Sucoff; is that correct?
17     A. Yes.
18     Q. In this e-mail, you say, "The broker tells
19 me that Epoch is very concerned about whether there
20 is an agreement between The Pointe Group and
21 KeyBank." Do you see that?
22     A. Yes.
23     Q. By that, are you referring to CBW?
24     A. I believe so.

Page 92

1      Q. Do you recall what CBW communicated to you
2  that lead you to write this e-mail?
3      A. I think that very thought.
4      Q. Which is what?
5      A. That Epoch was concerned about whether there
6  was an agreement between the sellers and KeyBank to
7  permit a 37 million dollar sale, because 37 million
8  dollars was less than the amount owed to KeyBank.
9      Q. Do you remember whether -- who communicated
10 that to you from CBW?
11     A. I'm tempted to say Matt Caine, but I don't
12 know whether I actually remember that or whether
13 because I've seen the previous e-mails, and I was
14 communicating to him I learned that from him.
15 Again, I have a confusion of the two Matts. I would
16 say it had to be one of the two Matts.
17     Q. When the individual from CBW relayed to you
18 this concern that Epoch had, did you say back to
19 this person from CBW, "I don't want you talking to
20 Epoch"?
21     A. I'm sure I did not.
22     Q. Did you think there was anything
23 inappropriate about CBW relaying to you a concern
24 that Epoch had expressed?

Page 93

1      A. No, I didn't.
2      Q. We previously looked at an e-mail in which
3  Epoch's counsel had said that Epoch would prefer to
4  keep CBW in the loop; is that right? Do you
5  remember that e-mail?
6      A. I think there was a qualification to it.
7      Q. As long as they were being helpful, correct?
8      A. I think it was actually in the reverse.
9      Q. Unless they were being unhelpful?
10     A. I think so.
11     Q. We can look at it.
12     A. Unless they are not being helpful was the
13 word.
14     Q. Did anyone from Epoch ever indicate to you
15 that they believed that CBW was being unhelpful?
16     A. I don't remember that.
17     Q. Did anyone from Epoch ever indicate to you
18 that they believed that the involvement of Barry
19 Freid was harmful to the transaction?
20     A. Yes.
21     Q. Who was that?
22     A. Andy Sucoff.
23     Q. Do you remember what Mr. Sucoff thought in
24 particular was unhelpful about Barry Freid's

24 (Pages 90 to 93)

Page 94

1  involvement?
2      A.  Mr. Sucoff thought that Barry was opposed to
3  the sale and was concerned that he would sabotage
4  it.
5      Q.  Did Mr. Sucoff ever point you to any
6  specific examples of conduct by Mr. Freid that he
7  thought demonstrated that?
8      A.  He might have.
9      Q.  Do you recall those right now?
10     A.  There was something about a copier being
11 removed from Cranberry Pointe or a fax machine or
12 something.  Then there was a question of whether it
13 was owned by Cranberry Pointe or whether it was
14 owned by a different entity and shouldn't have been
15 included in the sale.  Very, very small things.  I
16 think that the concern was more of a global concern
17 than a specific item by item concern.
18     Q.  During the time period September 30, 2003 to
19 September 30, 2004, to the best of your knowledge,
20 was Barry Freid an officer, director or employee of
21 any of the KeyBank Financed Facilities?
22     A.  I don't know.
23     Q.  You don't have knowledge one way or the
24 other?

Page 95

1      A.  I don't.
2      Q.  Same question with respect to Gerald Freid,
3  do you have knowledge one way or the other as to
4  whether he was an officer, director, employee of any
5  of those entities?
6      A.  I don't know.
7      Q.  Do you have any idea why -- you know, it
8  seems to me, looking through the various
9  communications relating to the sale to Epoch that
10 Barry Freid and Gerald Freid were more heavily
11 involved on the seller's side than anyone else.  Do
12 you have any idea why that is so?
13     A.  No.  Actually I should say I'm not even sure
14 that is so.  I know you preface it by saying "based
15 on the communications," but I'm not so sure that is.
16     Q.  Well, you probably looked at most of these
17 documents, too, correct?
18     A.  Yes.
19     Q.  Have you made any observation based on the
20 documents as to who was most involved in the
21 transaction from the seller's side?
22     A.  Most of the transaction was invisible to me.
23         MS. HIGGINS:  Mark that as the next
24 exhibit.

Page 96

1          (Exhibit 86 marked for identification.)
2          (Document exhibited to witness.)
3      Q.  Mr. Gordon, this e-mail -- the e-mail that's
4  reflected on the first page -- I guess I should
5  really start with -- if you look at the last e-mail
6  in the spring, which is the e-mail that was sent
7  from you to Matt Caine on May 19th, that's an e-mail
8  that we previously looked at that references the
9  Freid family and KeyBank having reached an agreement
10 in principle; do you see that?
11     A.  Yes, I do.
12     Q.  And in response to that -- then preceding
13 that, as you go backwards is an e-mail from you to
14 Matt Caine, it's actually not preceding, it's
15 afterwards, May 20, 2004.  You say in that e-mail --
16 I'm sorry, there is another e-mail here.  It's kind
17 of confusing to follow.  Matt Caine then sends an
18 e-mail to you saying, "Did you have any
19 conversations with Andy Sucoff today?"  Then you
20 send him an e-mail saying, "Andy has not called me
21 in response to yesterday's e-mail.  I'm about to
22 call him with Madeline Kauffman on the line.  Please
23 respond to this e-mail with as near as you are able
24 a verbatim transcription of the voice mail you left

Page 97

1  yesterday for Steve Dunham and, quote, reply to all
2  as I think it important for both the principals of
3  The Pointe Group and me to know exactly what message
4  you left for him."  Do you see that?
5      A.  Yes.
6      Q.  Who were the principals of The Pointe Group?
7      A.  You know, principals is a non-technical
8  word.  So I don't know what's --
9      Q.  And you don't remember what you were trying to
10 convey to Mr. Caine as far as who were you referring
11 to when you wrote this e-mail?
12     A.  Well, if he replied to all, he would be
13 replying to everyone that I had sent the e-mail to.
14     Q.  So when you indicated reply to all, we can
15 look at the cc's here, those were e-mail addresses
16 for Gerry Freid, Barry Freid, Frank Barker and your
17 partner, Peter Haley is obviously something
18 different, but when you communicated this message to
19 him then, what you're saying is you thought the
20 principals of The Pointe Group were Gerry Freid,
21 Barry Freid and Frank Barker?
22     A.  No, Georgia Freid is also on there.
23     Q.  Okay.  So that's what you intended to convey
24 to him when you referred to the principals of The

Stephen F. Gordon                                                                           06/09/2005

Page 98

1  Pointe Group?
2      A.  I can't tell you what I intended.  I don't
3  think I had any specific intention.  I wanted the
4  people who had received cc's to my e-mail to receive
5  his reply.
6      Q.  Was there any specific reason that you
7  wanted a verbatim as near as possible transcription
8  of a voice mail that Mr. Caine left for Mr. Dunham?
9      A.  My memory is that Mr. Caine had somehow
10  agitated Mr. Dunham, and I felt that, that was
11  counter productive.  And I needed to know exactly
12  what it was that he had left for Mr. Dunham so I
13  could treat with it and mollify KeyBank.
14      Q.  Do you remember what KeyBank was agitated
15  about?
16      A.  I don't.
17      Q.  And you see above there's a responsive
18  e-mail from Matt Caine that relates his conversation
19  with Steve Dunham; do you see that?
20      A.  Yes.
21      Q.  And he says that he called KeyBank to update
22  them on the progression of the deal; do you see
23  that?       -
24      A.  I see what he says, yes.

Page 99

1      Q.  Did you believe at that time that there was
2  anything improper about CBW advising Key of the
3  progression of the deal?
4      A.  No.
5      Q.  Was there anything in Mr. Caine's response
6  that you considered to be -- to reflect improper
7  behavior by CBW?
8      A.  No.
9      Q.  If you look -- now, the first page of the
10  exhibit, Exhibit 86, you send yet another message to
11  Mr. Caine as well as to various cc's.  And in the
12  third paragraph of that e-mail, you say, "I believe
13  as I expressed to you on the phone that your
14  communications at this point with both Epoch and Key
15  are harmful, and I recommend that you leave the
16  consummation of this deal to the lawyers."  Do you
17  see that?
18      A.  Yes.
19      Q.  Now, what was it that you believed was
20  harmful about the communications that CBW was having
21  with Epoch and Key?
22      A.  I don't recall.
23      Q.  You don't recall today?
24      A.  I don't recall today.

Page 100

1      Q.  You then go on to say, "Both as well as The
2  Pointe Group are looking to their lawyers for advice
3  and forward motion."  Now, in that sentence when you
4  were referring to The Pointe Group, were you
5  referring to the selling entities?
6      A.  I believe so.
7      Q.  And you were referring -- in referring to
8  the selling entities, you used the words The Pointe
9  Group?
10      A.  I think lots of people have used that
11  shorthand in conversation, in telephone
12  conversations, in e-mails and personal conversation.
13  The purchase and sale agreement, obviously, clearly
14  identifies the selling entities.
15      Q.  You then go on to say, "I don't know if you
16  are willing to accept that recommendation, but I
17  believe that if you ignore it, you are putting the
18  sale to Epoch at unnecessary jeopardy."  Do you see
19  that?
20      A.  I do.
21      Q.  Now, when you wrote that e-mail on May 20th,
22  did you have knowledge of anything that CBW had done
23  or said that potentially could jeopardize the sale
24  to Epoch?

Page 101

1      A.  I must have.
2      Q.  Do you remember as you sit here today what
3  that was?
4      A.  My memory is that they were agitating
5  KeyBank unnecessarily, but I'm not exactly sure.
6  This is not typical of the way in which I talk to
7  people or write to people.  So I was clearly
8  agitated about something.
9      Q.  But as you sit here today, you don't
10  remember exactly what CBW had done or said that
11  caused you to write this e-mail?
12      A.  That's correct.
13          (Exhibit 87 marked for identification.)
14          (Document exhibited to witness.)
15      Q.  Mr. Gordon, as reflected in this e-mail,
16  this May 21st e-mail, do you remember communicating
17  to David Hankin and some others as identified on
18  here that, "The Pointe Group will not agree under
19  any circumstances to disclose the terms of its
20  agreement with KeyBank"?  Do you remember that
21  communication being made?
22      A.  Yes.
23      Q.  My question is, was that something -- was
24  that communication something that KeyBank had asked

26 (Pages 98 to 101)

Stephen F. Gordon                                                                06/09/2005

Page 102

1  you to make? In other words, was KeyBank the party
2  that did not want the terms of the letter of
3  agreement disclosed to the buyer?
4      A. I think neither KeyBank nor the sellers
5  wanted the agreement disclosed to the buyer.
6      Q. Do you remember having discussions with
7  Madeline Kauffman about that?
8      A. I don't remember discussions. I obviously
9  forwarded this e-mail to her, but I don't remember
10  discussions.
11      Q. Mr. Gordon, I'm handing you what was
12  previously marked as Exhibit 18 at Barry Freid's
13  deposition.
14          (Document exhibited to witness.)
15      Q. You see that's a copy of a letter that
16  Mr. Freid sent to CBW and there's a cc of the letter
17  to you?
18      A. Yes.
19      Q. Did you draft that letter?
20      A. I don't think so.
21      Q. Okay, I'll take that back. I'm handing you
22  what was previously marked as Exhibit 19 at Barry
23  Freid's deposition, and that is a letter from Matt
24  Caine at CBW in response to Barry Freid's letter

Page 103

1  that you just looked at.
2          (Document exhibited to witness.)
3      Q. You see that, that letter also is cc'd to
4  you?
5      A. I do see that.
6      Q. Do you remember reviewing this response from
7  Mr. Caine to Barry Freid's letter?
8      A. I don't have a memory of having reviewed it.
9      Q. You'll see, as you look through the letter
10  now, that Mr. Caine relates various events and
11  conversations that occurred, including some in which
12  you were involved. What I'd like you to do, you can
13  read through his letter silently and just tell me if
14  there's anything that he's relayed or recounted in
15  terms of communications that you were involved in
16  that's inaccurate.
17      A. I don't think that CBW stayed out of the
18  negotiation of the letter of intent. I think that
19  they did have discussions with Epoch over the letter
20  of intent and perhaps exhibits to the letter of
21  intent.
22      Q. Okay, we'll come back to that.
23      A. I'm still reading. That's the only thing
24  that I have knowledge of.

Page 104

1      Q. Okay. You said that you believe that CBW
2  had discussions with Epoch regarding the letter of
3  intent and certain exhibits to the letter of intent.
4  Were you referring to this conversation between
5  Larry Gerber and Mr. Caine and Mr. Ryan that's
6  referenced here with respect to exhibit C?
7      A. I don't know. I wasn't party to that
8  conversation.
9      Q. Okay. Maybe my question might not have been
10  a good one. I believe you said that in terms of
11  CBW's statement that it's abided by The Pointe
12  Group's instructions to allow Steve Gordon to
13  negotiate the letter of intent, that you believed
14  that CBW had involved itself in that process; is
15  that right?
16      A. Yes.
17      Q. And what is the basis of your statement?
18      A. That's my memory.
19      Q. What facts do you remember that lead you to
20  make that statement?
21      A. I have a memory of being extremely upset
22  that we were receiving non-negotiable demands from
23  Epoch. And my memory was -- my memory is that, that
24  was based upon Epoch saying that CBW agrees with

Page 105

1  them or something of the sort. That's the only
2  memory I have.
3      Q. Would it be fair to say that in any
4  conversations you had with CBW or any communications
5  you had with CBW on that issue, CBW never agreed
6  that they had acknowledged Epoch's demands as
7  reasonable?
8      A. That would be fair to say.
9      Q. Showing you what was previously marked as
10  Exhibit 20 at Barry Freid's deposition.
11          (Document exhibited to witness.)
12      Q. And, again, this is a letter from Barry
13  Freid to Matt Caine dated June 2, 2004 in which you
14  were copied; do you see that?
15      A. Yes.
16      Q. In this letter, Mr. Freid says, in the first
17  sentence he says, "It has come to my attention that
18  KeyBank is factoring a broker fee of one million
19  dollars into their agreement with The Pointe Group
20  regarding the sale of the Cranberry Pointe and
21  Chestnut Hill properties." Do you see that?
22      A. Yes.
23      Q. Now, is that a reference to this plug-in
24  figure that we were talking about earlier?

27 (Pages 102 to 105)

Page 106

1     A. Yes. I think it is. This is Mr. Freid's
2  letter, but I think that is.
3     Q. So, to your knowledge, KeyBank was never
4  charging any sort of a broker's fee or commission,
5  apart --
6     A. KeyBank?
7     Q. Correct.
8     A. No.
9     Q. Okay. Then in the second paragraph it says,
10  "We've approached KeyBank to adjust their figure but
11  are not receiving favorable response." Do you know
12  what Mr. Freid -- let me ask the question this way.
13  On June 2nd, the date that Mr. Freid wrote this
14  letter, do you recall that there had been an
15  approach to KeyBank to adjust the amount that it was
16  willing to take from the transaction?
17     A. Yes.
18     Q. At that point it's fair to say, isn't it,
19  that Epoch's purchase price had not changed,
20  correct?
21     A. Yes, that's correct.
22     Q. Do you have any memory of any conversations
23  that you had with KeyBank as to why their figure
24  needed to be adjusted if there had been no change in

Page 107

1  the purchase price?
2     A. At the 37 million dollar purchase price,
3  there was a sum of money that was going to KeyBank
4  and a sum of money above that, that was being
5  divided between KeyBank and the Freid family. And
6  in arriving at those numbers, that plug number of a
7  million dollars had been used. And when you
8  increase that to a million 250 thousand dollars, my
9  memory is that the request was that KeyBank reduce
10  the overage, if you will, by 125 thousand dollars
11  and the Freid family would do likewise.
12     Q. Do you remember the response from KeyBank to
13  that proposal?
14     A. I do.
15     Q. What was the response?
16     A. No.
17     Q. Handing you what was marked as Exhibit 21 at
18  Barry Freid's deposition.
19        (Document exhibited to witness.)
20     Q. Mr. Gordon, this document marked as Exhibit
21  21, which is a document that was testified about I
22  think by both Barry and Gerald Freid, and it's a
23  letter dated June 3, 2004 and it's addressed to the
24  selling entities, is that correct, as well as to

Page 108

1  some individuals; do you see that?
2     A. Yes.
3     Q. And I believe this has generally been
4  referred to in some of the correspondence and some
5  of the deposition testimony as a forbearance
6  agreement?
7     A. Yes.
8     Q. Are you comfortable with referring to it
9  that way?
10     A. I am comfortable.
11     Q. Let me ask you first, do you recall who
12  prepared the first draft of this letter agreement?
13     A. I do.
14     Q. Who is that?
15     A. Madeline Kauffman.
16     Q. Do you recall --
17     A. I shouldn't say that, I'm sorry. I received
18  it from Madeline Kauffman.
19     Q. Do you recall when you received the first
20  draft of this letter from Madeline Kauffman, whether
21  the language on page three, which appears under
22  paragraph six, requiring that there be first a
23  payment to Casas, Benjamin & White up to one million
24  250 thousand dollars; do you see that?

Page 109

1     A. Yes.
2     Q. Was the language in that paragraph there
3  when you received the first draft from Madeline
4  Kauffman?
5     A. I don't know.
6     Q. Well, that isn't a paragraph that you would
7  have asked to be inserted, correct?
8     A. I can't necessarily say that.
9     Q. Was it your understanding that at the time
10  this agreement was signed, KeyBank's obligation
11  to -- strike that. Let me start again.
12        Was it your understanding at the time
13  that this forbearance agreement was signed, the
14  agreement dated June 3, 2004, that Key's agreement
15  to comply with the terms of this forbearance
16  agreement were premised in part on the payment to
17  CBW that's specified in paragraph 6A be made?
18     A. I don't understand that question.
19     Q. Okay. This forbearance agreement set out
20  the terms -- well, you see in the first paragraph,
21  the first paragraph of the letter on page one,
22     A. Yes.
23     Q. It says, "The following is provided in
24  follow-up to recent telephone conversations between

28 (Pages 106 to 109)

Stephen F. Gordon

06/09/2005

Page 110

1  Key's counsel and you concerning the distribution
2  and application of sale proceeds in the event of a
3  sale," correct?
4      A. Correct.
5      Q. And was it your understanding that this
6  agreement then set out certain terms on which
7  KeyBank would forbear on its rights under various
8  loan documents?
9      A. Yes.
10     Q. In paragraph six, was it your understanding
11 that one of the conditions of Key's forbearance was
12 that the following payments would be made as
13 specified in paragraph six?
14     A. I don't want to split hairs with you, but I
15 don't understand that, "as a condition to
16 forbearance."
17     Q. Let's go back, then. Looking at the
18 language of paragraph six.
19     A. Yes.
20     Q. Was it your understanding at the time this
21 was signed that this paragraph required the
22 borrowers as defined in the agreement to pay or
23 cause to be paid the following and immediately
24 available funds and in the following order, first to

Page 111

1  Casas, Benjamin & White up to one million 250
2  thousand of the fee for investment banking services
3  due and owing to CBW upon the closing of the sale
4  transaction?
5      A. I think you're asking me for a legal
6  opinion. I don't -- how else would I have an
7  understanding of what this is? I'm not going to
8  give you a legal opinion.
9      Q. Well, maybe my question was unclear. But
10 I'm not asking you for an opinion as to how to
11 accurately read this. My question is what was your
12 understanding at the time that this was signed? Was
13 your understanding at the time that this agreement
14 required the borrowers to make the payment to CBW as
15 specified in the agreement?
16     A. My understanding at any time is as a lawyer.
17 So it is a legal opinion. Whether it was what was
18 my legal opinion then versus what my legal opinion
19 is now, it's still a legal opinion, and I can't
20 answer that.
21     Q. I disagree that you can't answer that. But
22 if you're refusing to answer, I'm not going to ask
23 it again. I'm handing you what's marked as -- was
24 marked at Barry Freid's deposition at Exhibit Number

Page 112

1  23.
2          (Document exhibited to witness.)
3      Q. Would you agree with me that's a subsequent
4  version of the forbearance agreement dated June 16,
5  2004?
6      A. Again, I don't want to split hairs with you,
7  but I think it's an amendment to it. "And except as
8  amended," there may be some language in here that
9  says "except as amended." Yeah, right at the
10 beginning it says, "The following limited
11 modifications to the June 3, 2003 letter."
12     Q. Okay. Do you remember why it was necessary
13 for Key and the sellers to execute an amendment?
14 Was there something that had changed?
15     A. I think the problem was that the
16 transactional lawyers couldn't guarantee that the
17 transaction would close by a certain period of time,
18 because certain regulatory authorities, these are
19 health care facilities, certain regulatory
20 authorities' permission was necessary. Epoch was
21 not willing to expend considerable time, money and
22 effort in pursuing the transaction only to find that
23 as a result of a delay in receiving that regulatory
24 approval, obviously beyond the control of anyone

Page 113

1  involved in the transaction, that the time allotted
2  by KeyBank had ended. So again, without reading
3  Exhibit 23 front to back, I think that this was
4  necessary to address Epoch's concern that KeyBank
5  could pull the plug, if you will, while all we're
6  doing is waiting for various regulatory authorities
7  to say yes to Epoch.
8      Q. Okay. Looking at the Exhibit 21, which we
9  were just looking at -- actually, here's the
10 original.
11         (Document exhibited to witness.)
12     Q. And this Exhibit 23, would you agree with me
13 that there are no changes to paragraph six as a
14 result of the amendments of June 16th?
15     A. Yes.
16     Q. Handing you what was previously marked as
17 Barry Freid -- at Barry Freid's deposition as
18 Exhibit 25.
19         (Document exhibited to witness.)
20     Q. If you would turn to -- it's actually on
21 this document, sub Paragraph 3 that deals with
22 changes to paragraph six; do you see that?
23     A. Yes.
24     Q. It says, "Paragraph six of the Key

29 (Pages 110 to 113)

Stephen F. Gordon                                                                                06/09/2005

Page 114

1  forbearance agreement is hereby deleted and replaced
2  with the following." Then there are various
3  provisions. Would you agree with me that the
4  language pertaining to a payment to CBW was no
5  longer part of paragraph six?
6      A. Yes.
7      Q. Can you tell me whether in connection with
8  this, the negotiations with Key over this July 22nd
9  letter agreement, were there any discussions between
10 you and Madeline Kauffman with respect to changes to
11 paragraph six?
12     A. I don't recall.
13     Q. Do you recall any discussions with Madeline
14 Kauffman during the negotiation of this document
15 about whether there were sufficient -- going to be
16 sufficient sales proceeds to pay CBW's fee?
17     A. At this point in time?
18     Q. Yes.
19     A. No.
20     Q. So looking at the two documents together,
21 even though the two earlier letter agreements
22 contain a specific provision requiring the payment
23 of CBW's fee and the July 22nd letter does not, you
24 don't recall any discussions with Madeline Kauffman

Page 115

1  that lead to that provision not being in this
2  subsequent letter agreement?
3      A. I don't recall any specific discussions, but
4  Madeline Kauffman and I spoke often. And there must
5  have been discussions. And obviously the Epoch
6  price went down very substantially, and we had to
7  deal with that. This is the manner in which that
8  was dealt with. But I recall no specific -- no
9  specific discussion certainly of CBW.
10     Q. The July 22nd letter agreement, was the
11 first draft of that agreement also received by you
12 from Madeline Kauffman?
13     A. Again, I don't know whether it's the first
14 draft. The first draft I received was from Madeline
15 Kauffman.
16     Q. So your office did not prepare --
17     A. No.
18     Q. -- a draft of this?
19     A. No, we did not.
20     Q. Do you recall with respect to just this one,
21 the July 22, 2004 forbearance agreement, do you
22 recall receiving any drafts from Madeline Kauffman
23 and marking those up and sending them back to her?
24     A. I don't have any memory of having done that.

Page 116

1      Q. Is it your practice to, if you had done
2  something like that, would it have been your
3  practice to retain the drafts with your markups?
4      A. Probably not, although I'm not very often
5  marking up documents anymore, because they're all
6  electronic.
7      Q. If you do have occasion to make edits to a
8  document that you receive electronically, do you
9  typically do it by red line?
10     A. Yes.
11     Q. That was true at this time frame?
12     A. I don't know. I learn new things every day
13 on the computer.
14     Q. Do you have any personal knowledge,
15 Mr. Gordon, that CBW at any time conveyed any
16 information that you considered to be confidential
17 to Epoch or KeyBank?
18     A. No.
19     Q. Do you have any information --
20     A. Well, confidential, I'm sorry, confidential
21 from whom?
22     Q. Maybe my question wasn't clear. My question
23 was whether you had any information to suggest that
24 CBW conveyed information that you considered to be

Page 117

1  confidential to either Epoch or KeyBank?
2      A. Again, I don't want to split hairs with you.
3  The answer to the question is yes, but I don't think
4  that -- it was confidential information, but I don't
5  think it was information that CBW ought not to have
6  shared with Epoch or KeyBank. They shouldn't have
7  told some stranger, but the parties to the
8  transaction, I have no knowledge of anything that
9  CBW said to either Epoch or KeyBank that was a
10 disclosure of information that should not have been
11 disclosed to one of those two.
12     Q. Do you have any information to suggest that
13 CBW did or failed to do anything that lead Epoch to
14 reduce the purchase price?
15     A. No.
16     Q. Looking back at Exhibit 19. I think I may
17 have given it back to you. Oh, you know, I have it.
18 Looking at the last paragraph, you see Mr. Caine
19 proposes setting up a conference call on June 4th to
20 discuss the issues that are addressed in his letter?
21     A. Yes, I see it.
22     Q. Do you remember participating in a
23 conference call on or about June 4th with Mr. Caine
24 and Ed Casas of CBW?

30 (Pages 114 to 117)

Stephen F. Gordon                                                                06/09/2005

Page 118

1    A. I think so, yes.
2    Q. Do you remember that the purpose of the call
3  was to address concerns that CBW was not being
4  helpful in the process?
5    A. Yes.
6    Q. Who do you remember being on the call, other
7  than Ed Casas and Matt Caine?
8    A. I don't remember who else was on that call.
9    Q. Were you in your office at the time of the
10  call?
11    A. I don't know.
12    Q. Do you remember as a result of the call that
13  you gained some level of comfort that CBW was in
14  fact working towards the transaction happening?
15    A. No, I did not.
16    Q. You did not?
17    A. No.
18    Q. What do you remember you saying during that
19  call?
20    A. I don't have a memory of what I said during
21  the call. I don't have any memory of what I said
22  during the call.
23    Q. Do you have a memory of anything that Matt
24  Caine said during the call?

