# TAB D

```
 1                          Volume:  I

 2                          Pages:   1 - 236

 3                          Exhibits: 32 - 38

 4

 5           UNITED STATES DISTRICT COURT

 6              DISTRICT OF MASSACHUSETTS

 7                  No. 04CV12333MEL

 8    - - - - - - - - - - - - - - - - - - - - -

 9    CASAS, BENJAMIN & WHITE, LLC.,

10                    Plaintiff,

11

12    vs.

13

14    THE POINTE GROUP, INC., GERALD S. FREID; BARRY

15    FREID; KEY CORPORATE CAPITAL, INC.,

16                    Defendants.

17    - - - - - - - - - - - - - - - - - - - - -

18           DEPOSITION OF GERALD S. FREID

19           March 9, 2005 - 10:35 a.m.

20      Conn, Kavanaugh, Rosenthal, Peisch & Ford

21              10 Post Office Square

22              Boston, Massachusetts

23

24    Reporter:  Donna J. Whitcomb, CSR/RPR/RMR
```

Gerald S. Freid                                                                                                 03/09/05

Page 2

1  APPEARANCES:
2
3    CONN, KAVANAUGH, ROSENTHAL, PEISCH & FORD
4    By Erin K. Higgins, Esquire
5    10 Post Office Square
6    Boston, Massachusetts 02109
7    (617) 482-8200
8    On behalf of the Plaintiff.
9
10   GORDON HALEY, LLP
11   By Stephen F. Gordon, Esquire
12   101 Federal Street
13   Boston, Massachusetts 02110
14   (617) 261-0100
15   On behalf of The Pointe Group, Inc.
16
17   NIXON PEABODY, LLP
18   By W. Scott O'Connell, Esquire
19   100 Summer Street
20   Boston, Massachusetts 02110
21   (617) 345-1000
22   On behalf of Key Corporate Capital, Inc.
23
24

Page 3

1              INDEX
2   EXAMINATION OF:                          PAGE
3   GERALD FREID
4   By Ms. Higgins                           4, 227
5   By Mr. O'Connell                         173
6
7              EXHIBITS
8   NO.                                      PAGE
9   32  Indemnification Letter, 9/14/03      56
10      Gerald Freid to CBW
11  33  Letter with Attachments, 12/20/03    56
12      CBW to Freid
13  34  E-mail, 8/31/04, Gordon to Kauffman  133
14      Re: Encroachment Problem
15  35  E-mail, Gordon to Kauffman, 9/17/04  134
16      Re: Grand Jury Subpoena Objection Letter
17  36  E-mail, 9/25/04, Gordon to Sucoff    135
18      and Henken
19  37  E-mail, Caine to Freid, 9/29         151
20  38  E-mail, Cover Letter and             154
21      Closing Statement
22
23
24  *Original exhibits retained by Ms. Higgins.

Page 4

1              PROCEEDINGS
2         GERALD S. FREID, after having been
3   satisfactorily identified was duly sworn by the
4   Notary Public that his testimony would be the truth,
5   the whole truth, and nothing but the truth,
6   testified as follows in answer to direct
7   interrogatories by Ms. Higgins:
8     Q.  Sir, could you please state your full name
9   for the record including your middle name?
10    A.  Gerald Steven Freid.
11    Q.  Steven with a "V" or "P-H"?
12    A.  "V."
13    Q.  And your date of birth?
14    A.  2/11/58.
15    Q.  Where do you live, sir?
16    A.  47 William Street, Needham, 02494.
17    Q.  Who do you live there with?
18    A.  My wife and two children.
19    Q.  What is your wife's name?
20    A.  Kim.
21    Q.  Freid?
22    A.  Yes.
23    Q.  And your children's names?
24    A.  Older one is Jared. He goes to college so

Page 5

1   he's home half the year. He's 20. And Harry is 16.
2     Q.  How long have you lived at that address?
3     A.  20 years.
4     Q.  Where do you work?
5     A.  At The Pointe Group.
6     Q.  What is your position there?
7     A.  I'm the treasurer.
8     Q.  How long have you been the treasurer?
9     A.  About a year.
10    Q.  And The Pointe Group is located at the
11  address that your brother gave us yesterday?
12    A.  Yes.
13    Q.  And just to get this out of the way, do
14  you have a business card?
15    A.  I do.
16    Q.  And does it identify you as the treasurer
17  at The Pointe Group?
18    A.  It does.
19    Q.  What position did you hold before you
20  became treasurer?
21    A.  I didn't have a position.
22    Q.  Okay, did you have a business card, did
23  you carry a business card?
24    A.  No.

