# TAB E

Barry A. Freid                                                03/08/2005

Page 1

```
 1                          Volume:  I

 2                          Pages:  1 - 241

 3                          Exhibits:  1 - 31

 4

 5           UNITED STATES DISTRICT COURT

 6             DISTRICT OF MASSACHUSETTS

 7                No. 04CV12333MEL

 8    - - - - - - - - - - - - - - - - - - - - - - - -

 9    CASAS, BENJAMIN & WHITE, LLC.,

10                        Plaintiff,

11

12    vs.

13

14    THE POINTE GROUP, INC., GERALD S. FREID; BARRY

15    FREID; KEY CORPORATE CAPITAL, INC.,

16                        Defendants.

17    - - - - - - - - - - - - - - - - - - - - - - - -

18           DEPOSITION OF BARRY A. FREID

19           March 8, 2005 - 10:15 a.m.

20        Conn, Kavanaugh, Rosenthal, Peisch & Ford

21                10 Post Office Square

22                Boston, Massachusetts

23

24      Reporter:  Donna J. Whitcomb, CSR/RPR/RMR
```

Barry A. Freid                                                          03/08/2005

<div style="page">

Page 2

1  A P P E A R A N C E S:

2

3  CONN, KAVANAUGH, ROSENTHAL, PEISCH & FORD

4  By Erin K. Higgins, Esquire

5  10 Post Office Square

6  Boston, Massachusetts 02109

7  (617) 482-8200

8  On behalf of the Plaintiff.

9

10 GORDON HALEY, LLP

11 By Stephen F. Gordon, Esquire

12 101 Federal Street

13 Boston, Massachusetts 02110

14 (617) 261-0100

15 On behalf of The Pointe Group, Inc.

16

17 NIXON PEABODY, LLP

18 By W. Scott O'Connell, Esquire

19 100 Summer Street

20 Boston, Massachusetts 02110

21 (617) 345-1000

22 On behalf of Key Corporate Capital, Inc.

23

24 ALSO PRESENT: Gerald Freid

</div>

<div style="page">

Page 3

1              I N D E X

2  EXAMINATION OF:                    PAGE

3  BARRY FREID

4  By Ms. Higgins              5, 237

5  By Mr. O'Connell               188

6

7            E X H I B I T S

8  NO.                          PAGE

9  1  Profile, The Pointe Group, Inc., 2003      25

10    Re: Cranberry Pointe, Eastpointe

11 2  Profile, The Pointe Group, Inc., 2003      29

12    Re: Hammond Pointe

13 3  Business Card, Barry Freid            32

14 4  Casas, Benjamin & White, LLC          39

15 5  Copies of Checks, 8 Pages            46

16 6  Memorandum 12/2/04, Re: Status Update    77

17 7  Management Presentation April 2004      87

18 8  Confidential Information Memorandum      87

19 9  Non-Binding Expression of Interest       96

20 10 Letter of Intent               102

21 11 Series of E-Mails, Re: Letter of Intent  104

22 12 Confidential Presentation           104

23 13 Letter, Haley to Sucoff 5/24/04       116

24    Re: Letter of Intent

</div>

<div style="page">

Page 4

1           E X H I B I T S

2  NO.                          PAGE

3  14 Web Site Home Page              117

4  15 Amendment to Limited Guaranty        118

5  16 Fourth Modification and Extension      119

6  17 E-Mails, Subject: TPG Engagement      127

7  18 Letter, Barry Freid to CBW          129

8  19 Letter, CBW to Barry Freid          139

9  20 Letter, Barry Freid to CBW          141

10 21 Letter, 6/3/04, Re: Distribution and    144

11    Application of Sale Proceeds

12 22 E-Mail, Caine to B. Freid 6/4/04      146

13    Re: CBW Follow Up

14 23 Confirmation Letter Limited Modification 150

15 24 Draft P&S 6/25/04             152

16 25 Limited Modification to 6/3/04        167

17    Letter Agreement

18 26 E-Mail, Gordon to E. Casas          154

19 27 E-Mail 7/15/04, Re: TPG Request       154

20 28 Confirmation Letter Limited Modification 175

21 29 Epoch/TPG Closing Statement         227

22 30 Obligations Modification           232

23 31 E-Mail, Re: Epoch/TPG            234

24 *Original exhibits retained by Ms. Higgins.