Page 119

1    A. No. The only memory I have is I believe a
2  private call after that between Ed Casas and myself.
3    Q. Getting back to the first call. I believe
4  you said you had no memory of anything that Matt
5  Caine said during the call?
6    A. I don't.
7    Q. Do you have any memory of anything Ed Casas
8  said during that call?
9    A. No.
10    Q. Do you remember the general subject matters
11  discussed during that call?
12    A. Yes. The subject matter was how CBW could
13  be isolated from the transaction but still gain
14  knowledge of its progress.
15    Q. Who was proposing that CBW be isolated from
16  the transaction?
17    A. Well, it was obviously the seller's side,
18  not the CBW side.
19    Q. Was that you?
20    A. I don't remember.
21    Q. Do you remember any facts that were
22  discussed during the call as to the basis for the
23  seller's desire to have CBW isolated from the
24  transaction?

Page 120

1    A. I remember the call as being
2  non-confrontational. So I don't think that -- it
3  was more in the sense of how can this work or how
4  shall this work going forward. And some sort of
5  program was agreed upon where there would be regular
6  telephone calls between CBW and the sellers.
7    Q. And you said there was then a subsequent
8  call just between you and Ed Casas?
9    A. I believe just between Ed Casas and myself.
10  His was the only voice that I heard, and the call
11  was to me alone.
12    Q. Your recollection is that Ed Casas called
13  you back after the first call had ended?
14    A. I believe so, yes.
15    Q. What did Mr. Casas say during that
16  conversation?
17    A. Mr. Casas told me that my e-mail of the
18  previous week was devastating to the career of a
19  young man, Matt Caine. He asked me if I would
20  please send something that would eliminate that
21  problem for Matt Caine.
22    Q. What did you say in response to that?
23    A. I said I would do so.
24    Q. Getting back to the first call --

Page 121

1        MS. HIGGINS: Let's mark that as the
2  next exhibit.
3        (Exhibit 88 marked for identification.)
4        (Document exhibited to witness.)
5    Q. Is this the e-mail that you sent after your
6  subsequent telephone conversation with Ed Casas?
7    A. Yes.
8    Q. Is there anything that you said in this
9  e-mail that is untrue?
10    A. So long as what Matt Caine said that he had
11  said and done with respect to both KeyBank and Epoch
12  was true, then what I said here was true.
13    Q. I'm showing you what was marked as Exhibit
14  22 at Barry Freid's deposition.
15        (Document exhibited to witness.)
16    Q. You see that this is an e-mail from Matt
17  Caine dated June 4, 2004, 5:43 p.m. So this would
18  follow e-mail that we just discussed as Exhibit 8 --
19  excuse me, Exhibit 88. And this was an e-mail that
20  Matt Caine sent to you on June 4th at 5:43 p.m., to
21  you and to others; do you see that?
22    A. I do.
23    Q. Mr. Caine says in here, "We appreciate
24  everyone taking the time to join the call and

31 (Pages 118 to 121)

Page 122

1  providing valuable input." He then goes on to say,
2  "The positive comments from Steve, Barry and Frank
3  regarding CBW's performance and contributions to
4  date were appreciated." Do you see that?
5     A. Yes.
6     Q. So the comments that Barry and Frank made
7  must have been made during the first call, correct?
8     A. Correct.
9     Q. Do you remember what comments Barry and
10 Frank made regarding CBW's performance?
11    A. I don't.
12    Q. You see in point five -- well, let me say
13 this. He then goes on to say, "Going forward, TPG
14 and CBW have agreed to the following rules of
15 engagement to complete this transaction." He then
16 identifies five points. Reading those five points,
17 are there any of those points that you disagree with
18 in terms of what was agreed on during that call?
19    A. I don't remember what was agreed on during
20 the call. I have no reason to believe that any of
21 these were not as discussed in the call.
22    Q. You see point five, it says, "Ed Casas will
23 contact KeyBank to inquire as to any flexibility in
24 negotiations regarding the net distributable

Page 123

1  proceeds of this transaction. Ed will communicate
2  his findings back to Steve Gordon." Do you see
3  that?
4     A. Yes.
5     Q. Do you recall that Mr. Casas did in fact do
6  that?
7     A. I believe he did.
8        MS. HIGGINS: Mark that as the next
9  exhibit.
10       (Exhibit 89 marked for identification.)
11       (Document exhibited to witness.)
12    Q. Mr. Gordon, this Exhibit 89, this is a copy
13 of an e-mail that you sent the same day, 5:14 p.m.
14 to Ed Casas and Matt Caine that says, "Ed, thanks
15 for putting in a good word with Steve Dunham." So
16 does this reflect that in fact Ed did call
17 Mr. Dunham and relay that back to you?
18    A. I think perhaps he did.
19    Q. Then says, "Madeline and I have now reached
20 an agreement, which will be signed on Monday." Do
21 you see that?
22    A. Yes.
23    Q. Between the time -- between the time period
24 you were first retained in connection with the

Page 124

1  KeyBank Financed Facilities and the closing, did
2  anyone from CBW, Matt Caine, Matt Ryan, Ed Casas,
3  ever tell you that KeyBank had assured CBW that CBW
4  would get paid?
5     A. No.
6     Q. Did you ever have any discussions with
7  anyone at KeyBank about that issue, about whether
8  assurances had been given to CBW that it would be
9  paid?
10    A. No.
11    Q. Have you had any discussions from the date
12 this lawsuit was filed to the present with
13 Mr. O'Connell or anyone else representing KeyBank as
14 to whether in fact KeyBank made -- gave such
15 assurances?
16    A. Yes.
17    Q. Can you tell me what the response was --
18 strike that.
19       Can you tell me what KeyBank's attorneys
20 have told you about that issue?
21    A. They say it never happened.
22    Q. Did you attend a meeting at Goodwin, Procter
23 & Hoar in the middle of July of 2004 at which Epoch
24 made a presentation regarding its due diligence?

Page 125

1     A. Yes.
2     Q. Is your memory generally consistent with the
3  testimony we've already heard, that Epoch had a
4  Power Point presentation that they gave and that,
5  that Power Point presentation concluded with Epoch
6  announcing that it was reducing the purchase price?
7     A. Yes.
8     Q. And following the Epoch Power Point
9  presentation, do you recall that there were
10 subsequent meetings at Goodwin, Procter & Hoar's
11 office where Epoch was not present?
12    A. Immediately following?
13    Q. Yes.
14    A. Yes.
15    Q. Okay. Do you recall that a representative
16 of CBW was at the meeting?
17    A. Yes.
18    Q. That was Matt Caine?
19    A. I believe so, yes.
20    Q. That was the first time you had met
21 Mr. Caine?
22    A. Yes.
23    Q. Did Mr. Caine -- do you remember Mr. Caine
24 having, making any comments either in the larger

32 (Pages 122 to 125)

Stephen F. Gordon

06/09/2005

Page 126

1   group session or any smaller group session about
2   Epoch's presentation or Epoch's due diligence
3   results?
4       A.  No.
5       Q.  Do you remember Mr. Caine commenting on
6   whether or not the proposed reduction in purchase
7   price was fair or unfair?
8       A.  I don't.
9       Q.  Immediately after the Power Point
10  presentation and Epoch announcing -- let me ask this
11  question.
12          Do you remember that Epoch actually had
13  a specific number in mind as to the revised purchase
14  price?
15      A.  They certainly did have a number in mind.
16      Q.  And they shared that with those present?
17      A.  Oh, yes.
18      Q.  Was it immediately after that, that there
19  were sort of -- that there was a meeting where Epoch
20  wasn't present?
21      A.  Yes, in the very same room, Epoch and Matt
22  Caine left the room leaving the representatives of
23  the sellers and KeyBank in the room.
24      Q.  Do you remember who asked Mr. Caine to leave

Page 127

1   the room?
2       A.  I don't remember.
3       Q.  You don't remember?
4       A.  I don't remember.  Might well have been me,
5   but I don't recall.
6       Q.  After Epoch and Mr. Caine left the room, do
7   you remember who was still present in the room?
8       A.  The seller representatives and the KeyBank
9   representatives.
10      Q.  Who were the Key representatives?
11      A.  Madeline Kauffman, Steve Dunham and Rich
12  Marota, M-A-R-O-T-A.
13      Q.  When you said the seller representatives,
14  who was there representing the sellers?
15      A.  I believe John McCullough was there.  I
16  think Mark Tobin was there.  Barry Freid was there.
17  I think Gerry Freid was there, and Frank Barker was
18  there.
19      Q.  Who is Mr. Barker employed by?
20      A.  I don't know.
21      Q.  Does Mr. Tobin -- I mean, I understand that
22  he has an ownership interest in the facilities.  Did
23  he -- was he in an employment relationship, do you
24  know, with any of the facilities?

Page 128

1       A.  I don't know.
2       Q.  Now, after Epoch and Mr. Caine left the
3   room, what was the discussion?  What was the nature
4   of the discussion?
5       A.  KeyBank was asked what they wanted to do
6   with respect to the reduction in the purchase price.
7   Because even at the 37 million dollars, KeyBank had
8   to take a discount of the full amount that it was
9   owed.  So the question was whether KeyBank was
10  willing to take a further discount.  And obviously
11  the additional money that was going to be split
12  between KeyBank and the Freid family evaporated.  So
13  the only question was whether KeyBank would accept
14  what would be left from the reduced Epoch offer.
15      Q.  What was KeyBank's response, do you
16  remember?
17      A.  They were noncommittal.  They wanted the
18  sellers to negotiate with Epoch to see if the
19  offered purchase price could be increased before
20  they made their decision.
21      Q.  Did the sellers agree to do that?
22      A.  Within a day or two they did.
23      Q.  What was the response of the sellers at the
24  meeting that day?

Page 129

1       A.  "That's all there is, no more.  We've given
2   you our final offer, but maybe we should talk."
3       Q.  Okay.  So when you said "that's all there
4   is," is that something Epoch was saying?
5       A.  Yes.
6       Q.  When KeyBank asked if the sellers would
7   negotiate with Epoch, did the sellers agree to do
8   that, that day?
9       A.  Yes.
10      Q.  And there were actually further discussions
11  with Epoch that day about bumping the purchase price
12  up?
13      A.  I don't think so.
14      Q.  Did anyone -- when the seller's
15  representatives and KeyBank's representatives were
16  in the room together, was anyone scratching out on a
17  legal pad or cocktail napkin, you know, the numbers
18  and how it was going to work and whether it was
19  going to work?
20      A.  Not to my recollection.  I think the
21  conversation was very brief.
22      Q.  Do you remember -- I'm handing you back
23  Exhibit 21.  And remember that in paragraph six,
24  there were identified in some of the sub paragraphs

33 (Pages 126 to 129)

Stephen F. Gordon                                                            06/09/2005

Page 130

1  following paragraph six certain obligations
2  including the payment due to CBW, the payment due to
3  the Commonwealth, I think the payment due to
4  Wallerstein was in there. Do you remember any
5  discussion following this meeting with Key where the
6  KeyBank's representatives and the seller's
7  representatives were together as to those
8  obligations and whether they could be satisfied at
9  the reduced purchase price?
10  A. I don't recall anything that specific.
11  Q. Okay. At any time after, do you remember
12  during that meeting any reference to CBW and the fee
13  that was due?
14  A. No.
15  Q. Do you know what Mr. Caine was doing while
16  you were meeting? Was he still there? Had he left?
17  A. When I opened the door or when the door was
18  opened -- actually, when I walked out the door after
19  this brief meeting with KeyBank, Mr. Caine was
20  sitting in the reception area talking to Larry
21  Gerber.
22  Q. Was there any -- did you have any
23  discussions with Mr. Caine at that time as to what
24  was going to occur next?

Page 131

1  A. Not that I recall.
2  Q. Was there -- did the seller's
3  representatives then have any further discussion
4  with Epoch that day that you can recall?
5  A. I don't believe so.
6  Q. During the meeting with the three KeyBank
7  representatives that you identified, do you remember
8  any sense as to who was -- having a sense as to who
9  was calling the shots on the KeyBank side in terms
10  of the request that KeyBank take less?
11  A. Yes.
12  Q. Who was that?
13  A. Mr. Marota.
14  Q. Did you ask him for a business card or have
15  an understanding of what his position was?
16  A. The answer to the first question is I don't
17  remember whether I asked him for a business card.
18  But my understanding of his position was that he was
19  Steve Dunham's immediate superior.
20  Q. Following the meeting that day, the July
21  13th meeting, I think you said that in the next
22  couple -- over the next couple of days there were
23  some discussions with Epoch?
24  A. Yes.

Page 132

1  Q. Who had those discussions?
2  A. I had them with Andy Sucoff.
3  Q. What was the substance of those discussions?
4  A. The dollar amount of the purchase price.
5  Q. Do you remember in terms of those
6  discussions, were you -- you were obviously
7  advocating for a higher purchase price?
8  A. Yes.
9  Q. Were you advocating for a higher purchase
10  price based on any specific argument or disagreement
11  with what Epoch had put on in its Power Point
12  presentation?
13  A. No.
14  Q. Was the nature of the discussion more that
15  they had to raise the purchase price or the deal
16  wouldn't go?
17  A. Yes.
18  Q. Did you -- in the context of those
19  discussions with Andy Sucoff, did you ever disclose
20  to him the amount of the fee that was going to be
21  due to CBW?
22  A. I don't think that ever came up.
23  Q. Do you recall whether Epoch -- strike that.
24      In your conversations with Sucoff, do

Page 133

1  you recall suggesting to him a figure that was
2  absolutely essential to make the deal happen?
3  A. I'm sure I did.
4  Q. Do you remember that was a figure that Epoch
5  ultimately went up to?
6  A. No, I'm sure they went up to something less
7  than that.
8  Q. Do you recall how much less?
9  A. My memory is that I asked -- the offer at
10  the July meeting I think was 32 million dollars or
11  it might have been 31 and a high number of hundreds
12  of thousands of dollars. And I asked him to
13  increase it I believe to 32 million seven hundred
14  fifty thousand dollars. Again, this is from memory,
15  but I think we're in the ballpark. And I think that
16  at 32 million 250 thousand dollars he communicated
17  to me that, that was the end for his client. And
18  that they were willing to walk away for anything
19  more than that.
20  Q. During that same period were you also having
21  discussions with KeyBank to try to get them to take
22  less?
23  A. Yes.
24  Q. Were those with Madeline Kauffman?

34 (Pages 130 to 133)

Stephen F. Gordon

06/09/2005

Page 134

1  A. Yes, always.
2  Q. Was there a reason you didn't communicate
3  with this guy Marota?
4  A. I'm a lawyer.
5  Q. I was forgetting he wasn't a lawyer. In the
6  context of those discussions, did Madeline Kauffman
7  ever say that at a certain amount, Key would forego
8  the deal?
9  A. Sure.
10  Q. Did she ever tell you what that amount was?
11  A. You know, these are negotiations. And
12  everybody says "that's my bottom line," and the
13  bottom line never somehow quite seems to be the
14  bottom line. But it was -- it was a three-way
15  discussion trying to get Epoch to pay more,
16  obviously, which would have made things very easy as
17  they were at the 37 million dollar level. But the
18  discussions I had with Madeline Kauffman were that
19  there were certain things that had to be paid, and
20  would KeyBank accept the balance.
21  Q. What were the things that had to be paid?
22  A. One of them, I don't know whether it was the
23  first one we discussed, but I know it's the one you
24  were interested in, one of them was CBW, one of them

Page 135

1  was the Commonwealth of Massachusetts recoupment,
2  which was essentially an encumbrance on the
3  property, and I think they understood that. One was
4  the Beaver Builders' amount that was still
5  outstanding at that time. The incentive fee to
6  Mr. Wallerstein. I don't know if there were any
7  others.
8  Q. Now, did Beaver Brook, did they have some
9  sort of -- I'm no expert in any of this, but did
10  they have some kind of lien on the property as a
11  result of the amount that was owed to them?
12  A. I don't believe so. It's possible,
13  because -- I don't know anything about the real
14  estate title. So it's possible that they had some
15  sort of mechanics lien, but I don't know that.
16  Q. Prior to Epoch even surfacing, and I think
17  you said you had been having some negotiations with
18  Key prior to the whole process beginning with the
19  letters of intent and things like that; is that
20  right, in terms of keeping things going until the
21  transactions could happen?
22  A. I first got involved --
23  Q. This might be a simpler question. Prior to
24  Epoch making even its initial indication of

Page 136

1  interest, giving a range that went up to something
2  like 37 million, do you recall having any
3  discussions with Madeline Kauffman in terms of
4  trying to work something out as to what Key would
5  take? Before they ever heard this fantastic number
6  of 37 million, do you remember the bank ever saying
7  we need at least X amount?
8  A. I do remember the bank saying we need --
9  well, when I first got involved, I believe it was
10  May of 2003, and at that point the KeyBank Financed
11  Facilities included South Pointe. South Pointe and
12  Cranberry Pointe were covered I believe by a single
13  note. When South Pointe was HUD refinanced, I
14  believe at the end of calendar year 2003, the
15  proceeds were applied to that note. And I remember
16  Madeline Kauffman saying the balance of that note
17  had to be repaid. The balance of the Cranberry
18  Pointe note had to be repaid. And my memory is
19  that, that was 11 million dollars. It might have
20  been a bigger number than that, I don't know. My
21  memory is that it was 11 million, and that was
22  always a number that had to be paid. And as I
23  understood it, the discount was going to come from
24  the Chestnut Hill loan. The Cranberry Pointe loan

Page 137

1  was going to be repaid in full.
2  Q. As to the Chestnut Hill loan, again before
3  Epoch came in with this number, did you ever have
4  any discussions with the bank as to the minimum
5  amount they needed in terms of that loan?
6  A. No, I don't think I did.
7  (Exhibit 90 marked for identification.)
8  (Document exhibited to witness.)
9  Q. Mr. Gordon, these two e-mails again are
10  e-mails that were printed out from your computer
11  system?
12  A. Yes.
13  Q. And you see on the bottom e-mail you're
14  relaying to Andy Sucoff that -- you say, "Key and
15  The Pointe Group have both compromised to make the
16  deal happen." Do you recall at that point in time,
17  this was two days after that July 13th meeting,
18  whether KeyBank had in fact compromised its
19  position?
20  A. KeyBank had agreed that it would take less.
21  Q. You also say that The Pointe Group has
22  compromised. What did you mean by that?
23  A. The money that was going to the Freid family
24  was gone.

35 (Pages 134 to 137)

Stephen F. Gordon                                                    06/09/2005

Page 138

1    Q. It says, "We are still 250 thousand dollars
2  short, and we have asked Matt Caine of CBW to reduce
3  the commission from one million 50 thousand to eight
4  hundred thousand," correct? That's what it says in
5  this e-mail?
6    A. Yes.
7    Q. Was it you that asked Matt Caine to do that?
8  Did you relay that request to Matt Caine?
9    A. I don't remember.
10    Q. The amount that's reflected there, one
11  million 50 thousand, that was based on the new
12  purchase price?
13    A. Yes.
14    Q. And at the point where you relayed this
15  e-mail to Andy Sucoff, it's fair to say that you
16  still expected that CBW would still receive this
17  fee?
18    A. Yes.
19    Q. At the end of the e-mail you say, "There are
20  now three choices: One, CBW reduces 250 thousand;
21  two, Epoch pays 250 thousand more or no deal." Do
22  you recall which of those things happened?
23    A. None of the three.
24    Q. How was it that the deal was able to go

Page 139

1  forward?
2    A. KeyBank took less. So I suppose there was
3  actually a fourth choice.
4    Q. Do you remember after -- strike that.
5        Is it your memory that within say a week
6  of the July 13th meeting that there was agreement on
7  a new purchase price?
8    A. Approximately, yes.
9    Q. And between that time and let's say through
10  the end of August, is it fair to say there weren't
11  any further changes to the purchase price?
12    A. I think that is fair to say.
13    Q. And would it also be accurate that during
14  that time period, everybody was completing what
15  needed to be done in order for the transaction to
16  close?
17    A. I believe so, but that part of the
18  transaction was invisible to me.
19        (Exhibits 91 and 92 marked for
20  identification.)
21        (Documents exhibited to witness.)
22    Q. Mr. Gordon, these two e-mails, 91 and 92,
23  these were both printed from your computer system,
24  correct?

Page 140

1    A. Yes.
2    Q. Are these e-mails, would it be fair to say
3  that these e-mails pertain to the issue we were
4  talking about, that Epoch had difficulty dealing
5  with Barry Freid?
6    A. Yes, or perceived difficulty dealing with
7  Barry Freid.
8    Q. Did anyone from KeyBank ever express to you
9  that they had any difficulties with Barry Freid?
10    A. I don't think so.
11    Q. How about CBW, did anyone from CBW ever
12  communicate to you any concerns or complaints about
13  Barry Freid?
14    A. I don't think so.
15    Q. Mr. Gordon, do you recall that in late
16  August and early September of 2004, I think you
17  alluded to this earlier in your deposition
18  testimony, that the issue of an encroachment at the
19  Chestnut Hill property arose?
20    A. Yes.
21    Q. And ultimately did that encroachment issue
22  result in an increased -- result in the buyer
23  requiring an increased escrow at the time of the
24  closing?

Page 141

1    A. No.
2    Q. How was that issue ultimately resolved?
3    A. The buyer agreed to close over the title
4  defect for a seven hundred thousand dollar credit
5  against the purchase price.
6    Q. It would be fair to say that you have no
7  information to suggest that CBW knew about that
8  encroachment at any time prior to it becoming public
9  knowledge to everyone?
10    A. That would be fair.
11    Q. Do you also recall that in September of
12  2004, fairly close to the closing date, an issue
13  arose with respect to a grand jury subpoena being
14  served on representatives of the facility in Cape
15  Cod?
16    A. Yes.
17    Q. And that issue also was brought to the
18  buyer's attention, correct?
19    A. Correct.
20    Q. Do you recall the buyer requesting any
21  accommodation in light of that issue having arisen?
22    A. Yes.
23    Q. What was that?
24    A. They wanted to increase the amount of the

36 (Pages 138 to 141)

Page 142

1  escrow and increase the time before there would be a
2  release of the escrow.
3     Q. As you sit here today, do you know whether
4  that escrow has ever been released?
5     A. I believe it has not.
6     Q. And again, with respect to that issue,
7  obviously CBW had no involvement in that issue
8  arising or being brought to Epoch's attention?
9     A. Correct.
10    Q. Do you recall that shortly before the
11 closing, there was a conference call among you and
12 Madeline Kauffman and Epoch's counsel as to a final
13 resolution of what the purchase price would be in
14 light of these outstanding issues?
15    A. Yes.
16    Q. And during that conference call, do you
17 recall there being any discussion as to whether
18 there was sufficient funds to pay CBW?
19    A. I don't recall any.
20    Q. Do you recall during that telephone
21 conversation any discussion as to specific
22 obligations that had to be paid in order for the
23 transaction to close?
24    A. I don't recall that, either.

Page 143

1     Q. What do you recall the discussion being in
2  terms of who had to do what to make the numbers
3  work?
4     A. I recall the deal was that KeyBank would
5  take what was left after the list of things that had
6  to be paid from the closing proceeds. And if the
7  buyer was going to reduce the purchase price by
8  seven hundred thousand dollars, that was going to
9  reduce KeyBank's receipts by a like amount.
10    Q. So at the conclusion of that conference
11 call, it's your recollection that the understanding
12 was that -- well, let me ask this.
13        At the conclusion of that conference
14 call, was there agreement on what the price purchase
15 would be?
16    A. I'm not sure. I'm not sure when the
17 agreement actually took place.
18        (Exhibit 93 marked for identification.)
19        (Document exhibited to witness.)
20    Q. Mr. Gordon, this e-mail, which appears to be
21 again printed from your computer system and it's
22 dated September 27, 2004 from you to Madeline
23 Kauffman, does this e-mail reflect the agreement
24 that was reached at that conference call?

Page 144

1     A. I believe it does.
2     Q. And you do see that this is cc'd to John
3  McCullough and Peter Haley. Do you know if you sent
4  a copy of this e-mail or a similar e-mail to anyone
5  at Epoch to confirm that this was the deal?
6     A. I don't know. I generally do not use bcc's.
7  Although I think my system a bcc would show up. But
8  I don't use that. So --
9     Q. Okay, let me ask this question. On that
10 conference call where there was this discussion
11 about how the numbers would work, was Epoch part of
12 that call or was that just a call between KeyBank
13 and the sellers?
14    A. I believe just between KeyBank and the
15 sellers. I believe it's actually just among
16 counsel.
17    Q. You and Madeline Kauffman?
18    A. And John McCullough.
19    Q. There's a reference in here, it says, "We
20 have agreed that the KeyBank payoff, formerly 29
21 million, 925 thousand plus a 75 thousand dollar
22 note, will now be 29 million, 425 thousand dollars
23 and no note." Do you see that?
24    A. Yes.

Page 145

1     Q. What was the note that was being omitted?
2     A. KeyBank had insisted at some point that they
3  had to have 30 million dollars. That was a bottom
4  line. When there wasn't enough money for that, I
5  think Barry Freid said, "I'll sign a note for 75
6  thousand dollars."
7     Q. So KeyBank was now moving off that
8  requirement?
9     A. Moving off the 30 million dollars.
10    Q. Do you recall during that conference call on
11 September 24th, at that late stage of the game, do
12 you recall whether Madeline Kauffman was still
13 insisting that KeyBank would walk away from the deal
14 if they didn't get a certain amount?
15    A. Well, that's always the way negotiations
16 are. You know, it's sort of like union and
17 management. We'll strike. We'll close down. I
18 don't think it was again confrontational in any
19 sense. It was just this is the limit of our
20 authority or something of that sort.
21    Q. During that call, did Madeline Kauffman say
22 to you, you know, "I can't make this decision. I'm
23 going to have to get back to you," or did it appear
24 as though she would be able to make this agreement

37 (Pages 142 to 145)

Stephen F. Gordon                                                                                  06/09/2005

Page 146

1  to go down to the 29 million 425 without checking
2  with anyone else?
3      A. I believe that she had authority. I guess
4  it's possible that her client was on the phone. I
5  have a vague recollection this was just among
6  counsel, but I think that she had authority. I also
7  think that during that Friday, there were numerous
8  telephone calls where Madeline would convey the
9  bank's position to me. I would say, "Well, I can't
10 do that." I would talk with client representative.
11 She would I'm sure do likewise, and we would go back
12 and forth. I think this went on for -- the e-mail
13 says, "The hour was late for all of us on Friday."
14 So I think it went on well into the evening. I
15 don't mean two a.m., but well into the evening,
16 before the process of my client says this is all I
17 have authority for and so on and so forth reached
18 the agreement at the 29 million 425.
19     Q. Well, in terms of what -- I can understand
20 KeyBank was negotiating down from a number. Now, I
21 guess what I'm a little more confused about is what
22 you would be negotiating, because as I understand
23 it, your clients weren't going to get any money.
24 So, in terms of what you were saying to Madeline

Page 147

1  Kauffman, I guess I'm wondering what were you -- let
2  me ask it this way.
3          During that day on Friday, you said that
4  there were various communications between you and
5  Madeline Kauffman. What was it that you were
6  authorized by your clients to convey to Madeline
7  Kauffman?
8      A. What was I authorized to or what did I
9  convey to her?
10     Q. What did you convey to her?
11     A. I told her that we were willing to walk away
12 from the deal and pursue the HUD refinancing.
13     Q. Okay. Unless what?
14     A. Unless they reduced the amount that was
15 necessary to pay off the bank.
16     Q. But throughout that day, was it always going
17 to be the case, given the amount of money involved,
18 that your clients were going to get nothing?
19     A. Yes.
20     Q. So were you conveying to Madeline Kauffman
21 that the bank had to bring down what it was going to
22 take, because your clients weren't going to actually
23 bring money to the closing?
24     A. Yes.