2 (Pages 2 to 5)

### Page 158

1  sorts of massive confusion going on with thousands
2  of things being shoved in front of the people's
3  faces to have them sign.
4      And people running in and out of the
5  office making conferences left and right, and I
6  basically got dizzy watching it. So there was no
7  set this group was sitting here and this group was
8  sitting here. We were waiting for the okay so I
9  could take my mother home.
10    Q. Now, your mother I'm sure had to sign some
11  documents, correct?
12    A. Yes.
13    Q. And you said you were there holding her
14  hand, correct?
15    A. Yes.
16    Q. So were you sitting with her and looking
17  at documents that she was being asked to sign?
18    A. No.
19    Q. Was someone else doing that?
20    A. Yes.
21    Q. The attorneys?
22    A. Yes.
23    Q. Do you remember your mother asking whether
24  the brokers were going to be paid?

### Page 159

1    A. Absolutely not.
2    Q. Do you remember John McCullough saying
3  anything about when or how the brokers would be
4  paid; not in a private conference with you but --
5    A. No.
6    Q. -- in the presence of other people?
7    A. There were no discussions.
8    Q. How did you learn that CBW wasn't paid out
9  of the proceeds?
10    A. I don't know. I don't know whether I -- I
11  certainly didn't see these papers. I don't know. I
12  saw it written down somewhere that there was -- I
13  can't put my hand on it. I don't know how -- I
14  don't know how I was informed. I don't know how I
15  knew. My brother might have told me. I can't
16  recollect or -- but when I found out I was shocked.
17    Q. Now, you knew you had signed the
18  engagement letter so you knew that The Pointe Group
19  had agreed to pay this fee, correct?
20    A. That's correct.
21    Q. So when you learned that CBW wasn't going
22  to be paid out of the sale proceeds, were you also
23  concerned about a liability to CBW?
24    A. I was certainly concerned, yes.

### Page 160

1    Q. Did you have any discussions with Matt Caine
2  that day?
3    A. No, I did not.
4    Q. You didn't call Matt Caine and say you're
5  not getting paid?
6    A. I referred him to my attorney at that
7  point because...
8    Q. Okay, so he called you?
9    A. He could have called me and if I did pick
10  up the phone, I asked him to please call Steve
11  Gordon if he has any questions.
12    Q. How about after either the day of the
13  closing or after the closing; did you ever have any
14  conversations with Steve Dunham about CBW's fee?
15    A. He vanished; the last two weeks of the
16  sale.
17        MR. GORDON: I think the question was
18  after the closing; is that correct?
19    Q. Well, the day of or any time after did you
20  have any discussions with Steve Dunham --
21    A. No.
22    Q. -- about the fact that CBW wasn't paid out
23  of the sale proceeds?
24    A. No.

### Page 161

1    Q. Mr. Freid, are you aware that The Pointe
2  Group has brought a counterclaim against Casas,
3  Benjamin & White in this case?
4    A. No.
5    Q. Are you aware of anything that CBW did or
6  failed to do that you consider to be a breach of its
7  fiduciary duties to The Pointe Group?
8    A. I don't know the law, no.
9    Q. Okay. Well, is there anything that you
10  could think of that you thought CBW did or failed to
11  do that you thought was detrimental to The Pointe
12  Group?
13    A. No.
14    Q. And is there anything that they did or
15  failed to do that you thought indicated that they
16  were aligned with Key Bank against The Pointe Group?
17    A. I think they were aligned with themselves
18  and whatever benefited them, whatever they thought
19  the right thing to do at the time, they did.
20  Whether it went back and forth, allegiances to one
21  side to another side or even to the buyer, but
22  that's -- I believe wherever -- they were as
23  brokers, as the real estate brokers, they were
24  involved with the buyer, the seller and the bank.