</div>

<div style="page">

Page 5

1           P R O C E E D I N G S

2        MS. HIGGINS: Since this is the first

3  deposition in the case, should we put something on

4  the record?

5        MR. GORDON: Yes.

6        MS. HIGGINS: Then let the record

7  reflect that at this deposition and at all other

8  depositions in this case counsel have agreed that

9  all objections except as to the form of the question

10 will be reserved until the time of trial as well as

11 all motions to strike. I assume that Mr. Freid

12 would like to read and sign?

13       MR. GORDON: Yes, before any notary.

14       MS. HIGGINS: We'll waive the notary

15 requirement and 30 days to read and sign but,

16 obviously, Steve, if you need more time just let me

17 know. Anything else anyone want to say?

18       MR. O'CONNELL: I agree with what

19 you've indicated.

20       BARRY A. FREID, after having been

21 satisfactorily identified was duly sworn by the

22 Notary Public and testified as follows in

23 answer to direct interrogatories by Ms. Higgins:

24    Q.  Sir, could you state your full name

</div>

2 (Pages 2 to 5)

Barry A. Freid                                                              03/08/2005

Page 174

1      Q.   And this July 22nd letter has a purchase
2   price, if you look on the first page, of 32,650,000,
3   correct?
4      A.   Right.
5      Q.   Now, between the time of this letter and
6   the time of the closing were there any other issues
7   that arose that affected the purchase price other
8   than this abutter issue and the service of the grand
9   jury subpoena that you recall?
10      A.   Yeah, I recall -- I recall there was a
11   lien against -- I think there were a couple of liens
12   that had to be paid.
13      Q.   Were those issues that came up between the
14   time that this July 22nd letter was signed and the
15   closing?
16      A.   I think so.
17      Q.   What were the liens?
18      A.   There was a mechanic's lien from
19   construction costs; there was -- I think that there
20   was -- there might have been liens from some of the
21   utility companies; there were -- we were having
22   problems with an Otis elevator, for example.  We had
23   a legal case going.  There were some Workmen's
24   Compensation cases that were current; there was some

Page 175

1   claims that were current.  You know, all this stuff
2   started to come up all of a sudden when you're going
3   to go to a closing and your attorney says, well,
4   what's this, what's that; so we faced them as
5   necessary.
6          (Document marked as Exhibit No. 28
7   for identification.)
8   BY MS. HIGGINS:
9      Q.   Mr. Freid, my only question about this
10   document is whether that you recall there was a
11   final set of modifications to this, to the original
12   June 3rd, 2004 letter agreement which is referenced
13   in the first paragraph of this September 27th
14   letter?
15      A.   Right.
16      Q.   Do you remember that you received this
17   September 27th letter from Steve Dunham constituting
18   this Fourth Modification to the June 3rd letter?
19      A.   Probably.
20      Q.   As the closing was approaching did you
21   review any drafts of closing statements, attachments
22   to closing statements?
23      A.   No.
24      Q.   Do you know what I mean by a closing

Page 176

1   statement?
2      A.   Yeah.
3      Q.   And you said you went to the closing at
4   Goodwin Proctor, correct?
5      A.   Yes, I did.
6      Q.   And while you were there that day I
7   presume you saw a closing statement?
8      A.   Yes, I did.
9      Q.   And was that the first time you had seen a
10   closing statement for this transaction?
11      A.   Yes.
12      Q.   So you hadn't seen any drafts in the days
13   leading up to the closing?
14      A.   Not really.  I mean, I -- I probably did.
15   I mean, there was -- there was many of them.  You
16   know, I started to just not look so close at stuff.
17      Q.   To the extent that the purchase price that
18   Epoch had agreed to went down from what we saw in
19   that July 22nd letter, the 32,000,000 plus number,
20   to the extent that number went down, were you
21   involved in discussions as to whether any new
22   purchase price was acceptable to The Pointe Group?
23      A.   To the best of my recollection we were
24   just trying to come up with as little money as