Page 148

1      Q. In terms of the position of your clients
2  that you were conveying to Madeline Kauffman, who
3  was conveying that information to you to be conveyed
4  to Madeline Kauffman?
5      A. I can't answer that.
6      Q. Are you aware that in -- strike that.
7          We've talked about the closing in this
8  case, the closing occurring on September 30th of
9  2004, correct?
10     A. Yes.
11     Q. And prior to the closing, were you aware
12 that CBW had sent an invoice and wiring
13 instructions?
14     A. I don't think so.
15         (Exhibit 94 marked for identification.)
16         (Document exhibited to witness.)
17     Q. Mr. Gordon, this document marked as Exhibit
18 94 appears to be an e-mail printed out by Matt
19 Caine. You see that the e-mail below is an e-mail
20 from Matt Caine to you on September 28, 2004, two
21 days before the closing. You see that he says,
22 "Steve, thank you for the update yesterday, and
23 congratulations to you on bringing this transaction
24 on an intent to close." Do you recall what the

Page 149

1  update was?
2      A. I don't.
3      Q. He then goes on to say, "Can you please
4  share with us who will be overseeing the
5  administrative side to the transaction and where the
6  closing was to take place or if it's to be handled
7  remotely." Then he asks you if you anticipate a
8  closing for this Thursday. And you sent an e-mail
9  back to him saying, "I don't know the answers to
10 your question. I asked many of the same this
11 morning but was in a deposition all day today." Do
12 you see that?
13     A. Yes.
14     Q. Was it correct to say that on this day,
15 September 28th, you didn't know whether the closing
16 was going to be on September 30th?
17     A. That's correct.
18     Q. Just looking at that exhibit again, you say
19 I asked many of the same questions this morning.
20 Who did you ask about that?
21     A. I don't remember.
22         (Exhibit 95 marked for identification.)
23         (Document exhibited to witness.)
24     Q. Mr. Gordon, this document marked as Exhibit

38 (Pages 146 to 149)

Page 150

1   95, which was produced by Goodwin Procter in
2   response to the subpoena served on them. You see
3   that on the first page there's a message about
4   two-thirds of the way down from Laurie Woodward to
5   you. "I believe you're coming over for the closing.
6   If so, I wanted you to have this information." Then
7   she sends you what appears to be a message that she
8   sent the prior evening with details of the closing.
9   Then you respond back to her. You say, "I will be
10  coming at some point." When you received this
11  e-mail from Laurie Woodward, did you forward this on
12  to Matt Caine as it answered some of the questions
13  he had posed to you?
14      A. I don't believe I did.
15      Q. Did you call Matt Caine and tell him, "Now I
16  know where the closing is, it's tomorrow and it's at
17  Goodwin Procter"?
18      A. I doubt it.
19          (Exhibit 96 marked for identification.)
20          (Document exhibited to witness.)
21      Q. Mr. Gordon, you see this series of e-mails
22  that were sent between you and Madeline Kauffman the
23  night before the closing and the last one from her
24  to you is at 10:46 p.m.?

Page 151

1       A. I see that, yes.
2       Q. Do you know whether, at the time the night
3   before the closing these e-mails were being
4   exchanged, whether you were at your office or at a
5   home computer?
6       A. I was at a home computer. Well, I was out
7   that night. So I didn't see the e-mails until very
8   late. I didn't see the first of the e-mails until
9   my response at ten p.m., after ten p.m.
10      Q. And you see that at the top message from
11  Madeline Kauffman to you says, "I understand from
12  John McCullough that everything is set for
13  tomorrow." Do you see that?
14      A. Yes.
15      Q. That was on 10:46 p.m. on the night before
16  the closing?
17      A. Correct.
18      Q. Then the next morning you at some point
19  arrived at Goodwin Procter for the closing, correct?
20      A. Yes.
21      Q. And between getting Madeline Kauffman's
22  e-mail and arriving at Goodwin Procter for the
23  closing, did you have any conversations with anyone
24  or I should say communications with anyone, either

Page 152

1   by e-mail or by telephone or in person, concerning
2   any subject that was going to be addressed at the
3   closing?
4       A. I don't believe so.
5       Q. So you get this e-mail from Madeline
6   Kauffman, and it says, "I understand from John
7   McCullough that everything is set for tomorrow,"
8   correct?
9       A. Correct.
10      Q. And then the next morning you arrive at
11  Goodwin Procter for the closing?
12      A. Yes.
13      Q. And between those two, you had, had no
14  communications with anyone, including anyone on the
15  seller's side, regarding the closing?
16      A. I don't believe I did. I may have had a
17  conversation with Andy Sucoff, because at that point
18  we hadn't concluded on the extension of time for the
19  escrows to be outstanding. And he might even have
20  been asking for a little bit more money in escrow.
21  I don't know. The escrows for some reason had not
22  been determined.
23      Q. Did you go -- do you remember if before
24  going to Goodwin, Procter & Hoar for the closing,

Page 153

1   whether you went into your office in the morning?
2       A. Yes, I did.
3       Q. So if you had communications with Andy
4   about the escrows, it would have happened then?
5       A. Might have been on a cell phone or on the
6   way in. That's a possibility. Or it would have
7   been in my office. The fact that there don't appear
8   to be any e-mails leads me to believe that either --
9   certainly there was no e-mail, and maybe there was
10  no communication until I actually arrived at Goodwin
11  Procter mid morning.
12      Q. When you arrived at Goodwin, Procter & Hoar
13  for the closing, was it your understanding that CBW
14  was going to be paid out of the sale proceeds?
15      A. I had no understanding. I can't say that I
16  was thinking about that at all.
17      Q. Well, we've looked at some exhibits, and we
18  can certainly pull them out, where you had
19  calculated the fees that were due to CBW?
20      A. Yes.
21      Q. Correct?
22      A. That is correct.
23      Q. And between the time that you did those
24  calculations and the time that you arrived at the

39 (Pages 150 to 153)

Stephen F. Gordon                                                           06/09/2005

Page 154

1   closing, had your belief changed at all as to
2   whether CBW was going to be paid?
3       A.  No, it had not.  So I may have misanswered
4   your question.  My understanding was nothing
5   specific to CBW, but with respect to the listed
6   items of CBW, Medicaid recoupment, we had eliminated
7   Stanley Wallerstein.  Beaver Builders had been paid
8   previous to the closing, not out of the proceeds.
9   My understanding was that the sellers were walking
10  away with nothing.  But certainly that they weren't
11  contributing anything.
12      Q.  So going back to Exhibit 96.  When you asked
13  Madeline Kauffman, you said is there enough money,
14  was that question whether there was enough money to
15  pay Key what it had agreed to take and these other
16  obligations?
17      A.  Absolutely.  I wasn't for some reason copied
18  on the closing statement.  If you see, on the second
19  page of Exhibit 96, when I finally got back to my
20  computer, I left the office maybe at 4:30 to go out.
21  When I got back to the office -- to my home that
22  evening, I turned on the computer and I saw these
23  earlier messages.  I said, "Perhaps I missed it, but
24  I saw no draft settlement statement today.  When did

Page 155

1   you send it?  Can you please resend?"  Of course
2   everybody but Madeline and me were maybe asleep by
3   then.  But Madeline did not forward it to me,
4   either.
5       Q.  Even if you didn't see the settlement
6   statements that were being circulated that day, had
7   you seen any prior drafts of settlement statements?
8       A.  No.
9       Q.  When you arrived at Goodwin, Procter & Hoar
10  had folks started signing documents yet or --
11      A.  No.
12      Q.  Do you remember whether the Freids were
13  already there when you arrived?
14      A.  They were.
15      Q.  And John McCullough was there as well?
16      A.  Yes.
17      Q.  Do you remember during -- on the day of the
18  closing, whether anyone from KeyBank was at the
19  closing?
20      A.  I don't recall anybody from KeyBank being
21  there.
22      Q.  Did you expect to see someone from KeyBank
23  at the closing?
24      A.  I don't know whether I had any expectation.

Page 156

1       Q.  Had you had any discussions with Madeline
2   Kauffman or Steve Dunham -- well, you wouldn't have
3   had discussions with Steve, but with Madeline
4   Kauffman as to whether she was going to be there?
5       A.  I may have asked her whether she was coming.
6       Q.  Do you remember what her response was?
7       A.  I don't.
8       Q.  When you arrived at the closing, did you
9   then review settlement statements?
10      A.  No.
11      Q.  What did you do during the closing?
12      A.  When I arrived -- I don't want -- again, I
13  don't want to split hairs, but it depends on what
14  you mean by closing.  If closing is signing of
15  documents, I did not participate in that.  When I
16  arrived at Goodwin Procter on September 30th, there
17  was a large conference room about the size of this
18  conference room filled with papers on this.  Again,
19  I'm not a transactional lawyer, but they have those
20  accordion-type things with papers stretching from
21  one end of a gigantic conference table to the other.
22  My clients were not in that room.  The sellers were
23  in another conference room diagonally across the
24  hall, and I went into that room.  And shortly

Page 157

1   thereafter, John McCullough and I left that room to
2   have conversations with Andy Sucoff on the escrows,
3   which was the only open issue that I was working on.
4   I was working on KeyBank, the encroachment and the
5   escrows or the requests for additional escrow
6   arising from the Attorney General's investigation.
7   And John McCullough and I spoke with Andy Sucoff.
8   I believe we went back into the room with the clients.
9   We then left and concluded an agreement on the
10  escrows with Andy Sucoff.  And at that point, I
11  think it might have been another half an hour or 45
12  minutes after we concluded the agreement, obviously
13  somebody has to then put pen to paper.  I don't
14  remember actually reviewing the escrow documents.
15  John McCullough and his two people did that.  And
16  then everybody moved into the closing room.  By this
17  time, it was well after one o'clock in the afternoon
18  is my memory.  And I brought Georgia Freid into the
19  closing room.  This was very emotional for her,
20  because her late husband had built Chestnut Hill.
21  It was intended to be the crown jewel.  It was very
22  difficult for her.  I actually quite literally held
23  her hand for a few minutes in the closing room.  And
24  I asked her if everything was okay.  She was fine,

40 (Pages 154 to 157)

Page 158

1  and her sons were there. And Mark Tobin, whom I
2  think she has a nice relationship, was there. I
3  left.
4      Q. So you didn't stay while she actually signed
5  the documents?
6      A. I did not.
7      Q. Now, in connection with the discussions with
8  Andy Sucoff on the escrows, did you review the
9  settlement sheet to make sure they accurately
10  reflected what you had agreed on in terms of the
11  escrows?
12      A. No.
13      Q. So even if you weren't given a copy of a
14  settlement statement, it's your testimony that
15  through the day you were at Goodwin, Procter & Hoar
16  you never reviewed any draft settlement statements?
17      A. I never saw a settlement statement. I
18  didn't even know one had been prepared, other than a
19  draft that was sent that no one shared with me. But
20  if it was all set, it was all set. The closing
21  wasn't my responsibility.
22      Q. In terms of the discussion on the escrows
23  with Andy Sucoff, now those would have been -- there
24  were two escrows that were established, correct?

Page 159

1      A. I believe so.
2      Q. And the discussions were what the amount of
3  those escrows would be?
4      A. I'm not sure why there were two escrows.
5  One seemed to be for a purpose that the
6  transactional lawyers well understood, and there was
7  no issue with that. The other one seemed to be the
8  one that they were focusing on with respect to how
9  that would pay for any unanticipated additions
10  arising for the buyer out of the Attorney General's
11  investigation. That's the escrow that was the focus
12  of the discussion among Andy Sucoff, John McCullough
13  and myself the day of the closing.
14      Q. Do you recall whether as a result of those
15  discussions, the amount of the escrow went up or
16  went down or stayed the same?
17      A. I don't know whether the amount went up. I
18  know that the time that it would -- that the money
19  would remain in escrow was lengthened. The amount
20  may have gone up, too, maybe by one hundred thousand
21  dollars. I'm not sure.
22      Q. At any point during the time that you were
23  at Goodwin, Procter & Hoar, did you become aware
24  that CBW's fee was not going to be paid out of the

Page 160

1  sale proceeds?
2      A. I don't remember learning that at the time.
3      Q. During the discussions that you had with
4  Andy Sucoff about the escrow amounts, did the
5  subject of CBW's fee come up at all?
6      A. I don't believe so.
7      Q. Did you have discussions while you were at
8  Goodwin, Procter & Hoar with anyone as to whether
9  CBW's fee was going to be paid that day?
10      A. I can't answer that.
11      Q. You're not going to answer the question of
12  whether you had such discussions with anyone?
13      A. I can't answer that.
14      Q. When you left Goodwin, Procter & Hoar after
15  you were in the closing room with Georgia Freid, at
16  the time you left Goodwin, Procter & Hoar, did you
17  have an understanding as to whether CBW's fee was
18  going to be paid that day?
19      A. I can't answer that.
20      Q. While you were at Goodwin, Procter & Hoar,
21  did you have any communications with anyone at CBW?
22      A. No.
23      Q. Did you have communications while you were
24  at Goodwin, Procter & Hoar with anyone at KeyBank?

Page 161

1      A. No.
2      Q. What did you do after you left Goodwin,
3  Procter & Hoar?
4      A. I went back to my office for a pre-scheduled
5  meeting, which I believe was either at 2:00 or 2:30.
6      Q. Was that meeting unrelated to --
7      A. Totally.
8      Q. -- the transaction? While you -- do you
9  remember how late you were at the office that night?
10      A. I don't.
11      Q. While you were at the office, either before
12  or after this other meeting, did you have any
13  discussions with anyone from CBW about the
14  transaction or CBW's fee?
15      A. No.
16      Q. Did you have discussions about the
17  transaction with anyone from KeyBank that afternoon?
18      A. No.
19      Q. How about after you left the office that
20  day, did you have conversations with anyone from CBW
21  or KeyBank from home or the car?
22      A. I don't believe so.
23      Q. How about the next morning? I know you
24  testified earlier you remember that you had a

Stephen F. Gordon                                                                    06/09/2005

Page 162

1  telephone conversation with Ed Casas.
2      A. Yes.
3      Q. Do you remember whether Ed called you or you
4  called him?
5      A. I believe he called me.
6      Q. Before Ed Casas called you, had you had
7  conversations with anyone at KeyBank about whether
8  the transaction closed, anything related to the
9  transaction?
10     A. I don't believe so.
11     Q. What did Mr. Casas say when he called you?
12     A. He said, "Are we going to be paid?"
13     Q. What did you say?
14     A. I said, "I'm working on a letter to you."
15     Q. What was his response to that?
16     A. "I don't need a letter. Just tell me
17  whether we're going to get paid or not."
18     Q. What did you say?
19     A. "I'd rather send you a letter."
20     Q. What do you recall happening next in terms
21  of CBW?
22     A. I sent them a letter.
23     Q. Did Mr. Casas call you again after he
24  received the letter?

Page 163

1      A. I had a lot of calls that day. I think he
2  did. I think Mr. Casas did call me once more
3  without a lawyer and then once again with a lawyer
4  or maybe just his lawyer.
5      Q. Do you believe that, that day you did have
6  conversations with a lawyer for CBW, whether
7  Mr. Casas was on the call or not?
8      A. I think so.
9      Q. Was that Jeff Marwell?
10     A. I believe it was, yes.
11     Q. And you said you had a lot of calls. Were
12  those calls specific to the issue of whether or not
13  CBW was going to be paid?
14     A. Somewhat.
15     Q. Who were those calls with?
16     A. The only one I can disclose to you is Andy
17  Sucoff.
18     Q. Do you recall when Andy Sucoff called you in
19  terms of your letter? Was it before or after you
20  had sent your letter?
21     A. I don't recall. I do recall -- I don't
22  recall, because I don't remember whether it was
23  while I was working on it or after I had sent it. I
24  remember asking Mr. Sucoff to send me a copy of the

Page 164

1  closing statement, because Ed Casas had specifically
2  asked for it.
3      Q. So the call that you had with Andy Sucoff,
4  was that call initiated by you to Mr. Sucoff?
5      A. No.
6      Q. What did Mr. Sucoff say when he called?
7      A. He told me that his client had received a
8  threatening phone call from the broker, and he was
9  agitated because the broker had threatened to get an
10  injunction to stop the transaction.
11     Q. What did you say in response?
12     A. I said, "I'm working on a letter to the
13  broker," and I asked him for a copy of the closing
14  statement.
15     Q. Did you say anything else to Mr. Sucoff?
16     A. I don't recall.
17     Q. Did you tell Mr. Sucoff what was in your
18  letter?
19     A. I don't think so.
20         (Exhibit 97 marked for identification.)
21         (Document exhibited to witness.)
22     Q. Mr. Gordon, the document that's been marked
23  as Exhibit 97, did you send copies of this to anyone
24  other than Mr. Caine? I think I missed a word

Page 165

1  there. Did you send copies of this to anyone other
2  than Mr. Caine?
3      A. I don't know whether I e-mailed it
4  simultaneously to Mr. Casas.
5      Q. Did you send this letter to anyone from
6  KeyBank or Epoch?
7      A. I don't believe so.
8      Q. When did you start working on this letter?
9      A. I can't tell you that.
10     Q. Did you show drafts of this letter to anyone
11  before you sent it to Mr. Caine?
12     A. No.
13     Q. Did Gerry Freid specifically authorize you
14  to convey to CBW the number of 782,773 that's in
15  your letter?
16     A. I can't answer that.
17     Q. Well, you say in the first paragraph of your
18  letter that you will conclude with a settlement
19  proposal at Gerry Freid's insistence, correct?
20     A. That's what the letter says.
21     Q. Did Gerry Freid tell you something that he
22  intended for you to convey to CBW?
23     A. I can't answer that.
24     Q. You say in the letter that Mr. Freid sent

42 (Pages 162 to 165)

Stephen F. Gordon                                                                                       06/09/2005

Page 166

1  you the invoice from CBW. When did you first see
2  that invoice?
3      A. I don't recall.
4      Q. Do you recall that it was in connection with
5  writing this letter?
6      A. I don't remember. I believe so, but I don't
7  remember.
8      Q. In the third paragraph of your letter you
9  say, "To my knowledge, no analytical work at all,
10 let alone acceptable in all respects, has been
11 performed." Do you see that?
12     A. Yes.
13     Q. Is the basis of that statement that you
14 never reviewed any of CBW's work product?
15     A. No.
16     Q. What is the basis of your statement that no
17 analytical work at all has been performed?
18     A. I can't answer that.
19     Q. You go on to say, "I know of no
20 restructuring services rendered nor any meaningful
21 work done on refinancing or raising the capital."
22 Do you see that?
23     A. Yes.
24     Q. Your knowledge that no restructuring

Page 167

1  services were rendered nor any meaningful work done
2  on refinancing or raising new capital, is that based
3  on your independent review of any documents?
4      A. I'm sure -- well, I'm not sure. No, I'm not
5  sure if it's based on any review of documents.
6      Q. Did you ever review all of the work product
7  that CBW did and sent to your clients?
8      A. No.
9      Q. In the fourth paragraph of the letter,
10 second sentence says, "In any event, none of the
11 desired objectives of my client to either
12 restructure debt, refinance or raise new capital
13 were even explored." Isn't that inconsistent with
14 the summary of the letters of intent that we looked
15 at that CBW solicited and received?
16     A. I don't think so.
17     Q. The statement that you make at the bottom of
18 the first page carrying over to the second that,
19 "CBW is not qualified to act as a real estate broker
20 in Massachusetts, which is a necessary prerequisite
21 for earning and collecting a brokerage commission,"
22 is that statement based on any legal research that
23 you did?
24     A. I can't answer that.

Page 168

1      Q. When did you first conduct any legal
2  research regarding the issue of whether CBW was
3  entitled to collect its fee based on its status as a
4  licensed real estate broker?
5      A. I can't answer.
6          (Exhibit 98 marked for identification.)
7          (Document exhibited to witness.)
8      Q. In this -- Mr. Gordon, this obviously is an
9  affidavit of yours that was signed on January 4,
10 2005.
11     A. Yes.
12     Q. Even though obviously what appears here is
13 the new form of electronic signature, this is an
14 affidavit that you signed?
15     A. Absolutely.
16     Q. Looking at paragraph seven of the affidavit,
17 it refers to an attachment, which I believe is what
18 you previously testified to, the e-mail that you
19 sent to Mr. Casas on October 1st at 12:41 p.m.?
20     A. Correct.
21     Q. And beneath that is an e-mail from Andy
22 Sucoff at 12:19 p.m.?
23     A. Correct.
24     Q. In your e-mail to Mr. Casas, you say, "Ed, I

Page 169

1  am forwarding to you the just received closing
2  statement. As you can see the, quote, seller, close
3  quote, was required to pay over two hundred thousand
4  dollars at closing." Do you see that?
5      A. Yes.
6      Q. Have you ever reviewed -- strike that.
7          At the time you had sent this e-mail to
8  Mr. Casas, had you ever reviewed any other draft or
9  version of a closing statement that showed the
10 sellers bringing in excess of a million dollars to
11 the closing?
12     A. No.
13     Q. You then say, the fourth sentence, "I hear
14 that my clients are not the only ones who have
15 threatened." Do you see that?
16     A. Yes.
17     Q. What did you mean when you refer to your
18 clients being threatened?
19     A. I believe that Mr. Casas called them and
20 threatened them.
21     Q. When do you think that happened or what was
22 your understanding?
23     A. I think that happened on the morning of
24 October 1st.

43 (Pages 166 to 169)

Stephen F. Gordon                                                                    06/09/2005

Page 170

1    Q.  What was your understanding as to who
2  Mr. Casas called?
3    A.  I think it was Gerry Freid.
4    Q.  If you look at the closing statement that's
5  attached to your e-mail and you look at page -- it's
6  schedule seven.  It has the closing costs and
7  disbursements.
8    A.  Yes.
9    Q.  If you look at item number four, broker
10  commission, it says payable to Casas, Benjamin &
11  White, LLP, then it says POC by seller; do you see
12  that?
13    A.  Yes, I do.
14    Q.  You were at Mr. McCullough's deposition,
15  correct?
16    A.  Yes.
17    Q.  And you believe you were present when
18  Mr. McCullough testified that he communicated to
19  Andy Sucoff that CBW's fee would be taken care of
20  outside of the closing; do you remember that
21  testimony?
22    A.  I don't know if you're exactly
23  characterizing it, but I do remember his testimony.
24    Q.  To the best of your knowledge, when

Page 171

1  Mr. McCullough made that statement or substantially
2  similar statement to Mr. Sucoff, was Mr. McCullough,
3  did Mr. McCullough have authority from one of the
4  clients that you considered to be part of your
5  client group to communicate that statement to Andy
6  Sucoff?
7    A.  I can't answer that.
8    Q.  You were also present at Gerald Freid's
9  deposition, Barry Freid's deposition and Georgia
10  Freid's deposition, correct?
11    A.  Yes.
12    Q.  You heard each of those people testify that
13  they had no knowledge of any such statement being
14  communicated to Epoch's counsel until sometime after
15  the closing; do you remember that testimony?
16    A.  I don't specifically remember it.
17    Q.  If you look at the next page, there's item
18  number seven, payment to settle Medicaid, and
19  there's an amount there 869 thousand 55 dollars; do
20  you see that?
21    A.  Yes, I do.
22    Q.  After the closing actually occurred, do you
23  have any knowledge as to a check in that amount
24  being sent from the title agent, from the escrow

Page 172

1  agent to The Pointe Group?
2    A.  No.
3    Q.  Still staying on that schedule, item number
4  five, the escrow for successor liability.
5    A.  I'm sorry, that must be the previous page?
6    Q.  Yes.  Now, is that the escrow that you were
7  having discussions with Andy Sucoff about or was
8  that the escrow in item six?
9    A.  I believe it was item six.
10    Q.  What's described as the general escrow?
11    A.  I think so, because it's a round number, and
12  we were talking round numbers.  The other one is
13  obviously a more exact number.
14    Q.  As to either of the escrows in items five or
15  six, do you have any information as to whether any
16  funds have been disbursed from those two escrows?
17    A.  I don't know.  I don't believe so, but I
18  don't know.
19    Q.  At any time from the September 30, 2004
20  closing to the present, do you have any knowledge as
21  to whether sales proceeds were distributed to any
22  member of the Freid family?
23    A.  You mean from this closing statement?
24    Q.  From any money that was either escrowed at

Page 173

1  the closing or --
2    A.  I don't believe that the Freid family or any
3  member has received any money from escrows at the
4  closing.
5    Q.  On the day after the closing, I think you
6  said you had some conversations with Ed Casas and
7  also with Andy Sucoff.  Did you have any discussions
8  with Madeline Kauffman that day?
9    A.  I think I may have had discussions with her
10  as well.
11    Q.  Do you remember whether she called you or
12  you called her?
13    A.  I don't remember which it was.
14    Q.  Do you remember that the subject of the
15  conversation or one of the subjects of the
16  conversation was whether or not CBW was going to be
17  paid?
18    A.  I think so, yes.
19    Q.  Can you tell me with respect to that issue
20  what you said to her and what she said to you?
21    A.  I don't remember obviously exactly.  But I
22  remember I said to her, "Madeline, you got all the
23  money, and you're the only source."  I don't recall
24  her acquiescing.