Page 177

1   possible to get this -- to get the closing done.
2      Q.   Meaning The Pointe Group?
3      A.   No, meaning my family:  Meaning my mother,
4   my brother, and my two sisters and myself.  To the
5   best of my recollection we were just trying to come
6   up with as little money at the closing as possible.
7      Q.   And the day you went to the closing did
8   your family bring money to the closing?
9      A.   I believe so.
10      Q.   Do you remember how much?
11      A.   I think it was a little bit over 200,000.
12      Q.   And at any point prior to the day of the
13   actual closing were you ever told that your family
14   would have to bring more than that to the closing?
15      A.   Not that I remember.
16      Q.   When you went to the closing at Goodwin
17   Proctor it was on September 30th, correct?
18      A.   I'm pretty sure.
19      Q.   Were you expecting that CBW would be paid
20   out of the proceeds of the closing?
21      A.   When I went to the close -- when I went to
22   the closing I didn't know what to expect.
23      Q.   Do you remember in the days leading up to
24   the closing having discussions with your brother

45 (Pages 174 to 177)

Barry A. Freid                                                                                                03/08/2005

Page 178

1  about whether CBW's fee would need to be paid out of
2  the sale proceeds?
3      A.  No.
4      Q.  Did you ever see an invoice submitted by
5  CBW in advance of the closing?
6      A.  No, I didn't.
7      Q.  When you went to the closing and you --
8  did you actually see -- you said you saw a closing
9  statement?
10     A.  Yes, I did.
11     Q.  Did you make any observation as to what
12 that closing statement said about CBW's fee?
13     A.  I just saw that it was outside of the
14 deal.
15     Q.  How did you know it was outside of the
16 deal?
17     A.  It stated it clearly on the statement.
18     Q.  And were you surprised to see that?
19     A.  Pleasantly.
20     Q.  Did you have any knowledge when you went
21 to the closing that morning that such an agreement
22 had been reached?
23     A.  No.
24     Q.  Do you remember there being any discussion

Page 179

1  at the closing, other than obviously discussions
2  that were private between you and counsel, but do
3  you remember any discussion at the closing as to how
4  CBW was going to be paid?
5      A.  No.
6      Q.  And just so my question's clear, that
7  includes conversations that you weren't a party to
8  but conversations that you overheard as well; did
9  you ever hear anyone discussing that issue?
10     A.  All I know is that it was outside of the
11 closing statement.  It was to be paid outside.
12     Q.  Do you remember, you know, sometimes this
13 happens during a closing, you go down the closing
14 statement and sort of talk about each item on the
15 closing statement; did that happen at this closing?
16     A.  Just like it was said, there was three
17 initials outside of closing.
18     Q.  Okay, but my question was whether during
19 the closing did the people who were at the closing
20 go through each item and kind of check off each one
21 as to, okay, this amount is going to be paid, this
22 amount's going to be paid?
23     A.  I believe so.  I believe so.
24     Q.  When you got to CBW --

Page 180

1      A.  I told you there was three initials there.
2  I'm not sure what they were, but to be paid outside
3  of the closing.
4      Q.  Do you remember who discussed or who said,
5  well, that's what that means, they're going to be
6  paid outside of the closing?
7      A.  John McCullough.
8      Q.  And the initials "POC," does that mean
9  anything to you?
10     A.  Yeah, something like -- yes, that's...
11     Q.  And you remember John McCullough saying
12 that they were going to be taken care of outside of
13 the closing?
14     A.  He never said "taken care of"; he didn't
15 use that word.
16     Q.  What did he say?
17     A.  He said to be handled outside of the
18 closing; that's it.  He didn't...
19     Q.  And you don't remember having any
20 discussions with any of your family members, with
21 anyone other than counsel, in the days leading up to
22 the closing concerning how CBW was going to be paid?
23     A.  Well, the only conversations that I -- you
24 know, prior to it, no.  Prior to it, no, I didn't

Page 181

1  have any conversations.
2      Q.  Do you remember we saw those -- there was
3  the letter that you sent to CBW?
4      A.  Right.
5      Q.  Asking if they could compromise their fee,
6  right?
7      A.  Right.
8      Q.  We saw a later e-mail to CBW again
9  requesting that they compromise the fee?
10     A.  Right.
11     Q.  And you remember we talked about the fact
12 that they agreed to cut $50,000 off, correct?
13     A.  Right.
14     Q.  And so between the time of that
15 correspondence and the closing itself you had no
16 communications with anyone, leaving aside counsel,
17 about how CBW was going to be paid out of this
18 transaction when there was no money?
19     A.  You're right, there was -- there was no
20 money.  I --
21         MR. GORDON:  The question is
22 conversations.
23     A.  No, no.
24     Q.  You had no conversations with anyone about

46 (Pages 178 to 181)