44 (Pages 170 to 173)

Stephen F. Gordon                                                                                                06/09/2005

Page 174

1    Q. I'm sorry?
2    A. I don't recall her acquiescing in that.
3    Q. Did she tell you that she called you at the
4  request of anyone else?
5    A. I don't remember her saying that. It's
6  possible, but I don't remember it.
7    Q. At any time from that conversation to the
8  present, have you had any subsequent conversations
9  with Madeline Kauffman about the issue of CBW's fee?
10    A. I think we did, and we may even have had
11  conversation or -- might have had some conversation
12  at the time the complaint was filed, but not since
13  counsel was engaged.
14    Q. At the time the complaint was filed, what do
15  you remember about the communications you had with
16  Madeline Kauffman about the complaint?
17    A. I seem to recall that I got it before she
18  did, and she asked me to send her a copy. I don't
19  remember anything else about it.
20    Q. After the conversations that you had with
21  Andy Sucoff the day after the closing and Mr. Sucoff
22  sending you the closing statement, subsequent to
23  that, have you had any conversations with Andy
24  Sucoff about CBW's fee or this litigation?

Page 175

1    A. I don't think I've spoken to him on any
2  subject.
3    Q. Since that conversation?
4    A. Since October 1st. There might have been a
5  conversation -- October 1st was a Friday. There
6  might have been a conversation early the following
7  week, but I don't have a specific recollection of
8  it.
9    Q. I just have a few more questions.
10  Mr. Gordon, at any point on the day of the closing
11  or on any of the days leading up to the closing, had
12  Gerald Freid ever authorized you to convey any
13  instructions to Mr. McCullough with respect to CBW's
14  fee being taken care of outside of the closing?
15    A. I can't answer that.
16    Q. At any point on the day of the closing or
17  any of the days leading up to the closing, had Barry
18  Freid authorized you to convey any instructions to
19  Mr. McCullough that CBW's fee would be dealt with
20  outside of the closing?
21    A. I can't answer that.
22    Q. Would you give the same answer to that same
23  question with respect to Georgia Freid having
24  authorized you to give those instructions?

Page 176

1    A. I would.
2    Q. Would you answer the same way with respect
3  to Mark Tobin authorizing you to convey instructions
4  to Mr. McCullough?
5    A. Yes.
6    Q. And would you answer that question the same
7  way if I was asking about Frank Barker having
8  authorized you to convey those instructions to
9  Mr. McCullough?
10    A. Yes.
11    Q. At any point on the day of the closing or on
12  any of the days leading up to the closing, did
13  Gerald Freid authorize you to convey to Andy Sucoff
14  that CBW's fee would be dealt with outside of the
15  closing?
16    A. I can't answer that.
17    Q. Is your answer the same with respect to
18  Barry Freid having provided you with that
19  authorization?
20    A. Yes.
21    Q. Georgia Freid?
22    A. Yes.
23    Q. Mark Tobin?
24    A. Yes.

Page 177

1    Q. Frank Barker?
2    A. Yes.
3        MS. HIGGINS: I think that's all the
4  questions that I have.
5        CROSS EXAMINATION
6        BY MS. WORCESTER
7    Q. Mr. Gordon, I believe you testified that up
8  until the day of the closing, it was your
9  understanding that while the sellers wouldn't get
10  anything from the closing, they also wouldn't be
11  bringing money to the closing; is that correct?
12    A. I believe so, yes.
13    Q. Was that, to your knowledge,
14  Mr. McCullough's understanding as well?
15    A. I don't know.
16    Q. To your knowledge, would he have an
17  understanding of what his clients expected to have
18  happen at the closing?
19    A. I don't know.
20    Q. I understand that you apparently didn't
21  receive any drafts of the closing statement prior to
22  the day of the close, correct?
23    A. That's correct.
24    Q. To your knowledge, did Mr. McCullough?

45 (Pages 174 to 177)

Stephen F. Gordon                                                                                06/09/2005

Page 178

1    A. I don't know. I should correct that, I
2  didn't receive a draft of the closing statement on
3  the day of the closing, either.
4    Q. On the day of the closing, to your
5  knowledge, did Mr. McCullough review a draft of the
6  closing statement?
7    A. I don't know. I would be shocked if he
8  didn't, but I don't know.
9    Q. I'm assuming it would strike you as strange
10 that Mr. McCullough would participate in a closing
11 where he or someone on behalf of the sellers didn't
12 review the closing statement?
13   A. Yes, I would find that strange.
14   Q. So assuming that Mr. McCullough did review
15 the closing statement on the day of the closing, he
16 would have understood that there was a deficit of
17 around 204 thousand dollars?
18   A. You would have to ask Mr. McCullough what had
19 understood. Again, it seems painfully obvious, but
20 you have to ask him what he understood.
21   Q. Prior to sending your letter of October 1,
22 2004, did you have any conversations with anyone
23 from KeyBank that you were going to send such a
24 letter?

Page 179

1    A. No.
2    Q. No one from KeyBank was copied on the
3  letter?
4    A. I don't believe so.
5    Q. Other than the conversations that you
6  already testified to today, do you recall any other
7  conversations with anyone from KeyBank up until the
8  day of the closing or after that you haven't
9  discussed, other than -- I know you had lots of
10 conversations with Madeline Kauffman about sort of
11 details back and forth. So maybe let's narrow it to
12 any conversations about CBW being paid a commission
13 that you haven't testified to today?
14   A. I don't know. I hope I've testified to all
15 of them, but I'm not positive.
16   Q. Nothing else stands out in your mind?
17   A. Nothing strikes me. I think Ms. Higgins was
18 exhaustive. Not exhausting.
19       MS. HIGGINS: Oh, thank you.
20   Q. And just for clarification purposes, the
21 questions that you have responded to from
22 Ms. Higgins today that you can't answer, that's
23 based on an assertion of privilege?
24   A. Yes.

Page 180

1    Q. Such as one series of questions that I
2  believe you wouldn't answer that involved who was
3  paying you for attending depositions of Frank Barker
4  and Georgia Freid as well as your own deposition,
5  correct?
6    A. That's correct.
7    Q. Were you representing Ms. Freid in her
8  deposition?
9    A. Yes.
10   Q. She was your client?
11   A. Yes.
12   Q. And the same for Mr. Barker?
13   A. Yes. Mr. Barker was there as a keeper of
14 the records of an entity.
15   Q. That you were representing?
16   A. Yes.
17   Q. So it's your objection slash testimony, I'm
18 not sure how to characterize it, frankly, that the
19 information regarding who is paying for those
20 individual's legal services is protected by
21 privilege?
22   A. I believe it is, yes.
23       MS. WORCESTER: That's all I have.
24       (Whereupon, at 3:40 the deposition

Page 181

1  concluded.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

46 (Pages 178 to 181)

Stephen F. Gordon

06/09/2005

Page 182

```
 1          C E R T I F I C A T E
 2      I, STEPHEN F. GORDON, do hereby certify
 3   that I have read the foregoing transcript of my
 4   testimony, and further certify that it is a true and
 5   accurate record of my testimony (with the exception
 6   of the corrections listed below):
 7   Page   Line       Correction
 8   _____  _____  _____
 9   _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18
19   Signed under the pains and penalties of perjury this
20   _____ day of _____, 2005.
21        _____
22            STEPHEN F. GORDON
23
24
```

Page 183

```
 1   COMMONWEALTH OF MASSACHUSETTS)
 2   SUFFOLK, SS.              )
 3       I, Linda M. Grieco, Professional Shorthand
 4   Reporter and Notary Public in and for the
 5   Commonwealth of Massachusetts, do hereby certify
 6   that STEPHEN F. GORDON, the witness whose deposition
 7   is hereinbefore set forth, was duly sworn by me and
 8   that such deposition is a true record of the
 9   testimony given by the witness.
10       I further certify that I am neither related to
11   or employed by any of the parties in or counsel to
12   this action, nor am I financially interested in the
13   outcome of this action.
14       In witness whereof, I have hereunto set my hand
15   and seal this 14th day of June, 2005.
16
17
18
19
20
21        Linda M. Grieco
22        Notary Public
23        My commission expires
24        December 15, 2011
```

47 (Pages 182 to 183)

Stephen F. Gordon

| | | | |
|---|---|---|---|
| **A** | 41:20 57:10 59:1,6,15 | 176:13 | **arrive** 152:10 |
| **abided** 104:11 | 59:20 60:4,10 61:4 66:3 | **announcing** 125:6 126:10 | **arrived** 151:19 153:10,12 |
| **able** 19:15 81:2 96:23 | 69:17 101:18 112:3 | **answer** 3:15 11:13 14:19 | 153:24 155:9,13 156:8 |
| 138:24 145:24 | 113:12 114:3 128:21 | 19:7 20:14,17,19,22,23 | 156:12,16 |
| **absolutely** 26:22 133:2 | 129:7 | 21:4,8,12,14 22:2,3 | **arriving** 107:6 151:22 |
| 154:17 168:15 | **agreed** 84:11,14 85:7,16 | 23:3 25:2 26:12 27:6 | **aside** 40:21 |
| **abutter** 28:24 29:7 76:10 | 105:5 120:5 122:14,18 | 31:19 37:16,24 38:6,14 | **asked** 9:18 34:17 36:10 |
| **accept** 77:5 100:16 | 122:19 137:20 141:3 | 39:8,15,18,21 40:1 43:3 | 44:7 72:19 87:6 91:6 |
| 128:13 134:20 | 144:20 154:15 158:10 | 43:6,13 44:16,22 45:6,6 | 101:24 109:7 120:19 |
| **acceptable** 166:10 | **agreeing** 48:7 | 45:9,13 47:1 50:23 51:2 | 126:24 128:5 129:6 |
| **accommodation** 141:21 | **agreement** 26:9 34:4,15 | 52:6 56:17 69:12 71:5 | 131:17 133:9,12 138:2 |
| **accomplish** 25:23 57:17 | 34:18,21,23 35:14 | 72:3,10 111:20,21,22 | 138:7 149:10,19 154:12 |
| **accordion-type** 156:20 | 37:11,13,14,18 38:2,4,8 | 117:3 131:16 148:5 | 156:5 157:24 164:2,13 |
| **account** 79:24 80:1,1,2 | 38:21 39:3,7,14 56:14 | 160:10,11,13,19 165:16 | 174:18 |
| **accurate** 139:13 182:5 | 56:22 57:5 58:23 75:12 | 165:23 166:18 167:24 | **asking** 34:3 47:4,6,7 |
| **accurately** 111:11 158:9 | 75:13 78:14 81:1 87:7 | 168:5 171:7 175:15,21 | 50:17 86:1 87:11,13 |
| **acknowledge** 85:10 | 87:12,14,15,18 88:1,5 | 175:22 176:2,6,16,17 | 111:5,10 152:20 163:24 |
| **acknowledged** 105:6 | 91:2,20 92:6 96:9 | 179:22 180:2 | 167:3 |
| **acquiescing** 173:24 174:2 | 100:13 101:20 102:3,5 | **answered** 51:23 150:12 | **asks** 6:22 149:7 |
| **act** 167:19 | 105:19 108:6,12 109:10 | **answering** 6:9 23:4 47:10 | **asleep** 155:2 |
| **acted** 23:5 | 109:13,14,14,16,19 | **answers** 6:10 53:20 149:9 | **assertion** 179:23 |
| **acting** 2:16 | 110:6,22 111:13,15 | **anticipate** 149:7 | **associated** 50:16 |
| **action** 28:18 29:15 | 112:4 114:1,9 115:2,10 | **anybody** 155:20 | **associates** 28:7 |
| 183:12,13 | 115:11,21 123:20 139:6 | **anymore** 116:5 | **assuming** 20:22 178:9,14 |
| **active** 64:24 | 143:14,17,23 145:24 | **apart** 106:5 | **assumption** 34:13 |
| **actual** 19:16 | 146:18 157:9,12 | **apparently** 19:21 61:22 | **assurances** 124:8,15 |
| **add** 45:5 81:11 | **agreements** 54:12 114:21 | 86:24 177:20 | **assured** 124:3 |
| **adding** 45:4 | **agrees** 104:24 | **appear** 6:23 11:10 145:23 | **attached** 6:24 7:20 61:10 |
| **addition** 77:6 80:3 | **allotted** 113:1 | 153:7 | 81:15 170:5 |
| **additional** 7:8,12 9:9,13 | **allow** 104:12 | **APPEARANCES** 2:1 | **attaching** 35:10,10,14 |
| 9:19 27:17 82:17 | **alluded** 104:17 | **appears** 61:4 108:21 | **attachment** 168:17 |
| 128:11 157:5 | **amended** 112:8,9 | 143:20 148:18 150:7 | **attend** 124:22 |
| **additions** 159:9 | **amendment** 112:7,13 | 168:12 | **attended** 6:2 |
| **address** 113:4 118:3 | **amendments** 113:14 | **applicable** 6:4 | **attending** 12:11 180:3 |
| **addressed** 107:23 117:20 | **America** 65:3 | **application** 110:2 | **attention** 21:12 105:17 |
| 152:2 | **American** 13:16 15:4 | **applied** 17:5 136:15 | 141:18 142:8 |
| **addresses** 97:15 | **Amherst** 13:15 | **applies** 52:14 | **attorney** 20:14 29:2 |
| **adjust** 106:10,15 | **amount** 35:17 37:12 38:5 | **apply** 45:8 | 157:6 159:10 |
| **adjusted** 106:24 | 42:18,24 45:21 46:20 | **appreciate** 121:23 | **attorneys** 27:24 28:4 |
| **administrative** 149:5 | 68:2 89:8 92:8 106:15 | **appreciated** 122:4 | 124:19 |
| **admitted** 13:19,24 | 128:8 132:4,20 134:7 | **approach** 106:15 | **attorney's** 89:21,24 90:1 |
| **advance** 12:23 | 134:10 135:4,11 136:7 | **approached** 106:10 | 90:5 |
| **advice** 12:23 13:6 16:8 | 137:5 138:10 141:24 | **appropriate** 75:10 | **attorney/client** 50:7 70:1 |
| 47:2,4 100:2 | 143:9 145:14 147:14,17 | **approval** 112:24 | **attractive** 65:4 |
| **advise** 57:22 70:10 71:12 | 159:2,15,17,19 171:19 | **approximately** 18:2 | **August** 13:22 139:10 |
| 74:24 | 171:23 | 139:8 | 140:16 |
| **advising** 99:2 | **amounts** 160:4 | **April** 8:1,8,13 11:2 53:1 | **authorities** 112:18,20 |
| **advocating** 132:7,9 | **analytical** 166:9,17 | 53:17,22 54:16,18 58:5 | 113:6 |
| **affidavit** 4:22 168:9,14,16 | **Andy** 29:8 74:8 82:3,8 | 61:13 | **authority** 44:14 145:20 |
| **affiliated** 27:21 | 84:19,22 85:5 86:1,5,14 | **area** 130:20 | 146:3,6,17 171:3 |
| **afternoon** 157:17 161:17 | 91:16 93:22 96:19,20 | **areas** 15:13 | **authorization** 176:19 |
| **agent** 171:24 172:1 | 132:2,19 137:14 138:15 | **argument** 44:17 132:10 | **authorize** 165:13 176:13 |
| **agitated** 98:10,14 101:8 | 152:17 153:3 157:2,7 | **arisen** 141:21 | **authorized** 147:6,8 |
| 164:9 | 157:10 158:8,23 159:12 | **arising** 142:8 157:6 | 175:12,18,24 176:8 |
| **agitating** 101:4 | 160:4 163:16,18 164:3 | 159:10 | **authorizing** 176:3 |
| **ago** 17:16 | 168:21 170:19 171:6 | **arose** 140:19 141:13 | **available** 65:5 110:24 |
| **agree** 22:10 23:10 37:5 | 172:7 173:7 174:21,23 | **arrangements** 41:6 | **aware** 29:6 148:6,11 |

Stephen F. Gordon

159:23
awkward 20:20 21:1
a.m 1:22 63:7 146:15

**B**

B 3:10
back 24:24 25:1,10 35:22
  45:18 54:17 56:4 80:23
  86:14 90:1 92:18
  102:21 103:22 110:17
  113:3 115:23 117:16,17
  119:3 120:13,24 123:2
  123:17 129:22 145:23
  146:11 149:9 150:9
  154:12,19,21 157:8
  161:4 179:11
background 56:6
backwards 96:13
balance 89:17 90:9
  134:20 136:16,17
ballpark 133:15
bank 81:4,10,16 89:18,23
  89:24 90:4,10 136:6,8
  137:4 147:15,21
bankers 40:16,18
banking 40:7 41:9 57:6
  57:14,15 111:2
bankruptcies 15:12 19:19
bankruptcy 14:23 15:1,6
  15:8 18:8,11,12 20:6
  29:20
bank's 146:9
bar 13:19 14:4
Barker 30:11 39:24 62:9
  62:20,24 97:16,21
  127:17,19 176:7 177:1
  180:3,12,13
Barry 1:12 2:15 10:16
  11:7,24 29:12 39:17
  49:11 50:11,15,15,21
  51:5,18 59:17 60:10
  61:9,10 62:8,19,23
  68:18,20 69:13 75:19
  75:22 93:18,24 94:2,20
  95:10 97:16,21 102:12
  102:22,24 103:7 105:10
  105:12 107:18,22
  111:24 113:17,17
  121:14 122:2,6,9
  127:16 140:5,7,9,13
  145:5 171:9 175:17
  176:18
based 34:13 37:5 57:9
  68:1 89:9 95:14,19
  104:24 132:10 138:11
  167:2,5,22 168:3
  179:23

basis 10:7 49:22 79:10
  84:13 104:17 119:22
  166:13,16
bcc 144:7
bcc's 144:6
Beaver 79:21 135:4,8
  154:7
becoming 141:8
beginning 112:10 135:18
behalf 2:7,14,23 22:4,12
  23:7 40:23 51:17 57:17
  73:10 75:20,23 178:11
behavior 99:7
beings 51:16,17
belief 12:13 26:14 38:2
  47:7 154:1
believe 10:1 14:22 15:11
  16:12 18:20 26:13 27:6
  27:14 29:17 31:15,19
  33:4 35:21 38:22 41:3
  41:19 43:23 44:4,7,9,14
  46:3,9,22 48:24 49:5,16
  49:18 50:11 51:9,15,23
  52:2 54:15 62:6,14
  67:12 68:15 70:6 71:1
  77:16 79:2,21 80:2
  82:12 83:10 86:22
  88:23 91:5,24 99:1,12
  100:6,17 104:1,10
  108:3 119:1,3 120:9,14
  122:20 123:7 125:19
  127:15 131:5 133:13
  135:12 136:9,12,14
  139:17 142:5 144:1,14
  144:15 146:3 150:5,14
  152:4,16 153:8 157:8
  159:1 160:6 161:5,22
  162:5,10 163:5,10
  165:7 166:6 168:17
  169:19 170:17 172:9,17
  173:2 177:7,12 179:4
  180:2,22
believed 93:15,18 99:19
  104:13
beneath 168:21
Benjamin 1:7 30:22 31:3
  31:6,10,14,18,20 32:23
  35:8 39:6,13 40:8 55:13
  56:8 108:23 111:1
  170:10
Bernard 48:16
best 26:13 88:3 94:19
  170:24
better 32:13
beyond 112:24
bigger 136:20
bill 30:2,8,14,17

bills 27:1,7,9
bit 49:13 152:20
board 15:4 36:1
borrower 89:23 90:2
borrowers 110:22 111:14
Boston 1:21,24 2:6,13
  bottom 33:24 35:7 52:23
  53:3 56:9 58:15 61:7,7
  80:21 85:24 134:12,13
  134:14 137:13 145:3
  167:17
Boylston 21:17
break 6:11 49:12
breakdown 71:8,9 91:4
breaker 84:20
brief 129:21 130:19
bring 6:23 147:21,23
bringing 148:23 169:10
  177:11
Brockton 74:23
broker 41:2 44:20 45:23
  83:2,15 86:2,12 87:2,16
  87:18 88:4 91:18
  105:18 164:8,9,13
  167:19 168:4 170:9
brokerage 167:21
brokers 86:6
broker's 15:23 80:3 89:4
  106:4
Brook 135:8
brought 31:1 141:17
  142:8 157:18
builder 79:13
Builders 79:22 135:4
  154:7
built 157:20
bumping 129:11
business 15:1,6,12 17:1
  19:18 36:17 40:4,5 41:1
  58:21 131:14,17
buy 23:23 63:23 64:2
  66:4
buyer 84:10,11 102:3,5
  140:22 141:3,20 143:7
  159:10
buyers 60:20
buyer's 141:18

**C**

C 5:1 58:16,19 104:6
  182:1,1
Caine 3:23 4:3,6,8,12,17
  4:21 34:1,14,17 35:9
  52:24 53:5 54:17,18
  67:14 70:9,17 80:21
  81:9,9,14 82:14,15 84:9
  84:10,14 85:4,6,7,12,16

87:11 90:18,24 92:11
  96:7,14,17 97:10 98:8,9
  98:18 99:11 102:24
  103:7,10 104:5 105:13
  117:18,23 118:7,24
  119:5 120:19,21 121:10
  121:17,20,23 123:14
  124:2 125:18,21,23,23
  126:5,22,24 127:6
  128:2 130:15,19,23
  138:2,7,8 148:19,20
  150:12,15 164:24 165:2
  165:11
Caine's 99:5
calculated 153:19
calculation 35:17,19,20
  41:13
calculations 153:24
calendar 136:14
call 32:10 62:12,15,23
  63:5,6 65:21 67:2,5,10
  67:16,23 68:5,7,18,24
  69:1,3,4,6 70:8,15
  71:10 96:22 117:19,23
  118:2,6,8,10,12,19,21
  118:22,24 119:2,3,5,8
  119:11,22 120:1,8,10
  120:13,24 121:24 122:7
  122:18,20,21 123:16
  142:11,16 143:11,14,24
  144:10,12,12 145:10,21
  150:15 162:23 163:2,7
  164:3,4,8
called 5:13 14:20,21 29:8
  64:23 96:20 98:21
  120:12 162:3,4,5,6,11
  163:18 164:6 169:19
  170:2 173:11,12 174:3
calling 131:9
calls 85:14 120:6 146:8
  163:1,11,12,15
cancellation 77:8
capacities 51:22
capacity 10:9,15 30:11
  49:9 50:22 51:1,6,12
Cape 141:14
capital 1:13 2:23 58:21
  166:21 167:2,12
car 161:21
card 131:14,17
care 32:24 36:2,7,12,18
  37:1,14 57:18,24 65:1
  66:8 112:19 170:19
  175:14
career 6:3 120:18
carrying 167:18
Casas 1:7 4:12 30:22 31:3

Stephen F. Gordon

| | | | |
|---|---|---|---|
| 31:6,10,14,18,20 32:23 | 175:19 176:14 | 55:24 70:17 71:13 | 123:1 134:2 140:12 |
| 35:8 39:6,13 40:8 43:23 | cc 35:9 102:16 | 146:23 147:6,18,22 | 171:5 |
| 44:2,13,15,17,23 45:11 | cc'd 103:3 144:2 | 148:1 156:22 157:8 | communicated 51:18 |
| 45:19 46:4,11 55:13 | cc's 97:15 98:4 99:11 | 167:7 169:14,18 171:4 | 71:22 72:14 84:10 92:1 |
| 56:8 108:23 111:1 | cell 153:5 | 177:17 | 92:9 97:18 133:16 |
| 117:24 118:7 119:2,7 | certain 17:17 32:17 56:7 | close 112:17 139:16 141:3 | 170:18 171:14 |
| 120:8,9,12,15,17 121:6 | 57:6 77:3 85:19,20 | 141:12 142:23 145:17 | communicating 73:15 |
| 122:22 123:5,14 124:2 | 104:3 110:6 112:17,18 | 148:24 169:2 177:22 | 92:14 101:16 |
| 162:1,6,11,23 163:2,7 | 112:19 130:1 134:7,19 | closed 162:8 | communication 53:12 |
| 164:1 165:4 168:19,24 | 145:14 | closing 24:3 27:12,16 | 101:21,24 153:10 |
| 169:8,19 170:2,10 | certainly 40:19 48:8 | 29:9 36:23 38:17,22 | communications 45:11 |
| 173:6 | 53:18 64:21 71:6 115:9 | 39:1,4,10 42:9 55:15,20 | 45:19 46:4,10 48:18,19 |
| case 1:5 10:12 16:16,16 | 126:15 153:9,18 154:10 | 78:2,5,21,22 79:1,11 | 49:6 50:1,4,5,6,7 52:15 |
| 18:8,15 20:6 21:8 46:18 | certification 15:3,4,5,10 | 111:3 124:1 140:24 | 53:23 54:1,4 55:12 65:7 |
| 147:17 148:8 | certified 14:23 | 141:12 142:11 143:6 | 65:10 81:16 95:9,15 |
| cases 15:21,22 16:7,11 | certify 182:2,4 183:5,10 | 147:23 148:7,8,11,21 | 99:14,20 103:15 105:4 |
| cause 110:23 | change 14:18 106:24 | 149:6,8,15 150:5,8,16 | 147:4 151:24 152:14 |
| caused 101:1 | changed 106:19 112:14 | 150:23 151:3,16,19,23 | 153:3 160:21,23 174:15 |
| CBW 3:21 35:11,18 | 154:1 | 152:3,11,15,24 153:13 | company 40:7 79:16,17 |
| 36:24 37:12,20 38:5,12 | changes 113:13,22 | 154:1,8,18 155:18,19 | 79:19 |
| 38:21 41:14 42:24 | 114:10 139:11 | 155:23 156:8,11,14,14 | complaint 21:11 22:15 |
| 44:18 45:20,22 46:5,6,7 | characterize 180:18 | 157:16,19,23 158:20 | 174:12,14,16 |
| 46:15,19 48:1 53:7 | characterizing 170:23 | 159:13 160:15 164:1,13 | complaints 72:15 140:12 |
| 55:16,17,22 56:13,21 | charge 90:1 | 169:1,4,9,11 170:4,6,20 | complete 122:15 |
| 57:3,7,11,15,16,17,22 | charging 106:4 | 171:15,22 172:20,23 | completing 139:14 |
| 58:2,7,12,18 59:1,6,11 | Charles 64:23,24 | 173:1,4,5 174:21,22 | comply 109:15 |
| 59:21 60:5 61:23 63:1 | chart 66:13 | 175:10,11,14,16,17,20 | comprehensible 6:14 |
| 64:7,9 65:23 67:3,4,5 | check 171:23 | 176:11,12,15 177:8,10 | compromised 137:15,18 |
| 67:11,15,23 68:7 69:1 | checking 146:1 | 177:11,18,21 178:2,3,4 | 137:22 |
| 69:22 70:8 71:2,12 | Chestnut 21:18,21 28:24 | 178:6,10,12,15,15 | computer 11:11 35:5 61:5 |
| 72:14 80:5 83:2 86:2,16 | 29:7 30:12 57:22 64:3 | 179:8 | 76:18 81:23 88:16 |
| 86:22 87:6 89:8 91:23 | 70:24 76:11 77:21 | club 17:6,9,15,18 | 90:17 116:13 137:10 |
| 92:1,10,17,19,23 93:4 | 78:18 79:4,17 89:1 | cocktail 129:17 | 139:23 143:21 151:5,6 |
| 93:15 99:2,7,20 100:22 | 105:21 136:24 137:2 | Cod 141:15 | 154:20,22 |
| 101:10 102:16,24 | 140:19 157:20 | collect 168:3 | concern 68:14,17,20 |
| 103:17 104:1,14,24 | children 17:14,16,24 | collecting 167:21 | 92:18,23 94:16,16,17 |
| 105:4,5,5 109:17 111:3 | choice 139:3 | college 13:13,15 | 113:4 |
| 111:14 114:4 115:9 | choices 138:20 | column 66:17 | concerned 91:19 92:5 |
| 116:15,24 117:5,9,13 | Christie 74:23 | come 42:17 80:8,13 | 94:3 |
| 117:24 118:3,13 119:12 | circulated 155:6 | 103:22 105:17 136:23 | concerning 110:1 152:1 |
| 119:15,18,23 120:6 | circumstances 101:19 | 160:5 | concerns 55:24 69:10 |
| 122:14 124:2,3,3,8 | Civil 15:15 | comfort 118:13 | 71:13 72:6,14 118:3 |
| 125:16 130:2,12 132:21 | claim 76:11 | comfortable 11:8 108:8 | 140:12 |
| 134:24 138:2,16,20 | claiming 52:14 | 108:10 | conclude 165:18 |
| 140:11,11 141:7 142:7 | clarification 179:20 | coming 11:9 12:23 150:5 | concluded 125:5 152:18 |
| 142:18 148:12 153:13 | clarity 9:5 | 150:10 156:5 | 157:9,12 181:1 |
| 153:19 154:2,5,6 | clear 46:5 66:11 116:22 | commenting 126:5 | conclusion 143:10,13 |
| 160:21 161:13,20 | clearly 6:10 68:3 100:13 | comments 122:2,6,9 | condition 110:15 |
| 162:21 163:6,13 165:14 | 101:7 | 125:24 | conditions 38:12 110:11 |
| 165:22 166:1 167:7,15 | client 16:21 20:8,10 40:23 | commission 34:4,15,18 | conduct 7:6,8,11 94:6 |
| 167:19 168:2 173:16 | 43:20 44:14 45:2 48:9 | 34:22 35:19 41:15 | 168:1 |
| 179:12 | 48:12 69:5,5,23 70:2 | 42:18 80:4 89:4 106:4 | conference 62:12 65:21 |
| CBW's 34:4 41:21 72:6 | 86:2 133:17 146:4,10 | 138:3 167:21 170:10 | 67:2,5,9,16 69:10 70:8 |
| 80:12 104:11 114:16,23 | 146:16 164:7 167:11 | 179:12 183:23 | 70:14 71:10 117:19,23 |
| 122:3,10 159:24 160:5 | 171:5 180:10 | Commonwealth 130:3 | 142:11,16 143:10,13,24 |
| 160:9,17 161:14 166:14 | clients 21:3 26:5,6,10 | 135:1 183:1,5 | 144:10 145:10 156:17 |
| 170:19 174:9,24 175:13 | 38:19 46:2 47:17 52:8 | communicate 81:8,14 | 156:18,21,23 |

Stephen F. Gordon

confidences 21:3
confident 11:3 42:20
confidential 59:7,10
    63:16 116:16,20,20
    117:1,4
confidentiality 20:1
confirm 144:5
confirming 88:21
confrontational 145:18
confused 146:21
confusing 96:17
confusion 92:15
congratulations 148:23
Congress 1:24
Conn 1:19 2:3
connection 8:22 11:14
    16:8 19:1,11,22 23:14
    23:20 24:19 25:16 26:3
    28:22 29:4 31:11 40:4
    41:10 43:14 45:14 49:1
    49:5 51:6,13 52:4 53:13
    54:14 114:7 123:24
    158:7 166:4
Consequently 9:3
consider 26:4 38:19 45:15
    47:16 48:11,19
considerable 112:21
considered 26:6,10 43:19
    45:1 46:1 78:7 99:6
    116:16,24 171:4
consistent 34:10 63:21
    64:1,7 125:2
consists 61:8
constrained 69:23
constructed 79:17
construction 77:22 78:18
    79:4,16,17
consult 12:22
consultant 40:24 41:1
consultant's 15:24
consumer 15:8
consummated 38:3
consummation 57:20
    99:16
contact 70:9 86:6 122:23
contacted 58:22
contacting 58:19
contain 114:22
contemplated 76:23
context 17:1,2 132:18
    134:6
continue 27:11 86:16
continuously 14:16
contract 37:19,20
contracts 55:8
contributing 154:11
contributions 122:3

control 11:4 112:24
Cont'd 4:1
conversation 44:6,10
    69:7 82:16 84:5,18
    98:18 100:11,12 104:4
    104:8 120:16 121:6
    129:21 142:21 152:17
    162:1 173:15,16 174:7
    174:11,11 175:3,5,6
conversations 44:4,5
    69:18,21 70:2 96:19
    100:12 103:11 105:4
    106:22 109:24 132:24
    151:23 157:2 161:20
    162:7 163:6 173:6
    174:8,20,23 178:22
    179:5,7,10,12
convey 44:15 97:10,23
    146:8 147:6,9,10
    165:14,22 175:12,18
    176:3,8,13
conveyed 55:23 116:15
    116:24 148:3
conveying 147:20 148:2,3
copied 53:13 105:14
    154:17 179:2
copier 94:10
copies 27:9 164:23 165:1
copy 21:10 26:21 31:17
    32:22 34:3,11,15,17
    35:10 36:22 74:10 87:6
    87:12,13 88:4 102:15
    123:12 144:4 158:13
    163:24 164:13 174:18
corner 75:16
Corporate 1:12 2:23
corporation 1:10
correct 7:16 8:20 13:5,8
    14:8,11,12 15:1 17:20
    18:5 23:2 28:10 29:12
    29:24 34:8 37:7 38:24
    39:2 40:17 42:15,22
    49:14 50:12 52:5 54:22
    56:3 69:15,16 71:24
    72:9 75:21 76:13,19,24
    80:9,19,20 85:4,5,8
    86:8,16,18 88:19,20
    89:3,5,8,10 91:16 93:7
    95:17 101:12 106:7,20
    106:21 107:24 109:7
    110:3,4 122:7,8 138:4
    139:24 141:18,19 142:9
    148:9 149:14,17 151:17
    151:19 152:8,9 153:21
    153:22 158:24 165:19
    168:20,23 170:15
    171:10 177:11,22,23

178:1 180:5,6
Correction 182:7
corrections 182:6
correspondence 108:4
costs 170:6
counsel 5:3,13 10:9,10,11
    10:15 12:22 20:1 23:6
    44:11 51:18 73:24 74:1
    74:18,24 78:13 93:3
    110:1 142:12 144:16
    146:6 171:14 174:13
    183:11
counselors 36:19
counter 98:11
country 17:6,9,15,18
couple 131:22,22
course 79:2 155:1
court 1:3 6:9 16:18 33:18
    46:18
Courtney 2:20
courtrooms 19:17,19
courts 14:5
cover 74:6
covered 136:12
co-counsel 45:3,12,16
Cranberry 21:17,19,20
    29:3 57:21 71:1 80:7
    89:1 94:11,13 105:20
    136:12,17,24
credit 141:4
creditors 18:8,12
criminal 19:23
Cross 3:2 177:5
crown 157:21
currently 14:20
custody 11:4

            D
D 3:1 5:1
date 8:13 24:3 38:16
    39:3,9,10 72:7,16 86:7
    86:21 90:3 106:13
    122:4 124:11 141:12
dated 54:18 74:7 91:15
    105:13 107:23 109:14
    112:4 121:17 143:22
David 101:17
day 25:5 84:20 85:14
    90:22 116:12 123:13
    128:22,24 129:8,11
    131:4,20 147:3,16
    149:11,14 155:6,17
    158:15 159:13 160:9,18
    161:20 163:1,5 173:5,8
    174:21 175:10,16
    176:11 177:8,22 178:3
    178:4,15 179:8 182:20

183:15
days 5:6 131:22 137:17
    148:21 175:11,17
    176:12
deal 30:22 31:24 56:2
    76:5,5 84:20,21 98:22
    99:3,16 115:7 132:15
    133:2 134:8 137:16
    138:21,24 143:4 144:5
    145:13 147:12
dealing 54:13 73:22,23
    140:4,6
deals 113:21
dealt 115:8 175:19
    176:14
death 18:22
debt 58:22 77:22 78:2,19
    79:4 167:12
deceased 79:14,15
December 183:24
decision 60:12 71:19,22
    72:1,4,13 73:9 128:20
    145:22
defect 141:4
defendant 16:2,14
defendants 1:14 10:11
    22:3 23:5
defended 6:3
defending 30:3,9
deficit 178:16
defined 21:23 23:19
    26:11 27:5 41:14
    110:22
definition 42:1
delay 112:23
deleted 114:1
demands 82:17,20 104:22
    105:6
demonstrated 94:7
denigrating 76:5
denying 22:3
departure 55:17
depends 156:13
deponent 5:5
deposed 15:16,22
deposition 1:17 3:2 5:4
    6:5,17,23 11:18,20
    12:23 13:3 29:24 30:3,6
    30:9,15,18 102:13,23
    105:10 107:18 108:5
    111:24 113:17 121:14
    140:17 149:11 170:14
    171:9,9,10 180:4,8,24
    183:6,8
depositions 6:3 11:24
    12:4,6,12 69:14 180:3
describe 36:17

Stephen F. Gordon

described 19:6 32:24 38:3
  56:14,16,22 172:10
desire 119:23
desired 70:18 167:11
details 81:3,10 150:8
  179:11
determination 70:4 72:22
determined 152:22
determines 46:19
devastating 120:18
diagonally 156:23
different 7:2 15:18 59:3
  60:21 94:14 97:18
differently 12:16
difficult 6:6 157:22
difficulties 140:9
difficulty 140:4,6
diligence 124:24 126:2
direct 3:2 5:18 21:11
directed 36:1 51:20 74:8
  74:20
directly 73:23
director 94:20 95:4
directors 36:2
disagree 111:21 122:17
disagreed 48:3,8 91:9
disagreeing 91:11
disagreement 132:10
disbursed 172:16
disbursement 88:24
disbursements 170:7
disclose 101:19 132:19
  163:16
disclosed 102:3,5 117:11
disclosure 117:10
discount 128:8,10 136:23
discuss 36:24 43:4,7,11
  43:18 55:19 63:8
  117:20
discussed 45:12 46:12
  47:12,15 55:16 70:9
  119:11,22 121:18
  122:21 134:23 179:9
discussion 38:18 43:14,16
  44:1 48:11 65:19 68:1,8
  68:22 69:2 88:10 115:9
  128:3,4 130:5 131:3
  132:14 134:15 142:17
  142:21 143:1 144:10
  158:22 159:12
discussions 13:10 38:8,10
  39:4,11,16,19,22,23
  44:21,24 45:23 46:6
  47:21,22 58:6,11 65:22
  81:3,10 82:9 90:7 102:6
  102:8,10 103:19 104:2
  114:9,13,24 115:3,5

124:6,11 129:10 130:23
  131:23 132:1,3,6,19
  133:21 134:6,18 136:3
  137:4 156:1,3 158:7
  159:2,15 160:3,7,12
  161:13,16 172:7 173:7
  173:9
distributable 122:24
distributed 59:7 172:21
distribution 91:2 110:1
DISTRICT 1:3,4
divided 107:5
document 6:18 7:14 8:7
  8:18,22 21:6 22:17
  32:20,21 33:17 35:3
  52:21 60:24 61:2,16,23
  62:4 63:14 74:4 75:17
  75:23 76:2,4,15,16
  80:16 81:21 85:22,23
  85:24 87:20 88:14
  90:15 91:13 96:2
  101:14 102:14 103:2
  105:11 107:19,20,21
  112:2 113:11,19,21
  114:14 116:8 121:4,15
  123:11 137:8 143:19
  148:16,17 149:23,24
  150:20 164:21,22 168:7
documents 6:24 7:2,6,7
  7:18 8:24 9:4,6,10,12
  9:13,19 10:5,8,14,18,19
  11:3,6,17 36:13 57:9
  81:20 86:11 87:2 89:23
  95:17,20 110:8 114:20
  116:5 139:21 155:10
  156:15 157:14 158:5
  167:3,5
doing 13:2 70:12 71:18
  113:6 130:15
dollar 35:18 89:9 92:7
  107:2 132:4 134:17
  141:4 144:21
dollars 41:18 66:8,9 77:7
  78:9,15 89:5 92:8
  105:19 107:7,8,10
  108:24 128:7 133:10,12
  133:14,16 136:19 138:1
  143:8 144:22 145:3,6,9
  159:21 169:4,10 171:19
  178:17
door 130:17,17,18
doubt 64:5 150:18
dozen 15:19,20
draft 74:15 102:19
  108:12,20 109:3 115:11
  115:14,14,18 154:24
  158:16,19 169:8 178:2

178:5
drafts 115:22 116:3 155:7
  165:10 177:21
driver's 5:15
due 35:17 37:20 42:8
  47:14 48:13 77:9 80:5
  111:3 124:24 126:2
  130:2,2,3,13 132:21
  153:19
duly 5:15 183:7
Dunham's 73 15:1 97:1 98:8
  98:10,12,19 123:15,17
  127:11 156:2
Dunham's 131:19
duplicate 10:18
duplicative 10:23 11:6
D.C 13:16
d/b/a 1:11

E

E 3:1,10 5:1,1 182:1,1
earlier 22:18 52:3 105:24
  114:21 140:17 154:23
  161:24
early 22:21 140:16 175:6
earning 167:21
eastern 63:7
easy 134:16
Ed 43:23 45:19 117:24
  118:7 119:2,7 120:8,9
  120:12 121:6 122:22
  123:1,14,14,16 124:2
  162:1,3,6 164:1 168:24
  173:6
edits 116:7
effort 112:22
efforts 57:17
eight 138:3
either 14:16 18:4 19:8
  31:24 32:15 43:9 55:22
  55:23 57:23 87:13
  117:1,9 125:24 142:24
  151:24 153:8 155:4
  161:5,11 167:11 172:14
  172:24 178:3
electronic 116:6 168:13
electronically 116:8
eliminate 120:20
eliminated 154:6
Elm 2:21
else's 68:3
emotional 157:19
employed 49:8,13,15,16
  49:17 127:19 183:11
employee 94:20 95:4
employees 50:1,9 51:22
  52:15 82:3

employment 127:23
Enclosed 74:10
encompassed 7:19
encroachment 28:24
  76:12 140:18,21 141:8
  157:4
encumbrance 135:2
ended 83:6 113:2 120:13
ends 66:8
enforce 76:8
enforceable 38:11,20
  39:6,13
enforcement 12:19
engaged 31:16 174:13
engagement 3:17 18:21
  26:15,19 31:17 32:22
  34:11 35:11,23 36:5,11
  36:22 38:12,16 41:5
  46:21 56:5 89:13
  122:15
entire 87:20
entities 19:6 21:18,23
  22:24 24:13,14 26:7,7
  50:16 51:15,17 55:24
  58:13 60:5 72:12 95:5
  100:5,8,14 107:24
entitled 19:24 20:2 40:24
  42:24 44:18 45:20
  46:19 168:3
entitlement 41:21
entity 7:13 15:2 26:24
  27:20 32:23 36:6,24
  37:2,21,21 40:6,6 46:22
  74:21 94:14 180:14
Epoch 24:19,22 25:13,17
  26:3 31:12 51:7,13 52:5
  53:15,16 54:7 60:4 66:4
  66:7,24 68:1,9 69:11
  70:11,16,19 71:11,13
  71:20,23 72:2,5,14
  73:10,13,16,23,24 75:6
  82:10 84:11,11 86:15
  91:3,19 92:5,18,20,24
  93:3,14,17 95:9 99:14
  99:21 100:18,24 103:19
  104:2,23,24 112:20
  113:7 115:5 116:17
  117:1,6,9,13 121:11
  124:23 125:3,5,8,11
  126:10,12,19,21 127:6
  128:2,14,18 129:4,7,11
  131:4,23 132:11,23
  133:4 134:15 135:16,24
  137:3 138:21 140:4
  144:5,11 165:6
Epoch's 60:1 66:20 68:14
  74:18,24 83:10 93:3

Stephen F. Gordon

105:6 106:19 113:4
126:2,2 142:8,12
171:14
Erin 2:4 47:3
error 8:15
escrow 140:23 142:1,2,4
152:20 157:5,14 159:11
159:15,19 160:4 171:24
172:4,6,8,10
escrowed 172:24
escrows 152:19,21 153:4
157:2,5,10 158:8,11,22
158:24 159:3,4 172:14
172:16 173:3
Esquire 2:4,11,20
essential 133:2
essentially 135:2
established 158:24
estate 19:9 21:19 41:2
44:20 45:22 46:7
135:14 167:19 168:4
evaporated 128:12
evening 146:14,15 150:8
154:22
event 18:23 110:2 167:10
events 12:8 103:10
everybody 134:12 139:14
155:2 157:16
everyone's 67:6
exact 10:18,19 19:15
59:23 172:13
exactly 12:18,20 15:9
33:4 77:13 97:3 98:11
101:5,10 170:22 173:21
EXAMINATION 5:18
177:5
examined 5:16
example 20:5
examples 94:6
exception 182:5
excess 90:12 169:10
exchanged 151:4
exclude 45:7,8
excuse 121:19
execute 112:13
executed 34:3 35:10
74:11
exhausting 179:18
exhaustive 179:18
exhibit 5:24 6:1,15,15 8:5
8:6,12,18 21:5,8 32:19
33:16,19 34:16 35:1,2,4
35:22 41:12 52:19,20
56:4,17 58:5 60:23 61:1
61:3,15,19 62:3 63:15
74:3 76:14,17 80:15
81:22 82:13,13 85:21

85:24 88:9,12,13 89:12
90:14,20,21 91:4,12
95:24 96:1 99:10,10
101:13 102:12,22 104:6
105:10 107:17,20
111:24 113:3,8,12,18
117:16 121:2,3,13,18
121:19 123:9,10,12
129:23 137:7 143:18
148:15,17 149:18,22,24
150:19 154:12,19
164:20,23 168:6
exhibited 6:18 8:7 21:6
22:17 32:20 33:17 35:3
52:21 60:24 61:2 74:4
76:15 80:16 81:20
85:22 88:14 90:15
91:13 96:2 101:14
102:14 103:2 105:11
107:19 112:2 113:11,19
121:4,15 123:11 137:8
139:21 143:19 148:16
149:23 150:20 164:21
168:7
exhibits 4:1 81:18 88:7
103:20 104:3 139:19
153:17
expect 155:22
expectation 155:24
expected 138:16 177:17
expend 112:21
expert 64:21 135:9
expertise 72:22
expires 183:23
explored 167:13
express 9:5 10:3 69:10
70:17 140:8
expressed 68:17 92:24
99:13
extension 152:18
extensions 54:11
externally 55:3
extremely 104:21
e-mail 3:16,17,18,19,22
3:23 4:3,5,6,7,10,11,12
4:14,15,16,17,18 33:20
33:23,24 34:1,8,14,15
34:19 35:5,8,13,15,16
37:5 41:11,15 42:14,18
44:13 52:23,23 53:6,6
54:16,17 55:6 61:18
63:4 76:18,21,23 77:2
78:3 80:11,18,21,23
81:7 82:8,9,14 84:8
85:3,4,13 86:14,21
88:16,18,21 90:9,17,21
90:21 91:7,10,14,18

92:2 93:2,5 96:3,3,5,6,7
96:13,15,16,18,20,21
96:23 97:11,13,15 98:4
98:18 99:12 100:21
101:11,15,16 102:9
120:17 121:5,9,16,18
121:19 123:13 137:13
138:5,15,19 143:20,23
144:4,4 146:12 148:18
148:19,19 149:8 150:11
151:22 152:1,5 153:9
168:18,21,24 169:7
170:5
e-mailed 44:8 165:3
e-mails 3:24 4:4,8,13,19
11:10,11,14,16 54:2
81:22 92:13 100:12
137:9,10 139:22 140:2
140:3 150:21 151:3,7,8
153:8

**F**

F 1:17 2:11 3:3 5:12
182:1,2,22 183:6
facade 20:15
facilities 18:14 21:15,23
23:6,16,18,20 24:4,15
24:20 25:18,20 26:4,11
26:17,24 27:12,17 28:2
30:21 31:2,13 37:23
40:3 45:15 49:10,14,18
51:8,14 52:5 54:6 55:8
55:9,11 57:22 58:2 59:3
60:20,21 63:23 65:2,6
65:16 72:21 73:4,11
76:1 82:4,11 94:21
112:19 124:1 127:22,24
136:11
facility 27:4 64:3 76:11
79:18 83:7 141:14
fact 7:12 9:10 46:18,24
47:8,11,14 50:18 56:1
68:2 118:14 123:5,16
124:14 137:18 153:7
factoring 105:18
facts 104:19 119:21
failed 117:13
fair 20:13,16 25:4 27:8
56:24 72:20 73:10,14
105:3,8 106:18 126:7
138:15 139:10,12 140:2
141:6,10
fairly 141:12
faith 76:4
family 27:21 77:5,23
78:20 89:19 90:10,11
91:1 96:9 107:5,11

128:12 137:23 172:22
173:2
fantastic 136:5
far 66:3,6,10,12,23 97:10
father 29:19
favor 77:14 83:10 85:1
favorable 106:11
fax 34:14 75:17 94:11
faxes 54:2
federal 2:12 14:5
fee 15:23,24 38:12 40:24
41:6 78:9,14,15 80:13
105:18 106:4 111:2
114:16,23 130:12
132:20 135:5 138:17
159:24 160:5,9,17
161:14 168:3 170:19
174:9,24 175:14,19
176:14
fees 42:13 77:9 89:21,24
90:1,5 153:19
felt 98:10
field 64:21
fifty 133:14
figure 41:17 105:24
106:10,23 133:1,4
filed 16:17 124:12 174:12
174:14
files 27:9
filing 5:7
filled 83:6 156:18
final 70:16 73:12 129:2
142:12
finally 154:19
Financed 19:6 21:15,22
22:24 23:6,15,18 24:4
24:15,20 25:17,19 26:4
26:11,16,24 27:4,12
28:1 30:21 31:2,13
37:22 40:3 45:15 49:10
49:13,18 51:7,14 52:5
54:6 72:12 73:3,11
94:21 124:1 136:10
financial 59:18
financially 183:12
financing 32:1 58:22 65:5
find 61:11 74:10 112:22
178:13
finder 46:18
findings 123:2
fine 157:24
finish 6:8
firm 14:6,7,13,18,19 28:1
firm's 34:4
first 5:24 6:15 8:11,13,19
13:22 16:23 17:21 29:6
31:1,3,10,13,18 33:3,10

Stephen F. Gordon

33:12 34:11 37:4,9,17
38:1,7,15 39:2,9 41:7
42:23 43:7,11,14,18
49:24 53:12 56:7,9
57:12 61:17 72:11
74:15 76:22 77:7 83:13
96:4 99:9 105:16
108:11,12,19,22 109:3
109:20,21 110:24
115:11,13,14 119:3
120:13,24 122:7 123:24
125:20 131:16 134:23
135:22 136:9 150:3
151:8 165:17 166:1
167:18 168:1
**five** 59:8 122:12,16,16,22
172:4,14
**flexibility** 122:23
**focus** 159:11
**focused** 36:8,9
**focusing** 159:8
**folks** 67:15 69:1 155:10
**follow** 96:17 121:18
**followed** 18:22
**following** 57:16 58:18
70:7 109:23 110:12,23
110:24 112:10 114:2
122:14 125:8,12 130:1
130:5 131:20 175:6
**follows** 5:17
**follow-up** 109:24
**forbear** 110:7
**forbearance** 54:12 108:5
109:13,15,19 110:11,16
112:4 114:1 115:21
**Ford** 1:19 2:3
**forego** 134:7
**foregoing** 182:3
**forgetting** 134:5
**forgiven** 89:22
**form** 5:9 37:10,18 42:23
53:6 54:1 168:13
**formed** 14:13
**former** 16:21
**formerly** 144:20
**forth** 146:12,17 179:11
183:7
**forward** 36:23 54:9 59:16
68:1,8 69:11,19 70:11
70:18 71:13,20,22 72:2
72:5,13 73:9 100:3
120:4 122:13 139:1
150:11 155:3
**forwarded** 82:24 102:9
**forwarding** 34:7 53:5
169:1
**four** 16:6 29:10 55:11

59:22 63:17 170:9
**fourth** 79:23 139:3 167:9
169:13
**frame** 72:18 116:11
**Frank** 30:11 39:24 62:9
62:19,24 97:16,21
122:2,6,10 127:17
176:7 177:1 180:3
**Franklin** 5:22
**frankly** 81:12 180:18
**Freid** 1:12,12 2:15,15
10:16,16 11:7,7,24 12:1
12:1 16:23 17:11,22,22
17:24,24 18:7,7,19 19:9
20:5 27:21 29:12,12,23
39:12,17 49:11,11
50:11,15,15,22 51:1,6
51:12,19 59:17,17
60:10,11 61:9,9 62:9,19
62:24 68:18 75:19,23
77:5,22 78:19 89:19
90:10,11 91:1 93:19
94:6,20 95:2,10,10 96:9
97:16,16,20,21,22
102:16 105:13,16
106:12,13 107:5,11,22
113:17 127:16,17
128:12 137:23 140:5,7
140:9,13 145:5 157:18
160:15 165:13,21,24
170:3 172:22 173:2
175:12,18,23 176:13,18
176:21 180:4,7
**Freids** 22:5,12 23:7,13,17
155:12
**Freid's** 18:13 69:13,14,14
80:2 93:24 102:12,23
102:24 103:7 105:10
106:1 107:18 111:24
113:17 121:14 165:19
171:8,9,10
**Friday** 61:13 84:20 146:7
146:13 147:3 175:5
**front** 113:3
**full** 5:20 42:24 45:21
46:20 57:12 77:3 80:24
128:8 137:1
**function** 85:10
**funds** 110:24 142:18
172:16
**further** 9:4 23:4 42:6
48:4 51:3 69:2 128:10
129:10 131:3 139:11
182:4 183:10

**G**

**G** 5:1

**gain** 119:13
**gained** 118:13
**game** 145:11
**general** 22:9 119:10
172:10
**generally** 19:13 24:10
108:3 125:2 144:6
**general's** 29:2 157:6
159:10
**Georgia** 12:1 17:11,24
29:23 62:8,19,23 69:14
80:2 97:22 157:18
160:15 171:9 175:23
176:21 180:4
**Gerald** 1:12 2:15 10:16
11:7,24 29:12 39:12
51:1,12 60:11 69:14
95:2,10 107:22 171:8
175:12 176:13
**Gerber** 73:23 82:16,24
83:1 84:14 85:17 104:5
130:21
**germane** 71:6
**Gerry** 49:10 51:19 59:17
61:9,10 62:8,19,24
97:16,20 127:17 165:13
165:19,21 170:3
**getting** 35:22 119:3
120:24 151:21
**gigantic** 156:21
**give** 47:2 50:18,19 55:2
87:8 88:4 111:8 175:22
175:24
**given** 12:6 117:17 124:8
129:1 147:17 158:13
183:9
**giving** 87:24 136:1
**glanced** 12:2
**global** 94:16
**go** 9:3 20:15 22:18,21
25:5 42:6 45:18 54:24
71:20 80:3 83:11,20
88:8 96:13 100:1,15
110:17 132:16 138:24
146:1,11 152:23 154:20
166:19
**goes** 23:4 42:3 56:9 57:5
122:1,13 149:3
**going** 6:4 19:3 20:15
21:10 25:5 47:1,2 54:8
54:10 56:8 82:4,10 88:8
90:1 107:3 111:7,22
114:15 120:4 122:13
128:11 129:18,19
130:24 132:20 135:20
136:23 137:1,23 143:7
143:8 145:23 146:23

147:16,18,21,22 149:16
152:2,24 153:14 154:2
154:12 156:4 159:24
160:9,11,18 162:12,17
163:13 173:16 178:23
**good** 75:6 76:4 104:10
123:15
**Goodwin** 4:18 29:8
124:22 125:10 150:1,17
151:19,22 152:11,24
153:10,12 155:9 156:16
158:15 159:23 160:8,14
160:16,20,24 161:2
**Gordon** 1:17 2:10,11 3:3
3:13 4:20 5:12,22 6:2
8:8 11:17 13:11 14:8,10
14:16,16,20,21 21:7
23:5 32:18,21 33:18
35:4 41:4 42:23 52:22
61:3 74:2 76:16 80:17
81:21 85:23 88:15
90:16 91:14 96:3
101:15 102:11 104:12
107:20 116:15 123:2,12
137:9 139:22 140:15
143:20 148:17 149:24
150:21 164:22 168:8
175:10 177:7 182:2,22
183:6
**graduate** 13:17
**grand** 141:13
**great** 84:21
**Grieco** 1:23 183:3,21
**gross** 42:3
**grounds** 20:23
**group** 1:10,11 2:14 8:23
10:16,24 11:7,15 19:9
24:18,21 25:13 27:7
28:10,15,18,19,23 29:1
32:24 34:5 35:11 36:2,7
36:12,15,24 37:14 38:4
38:11 49:10,20 50:2,9
52:4,13,16 54:21 55:1,5
57:18,23,24 58:8 69:5,6
69:23 70:10 74:11,21
75:1,20,24,24 82:18
83:12,21,23 91:20 97:3
97:6,20 98:1 100:2,4,9
101:18 105:19 126:1,1
137:15,21 171:5 172:1
**Group's** 19:7 104:12
**guarantee** 65:17 112:16
**guaranteed** 65:2 73:2
77:22 78:19
**guess** 22:18 32:10 36:17
40:19 89:12 96:4 146:3
146:21 147:1

Stephen F. Gordon

guilty 84:4
guy 134:3

**H**

H 3:10
hairs 110:14 112:6 117:2
  156:13
Haley 2:10 14:8,17,21
  28:5 74:7 97:17 144:3
Haley's 28:6
half 15:19 33:24 61:7
  157:11
halfway 41:24 54:24
hall 156:24
hallmarks 12:17
Hammond 21:16 85:11
Hampshire 2:22
hand 157:23 183:14
handed 8:12 21:7 33:19
handing 6:15 32:18 74:2
  102:11,21 107:17
  111:23 113:16 129:22
handle 19:17,18,18
handled 149:6
Hankin 101:17
happen 16:13 58:4 133:2
  135:21 137:16 177:18
happened 124:21 138:22
  153:4 169:21,23
happening 118:14 162:20
harmful 83:12,21,22
  93:19 99:15,20
health 32:24 36:2,7,12,18
  37:1,14 57:18,24 65:1
  112:19
Healthcare 1:11
hear 46:15 169:13
heard 12:14 31:3,6,14,18
  31:20 120:10 125:3
  136:5 171:12
hearing 85:16
heavily 95:10
held 157:22
helpful 86:8,20,23 93:7
  93:12 118:4
hereinbefore 183:7
hereunto 183:14
Higgins 2:4 3:4,14 5:19
  5:23 8:4 24:23 25:9
  33:15 34:24 52:18 88:6
  88:11 95:23 121:1
  123:8 177:3 179:17,19
  179:22
high 68:15 71:14 133:11
higher 68:3 132:7,9
highest 60:2 66:4,7,21
  67:1

Hill 21:18,21 28:24 29:7
  30:12 57:22 64:3 70:24
  76:11 77:21 78:18 79:4
  79:18 89:1 105:21
  136:24 137:2 140:19
  157:20
Hoar 124:23 152:24
  153:12 155:9 158:15
  159:23 160:8,14,16,20
  160:24 161:3
Hoar's 125:10
home 17:7 18:14 21:16,17
  151:5,6 154:21 161:21
honestly 12:16
hope 27:10 179:14
hour 146:13 157:11
HUD 64:16,17,19 65:5,8
  65:17,24 68:12 73:2
  136:13 147:12
human 51:16,16
hundred 133:13 138:4
  141:4 143:8 159:20
  169:3
hundreds 133:11
husband 157:20

**I**

idea 95:7,12
identification 6:1 8:6
  21:5 33:16 35:2 52:20
  60:23 61:1 76:14 80:15
  81:19 85:21 88:13
  90:14 91:12 96:1
  101:13 121:3 123:10
  137:7 139:20 143:18
  148:15 149:22 150:19
  164:20 168:6
identified 5:14 6:24 21:16
  37:2,13 43:1 54:7 59:2
  62:19 77:8 101:17
  129:24 131:7
identifies 100:14 122:16
identify 12:20 19:15
  64:19
Identifying 58:19
ignore 100:17
immediate 131:19
immediately 110:23
  125:12 126:9,18
important 55:1 75:9,11
  75:22 97:2
impression 55:3
improper 99:2,6
inaccurate 12:14 103:16
inappropriate 92:23
incentive 41:13,21 42:8
  43:1 44:19 45:21 46:20

78:9,15 135:5
inclined 86:7
include 34:22 57:16
included 78:3 94:15
  136:11
includes 61:11
including 52:24 58:22
  59:4,8,22 61:9 103:11
  130:2 152:14
inconsistent 12:7 167:13
incorrect 12:14
increase 107:8 133:13
  141:24 142:1
increased 128:19 140:22
  140:23
indented 77:3
independent 167:3
indicate 93:14,17
indicated 65:15 76:22
  97:14
indicates 66:13
indicating 34:2 77:4
indication 60:1 135:24
indications 59:21 66:14
individual 18:9 27:1
  43:19 46:22 50:22 51:1
  51:6,12,21 92:17
individuals 7:14 29:15
  38:19 46:1 47:16 48:17
  48:24 49:4 52:24 60:11
  62:18,23 80:22 108:1
individual's 180:20
information 59:3,7,11
  60:7 116:16,19,23,24
  117:4,5,10,12 141:7
  148:3 150:6 172:15
  180:19
initial 58:16 59:2 66:14
  135:24
initiated 164:4
injunction 164:10
input 122:1
inquire 122:23
inserted 109:7
insisted 145:2
insistence 165:19
insisting 145:13
instance 40:11,22 83:14
  84:3
instructing 20:14,21,22
instruction 21:1
instructions 104:12
  148:13 175:13,18,24
  176:3,8
insure 7:18 10:21
intend 30:17
intended 97:23 98:2

157:21 165:22
intends 53:7
intent 3:20 61:12,24
  63:19 66:18,22 67:21
  68:3 70:15,16 71:11
  73:13,16 74:11,14,20
  75:10,11,12 76:6,8,9
  103:18,20,21 104:3,3
  104:13 135:19 148:24
  167:14
intention 98:3
interest 37:22 58:1,12
  59:21,24 60:2 66:14
  127:22 136:1
interested 53:7 59:16
  60:20 65:16 134:24
  183:12
interests 55:2,5
internally 55:3
internet 14:22
interview 17:7
introduced 60:5
introducing 58:20
introductory 58:16
investigation 29:3 157:6
  159:11
investment 40:7,15,18
  41:9 57:6,14,15 111:2
invisible 95:22 139:18
invite 60:12
invoice 148:12 166:1,2
involve 22:11 23:1 81:3
involved 22:3 23:13 28:8
  29:2 30:23 31:23 32:16
  40:14 49:8 53:18,22
  81:9 82:9,12 95:11,20
  103:12,15 104:14 113:1
  135:22 136:9 147:17
  180:2
involvement 18:14 31:22
  53:15 75:2 83:12,20
  86:1 93:18 94:1 142:7
involving 19:16 50:6
  57:21
isolated 119:13,15,23
issue 44:21,23,24 45:12
  45:24 46:12 47:13,13
  47:15,22 48:12 83:8
  105:5 124:7,20 140:3
  140:18,21 141:2,12,17
  141:21 142:6,7 157:3
  159:7 163:12 168:2
  173:19 174:9
issues 55:16 117:20
  142:14
item 77:7,21 79:23 94:17
  94:17 170:9 171:17

Stephen F. Gordon

172:3,8,9
**itemization** 89:17
**items** 77:4 78:23 154:6
  172:14

**J**

**January** 168:9
**Jeff** 163:9
**jeopardize** 100:23
**jeopardy** 100:18
**jewel** 157:21
**John** 8:19 39:4 45:17
  73:17,18,19,21 127:15
  144:2,18 151:12 152:6
  155:15 157:1,7,15
  159:12
**John's** 9:6 10:4
**join** 121:24
**Judge** 48:21
**July** 114:8,23 115:10,21
  124:23 131:20 133:10
  137:17 139:6
**June** 1:18 105:13 106:13
  107:23 109:14 112:4,11
  113:14 117:19,23
  121:17,20 183:15
**jurisdictions** 14:3
**jury** 141:13

**K**

**K** 2:4
**Kathy** 16:20
**Kauffman** 3:22 4:5,16,19
  32:15 34:8 35:14 37:6
  41:11 42:14 54:15
  76:19,22 77:4 80:12
  88:18,22 90:8 91:7,8,9
  96:22 102:7 108:15,18
  108:20 109:4 114:10,14
  114:24 115:4,12,15,22
  127:11 133:24 134:6,18
  136:3,16 142:12 143:23
  144:17 145:12,21 147:1
  147:5,7,20 148:2,4
  150:22 151:11 152:6
  154:13 156:2,4 173:8
  174:9,16 179:10
**Kauffman's** 151:21
**Kavanaugh** 1:19 2:3
**keep** 21:3 26:20 86:7 93:4
**keeper** 30:12 180:13
**keeping** 82:21,22,23
  135:20
**Kelly** 55:13,17 56:1
**Key** 1:12 2:23 22:24 99:2
  99:14,21 112:13 113:24
  114:8 127:10 130:5

134:7 135:18 136:4
  137:14 154:15
**KeyBank** 18:21 19:4,5
  21:15,22 23:6,15,18
  24:4,8,15,19 25:17,19
  26:3,11,16,23 27:4,11
  27:16,20 28:1 30:20
  31:2,12,24 32:8,9 34:23
  37:22 40:2 45:15 47:24
  49:2,10,13,17 51:7,13
  52:5 53:19,22,23 54:6,6
  54:10,13 55:20,22
  72:12 73:3,5,11 77:15
  78:5 81:1 91:1,21 92:6
  92:8 94:21 96:9 98:13
  98:14,21 101:5,20,24
  102:1,4 105:18 106:3,6
  106:10,15,23 107:3,5,9
  107:12 110:7 113:2,4
  116:17 117:1,6,9
  121:11 122:23 124:1,3
  124:7,13,14 126:23
  127:8 128:5,7,9,12,13
  129:6 130:19 131:6,9
  131:10 133:21 134:20
  136:10 137:18,20 139:2
  140:8 143:4 144:12,14
  144:20 145:2,7,13
  146:20 155:18,20,22
  157:4 160:24 161:17,21
  162:7 165:6 178:23
  179:2,7
**KeyBank's** 109:10
  124:19 128:15 129:15
  130:6 143:9
**Key's** 109:14 110:1,11
**kind** 24:10 72:22 88:6
  96:16 135:10
**knew** 71:4 77:19 141:7
**know** 6:11,12 8:11,14,14
  20:24 22:13,19 25:21
  25:23,24 26:18 27:15
  27:18,19,22 29:1 31:18
  36:16 40:9,10 44:5 52:6
  52:8,9 53:14,19 56:15
  56:23 59:5,9,23 60:6,14
  60:17 66:6,9 68:4 69:20
  69:21 71:3 73:6,8,15,21
  74:17 76:8 79:9 83:5,8
  83:16 84:2,7 85:9,12
  87:5 88:2 90:3 92:12
  94:22 95:6,7,14 97:3,7
  97:8 98:11 100:15
  104:7 106:11 109:5
  115:13 116:12 117:17
  118:11 127:20,24 128:1
  129:17 130:15 134:11

134:22,23 135:6,13,15
  136:20 142:3 144:3,6
  145:16,22 149:9,15
  150:16 151:2 152:21
  155:24 158:18 159:17
  159:18 161:23 165:3
  166:19 170:22 172:17
  172:18 177:15,19 178:1
  178:7,8 179:9,14
**knowledge** 56:12,20,20
  57:1 59:19 67:11 72:21
  72:24 76:10 78:16
  94:19,23 95:3 100:22
  103:24 106:3 116:14
  117:8 119:14 141:9
  166:9,24 170:24 171:13
  171:23 172:20 177:13
  177:16,24 178:5
**known** 14:10

**L**

**lack** 32:13
**language** 41:22 42:12
  58:23 108:21 109:2
  110:18 112:8 114:4
**large** 156:17
**larger** 61:16 125:24
**Larry** 73:23 82:16 85:17
  104:5 130:20
**Laska** 48:21
**late** 20:5 29:19 33:5 53:17
  53:22 140:15 145:11
  146:13 151:8 157:20
  161:9
**Laurie** 150:4,11
**law** 12:18 13:13,16,17
  14:23 15:1 36:19 50:19
  74:17
**lawsuit** 16:3,14 124:12
**lawyer** 21:2 40:14 52:12
  76:7,7 111:16 134:4,5
  156:19 163:3,3,4,6
**lawyers** 6:7 12:17 75:6
  99:16 100:2 112:16
  159:6
**lead** 92:2 104:19 115:1
  117:13
**leading** 175:11,17 176:12
**leads** 153:8
**learn** 12:17 84:16,17
  116:12
**learned** 31:10 92:14
**learning** 160:2
**leave** 69:1 99:15 126:24
**leaving** 40:21 126:22
**left** 34:2 39:1 66:16 96:24
  97:4 98:8,12 126:22

127:6 128:2,14 130:16
  143:5 154:20 157:1,9
  158:3 160:14,16 161:2
  161:19
**legal** 12:23 13:6 16:8
  17:23 18:6,18,24 19:8
  19:14 23:6 24:3,6,11,14
  24:18 25:15,18 27:1
  28:1,19,21 37:2 47:2,4
  49:2 50:17 111:5,8,17
  111:18,19 129:17
  167:22 168:1 180:20
**lend** 73:3
**lender** 31:24 32:10,14
  73:2
**lenders** 59:4,8,16,22
  60:20 64:22 65:1,11,15
**lending** 54:5 65:16
**length** 69:18,20
**lengthened** 159:19
**Lenny** 79:7
**lent** 32:12
**letter** 3:13,17 4:21 8:2,8,9
  8:16 9:13 11:3 26:15,16
  26:19,20 28:14 31:17
  32:22 34:11 35:11,23
  36:5,11,22 37:4,7,10
  38:12,16 39:10 44:3,8,8
  44:12 46:22 56:5 68:2
  70:15,16 71:11 73:12
  73:16 74:6,11,14,20
  75:10,11 76:8,9 89:13
  102:2,15,16,19,23,24
  103:3,7,9,13,18,19,20
  104:2,3,13 105:12,16
  106:2,14 107:23 108:12
  108:20 109:21 112:11
  114:9,21,23 115:2,10
  117:20 162:14,16,19,22
  162:24 163:19,20
  164:12,18 165:5,8,10
  165:15,18,20,24 166:5
  166:8 167:9 178:21,24
  179:3
**letterhead** 36:15,16,19,20
  74:7
**letters** 3:20 61:12,24 63:8
  63:19 66:18,22 67:20
  75:12 76:6 135:19
  167:14
**let's** 5:23 8:4 25:9 33:15
  45:10 52:18 88:11
  110:17 121:1 139:9
  179:11
**level** 118:13 134:17
**Lewis** 85:10
**liability** 32:10,14 48:8

Stephen F. Gordon

172:4
liable 46:23 47:13 48:1,5
  48:9,13
license 5:15 46:7,16
licensed 41:1 44:19 45:22
  168:4
lien 135:10,15
Lifecare 30:12
light 141:21 142:14
likewise 107:11 146:11
limit 145:19
limited 112:10
Linda 1:23 183:3,21
line 67:3 68:7 96:2 116:9
  134:12,13,14 145:4
  182:7
list 20:9 143:5
listed 154:5 182:6
literally 157:22
litigation 15:15 19:22
  28:9 29:1,7,11 32:6,7
  40:21 174:24
little 20:20 21:1 49:12
  146:21 152:20
living 1:11 33:1 36:3,7,13
  36:18 37:1,15 57:19
  58:1 66:5,7
LLC 1:7 21:16,18,21
LLP 1:19 2:3,10,19 14:21
  170:11
loan 65:1 77:8,12,14,14
  110:8 136:24,24 137:2
  137:5
loaned 27:16,20
loans 29:18 65:2,4
located 64:8,15
locating 64:9,11
long 14:6 25:5 93:7
  121:10
longer 56:1 114:5
look 9:22 10:17 22:14
  23:11 41:4,24 56:4
  61:15 63:14 74:14
  75:14 77:2 85:4 88:8
  90:20 93:11 96:5 97:15
  99:9 103:9 170:4,5,9
  171:17
looked 9:20,21 10:1 41:16
  90:21 93:2 95:16 96:8
  103:1 153:17 167:14
looking 63:21 64:6 66:2
  76:16 82:13 95:8 100:2
  110:17 113:8,9 114:20
  117:16,18 149:18
  168:16
looks 34:7
loop 86:7,16 93:4

lot 12:9 163:1,11
lots 100:10 179:9

**M**

M 1:23 183:3,21
MA 1:24
machine 94:11
Madeline 32:15 34:8
  35:13 37:6 41:11 42:14
  54:15 76:19 88:18,22
  90:7 96:22 102:7
  108:15,18,20 109:3
  114:10,13,24 115:4,12
  115:14,22 123:19
  127:11 133:24 134:6,18
  136:3,16 142:12 143:22
  144:17 145:12,21 146:8
  146:24 147:5,6,20
  148:2,4 150:22 151:11
  151:21 152:5 154:13
  155:2,3 156:1,3 173:8
  173:22 174:9,16 179:10
mail 34:2 96:24 98:8
Maine 13:22,24
making 125:24 135:24
man 18:7 120:19
management 49:9 55:8
  60:13,15,18,21 145:17
Manchester 2:22
manner 115:7
March 8:13,15,16 59:20
mark 5:23 8:4 33:15
  34:24 39:20 52:18 88:7
  88:11 95:23 121:1
  123:8 127:16 158:1
  176:3,23
marked 6:1,15 8:6,18
  21:5,8 32:19 33:16,19
  35:2 41:12 52:20 60:23
  61:1,18 63:14 74:3
  76:14,17 80:15 81:18
  81:22 85:21,23 88:13
  90:14 91:12 96:1
  101:13 102:12,22 105:9
  107:17,20 111:23,24
  113:16 121:3,13 123:10
  137:7 139:19 143:18
  148:15,17 149:22,24
  150:19 164:20,22 168:6
market 72:20
marketed 58:2
marketing 85:10
marking 115:23 116:5
markups 116:3
Marota 127:12 131:13
  134:3
Marwell 163:9

Mass 74:23
Massachusetts 1:4,10,21
  2:6,13 13:14,21,23 14:1
  16:11 41:2 44:20 45:23
  46:8 135:1 167:20
  183:1,5
Matt 34:1,2,14 35:8,9
  52:24 54:17,17 61:8
  62:8 67:7,13,14,14 70:9
  70:17 80:21,24 83:12
  85:4,6,7,12,16 87:11
  90:17 92:11 96:7,14,17
  98:18 102:23 105:13
  118:7,23 119:4 120:19
  120:21 121:10,16,20
  123:14 124:2,2 125:18
  126:21 138:2,7,8
  148:18,20 150:12,15
matter 18:11,12,23 19:15
  19:21 20:4,7 31:21,23
  32:6,7 119:12
matters 19:16,19 28:21
  29:4 119:10
Matts 92:15,16
Maureen 85:10
maximum 69:24
McCullough 8:20 30:5
  39:5 45:17 46:1 73:17
  73:18,19,22 127:15
  144:3,18 151:12 152:7
  155:15 157:1,7,15
  159:12 170:18 171:1,2
  171:3 175:13,19 176:4
  176:9 177:24 178:5,10
  178:14,18
McCullough's 170:14
  177:14
mean 11:19 26:13 38:23
  42:2 64:18 66:6,9 80:4
  83:13 127:21 137:22
  146:15 156:14 169:17
  172:23
meaningful 166:20 167:1
means 22:22 69:20
mechanics 135:15
Medicaid 80:7 154:6
  171:18
Medicare 80:7
meet 16:23 17:4
meeting 124:22 125:16
  126:19 128:24 130:5,12
  130:16,19 131:6,20,21
  133:10 137:17 139:6
  161:5,6,12
meetings 60:19 125:10
member 14:4 172:22
  173:3

members 17:8,12,14
  77:22 78:19 90:11,24
membership 17:5
memoranda 59:7
memorandum 59:11
Memorial 84:20
memory 30:24 34:10
  55:18,21 59:12,13
  61:20 63:22 64:2,4,7,9
  67:22 69:4 84:15 85:1
  87:16,19,22 88:3 91:11
  98:9 101:4 103:8
  104:18,21,23,23 105:2
  106:22 107:9 115:24
  118:20,21,23 119:1,4,7
  125:2 133:9,14 136:18
  136:21 139:5 157:18
mentioned 39:23
message 61:8 62:8 63:4
  82:2,2 83:1 97:3,18
  99:10 150:3,7 151:10
messages 154:23
met 17:21 38:13 60:21
  67:11 125:20
mid 153:11
middle 124:23
Middlesex 16:18
Mike 48:16
million 35:18 66:8,9
  76:24 89:5,9 91:3 92:7
  92:7 105:18 107:2,7,8
  108:23 111:1 128:7
  133:10,13,16 134:17
  136:2,6,19,21 138:3,11
  144:21,22 145:3,9
  146:1,18 169:10
mind 72:5 126:13,15
  179:16
minimum 137:4
minute 18:3
minutes 157:12,23
misanswered 154:3
missed 154:23 164:24
misstate 49:19
misunderstand 51:4
modifications 112:11
mollify 98:13
Monday 123:20
money 27:17 32:11 65:16
  73:3 107:3,4 112:21
  128:11 137:23 145:4
  146:23 147:17,23
  152:20 154:13,14
  159:18 172:24 173:3,23
  177:11
monies 27:20
monthly 78:24

Stephen F. Gordon

months 78:24
morning 149:11,19
    151:18 152:10 153:1,11
    161:23 169:23
Mortgage 64:24
motion 100:3
motions 5:9
move 54:9 59:16 69:19
    70:10,18 71:22 72:1,4
    72:13 73:9
moved 157:16
moving 68:1,8 69:10
    71:13 145:7,9
multiple 85:14
M-A-R-O-T-A 127:12

**N**

N 3:1 5:1
name 5:20 14:18 36:6
    40:19 67:6 79:19
named 16:2,14 67:13
napkin 129:17
narrow 179:11
Nathan 16:20
nature 128:3 132:14
near 96:23 98:7
necessarily 109:8
necessary 10:20 112:12
    112:20 113:4 147:15
    167:20
need 6:11 21:9 22:21 76:6
    136:7,8 162:16
needed 75:5 98:11 106:24
    137:5 139:15
negotiate 76:4 104:13
    128:18 129:7
negotiated 78:14
negotiating 54:11 146:20
    146:22
negotiation 54:10 103:18
    114:14
negotiations 54:8 73:12
    114:8 122:24 134:11
    135:17 145:15
neither 102:4 183:10
net 122:24
never 32:11 67:11 75:5
    105:5 106:3 124:21
    134:13 158:16,17
    166:14
new 2:22 27:20 83:7
    116:12 138:11 139:7
    167:2,12 168:13
nice 84:22 158:2
night 150:23 151:2,7,15
    161:9
NIXON 2:19

noncommittal 128:17
non-binding 76:2
non-confrontational
    120:2
non-instruction 21:2
non-negotiable 82:17,20
    82:21 104:22
non-payment 15:23
non-privileged 8:24
non-substantive 44:7
non-technical 97:7
nose 83:15
Notary 5:16 183:4,22
note 136:13,15,16,18
    144:22,23 145:1,5
notice 6:22
November 13:23
number 14:4 59:23 63:22
    66:20 68:14 75:15
    89:14 107:6 111:24
    126:13,15 133:11 136:5
    136:20,22 137:3 146:20
    165:14 170:9 171:18
    172:3,11,13
numbers 63:17 66:17,21
    71:8 107:6 129:17
    143:2 144:11 172:12
numerous 146:7
nursing 18:14 21:16,17
    27:4

**O**

O 5:1
objected 10:13
objection 7:23,24 8:10
    9:6 10:7 180:17
objections 5:8 10:4
objectives 167:11
obligated 21:2
obligation 38:11,21 39:6
    39:13 76:3 109:10
obligations 26:7 73:5
    130:1,8 142:22 154:16
obligor 79:3
obligors 77:17,18
observation 95:19
obtain 12:22 13:6
obvious 178:19
obviously 6:10 19:3 20:13
    42:17 51:18 65:3 77:19
    97:17 100:13 102:8
    112:24 115:5 119:17
    128:10 132:6 134:16
    142:7 157:12 168:8,12
    172:13 173:21
occasion 116:7
occasions 46:11

occur 130:24
occurred 103:11 171:22
occurring 148:8
October 43:21 44:6 49:7
    50:3 168:19 169:24
    175:4,5 178:21
offensive 75:7
offer 48:4 66:4 128:14
    129:2 133:9
offered 128:19
offers 22:23 23:22 63:22
    64:2 69:8 70:8,24
office 1:20 2:5 6:20 13:11
    33:21 62:17,20 74:17
    74:19 115:16 118:9
    125:11 151:4 153:1,7
    154:20,21 161:4,9,11
    161:19
officer 94:20 95:4
officers 51:22
offices 32:3,5 74:24
Oh 117:17 126:17 179:19
okay 7:3,24 8:17 11:2
    19:13 22:16,21 23:18
    24:10 25:15 31:22
    33:14 34:21 42:19
    45:10 53:21 56:19
    64:17 66:19 67:8 73:15
    78:4 97:23 102:21
    103:22 104:1,9 106:9
    109:19 112:12 113:8
    125:15 129:3 130:11
    144:9 147:13 157:24
old 83:7
omitted 145:1
once 83:11,13 84:1,5
    163:2,3
ones 27:5 169:14
open 157:3
opened 130:17,18
operation 83:7
opinion 12:12 37:10,18
    42:24 43:4,7,12,15,18
    47:6,8,9 50:17 72:19
    111:6,8,10,17,18,18,19
opportunities 23:22
    64:15 65:24
opposed 15:8 94:2
option 68:9,11,12,13
options 64:8,10,12
order 110:24 139:15
    142:22
ordinary 79:1
original 113:10
ought 84:24 117:5
outcome 183:13
outside 31:21 48:18 78:5

170:20 175:14,20
    176:14
outstanding 135:5 142:14
    152:19
overage 107:10
oversaw 73:11
overseeing 149:4
owe 38:4
owed 92:8 128:9 135:11
owing 111:3
owned 21:19 94:13,14
ownership 37:22 40:6
    49:9 58:1,12 127:22
o'clock 62:9 157:17
O'Connell 47:20,23 48:4
    48:10 124:13
O'Connell's 48:2

**P**

P 5:1
pad 129:17
page 3:11 4:2 8:13,14
    21:13 41:7,8 56:9,10
    57:6,13 61:4 62:5,6
    63:15,17,17,18 74:6
    75:14,15,16,17 96:4
    99:9 108:21 109:21
    150:3 154:19 167:18
    170:5 171:17 172:5
    182:7
Pages 1:2
paid 78:2,4,6,16,20,21
    79:8 110:23 124:4,9
    134:19,21 136:22
    142:22 143:6 153:14
    154:2,7 159:24 160:9
    160:18 162:12,17
    163:13 173:17 179:12
Paine 79:24,24
painfully 178:19
pains 5:5 182:19
paper 157:13
papers 156:18,20
paperwork 65:14
paragraph 8:17 21:12
    22:1,2 23:2,19 27:5
    41:8,10,14,16,20 42:7
    42:13,20 43:2 46:21
    56:6 57:12 58:16,19
    63:5 77:3 89:16 99:12
    106:9 108:22 109:2,6
    109:17,20,21 110:10,13
    110:18,21 113:13,21,22
    113:24 114:5,11 117:18
    129:23 130:1 165:17
    166:8 167:9 168:16
paragraphs 129:24

Stephen F. Gordon

parents 17:19
part 14:7 42:20 58:20
  67:2,16,23 68:6 76:1
  109:16 114:5 139:17
  144:11 171:4
participants 29:18
participate 156:15
  178:10
participating 67:24
  117:22
particular 31:21,23 40:21
  64:23 67:10 83:24
  93:24
parties 5:4 53:7 59:4,8,22
  60:12 75:10 117:7
  183:11
partner 28:6 97:17
Partnership 21:20
parts 37:6
party 28:24 37:13 52:13
  54:8 102:1 104:7
passed 17:22
passing 18:19
pay 38:11,21 39:6,13
  89:24 110:22 114:16
  134:15 142:18 147:15
  154:15 159:9 169:3
payable 34:23 37:12 42:9
  89:8 170:10
paying 180:3,19
payment 48:1 77:21 90:4
  108:23 109:16 111:14
  114:4,22 130:2,2,3
  171:18
payments 37:19 41:13,22
  42:8 43:1 44:19 45:22
  46:20,23 47:14,14 48:6
  48:12,13 78:24 80:4
  110:12
payoff 144:20
pays 138:21
PEABODY 2:19
Peisch 1:19 2:3 48:16
pen 157:13
penalties 5:6 182:19
people 12:15,19 20:9,10
  45:8 63:1 69:3 70:23
  82:23 83:6,8 98:4
  100:10 101:7,7 157:15
  171:12
perceived 140:6
percentages 42:17
perform 26:8
performance 41:13,21
  42:8 43:1 44:18 45:21
  46:20 72:15 122:3,10
performed 56:13,21

166:11,17
performing 25:15
period 24:2,16 25:16
  27:23 36:10 39:17,20
  39:23 49:6 50:2,20,24
  51:5,10 52:1 57:10 58:8
  64:13 65:13 94:18
  112:17 123:23 133:20
  139:14
perjury 5:6 182:19
permission 112:20
permit 92:7
permitted 20:19 21:3
person 17:6 43:8 67:12
  92:19 152:1
personal 56:12,20 57:1
  59:18 100:12 116:14
personnel 82:10
persons 69:22
pertain 140:3
pertaining 42:13 55:17
  114:4
Peter 28:5 74:7 97:17
  144:3
PGHS 57:17
phone 65:23 99:13 146:4
  153:5 164:8
phrases 58:17
pinpoint 28:13
place 21:17 62:13,16
  74:23 143:17 149:6
placed 82:17
Plaintiff 1:8 2:7 5:13
  16:20
plaintiffs 16:19
plan 56:16
please 5:21 6:8 61:10
  74:10 96:22 120:20
  149:3 155:1
plug 89:14 107:6 113:5
plug-in 105:23
plus 144:21
POC 170:11
point 24:21 27:3,6 36:23
  67:10 68:24 70:7,23
  75:3 88:7 89:11 90:8
  94:5 99:14 106:18
  114:17 122:12,22 125:4
  125:5,8 126:9 132:11
  136:10 137:16 138:14
  145:2 150:10 151:18
  152:17 157:10 159:22
  175:10,16 176:11
Pointe 1:10,11 2:14 8:23
  10:15,24 11:7,14 19:7,9
  21:16,17,20,20 24:18
  25:12 27:3,7 28:10,15

28:17,19,23 29:1,3
  32:24 34:4 35:11 36:2,6
  36:12,15,24 37:14 38:4
  38:11 49:10,19 50:2,9
  52:4,13,16 54:21 55:1,5
  57:18,21,23,24 58:8
  70:10 71:1 74:11,21
  75:1,20,24,24 80:7
  82:18 83:12,21,22 89:1
  91:20 94:11,13 97:3,6
  97:20 98:1 100:2,4,8
  101:18 104:11 105:19
  105:20 136:11,11,12,13
  136:18,24 137:15,21
  172:1
points 122:16,16,17
portion 87:17
posed 150:13
position 9:12 40:23 44:15
  45:20 49:23 50:1,14
  85:6,8 131:15,18
  137:19 146:9 148:1
positions 83:6
positive 122:2 179:15
possession 11:4 33:8
possessions 9:1
possibility 153:6
possible 87:9,21,22 88:5
  98:7 135:12,14 146:4
  174:6
possibly 87:24
Post 1:20 2:5
potential 19:16 58:20
  65:11
potentially 100:23
Power 125:4,5,8 126:9
  132:11
practice 15:13 26:20
  116:1,3
practiced 14:15
preceded 18:21
preceding 96:12,14
preface 95:14
prefer 93:3
premised 109:16
premises 23:23
premium 78:14
preparation 11:18,20
prepare 115:16
prepared 74:15 108:12
  158:18
preparing 41:11
prerequisite 167:20
presence 46:13
present 12:3,5 14:15 19:8
  43:16,17 46:11 60:15
  60:19 69:6,13,22,23

124:12 125:11 126:16
  126:20 127:7 170:17
  171:8 172:20 174:8
presentation 60:18 63:16
  124:24 125:4,5,9 126:2
  126:10 132:12
presentations 60:13,16
pretending 20:15
previous 83:14 92:13
  120:18 154:8 172:5
previously 32:19 74:3
  93:2 96:8 102:12,22
  105:9 113:16 168:18
pre-scheduled 161:4
price 71:14 76:23,24
  106:19 107:1,2 115:6
  117:14 125:6 126:7,14
  128:6,19 129:11 130:9
  132:4,7,10,15 138:12
  139:7,11 141:5 142:13
  143:7,14
principals 97:2,6,7,20,24
principle 81:1 91:2 96:10
printed 33:20 35:7 80:18
  81:23 137:10 139:23
  143:21 148:18
printout 35:4 61:5 76:17
  81:22 88:15 90:16
  91:14
prior 7:13 8:16 11:9
  18:19 28:17 29:9,14,16
  30:20 31:7,8,15 40:2,22
  43:5 44:5,6,17,23 45:10
  45:18 46:10 47:12
  53:16,19,22 54:7 55:15
  55:19 78:13 82:7 84:4
  135:16,18,23 141:8
  148:11 150:8 155:7
  177:21 178:21
private 64:22 65:1 119:2
privilege 20:23 45:8 49:1
  49:5,23 50:15 52:14
  70:1 81:15 179:23
  180:21
privileged 11:16 48:18,20
  50:4,6,8
Pro 2:16
probably 18:4 95:16
  116:4
problem 67:6 84:23,24
  86:10,18 112:15 120:21
proceeding 19:23 29:21
proceeds 42:3 77:6 78:6
  80:9,13 88:24 89:2,18
  90:9,12 91:3 110:2
  114:16 123:1 136:15
  143:6 153:14 154:8

Stephen F. Gordon

160:1 172:21
**process** 13:4 22:4,6,6,11
  22:13,19,22,22 23:1,12
  23:21 59:17 64:19 86:3
  104:14 118:4 135:18
  146:16
**Procter** 4:18 29:8 124:22
  125:10 150:1,17 151:19
  151:22 152:11,24
  153:11,12 155:9 156:16
  158:15 159:23 160:8,14
  160:16,20,24 161:3
**produce** 9:4,10
**produced** 7:19 8:23 9:15
  11:6,15 150:1
**product** 166:14 167:6
**production** 5:15 7:1,3,15
  7:23 8:1 9:6,11 10:4,8
  10:13,19,21,23
**productive** 98:11
**Professional** 183:3
**program** 120:5
**progress** 119:14
**progression** 98:22 99:3
**properties** 64:12 66:4
  105:21
**property** 16:9 76:12
  135:3,10 140:19
**proposal** 88:21 107:13
  165:19
**proposed** 53:6 126:6
**proposes** 117:19
**proposing** 119:15
**prospective** 22:23
**protect** 69:24
**protected** 180:20
**proved** 83:12,21
**provide** 28:1 56:8 57:7,15
  58:18,21 59:18 89:23
**provided** 49:2 57:3 66:13
  109:23 176:18
**provides** 66:17
**providing** 18:24 32:1
  122:1
**provision** 114:22 115:1
**provisions** 114:3
**public** 5:16 20:4 141:8
  183:4,22
**pull** 113:5 153:18
**purchase** 22:23 26:8
  76:23,24 87:7,12,14,15
  87:17,24 88:4 100:13
  106:19 107:1,2 117:14
  125:6 126:6,13 128:6
  128:19 129:11 130:9
  132:4,7,9,15 138:12
  139:7,11 141:5 142:13

143:7,14
**purchasers** 58:20
**purpose** 118:2 159:5
**purposes** 179:20
**pursuant** 9:7 10:5,14,22
**pursue** 147:12
**pursuing** 112:22
**pursuit** 58:17 59:1
**put** 132:11 157:13
**putting** 100:17 123:15
**p.m** 80:24 90:18 121:17
  121:20 123:13 150:24
  151:9,9,15 168:19,22

--------------------------

**_____ Q _____**

**qualification** 93:6
**qualified** 167:19
**quality** 57:1 72:6
**quarrel** 66:23
**question** 6:8 11:1,13 21:4
  22:9 24:1,23 25:1,2,6,7
  25:9,11,12,14 26:1
  31:20 37:16,24 38:6,14
  45:4,5,7,9 47:1,10 49:3
  49:24 51:3,10,20 52:7
  53:14,20 55:4 56:18,19
  61:17 66:12,24 71:6
  72:3,10 94:12 95:2
  101:23 104:9 106:12
  109:18 111:9,11 116:22
  116:22 117:3 126:11
  128:9,13 131:16 135:23
  144:9 149:10 154:4,14
  160:11 175:23 176:6
**questions** 6:10,13 20:17
  20:19 21:10,13 149:19
  150:12 175:9 177:4
  179:21 180:1
**quite** 17:16 32:17 134:13
  157:22
**quote** 97:1 169:2,3

--------------------------

**_____ R _____**

**R** 5:1 182:1
**raise** 132:15 167:12
**raised** 46:5
**raising** 44:17,23 166:21
  167:2
**range** 60:2 66:7 136:1
**ranges** 66:13
**reach** 75:13 80:24
**reached** 84:22 91:1 96:9
  123:19 143:24 146:17
**reaching** 41:17
**read** 5:5 12:3 24:24 25:1
  25:9 37:6 42:17,20,21
  103:13 111:11 182:3

**reading** 33:10,12 103:23
  113:2 122:16
**real** 21:19 41:2 44:20
  45:22 46:7 76:5 135:13
  167:19 168:4
**really** 25:21 96:5
**Realty** 21:21
**reason** 7:22 19:20 32:11
  64:5 86:22 87:23 89:15
  98:6 122:20 134:2
  152:21 154:17
**reasonable** 57:16 105:7
**reasoning** 81:8
**recall** 6:19 8:3 15:19
  28:23 33:3,4,7,10,12
  34:17 40:22 48:7,7
  53:10 55:10 59:10
  61:16,17,23 62:12,18
  62:22 63:3,13 64:6
  65:18,19 67:15,19 68:6
  68:22 70:12 71:7 72:1
  74:15 77:18 82:7 90:6
  92:1 94:9 99:22,23,24
  106:14 108:11,16,19
  114:12,13,24 115:3,8
  115:20,22 123:5 125:9
  125:15 127:5 130:10·
  131:1,4 132:23 133:1,8
  136:2 137:16 138:22
  140:15 141:11,20
  142:10,17,19,20,24
  143:1,4 145:10,12
  148:24 155:20 159:14
  162:20 163:18,21,21,22
  164:16 166:3,4 173:23
  174:2,17 179:6
**receipt** 5:6 7:13
**receipts** 143:9
**receive** 98:4 116:8 138:16
  177:21 178:2
**received** 7:5,17 36:22
  37:4,7,9,17 38:1,7,15
  39:2,9 57:9 59:21 61:12
  61:21 62:1 63:19 67:21
  82:3 98:4 108:17,19
  109:3 115:11,14 150:10
  162:24 164:7 167:15
  169:1 173:3
**receiving** 6:19 61:16,18
  61:23 82:8 104:22
  106:11 112:23 115:22
**reception** 130:20
**recipients** 53:6
**recognize** 32:21 33:20
  62:3
**recollection** 12:8 46:17
  67:17 70:2 83:18,19,22

85:15 120:12 129:20
  143:11 146:5 175:7
**recommend** 99:15
**recommendation** 100:16
**record** 5:21 20:4 53:11
  88:10 182:5 183:8
**records** 30:12 180:14
**recounted** 103:14
**recoupment** 80:8 135:1
  154:6
**red** 116:9
**reduce** 107:9 117:14
  138:2 143:7,9
**reduced** 79:1 128:14
  130:9 147:14
**reduces** 138:20
**reducing** 125:6
**reduction** 126:6 128:6
**refer** 57:18 77:11 78:12
  89:22 169:17
**reference** 78:8 105:23
  130:12 144:19
**referenced** 39:17,20
  104:6
**references** 96:8
**referred** 8:9 22:14,19
  36:13 87:15,18 97:24
  108:4
**referring** 7:12 8:1 9:10
  10:6 20:7 29:20 66:21
  83:3,17 91:3,23 97:10
  100:4,5,7,7 104:4 108:8
**refers** 41:21 56:7 168:17
**refinance** 16:9 23:14,15
  68:13 167:12
**refinanced** 136:13
**refinancing** 22:24 23:22
  40:5 64:8,9,12,20
  147:12 166:21 167:2
**refinancings** 40:15
**reflect** 99:6 123:16
  143:23
**reflected** 91:4 96:4
  101:15 138:10 158:10
**reflects** 89:4
**refuse** 45:6 88:3
**refused** 59:16,17 87:8
**refusing** 20:17 87:19
  111:22
**regarding** 41:12 43:15
  54:4,5 73:12 88:24
  104:2 105:20 122:3,10
  122:24 124:24 152:15
  168:2 180:19
**Regardless** 36:9
**regular** 78:23 120:5
**regulatory** 112:18,19,23

113:6
**Relate** 47:21
**related** 162:8 183:10
**relates** 85:3 98:18 103:10
**relating** 95:9
**relationship** 54:5 84:23
  127:23 158:2
**relationships** 50:7
**relay** 123:17 138:8
**relayed** 92:17 103:14
  138:14
**relaying** 92:23 137:14
**release** 79:23 142:2
**released** 142:4
**relevant** 57:10
**remain** 159:19
**remaining** 21:18 69:2
**remember** 6:7 12:9,11
  18:24 32:3,14 40:11
  43:17 53:15 55:23
  59:24 60:1 62:15 64:11
  65:22 66:1 67:3,4,24
  68:19,21 71:17,18 79:3
  87:11,13 91:7,9 92:9,12
  93:5,16,23 97:9 98:14
  101:2,10,16,20 102:6,8
  102:9 103:6 104:19
  107:12 112:12 117:22
  118:2,6,8,12,18 119:10
  119:20,21 120:1 122:9
  122:19 125:23 126:5,12
  126:24 127:2,3,4,7
  128:16 129:22,23 130:4
  130:11 131:7,17 132:5
  133:4 136:6,8,15 138:9
  139:4 149:21 152:23
  155:12,17 156:6 157:14
  160:2 161:9,24 162:3
  163:22,24 166:6,7
  170:20,23 171:15,16
  173:11,13,14,21,22
  174:5,6,15,19
**remind** 6:6
**remotely** 149:7
**removed** 94:11
**render** 17:23 18:6,18
  24:3,6,14,18
**rendered** 16:8 19:8,14
  23:17 24:11 28:18
  166:20 167:1
**rendering** 19:21 25:19
**repaid** 136:17,18 137:1
**repeat** 84:3
**rephrase** 6:14
**replaced** 114:1
**replied** 97:12
**reply** 97:1,14 98:5

**replying** 97:13
**reporter** 1:23 6:9 33:18
  183:4
**represent** 7:14 23:20
  27:11 28:9 29:11,15
  31:2 46:15 50:21 51:1,5
  51:12 52:3
**representation** 18:17
  19:4,5 20:5,11 26:23
  28:12,17 30:20 40:2
  51:21
**representative** 125:15
  146:10
**representatives** 126:22
  127:8,9,10,13 129:15
  129:15 130:6,7 131:3,7
  141:14
**represented** 20:3 29:19
  29:23 30:5,11
**representing** 20:3 29:14
  30:14 32:8,9 124:13
  127:14 180:7,15
**request** 7:7,9,18 8:23
  70:23 71:1,3,4 107:9
  131:10 138:8 174:4
**requested** 9:11
**requesting** 141:20
**requests** 7:1,19 157:5
**require** 90:4
**required** 110:21 111:14
  169:3
**requirement** 145:8
**requiring** 108:22 114:22
  140:23
**reread** 25:11
**research** 167:22 168:2
**resend** 155:1
**reserved** 5:9
**resolution** 142:13
**resolved** 83:9,10 85:1
  141:2
**respect** 8:19 18:21 19:4
  21:1 23:12 24:8 50:19
  53:18 55:22 85:9 95:2
  104:6 114:10 115:20
  121:11 128:6 141:13
  142:6 154:5 159:8
  173:19 175:13,23 176:2
  176:17
**respective** 5:4 8:24
**respects** 166:10
**respond** 96:23 150:9
**responded** 61:21 87:16
  179:21
**response** 11:15 34:14
  48:2 54:16 62:7 82:2
  86:5 96:12,21 99:5

102:24 103:6 106:11
  107:12,15 120:22
  124:17 128:15,23 150:2
  151:9 156:6 162:15
  164:11
**responsibility** 158:21
**responsive** 7:7 9:14 11:5
  11:12 98:17
**restructure** 167:12
**restructuring** 41:7 56:7
  56:13,16,21 57:2
  166:20,24
**result** 82:15 112:23
  113:14 118:12 135:11
  140:22,22 159:14
**resulted** 53:16
**results** 126:3
**retain** 116:3
**retained** 27:8 40:3 72:12
  123:24
**retainer** 26:16,19 28:14
**retention** 45:14
**reverse** 93:8
**review** 7:9,18 11:17 65:14
  156:9 158:8 167:3,5,6
  178:5,12,14
**reviewed** 9:18 11:23
  34:16 37:9,17 38:1,7,16
  39:3,10 41:10 42:12
  53:11 70:3 103:8
  158:16 166:14 169:6,8
**reviewing** 59:10 103:6
  157:14
**revised** 126:13
**Rich** 127:11
**Richard** 18:10
**right** 9:19 14:7,24 20:24
  25:4 47:6 61:18 63:2
  66:12 71:23 76:12
  80:10 81:24 84:12
  90:18,22 91:8 93:4 94:9
  104:15 112:9 135:20
**rights** 110:7
**right-hand** 75:16
**River** 64:23,24
**role** 31:11
**room** 126:21,22,23 127:1
  127:6,7 128:3 129:16
  156:17,18,22,23,24
  157:1,8,16,19,23
  160:15
**Rosenthal** 1:19 2:3
**roughly** 34:10
**round** 172:11,12
**Rudofsky** 79:7
**rules** 6:4 122:14
**runs** 49:1,5,23

**Ryan** 3 5:8 61:8 63:11
  67:14 104:5 124:2
**Ryan's** 62:7 63:4
**R-U-D-O-F-S-K-Y** 79:7

**S**

**S** 1:12 3:10 5:1
**sabotage** 94:3
**sake** 9:5
**sale** 16:9 23:15 24:19
  25:17 26:3,8 31:12
  35:18 40:4,24 42:3 51:7
  51:13 52:4 53:15,16
  54:22 55:2,4,7 78:6
  80:8,13 87:7,12,14,15
  87:17 88:1,4 89:2,9,17
  90:9,12 91:3 92:7 94:3
  94:15 95:9 100:13,18
  100:23 105:20 110:2,3
  111:3 153:14 160:1
**sales** 40:14 77:6 114:16
  172:21
**sat** 12:11,13
**satisfactorily** 5:14
**satisfied** 130:8
**satisfy** 73:5
**saw** 14:22 33:3,10,12
  34:11 36:5 71:8,9
  154:22,24 158:17
**saying** 9:23 42:19 54:21
  63:13 83:13 84:1,2,5
  86:6 91:7 95:14 96:18
  96:20 97:19 104:24
  118:18 129:4 136:6,8
  136:16 146:24 149:9
  174:5
**says** 35:9 36:19 41:7,9,15
  42:2,7 54:23 57:14
  58:19 61:10 63:6,15
  74:10 75:16 77:13,21
  79:23 80:24 85:5,9 89:1
  89:17,21 98:21,24
  105:16,17 106:9 109:23
  112:9,10 113:24 121:23
  122:22 123:14,19
  134:12 138:1,4 144:19
  146:13,16 148:21
  151:11 152:6 165:20
  167:10 170:10,11
**schedule** 6:24 9:23 10:1
  63:21 64:1,6 170:6
  172:3
**school** 13:13,17
**scope** 56:6
**Scott** 47:20
**scratching** 129:16
**Se** 2:16

Stephen F. Gordon

**seal** 183:15
**sealing** 5:7
**search** 7:6,8,12 11:10
**searched** 11:14
**second** 8:14,17 34:19
  57:11 63:5 77:3 89:16
  106:9 154:18 167:10,18
**section** 41:5 87:14
**secured** 18:7
**see** 7:6 8:17 9:1,7 11:11
  21:14,21,24 22:2,5,8
  23:7,11 31:17 34:5 35:7
  36:1,3 41:6,22,23,24
  42:4,7,10,11 52:22 53:1
  53:4,8 54:18 56:5,11
  57:5,8,12 58:15,23 61:3
  61:7,13 62:10 63:4,9
  66:12,18,19 70:23 74:5
  74:6,12,21 75:19 77:9
  77:23 78:10 80:21 81:5
  81:21 82:18 85:24 86:3
  86:12 87:2 89:19 90:3
  91:21 96:10 97:4 98:17
  98:19,22,24 99:17
  100:18 102:15 103:3,5
  103:9 105:14,21 108:1
  108:24 109:20 113:22
  117:18,21 121:16,21
  122:4,12,22 123:2,21
  128:18 137:13 144:2,23
  148:19,21 149:12 150:2
  150:21 151:1,7,8,10,13
  154:18 155:5,22 166:1
  166:11,22 169:2,4,15
  170:11 171:20
**seen** 36:6,6,12,20 56:15
  89:12 92:13 155:7
**sell** 23:14 24:21 25:13
  46:7 75:1 76:1
**seller** 84:12 127:8,13
  169:2 170:11
**sellers** 52:9 92:6 102:4
  112:13 120:6 126:23
  127:14 128:18,21,23
  129:6,7 144:13,15
  154:9 156:22 169:10
  177:9 178:11
**seller's** 85:1 95:11,21
  119:17,23 129:14 130:6
  131:2 152:15
**selling** 26:6 40:5 58:12
  60:5 100:5,8,14 107:24
**send** 27:1 34:3,17 53:7
  87:19 96:20 99:10
  120:20 155:1 162:19
  163:24 164:23 165:1,5
  174:18 178:23

**sending** 87:17 115:23
  174:22 178:21
**sends** 96:17 150:7
**senior** 1:11 33:1 36:3,7
  36:12,18 37:1,14 57:19
  57:24 66:5,7
**sense** 84:6 120:3 131:8,8
  145:19
**sent** 8:2 27:3,6 35:13 37:6
  44:3,13 54:17 59:2,11
  76:18,21 83:1 86:14,21
  90:22 96:6 97:13
  102:16 121:5,20 123:13
  144:3 148:12 149:8
  150:8,22 158:19 162:22
  163:20,23 165:11,24
  167:7 168:19 169:7
  171:24
**sentence** 8:19 34:19 76:22
  81:2 100:3 105:17
  167:10 169:13
**separate** 70:24
**September** 24:2,2,17,17
  27:12,16,19,23,24
  38:17,23 39:11 43:5,9
  43:10 49:7 50:3,3,20,21
  51:11,11 52:1,2 55:15
  58:9 64:13,13 65:13,14
  94:18,19 140:16 141:11
  143:22 145:11 148:8,20
  149:15,16 156:16
  172:19
**series** 57:20 150:21 180:1
**served** 6:16 10:6,14,22
  11:5,12 141:14 150:2
**service** 19:14
**services** 17:23 18:6,18,24
  19:8,22 23:16 24:4,6,11
  24:14,18 25:16,18 27:2
  28:1,19,21 40:7 41:7,9
  49:2 56:6,7,14,21 57:2
  57:2,7,14,15 72:6 111:2
  166:20 167:1 180:20
**session** 126:1,1
**set** 109:19 110:6 151:12
  152:7 158:20,20 183:7
  183:14
**sets** 11:16
**setting** 6:5 117:19
**settle** 171:18
**settlement** 77:6 154:24
  155:5,7 156:9 158:9,14
  158:16,17 165:18
**seven** 133:13 141:4 143:8
  168:16 170:6 171:18
**share** 149:4
**shared** 117:6 126:16

158:19
**shareholder** 77:8,11
**shareholders** 63:8,12
**sheet** 158:9
**shocked** 178:7
**short** 138:2
**shorthand** 100:11 183:3
**shortly** 142:10 156:24
**shots** 131:9
**show** 144:7 165:10
**showed** 169:9
**showing** 105:9 121:13
**side** 95:11,21 119:17,18
  131:9 149:5 152:15
**sign** 145:5
**signature** 75:17 168:13
**signed** 5:5 70:16 71:12
  74:7 75:19 76:10
  109:10,13 110:21
  111:12 123:20 158:4
  168:9,14 182:19
**signing** 75:23 155:10
  156:14
**silently** 103:13
**similar** 144:4 171:2
**simpler** 135:23
**simply** 8:15 17:18 44:7
  85:3
**simultaneously** 86:11
  87:1 165:4
**single** 136:12
**sit** 40:12 72:24 101:2,9
  142:3
**site** 14:22
**sitting** 12:21 130:20
**six** 63:18 108:22 110:10
  110:13,18 113:13,22,24
  114:5,11 129:23 130:1
  172:8,9,15
**size** 156:17
**skipping** 81:2
**slash** 180:17
**small** 84:23,24 94:15
**smaller** 126:1
**social** 17:1,3
**solicitation** 3:19 22:6,11
  22:13,19,22 23:12,22
  61:11 63:18 66:2 69:9
**solicited** 167:15
**soliciting** 22:23
**solve** 84:23
**somebody** 64:18 157:13
**somewhat** 12:16 66:24
  163:14
**sons** 158:1
**sorry** 21:20 25:8 53:3
  66:11 96:16 108:17

116:20 172:5 174:1
**sort** 19:23 64:18 81:15
  105:1 106:4 120:4
  126:19 135:9,15 145:16
  145:20 179:10
**source** 173:23
**sources** 58:21 64:19
**South** 27:3 136:11,11,13
**speak** 51:16
**specializes** 15:14
**specific** 58:6 61:20 64:4
  67:17 85:15 94:6,17
  98:3,6 114:22 115:3,8,9
  126:13 130:10 132:10
  142:21 154:5 163:12
  175:7
**specifically** 11:19 29:2
  71:5 164:1 165:13
  171:16
**specified** 46:21 51:5
  109:17 110:13 111:15
**speculate** 88:2
**spending** 30:18
**spends** 85:11
**spent** 30:3,8 84:21
**split** 89:18 90:10 110:14
  112:6 117:2 128:11
  156:13
**spoke** 51:17 85:5 115:4
  157:7
**spoken** 175:1
**spring** 33:5,5 34:12 72:18
  73:1 96:6
**Square** 1:20 2:5
**SS** 183:2
**stage** 145:11
**standard** 63:7
**stands** 179:16
**Stanley** 78:8 154:7
**start** 6:8 66:7 96:5 109:11
  165:8
**started** 69:3 155:10
**starting** 52:22
**starts** 56:9 63:17
**state** 5:20 23:5 53:10
**stated** 9:12
**statement** 9:17 22:10
  23:2,10 48:5 84:13
  104:11,17,20 154:18,24
  158:14,17 164:1,14
  166:13,16 167:17,22
  169:2,9 170:4 171:1,2,5
  171:13 172:23 174:22
  177:21 178:2,6,12,15
**statements** 59:18 155:6,7
  156:9 158:16
**states** 1:3 34:20 65:3

Stephen F. Gordon

stating 8:9
status 18:12 168:3
stay 158:4
stayed 103:17 159:16
staying 172:3
Stephen 1:17 2:11 3:3
  5:12,22 182:2,22 183:6
Steve 5:20 25:5 32:15
  97:1 98:19 104:12
  122:2 123:2,15 127:11
  131:19 148:22 156:2,3
stickers 88:8,9
sticking 88:6
stipulated 5:3
STIPULATION 5:2
stockholders 57:19,23
  58:7
stood 65:23
stop 164:10
stories 12:19
story 12:18 85:13
strange 178:9,13
stranger 117:7
Street 1:24 2:12,21
stretching 156:20
strike 5:9 7:9 33:23 43:24
  57:11 65:20 68:23
  71:20 109:11 124:18
  132:23 139:4 145:17
  148:6 169:6 178:9
strikes 179:17
stuck 83:15
sub 58:15,18 113:21
  129:24
subject 18:15 78:23
  119:10,12 152:2 160:5
  173:14 175:2
subjects 173:15
submit 86:11 87:1
subpoena 3:12 6:16,19,22
  7:5,13,17,20 8:10 9:7
  9:11,14,18,20,21,23
  10:6,14,22 11:5,12
  141:13 150:2
subpoenas 10:5
subsequent 27:15 31:9
  44:4 112:3 115:2 120:7
  121:6 125:10 174:8,22
subsequently 17:8
substance 38:9 132:3
substantially 115:6 171:1
successor 172:4
Sucoff 3:24 4:4,7,13 29:8
  74:8 82:3,8,23 84:19,22
  85:5 86:1,5,15 91:16
  93:22,23 94:2,5 96:19
  132:2,19,24 137:14

138:15 152:17 157:2,7
  157:10 158:8,23 159:12
  160:4 163:17,18,24
  164:3,4,6,15,17 168:22
  170:19 171:2,6 172:7
  173:7 174:21,21,24
  176:13
sufficient 73:4 114:15,16
  142:18
SUFFOLK 183:2
suggest 60:7 116:23
  117:12 141:7
suggested 84:24
suggesting 133:1
suggestion 78:1
suggestive 66:24
suit 32:10,14
sum 42:2 77:7 107:3,4
summarized 61:24 69:9
summary 3:20 61:12
  63:18 66:2,3 67:20
  167:14
superior 16:18 131:19
suppose 139:2
sure 6:2 11:13 12:15
  18:20 28:7 36:8,20
  40:14,19 42:16,21
  44:11 51:4 56:17 61:21
  67:9,14 71:4,21 77:20
  81:4 92:21 95:13,15
  101:5 133:3,6 134:9
  143:16,16 146:11 158:9
  159:4,21 167:4,4,5
  180:18
surfacing 135:16
sworn 5:15 183:7
system 33:21 35:5 61:5
  76:18 80:18 81:23
  88:16 90:17 91:15
  137:11 139:23 143:21
  144:7

**T**
T 3:10 182:1,1
table 156:21
take 6:9 22:14 23:11
  102:21 106:16 128:8,10
  131:10 133:21 136:5
  137:20 143:5 147:22
  149:6 154:15
taken 6:2 11:24 170:19
  175:14
talk 57:6 75:7 101:6
  129:2 146:10
talked 23:21 67:20 148:7
talking 66:20 92:19
  105:24 130:20 140:4

172:12
talks 57:13 63:5
telephone 44:2,4,5,6,9
  82:16 84:4,18,21 85:14
  100:11 109:24 120:6
  121:6 142:20 146:8
  152:1 162:1
tell 6:13 8:12 9:20 13:12
  18:2 19:12,13,20 20:2,8
  20:12 24:7,7,9,10 30:4
  30:10,16,19 85:13
  90:24 98:2 103:13
  114:7 124:3,17,19
  134:10 150:15 162:16
  164:17 165:9,21 173:19
  174:3
telling 38:9 84:6
tells 91:18
tempted 92:11
ten 21:12 23:19 151:9,9
term 32:13
terminated 69:4
terminology 21:14,22
terms 21:13 37:11,19
  39:7 53:11 56:4 69:8
  73:4,16 101:19 102:2
  103:15 104:10 109:15
  109:20 110:6 122:18
  131:9 132:5 135:20
  136:3 137:5 143:2
  146:19,24 148:1 158:10
  158:22 162:20 163:19
testified 5:16 69:18,22
  107:21 161:24 168:18
  170:18 177:7 179:6,13
  179:14
testify 12:16,16 70:1
  171:12
testimony 12:6,10 49:19
  50:19 52:3 108:5 125:3
  140:18 158:14 170:21
  170:23 171:15 180:17
  182:4,5 183:9
thank 148:22 179:19
thanks 123:14
thereof 5:8
thing 103:23
things 12:2 65:23 94:15
  116:12 134:16,19,21
  135:19,20 138:22 143:5
  156:20
think 6:6 16:1,10 18:4
  19:6,24 20:2,18 21:9
  23:1,13 28:16 33:5
  36:19 40:9 46:14 48:23
  53:24 55:1,10,14 58:10
  58:14 60:17 68:12,13

68:18 70:20,22 71:6,9
  72:17 73:14,17 74:19
  75:3,7 78:7,21,22 87:9
  87:10 92:3,22 93:6,8,10
  94:16 97:2 98:3 100:10
  102:4,20 103:17,18
  106:1,2 107:22 111:5
  112:7,15 113:3 117:3,5
  117:16 118:1 120:2
  123:18 127:16,17
  129:13,20 130:3 131:21
  132:22 133:10,15,15
  135:3,16 137:6 139:12
  140:10,14,16 144:7
  145:5,18 146:6,7,12,14
  148:14 157:11 158:2
  163:1,2,8 164:19,24
  167:16 169:21,23 170:3
  172:11 173:5,9,18
  174:10 175:1 177:3
  179:17
thinking 153:16
third 41:5 99:12 166:8
thought 10:20 13:1,2,3,4
  47:24 48:5 81:14 92:3
  93:23 94:2,7 97:19
thousand 41:8 78:9,15
  107:8,10 108:24 111:2
  133:14,16 138:1,3,4,11
  138:20,21 141:4 143:8
  144:21,21,22 145:6
  159:20 169:3 171:19
  178:17
thousands 133:12
threatened 164:9 169:15
  169:18,20
threatening 164:8
three 10:11 12:5 16:6
  29:9 55:10 69:17 72:20
  108:21 131:6 138:20,23
three-way 134:14
Thursday 1:18 149:8
time 5:10 7:2 8:11 11:9
  14:10 17:21,22 19:7
  24:1,16 25:16 30:2,8,14
  30:17 31:3,13,16 36:10
  36:11,21 37:10,17 38:1
  38:7,15 39:1,2,17,20,23
  43:24 44:12 49:6 50:2
  50:20,24 51:5,10 52:1
  53:19 54:7 57:10 58:8
  63:7,8 67:10 68:24 70:7
  70:14,15 71:10,11,19
  72:4,11,13,18 73:20,20
  73:22 76:9,21 77:19
  78:2 80:24 81:12 84:21
  85:11 94:18 99:1 109:9

Stephen F. Gordon

109:12 110:20 111:12
111:13,16 112:17,21
113:1 114:17 116:11,15
118:9 121:24 123:23,23
125:20 130:11,23 135:5
137:16 139:9,14 140:23
141:8 142:1 151:2
152:18 153:23,24
157:17 159:18,22 160:2
160:16 169:7 172:19
174:7,12,14
times 10:2 15:18 16:5
title 63:15 135:14 141:3
171:24
titled 41:6
Tobin 39:20 127:16,21
158:1 176:3,23
today 6:17 11:9 12:24
13:24 30:18 40:12,22
47:12 73:1 96:19 99:23
99:24 101:2,9 142:3
149:11 154:24 179:6,13
179:22
Todd 13:10
told 47:24 79:12 117:7
120:17 124:20 147:11
164:7
Tom 48:16
tomorrow 150:16 151:13
152:7
top 35:15 52:22 53:2
57:13 58:17 75:15 82:2
86:10 151:10
Totally 161:7
toured 60:20
TPG 22:4,12 23:7,13,17
61:11 63:7,11 122:13
transaction 29:5 31:12
38:3 42:1,2,9 52:13
53:13 57:20 58:17 59:2
75:2 76:1 93:19 95:21
95:22 106:16 111:4
112:17,22 113:1 117:8
118:14 119:13,16,24
122:15 123:1 139:15,18
142:23 148:23 149:5
161:8,14,17 162:8,9
164:10
transactional 40:13 52:12
76:7 112:16 156:19
159:6
transactions 19:17,18
57:21 135:21
transcript 5:7 182:3
transcription 96:24 98:7
transcripts 11:23 12:3
70:3

treat 98:13
trial 5:10 12:17 76:7
true 25:18,21 70:22 87:6
87:9 116:11 121:12,12
182:4 183:8
try 6:13 49:12 51:3 64:19
75:13 133:21
trying 25:22,23,24 45:7
81:8,13 97:9 134:15
136:4
Tuch 18:10
turn 22:1 83:16 113:20
turned 154:22
two 4:13 11:16 29:14
41:5 78:23 82:21,22,23
92:15,16 114:20,21
117:11 128:22 137:9,17
138:21 139:22 146:15
148:20 152:13 157:15
158:24 159:4 169:3
172:16
two-thirds 150:4
type 15:23 18:6 19:13,21
24:9 32:7 54:9
types 24:6 54:9
typical 101:6
typically 116:9
T-U-C-H 18:10

            U

UBS 79:23,24
ultimately 26:8 46:19
53:16 83:5,8 133:5
140:21 141:2
unanticipated 159:9
unclear 111:9
underlined 41:8
understand 6:12 11:1
25:7,12,14,22 26:1 81:4
84:9 109:18 110:15
127:21 146:19,22
151:11 152:6 177:20
understanding 9:16
52:11,12 64:22 65:4
79:10 80:12 86:15 89:7
109:9,12 110:5,10,20
111:7,12,13,16 131:15
131:18 143:11 153:13
153:15 154:4,9 160:17
169:22 170:1 177:9,14
177:17
understood 135:3 136:23
159:6 178:16,19,20
unenforceable 37:11,19
unfair 126:7
unhelpful 93:9,15,24
union 145:16

United 1:3 65:3
University 13:14,16
unnecessarily 101:5
unnecessary 100:18
unrelated 161:6
unsustainable 68:16
untrue 121:9
update 3:19 61:11 63:18
66:3 69:9 98:21 148:22
149:1
upset 104:21
use 57:16 144:6,8
utilizing 40:6

. . . . . . . . . . .      V

v 1:9
vague 146:5
valuable 122:1
value 42:1,2 72:20
various 52:24 53:5 67:20
69:8 70:8 95:8 99:11
103:10 110:7 113:6
114:2 147:4
Ventures 66:8
verbatim 96:24 98:7
version 112:4 169:9
versus 74:18 82:4 83:7
111:18
view 12:19
visits 19:16
voice 34:2 96:24 98:8
120:10
voiced 68:20
Volume 1:1

. . . . . . . . . . .      W

wait 18:3 44:8
waiting 113:6
waived 5:8
waiver 69:24 70:5,6
walk 133:18 145:13
147:11
walked 130:18
walking 154:9
Wallerstein 78:9,13
130:4 135:6 154:7
want 9:5 10:3,17 49:19
52:10 92:19 102:2
110:14 112:6 117:2
156:12,13
wanted 70:10 86:15 98:3
98:7 102:5 128:5,17
141:24 150:6
Washington 13:15,16
wasn't 31:8 32:9 40:24
41:1 45:20 66:11 75:9
75:22 81:13 104:7

116:22 126:20 134:5
145:4 154:17 158:21
waste 81:12
way 6:14 26:2 30:23
31:21 49:3 50:16 73:7
75:8 94:23 95:3 101:6
106:12 108:9 145:15
147:2 150:4 153:6
176:2,7
ways 45:10
Webber 79:24,24
Wednesday 63:6 91:15
week 16:15 120:18 139:5
175:7
weeks 29:10,10
went 10:3 13:13,13,14,15
64:18 67:19 115:6
133:5,6 136:1 146:12
146:14 153:1 156:24
157:8 159:15,16,17
161:4
weren't 81:13 139:10
146:23 147:22 154:10
158:13
we'll 103:22 145:17,17
we're 19:3 21:13 113:5
133:15 162:17
we've 41:12 53:11 106:10
125:3 129:1 148:7
153:17
whereof 183:14
White 1:7 30:22 31:4,7
31:11,14,19,21 32:23
35:8 39:7,14 40:8 55:13
55:13 56:1,8 108:23
111:1 170:11
White's 55:17
wife 17:5
William 16:23 17:11,23
willing 73:3 77:5 100:16
106:16 112:21 128:10
133:18 147:11
wiring 148:12
Wise 14:11,16,21
wish 86:2
witness 5:13 6:5,18 8:7
21:6 22:17 32:20 33:17
35:3 46:24 47:8,9,11
50:18 52:21 60:24 61:2
74:4 76:15 80:16 81:20
85:22 88:14 90:15
91:13 96:2 101:14
102:14 103:2 105:11
107:19 112:2 113:11,19
121:4,15 123:11 137:8
139:21 143:19 148:16
149:23 150:20 164:21

Stephen F. Gordon

| | | | |
|---|---|---|---|
| 168:7 183:6,9,14 | **10:46** 150:24 151:15 | 53:1,17,23 54:16,18 | 92:7,7 107:2 128:7 |
| **witnesses** 6:7 12:7 | **101** 2:12 4:10 | 55:15 58:5,9 59:21 61:8 | 134:17 136:2,6 |
| **wondering** 147:1 | **11** 62:9 63:7 75:16 136:19 | 61:13 63:16 64:13 | |
| **Woodward** 150:4,11 | 136:21 | 65:14,21 72:18 73:1 | **4** |
| **Worcester** 2:20 3:5 177:6 | **12** 59:4,22 80:22 | 74:8 80:22,23 82:15 | **4** 8:8 32:19 35:22 56:4 |
| 180:23 | **12th** 76:19 80:23 | 88:19 91:15 94:19 | 61:8 89:12 121:17 |
| **word** 93:13 97:8 123:15 | **12:19** 168:22 | 96:15 105:13 107:23 | 168:9 |
| 164:24 | **12:41** 168:19 | 109:14 112:5 115:21 | **4th** 8:2,13 11:2 117:19,23 |
| **words** 100:8 102:1 | **121** 4:11 | 121:17 124:23 140:16 | 121:20 |
| **work** 14:6 30:22 32:5 | **123** 4:12 | 141:12 143:22 148:9,20 | **4/26/04** 3:18 |
| 56:16 85:2 120:3,4 | **125** 107:10 | 172:19 178:22 | **4/27/04** 3:18 |
| 129:18,19 136:4 143:3 | **13** 74:3 75:16 | **2005** 1:18 8:8 168:10 | **4/4/05** 3:13 |
| 144:11 166:9,14,17,21 | **13th** 131:21 137:17 139:6 | 183:15 | **4:30** 154:20 |
| 167:1,6 | **137** 4:13 | **2011** 183:24 | **425** 144:22 146:1,18 |
| **worked** 32:3 | **139** 4:14,15 | **204** 178:17 | **43** 22:2 23:2 27:5 |
| **working** 56:1 80:24 89:15 | **14th** 183:15 | **21** 3:15 107:17,21 113:8 | **45** 157:11 |
| 118:14 157:3,4 162:14 | **143** 4:16 | 129:23 | |
| 163:23 164:12 165:8 | **148** 4:17 | **21st** 101:16 | **5** |
| **wouldn't** 132:16 156:2 | **149** 4:18 | **22** 115:21 121:14 | **5** 3:4 63:16 65:21 |
| 177:9,10 180:2 | **15** 183:24 | **22nd** 114:8,23 115:10 | **5/12** 3:22 |
| **write** 92:2 101:7,11 | **150** 4:20 78:9,15 | **23** 112:1 113:3,12 | **5/12/04** 3:23 |
| **writing** 44:2 166:5 | **16** 112:4 | **24** 74:7 | **5/17** 4:4 |
| **wrong** 47:7 84:12 | **16th** 113:14 | **24th** 8:13,15,16 145:11 | **5/19** 4:6,8 |
| **wrote** 11:2 42:14 44:12 | **164** 4:21 | **25** 113:18 | **5/19/04** 4:5,7 |
| 55:6 77:2 80:11 81:7 | **168** 4:22 | **250** 107:8 108:24 111:1 | **5/20** 4:9 |
| 84:8 97:11 100:21 | **17th** 86:22 | 133:16 138:1,20,21 | **5/21** 4:10 |
| 106:13 | **177** 3:5 | **26** 54:16 | **5/27** 3:24 |
| | **18** 102:12 | **26th** 53:1 | **5/27/04** 3:16 |
| **X** | **183** 1:2 | **261-0100** 2:17 | **5/28/04** 4:3 |
| **X** 3:1,10 136:7 | **19** 88:19 91:15 102:22 | **27** 34:1 54:18 58:5 66:8,8 | **5/4/04** 3:19 |
| | 117:16 | 143:22 | **5/5/04** 3:21 |
| **Y** | **19th** 59:20 90:4,18 96:7 | **27th** 42:14,16,18 82:9 | **5:14** 123:13 |
| **Yeah** 112:9 | **1971** 13:18,22 | **28** 148:20 | **5:43** 121:17,20 |
| **year** 13:17,19 136:14 | **1976** 16:24 17:21 | **28th** 82:14 149:15 | **50** 74:23 138:3,11 |
| **years** 17:16 | **1987** 14:14,15,19 | **29** 144:20,22 146:1,18 | **50/50** 89:18 90:10 |
| **yesterday** 97:1 148:22 | **1992** 15:11 | | **52** 3:18 |
| **yesterday's** 96:21 | **1998** 18:3 | **3** | **55** 171:19 |
| **young** 17:17 120:19 | **1999** 18:3 | **3** 107:23 109:14 112:11 | |
| | | 113:21 | **6** |
| **Z** | **2** | **3:40** 180:24 | **6** 3:12 |
| **zeroed** 78:22 79:11 | **2** 57:6,13 105:13 | **30** 5:6 17:16 24:2,2,17,17 | **6A** 109:17 |
| | **2nd** 106:13 | 27:16,19,23,24 38:17 | **6/4/05** 4:22 |
| **0** | **2,568,000** 77:7 | 38:23 39:11 43:5 49:7 | **60** 3:19 |
| **02109** 2:6 | **2:00** 161:5 | 50:3,3,20,21 51:11,11 | **603** 2:24 |
| **02110** 2:13 | **2:30** 161:5 | 52:1,2 55:15 58:9 61:13 | **61** 3:21 |
| **02210** 1:24 | **20** 96:15 105:10 | 64:13,13 65:13,14 | **617** 2:8,17 |
| **03101** 2:22 | **20th** 100:21 | 94:18,19 145:3,9 | **628-4048** 2:24 |
| **04-CV12333-MEL** 1:5 | **2000** 18:4 | 172:19 | **65** 58:5 |
| | **2001** 14:20,21 18:4 | **30th** 27:13 43:9,10 148:8 | |
| **1** | **2003** 24:2,17 27:23 49:7 | 149:16 156:16 | **7** |
| **1** 1:2 49:7 50:3 178:21 | 50:3,21 51:11 52:2 58:9 | **31** 59:8 133:11 | **7:12** 80:23 |
| **1st** 43:21 44:6 168:19 | 64:13 65:13 94:18 | **32** 133:10,13,16 | **70** 3:12 6:1,16 |
| 169:24 175:4,5 | 112:11 136:10,14 | **320** 1:24 | **71** 3:13 8:6,12,18 |
| **1,250** 41:17 | **2004** 24:2,17 27:16,19,24 | **33** 3:16 | **72** 3:15 21:5,8 |
| **10** 1:20 2:5 | 33:6 34:1,12 36:11 | **348-8200** 2:8 | **73** 3:16 33:16,19 34:16 |
| **10:20** 1:22 | 38:17,23 39:11 43:5 | **35** 3:5 | **74** 3:17 35:2,4 41:12 |
| **10:32** 90:18 | 49:7 50:4,21 51:11 52:2 | **37** 35:18 76:24 89:9 91:2 | **75** 3:18 52:20 144:21 |

Stephen F. Gordon

|   |   |   |   |
|---|---|---|---|
| 145:5<br>**76** 3:19,22 60:23 61:3,19<br>**77** 3:20 61:1,15 62:3<br>   63:15<br>**78** 3:22 76:14,17<br>**782,773** 165:14<br>**79** 3:23 80:15<br><br>   **8**<br>**8** 3:14 121:18<br>**80** 3:23,24 81:18,22<br>**81** 3:24 4:3,3 81:18 82:13<br>**82** 4:4 85:21,24<br>**83** 4:5 88:13 90:21 91:4<br>**84** 4:6 90:14,22<br>**85** 4:4,7 91:12<br>**86** 4:8 96:1 99:10<br>**869** 171:19<br>**87** 4:10 101:13<br>**88** 4:5,11 59:3 121:3,19<br>**889** 2:21<br>**89** 4:12 123:10,12<br><br>   **9**<br>**9** 1:18<br>**9/27/04** 4:16<br>**9/28/04** 4:17<br>**90** 4:6,13 137:7<br>**91** 4:7,14 139:19,22<br>**92** 4:15 139:19,22<br>**925** 144:21<br>**93** 4:16 143:18<br>**94** 4:17 148:15,18<br>**95** 4:18 149:22 150:1<br>**96** 4:9,19 150:19 154:12<br>   154:19<br>**97** 4:21 164:20,23<br>**98** 4:22 168:6 |   |   |   |